**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| STRUDEL HOLDINGS LLC and | § | Case No. 23-90757 (CML) |
| AVR AH LLC, | § | |
| | § | (Joint Administration Requested) |
| Debtors. | § | |
| | § | |
| | § | |
| AVR AH LLC; STRUDEL HOLDINGS LLC; | § | Adv. Pro. No. _____ |
| CHARIF SOUKI; and KARIM SOUKI, | § | |
| CHRISTOPHER SOUKI, and LINA RIZZUTO, | § | |
| as Trustees of the SOUKI FAMILY 2016 | § | |
| TRUST. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| NINETEEN77 CAPITAL SOLUTIONS A LP; | § | |
| BERMUDEZ MUTUARI, LTD; WILMINGTON | § | |
| TRUST NATIONAL ASSOCIATION, and UBS | § | |
| O'CONNOR LLC | § | |
| | § | |
| Defendants. | § | |
| | § | |

## OBJECTION TO CLAIMS AND COMPLAINT

Plaintiffs AVR AH LLC ("**AVR**"), Strudel Holdings LLC ("**Strudel**" and together with AVR, the "**Debtors**"), Charif Souki ("**Souki**"), and Karim Souki, Christopher Souki, and Lina Souki Rizzuto, in their capacities as trustees of the Souki Family 2016 Trust (the "**Trust**" and together with the Debtors and Souki, "**Plaintiffs**") file this objection to the claims of, and complaint for declaratory judgment, injunctive relief, and damages against, defendants Nineteen77 Capital Solutions A LP; Bermudez Mutuari, Ltd; Wilmington Trust National Association, and UBS O'Connor LLC (collectively, "**Defendants**"), alleging as follows:

## I.      **INTRODUCTION**

1.      By this Complaint, Plaintiffs seek disallowance of any claims held by Defendants against the Debtors and a declaratory judgment that Plaintiffs' obligations to Defendant have been discharged and that Defendants' liens and security interests in Plaintiffs' assets have been released and are of no further force and effect.  Plaintiffs also seek damages for significant harm caused by Defendants' unconscionable, unreasonable, bad faith conduct, and repeated violations of their duties under certain loan agreements and injunctive relief prohibiting Defendants from taking further action to harm Plaintiffs.

2.      Plaintiffs are obligors under a loan facility issued by Defendants.  This loan facility is secured by certain assets of the Plaintiffs, including securities owned by Strudel and real property owned by AVR, the Debtors.  After Plaintiffs defaulted under the loan facility, they attempted to work with Defendants to reach an amicable resolution of their obligations, and, failing that, an orderly liquidation of the collateral securing the loan facility.  Instead, Defendants embarked on a bad faith, reckless, and commercially unreasonable exercise of remedies against Plaintiffs, resulting in significant harm.  Had Defendants fulfilled their duties under the loan agreements and applicable law, they would have already realized sufficient funds to pay off all the obligations due under the loan facility.  Absent court action to stop them, Defendants intend to continue pursuing their reckless and unreasonable course of conduct against Plaintiffs, including foreclosing on assets belonging to the Debtors.

3.      On March 6, 2023, Plaintiffs commenced a lawsuit against Defendants in the Supreme Court of New York, New York County, seeking relief from Defendants' bad faith, reckless, and commercially unreasonable conduct and corresponding damages. But Defendants continued to take commercially unreasonable actions in their liquidation efforts, forcing the

2

Debtors to commence these bankruptcy cases to allow the Debtors to sell their assets in an orderly manner at fair market value rather than having them disposed of in the commercially unreasonable manner Defendants have proceeded in thus far.  A timely ruling on the merits of the claims asserted in this Complaint is essential for the success of these cases.  Accordingly, Plaintiffs are entitled to a judgment and injunctive relief to remedy the harms caused by Defendants and to prevent further irreparable harm to Plaintiffs and the Debtors' estates.

## II.        PARTIES

4.        Plaintiff Strudel Holdings LLC is a Texas limited liability company with a principal place of business at 1201 Louisiana Street, Suite 3100, Houston, Texas 77002.  Souki owns 100% of the equity interests in Strudel.

5.        Plaintiff AVR AH LLC is a Colorado limited liability company with a principal place of business at 514 East Hyman Avenue, Aspen, CO, 81611.  Souki owns 100% of the equity interests in AVR.

6.        Plaintiff Charif Souki is an individual residing in Colorado.

7.        Plaintiffs Karim Souki, Christopher Souki, and Lina Souki Rizzuto (together, the "**Trustees**") are Trustees of the Souki Family 2016 Trust.  The Trust is organized under the laws of the state of Colorado, with a principal place of business in Colorado.

8.        Upon information and belief, Defendant Nineteen77 Capital Solutions A LP is a limited partnership organized under the laws of the state of Delaware with a principal place of business in New York, New York. Defendant Nineteen77 Capital Solutions A LP may be served at UBS Tower, One North Wacker Drive, Floor 32, Chicago, Illinois 60606 and via its registered agent Maples Fiduciary Services (Delaware Inc.) at 4001 Kennett Pike, Suite 302, Wilmington, Delaware, 19807.

3

9.      Upon information and belief, Defendant Bermudez Mutari, LTD is a corporation organized under the laws of the Cayman Islands, with a principal place of business in the Cayman Islands.  Defendant Bermudez Mutari, LTD may be served at UBS Tower, One North Wacker Drive, Floor 32, Chicago, Illinois 60606.

10.      Upon information and belief, Defendant Wilmington Trust National Association is a financial institution organized under the laws of the state of Delaware, with a principal place of business in Delaware.  Wilmington Trust National Association may be served at 50 South Sixth Street, Ste. 1290, Minneapolis, Minnesota 55402 and via its registered Agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

11.      Upon information and belief, Defendant UBS O'Connor LLC is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Chicago, Illinois.  UBS O'Connor may be served via its registered agent Corporate Creations Network Inc. at 5444 Westheimer #1000, Houston, Texas 77056.

### III.    JURISDICTION AND VENUE

12.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order or judgment consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.      This adversary proceeding is commenced pursuant to section 105(a), of title 11 of the United States Code (the "**Bankruptcy Code**"), section 2201 of title 28 of the United States Code, and rules 7001(2), (7), and (9) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4

14.     Pursuant to Bankruptcy Rule 7008 and rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, Plaintiffs consent to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## IV.     FACTUAL BACKGROUND

**A.     Defendants' loans to Souki and the pledge of assets of Plaintiffs as collateral.**

15.     In 2017 and 2018, Defendants extended two loans to Plaintiffs in the initial principal amounts of $50 million and $70 million, respectively.  Charif Souki was the borrower and the remaining Plaintiffs were guarantors.  Plaintiffs also pledged certain assets as collateral in support of these loans including the Ranch (defined below) owned by AVR and Ajax Shares (defined below) owned by Strudel.

16.     Specifically, Plaintiffs are party to that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Loan Agreement**"), dated as of April 27, 2017, by and among Souki, as borrower; the Debtors and the Trust, as guarantors; Defendants Nineteen77 Capital Solutions A LP and Bermudez Mutari, LTD (together, the "**Lenders**"), as lenders; and Defendant Wilmington Trust National Association (the "**Agent**"), as administrative agent.[1]  The initial principal amount advanced under the Loan Agreement was $50 million (the "**2017 Loan**").  Plaintiffs are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Pledge Agreement**"), dated as of April 27, 2017, by and among, Souki, the Debtors, the Trust, and the Agent.  AVR also executed a deed of trust (the "**2017 Deed of Trust**" and,

---

[1]     Defendant UBS O'Connor LLC ("**O'Connor**") executed the 2017 Loan Agreement on behalf of the Lenders as investment adviser.

DMS 302887469v12

together with the 2017 Loan Agreement and the 2017 Pledge Agreement, the "**2017 Loan Documents**"), dated as of April 27, 2017, in favor of the Agent.

17.     Also on April 27, 2017, and at Defendants' insistence, Souki executed an account control agreement with his broker that gave Defendants the right to take exclusive control of Souki's shares in Tellurian, Inc. ("**Tellurian**").  Souki is largely recognized as the founder of the domestic liquefied natural gas industry having founded Cheniere Energy, Inc. ("**Cheniere**") in 1996, which was the first United States-based company to build a domestic LNG liquefaction and export facility and to use that facility to manufacture and ship LNG to overseas markets.  In early 2016, after departing Cheniere, Souki co-founded Tellurian with plans to construct and operate an LNG facility roughly the same size as Cheniere's facility.  In exchange for his investments in Tellurian, Tellurian issued him 25 million shares of the company's stock (the "**Tellurian Shares**").  Souki's family trust also made a sizable investment and became a large shareholder making Souki the largest beneficial holder of Tellurian stock.   Under the account control agreement's unambiguous language, if Defendants ever exercised their rights under the control agreement, Souki's broker would immediately be required to cease complying with Souki's orders and instructions unless and until the broker received notice from Defendants withdrawing their notice of exclusive control

18.     By January 2018, the 2017 Loan was paid down by approximately $30 million, leaving a balance of approximately $20 million.  On March 30, 2018, the Lenders provided an additional loan in the principal amount of $70 million (the "**2018 Loan**" and together with the 2017 Loan, the "**O'Connor Loans**") under the terms of that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Loan Agreement**" and together with the 2017 Loan Agreement, the "**O'Connor Loan Agreements**"),

6

dated as of March 30, 2018, by and among Souki, as borrower; the Debtors, the Trust, and AJAX,[2] as guarantors; the Lenders, as lenders; and the Agent, as administrative agent.[3]   The parties also entered into that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Pledge Agreement**"), dated as of March 30, 2018 by and among Souki, the Debtors, the Trust, and the Agent.   AVR also executed a deed of trust (the "**2018 Deed of Trust**" and together with the 2018 Loan Agreement and the 2018 Pledge Agreement, the "**2018 Loan Documents**" and collectively with the 2017 Loan Documents, the "**O'Connor Loan Documents**"), dated as of March 30, 2018, in favor of the Agent.

19.     The addition of the 2018 Loan brought the total balance outstanding on the O'Connor Loans to approximately $90 million.   Under the O'Connor Loan Documents, Plaintiffs pledged the following as collateral for the O'Connor Loans:   the Tellurian Shares (owned by Souki), a ranch outside of Aspen, Colorado commonly known as Aspen Valley Ranch (the "**Ranch**") (owned by AVR), and the equity interests in two affiliated companies, Ajax Holdings, LLC (the "**Ajax Shares**") (50% of which are owned by Strudel and 50% of which are owned by the Trust) and Ajax Cayman.   The value of this collateral package (the "**Collateral**") was more than sufficient to cover all obligations due under the O'Connor Loan Documents.   The O'Connor Loan Documents were subsequently amended, through a series of amendments, to extend the maturity date of the O'Connor Loans to May 6, 2020.   Under the O'Connor Pledge Agreements, the Agent may only exercise powers to "[l]iquidate, withdraw or sell all or any part of the Collateral" "following the occurrence and continuance of an Event of Default" and only "until all of the Obligations have been paid in full and the Loan Agreement has been terminated."

---

[2]     AJAX is an exempted company incorporated in the Cayman Islands with limited liability.

[3]     O'Connor executed the 2018 Loan Agreement on behalf of the Lenders as investment adviser.

In other words, Defendants may not continue exercising their remedies under the Loan Agreements after the obligations have been paid in full.

20.     In May 2019, Defendants entered into a separate loan agreement with Tellurian (the "**Tellurian Loan**").  Other than making introductions, Souki was not involved in the negotiations of the Tellurian Loan.  Once Defendants entered into the Tellurian Loan, in combination with the O'Connor Loans, Defendants were heavily exposed to Tellurian.

**B.     Tellurian's financial troubles.**

21.     When Souki co-founded Tellurian, he became the Chairman of the company's Board of Directors; this was a non-executive position that did not require him to be involved in the day-to-day management or operations of the company.  As noted above, Souki was the largest beneficial owner of the company's stock.  Moreover, given his stature in the industry and his position as Chairman of the Board, Souki was effectively the face of the company, despite not having a role in the day-to-day management of Tellurian.

22.     In early 2020, Tellurian's stock was trading in the $7-$8 range.  However, in late February 2020, trouble began to brew.  Tellurian announced that one of its largest prospective customers, Petronet in India, had requested an extension of several weeks to finalize the parties' contract.  This news was not well-received by the market, and Tellurian's stock price began to fall precipitously.  Going into March 2020, the stock was trading at just over $2 per share.

23.     Tellurian's troubles were severely compounded in early March 2020, when the lockdowns associated with COVID-19 eviscerated oil and gas demand and devastated the international oil and gas markets.  As a result, Tellurian's stock price went into a further tailspin, quickly falling below $1 per share.  In short, the company was in a liquidity crisis and on the verge

8

of bankruptcy. Also, the drop in value of the Tellurian Shares complicated efforts to repay the O'Connor Loans, which by that point had grown to $102,763,266 (inclusive of interest).

24.      As a result of these extraordinary developments, Defendants were extremely concerned about Tellurian's ability to repay its loan. To address these concerns, Defendants' principal, Baxter Wasson, reached out to Souki personally. Through a series of discussions that began in March 2020 and continued for several weeks, Wasson made it clear that Defendants wanted Souki to focus on righting the ship at Tellurian, because absent him doing so, the stock price would likely continue to fall and the company would default on its loan.

25.      As a result, the parties moved forward on three key fronts. First, on May 5, 2020, Plaintiffs and the Lenders entered into two Bridge Agreements – one related to the 2017 Loan and one related to the 2018 Loan. Under the Bridge Agreements, Defendants agreed that they would forbear from exercising any of their remedies under the O'Connor Loan Documents during the Agreement Period, which would end on March 30, 2021, unless a Termination Event ended it sooner. Also, the Bridge Agreements put in place a protocol for enforcement of the Lenders' remedies after the Agreement Period expired. Under this protocol, captured in Section 4.3 of the Bridge Agreements, which was heavily negotiated by the parties, Defendants agreed that in the event they ever commenced disposing of the Tellurian Shares, they would "use their commercially reasonable efforts to avoid any material disruption of Tellurian's stock price."

26.      Second, and also on May 5, 2020, Defendants provided notice that they were exercising exclusive control over the Tellurian Shares under Section 3(a) of the account control agreement. Accordingly, Souki's broker was required to cease complying with Souki's orders and instructions unless and until the broker received notice from Defendants rescinding their notice of exclusive control. Defendants never rescinded their notice of exclusive control. Therefore, Souki

9

never had the ability to sell his Shares after May 5, 2020; that exclusive right was held by Defendants.

27.     Third, with the Bridge Agreements in place, Souki agreed to re-engage with Tellurian.  On June 22, 2020, Souki became the Executive Chairman of Tellurian's Board of Directors.  Unlike his prior non-executive position on the Board, this new role effectively put Souki in charge of the company and required him to interface with investors and lenders to secure the funding Tellurian so desperately needed.  It would also put him in a position to assist the company in righting its financial ship and in repaying expensive debt, including the Tellurian Loan.

28.     Based largely on Souki's efforts, as well as the efforts of many others on his team, Tellurian repaid the Tellurian Loan in full on March 12, 2021, more than a year before the maturity date.  Shortly thereafter, on March 31, 2021, Tellurian fully repaid another significant loan that it had taken out in the early days of the COVID-19 pandemic.  This repayment, which was nearly two months before the loan's maturity date, was also part of what Defendants asked Souki to focus on when they pleaded with him to re-engage in an executive capacity at Tellurian.

## C.     Defendants push for repayment of the O'Connor Loans through 2021, but repeatedly reject reasonable attempts to do so.

29.     Nearly immediately after Tellurian repaid its loan to Defendants, and despite Souki's extraordinary efforts to ensure Tellurian's full and early repayment of its loans, Defendants began pressuring Plaintiffs to quickly repay the O'Connor Loans in full.  On March 22, 2021, just ten days after Tellurian had completed its repayment of the Tellurian Loan to Defendants, Defendants sent Plaintiffs a proposal that would have required an immediate, upfront payment of $5 million and that would have required full repayment of the O'Connor Loans by October 30, 2021.  Plaintiffs responded that the proposal was "unrealistic" in light of current

10

circumstances, but that Defendants should take comfort in the fact that they were overcollateralized by the pledge of Plaintiffs' assets.

30.     Defendants were well aware of Tellurian's financial condition at that time and that selling the Tellurian Shares during this time would not be commercially reasonable.  Thus, efforts to reduce the debt at that time focused on selling the Ranch in its entirety, but that proved challenging.  Plaintiffs pivoted to a strategy that included (a) marketing and selling the Ranch's houses and undeveloped lots as separate properties, and (b) renting out the houses in the meantime in order to generate revenue that could be used to help cover the operating costs and potentially pay down some of the O'Connor Loans.  To execute this strategy, members of Souki's family, who had lived in the Ranch houses for five years, moved off the Ranch in early 2021 and Plaintiffs' broker began marketing the properties at market values.

31.     For this strategy to work, Plaintiffs would need Defendants' cooperation.  This was, in part, because Defendants' lien under the O'Connor Loan Documents encumbered the Ranch.  Therefore, to close on a sale of any of the individual pieces of the Ranch, there would need to be agreement by Defendants on "release prices" – i.e., the prices at which Defendants would release their lien as to a particular house or lot for the amount of the sale.  Defendants would also need to agree on how to allocate the proceeds of the sales between repayment of the O'Connor Loans and other obligations, including commission to the realtors.  Defendants knew this when they submitted their March 22, 2021 proposal, because Plaintiffs had raised it with them multiple times before then.  Nevertheless, Defendants' proposal completely ignored this and other critical issues, thus making it extremely difficult to convince prospective buyers to enter into contracts to acquire any of the Ranch properties.  As a result, Plaintiffs had no choice but to reject Defendants' proposal.

DMS 302887469v12

32.     Defendants delivered their next proposal in May 2021, insisting that Souki begin selling his Tellurian Shares by arbitrary dates in the near term.  Defendants also attempted to insert short term, share price thresholds that would trigger a default if not reached, potentially terminating the agreement less than six weeks after its effective date.  While the proposal finally contained lien release prices for portions of the Ranch, there was no agreement to establish separate liens per property and the releases were contingent on numerous, other unreasonable terms.  For example, Defendants demanded that the Trust continue to fund any operational shortfalls at the Ranch while also subordinating its repayment claims to Defendants' lien.  Again, Plaintiffs had no choice but to reject Defendants' unreasonable proposal.  Notably, Defendants also objected to reasonable attempts by Plaintiffs to obtain third-party financing that would have helped pay down a meaningful portion of the debt on reasonable terms.

33.     In the summer and fall of 2021, Plaintiffs' strategy and efforts began to pay off.  AVR received offers to purchase three of the eleven Ranch properties and expressions of interest in other Ranch properties.  Ultimately, AVR was able to reach agreement with a buyer on one of the properties and another buyer on two of the properties for a total of $46.5 million.  The proceeds from these transactions would enable AVR to pay off a prior loan from Alpine Bank of $30 million and to pay down more than $12.6 million of his debt to Defendants.[4]  To close on these transactions, however, Plaintiffs would need Defendants to agree that they would release their lien as to the subject properties and allow an amendment to the Ranch's HOA bylaws that would require any lender who foreclosed on the remaining Ranch properties to continue funding the Ranch's operations and amenities at the same level as before foreclosure.

---

[4]     The loan to Alpine Bank has since been paid in full.

12

34.     Plaintiffs asked for Defendants' cooperation in response to concerns specifically raised by prospective buyers whose due diligence revealed the lien against the Ranch as a whole. Not surprisingly, given Defendants' history of unreasonable positions, before they would agree to release the liens and amend the HOA bylaws, Defendants attempted to bully Plaintiffs into agreeing to additional, unfavorable terms, which they would not do.  Only at the last minute and after extensive efforts by Plaintiffs did Defendants agree to these terms.  Thankfully, the buyers had not walked away from the deals, so despite Defendants' intransigence and continued bad faith tactics, the transactions closed in late summer and fall of 2021.

35.     Another example of Defendants' inconsistent and confusing behavior revolves around the sale proceeds from the transactions described above.  Although Alpine Bank was entitled to 100% of the net proceeds of all sales until its loan was paid down, Plaintiffs offered to negotiate with Alpine Bank to accept partial prepayment so that Defendants could begin receiving proceeds from the very first transaction.  Defendants were initially receptive to this proposal and encouraged Plaintiffs to negotiate such an arrangement.  With no small effort, Plaintiffs were able secure an agreement in principle from Alpine Bank that would have allocated $6 million in proceeds from each home sold and $3 million from each lot sold to Defendants.  Plaintiffs then communicated this development to Defendants on multiple occasions, but Defendants failed to respond and ultimately chose to reverse course and reject the arrangement altogether.  Based on the three transactions that ultimately occurred, this would have resulted in an additional repayment to Defendants of $15 million; however, Defendants stated that they preferred more of the proceeds to go to the first lienholder, disposing of the first lien entirely and giving Defendants priority over Plaintiffs' assets going forward.

13

**D.     Defendants refuse to take commercially reasonable steps to eliminate the debt in its entirety, instead preferring to keep the O'Connor Loans in place and increasing the interest rate charged.**

36.     Defendants continued pressuring Souki to begin selling his Tellurian Shares, which Defendants knew he was restricted from doing at that time due to Defendants' exclusive control of the Tellurian Shares, applicable securities rules and regulations applicable to holders of material non-public information, and restrictions placed on Souki by Tellurian's Board of Directors.  In response, in late 2021, Souki's son and representative, Karim Souki, told Defendants that Souki was not able to sell the Tellurian Shares himself and if Defendants believed that the Shares should be sold, Defendants should do so.

37.     On May 26, 2022, Defendants informed Souki that they were terminating the Bridge Agreements.  The value of the Tellurian Shares on May 27, 2022 was more than $120 million, which still exceeded Plaintiffs' purported debt to Defendants.[5]  This is critical because, at that time, Defendants had had exclusive control of the Tellurian Shares for nearly two years, and it had been nearly a year since the expiration of the term of the Bridge Agreements.  Defendants have no commercially reasonable excuse for waiting to sell; no clairvoyance was needed—Defendants chose when to exercise exclusive control and when to terminate the Bridge Agreements.  Upon terminating the Bridge Agreements and given the value of the Tellurian Shares and the length of time Defendants had held the Shares, it was incumbent upon Defendants to immediately liquidate the Tellurian Shares in an orderly manner and extinguish the debt without the need to dispose of any other Collateral.

---

[5]     This figure included approximately $8 million of default interest, which Plaintiffs contest that Defendants could charge for any period prior to issuance of the termination notice on May 26, 2022.  Additionally, even if the Tellurian Shares' value was slightly less than the total debt on May 26, 2022, any difference would have been made up by a $25 million financing that Plaintiffs had secured at that time related to houses on the Ranch but which Defendants rejected.

38.     Shockingly, though, Defendants chose to continue holding the Tellurian Shares and instead indicated that they would foreclose on the Ranch.  But Defendants halted the foreclosure process a few weeks later after they learned that Colorado law required them to submit a credit bid at or near fair market value.  Because of this, submitting such a credit bid would likely mean that Defendants would acquire the Ranch for that amount, leaving Defendants with a substantial asset that they would need to market and sell to get a cash recovery.  In the meantime, they would need to take on the substantial financial obligations associated with the operations of the Ranch. Ultimately, Defendants did not move forward with foreclosure, but by the time they made that decision, the window in which they should have sold the Tellurian Shares had closed, as prices had decreased significantly.

39.     Rather than pursuing this commercially reasonable course and allowing Plaintiffs to eliminate the debt, Defendants pursued a bad faith course of conduct – they prevented Plaintiffs from taking steps to pay down the debt, started charging a default interest rate of 15%, and manipulated Plaintiffs' position so that they would be unable to reduce the debt and would continue to accrue interest at an exorbitantly high rate until whenever Defendants decide they have extracted maximum value.  This was a continuation of Defendants' refusal to work with Plaintiffs in good faith.

**E.      Apparently satisfied with the additionally accrued interest, Defendants begin seizing and selling Plaintiffs' assets in a wildly reckless and commercially unreasonable manner.**

40.     On December 22, 2022, Defendants notified Plaintiffs that they were seizing Souki's sailboat, the Tango.  At the time Defendants seized the Tango, it was in a yard in Europe awaiting substantial repairs that Souki had planned to make.  Investing the funds necessary to complete these repairs before making the boat available to prospective buyers would have resulted

DMS 302887469v12

in a substantial increase in sale price possibilities.  Defendants, however, did not do so.  Instead, they made nominal repairs and otherwise put the sailboat on the market in an "as is, where is" condition.  Additionally, Defendants refused to include Souki in the process to market and sell the sailboat, despite his vast knowledge of the market.  They also refused to provide the Plaintiffs with any information whatsoever about the process, despite their status as borrower and guarantors.  Excluding Souki, as both borrower and a sophisticated market participant, from this process was unreasonable and failed to comply with industry standards.

41.     Furthermore, Defendants failed to conduct a comprehensive marketing campaign that is typical for a sale of this type of sailboat and failed to identify several prospective buyers who would have been interested in submitting bids to acquire the Tango.  As a result of the shoddy process run by Defendants, they ultimately entered into an agreement with a buyer for an amount far less than the market value of the Tango.

42.     Defendants' incompetence and unreasonableness turned into sheer recklessness in early February 2023.  On February 6 and 7, Defendants forced a transfer of the Tellurian Shares from Souki's account to theirs.  At the time of this transfer, the Shares were worth approximately $51.5 million.  Moreover, by effecting a transfer of ownership, Defendants triggered an obligation for Souki to file a Form 13-D with the Securities and Exchange Commission, yet Defendants failed to inform Souki of this critical development; instead, he learned of it through a contact at his bank.

43.     On February 8, again with no notice to Plaintiffs, Defendants began selling the Tellurian Shares.  When the market opened that morning, the stock was trading at $2.05, still nowhere near where it had been during most of 2022.  Defendants were also in possession of material nonpublic information ("**MNPI**") – unlike the general investing public, Defendants were fully aware that Souki, the largest shareholder of the company and its Executive Chairman, no

16

longer controlled the Tellurian Shares.  Securities laws prohibit a party from trading in securities for which it was aware of MNPI, but that's exactly what Defendants did.  That day, Defendants dumped nearly two million of the Tellurian Shares on the market.  This constituted a nearly 20% increase over the average daily volume of Tellurian stock sold in the prior ten days.  Plus, the vast majority of Defendants' sales occurred within the first two hours of trading.  Any prudent investor would know that taking such actions with respect to the stock of a company that is on uncertain financial footing is the opposite of taking commercially reasonable steps to avoid material disruption of the stock price.  And the proof is in the results – as a result of Defendants' recklessness, Tellurian's stock price fell almost 10%, closing at $1.89 on February 8.

44.     But this was just the beginning of the recklessness and willful misconduct by Defendants.  That evening, Souki, a seasoned investor, informed Defendants that their conduct was wholly unreasonable and pleaded with them to use an industry-accepted methodology if they were going to continue selling his shares.  The methodology that Souki proposed would have called for Defendants to use an algorithm to ensure they did not sell more than 3% of the daily volume of Tellurian shares sold.  The goal of using this methodology, of course, was to avoid any further material disruption in the stock price and to capture any gains that occur over the next several weeks.

45.     Also that evening, Souki advised Defendants that he would need to file a Form 13-D with the SEC as a result of the transfer and sale of the Tellurian Shares but that he would not be able to file it until later the next day.  In the meantime, Defendants should not sell the Tellurian Shares because they were still in possession of MNPI.  But Defendants failed to heed Souki's advice.  The next morning, they continued recklessly selling millions of the Tellurian Shares.  This continued for the next five business days.  By the end of these first six business days, Defendants

17

had sold 8,837,798 shares for $15,431,502 and the price had dropped by more than 25% to $1.50 per share on February 15, a low point in the share price not seen since January 2021.

46.     Nevertheless, Defendants continued selling the Tellurian Shares until they were all sold by early April 2023. By that time, the stock price was around $1.18 per share, and Defendants had sold the Shares for $37,041,309.67 million, at an average of $1.37 per share. Additionally, every time Defendants sold more of the Tellurian Shares, Souki was obligated to disclose that sale in a public filing with the SEC. As a result, Tellurian's stock price was less than 50% of what it was before Defendants commenced their fire sale of the Tellurian.

**F.      Defendants' recklessness and bad faith continues, and worsens, after Plaintiffs file suit in New York.**

47.     On March 6, 2023, Plaintiffs commenced a lawsuit against Defendants in the Supreme Court of New York, New York County, seeking relief from Defendants' bad faith, reckless, and commercially unreasonable conduct and corresponding damages.[6] A week later, the receiver appointed by Defendants to sell the Tango refused to provide Plaintiffs with further information regarding the marketing and sales process related to the Tango.

48.     On March 15, 2023, Defendants gave notice that they also intended to foreclose on the Ajax Shares. Specifically, they gave notice that they intended to conduct a public auction of the interests at 12:00 pm on June 13, 2023, or such later date as determined by the Administrative Agent in New York, New York. After providing that notice, and similar to the marketing process related to the Tango, Defendants wholly excluded Plaintiffs from the marketing of the Ajax Shares. Additionally, Defendants instructed all prospective bidders not to work with or provide information to Plaintiffs as a condition for having access to the data room set up for prospective

---

[6]     The O'Connor Loan Documents are governed by New York law and specify New York as the venue for any actions under them.

bidders.  Defendants agreed to allow Plaintiffs to participate in the process only after Plaintiffs filed a request for injunctive relief requiring Defendants to allow such participation.  But despite these assurances to induce Plaintiffs to withdraw their request for a preliminary injunction, the bidding procedures prepared by Defendants still ask all prospective bidders to confirm, among other things, that they are "not prohibited from purchasing" the Ajax Shares and that they "will not engage in any collusion … with the Pledgors … with respect to the Auction."  Clearly, Plaintiffs cannot avoid colluding with the Pledgors, as some of them are the Pledgors.  Upon seeing this in the data room on June 5, 2023, Plaintiffs requested Defendants to confirm they will not use these conditions to disqualify Plaintiffs from bidding.  Defendants only confirmed Plaintiffs would be allowed to bid at the auction after Plaintiffs sought a preliminary injunction from the New York court to ensure they could participate.  Plaintiffs withdrew their request for a preliminary injunction after Defendants made this representation.

49.     Additionally, once Defendants began to include Plaintiffs in the process for the Ajax Shares auction, Plaintiffs realized that Defendants were not sharing critically important information with prospective buyers about the debt held by Ajax Holdings.  Specifically, Ajax Holdings owes approximately $53 million to five lenders, and all of that debt would likely be immediately accelerated upon a change of control at Ajax Holdings.  A sale of the Ajax Shares, as is contemplated by Defendants, would necessarily constitute a change of control of Ajax Holdings that would trigger immediate acceleration.  It would also trigger other remedies by the company's lenders that would preclude the company from using its assets and cash on hand to fund operations.  Inevitably, this would cause the destruction of any and all value at Ajax Holdings and would cause the company to file for bankruptcy or liquidate.  This cannot be described as anything other than irreparable harm.

DMS 302887469v12

50.     Finally, on May 19, 2023, Plaintiffs received an offer from a prospective buyer for the Ranch and forwarded it to Defendants for their consideration since, if the O'Connor Loan Documents are still effective, Plaintiffs cannot sell the Ranch without Defendants' prior approval. After waiting two weeks to respond, Defendants rejected the offer without explanation.  Instead, as has been the case for nearly two years, Defendants simply blocked yet another attempt by Plaintiffs to reduce the debt.

## G.     The Debtors commence these Chapter 11 Cases to conduct an orderly sale of assets and forestall any further reckless actions by Defendants

51.     As a result of Defendants' continued intransigence and refusal to consent to any reasonable disposition of the Debtors' assets, the Debtors commenced these cases to take advantage of the breathing spell afforded by the automatic stay to allow for proper marketing of their assets without the threat of foreclosure proceedings from Defendants.  Contemporaneously herewith, the Debtors have a filed a motion seeking approval of certain bidding procedures, as well as the ability to designate a stalking horse bidder for an auction of the Ranch.  The bidding procedures are designed to produce the highest and best offer for the Ranch and achieve an orderly sale of the Ranch with minimal delay.  The bad faith and reckless actions of Defendants have depressed interest in the Ranch, and the Debtors are confident that, absent Defendants' malign influence, the auction for the Ranch will result in a value-maximizing sale for the Debtors' estates.

52.     Defendants have also noticed a public sale of the Ajax Shares for August 30, 2023. As noted above, the sale process contemplated by Defendants will be value-destructive to the Debtors and will not maximize the value of the Debtors' assets.  Through the Chapter 11 Cases, the Debtors will ensure that the value of the Ajax Shares is preserved and that any disposition of the Ajax Shares is value-maximizing.

20

53.     Accordingly, a prompt determination of Defendants' rights and claims against the Debtors, their estates, and their property is integral to the success of these Chapter 11 Cases.  An orderly sale and proper distribution to the Debtors' creditors can only be achieved through adjudication of Plaintiffs' claims raised herein.  Accordingly, Plaintiffs' have filed this Complaint to resolve these core bankruptcy issues and complete a value-maximizing transaction or transactions for the benefit of the Debtors' stakeholders.

## V.     CAUSES OF ACTION

### Count 1 – Disallowance of Claims
**(Against All Defendants)**

54.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

55.     The following claim objections are made under 11 U.S.C. § 502(b)(1), Bankruptcy Rule 3007, and Local Bankruptcy Rule 3007-1.  Because these claim objections are joined with a demand for relief of the kind specified in Bankruptcy Rule 7001, the objections are brought as an adversary proceeding.

56.     While Defendants have not yet filed any proofs of claim in the Chapter 11 Cases, they will certainly assert claims related to the O'Connor Loans against the Debtors in due course. As set forth herein, Defendants' bad faith, reckless, and commercially unreasonable conduct in connection with their exercise of remedies under the O'Connor Loan Documents has obviated any obligation Plaintiffs had to them.  But for their wrongful actions, Defendants would have already realized sufficient funds to repay all the obligations due under the O'Connor Loan Documents. Accordingly, any claims they might assert under the O'Connor Loan Documents should be disallowed.

57.     Section 502(a) of the Bankruptcy Code provides, in pertinent part, as follows: "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed

21

allowed, unless a party in interest . . . objects." 11 U.S.C. § 502.  Moreover, section 502(b)(1) of

the Bankruptcy Code provides, in relevant part, that a claim may not be allowed if "such claim is

unenforceable against the debtor and property of the debtor, under any agreement or applicable

law . . . ." 11 U.S.C. § 502(b)(1).  As set forth in further detail below, Defendants have violated

numerous provisions of the New York Uniform Commercial Code, which governs the O'Connor

Loan Documents, as well as their duty of good faith and fair dealing.  As a direct consequence of

these violations, Defendants realized significantly less from the sales of the Collateral than they

would have if they had acted in a commercially reasonable manner, as Plaintiffs encouraged them

to do on several occasions.

58.     Indeed, if Defendants had acted in a commercially reasonable manner, they would

have realized sufficient funds to pay the balance of the O'Connor Loans in full with, potentially,

a surplus for Plaintiffs.  Under New York law, Plaintiffs are entitled to damages (as set forth more

fully below) for Defendants' numerous breaches of their duties in connection with their bad faith,

reckless, and commercially unreasonable dispositions of the Collateral.  Such damages would be

sufficient to pay the alleged remaining obligations due under the O'Connor Loan Documents in

full.  Accordingly, any claims asserted by Defendants against the Debtors should be disallowed.

### Count 2 – Declaratory Judgment
**(Against All Defendants)**

59.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

60.     Paragraph 7(f) of the Pledge Agreement provides that the Agent may only exercise

powers to "[l]iquidate, withdraw or sell all or any part of the Collateral" … "following the

occurrence and continuance of an Event of Default" and only "until all of the Obligations have

been paid in full and the Loan Agreement has been terminated."  But the Collateral already

foreclosed on by Defendants would have satisfied all obligations due under the O'Connor Loan

DMS 302887469v12

Documents if Defendants had acted in a commercially reasonable manner, as they are obligated. Therefore, Defendants have no right to liquidate, withdraw, or sell any additional collateral pledged under the O'Connor Loan Documents.

61.     Based on the foregoing, Plaintiffs seek a declaration from this Court that there is no continuing Event of Default under the O'Connor Loan Documents, the obligations under the O'Connor Loan Documents have been paid in full, the O'Connor Loans are terminated, all liens and security interests on the Collateral are released and of no further force and effect, and Defendants have no legal right to continue to foreclose upon any further Collateral pledged by the Debtors or the Trust under the O'Connor Loan Documents.

### Count 3 – Breach of UCC's Duty of Commercial Reasonableness and Duty of Care When In Possession of Collateral
### (Against the Lenders and Agent)

62.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

63.     The O'Connor Loan Documents and the Bridge Agreements are valid and enforceable agreements that are governed by New York law and therefore incorporate New York's version of the Uniform Commercial Code.

64.     Under NY UCC § 9-610(b), the Lenders and the Agent must use commercial reasonableness in "every aspect of a disposition of collateral, including the method, manner, time, place, and other terms."   Defendants breached this clear obligation in multiple respects in connection with their disposition of the Collateral.

65.     First, Defendants breached this obligation by selling the Tellurian Shares at a commercially unreasonable time.   The Official Comments to section 9-610 are clear that a lender can breach this duty by holding shares for a protracted period of time and then selling at a low point in the market:

23

> It may, for example, be prudent not to dispose of goods when the market has collapsed … [I]f a secured party … holds collateral for a long period of time without disposing of it, and if there is no good reason for not making a prompt disposition, the secured party may be determined not to have acted in a 'commercially reasonable' manner.

N.Y. U.C.C. Law § 9-610 cmt. 3.

66.     Here, Defendants held the Tellurian Shares starting in May 2020 when they exercised their right to exclusive control under the Account Control Agreement.   They continuously insisted that Souki sell the Tellurian Shares even though he had no ability to do so, and starting in late 2021, Plaintiffs instructed Defendants to sell the Tellurian Shares to extinguish the debt.  At that time, and particularly in April and May 2022, the stock was trading at prices high enough that Defendants could have sold most of the Tellurian Shares to satisfy all amounts due under the O'Connor Loan Documents.  But they failed to do so.  Instead, Defendants held the Tellurian Shares for another eight months, waited for the stock price to go down to a two-year low, and then sold them for a fraction of the balance due under the O'Connor Loan Documents. Defendants therefore breached their duty to dispose of the Collateral at a commercially reasonable time.

67.     Additionally, Defendants breached their duty under NY UCC §9-610(b) to use a commercially reasonable method when selling the Tellurian Shares.  Specifically, Defendants recklessly dumped massive amounts of the Tellurian Shares on the market in a manner that drove the price down by nearly 50%, and continued doing so even after Plaintiffs advised them to use an industry-standard methodology that would help avoid any material disruption in the stock price.

68.     Defendants further breached their duty under NY UCC §9-610(b) by setting an auction of the Ajax Shares at a time and under circumstances that make it inevitable that Ajax

Holdings will need to file for bankruptcy as soon as the auction is complete. This is the opposite of maximizing value of collateral and therefore is, by definition, commercially unreasonable.

69.     Defendants also breached their duty under NY UCC §9-610(b) to use commercial reasonableness in connection with their sale of the Tango sailboat. Specifically, they excluded Souki from the marketing and sales process altogether, refusing multiple times to update him or to provide him any information regarding the process. Such exclusion of the borrower from the marketing and sales of his collateral is "per se unreasonable."

70.     Under NY UCC §9-207(a), the Lenders and the Agent "shall use reasonable care in the custody and preservation of collateral in [their] possession." Courts have held that a lender's failure to sell stock pledged as collateral at "points in time" when the collateral's price "substantially satisfied the debt" is commercially unreasonable. *See, e.g.*, *LBO Capital Corp. v Home & City Sav. Bank*, No. 92-cv-202, 1992 WL 209310, (N.D.N.Y. Aug. 18, 1992); *Solfanelli v Corestates Bank, N.A.*, 203 F3d 197, 202 (3d Cir 2000).

71.     As noted above, Defendants failed to sell the Tellurian Shares when Tellurian's stock was trading at prices high to satisfy all the outstanding obligations under the O'Connor Loan Documents. Instead, Defendants sold the stock during a two-year low in the price for a fraction of the balance due. Defendants therefore breached their duty of care under NY UCC §9-207(a).

72.     Defendants' multiple breaches of the duty under NY UCC §9-610(b) and §9-207(a) to use commercial reasonableness and care in the disposition and possession of the Collateral caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

### Count 4 – Breach of Bridge Agreements
**(Against all Defendants)**

73.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

74.     The Bridge Agreements are valid and enforceable agreements.  Section 4.3 of the Bridge Agreements require Defendants to "use commercially reasonable efforts to avoid any material disruption of Tellurian's stock price during such process."

75.     Defendants breached that obligation when they recklessly dumped massive amounts of the Tellurian Shares on the market in a manner that drove the price down by nearly 50%, and continued doing so even after Plaintiffs advised them to use an industry-standard methodology that would help avoid any material disruption in the stock price.

76.     Defendants' breach of the duty under Section 4.3 of the Bridge Agreements to use commercial reasonableness caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

### Count 5 – Breach of Duty of Good Faith and Fair Dealing
**(Against all Defendants)**

77.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

78.     Defendants owed Plaintiffs a duty to act in good faith and not to engage in unfair dealing.  This includes a duty not to deprive Plaintiffs of the fundamental benefits of the O'Connor Loan Documents and the Bridge Agreements and not to undermine Plaintiffs' reasonable economic expectations under these agreements.  In wanton violation of these duties, Defendants, unreasonably, and in bad faith interfered with and hindered Plaintiffs' attempts to repay the obligations due under the O'Connor Loan Documents and to reduce or eliminate additional interest owed.  This included objecting to prospective buyers, objecting that list prices were too high and then later complaining they were too low, refusing to engage in discussions about release prices, and reneging on assurances made about how the Ranch would be operated so as to give comfort to prospective buyers.

26

79.     Defendants' breach of the duty of good faith and fair dealing caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

## Count 6 – Tortious Interference with Contract
### (Against O'Connor)

80.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

81.     As demonstrated above, the Lenders and the Agent breached express and implied obligations in the O'Connor Loan Documents and the Bridge Agreements.  O'Connor knew at all relevant times of the existence of the O'Connor Loan Documents and the Bridge Agreements and Plaintiffs' rights thereunder.  Indeed, O'Connor, as "investment adviser," served as signatory for the Lenders on the O'Connor Loan Documents and each of the Bridge Agreements.  The Bridge Agreements are signed by Baxter Wasson and Rodrigo Trelles (each of whom had direct communications with Plaintiffs), acting in their capacity as Managing Directors of O'Connor.

82.     O'Connor improperly and intentionally assisted in, induced, and procured the Lenders' and the Agent's breaches of the O'Connor Loan Documents and the Bridge Agreements by causing the Lenders and the Agent to engage in the misconduct described herein.  Upon information and belief, O'Connor's advised the Lenders when and how to sell the Tellurian Shares, the Tango sailboat, and the Ajax Shares.  O'Connor's investment advice to the Lenders and Agent was not given to protect O'Connor's economic interest in the Collateral, but rather to increase O'Connor's profit (in the form of increased interest) to the detriment of Plaintiffs and specifically the value of the Tellurian Shares, the Tango sailboat, and Ajax Holdings.  O'Connor's interference was improper.

83.     O'Connor's conduct described herein was malicious and caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

DMS 302887469v12

**Count 7 – Injunctive Judgment**
**(Against All Defendants)**

84.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

85.     Defendants have already foreclosed on Collateral – the Tellurian Shares – that would have satisfied the obligations due under the O'Connor Loan Documents in full if Defendants had acted in a commercially reasonable manner as they are obligated. Nonetheless, Defendants have made clear that they still intend to foreclose on the Ajax Shares.

86.     Because Strudel's and the Trust's interests in Ajax are of the nature of a unique, family-owned real estate business, similar to the sale of unique real property, if their interests are sold, they will suffer irreparable harm for which there could be no adequate compensation.  In fact, if the auction is allowed to proceed, unless the Ajax Shares are sold to Plaintiffs, any sale will result in a change of control that will accelerate nearly $53 million of debt owed by the company at a time when the company will not be able to satisfy that massive debt.  As a result, Ajax Holdings will have no choice but to file for bankruptcy or otherwise liquidate.

87.     As a result, the Court should grant preliminary and permanent injunctive relief forbidding Defendants from foreclosing, liquidating, selling, or otherwise disposing of the Ajax Shares.

### VI.     PRAYER FOR RELIEF

88.     Plaintiffs request judgment against Defendants as follows:

    a.     disallowing any claims asserted by Defendants against the Debtors on account of obligations arising under the O'Connor Loan Documents;

    b.     a declaration from the Court that all obligations owed by Plaintiffs to Defendants under the O'Connor Loan Documents have been effectively been

28

repaid in full, no further debt is owed by Plaintiffs, and Defendants have no further right to exercise remedies under the O'Connor Loan Documents;

c.     a declaration from the Court that all liens on, and security interests in, the Collateral are deemed released and of no further force or effect;

d.     a declaration from the Court that there is no continuing Event of Default under the O'Connor Loan Documents, the obligations under the O'Connor Loan Documents have been paid in full, the O'Connor Loans are terminated, and Defendants have no legal right to continue to foreclose upon any further Collateral pledged under the O'Connor Loan Documents;

e.     granting permanent injunctive relief forbidding Defendants from foreclosing, liquidating, selling, or otherwise disposing of the Ajax Shares;

f.     awarding Souki shares of Tellurian stock in an amount to be determined at trial;

g.     for damages, including actual, compensatory, consequential, special, exemplary, in an amount to be proved at trial;

h.     interest, including pre-judgment, post-judgment, and statutory interest;

i.     an award of attorneys' fees and costs of suit incurred; and

j.     for such other and further relief, including any equitable relief, as the Court deems just and proper.

[*Remainder of page of left intentionally blank*]

29

Dated: July 27, 2023                              Respectfully submitted,

                                                  */s/ Jamie A. Aycock*
                                                  R. Paul Yetter
                                                  State Bar No. 22154200
                                                  Timothy S. McConn
                                                  State Bar No. 24032713
                                                  Jamie A. Aycock
                                                  State Bar No. 24050241
                                                  Amy C. Farish
                                                  State Bar No. 24097818
                                                  YETTER COLEMAN LLP
                                                  811 Main Street, Suite 4100
                                                  Houston, Texas 77002
                                                  (713) 632-8000
                                                  pyetter@yettercoleman.com
                                                  tmcconn@yettercoleman.com
                                                  jamieaycock@yettercoleman.com
                                                  afarish@yettercoleman.com

                                                  *Counsel to Charif Souki and Karim Souki,*
                                                  *Christopher Souki, and Lina Souki Rizzuto, in their*
                                                  *capacities as trustees of the Souki Family 2016*
                                                  *Trust and Proposed Special Counsel for the*
                                                  *Debtors and Debtors in Possession*

                                                  and

                                                  */s/ Joshua W. Wolfshohl*
                                                  **PORTER HEDGES LLP**
                                                  Joshua W. Wolfshohl (TX Bar No. 24038592)
                                                  Heather K. Hatfield (TX Bar No. 24050730)
                                                  Aaron J. Power (TX Bar No. 24058058)
                                                  1000 Main St., 36th Floor
                                                  Houston, TX 77002
                                                  Tel: (713) 226-6000
                                                  Fax: (713) 226-6248
                                                  jwolfshohl@porterhedges.com
                                                  hhatfield@porterhedges.com
                                                  apower@porterhedges.com

                                                  *Proposed Bankruptcy Counsel for the Debtors and*
                                                  *Debtors in Possession*