**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** § | **Chapter 11** |
| § | |
| **STRUDEL HOLDINGS LLC and** § | **Case No. 23-90757 (CML)** |
| **AVR AH LLC,** § | |
| § | **(Joint Administration Requested)** |
| **Debtors.**[1] § | **(Emergency Hearing Requested)** |
| § | |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN**
**ORDER (I) APPROVING THE BIDDING PROCEDURES, (II) APPROVING**
**BID PROTECTIONS, (III) SCHEDULING CERTAIN DATES WITH RESPECT**
**THERETO, (IV) APPROVING THE FORM AND MANNER OF NOTICE**
**THEREOF, (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT**
**PROCEDURES, (VI) AUTHORIZING THE DEBTORS TO ENTER INTO DEFINITIVE**
**PURCHASE AGREEMENTS, AND (VII) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than August 9, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") state the following in support of this emergency motion (this "**Motion**"):[2]

**PRELIMINARY STATEMENT**

1.      The Debtors commenced these chapter 11 cases (the "**Chapter 11 Cases**") to facilitate an orderly sale of certain assets in an effort to maximize the value of their estates. As set forth more fully in the Objection to Claims and Complaint (the "**Complaint**"), filed

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AVR AH LLC (0148) and Strudel Holdings LLC (5426). The Debtors' service address is: PO Box 4068, Aspen, CO 81612.

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed in the First Day Declaration or the Bidding Procedures (as defined below), as applicable.

contemporaneously herewith, the Chapter 11 Cases were necessitated by the bad faith and unreasonable actions of certain alleged secured creditors of the Debtors.

2.      Prior to the Petition Date (defined below), Debtor AVR AH LLC ("**AVR**"), with the assistance of Coldwell Banker Mason Morse Real Estate ("**Coldwell**") and Christie's International Real Estate ("**Christies**", and together with Coldwell, the "**Brokers**"), has been marketing its assets, specifically the 813 acre property known as Aspen Valley Ranch and certain related assets (the "**Ranch**").  The prepetition marketing process was successful in that it resulted in both: (i) the sale of three of the eleven parcels comprising the Ranch for total consideration of $46.5 million; and (ii) substantial interest from a potential stalking horse bidder to purchase the remaining 8 of 11 parcels of Ranch.  The Bidding Procedures will permit the Debtors to continue the prepetition marketing efforts in an orderly fashion.  The proposed timeline for the postpetition marketing process is more than sufficient when viewed in the context of the Debtors' prepetition marketing process.

3.      The Debtors seek approval of the Bidding Procedures to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the Ranch and will have sufficient time to (i) receive and evaluate bids, (ii) execute a Stalking Horse Agreement (as defined below), if doing so will maximize the value received for the Ranch, (iii) hold an Auction (as defined below), if necessary, and (iii) prepare documentation to effectuate one or more sale(s) of the parcels comprising the Ranch.  The Bidding Procedures and relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  The Debtors request that the Court grant the relief requested herein.

DMS 302936897v17

## RELIEF REQUESTED

4.     The Debtors seek entry of an order substantially in the form attached hereto

(the "**Bidding Procedures Order**"):

(a)     authorizing and approving the Bidding Procedures attached as **Exhibit 1** to
the Bidding Procedures Order (the "**Bidding Procedures**");

(b)     approving the form and manner of notice of the sale hearing (the "**Sale
Hearing**") with respect to the sale (the "**Sale Transaction**") of the Ranch,
attached as **Exhibit 2** to the Bidding Procedures Order (the "**Sale Notice**");

(c)     scheduling the auction (the "**Auction**") (if necessary) and Sale Hearing;

(d)     authorizing the Debtors in their discretion to (i) select one or more potential
bidders to act as stalking horse bidders (each, a "**Stalking Horse Bidder**")
and enter into a purchase agreement with such Stalking Horse Bidder (each
such agreement, a "**Stalking Horse Agreement**") and (ii) in connection
with any Stalking Horse Agreement with a Stalking Horse Bidder, offer
(A) a breakup fee (the "**Breakup Fee**"), (B) to reimburse reasonable and
documented out-of-pocket fees and expenses of the Stalking Horse Bidder
incurred in negotiating the Stalking Horse Agreement and investigating the
Ranch (the "**Expense Reimbursement**") and/or (C) to provide other
appropriate and customary protections (together with the Breakup Fee and
the Expense Reimbursement, the "**Bid Protections**"); *provided* that, with
respect to any particular Stalking Horse Agreement, the total Bid
Protections shall not exceed (a) 4% of the cash purchase price contemplated
by such Stalking Horse Agreement for the Breakup Fee plus $150,000 for
any Expense Reimbursement;

(e)     approving procedures for the assumption and assignment of executory
contracts and leases (the "**Transferred Contracts**"), including notice of
proposed cure amounts; and

(f)     granting related relief.

5.     Lastly, the Debtors will seek entry of an order at the Sale Hearing (the "**Sale

Order**"):[3]

(a)     authorizing and approving the Sale Transaction to the Winning Bidder (as
defined in the Bidding Procedures) on the terms substantially set forth in
the Winning Bid (as defined in the Bidding Procedures);

---

[3]     A proposed Sale Order will be filed prior to the Sale Hearing.

DMS 302936897v17

(b)      authorizing and approving the Sale Transaction free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the asset purchase agreement with a Winning Bidder;

(c)      authorizing the assumption and assignment of the Transferred Contracts as set forth in the asset purchase agreement with the Winning Bidder; and

(d)      granting any related relief.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105, 363, 365, 503, and 507 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 2002, 6003, 6004, 6006(a), 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

9.      On the date hereof (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases.  Contemporaneously therewith, the Debtors filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no official committees have been appointed or designated.

DMS 302936897v17

## SALE AND MARKETING PROCESS

**I.     The Prepetition Marketing and Sale Process**

10.     The Ranch is an 813-acre compound situated in the Rocky Mountains a mere 12 miles from the center of Aspen, Colorado and just 8.3 miles from the Aspen Airport.  AVR acquired the Ranch—in a far less developed state—in 2013.  The Ranch has been a working ranch since the late 1800s.  Since acquiring the Ranch, AVR has invested in substantial improvements to the property.  Between 2016 and 2019, AVR built eight luxury homes on the Ranch totaling more than 34,000 square feet and comprising over 31 bedrooms.

11.     The Ranch also boasts extensive amenities with common areas collectively comprising 13,900 square feet including:

i.     the "Ranch House," a 3,500 square foot structure designed for gatherings and complete with a large dining area, several entertainment spaces, an open theatre, wine room, and covered patios;

ii.     the "Historic Barn," a 2,000 square foot entertaining space offering a large game room complete with, among other things, arcade games, a pool table, and an eight-person bar, and a spacious 2,000 foot garage housing snowmobiles, four-wheelers, and dirt bikes;

iii.     the "Gym/Pool House," a 2,500 square-foot state-of-the-art facility with a full weight room, his and her locker rooms, a hot tub concealed by a retractable floor, a drink station, wet bar, and twenty-five yard pool;

iv.     the "Equipment Barn," a 6,543 square foot facility where all of the ranch equipment is stored and all of controls for the irrigation systems running throughout the Ranch are located.  Additionally, the Equipment Barn also includes office space for on-site staff affiliated with the Ranch; and

v.     the "Horse Barn," an eight-stable horse barn with a large outdoor exterior-riding area.

12.     The Ranch also includes a large outdoor recreational area complete with a dock suitable for swimming and fishing, and over 200 acres of flat usable pasture land for riding.

DMS 302936897v17

Throughout the Ranch are miles of recreational trails great for snowmobiling or skiing in the winter or dirt biking, mountain biking, or four-wheeling in the summer.

13.     Maintenance and operations of the Ranch are conducted by Aspen Valley Ranch Homeowners Association, Inc. ("**AVR HOA**"), a non-debtor entity, which is controlled by the owners of the 11 parcels comprising the Ranch.  AVR is the "Declarant" under the Amended and Restated Declaration of Protective Covenants for Aspen Valley Ranch dated August 20, 2021 and recorded August 20, 2021 as Reception No. 679960, Pitkin County, Colorado (the "**Declaration**"). AVR HOA administers the Declaration.  AVR HOA also owns the real property underlying the common areas, which is not proposed to be sold as part of the Sale Transaction.

14.     Following this extensive development, AVR through Coldwell, began marketing the Ranch as a single property in May of 2020.  While Coldwell received significant interest for a property of the Ranch's size and market, they did not receive an offer during 2020.  Coldwell and AVR then pivoted to marketing the eleven individual homesteads comprising the Ranch as separate properties in the summer of 2021.  This new strategy immediately bore fruit and AVR signed contracts with two buyers for three homesteads, two of which had homes already constructed and one of which was vacant, for a total of $46.5 million.  These sales closed in late summer and fall of 2021.

15.     Coldwell continued marketing the homesteads on the Ranch through the summer of 2022 and received significant interest, conducting multiple showings per week over this period, though no additional sales were closed.  Unfortunately, as noted above and detailed in the Complaint, certain alleged secured creditors began taking aggressive, unreasonable, and bad faith actions to dispose of certain collateral, including the Ranch.  This included commencing foreclosure proceedings in Colorado against the Ranch.  These actions significantly depressed

interest in the Ranch and forced the Debtors to commence the Chapter 11 Cases to facilitate an

orderly, value-maximizing process for the sale of the Ranch.

II.     **The O'Connor Defendants**

16.     In 2017, Charif Souki, the owner and principal of the Debtors, took out a loan in

the original principal amount of $50 million (the "**2017 Loan**") from affiliates of UBS O'Connor

LLC ("**O'Connor**").  The Debtors and another affiliate of Souki guaranteed the 2017 Loan.  The

2017 Loan is governed by that certain Loan Agreement (as may be amended, supplemented,

restated, or otherwise modified from time to time, the "**2017 Loan Agreement**"), dated as of April

27, 2017, by and among Charif Souki, as borrower; the Debtors and Charif Souki as trustee of the

Souki Family 2016 Trust (the "**Trust**"),[4] as guarantors; Nineteen77 Capital Solutions A LP and

Bermudez Mutari, LTD (together, the "**Lenders**"), as lenders; and Wilmington Trust National

Association (the "**Agent**", and together with O'Connor and the Lenders, the "**O'Connor**

**Defendants**"), as administrative agent.[5]  The Debtors are also party to that certain Pledge

Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time,

the "**2017 Pledge Agreement**"), dated as of April 27, 2017, by and among, Souki, the Debtors,

the Trust, and the Agent.  AVR also executed a deed of trust (the "**2017 Deed of Trust**" and,

together with the 2017 Loan Agreement and the 2017 Pledge Agreement, the "**2017 Loan**

**Documents**"), dated as of April 27, 2017, in favor of the Agent.  Under the 2017 Loan Documents,

the Debtors pledged certain assets as collateral, including the Ranch, for the obligations due under

the 2017 Loan Documents that could be foreclosed upon in enumerated circumstances.

---

[4]     The current trustees of the Souki Family 2016 Trust are Karim Souki, Christopher Souki, and Lina Souki Rizzuto.

[5]     O'Connor executed the 2017 Loan Agreement on behalf of the Lenders as investment adviser.

DMS 302936897v17

17.     In 2018, Souki took out an additional loan from the Lenders in the original Principal amount of $70 million (the "**2018 Loan**" and together with the 2017 Loan, the "**O'Connor Loans**").  The 2018 Loan is governed by that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Loan Agreement**" and together with the 2017 Loan Agreement, the "**O'Connor Loan Agreements**"), dated as of March 30, 2018, by and among Souki, as borrower; the Debtors, the Trust, and AJAX,[6] as guarantors; the Lenders, as lenders; and the Agent, as administrative agent.[7]  The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Pledge Agreement**"), by and among Souki, the Debtors, the Trust, and the Agent.  AVR also executed a deed of trust (the "**2018 Deed of Trust**" and together with the 2018 Loan Agreement and the 2018 Pledge Agreement, the "**2018 Loan Documents**" and collectively with the 2017 Loan Documents, the "**O'Connor Loan Documents**"), dated as of March 30, 2018, in favor of the Agent.  Under the 2018 Loan Documents, the Debtors pledged certain assets as collateral, including the Ranch, for the obligations due under the 2018 Loan Documents that could be foreclosed upon in enumerated circumstances.

18.     Despite considerable efforts, the Debtors have been unable to resolve disputes that have arisen with the O'Connor Defendants.  These disputes, as more fully set forth in the Complaint, culminated in the O'Connor Defendants disposing of certain collateral which, but for the bad-faith acts and commercially unreasonable disposition of such collateral by the O'Connor

---

[6]     AJAX is an exempted company incorporated in the Cayman Islands with limited liability.

[7]     O'Connor executed the 2018 Loan Agreement on behalf of the Lenders as investment adviser.

Defendants, would have satisfied the entirety of the balance outstanding under the O'Connor Loan Documents.

19.     Unfortunately, as a result of the O'Connor Defendants bad-faith acts, the collateral was disposed of for far less than its value, and the O'Connor Defendants continue to attempt to exercise remedies against collateral, including the Ranch, which is currently subject to judicial foreclosure proceedings in Colorado despite: (i) the robust prepetition marketing effort to sell the Ranch; (ii) the successful sale of 3 of the 11 parcels comprising the Ranch for the substantial sum of $46.5 million, and (iii) the fact that there is likely a buyer for the remaining 8 of the 11 parcels comprising the Ranch.

20.     As a result of such indefensible action by the O'Connor Defendants, the Debtors were forced to commence the Chapter 11 Cases to permit an orderly, value-maximizing sale. Moreover, and as discussed in more detail in the *Debtors' Motion Seeking Entry of an Order Precluding Certain Alleged Secured Parties from Submitting Credit Bids Pursuant to Sections 105(a) and 363(k) of the Bankruptcy Code* filed contemporaneously herewith, the Debtors, in an effort to ensure that the sale of the Ranch maximizes value for the Debtors' estates, have requested that the Court prohibit the O'Connor Defendants from credit bidding their alleged secured debt, if any, for cause pursuant to section 363(k) of the Bankruptcy Code.

**III.    Proposed Timeline**

21.     Pursuant to the Bidding Procedures, the Debtors will solicit proposals according to the following proposed schedule, subject to Court approval and availability:

DMS 302936897v17

| Event or Deadline | Date |
|---|---|
| Deadline to Object to Designation of any Stalking Horse Bidder or Grant of Bid Protections | Five (5) business days following filing of the applicable Stalking Horse Notice |
| Bid Deadline | September 5, 2023, at 4:00 p.m. prevailing Central Time |
| Auction (if necessary) | September 13, 2023, at 9:00 a.m. prevailing Central Time |
| Cure Objection Deadline | September 5, 2023, at 4:00 p.m. prevailing Central Time |
| Sale Objection Deadline | September 5, 2023, at 4:00 p.m. prevailing Central Time |
| Sale Hearing | September 19, 2023, subject to Court availability |

22.     The proposed timeline will provide the Debtors with the opportunity to conclude their marketing process and to proceed expeditiously towards consummation of one or more sales. The Debtors believe the proposed schedule is in the best interests of their creditors, other stakeholders, and all other parties in interest, and should be approved.

23.     During the Debtors' robust prepetition marketing process, the information necessary to permit parties to conduct due diligence on the Ranch was made available to potential bidders, which permitted potential bidders to conduct diligence on the Ranch, and AVR has been marketing the Ranch for more than three years prior to the commencement of the Chapter 11 Cases. To the extent that any potential bidder has not previously conducted such diligence, such bidder will have immediate access to, subject to the execution of an appropriate confidentiality agreement, information regarding the Debtors' assets contained in the virtual data room. Accordingly, the Debtors believe the Bidding Procedures will provide sufficient time for potential bidders to conduct any remaining due diligence and submit qualifying bids.

DMS 302936897v17

**IV.     Stalking Horse Procedures**

24.     The Debtors also request authority, as set forth in the Bidding Procedures and the Bidding Procedures Order, to (a) select one or more Stalking Horse Bidders and enter into Stalking Horse Agreements, and (b) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide Bid Protections to the extent the Debtors determine that provision of such Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates.

25.     No later than one (1) business day after selecting a Stalking Horse Bidder, the Debtors shall file with the Court and serve a notice (a "**Stalking Horse Notice**") (a) identifying the Stalking Horse Bidder, the material terms of the Stalking Horse Bid (including the purchase price and Assets subject to such Stalking Horse Bid), and the amount and terms of any Bid Protections offered to the Stalking Horse Bidder, and (b) attaching a copy of the relevant Stalking Horse Agreement.  Any objection to the designation of the Stalking Horse Bidder or to the Bid Protections and Expense Reimbursement set forth in the Stalking Horse Notice and Stalking Horse Agreement (a "**Stalking Horse Objection**") shall be filed no later than five (5) business days after the filing of the applicable Stalking Horse Notice.

26.     Having the flexibility to designate one or more Stalking Horse Bidders and provide Bid Protections will provide the Debtors with the ability to maximize the value of the Assets. Given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing process, the ability to designate Stalking Horse Bidders and offer Bid Protections to each such bidder (although the Debtors ultimately may, in the exercise of their business judgment, not designate a Stalking Horse Bidder at all) is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

DMS 302936897v17

V.      **The Bidding Procedures.**[8]

27.     To optimally and expeditiously solicit, receive, and evaluate final bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures.  Because the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully herein.  Generally speaking, the Bidding Procedures establish, among other things:

- the deadlines and requirements that Potential Bidders (other than any Stalking Horse Bidder) must satisfy to participate in the bidding process and become Qualified Bidders;

- the availability of and access to due diligence by Potential Bidders;

- the conditions for having an Auction and procedures for conducting the Auction, if any; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights (including the right to modify the Bidding Procedures as appropriate).

28.     Importantly, the Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals, and they preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.  The Bid Procedures further allow the Debtors the flexibility to consider alternative transaction structures, including bids for certain subsets of the Ranch (i.e., Partial Bids), in determining which bid(s) will result in the highest and best offer.  Having the option to enter into a Stalking Horse Agreement with a Stalking Horse Bidder ensures that the Debtors retain flexibility to "lock in" a minimum purchase price for any Assets that will be subject to a further market test.  Accordingly, the Bidding Procedures uphold and comply with the Debtors' fiduciary obligations to maximize value.

---

[8]     This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

DMS 302936897v17

29.     Following conclusion of the Auction, if any, and the selection of a Winning Bidder, the Debtors shall present the results of the Auction at the Sale Hearing and shall seek entry of the Sale Order (or Sale Orders).  Each Sale Order shall authorize the Debtors to enter into and perform under the applicable definitive purchase agreement and deem the Debtors' selection of the applicable Winning Bid final.

**VI.     Form and Manner of Sale Notice.**

30.     The Debtors intend to conduct the Auction, if any, on **September 11, 2023, at 9:00 a.m. (prevailing Central Time)**, in person, by videoconference, or by such other form of remote communication selected by the Debtors.

31.     Within three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the Office of the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors; (c) the O'Connor Defendants; (d) counsel for the O'Connor Defendants; (e) all parties who have expressed a written interest in the Ranch; (f) the Internal Revenue Service; (g) the state attorneys general for states in which the Debtors conduct business; (h) all known holders of liens, encumbrances, and other claims secured by the Ranch, if any; i*l*) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (j) any other party entitled to notice pursuant to Local Rule 9013-1(d).

32.     In addition, within five (5) business days after entry of the Bidding Procedures Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, and marketing materials on a website maintained by one or both of the Brokers to provide notice to any other potential interested parties.

33.     The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sale Transaction, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Sale Transaction or the Auction (in each case, if any) be required.

**VII.    Summary of the Assumption and Assignment Procedures.**

34.     The Debtors are also seeking approval of the assumption and assignment procedures (the "**Assumption and Assignment Procedures**") set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of executory contracts and unexpired leases (such executory contracts and unexpired leases to be potentially assumed or assumed and assigned, collectively, the "**Potential Transferred Contracts**" and each a "**Potential Transferred Contract**") in connection with  the Sale Transaction.  The proposed Assumption and Assignment Procedures are as follows:

a.     **Potential Assumption Notice**.  Within five (5) business days after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Potential Assumption Notice, attached as **Exhibit 3** to the proposed Bidding Procedures Order, on certain non-Debtor contract counterparties (collectively, the "**Contract Counterparties**," and each, a "**Contract Counterparty**").

b.     **Content of Potential Assumption Notice**.  The Potential Assumption Notice shall notify the applicable Contract Counterparties that their Potential Transferred Contract may be subject to assumption and assignment in connection with the Sale Transaction, and contain the following information: (i) a list of the applicable Potential Transferred Contracts that may be assumed and assigned in connection with the Sale Transaction; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each of the Potential Transferred Contracts (the "**Cure Costs**"); and  (iv) the deadline by which any Contract Counterparty to a Potential Transferred Contract on the Potential Assumption Notice must file an objection to the proposed assumption,

14

assignment, cure, and/or adequate assurance and the procedures relating thereto (the "**Cure Objection**"); *provided* that service of a Potential Assumption Notice does not constitute an admission that such Potential Transferred Contract is an executory contract or unexpired lease or that such Potential Transferred Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Winning Bid.

c.    **Cure Objections**.  Cure Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of the Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court prior to **September 5, 2023, at 4:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**"); *provided* that the Debtors may extend the Cure Objection Deadline by filing a notice of such extension on the Court's docket or by written agreement, email being sufficient, with a Contract Counterparty.

d.    **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Potential Transferred Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

e.    **Dispute Resolution**.  Any Cure Objection to the proposed assumption and assignment of a Potential Transferred Contract or Cure Costs that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the applicable Winning Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Potential Transferred Contract may be conditionally assumed and assigned, subject to the consent of the applicable Winning Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the applicable Winning Bidder may determine that such Potential Transferred Contract should be rejected and not assigned, in which case the Winning Bidder will not be responsible for any Cure Costs in respect of such contract.  Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "**Cure Dispute**"), the applicable Potential Transferred Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under

Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.   **No Cure, or other, Objections**.   If there are no Cure Objections, Supplemental Cure Objections, or Supplemental Adequate Assurance Objections, or if a Contract Counterparty does not file and serve a Cure Objection, Supplemental Cure Objection, or Supplemental Adequate Assurance Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Potential Assumption Notice (or Supplemental Potential Assumption Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, (ii) the Contract Counterparty will be deemed to have consented to the Cure Costs, if any, and will be forever barred from objecting to the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Winning Bidder, or the property of any of them; (iii) the assumption will be effective notwithstanding anything to the contrary in any Potential Transferred Contract or any other document; and (iv) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Potential Transferred Contract and will be forever barred from asserting any other claims related to such Potential Transferred Contract against the Debtors or the Winning Bidder, or the property of either of them.

## BASIS FOR RELIEF

### I.   The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtors' Reasonable Business Judgment.

35.   A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.   *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the

16

ordinary course of business but the movant must articulate some business justification for the sale.").

36.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

37.     Here, the Bidding Procedures will permit the Debtors to continue their prepetition efforts and promote active bidding from interested parties to elicit the highest or otherwise best offers available for some or all of the parcels that comprise the Ranch.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from any eventual transactions.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

38.     Where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).  This is especially true here, where the Sale Transaction, or any sale of the Ranch, has been subjected to an extensive marketing process and intensively scrutinized by the Debtors and their retained

17

advisors.  As a result, the Debtors and their creditors can be assured that the consideration obtained
will be fair and reasonable and at or above market.

39.     The proposed Bidding Procedures will encourage competitive bidding and are
appropriate under the relevant standards governing auction proceedings and bidding incentives in
bankruptcy proceedings.  Accordingly, the Court should enter the Bidding Procedures Order.

## II.     The Bid Protections Have a Sound Business Purpose and Should Be Approved.

40.     The Debtors also seek to designate a Stalking Horse Bidder and offer the Bid
Protections to the Stalking Horse Bidder.  The use of a stalking horse in a public auction process
for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many
circumstances, the best way to maximize value in an auction process by "establish[ing] a
framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum
Holding LLC*, 2011 WL 2671254 at *1 n. 1.  As a result, stalking horse bidders virtually always
require break-up fees and, in many cases, other forms of bidding protections as an inducement for
"setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other
bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*.
(citation omitted).  Thus, the use of bidding protections has become an established practice in
chapter 11 cases.

41.     Specifically, break-up fees and other forms of bidding protections are a normal and,
in many cases, necessary component of significant sales conducted in chapter 11:  "Break-up fees
are important tools to encourage bidding and to maximize the value of the debtor's assets . . .  In
fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be
*necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659–
60 (emphasis in original).  Bid protections "may be legitimately necessary to convince a 'white

18

knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

42.     Courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").  The allowance of Bid Protections is in the best interests of the Debtors' estates and their creditors, as a Stalking Horse Purchase Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Ranch, which will inure to the benefit of the Debtors' estates.

43.     Courts in the Fifth Circuit apply the "business judgment rule" standard and consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price.  *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule).

44.     The flexibility to offer Bid Protections is a critical component of the Debtors' ability to obtain the commitment of one or more Stalking Horse Bidders.  To qualify as a Stalking Horse Bidder, a bidder will need to have expended and will continue to expend time and resources

negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties.  Any Bid Protections offered to a Stalking Horse Bidder will have been negotiated in good faith and at arm's length and with significant give-and-take with respect to such Bid Protections.  As a result, by preserving the flexibility to offer Bid Protections, the Debtors ensure that their estates can realize the benefit of a transaction with a Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

45.     The Bid Protections provided to any Stalking Horse Bidder (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed transactions (including any Sale transactions), the commitments that have been made, and the efforts that have been and will be expended by any Stalking Horse Bidder.  The Bid Protections are necessary to induce a Stalking Horse Bidder to pursue a Sale and enter into a Stalking Horse Agreement.

46.     If the Court does not approve Bid Protections, the Debtors may not be able to induce any bidders to serve as Stalking Horse Bidders, to the detriment of the Debtors' estates.  Further, if the Debtors enter into a Stalking Horse Agreement with Bid Protections that were ultimately to be paid, it will necessarily be because the Debtors have received higher or otherwise superior offers for the applicable Assets.  In short, the proposed Bid Protections are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

20

47.     The Bid Protections are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders. The Court should approve Bid Protections.

**III.     The Court Should Approve the Debtors' Entry into One or More Definitive Purchase Agreements As a Sound Exercise of Business Judgment.**

48.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Courts authorize the sale of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."  *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

49.     The business judgment rule shields a debtor's management's decisions from judicial second-guessing.  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).  The business judgment rule protects certain debtor decisions—such as the Debtors' entry into one or more definitive purchase agreements—from reevaluation by a court with the benefit of hindsight.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for

21

private control of administration of the estate, and threaten the court's ability to control a case impartially."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

    A.  <u>A Sound Business Purpose Exists for the Sale.</u>

      50.    The Debtors have a sound business justification for selling the Ranch. In accordance with Bankruptcy Rule 6004, sales of property outside the ordinary course of business may be by private sale or public auction. The Debtors have determined that the sale of the Ranch by public auction will enable the Debtors to obtain the highest or otherwise best offer for the Ranch (thereby maximizing the value of the estate) and, as a result, is in the best interest of the Debtors' creditors. The Debtors have determined in their business judgment that a sale of the Ranch through a competitive, public auction is the best way to maximize the value of the Ranch.

      51.    Any Stalking Horse Bidder and Stalking Horse Purchase Agreement will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Ranch. Consequently, the ultimate Winning Bid(s), after being subject to a further "market check" in the form of the Auction (if warranted), will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Ranch and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

      52.    Thus, the Stalking Horse Purchase Agreement or the purchase agreement of any Winning Bidder(s) will constitute the highest or otherwise best offer for the Ranch, which will

provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. Accordingly, the Debtors' determination to sell the Ranch through an Auction process and subsequently to enter into the Winning Bidder's purchase agreement will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court authorize the proposed Sale Transaction (or Sale Transactions) as a proper exercise of the Debtors' business judgment.

    B.   <u>The Sale Transaction Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.</u>

53. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

54. Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Ranch free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "**Encumbrances**"), except with respect to any Encumbrances that may be assumed Encumbrances under the definitive purchase agreement of the applicable Winning Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

55. Any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to

23

the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Ranch to the Winning Bidder(s) free and clear of all Encumbrances including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the applicable Sale Transaction.[9]

56.     Moreover, the only—alleged—Encumbrances on the Ranch stem from the debt of the O'Connor Defendants, and such debt is in "bona fide dispute," within the meaning of section 363(f)(4) of the Bankruptcy Code.  The term "bona fide dispute" is not defined in section 363(f)(4), "[but] many courts have stated that courts must determine 'whether there is an objective basis for either a factual or legal dispute as to the validity of the debt.'"  *In re Gaylord Grain L.L.C.*, 306 B.R. 624, 627 (B.A.P. 8th 2004) (internal citations omitted); *see also In re Patriot Place Ltd.*, 486 B.R. 773, 815 (Bankr. W.D. Tex. 2013) (same); *Subway Equip Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir. 1993) (in the context of 303(b)(1) , holding a bona fide dispute exists if there is an objective basis for a factual or legal dispute as to the validity of a debt).

57.     As more set forth more fully in the Complaint, there is an objective basis for both legal and factual disputes regarding the validity of the O'Connor Defendants' debt, therefore section 363(f)(4) authorizes the sale of the Ranch free and clear of any and all interests.

---

[9]   As set forth in the Complaint the Debtors do not believe that the O'Connor Defendants have a lien, or other Encumbrance, on the Ranch, and the Debtors are seeking a determination that the O'Connor Defendants bad-faith acts and commercially unreasonable disposition of certain other collateral has resulted in the satisfaction of any such Encumbrance the O'Connor Defendants would otherwise have on the Ranch.  As a result, the Debtors intend for the Sale Order to place the proceeds of the Sale Transaction into an escrow account pending the Court's determination of the status of the O'Connor Defendants' liens.

24

C.   The Sale Transaction Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Winning Bidder Is a "Good-Faith Purchaser."

58.     The Debtors request that the Court find the Stalking Horse Bidder, if any, and/or other Winning Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Ranch.

59.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  This section thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.* ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

60.     The Debtors submit that the Stalking Horse Bidder, if any, or any other Winning Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code.  If the Debtors seek to consummate a Sale Transaction pursuant to a Winning Bid obtained in accordance with the Bid Procedures, such Sale Transaction

25

will have been negotiated at arm's length and/or through a fair and open auction process.  To that end the Debtors request that the Court find in the Sale Order that the Winning Bidder is a good faith purchaser within the meaning of section 363(m).  Providing the Winning Bidder with such protection will ensure that the Debtors receive the maximum price for the Assets and the Sale Transaction will occur promptly.[10]

D.  The Sale and Purchase Price Reflects a Fair Value Transaction.

61.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

62.     Moreover, as described herein, even as the Debtors move forward with the Sale Transaction, the Brokers will continue to market the Debtors' assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to

---

[10]   The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Winning Bidder arising from the Auction.  Pursuant to the Bidding Procedures, any Winning Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Winning Bidder or Back-Up Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

DMS 302936897v17

participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the proposed Purchase Price will, conclusively, be fair value.

**IV.     The Form And Manner of the Sale Notice Should Be Approved.**

63.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction.  Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**V.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

A.     The Assumption and Assignment of the Potential Transferred Contracts Reflects the Debtors' Reasonable Business Judgment.

64.     To facilitate and effectuate the Sale Transaction (or Sales Transactions), the Debtors seek authority to assign or transfer the Potential Transferred Contracts to a Winning Bidder to the extent required by such bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an

27

executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

65.     The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Potential Transferred Contract be deemed to consent to the assumption and assignment of the applicable Potential Transferred Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Potential Assumption Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent).

66.     Here, the Court should approve the decision to assume and assign the Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment.  ***First***, the Potential Transferred Contracts are essential to the value of the Ranch and, as such, they are essential to inducing the highest or otherwise best offer for the Ranch.  ***Second***, it is unlikely that any purchaser would want to acquire the Ranch unless certain of the contracts and leases needed to conduct day-to-day operations of the Ranch were included in the transaction.  ***Third***, the Potential Transferred Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in the Chapter 11 Cases.

67.     Accordingly, the assumption and assignment of the Potential Transferred Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

B.  Defaults Under the Transferred Contracts Will Be Cured in Connection with any Sale.

68.     Upon finding that a debtor has exercised its business judgment in deciding to assume an executory contract, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

69.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

C.  Non-Debtor Parties Will Be Adequately Assured of Future Performance.

70.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re*

29

*Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

71.     The Debtors will demonstrate that the requirements for assumption and assignment of the Potential Transferred Contracts to the Winning Bidder will be satisfied.  The Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Winning Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Potential Transferred Contracts assigned to the Winning Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Winning Bidder to provide adequate assurance of future performance and object to the assumption of the Potential Transferred Contracts or proposed Cure Costs.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Potential Transferred Contracts as set forth in the definitive purchase agreement of the Winning Bidder.

## EMERGENCY CONSIDERATION

72.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The requested relief will save costs and avoid undue administrative burden and confusion only if granted immediately.  Given imminent and ongoing disputes between the

30

Debtors and the O'Connor Defendants, including the O'Connor Defendants prepetition efforts to force commercially unreasonable dispositions of collateral, the Debtors have satisfied the "immediate and irreparable harm" standard and request that the Court approve the Motion on an emergency basis.

### WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

73.    The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### RESERVATION OF RIGHTS

74.    Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties

in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **<u>NOTICE</u>**

75.    Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances.  The Debtors will provide notice to parties-in-interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the O'Connor Defendants; (d) counsel to the O'Connor Defendants; (e) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; (f) all known lienholders; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice is needed.

*[Remainder of this page intentionally left blank]*

DMS 302936897v17

WHEREFORE, The Debtors request that the Court enter the Order, respectively, and grant such other and further relief as is appropriate under the circumstances.

Dated: July 27, 2023                    Respectfully submitted,


                                        /s/ Joshua W. Wolfshohl
                                        **PORTER HEDGES LLP**
                                        Joshua W. Wolfshohl (TX Bar No. 24038592)
                                        Aaron J. Power (TX Bar No. 24058058)
                                        Michael B. Dearman (TX Bar No. 24116270)
                                        1000 Main St., 36th Floor
                                        Houston, TX 77002
                                        Tel: (713) 226-6000
                                        Fax: (713) 226-6248
                                        jwolfshohl@porterhedges.com
                                        apower@porterhedges.com
                                        mdearman@porterhedges.com

                                        *Proposed Counsel for the Debtors and Debtors in Possession*

### CERTIFICATE OF SERVICE

I certify that on July 27, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                        /s/ Joshua W. Wolfshohl
                                        Joshua W. Wolfshohl

DMS 302936897v17