**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § § | **Chapter 11** |
| **STRUDEL HOLDINGS LLC and AVR AH LLC,** | § § § | **Case No. 23-90757 (CML)** |
| | § § | **(Joint Administration Requested)** |
| Debtors.[1] | § § | |

**DEBTORS' MOTION SEEKING ENTRY OF AN ORDER PRECLUDING CERTAIN ALLEGED SECURED PARTIES FROM SUBMITTING CREDIT BIDS PURSUANT TO SECTIONS 105(a) AND 363(k) OF THE BANKRUPTCY CODE**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") respectfully state the following in support of this motion (the "**Motion**"):

**PRELIMINARY STATEMENT**

1. The Debtors have commenced these chapter 11 cases (the "**Chapter 11 Cases**") to market and sell their assets in a value-maximizing transaction for the benefit of all stakeholders. In particular, the Debtors seek to continue their prepetition marketing process and consummate a sale of the 813 acre property owned by debtor AVR AH, LLC ("**AVR**") commonly known as

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AVR AH LLC (0148) and Strudel Holdings LLC (5426). The Debtors' service address is: PO Box 4068, Aspen, CO 81612.

Aspen Valley Ranch and certain related assets (the "**Ranch**"). As set forth below, the Debtors have filed a motion seeking to establish bidding procedures and approve a sale of the Ranch.

2. Contemporaneously with the filing of this Motion, the Debtors and certain related parties have also commenced an adversary proceeding in this Court (Adv. Pro. No. 23-09003) (the "**Adversary Proceeding**") by filing a complaint (the "**Complaint**") against the O'Connor Defendants (defined below), alleged secured creditors of the Debtors. The Adversary Proceeding seeks, among other things, disallowance of any claims held by the O'Connor Defendants against the Debtors as well as a declaration that the O'Connor Defendants have no security interests in, or liens on, any of the property of the Debtors' estates, including the Ranch. Accordingly, the Debtors have filed this Motion to preclude the O'Connor Defendants from submitting a credit bid for the Ranch premised on alleged secured claims the Debtors believe should be disallowed. As set forth more fully in the Complaint, the allegations of which are incorporated herein by reference, the Chapter 11 Cases were necessitated by the bad faith and unreasonable actions of the O'Connor Defendants.

3. To ensure that the proposed sale process results in the highest and best offer for the Debtors' assets, the Debtors are seeking to prevent the O'Connor Defendants from credit bidding their disputed claims. Failure to restrict their ability to credit bid will allow dubious claims shrouded in inequitable conduct to chill the bidding for the Debtors' assets. Accordingly, cause exists to prohibit the O'Connor Defendants from submitting a credit bid in connection with the proposed sale.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern*

*District of Texas*, dated May 24, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

5. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The bases for the relief requested herein are Sections 105(a) and 363(k) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "**Bankruptcy Code**"), Rule 9013 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**").

## BACKGROUND

7. On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and commenced these Chapter 11 Cases.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official statutory committees have been appointed or designated by the Office of the United States Trustee.

8. As noted above, the Debtors have commenced the Chapter 11 Cases to achieve an orderly sale of certain of their assets to maximize the value of their estates.  Specifically, the Debtors plan to continue their prepetition marketing process and consummate a sale pursuant to section 363 of the Bankruptcy Code of the Ranch (the "**Sale Transaction**").  Contemporaneously with the filing of this motion, the Debtors have also filed a motion seeking entry of orders

3

(i) establishing bidding procedures (the "**Bidding Procedures**") for the Sale Transaction and (ii) approving the Sale Transaction.

I. **The O'Connor Loans**

9. In 2017, Charif Souki, the owner and principal of the Debtors, took out a loan in the original principal amount of $50 million (the "**2017 Loan**") from affiliates of UBS O'Connor LLC ("**O'Connor**"). The Debtors and another affiliate of Souki guaranteed the 2017 Loan. The 2017 Loan is governed by that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Loan Agreement**"), dated as of April 27, 2017, by and among Charif Souki, as borrower; the Debtors and Charif Souki as trustee of the Souki Family 2016 Trust (the "**Trust**"),[2] as guarantors; Nineteen77 Capital Solutions A LP and Bermudez Mutari, LTD (together, the "**Lenders**"), as lenders; and Wilmington Trust National Association (the "**Agent**" and together with O'Connor and the Lenders, the "**O'Connor Defendants**"), as administrative agent.[3] The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Pledge Agreement**"), dated as of April 27, 2017, by and among, Souki, the Debtors, the Trust, and the Agent. AVR also executed a deed of trust (the "**2017 Deed of Trust**" and, together with the 2017 Loan Agreement and the 2017 Pledge Agreement, the "**2017 Loan Documents**"), dated as of April 27, 2017, in favor of the Agent.

10. In 2018, Souki took out an additional loan from the Lenders in the original Principal amount of $70 million (the "**2018 Loan**" and together with the 2017 Loan, the "**O'Connor Loans**"). The 2018 Loan is governed by that certain Loan Agreement (as may be amended,

---

[2] The current trustees of the Souki Family 2016 Trust are Karim Souki, Christopher Souki, and Lina Souki Rizzuto.

[3] O'Connor executed the 2017 Loan Agreement on behalf of the Lenders as investment adviser.

4

supplemented, restated, or otherwise modified from time to time, the "**2018 Loan Agreement**" and together with the 2017 Loan Agreement, the "**O'Connor Loan Agreements**"), dated as of March 30, 2018, by and among Souki, as borrower; the Debtors, the Trust, and AJAX,[4] as guarantors; the Lenders, as lenders; and the Agent, as administrative agent.[5] The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Pledge Agreement**"), by and among Souki, the Debtors, the Trust, and the Agent. AVR also executed a deed of trust (the "**2018 Deed of Trust**" and together with the 2018 Loan Agreement and the 2018 Pledge Agreement, the "**2018 Loan Documents**" and collectively with the 2017 Loan Documents, the "**O'Connor Loan Documents**"), dated as of March 30, 2018, in favor of the Agent.

11. Under the O'Connor Loan Documents, the Debtors pledged certain collateral as security for the O'Connor Loans. This included, among other things, 25 million shares of Tellurian, Inc. (the "**Tellurian Shares**") (owned by Souki),[6] the Ranch (owned by AVR) and the equity interests in non-debtor affiliate Ajax Holdings, LLC (the "**Ajax Shares**") (50% of which are owned by Debtor Strudel Holdings, LLC and 50% of which are owned by the Trust). The value of this collateral package (the "**Collateral**") was more than sufficient to cover all obligations due under the O'Connor Loan Documents. Under the O'Connor Pledge Agreements, the Agent may only exercise powers to "[l]iquidate, withdraw or sell all or any part of the Collateral" "following the occurrence and during the continuance of an Event of Default" and only "until all of the Obligations have been paid in full and the Loan Agreement has been terminated." Pledge

---

[4] AJAX is an exempted company incorporated in the Cayman Islands with limited liability.

[5] O'Connor executed the 2018 Loan Agreement on behalf of the Lenders as investment adviser.

[6] Souki was the co-founder and chairman of the board of Tellurian, which was founded to construct and operate a facility to manufacture and ship LNG to overseas markets.

DMS 303089468v5

Agreements § 7. In other words, the O'Connor Defendants may not continue exercising their remedies under the Loan Agreements after the obligations have been paid in full. After a series of amendments, the O'Connor Loans were scheduled to mature on May 6, 2020.

## II.     Tellurian's Financial Troubles and Recovery

12.     As set forth in more detail in the Complaint, the O'Connor Defendants also extended a separate loan to Tellurian. As a result of a delay with a key contract and the COVID-19 pandemic, Tellurian suffered financial troubles in early 2020 and fell behind on its loan with the O'Connor Defendants. The resulting fall in the share price of Tellurian also impaired the value of the Tellurian Shares, complicating Souki's efforts to repay the O'Connor Loans. The O'Connor Defendants reached out to Souki, who was not in an active role with Tellurian at the time, and asked him to focus on righting the ship with Tellurian.

13.     As a result of these discussions, Souki agreed to take on a more active role with Tellurian and the parties also entered into two bridge agreements (the "**Bridge Agreements**") on May 5, 2020. Under the Bridge Agreements, the O'Connor Defendants agreed that they would forbear from exercising any of their remedies under the O'Connor Loan Documents until March 30, 2021, absent a termination event. Also on May 5, 2020, the O'Connor Defendants sent a notice of exclusive control to Souki's broker taking control of the account holding the Tellurian Shares.

14.     Souki became executive chairman of the Tellurian on June 20, 2022, and set to work getting Tellurian back on course. Fortunately, thanks to his efforts and the efforts of numerous members of his team, Tellurian was able to fully repay its loan with the O'Connor Defendants on March 12, 2021, as well as another significant loan on March 31, 2021.

6

**III.     The O'Connor Defendants' Unreasonable Actions**

15.     As set forth in more detail in the Complaint, after Tellurian's loan had been repaid, the O'Connor Defendants began pressuring Souki to quickly pay down the O'Connor Loans. While the Bridge Agreements were set to expire on March 30, 2021, Tellurian's share price was still low enough that selling shares to repay the O'Connor Loans would not have been commercially reasonable.  Accordingly, Souki and the Debtors began marketing the Ranch, both in its entirety and as individual homesteads.  Rather than assisting with this process, which was being done for their benefit, the O'Connor Defendants' unnecessarily delayed approving lien release prices and attempted to use the sale process to extract additional, unfavorable terms from Souki and the Debtors.  The O'Connor Defendants also refused to agree to any third party funding proposals related to the Ranch that would have helped pay down the O'Connor Loans.  Despite the O'Connor Defendants' unreasonable behavior, Souki and the Debtors were able to close sales in August and November 2021 for three of the eleven homesteads comprising the Ranch for $46.5 million, though the majority of the proceeds from these sales were used to pay off the first lien debt on the Ranch.

16.     While marketing efforts for the Ranch continued, on May 26, 2022, the O'Connor Defendants announced they were formally terminating the Bridge Agreements and would begin exercising remedies against the Collateral.  At this time, the value of the Tellurian Shares was over $120 million and was more than enough to pay the O'Connor Loans in full.  The O'Connor Defendants also had had exclusive control of the account where the Tellurian Shares were held for over two years at this point.  The O'Connor Defendants did not, however, elect to sell the Tellurian Shares and instead commenced foreclosure proceedings on the Ranch.  Upon learning, however,

DMS 303089468v5

that Colorado law would require a them to submit credit bid at or near fair-market value in any foreclosure sale, the O'Connor Defendants elected not to move forward with the foreclosure.

17. They also began seizing other assets, including a sailboat owned by an affiliate of Souki and the Debtors. But, rather than allowing Souki to participate in the marketing process of the sailboat, the O'Connor Defendants failed to conduct a comprehensive marketing process and sold the sailboat for significantly less than its market value.

18. By this point, the value of the Tellurian Shares had dropped again meaning that the O'Connor Defendants had missed their window to sell the shares to pay off the O'Connor Loans. Despite this, the O'Connor Defendants began selling the Tellurian Shares on February 8, 2023, when the price was around $2.00 per share. That day, the O'Connor Defendants dumped nearly 2 million shares on the market, a significant increase in Tellurian's trading volume. This, naturally, resulted in a further reduction of the price, causing a drop of almost 10% on the first day. Despite Souki warning the O'Connor Defendants that this course of action was reckless and unreasonable and suggesting a more reasonable strategy, the O'Connor Defendants plowed ahead and continued dumping large amounts of the Tellurian Shares on the market day after day. By the time the O'Connor Defendants finished selling the Tellurian Shares, the price had further collapsed to around $1.18 per share and the O'Connor Defendants had only realized approximately $37 million in proceeds.

19. The O'Connor Defendants have continued to be unreasonable and to act in bad faith regarding the disposition of the Collateral. This includes refusing to consider additional offers for the Ranch and seeking to liquidate the Ajax Shares in such way as to trigger the acceleration of over $53 million in debt, all as set forth more fully in the Complaint.

**IV.     The Debtors File Suit**

20.     In an attempt to stop the O'Connor Defendants' reckless liquidation of the Collateral, Souki, the Debtors, and the Trust filed a lawsuit in New York state court against the O'Connor Defendants.  In the New York Action, Souki and the Debtors sought, relief from Defendants' bad faith, reckless, and commercially unreasonable conduct and corresponding damages.  This included seeking a declaration that the O'Connor Loans were effectively paid in full and an injunction against the O'Connor Defendants to prevent them from engaging in further bad faith, unreasonable, and reckless conduct.

**V.      The Debtors Commence the Chapter 11 Case**

21.     As noted above, the Debtors have commenced these Chapter 11 Cases to provide some breathing room while they complete the marketing and sale process for the Ranch (and potentially other assets) in an orderly and value-maximizing way.  The Debtors have sought approval of the Bidding Procedures for a potential auction.  In connection with this process, the Debtors are also seeking to prevent the O'Connor Defendants from submitting a credit bid based on a debt the Debtors believe is no longer valid.

## RELIEF REQUESTED

22.     By this Motion, the Debtors respectfully request that the Court enter an order pursuant to Bankruptcy Code sections 105 and 363(k) precluding the O'Connor Defendants from credit bidding their alleged claims in connection with the Sale Transaction or any other proposed sale of the Debtors' assets.

## BASIS FOR RELIEF

23.     A secured creditor's right to credit bid is governed by section 363(k) of the Bankruptcy Code, which provides as follows:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures and allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). This right, however, is not absolute as the statute specifically allows a court to limit or restrict the right "for cause." *Id.*; *In re Aeropostale, Inc.*, 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016) ("[T]he right to credit bid is not absolute."); *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 808 (Bankr. E.D. Va. 2014) ("Credit bidding . . . is not an absolute right").

24. "The term 'cause' is not defined by the Bankruptcy Code and it is left to the court to determine whether cause exists on a case-by-case basis." *In re Aeropostale, Inc.*, 555 B.R. at 414. The court has discretion in deciding whether to deny credit bidding. *Id.* at 415; *In re Phila. Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."), *citing* 3 Collier on Bankruptcy 363.09[1]. Courts have limited the right to credit bid when the validity of a creditor's lien is in dispute. *In re Daufuskie Islands Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (holding that a secured creditor, whose lien and $34 million claim were disputed and the subject of adversary proceedings seeking avoidance and equitable subordination, was not entitled to credit bid its claim at the sale of the debtor's assets); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996), *aff'd*, 162 F.3d 1164 (8th Cir. 1998)).

25. Bankruptcy Courts have found "cause" exists to deny or limit a secured party's right to credit bid in a variety of situations. *See, e.g.*, *Flowers v. Sherman, Tr. for Estate of Brain Synergy Inst. LLC*, No. 3:18-CV-01139-S, 2018 WL 11470501, at *1 (N.D. Tex. May 10, 2018) (dismissing secured creditor's appeal of bankruptcy court's order granting the trustee's motion to

deny secured creditor's credit bid based on secured creditor's claim being subject to *bona fide* dispute); *In re Akard St. Fuels, L.P.*, No. 3:01-CV-1927-D, 2001 WL 1568332, at *2-3 (N.D. Tex. 2001) (finding bankruptcy court did not commit reversible error in denying Morgan Stanley the ability to credit bid for cause and permitting sale of property free and clear of interests pursuant to 363(f)(4)); *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 60-61 (Bankr. D. Del. 2014) (capping the amount of credit bids based on potential chilling of bidding and creditor's insistence on unfair sale process); *In re Free Lance-Star Publ'g Co.*, 512 B.R. at 805 (limiting credit bid based on bid chilling, and secured creditor's inequitable conduct in unilaterally filing financing statements on additional assets by limiting credit bid to assets secured creditor had valid liens on).

26. Here, ample cause exists to preclude the O'Connor Defendants from credit bidding on the Ranch. *First*, the O'Connor Defendants' liens and claims are in dispute and subject to a bona fide dispute. The Debtors are parties to prepetition litigation over the validity of the liens and claims of the O'Connor Defendants and initiated the Adversary Proceeding to resolve those issues expeditiously. As set forth herein and in further detail in the Complaint, the O'Connor Defendants' reckless, unreasonable, and bad faith actions have caused significant damages to Souki and the Debtors. In particular, had the O'Connor Defendants not engaged in their wrongful conduct, they would have realized sufficient proceeds from the Tellurian Shares to pay the balance of the O'Connor Loans in full. Further, the resulting damages to Souki and the Debtors are more than sufficient to offset any balance that may still be owed to the O'Connor Defendants.

27. *Second*, allowing the O'Connor Defendants to submit a credit bid will chill bidding for the Ranch. The O'Connor Defendants assert they are owed over $90 million. With that credit bid looming in the background, there is a significant risk that bidders will be scared off. Further, as alleged in the Complaint, the O'Connor Defendants have previously engaged in inequitable

conduct in their disposition of the Collateral. Allowing them to credit bid their disputed debt would further reward such inequitable behavior.

28. Additionally, the proceeds of the Sale Transaction can be held by the Debtors with all valid liens attaching thereto, pending a resolution of the claims asserted in the Complaint. If the Court ultimately determines that the O'Connor Defendants do have an allowed secured claim, such claim may still be asserted against the proceeds of the sale. Assuming the O'Connor Defendants do have a valid claim, maximizing the cash received from the Sale Transaction will only inure to their benefit.

## **NOTICE**

29. The Debtors will provide notice to parties-in-interest, including: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the O'Connor Defendants; (d) counsel to the O'Connor Defendants; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice is needed.

WHEREFORE, the Debtors request that the Court enter an order granting the Motion and granting such other and further relief as is appropriate under the circumstances.

[*Remainder of this page intentionally left blank*]

Dated: July 27, 2023

Respectfully submitted,

*/s/ Joshua W. Wolfshohl*
**PORTER HEDGES LLP**
Joshua W. Wolfshohl (TX Bar No. 24038592)
Aaron J. Power (TX Bar No. 24058058)
Michael B. Dearman (TX Bar No. 24116270)
1000 Main St., 36th Floor
Houston, TX 77002
Tel: (713) 226-6000
Fax: (713) 226-6248
jwolfshohl@porterhedges.com
apower@porterhedges.com
mdearman@porterhedges.com

*Proposed Counsel for the Debtors and Debtors in Possession*

**CERTIFICATE OF SERVICE**

    I certify that on July 27, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

DMS 303089468v5