**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | **Chapter 11** |
| **In re:** | § | |
| | § | |
| **STRUDEL HOLDINGS LLC AND** | § | **Case No. 23-90757 (CML)** |
| **AVR AH LLC,** | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

**LENDER PARTIES' MOTION TO DISMISS THE CHAPTER 11 CASES**
**PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE**

> **If you object to the relief requested, you must respond in writing.  Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on September 21, 2023 at 2:30 p.m. in Courtroom 401, floor, 515 Rusk, Houston TX 77002.  You may participate in the hearing either in person or by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 832-917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Lopez's conference room number is 590153.**
>
> **Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez."  Click the settings icon in the upper right corner and enter your name under the personal information setting.  Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AVR AH LLC (0148) and Strudel Holdings LLC (5426).  The Debtors' service address is: PO Box 4068, Aspen, CO 81612.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

JURISDICTION, VENUE, AND BASIS FOR RELIEF ................................................. 3

BACKGROUND ............................................................................................................. 4

    A.    Each of the Debtors Is a Non-Operating Entity with One Material Asset and Both Debtors Are Wholly Owned by Charif Souki ........................................ 4

    B.    The Debtors Guaranteed Souki's Loans and Granted the Lender Parties Security Interests in Their Only Material Assets, and Souki Defaulted. ............... 5

    C.    After a Lengthy Forbearance, the Lender Parties Began Foreclosing. ................. 7

    D.    The State Court Rejected the Debtors' Preliminary Injunction Requests. ............. 9

    E.    Having Failed to Obtain an Injunction and Facing a Motion to Dismiss, the Debtors Triggered the Automatic Stay and Refiled Their Litigation. ................... 11

ARGUMENT .................................................................................................................. 12

I.    THESE CHAPTER 11 CASES ARE CLASSIC BAD FAITH FILINGS THAT SHOULD BE DISMISSED UNDER *LITTLE CREEK* ...................................... 12

    A.    The Debtors Filed These Chapter 11 Cases to Obtain a Substitute Stay of the Lender Parties' Imminent Foreclosures and to Shop for a New Forum in a Two-Party Dispute ............................................................................................. 13

    B.    The Debtors Have No Going Concern to Protect, No Employees to Protect, and No Hope of Rehabilitation and, Thus, No Good Faith Basis for Filing. ........ 17

II.    AVR'S CHAPTER 11 CASE SHOULD BE DISMISSED BECAUSE ITS PETITION IS ULTRA VIRES ........................................................................... 19

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.),*
   431 F. App'x 272 (5th Cir. 2011) ............................................................................ 15

*In re C-TC 9th Ave. P'ship,*
   113 F.3d 1304 (2d Cir. 1997) ................................................................................... 18

*In re Davis,*
   93 B.R. 501 (Bankr. S.D. Tex. 1987) ....................................................................... 15

*In re Franchise Servs. of N. Am., Inc.,*
   891 F.3d 198 (5th Cir. 2018) ................................................................................... 19

*In re Humble Place Joint Venture,*
   936 F.2d 814 (5th Cir. 1991) ................................................................................... 12

*Investors Grp., LLC v. Pottorff,*
   518 B.R. 380 (N.D. Tex. 2014) ................................................................................ 15

*In re Kickapoo Kennels, LLC,*
   Case No. 12–39321-HE–11, 2013 WL 3148656 (S.D. Tex. Jun. 19, 2013) ......................... 15

*Little Creek Dev. Co. v. Commonwealth Mortg. Corp.*
   *(In re Little Creek Dev. Co.),*
   779 F.2d 1068 (5th Cir. 1986) ..........................................................................*passim*

*In re Nat'l Rifle Ass'n of Am.,*
   628 B.R. 262 (Bankr. N.D. Tex. 2021) ..................................................................... 15

*Price v. Gurney,*
   324 U.S. 100 (1945) ................................................................................................. 19

*In re Sherwood Enters., Inc.,*
   112 B.R. 165 (Bankr. S.D. Tex. 1989) ..................................................................... 15

*In re Triumph Christian Ctr., Inc.,*
   493 B.R. 479 (Bankr. S.D. Tex. 2013) ................................................................ 15, 16

*In re Walter,*
   108 B.R. 244 (Bankr. C.D. Cal. 1989) ............................................................... 15, 16

*In re Zamora-Quezada,*
   622 B.R. 865 (Bankr. S.D. Tex. 2017) ..................................................................... 18

**Statutes**

11 U.S.C. § 101(51)(B) ..................................................................................................... 4

11 U.S.C. § 1112(b) ................................................................................................... 1, 3, 12

28 U.S.C. § 157 ................................................................................................................. 3

28 U.S.C. § 1334 ............................................................................................................... 3

28 U.S.C. § 1408 ............................................................................................................... 3

28 U.S.C. § 1409 ............................................................................................................... 3

Colo. Rev. Stat. § 38-38-102.5 ......................................................................................... 7

Nineteen77 Capital Solutions A LP and Bermudez Mutuari, Ltd. (together, the "Lenders"), and Wilmington Trust National Association, in its capacity as Administrative Agent (the "Administrative Agent", and together with the Lenders, the "Lender Parties"), respectfully submit this motion pursuant to 11 U.S.C. § 1112(b) to dismiss the instant chapter 11 cases for Strudel Holdings LLC ("Strudel") and AVR AH LLC ("AVR," and together with Strudel, the "Debtors").

## PRELIMINARY STATEMENT

1.      These chapter 11 cases are paradigmatic bad faith filings that the Court should dismiss for cause pursuant to Bankruptcy Code section 1112(b).  The non-operating Debtors, which each have only one material asset, do not seek to reorganize but rather to obtain a "do over" of a New York state court action that they filed to block the Lender Parties from foreclosing on their assets and to evade their guarantees to the Lender Parties of the repayment of more than $99 million of outstanding debt secured in part by those assets.  Chapter 11 exists to provide good faith debtors with a fresh start in business, not in litigation.  It is indeed hard to envision a case that more closely embodies the elements of a classic bad faith filing set forth in *Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.)*, 779 F.2d 1068 (5th Cir. 1986), and its progeny.

2.      The Debtors first sued the Lender Parties in New York five months ago because the relevant contracts provide the New York courts with exclusive jurisdiction over the Debtors' claims, which arise under New York law.  The Debtors filed two separate motions for emergency injunctive relief, but the New York state court *twice* declined to enjoin the Lender Parties from foreclosing on the Debtors' assets.  In so doing, the New York court found that the Debtors do not have a likelihood of success on their claims under New York law.  Facing the Lender Parties' imminent foreclosures and a motion to dismiss their New York action that would put to bed their efforts to escape their obligations, the Debtors decided to switch forums.  They filed their chapter

11 petitions—without the requisite authorization from the Administrative Agent in the case of AVR—and immediately filed an adversary complaint in this Court duplicating their New York state court complaint.

3.      The Debtors would not be in this Court but for their dispute with the Lender Parties over their contractual repayment obligations.  They are using the automatic stay as a substitute for the preliminary injunction that they could not obtain from the New York court and are attempting to restart their litigation away from that state court, which already found that their claims are unlikely to succeed, in the hopes that this Court will view their claims more favorably.  Indeed, their adversary complaint admits that the Debtors filed these chapter 11 cases to "forestall" the Lender Parties and "take advantage of the breathing spell afforded by the automatic stay."[2] This is not just forum shopping; it is also an abuse of the bankruptcy system.

4.      Perpetuating these cases, which are, at bottom, a two-party dispute over a secured lending transaction governed by New York law, would not serve any legitimate chapter 11 purpose.  The Debtors are non-operating entities with only one material non-insider liability— their guarantee of loan obligations of their sole member, Charif Souki, who has defaulted under loan agreements with the Lender Parties.  This entire bankruptcy proceeding turns on the Debtors' claims in their adversary proceeding, which had been pending in New York and which should be adjudicated by the New York state court.  If the Debtors' claims fail, which the New York court held is likely, then there will be no equity remaining in their only material assets, which are fully encumbered by the Lender Parties' liens and security interests.  Conversely, if the Debtors' claims were to succeed, the Debtors would have no need for chapter 11 relief, because their assets far surpass their de minimis obligations to other non-insider creditors.  If the Debtors believe the

---

[2]      Objection to Claims and Complaint, Adv. No. 23-09003, ECF No. 1, ¶ 51.

claims asserted in their adversary proceeding have merit, then state court, not bankruptcy court, is the proper forum to resolve them, as the Debtors themselves recognized by prosecuting them in New York until it became clear that they were unlikely to succeed there.

5.      The New York court is not only well suited to the task of adjudicating the Debtors' New York state law claims, but also is the exclusive forum for adjudicating such claims under the parties' contracts.  In the five-plus months that the state court action was active before the petition date, Justice Andrea Masley already found that under controlling New York law, those claims were unlikely to succeed on the merits.  As of the petition date, the Lender Parties already moved to dismiss the Debtors' claims, which motion was stayed but is subject to renewal, and the Lender Parties have since filed a new plenary action against the non-debtor co-plaintiffs named in the Debtors' adversary complaint, Souki and the Debtors' co-guarantors, in a separate, unstayed action in New York state court.[3]

6.      The Court should dismiss both these bad faith chapter 11 cases and send this two-party dispute back to New York state court.  And the Court should dismiss AVR's case for the additional reason that the Administrative Agent did not authorize AVR's ultra vires petition.

## JURISDICTION, VENUE, AND BASIS FOR RELIEF

7.      The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The basis for the relief requested herein is 11 U.S.C. § 1112(b).

---

[3]      *See* Declaration of James W. Burke ("Burke Decl.") Ex. 1 (notice of motion filed in *Nineteen77 Capital Solutions A LP v. Souki*, Index No. 654043/2023 (N.Y. Sup. Ct. N.Y. Cnty.).

## BACKGROUND

A.    <u>Each of the Debtors Is a Non-Operating Entity with One Material Asset and Both Debtors Are Wholly Owned by Charif Souki.</u>

10.    The Debtors are both corporate appendages of Charif Souki, their sole member. *See* ECF No. 55 ("<u>Strudel's SoFA</u>") at No. 28; ECF No. 57 ("<u>AVR's SoFA</u>") at No. 28.  Souki is a sophisticated energy industry executive and high net worth individual who is not a debtor in these or any other active bankruptcy cases.

11.    Strudel is a holding company that owns a 50% equity interest in Ajax Holdings, LLC ("<u>Ajax Holdings</u>"), a real estate holding company.  *See* ECF No. 54 ("<u>Strudel's Schedules</u>"), at Schedule A/B No. 15; Strudel's SoFA at No. 25.1.  Strudel has no revenue generating operations. Strudel's SOFA at No. 1.  Apart from the Ajax Holdings, the only other assets listed on Strudel's Schedules are approximately $1,800 of cash and an approximately $250,000 net operating loss. Strudel's Schedules at Schedule A/B Nos. 3 & 72.

12.    Strudel's Schedules do not list any creditors other than the Lender Parties.  *Id*. at Schedules D & E/F.

13.    AVR is a single asset real estate holding company.  *See* Case No. 23-90758, ECF No. 1, at No. 7 (AVR petition checked box indicating that its business is "Single Asset Real Estate" as defined in 11 U.S.C. § 101(51)(B)).  Its sole material asset is an 800-acre luxury ranch outside Aspen, Colorado (the "<u>Ranch</u>").  *See* ECF No. 56 ("<u>AVR's Schedules</u>") at Schedule A/B No. 55.[4]

---

[4]    The various other assets listed on AVR's Schedules are comparatively de minimis.  *See id*. at Schedule A/B No. 1 (valuing non-real property assets at $400,000).

AVR averages approximately $1 million of annual gross revenue from its supposed operations. *See* AVR's SOFA at No. 1.[5]

14.     AVR's Schedules show that the Lender Parties are the only AVR creditors with a lien on the Ranch, except for an approximately $76,000 tax debt owed to Pitkin County, Colorado. *See id*. at Schedule D.  Aside from AVR's guarantee obligations to the Lender Parties and intercompany loans to insiders (Ajax Holdings and "TKCL Loan"), AVR's Schedules list few claims, totaling approximately $1 million, most of which are $3,000 or less.  *See id*. at Schedule D & E/F.[6]

     **B.**     <u>**The Debtors Guaranteed Souki's Loans and Granted the Lender Parties Security Interests in Their Only Material Assets, and Souki Defaulted.**</u>

15.     These chapter 11 cases are the latest in a series of efforts by Souki and the Debtors, acting under his control, to avoid the consequences of Souki's default on his loan obligations.

16.     Under certain agreements executed in 2017 and 2018, the Lenders loaned to Souki $138 million.  *See* Burke Decl. Exs. 2 & 3 (the "<u>Loan Agreements</u>").

17.     The Debtors guaranteed Souki's loan obligations, agreeing "that upon the failure of [Souki] to pay any of the Obligations when and as the same shall become due, . . . [the Debtors] will upon demand pay, or cause to be paid, in Cash, to the Administrative Agent for the ratable benefit of [the Lenders], an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations[.]"  Loan Agreements § 7.2; *id*. § 7.1.

---

[5]     According to the Debtors, after Souki defaulted on his obligations under the Loan Agreements and failed to market and sell the Ranch, Souki's family moved out of the Ranch houses and attempted to rent the properties, apparently with very little success.  Objection to Claims and Complaint, Adv. No. 23-09003, ECF No. 1, ¶ 30.

[6]     There is substantial doubt that the intercompany claims listed on AVR's Schedules are, in fact, claims against AVR, as opposed to AVR's affiliates.  The Lender Parties have sought discovery pursuant to Bankruptcy Rule 2004 in connection with these claims and reserve all rights to challenge the validity of these claims.

18.     Souki, Strudel, and other pledgors granted the Administrative Agent (for the benefit of the Lenders) security interests in various assets, including all "right, title and interest in and to":

- Souki's luxury yacht, the "Tango";

- 25 million shares of common stock that Souki owned in Tellurian Inc. ("Tellurian"), a publicly traded natural gas company he co-founded (the "Tellurian Shares");

- Souki's 100% membership interest in AVR; and

- Strudel's 50% equity interest in Ajax Holdings ("Strudel's Ajax Interest").

*See* Burke Decl. Exs. 4 & 5 ("Pledge Agreements") § 2.

19.     AVR, in turn, granted the Administrative Agent a deed of trust for the Ranch. *See* Burke Decl. Exs. 6 & 7 (the "Deeds of Trust").

20.     After multiple amendments to the Loan Agreements gave Souki additional time to repay his debts, the loans matured on May 6, 2020.  Burke Decl. Ex. 8 (Amendment No. 6 to 2017 Loan Agreement); *id*. Ex. 9 (Amendment No. 4 to 2018 Loan Agreement).  Souki failed to satisfy his obligations (and still has not done so today).  Souki and the Debtors have acknowledged several events of default under the Loan Agreements, and that "all outstanding Indebtedness is payable in accordance with the terms of the Loan [Agreements]."  Burke Decl. Exs. 10 & 11 § 5.1 & sched. I.

21.     The loan and security agreements collectively provide that if there is an event of default, the Administrative Agent may: declare the loans to Souki immediately due and payable (Loan Agreements § 8); "*at any time*" "[l]iquidate, withdraw or sell all or any part of" the Tellurian Shares, the Tango, and/or Strudel's Ajax Interest and apply the proceeds to the amounts due under the Loan Agreements (Pledge Agreements § 7(f)) (emphasis added); and foreclose on the Ranch (Deeds of Trust Art. 4).

22.     As relevant to AVR, the Pledge Agreements further provide that upon an event of default, "all rights of each Pledgor [to exercise voting rights and powers and to receive any distributions arising from or relating to the Collateral] shall cease, and all voting rights and powers and rights to distributions included in the Collateral . . . shall thereupon become vested in the Administrative Agent, and the Administrative Agent shall thereafter have the sole and exclusive right and authority to exercise such voting rights and powers."  Pledge Agreements § 6(b).

### C.     After a Lengthy Forbearance, the Lender Parties Began Foreclosing.

23.     As the maturity date approached, the parties entered into two bridge agreements pursuant to which the Lender Parties agreed to forbear through an outside date to allow more time to negotiate a good-faith resolution.  Burke Decl. Exs. 10 & 11 ("Bridge Agreements").  But the Bridge Agreements made clear that once the forbearance period expired, "the Administrative Agent may . . . foreclose upon and/or dispose of any of the Collateral" "at the time and in such manner that the Administrative Agent determines in its sole and absolute discretion; provided that the Administrative Agent and the Lenders will use their commercially reasonable efforts to avoid any material disruption of Tellurian's stock price during such process."  Bridge Agreements § 4.3(a).

24.     The forbearance period under the Bridge Agreements expired on March 30, 2021. *See* Bridge Agreements § 3.1.

25.     Rather than foreclose immediately, the Lender Parties spent another two years negotiating in good faith with Souki.[7]  In late 2022 and early 2023, however, the Lender Parties

---

[7]     Although they had no obligation to do so under the Loan Agreements or the Bridge Agreements, on May 26, 2022, more than two years after Souki's loans had matured, the Lender Parties gave formal notice to Souki of the expiration of the forbearance period under the Bridge Agreements and of his continuing default.  Burke Decl. Ex. 12.  This notice satisfied a statutory requirement under Colorado law to initiate foreclosure proceedings for the Ranch.  *See* Colo. Rev.

began to exercise their remedies.  Those efforts were continuing when the Debtors filed their chapter 11 petitions.

26.     ***Completed Prepetition: The Tellurian Shares and The Tango.***   On February 6, 2023, the Lender Parties foreclosed on the Tellurian Shares.  Starting on February 8, 2023 and continuing through April 5, 2023, the Lender Parties sold the shares in various increments (generally 5% or less of total volume per day) at the prevailing prices on the New York Stock Exchange.

27.     The Lender Parties also initiated foreclosure actions related to the Tango.  The sale of the Tango closed in May 2023.

28.     The actual proceeds received from the sales of the Tellurian Shares and the Tango were insufficient to satisfy Souki's outstanding obligations under the Loan Agreements, leaving a deficiency currently in an amount not less than approximately $99 million.  Burke Decl. Ex. 13.

29.     ***Interrupted by These Chapter 11 Cases: The Ranch and Strudel's Ajax Interest.*** The Lender Parties also initiated foreclosure proceedings for the Ranch before the petition date, but those proceedings were stayed by AVR's bankruptcy filing.[8]

30.     Consistent with applicable Colorado law, the Administrative Agent had filed in Colorado state court a verified motion for an order authorizing sale of the Ranch.  Burke Decl. Ex. 14.  The foreclosure sale had been scheduled to take place on August 9, 2023.

---

Stat. § 38-38-102.5.  Even after the May 26, 2022 notices, the Lender Parties continued to engage in good faith negotiations with the Souki parties.

[8]     The Lender Parties initially attempted to work with Souki on a cooperative basis and accommodate his attempts to sell various parcels of the Ranch.  Thus, in late 2021, the Lender Parties released their liens on three properties, which Souki sold for $46.5 million, $25 million of which was used to repay a first mortgage.  The Debtors did not sell any additional parcels in 2022 and have not identified a single reasonable third-party offer where the Lender Parties withheld permission to release their lien.

31.     In response to the motion, Souki and AVR filed an opposition which, among other things, argued that the Colorado court "should deny the [] motion because it asks the Court to decide a question—whether there is an ongoing default that would justify foreclosure—that the parties expressly agreed would be decided by a New York court under New York law."  Burke Decl. Ex. 15 ¶ 3.

32.     A hearing on the Administrative Agent's motion was scheduled for July 28, 2023. Burke Decl. Ex. 16.  But on July 27, 2023, the day before Souki would have been required to present his arguments to the Colorado court, Souki caused the Debtors to file chapter 11 petitions. Both the Colorado court hearing and the foreclosure sale were stayed by AVR's bankruptcy filing.

33.     The Lender Parties had also scheduled a foreclosure auction under the Uniform Commercial Code for the equity in Ajax Holdings, including both Strudel's Ajax Interest and the other 50% of Ajax Holdings' equity, which is held by a trust benefitting Souki's family, the Souki Family 2016 Trust.  Burke Decl. Ex. 17.  That foreclosure sale, which was scheduled for August 30, 2023, was also stayed with respect to Strudel's Ajax Interest by Strudel's bankruptcy filing.

**D.      The State Court Rejected the Debtors' Preliminary Injunction Requests.**

34.     More than four months before the petition date, on March 6, 2023, the Debtors, Souki, and the Trustees of the Souki Family 2016 Trust (collectively, the "Plaintiffs") filed suit in the Commercial Division of the New York Supreme Court (the "New York Action").  The complaint in that action (as amended) principally alleges that the Lender Parties breached their obligation to conduct the sale of the Tellurian Shares and the Tango in a commercially reasonable manner and to take commercially reasonable efforts not to materially disrupt the share price of Tellurian.  Burke Decl. Ex. 18.  Among other remedies, the Plaintiffs argued that the entirety of the remaining debt owed to the Lender Parties should be deemed extinguished.  *Id*. ¶¶ 81-82.

35.     Before the Debtors turned to this Court for chapter 11 relief, the state court already had preliminarily rejected the Plaintiffs' claims.  On April 3, 2023, the Plaintiffs moved for an emergency injunction, asking the New York court to stop sales of the Ranch and Strudel's Ajax Interest.  Their principal argument, and the basis for fraud claims against the Lender Parties, was that the Lender Parties agreed not to sell the Tellurian Shares until certain yet-to-occur milestones were met.  *See* Burke Decl. Ex. 19 at 6-7.  At the same time, they also argued that the Lender Parties should have sold the shares *earlier*, when the shares were trading at a brief three-year high, rather than waiting until February 2023.  *Id*.

36.     At a contested hearing on May 1, 2023, Justice Masley denied the Plaintiffs' motion, stating she was "not satisfied that the plaintiffs have established a likelihood of success on the merits."  Burke Decl. Ex. 20 at 52:11-13.  Addressing the Plaintiffs' claims related to the Tellurian Shares specifically, Justice Masley observed, "I just don't think that I can find that selling shares on the New York Stock Exchange over a two-month period, that it's commercially unreasonable."  *Id*. at 53:9-11.  Recognizing that the Plaintiffs were arguing *both* that the Lender Parties sold the Tellurian Shares too late *and* that they sold them too soon, Justice Masley held that the "too late" argument "doesn't work" because "you can not say that they should have sold sooner when your argument is that they couldn't sell sooner because they made an agreement to wait for milestones," and that the "too soon" argument "also doesn't work" because "you don't want to punish lenders for working or trying to work with parties."  *Id.* at 54:8-55:3.  Summarizing the Plaintiffs' argument to be that "lenders can not just do whatever they want and sell whenever they want and sell as much as they want," Justice Masley held "that's not the record that I have here."  *Id*. at 53:23-54:1.

37.     After the Lender Parties moved to dismiss the complaint, the Plaintiffs filed a second motion for a preliminary injunction and sought leave to amend their complaint for a second time.  Justice Masley summarily denied their second motion for a preliminary injunction without a hearing.  Burke Decl. Ex. 21.  The Plaintiffs subsequently filed their second amended complaint, dropping their fraud claims and advancing an entirely new theory for when the Lender Parties supposedly should have sold the Tellurian Shares.

38.     On July 25, 2023, the Lender Parties moved to dismiss the second amended complaint in the New York Action (which is virtually identical to the Debtors' adversary complaint in this Court).  Burke Decl. Ex. 22.

**E.      Having Failed to Obtain an Injunction and Facing a Motion to Dismiss, the Debtors Triggered the Automatic Stay and Refiled Their Litigation.**

39.     The state court's repeated denial of any preliminary injunction left the Lender Parties free to proceed with their scheduled foreclosures for the Ranch and Strudel's Ajax Interest.

40.     On July 27, 2023, just two days after the Lender Parties again moved to dismiss the operative complaint in the New York Action, the Debtors filed their chapter 11 petitions.  That same day, the Debtors, joined by the other Plaintiffs from the New York Action, filed their adversary complaint in this Court, which is a copycat of the second amended complaint in the New York Action.  *Compare* Burke Decl. Ex. 18 *with* Objection to Claims and Complaint, Adv. No. 23-09003, ECF No. 1 ("Adversary Complaint").  In their Adversary Complaint, the Debtors freely *admit* that they filed these chapter 11 cases to "forestall" the Lender Parties and "take advantage of the breathing spell afforded by the automatic stay."  Adversary Complaint ¶ 51.

11

## ARGUMENT

### I.   THESE CHAPTER 11 CASES ARE CLASSIC BAD FAITH FILINGS THAT SHOULD BE DISMISSED UNDER *LITTLE CREEK*

41.   Bankruptcy Code section 1112(b) authorizes the Court to dismiss a chapter 11 petition "for cause."  11 U.S.C. § 1112(b).  Although "cause" is a flexible concept, the Fifth Circuit has repeatedly held that "cause" for dismissal exists where a debtor filed its petition in bad faith. *In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991) ("The Bankruptcy Code provision that a Chapter 11 case may be dismissed 'for cause' has been interpreted to include the lack of good faith in its filing."); *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (recognizing that "[n]umerous cases have found a lack of good faith to constitute 'cause' . . . for dismissing the case").

42.   In *Little Creek*, the Fifth Circuit described the typical case dismissed on bad faith grounds as one in which "[s]everal, but not all, of the following conditions usually exist":

- "The debtor has one asset" and "secured creditors' liens encumber [that asset]";

- "The property usually has been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court" such that "[b]ankruptcy offers the only possibility of forestalling loss of the property";

- "[T]here are only a few, if any, unsecured creditors whose claims are relatively small"; and

- There are "no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization."

779 F.2d at 1072-73.[9]

43.     "Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation." *Id*. at 1073.  Thus, "[n]either the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions." *Id*.

44.     Here, the Debtors' chapter 11 cases *embody* the typical bad faith case described in *Little Creek*.  Having failed in their attempt to defend against the Lender Parties' imminent foreclosures in the New York Action, the Debtors filed their petitions to use the automatic stay as an alternative to the injunctive relief that Justice Masley denied and to evade Justice Masley's decision that the Plaintiffs' claims are unlikely to succeed.  The Bankruptcy Code does not protect this type of blatant forum shopping in a two-party dispute over a secured lending transaction.  And while that alone establishes the Debtors' bad faith, these cases run afoul of nearly all the other *Little Creek* criteria—the Debtors each have only one material asset and that asset is encumbered by the Lender Parties' liens and security interests, there are few unsecured creditors, and the Debtors have virtually no employees, cash flow, or funding for reorganization.  In short, the Debtors are not entitled to avail themselves of the protections provided by chapter 11.

A.     **The Debtors Filed These Chapter 11 Cases to Obtain a Substitute Stay of the Lender Parties' Imminent Foreclosures and to Shop for a New Forum in a Two-Party Dispute.**

45.     The timing and circumstances of the Debtors' chapter 11 filings mirror those of the bad faith filings described in *Little Creek*.  Apart from their obligations to the Lender Parties, the Debtors had no reason to seek chapter 11 protection.  The Debtors' petitions were not prompted

---

[9]     The Fifth Circuit also observed that "[t]here are sometimes allegations of wrongdoing by the debtor or its principals." *Id*. at 1073.

by any operational issue or liquidity event.  Rather, the sole impetus for the Debtors' bankruptcy filings—filed on the eve of the foreclosure hearing for the Ranch and one month before the scheduled auction for Strudel's Ajax Interest—was that the Debtors' material assets "ha[ve] been posted for foreclosure because of arrearages on the debt" that Souki owes to the Lender Parties under the Loan Agreements, which the Debtors guaranteed.  *See Little Creek*, 779 F.2d at 1073.

46.     The Debtors were "unsuccessful in defending actions against the foreclosure in state court," *see Little Creek*, 779 F.2d at 1073, with Justice Masley twice denying their motions for preliminary injunction and holding that the Debtors are unlikely to succeed on their claims. And they had doubled down on their New York Action by asking the Colorado court considering the Administrative Agent's motion for foreclosure on the Ranch to stay any foreclosure pending resolution of their claims in the New York Action.

47.     It was only after they twice failed to stop the foreclosures in New York, with the hearing on the Administrative Agent's Colorado motion imminent, that the Debtors took any steps toward seeking chapter 11 relief.  In other words, the Debtors filed these cases only after it became clear that "[b]ankruptcy offers the only possibility of forestalling loss of the property." *Little Creek*, 779 F.2d at 1073.  And now in chapter 11, the Debtors are admittedly "tak[ing] advantage of the breathing spell afforded by the automatic stay," Adversary Complaint ¶ 51, and seeking to relitigate their New York law claims against the Lender Parties before this Court.

48.     As the Fifth Circuit recognized in *Little Creek*, these facts demonstrate the Debtors' bad faith and establish "cause" to dismiss these cases under section 1112(b).  Other courts have likewise dismissed chapter 11 cases as bad faith filings on very similar facts.[10]  For example,

---

[10]     Consistent with *Little Creek*, courts in non-foreclosure contexts have similarly recognized that "filing in bad faith to secure a litigation advantage in another forum . . . necessitates a

Chief Judge Bohm held in *In re Triumph Christian Center, Inc.*, 493 B.R. 479 (Bankr. S.D. Tex. 2013), that a debtor's second chapter 11 petition was a bad faith filing under *Little Creek* where the debtor filed prepetition litigation in state court to stop its secured creditor from foreclosing. *Id*. at 495. The "most important" factors supporting Judge Bohm's conclusion that the debtor filed in bad faith were that the dispute was "essentially a two-party dispute between the [d]ebtor and [the secured creditor]," which held ninety-seven percent of the debtor's total debt, and that the dispute "was already in litigation in state court." *Id*. at 495. Judge Bohm concluded that there was "no good reason why the [d]ebtor should now be allowed to further forum shop" by filing bankruptcy and "looking to this court for protection" when it had already chosen its forum in state court. *Id.*

49. *In re Walter*, 108 B.R. 244 (Bankr. C.D. Cal. 1989), is also especially on point here. Following *Little Creek*, the *Walter* court dismissed a chapter 11 petition filed by debtors whose secured creditor was attempting to foreclose on their sole asset, a parcel of real property. *Id.* at 247-48. "[A]fter opting to litigat[e] their dispute with [the secured creditor] in a state court forum (and failing to obtain relief in that forum)," the debtors filed chapter 11 to "use [] the 'automatic stay' of Title 11 as a replacement for the unavailable state court 'preliminary injunction.'" *Id.* at

---

dismissal." *Investors Grp., LLC v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014) (internal citation omitted); *Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.)*, 431 F. App'x 272, 275 (5th Cir. 2011) (affirming dismissal of chapter 11 case where the purpose of the petition was to gain an unfair advantage in a shareholder derivative action); *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 264 (Bankr. N.D. Tex. 2021) (dismissing petitions where the debtor's objective was to deprive the New York Attorney General of the litigation remedy of dissolution); *In re Kickapoo Kennels, LLC*, Case No. 12–39321-HE–11, 2013 WL 3148656, at *2 (S.D. Tex. Jun. 19, 2013) (dismissing case where the debtor filed "in order to gain an unfair advantage in a two-party dispute" by delaying implementation of court order while the debtor pursued an appeal); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 168-69 (Bankr. S.D. Tex. 1989) (dismissing cases filed "to avoid the imposition and effect of [a] state court judgment on the debtor entities" where the "primary motivation" was to obtain "another chance at litigating the matters which were tried in the state court lawsuit"); *In re Davis*, 93 B.R. 501, 504 (Bankr. S.D. Tex. 1987) (petition filed in lieu of a supersedeas bond was a bad faith filing).

248.  The court concluded that the bankruptcy filing was "at bottom forum shopping, carried on after [the debtor] sought but failed to obtain relief against their secured creditor from state court." *Id.* at 250.  It therefore held that the petition was filed in bad faith.

50.     The Debtors' conduct here is strikingly similar to the bad faith filings in *Triumph* and *Walter*.  The Debtors (and their co-Plaintiffs) had already commenced litigation in state court against their only significant secured creditors, the Lender Parties.  And as in *Walter*, the Debtors had already attempted to obtain relief from the state court, requesting a preliminary injunction on two separate occasions, but failed to do so, including because the court held that the Debtors were unlikely to succeed on the merits of their claims.  *See* Burke Decl. Ex. 20 at 52:11-13 (New York court was "not satisfied that [Debtors] have established a likelihood of success on the merits").  Having failed to win in the New York Action, and with foreclosure looming, the Debtors decided to switch litigation forums and are now using the automatic stay as a substitute for a preliminary injunction that they failed to obtain.

51.     Further, as in *Triumph* and *Walter*, these cases are a two-party dispute between the Debtors and the Lender Parties.  Indeed, the Lenders' claims, which, after the sales of the Tellurian Shares and the Tango, total not less than approximately $99 million, represent more than 99% of the non-insider claims against AVR and 100% of the claims against Strudel.  If the Debtors are allowed to continue in this forum and fail to prove their claims against the Lender Parties, as the New York state court has already said is likely, each of the Debtors will be left with no equity in their only assets.  And if the Debtors do somehow succeed in their claims against the Lender Parties, the value of the Debtors' assets would far exceed the value of their liabilities, meaning there would be no need for these chapter 11 cases.  Thus, the only issue that needs to be resolved is the dispute between the parties over the validity of the Lender Parties' claims, which the

16

New York state court is already well situated to decide and which is in fact the agreed-upon forum for resolution of such claims.

52.     For this reason alone, the Court should dismiss these cases.

**B.      The Debtors Have No Going Concern to Protect, No Employees to Protect, and No Hope of Rehabilitation and, Thus, No Good Faith Basis for Filing.**

53.     Even if the Debtors had not been so transparent in their bad faith intentions, other *Little Creek* criteria still would support dismissal here:

- "The debtor has one asset" and "secured creditors' liens encumber [that asset]": The Debtors' own schedules confirm that each Debtor has only one material asset: Strudel's Ajax Interest, in the case of Strudel, and the Ranch, in the case of AVR. Strudel's Schedules at Schedule A/B No. 15; AVR's Schedules at Schedule A/B No. 55.  There is no dispute that the Lender Parties' liens and security interests encumber those assets.  *See* Burke Decl. Exs. 4-7.

- "[T]here are only a few, if any unsecured creditors whose claims are relatively small":  According to the Debtors' schedules, Strudel has *zero* unsecured creditors, and AVR's reported unsecured claims, excluding the dubious intercompany claims of their insiders, total less than $1 million, the vast majority of which is owed to a single creditor, the homeowner's association to which the Ranch belongs.  Strudel's Schedules at Schedules D & E/F; AVR's Schedules at Schedules D & E/F.

- There are "no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization":  Although the Debtors declined to file any declarations in support of these chapter 11 cases or any standard first day relief, on information and belief, neither Strudel nor AVR has any employees.  Strudel's SoFA shows that it has *zero* revenue, and AVR's SoFA

17

reports approximately $700,000 of *gross* revenue in 2023—hardly an "ongoing business" around which it could reorganize. Strudel's SOFA at No. 1; AVR's SOFA at No. 1. Moreover, the Debtors commenced these cases with a combined total of less than $30,000 cash-on-hand, and neither has sought debtor-in-possession financing, leaving them with no discernible way to fund these chapter 11 cases or their intended adversary proceeding, let alone a plan of reorganization. *See* AVR's Schedules at No. 5; Strudel's Schedules at No. 5.

54. In these circumstances, the law in the Fifth Circuit is clear: "[r]esort to the protection of the bankruptcy laws is not proper" because "there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation." *Little Creek*, 779 F.2d at 1073; *In re Zamora-Quezada*, 622 B.R. 865, 886 (Bankr. S.D. Tex. 2017) (finding no reasonable likelihood of rehabilitation because the debtor had no business prospects and was merely being wound down); *see also In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997) (case filed in bad faith when the debtor has "no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing").

55. Indeed, it should not be lost on this Court that the Debtors have shown no interest in reorganizing. The only substantive relief AVR has requested relates to a sale of the Ranch—the outcome the Lender Parties were pursuing through the Colorado foreclosure process. Strudel, for its part, has not taken *any* action in its case. And neither of the Debtors has filed a chapter 11 plan. As the Debtors candidly admitted, these cases serve only one goal: to frustrate the Lender Parties' efforts to exercise their bargained-for and statutory rights to foreclose on their collateral. Adversary Complaint ¶ 51. The Court should dismiss both of these bad faith cases for cause.

## II.     AVR'S CHAPTER 11 CASE SHOULD BE DISMISSED BECAUSE ITS PETITION IS ULTRA VIRES

56.     The Court should also dismiss AVR's chapter 11 petition for a second, independent reason:  It is ultra vires.  Souki, the individual who signed the resolutions authorizing AVR to file its petition (Case No. 23-90758, ECF No. 1 at 11–13), lacked the requisite authority to do so.

57.     Where a bankruptcy court "finds that those who purport to act on behalf of the [debtor] have not been granted authority by local law to institute proceedings, it has no alternative but to dismiss the petition."  *Price v. Gurney*, 324 U.S. 100, 106 (1945); *see also In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 207 (5th Cir. 2018) (state law determines who has the authority to file a voluntary petition on behalf of a corporation).

58.     Here, Souki is the sole member of AVR (AVR's SoFA at No. 28), and he pledged the "Capital Stock of AVR . . . owned by [Souki]" as part of the "Collateral" for his obligations under the Loan Agreements (Pledge Agreements § 2).

59.     The Pledge Agreements provide that "[u]pon the occurrence of an Event of Default . . . all voting rights and powers and rights to distributions included in the Collateral . . . shall thereupon become vested in the Administrative Agent, and the Administrative Agent shall thereafter have the sole and exclusive right and authority to exercise such voting rights and powers[.]"  Pledge Agreements § 6(b).

60.     As Souki and the Debtors have acknowledged, several events of default occurred under the Loan Agreements, long before the Debtors filed their chapter 11 petitions.  *See* Pledge Agreements § 5.1 & sched. I.

61.     Upon those events of default, the Pledge Agreements automatically divested Souki of any power to act for AVR, including by executing resolutions on AVR's behalf, and vested that power in the Administrative Agent.

62.     Because the Administrative Agent did not authorize AVR's chapter 11 filing, Souki's attempts to execute the resolutions attached to AVR's chapter 11 petition were ineffective and *void ab initio*.

63.     In these circumstances, there is "no alternative but to dismiss" AVR's petition. *Price*, 324 U.S. at 106.

## **CONCLUSION**

64.     For the foregoing reasons, the Lender Parties respectfully request that this Court enter an order dismissing these chapter 11 cases.

Dated: August 24, 2023

Respectfully,

ORRICK HERRINGTON &
SUTCLIFFE LLP

/s/ *Darrell Cafasso*
Laura Metzger*
Darrell Cafasso*
David Litterine-Kaufman*
Nicholas Poli*
Mark Franke*
Harry Murphy*
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
E-mail: lmetzger@orrick.com
        dcafasso@orrick.com
        dlitterinekaufman@orrick.com
        npoli@orrick.com
        mfranke@orrick.com
        hmurphy@orrick.com

-and-

ALSTON & BIRD LLP

/s/ *Sam Bragg*
Sam Bragg
Texas Bar No. 24097413
S.D. Tex. Bar. No. 3395594
2200 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 922-3400
Facsimile: (214) 922-3899
Email: Sam.Bragg@alston.com

-and-

William Hao*
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: William.Hao@alston.com

-and-

Ryan Wooten
609 Main Street, 40th Floor
Houston, TX 77002
Telephone: (713) 658-6617
Email: rwooten@orrick.com

James W. Burke**
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 339-8400
Email: jburke@orrick.com

Nick Sabatino**
400 Capital Mall, Suite 3000
Sacramento, CA 95814
Telephone: (916) 447-9200
Email: nsabatino@orrick.com

*Counsel for Nineteen77 Capital Solutions A LP and Bermudez Mutuari, Ltd.*

Chris Riley*
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Chris.Riley@alston.com

*Attorneys for Wilmington Trust National Association*

*Admitted *pro hac vice*
**Pro hac vice* application forthcoming