# EXHIBIT 3

EXECUTION VERSION

## LOAN AGREEMENT

This **LOAN AGREEMENT** (this "**Agreement**"), dated as of March 30, 2018 (the "**Effective Date**") among CHARIF SOUKI, with an address at 1201 Louisiana St., Suite 3100, Houston Texas 77002, in his individual capacity (the "**Borrower**"), CHARIF SOUKI, as Trustee of the SOUKI FAMILY 2016 TRUST effective March 11, 2016, as amended (the "**Trust**"), STRUDEL HOLDINGS LLC, a Texas limited liability company ("**Strudel**"), AJAX, an exempted company incorporated in the Cayman Islands with limited liability ("**Ajax Cayman**"), AVR AH LLC, a Colorado limited liability company ("**AVR**" and, together with the Trust, Strudel and Ajax Cayman and each entity that becomes a party to this Agreement as a Guarantor pursuant to <u>Section 3.2</u>, the "**Guarantors**"), each lender from time to time party hereto (each, a "**Lender**" and, collectively, the "**Lenders**") and WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") for the Lenders, provides the terms on which the Lenders shall lend to the Borrower and the Borrower shall repay the Lenders.  The parties agree as follows:

## 1.    DEFINITIONS; ACCOUNTING AND OTHER TERMS

**1.1**    **Definitions**.  As used in this Agreement, the following capitalized terms have the following meanings:

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereof.

"**Administrative Agent Fee Letter**" shall mean that certain fee letter agreement, dated on or about the date hereof, between the Administrative Agent and the Borrower.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in <u>Section 2.6(b)</u>.

"**Administrative Agent's Account**" means the account designated from time to time in writing as the "Administrative Agent's Account" by the Administrative Agent to the other parties hereto.

"**Administrative Questionnaire**" means an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; <u>provided</u> that the term "Affiliate" shall also include any Person that directly or indirectly owns more than 5.0% of any class of Capital Stock of the Person specified or that is an officer or director of the Person specified.

"**Aggregate Collateral Value**" shall mean the aggregate Asset Value of (i) the Capital Stock in Tellurian Inc. owned by the Borrower held in the Securities Account at any time, (ii) any other Capital Stock owned by the Borrower and held in the Securities Account approved by the Required Lenders in their sole discretion, (iii) any cash of the Borrower held in a blocked deposit account subject to a control agreement, in form and substance satisfactory to the

Administrative Agent and the Required Lenders, in favor of the Administrative Agent and (iv) from and after the Vessel Security Date, each of the vessels set forth on <u>Schedule 1.1(d)</u>, it being agreed that the Aggregate Collateral Value as of March 30, 2018 was $180,250,000, as set forth in <u>Schedule 1.1(a)</u>.

"**Agreement Value**" shall mean, for any Hedging Agreement of any Person, on any date of determination, the maximum aggregate amount (giving effect to any netting agreements) that such Person would be required to pay if such Hedging Agreement were terminated on such date.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereof.

"**Ajax Cayman**" shall have the meaning assigned to such term in the preamble hereof.

"**Ajax Entity**" shall mean Ajax Holdings and each of its direct and indirect subsidiaries.

"**Ajax Holdings**" shall mean Ajax Holdings LLC, a Colorado limited liability company.

"**Alpine Intercreditor Agreement**" shall mean that certain Intercreditor Agreement entered into as of the date hereof among AVR, the Administrative Agent, on behalf of the Secured Parties, and Alpine Bank, as lender under the Existing Alpine Facilities.

"**Applicable Margin**" shall mean, on any date of determination, (a) if the DTA Ratio is less than 40%, 10.0% and (b) if the DTA Ratio is greater than or equal to 40%, 14.0%. Any increase or decrease in the Applicable Margin resulting from a change in the DTA Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 5.2(d) setting forth the DTA Ratio; <u>provided</u>, <u>however</u>, that if a Compliance Certificate is not delivered to the Administrative Agent when due in accordance with such Section, then the pricing level set forth in clause (b) of the prior sentence shall apply as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered and shall remain in effect until the first Business Day after the date on which such Compliance Certificate is delivered to the Administrative Agent.

"**Asset Sale**" shall mean the sale, transfer or other disposition (by way of merger, casualty, condemnation or otherwise) by any Loan Party or Ajax Entity to any Person of any assets of such Loan Party or Ajax Entity in a single transaction or series of related transactions with an aggregate value in excess of $250,000; <u>provided</u> that with respect to the Trust, "Asset Sale" shall mean only the sale, transfer or other disposition by the Trust of the Trust Collateral, and not any of its other assets or property in the Trust Estate; <u>provided</u>, <u>further</u>, that with respect to the Capital Stock of Cheniere Energy, Inc. owned by the Borrower, "Asset Sale" shall exclude the 1,050,000 shares subject to the Borrower's divorce settlement agreement dated March 8, 2016.

"**Asset Value**" shall mean for any asset, the value of such asset determined using the lower of the asset's cost basis and its fair market value; <u>provided</u> that with respect to the value of the Capital Stock of Cheniere Energy, Inc. and Tellurian Inc., only fair market value shall be used in such determination.

"**Assignment of Entitlements**" shall mean the Assignment of Entitlements, Contracts, Rents and Revenues, dated as of the Effective Date, by and between AVR and the Administrative Agent.

"**Assignment and Assumption Agreement**" shall mean an Assignment and Assumption Agreement (in a form reasonably acceptable to the Administrative Agent) delivered to the Administrative Agent in connection with any assignment of a Lender's interest hereunder in accordance with Section 12.1.

"**AVR**" shall have the meaning assigned to such term in the preamble hereof.

"**AVR Assets**" shall mean, collectively (i) all Capital Stock of AVR owned or held by any Loan Party or Ajax Entity and (ii) all assets and property owned or held by AVR.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Beneficiary**" shall mean each Person that from time to time is a beneficiary of the Trust.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower**" shall have the meaning assigned to such term in the preamble hereof.

"**Breakage Event**" shall have the meaning assigned to such term in Section 2.7(c).

"**Business Day**" shall mean any day other than (a) a Saturday, a Sunday or other day on which banks in New York City are authorized or required by law to close and (b) if such day relates to any interest rate settings as to a LIBO Rate Term Loan, any fundings, disbursements, settlements and payments in respect of any such LIBO Rate Term Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such LIBO Rate Term Loan, any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

 "**Capital Lease Obligations**" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Capital Stock**" shall mean (a) in the case of a corporation, capital stock, (b) in the case of an exempted company with limited liability, shares (c) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (d) in the case of a partnership, partnership interests (whether general or limited), (e) in the case of a limited liability company, membership interests, (f) any other interest (including any trust interest) or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person and (g) any and all warrants, rights or options to purchase any of the foregoing.

-3-

"**Cash**" shall mean all cash in Dollars.

"**Cash Equivalents**" shall mean (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case, maturing within one year from the date acquired; (b) certificates of deposit with maturities of not more than 30 days from the date acquired, issued by any U.S. Federal or state chartered commercial bank of recognized standing, so long as (i) such bank has capital and unimpaired surplus in excess of $1,000,000,000 and (ii) such bank or its holding company has a short-term commercial paper rating of at least A-1 or the equivalent by S&P or at least P-1 or the equivalent by Moody's; (c) commercial paper issued by any Person incorporated under the laws of the United States or any state thereof and rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's, in each case, with maturities of not more than 30 days from the date acquired; and (d) investments in money market funds registered under the Investment Company Act of 1940, which have net assets of at least $1,000,000,000 and at least 95% of whose assets consist of securities and other obligations of the type described in clauses (a) through (c) above.

"**Cayman Equitable Share Mortgage**" shall mean an equitable share mortgage in respect of the shares of Ajax Cayman executed by the Borrower and the Administrative Agent, in form and substance satisfactory to the Required Lenders and the Administrative Agent.

"**Change in Law**" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Property. For the avoidance of doubt, with respect to the Trust, "Collateral" shall include only the Trust Collateral, and not any of the Trust's other assets or property in the Trust Estate.

"**Communication**" shall have the meaning assigned to such term in Section 10.

"**Compliance Certificate**" shall have the meaning assigned to such term in Section 5.2(d).

OHSUSA:766765284

"**Contractual Obligation**" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its assets or properties is bound.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Default**" shall mean any event which with notice or passage of time or both, would constitute an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.5(a).

"**Disbursement Date**" shall mean the Effective Date, the Second Disbursement Date or the Third Disbursement Date.

"**Dollars**", "**dollars**" or use of the sign "**$**" shall mean lawful money of the United States of America.

"**DTA Ratio**" shall mean, at any time, the quotient (expressed as a percentage) of (a) the aggregate outstanding principal amount of the Term Loans at such time, divided by (b) the Aggregate Collateral Value at such time (as calculated by the Lenders on the basis of the most recent financial statements and certificate delivered pursuant to Section 5.2(a) and Section 5.2(d) and other information reasonably available to them).

"**DTA Total Ratio**" shall mean, at any time, the quotient (expressed as a percentage) of (a) the sum of all Indebtedness and other liabilities (assuming a 20% tax rate on the Tellurian Shares) of the Loan Parties (excluding the Trust) and their respective subsidiaries at such time, divided by (b) the aggregate Asset Value of the Loan Parties (excluding the Trust) and their respective subsidiaries at such time (in each case, as calculated by the Lenders on the basis of the most recent financial statements and certificate delivered pursuant to Section 5.2(a) and Section 5.2(d) and other information reasonably available to them).

"**Early Payment Fee**" shall mean a fee equal to, on the date of the applicable prepayment or repayment, an amount determined by the Required Lenders equal to the present value at such date of each interest payment due on each Interest Payment Date on such portion of the Term Loans so prepaid or repaid during the period from such date through (and including) the first anniversary of the Effective Date (excluding accrued but unpaid interest as of such date of prepayment or repayment), discounted to the date of the prepayment at a rate equal to the Treasury Rate plus 0.50%; provided that such interest calculation shall be based upon the Applicable Margin plus the reasonably anticipated LIBO Rate, as determined by the Required Lenders on the basis of the forward one-month LIBOR curve, as promulgated by Bloomberg Financial Services or any other data provider reasonably acceptable to the Required Lenders. For purposes hereof, "Treasury Rate" shall mean, as of any date, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that

OHSUSA:766765284

has become publicly available at least two Business Days (but no more than five Business Days) prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data selected by the Required Lenders)).

"**Effective Date**" shall have the meaning assigned to such term in the preamble hereof.

"**Effective Date Term Loans**" shall have the meaning assigned to such term in <u>Section 2.2(a)(i)</u>.

"**Environmental Indemnity Agreement**" shall mean that certain Certificate and Indemnification Regarding Hazardous Substances, dated as of the Effective Date, executed by the Borrower and AVR in favor of the Administrative Agent on behalf of the Secured Parties.

"**Environmental Laws**" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Event of Default**" shall have the meaning assigned to such term in <u>Section 8</u>.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" shall mean any of the following Taxes, imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to any such Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed by the United States of America or by the jurisdiction (or any political subdivision thereof) under the laws of which such Recipient is organized or conducts business or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) that are Other Connection Taxes, (b) in the case of any Lender, any U.S. Federal withholding Taxes that are imposed on amounts payable to or for the account of such Lender with respect to an applicable interest under the Loan Documents pursuant to a law in effect on the date on which (i) such Lender acquires such interest or (ii) such Lender changes its lending office, except in each case to the extent that, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its

OHSUSA:766765284

lending office, (c) Taxes attributable to a Lender's failure to comply with Section 2.10(a) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"**Existing Alpine Facilities**" shall mean (a) the Business Loan Agreement dated as of August 30, 2013 between AVR and Alpine Bank and the Related Documents (as defined thereunder), each as in effect on the date hereof and (b) the Business Loan Agreement dated as of February 4, 2016 between AVR and Alpine Bank and the Related Documents (as defined thereunder), each as in effect on the date hereof.

"**Existing OCS Administrative Agent**" shall mean Wilmington Trust, National Association, as Administrative Agent under the Existing OCS Facility.

"**Existing OCS Facility**" shall mean the Loan Agreement, dated as of April 27, 2017, by and among the Borrower, each Guarantor (other than Ajax Cayman) and lender from time to time party thereto, and the Existing OCS Administrative Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Extended Maturity Date**" shall have the meaning assigned to such term in Section 2.3(a).

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"**FCPA**" shall have the meaning assigned to such term in Section 4.17.

"**Final Payment Fee**" shall have the meaning assigned to such term in Section 2.6(d).

"**GAAP**" shall mean United States generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination, in any case consistently applied.

"**Government Official**" shall mean (a) an executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or controlled company or business, (c) a political party or official thereof, or candidate for political office or (d) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank).

"**Governmental Approval**" shall mean any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"**Governmental Authority**" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee Fee Agreement**" shall mean that certain Guarantee Fee Agreement, dated as of March 30, 2018 by and among the Borrower and the Trust.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.1.

"**Guarantors**" shall have the meaning assigned to such term in the preamble hereof.

"**Guaranty**" shall mean the guaranty of the Guarantors set forth in Section 7.

"**Hazardous Materials**" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Hedging Agreement**" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement, other interest or currency exchange rate or commodity price hedging arrangement or other swap or derivative arrangement.

"**Improvements**" shall mean all buildings, fixtures, structures, parking areas, landscaping and other improvements whether existing now or hereafter constructed, together with all machinery and mechanical, electrical, HVAC and plumbing systems presently located thereon and used in the operation thereof, excluding (a) any such items owned by utility service providers, (b) any such items owned by tenants or other third parties unaffiliated with the Loan Parties or an Ajax Entity and (c) any items of personal property.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments (including all obligations under repo agreements), (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all monetary obligations of such Person under Synthetic Leases, (j) net obligations of such Person under any Hedging Agreements, valued at the Agreement

OHSUSA:766765284

Value thereof, (k) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock of such Person or any other Person or any warrants, rights or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (l) all obligations of such Person to make any capital contribution to any other Person, (m) all obligations of such Person as an account party in respect of letters of credit and (n) all obligations of such Person in respect of bankers' acceptances.    The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"**Indemnified Person**" shall have the meaning assigned to such term in <u>Section 12.2(a)</u>.

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in <u>clause (a)</u>, Other Taxes.

"**Interest Payment Date**" shall mean the fifteenth day of each calendar month (or if such day is not a Business Day, the next succeeding Business Day), beginning with April 16, 2018.

"**Interest Reserve Account**" shall have the meaning assigned to such term in the Pledge Agreement.

"**Interest Period**" shall mean, with respect to the Term Loans, each period commencing on a LIBOR Reset Date and ending on the day immediately preceding the then-next succeeding LIBOR Reset Date.

"**Interest Reserve Requirement**" shall mean, as of any date of determination, an amount equal to 100% of the aggregate amount of all interest payments scheduled to become due and payable hereunder (and which have not yet been paid) from such date of determination until and including the date 90 days thereafter, which calculation with respect to interest shall be based on the Applicable Margin plus the reasonably anticipated LIBO Rate, as determined by the Required Lenders on the basis of the forward one-month LIBOR curve, as promulgated by Bloomberg Financial Services or any other data provider reasonably acceptable to the Required Lenders.   The aggregate amount of the Interest Reserve Requirement as of the Effective Date is set forth on <u>Schedule 1.1(b)</u>.

"**Lenders**" shall have the meaning assigned to such term in the preamble hereof.

"**LIBO Rate**" shall mean, with respect to any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the interest settlement rates for deposits in Dollars (as set forth by (i) by the ICE Benchmark Administration, (ii) by any successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate or (iii) on the applicable Bloomberg screen page or by such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time, which selection shall be binding absent manifest error) for a period of one month; provided that, to the

extent that an interest rate for any Interest Period is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate *per annum* determined by the Administrative Agent, which determination shall be binding absent manifest error (including by reference to any applicable published market data) to be the average of the rates per annum at which deposits in Dollars are offered to the Administrative Agent for a period of one month by major banks in the London interbank market in London, England at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"**LIBOR Reset Date**" means the Effective Date and each Interest Payment Date occurring thereafter.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" shall mean, collectively, this Agreement, the Security Documents, the Environmental Indemnity Agreement, the Alpine Intercreditor Agreement, the OCS Intercreditor Agreement, the Administrative Agent Fee Letter, any note executed by the Borrower in favor of any Lender and any other document executed in connection with the foregoing.

"**Loan Parties**" shall mean, collectively, the Borrower and the Guarantors.

"**Margin Regulations**" shall mean all rules and regulations of the Board adopted pursuant to Section 7 of the Exchange Act as from time to time in effect (including Regulations T, U and X) and all official rulings and interpretations thereunder or thereof.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board.

"**Material Adverse Effect**" shall mean (a) a materially adverse effect on the assets, liabilities or financial condition of any Loan Party, (b) a material impairment of the ability of any Loan Party to perform any of such Loan Party's obligations under any Loan Document to which such Loan Party is a party or (c) a material impairment of the rights and remedies of or benefits available to the Secured Parties under any Loan Document.

"**Material Indebtedness**" shall mean Indebtedness (other than the Term Loans) of any Loan Party in an aggregate principal amount exceeding $250,000.

"**Maturity Date**" shall mean the Stated Maturity Date (as such date may be extended in accordance with Section 2.3(a)).

OHSUSA:766765284

"**Maximum Effective Date Term Loan Amount**" shall mean (a) with respect to each Lender, the amount set forth for such Lender on Schedule 2.2 and (b) with respect to all Lenders, $55,000,000 in the aggregate.

"**Maximum Second Disbursement Date Term Loan Amount**" shall mean (a) with respect to each Lender, the amount set forth for such Lender on Schedule 2.2 and (b) with respect to all Lenders, $10,000,000 in the aggregate.

"**Maximum Third Disbursement Date Term Loan Amount**" shall mean (a) with respect to each Lender, the amount set forth for such Lender on Schedule 2.2 and (b) with respect to all Lenders, $5,000,000 in the aggregate.

"**Moody's**" shall mean Moody's Investors Service, Inc., or any successor thereto.

"**Mortgaged Property**" shall mean, collectively, the Real Property (a) specified on Schedule 1.1(c), with respect to which a Mortgage is granted as of the Effective Date and (b) acquired after the Effective Date with respect to which a Mortgage is granted pursuant to this Agreement.

"**Mortgages**" shall mean the mortgages, deeds of trust, leasehold mortgages, assignments of leases and rents, modifications and other security documents delivered pursuant to clauses (i) and (iii) of Section 3.1(o) or otherwise pursuant to this Agreement.

"**Net Cash Proceeds**" shall mean (a) with respect to any Asset Sale of any Collateral, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) selling expenses (including reasonable broker's fees or commissions, legal fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale), (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale (provided that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by the asset sold in such Asset Sale and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset), and (b) with respect to any issuance or incurrence of Indebtedness, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses incurred in connection therewith.

"**Notice of Borrowing**" shall mean a written notice requesting a borrowing of Term Loans in form and substance satisfactory to each Lender and the Administrative Agent, which notice shall contain the information required by the second sentence of Section 2.2(b)(i).

"**Obligations**" shall mean (a) the due and punctual payment of (i) the principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Term Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each Early Payment Fee and the Final

OHSUSA:766765284

Payment Fee due under this Agreement, when and as due and (iii) all other monetary obligations of any Loan Party to any of the Secured Parties under this Agreement and each of the other Loan Documents, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual performance of all other obligations of any Loan Party under or pursuant to this Agreement and each of the other Loan Documents and (c) any amounts expended pursuant to statutory cure rights in respect of Indebtedness permitted under Section 6.1(b).

"**OCS Intercreditor Agreement**" shall mean the Intercreditor Agreement dated as of March 30, 2018 by and between the Administrative Agent, on behalf of the Secured Parties, and the Existing OCS Administrative Agent.

"**OFAC**" shall have the meaning assigned to such term in Section 4.16.

"**Other Connection Taxes**" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing the Tax (other than a connection arising from the execution, delivery or enforcement of, or performance under, or receipt of payments under any Loan Document, or from the sale or assignment of an interest in any Loan Document).

"**Other Taxes**" shall mean any and all present or future stamp, court, recording, filing, intangible, documentary or similar Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement or registration of, or performance under, or from the receipt or perfection of a security interest under or otherwise with respect to this Agreement or any other Loan Document (except any such Taxes that are Other Connection Taxes imposed with respect to an assignment).

"**Participant**" shall have the meaning assigned to such term in Section 12.1(c).

"**Participant Register**" shall have the meaning assigned to such term in Section 12.1(c).

"**Perfection Certificate**" shall mean that certain Perfection Certificate, dated as of the Effective Date, executed by the Borrower, Strudel, the Trust, Ajax Cayman and AVR.

"**Permitted Vessel Liens**" shall mean, in relation to any vessel set forth on Schedule 1.1(d):

(a)     the Ship Mortgage applicable to that vessel;

(b)     liens for unpaid crew's wages in accordance with first class yacht ownership and management practice;

(c)     liens for salvage;

> (d)  liens for master's disbursements incurred in the ordinary course of operation of that vessel; and
>
> (e)  any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of that vessel in accordance with first class yacht ownership and management practice and not as a result of any default or omission by any Loan Party, provided such liens do not secure amounts more than 30 days overdue (unless the overdue amount is being contested in good faith by appropriate steps) and subject, in the case of liens for repair or maintenance, to the applicable provisions of the Ship Mortgage applicable to that vessel.

"**Person**" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, trust, Governmental Authority or other entity. "*Person*" also includes the Trustee, acting in his, her or its capacity as trustee for the Trust.

"**Platform**" shall have the meaning assigned to such term in Section 10.

"**Pledge Agreement**" shall mean the Pledge Agreement, dated as of the Effective Date, among the Borrower, AVR, Strudel, the Trust and the Administrative Agent.

"**Real Property**" shall mean any present and future right, title and interest (including any fee simple estate, leasehold estate and subleasehold estate) in (a) any plots, pieces or parcels of land, (b) any improvements of every nature whatsoever (the rights and interests described in clauses (a) and (b) above being the "**Premises**"), (c) all easements, rights of way, gores of land or any lands occupied by streets, ways, alleys, passages, sewer rights, water courses, water rights and powers, and public places adjoining such land, and any other interests in property constituting appurtenances to the Premises, or which hereafter shall in any way belong, relate or be appurtenant thereto, (d) all hereditaments, gas, oil, minerals (with the right to extract, sever and remove such gas, oil and minerals), and easements, of every nature whatsoever, located in, on or benefiting the Premises and (e) all other rights and privileges thereunto belonging or appertaining and all extensions, additions, improvements, betterments, renewals, substitutions and replacements to or of any of the rights and interests described in clauses (c) and (d) above.

"**Recipient**" shall mean (a) the Administrative Agent, (b) any Lender or (c) any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document.

"**Register**" shall have the meaning assigned to such term in Section 12.1(b).

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and Transaction-related advisors of such Person and such Person's Affiliates.

OHSUSA:766765284

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"**Required Lenders**" shall mean, at any time, any combination of Lenders hereunder holding more than 66.66% of the sum of (i) the outstanding principal amount of the Term Loans at such time and (ii) aggregate unfunded commitments in respect of the Maximum Effective Date Term Loan Amount, Maximum Second Disbursement Date Term Loan Amount and Maximum Third Disbursement Date Term Loan Amount at such time.

"**Requirements of Law**" shall mean, as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its assets or property or to which such Person or any of its assets or property is subject.

"**Responsible Officer**" shall mean, with respect to any Person, any executive officer or financial officer or director of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"**S&P**" shall mean Standard & Poor's Financial Services LLC, a part of McGraw Hill Financial Inc., or any successor thereto.

"**Sanctions**" shall have the meaning assigned to such term in <u>Section 4.16</u>.

"**Second Disbursement Date**" shall have the meaning assigned to such term in <u>Section 2.2(a)(ii)</u>.

"**Second Disbursement Date Term Loans**" shall have the meaning assigned to such term in <u>Section 2.2(a)(ii)</u>.

"**Securities Act**" shall mean the U.S. Securities Act of 1933, as amended.

"**Secured Parties**" shall mean (a) the Lenders, (b) the Administrative Agent, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (d) the permitted successors and assigns of each of the foregoing.

"**Securities Account**" shall mean account SB07811 of the Borrower at UBS Financial Services Inc., which is subject to a first priority perfected lien and Securities Account Control Agreement in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Securities Account Control Agreement**" shall mean that certain Account Control Agreement, of even date herewith, between UBS Financial Services Inc., the Borrower and the Administrative Agent.

"**Security Documents**" shall mean the Pledge Agreement, the Cayman Equitable Share Mortgage, the Mortgages, the Ship Mortgages, the Assignment of Entitlements, the Alpine Intercreditor Agreement, the OCS Intercreditor Agreement, the Securities Account Control

-14-

Agreement, and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to <u>Section 5.7</u>.

"**Settlor**" shall mean Charif Souki in his capacity as settlor of the Trust.

"**Shares**" shall have the meaning assigned to such term in <u>Section 4.16(d)</u>.

"**Ship Mortgages**" shall have the meaning assigned to such term in <u>Section 3.2(f)</u>.

"**Ship Total Loss Proceeds**" means the proceeds of insurance or other moneys payable following the occurrence of a Total Loss (as defined in the applicable Ship Mortgage) of the applicable vessel.

"**Stated Maturity Date**" shall mean March 30, 2019.

"**Strudel**" shall have the meaning assigned to such term in the preamble hereof.

"**Synthetic Lease**" shall mean, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. Federal income tax purposes, other than any such lease under which such Person is the lessor.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, withholdings (including backup withholding), assessments, fees, assessments or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loans**" shall mean the Effective Date Term Loans, the Second Disbursement Date Term Loans and the Third Disbursement Date Term Loans.

"**Third Disbursement Date**" shall have the meaning assigned to such term in <u>Section 2.2(a)(iii)</u>.

"**Third Disbursement Date Term Loans**" shall have the meaning assigned to such term in <u>Section 2.2(a)(iii)</u>.

"**Total Net Worth**" shall mean the Asset Value of the aggregate assets of the Borrower on a consolidated basis, minus his aggregate liabilities on a consolidated basis (including contingent liabilities and assuming a 20% tax rate on the Tellurian Shares). For the avoidance of doubt, Total Net Worth shall exclude the Asset Value of the assets in the Trust.

"**Transaction**" shall mean (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Term Loans hereunder and (b) the payment of related fees and expenses.

"**Trust**" shall have the meaning assigned to such term in the preamble hereof.

OHSUSA:766765284

"**Trust Agreement**" shall mean that certain Trust Agreement effective March 11, 2016 (as amended, restated, supplemented or otherwise modified) executed by Charif Souki, as Settlor and as the Trustee.

"**Trust Collateral**" shall mean the Capital Stock owned by the Trust in Ajax Holdings.

"**Trust Consents**" shall mean (i) Acknowledgment, Consent, Modification and Waiver executed by Brooke A. Peterson as Trust Protector for the Souki Family 2016 Trust, dated as of March 28, 2018, (ii) Acknowledgment, Consent and Waiver executed by Christopher Souki as a beneficiary for the Souki Family 2016 Trust, dated as of March 28, 2018, (iii) Acknowledgment, Consent and Waiver executed by Karim Souki as a beneficiary for the Souki Family 2016 Trust, dated as of March 27, 2018, (iv) Acknowledgment, Consent and Waiver executed by Lina Souki as a beneficiary for the Souki Family 2016 Trust, dated as of March 28, 2018, (v) Acknowledgment, Consent and Waiver executed by Charif Souki as guardian of Samuel Souki as a beneficiary for the Souki Family 2016 Trust, dated as of March 20, 2018 and (vi) Acknowledgment, Consent and Waiver executed by Tarek Souki as a beneficiary for the Souki Family 2016 Trust, dated as of March 28, 2018.

"**Trust Estate**" shall mean the assets and property from time to time comprising the trust estate of the Trust.

"**Trust Related Person**" shall mean any of the following: (a) the Settlor, (b) any Beneficiary, (c) the spouse of the Settlor or any Beneficiary, (d) any lineal descendant (including by adoption) of a Person described in clause (a), (b) or (c), (e) any brother or sister of a Person described in clause (a), (b), (c) or (d) (each Person described in clauses (a), (b), (c), (d) or (e) a "**Family Member**"), (f) any of the following acting in his or her capacity as such: (i) an executor, administrator or personal representative of the estate of a Family Member, (ii) a trustee of the estate of a bankrupt or insolvent Family Member and (iii) a guardian or conservator of a Family Member who is adjudged disabled or incompetent by a court of competent jurisdiction, or (g) any trust (including a voting trust but excluding the Trust) established principally for the benefit of a Family Member.

"**Trustee**" shall mean, initially, Charif Souki, in his capacity as trustee of the Trust, and any successor trustee for the Trust from time to time appointed in accordance with the Trust Agreement.

"**Upfront Fees**" shall have the meaning assigned to such term in Section 2.6(a).

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"**Vessel Security Date**" shall mean the first date on which (a) the Administrative Agent has a first priority perfected security interest (subject to any Permitted Vessel Liens) in each of the vessels set forth on Schedule 1.1(d) by way of the Ship Mortgages and Required Lenders are satisfied as to compliance with all applicable representations, warranties and undertakings in

-16-

each of the Ship Mortgages and (b) the Administrative Agent has received the Cayman Equitable Share Mortgage, duly executed and delivered by each party thereto.

"**Wilmington Trust**" shall have the meaning given to such term in the preamble.

"**Withholding Agent**" means the Borrower and the Administrative Agent.

**1.2     Terms Generally**.  The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time, in each case, in accordance with the express terms of this Agreement, and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect on the date hereof.

**1.3     Ship Mortgages**.  Where the Ship Mortgages contain representations, warranties or undertakings in respect of the vessels thereunder which are more specific than those contained in this Agreement, the former shall take precedence over the latter and in the event of inconsistency the representations, warranties and undertakings in the Ship Mortgages shall prevail.

**2.     THE CREDIT AND TERMS OF PAYMENT**

**2.1     Promise to Pay**.  Subject to the terms of this Agreement, the Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the outstanding principal amount of the Term Loans and accrued and unpaid interest thereon as and when due in accordance with this Agreement.

**2.2     Term Loans**.

(a)     **Term Loans**.

(i)     Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make a term loan to the Borrower on the Effective Date (each, an "**Effective Date Term Loan**" and collectively, the "**Effective Date Term Loans**"), in the principal amount equal to the Maximum Effective Date Term Loan Amount for such Lender.  The Effective Date Term Loans shall be made by the Lenders ratably in relation to the aggregate Maximum Effective Date Term Loan Amount for all Lenders; provided that the failure of any Lender to make any Effective Date Term Loan shall not in itself relieve

-17-

any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Effective Date Term Loan required to be made by such other Lender). Notwithstanding the foregoing, should there be a failure by the Lenders to fund the Maximum Effective Date Term Loan Amount on the Effective Date, the Borrower may refuse to accept partial funding, upon which all monies and things of value given by the Loan Parties shall be promptly returned. Amounts paid or prepaid in respect of the Effective Date Term Loans may not be reborrowed.

(ii)     Subject to the terms and conditions and relying upon the representations and warranties herein set forth (including each of the conditions set forth in Section 3.2), each Lender agrees, severally and not jointly, to make a term loan to the Borrower after the Effective Date (each, a "**Second Disbursement Date Term Loan**" and collectively, the "**Second Disbursement Date Term Loans**") on the date specified in writing by the Borrower to the Administrative Agent in the Notice of Borrowing (which date shall be no less than 5 Business Days after date such Notice of Borrowing is delivered) (the "**Second Disbursement Date**") in the principal amount equal to the Maximum Second Disbursement Date Term Loan Amount for such Lender; provided that no Second Disbursement Date Term Loans shall be made after the date 30 days after the Effective Date. The Second Disbursement Date Term Loans shall be made by the Lenders ratably in relation to the aggregate Maximum Second Disbursement Date Term Loan Amount for all Lenders; provided that the failure of any Lender to make any Second Disbursement Date Term Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Second Disbursement Date Term Loan required to be made by such other Lender). Notwithstanding the foregoing, should there be a failure by the Lenders to fund the Maximum Second Disbursement Date Term Loan Amount on the Second Disbursement Date, the Borrower may refuse to accept partial funding, upon which all monies and things of value given by the Loan Parties shall be promptly returned. Amounts paid or prepaid in respect of the Second Disbursement Date Term Loans may not be reborrowed.

(iii)     Subject to the terms and conditions and relying upon the representations and warranties herein set forth (including each of the conditions set forth in Section 3.3), each Lender agrees, severally and not jointly, to make a term loan to the Borrower after the Second Disbursement Date (each, a "**Third Disbursement Date Term Loan**" and collectively, the "**Third Disbursement Date Term Loans**") on the date specified in writing by the Borrower to the Administrative Agent in the Notice of Borrowing (which date shall be no less than 5 Business Days after date such Notice of Borrowing is delivered) (the "**Third Disbursement Date**") in the principal amount equal to the Maximum Third Disbursement Date Term Loan Amount for such Lender. The Third Disbursement Date Term Loans shall be made by the Lenders ratably in relation to the aggregate Maximum Third Disbursement Date Term Loan Amount for all Lenders; provided that the failure of any Lender to make any Third Disbursement Date Term Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other

-18-

Lender to make any Third Disbursement Date Term Loan required to be made by such other Lender).  Notwithstanding the foregoing, should there be a failure by the Lenders to fund the Maximum Third Disbursement Date Term Loan Amount on the Third Disbursement Date, the Borrower may refuse to accept partial funding, upon which all monies and things of value given by the Loan Parties shall be promptly returned.  Amounts paid or prepaid in respect of the Third Disbursement Date Term Loans may not be reborrowed.

(b)     Borrowing Notice; Funding of Term Loans.

(i)     Each request for a borrowing of Term Loans shall be submitted to the Administrative Agent in writing not less than one (1) Business Day prior to the Effective Date (in the case of a borrowing of Effective Date Term Loans) or five (5) Business Days prior the requested date of such borrowing (in the case of a borrowing of Second Disbursement Date Term Loans or Third Disbursement Date Term Loans), and shall be in the form of a Notice of Borrowing appropriately completed and signed by a Responsible Officer of the Borrower.  The Notice of Borrowing shall specify (x) the requested date of the borrowing (which shall be a Business Day), (y) the principal amount of the Term Loans to be borrowed and (z) the wiring information of the account of the Borrower to which the proceeds of such borrowing (other than the portion thereof that is to be transferred to the Interest Reserve Account pursuant to clause (ii) below) are to be disbursed.  Following receipt of a Notice of Borrowing, the Administrative Agent shall promptly notify each Lender of its ratable amount of the Term Loans requested.

(ii)     Each Lender shall make the Term Loan to be made by it hereunder on the applicable Disbursement Date, by wire transfer of immediately available funds to an account designated by the Administrative Agent not later than 2:00 p.m. (Eastern time) on the Business Day specified in the Notice of Borrowing, and the Administrative Agent shall promptly wire the respective portion of such funds (x) first, to the Interest Reserve Account in an amount reasonably calculated by the Lenders and identified in writing by the Lenders to the Administrative Agent as sufficient, when combined with the funds (if any) then on deposit in the Interest Reserve Account, to satisfy the Interest Reserve Requirement on such Disbursement Date (and the Borrower hereby instructs the Administrative Agent to wire such amount to the Interest Reserve Account) and (y) second, with the remaining funds, to an account or accounts designated by the Borrower in the Notice of Borrowing, or, if a borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return all amounts received to the respective Lenders, without interest, within one Business Day thereafter.

(c)     Termination.  All commitments of each Lender to make any (i) Effective Date Term Loans shall automatically terminate upon the making of the Effective Date Term Loans on the Effective Date, (ii) Second Disbursement Date Term Loans shall automatically terminate upon the making of the Second Disbursement Date Term Loans on the Second Disbursement Date and (iii) Third Disbursement Date Term Loans shall automatically terminate upon the making of the Third Disbursement Date Term Loans on the Third Disbursement Date.

OHSUSA:766765284

**2.3    Repayments.**

(a)    <u>Repayment</u>.  To the extent not previously paid, all Term Loans shall be due and payable on the Stated Maturity Date together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment; <u>provided</u> that the Borrower may extend the Stated Maturity Date to the first anniversary of the Stated Maturity Date (the "<u>Extended Maturity Date</u>"), so long as (and as a condition precedent to any such extension):

(i)    the Borrower shall have delivered a written notice to the Administrative Agent, at least 30 days before the Stated Maturity Date, requesting the Extended Maturity Date;

(ii)    the representations and warranties set forth in <u>Section 4</u> and in each other Loan Document shall be true, accurate and complete in all material respects on the Stated Maturity Date, with the same effect as though made on and as of such date; <u>provided</u> that (x) such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof and (y) those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

(iii)    no Default or Event of Default shall have occurred and be continuing as of the Stated Maturity Date;

(iv)    the Borrower shall be in compliance with the financial covenants set forth in <u>Section 6.6</u> as of the Stated Maturity Date on the basis of the most recent financial statements delivered pursuant to <u>Section 5.2</u>;

(v)    the Borrower shall have repaid at least $10,000,000 of the principal amount of the Term Loans (together with accrued and unpaid interest on the principal amount repaid to but excluding the date of repayment) on or before the Stated Maturity Date; <u>provided</u> that no repayment shall be required pursuant to this clause so long as the DTA Ratio as of the Stated Maturity Date does not exceed 15.0%;

(vi)    the Borrower shall have paid to the Administrative Agent (for the ratable account of each Lender) an extension fee of $300,000;

(vii)    to the extent necessary, the Borrower shall have deposited funds into the Interest Reserve Account as of the Stated Maturity Date that are sufficient (as reasonably determined by the Required Lenders) to satisfy the Interest Reserve Requirement in light of the extension of the Maturity Date; and

(viii)    the Administrative Agent and the Lenders shall have received a certificate, dated as of the Stated Maturity Date and executed by the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (ii), (iii) and (iv) of this <u>Section 2.3(a)</u> (which certificate the Administrative Agent may rely on in extending the Stated Maturity Date in the Register).

OHSUSA:766765284

Following an extension pursuant to the forgoing, and to the extent not previously paid, all Term Loans shall be due and payable on the Extended Maturity Date together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(b)     <u>Voluntary Prepayments</u>.  Subject to <u>Section 2.6(c)</u> and <u>Section 2.6(d)</u>, the Borrower shall have the right at any time and from time to time to prepay the Term Loans in whole or in part, upon at least three Business Days' prior written notice to the Administrative Agent before 12:00 p.m. (noon), New York City time; <u>provided</u> that each partial prepayment shall be in a minimum amount of $5,000,000 and in increments of $1,000,000 in excess thereof. All prepayments under this <u>Section 2.3(b)</u> shall be subject to <u>Section 2.6(c)</u>, <u>Section 2.6(d)</u> and <u>Section 2.7(c)</u>, but otherwise without premium or penalty.  All prepayments under this <u>Section 2.3(b)</u> shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(c)     <u>Mandatory Prepayments</u>.

(i)     Not later than the first Business Day following the receipt of any Net Cash Proceeds by any Loan Party or Ajax Entity with respect to any Asset Sale, the Borrower shall apply, or shall cause to be applied, 100% of the amount of such Net Cash Proceeds to prepay outstanding Term Loans; <u>provided</u> that such application shall not be required with respect to any Asset Sale (other than any Asset Sale of any AVR Assets) so long as the Borrower shall be in compliance with the financial covenants set forth in <u>Section 6.6</u> both prior to and after giving effect to such Asset Sale.

(ii)     In the event that any Loan Party or any Affiliate of any Loan Party shall receive Net Cash Proceeds from the issuance or incurrence of Indebtedness for money borrowed of any Loan Party (other than any Indebtedness permitted under <u>Section 6.1</u>), the Borrower shall, substantially simultaneously with (and in any event not later than the first Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such Affiliate, apply, or cause to be applied, an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Term Loans.

(iii)     Not later than the first Business Day following receipt of any Ship Total Loss Proceeds by any Loan Party, Ajax Entity or the Administrative Agent, the Borrower shall apply, or shall cause to be applied, 100% of such Ship Total Loss Proceeds to prepay outstanding Term Loans.

(iv)     The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this <u>Section 2.3(c)</u>, (x) a certificate signed by the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (y) to the extent practicable, at least three days' prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date (which shall be a Business Day) and the principal amount of the Term Loans to be prepaid. All prepayments under this <u>Section 2.3(c)</u> shall be subject to <u>Section 2.6(c)</u>, <u>Section 2.6(d)</u> and <u>Section 2.7(c)</u>, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

OHSUSA:766765284

**2.4**     **Evidence of Debt**.

(a)     <u>Promissory Notes</u>.  Any Lender may request to the Borrower that the Term Loans made by such Lender hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form and substance reasonably acceptable to such Lender and the Borrower.

(b)     <u>Record of Debt</u>.

(i)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from the Term Loans made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(ii)     The Administrative Agent shall maintain accounts in which it will record (x) the amount of each Term Loan made hereunder, (y) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (z) the amount of any sum received by the Administrative Agent hereunder from the Borrower for the account of the Lenders and each Lender's share thereof.

(iii)     The entries made in the accounts maintained pursuant to <u>clauses (i)</u> and <u>(ii)</u> above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Term Loans or satisfy any other Obligations in accordance with their terms.  In the event of any inconsistency between the entries made pursuant to paragraphs (i) and (ii) of this Section 2.4(b), the accounts maintained by the Administrative Agent pursuant to paragraph (ii) of this Section 2.4(b) shall control.

**2.5**     **Interest**.

(a)     <u>Interest Rate</u>.  Subject to <u>Section 2.5(a)</u>, the outstanding principal amount of the Term Loans shall accrue interest at a floating per annum rate equal to the LIBO Rate <u>plus</u> the Applicable Margin, which interest shall be payable on each Interest Payment Date for the period from the immediately prior Interest Payment Date (or the Closing Date, in the case of the first Interest Payment Date) to but excluding such Interest Payment Date, in arrears, in accordance with <u>Section 2.5(d)</u>.

(b)     <u>Default Rate</u>.  If (i) the Borrower shall default in the payment of any principal of or interest on any Term Loan or any other amount due hereunder or under any other Loan Document or (ii) if any Event of Default under <u>Section 8</u> has occurred and is continuing and the Required Lenders so elect by written notice to the Administrative Agent, then, in the case of <u>clause (i)</u> above, until such defaulted amount shall have been paid in full or, in the case of <u>clause (ii)</u> above, from the date that such determination has been made by the Required Lenders

OHSUSA:766765284

and for so long as such Event of Default is continuing, to the extent permitted by law, all Obligations shall bear interest (after as well as before judgment), payable on demand, (i) in the case of the principal of the Term Loans, at the rate otherwise applicable to the Term Loans pursuant to Section 2.5(a) plus 5.0% *per annum* (or such lower *per annum* rate specified by the Required Lenders in writing to the Administrative Agent) and (ii) in all other cases, at a rate per annum equal to the rate that would be applicable to the Term Loans (assuming it to be drawn at such time) plus 5.0% *per annum* (or such lower *per annum* rate specified by the Required Lenders in writing to the Administrative Agent) (in each case, the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this Section 2.5(a) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.  Interest accruing at the Default Rate shall be payable on demand.

(c)     Computation; 360-Day Year.  In computing interest, the date of the making of any Term Loan shall be included and the date of payment shall be excluded; provided that if any Term Loan is repaid on the same day on which it is made, such day shall be included in computing interest on such Term Loan.  Interest shall be computed on the basis of a 360-day year for the actual number of days elapsed.  The applicable LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(d)     Payment; Interest Computation.  Unless otherwise noted herein, interest shall be payable on each Interest Payment Date.  On each Interest Payment Date, the Administrative Agent shall, and is hereby instructed by the Borrower to, withdraw the amount of such interest payment directly from the Interest Reserve Account and distribute such amount ratably to the Lenders in proportion to their respective Term Loans.  In the event insufficient funds are available from the Interest Reserve Account to make the full amount of any such payment on any Interest Payment Date, the Borrower shall pay directly by wire transfer of immediately available funds to the Administrative Agent's Account the amount by which the amount of the payment due on such Interest Payment Date exceeds the amount of available funds in the Interest Reserve Account on such Interest Payment Date, and the Administrative Agent will promptly distribute to each Lender its applicable share of such payment in like funds as received.  At the discretion of the Administrative Agent, any payments received by the Administrative Agent after 12:00 Noon (Eastern time) on any date shall be deemed received by the Administrative Agent on the next succeeding Business Day.

2.6     **Fees.**

(a)     Upfront Fees.  The Borrower shall pay to each Lender, through the Administrative Agent, an upfront fee (collectively, the "**Upfront Fees**") equal to 1.0% of the sum of such Lender's (i) Maximum Effective Date Term Loan Amount, (ii) Maximum Second Disbursement Date Term Loan Amount and (iii) Maximum Third Disbursement Date Term Loan Amount, which fee shall be earned and due and payable on the Effective Date.  A portion or the full amount of the Upfront Fees (that have not been credited in accordance with the above proviso) due to any Lender may, at the option of such Lender (and with written notice to the Administrative Agent prior to the Effective Date), be off-set against the amount of the Effective

OHSUSA:766765284

Date Term Loan to be funded by such Lender on the Effective Date; provided that any such off-set shall not reduce the principal amount of the Term Loans outstanding hereunder.

(b)     Administrative Agent Fees.    The Borrower agrees to pay to the Administrative Agent, for its own account, the fees and other amounts set forth in the Administrative Agent Fee Letter at the times and in the amounts specified therein (the "**Administrative Agent Fees**").  The Administrative Agent Fees shall be fully earned when due and shall not be refundable for any reason whatsoever and will be in addition to the reimbursement of the Administrative Agent's out-of-pocket expenses in accordance with Section 12.2.

(c)     Early Payment Fee.    In the event that prior to the Stated Maturity Date, the Borrower prepays or otherwise repays all or any portion of the principal of the Term Loans, or the Term Loans are accelerated or become due and payable in connection with any Event of Default, the Borrower shall, in each case, pay to the Lenders, through the Administrative Agent, the Early Payment Fee.  The Early Payment Fee shall be due and payable on the date of prepayment, repayment, other payment or acceleration.  For the avoidance of doubt, the Early Payment Fee shall become immediately due and payable as detailed in this Section 2.6(c), shall constitute part of the Obligations under this Agreement and the other Loan Documents and shall be due and payable by the Borrower immediately prior to, and notwithstanding, the automatic acceleration of the outstanding principal of the Term Loans and all other accrued Obligations.

(d)     Final Payment Fee.    In addition to the obligations contained in Section 2.6(c), in the event that on or prior to the Maturity Date, the Borrower prepays or otherwise repays all of the then outstanding Term Loans in full for any reason or the Term Loans are accelerated or become due and payable in connection with any Event of Default, the Borrower shall pay to the Lenders, through the Administrative Agent, an amount equal to $1,050,000 (the "**Final Payment Fee**").  The Final Payment Fee shall be due and payable on the date of such prepayment, repayment, other payment or acceleration.  Pursuant to Section 6.7, such payment shall be made by the Administrative Agent, at the written request of the Borrower, from the Interest Reserve Account (to the extent there are sufficient available funds in the Interest Reserve Account).  In the event there are excess funds in the Interest Reserve Account after payment of all Obligations in full (including the Final Payment Fee), the Administrative Agent shall promptly cause such excess funds to be transferred to the Borrower at such account of the Borrower as designated in writing by the Borrower.  For the avoidance of doubt, the Final Payment Fee shall become immediately due and payable as detailed in this Section 2.6(d), shall constitute part of the Obligations under this Agreement and the other Loan Documents and shall be due and payable by the Borrower immediately prior to, and notwithstanding, the automatic acceleration of the outstanding principal of the Term Loans and all other accrued Obligations.

(e)     Fees Generally.    All fees paid hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the fees payable hereunder shall be refundable under any circumstances.

OHSUSA:766765284

2.7    **Payments; Additional Costs; Breakage**.

(a)    <u>Payments Generally</u>.  All payments (including prepayments) to be made by any Loan Party under any Loan Document shall be made in immediately available funds in Dollars, without setoff or counterclaim, before 12:00 p.m. (noon), New York City time, on the date when due.  Payments of principal or interest received after 12:00 p.m. (noon), New York City time, will, in the discretion of the Administrative Agent, be considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.  Each such payment shall be made by wire transfer to the Administrative Agent's Account. The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)    <u>Change in Law</u>.  If any Change in Law increases any Lender's costs or reduces its income from the Term Loans (excluding Indemnified Taxes and Taxes described in <u>clauses (b)</u> through <u>(d)</u> of the definition of Excluded Taxes), the Borrower shall pay the actual and documented increase in cost or the actual and documented reduction in income or additional expense.  A certificate of any Lender setting forth the amount or amounts necessary to compensate such Lender as specified in this <u>Section 2.7(b)</u> shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within ten days after its receipt of the same.

(c)    <u>Breakage</u>.  The Borrower shall indemnify each Lender against any actual loss or expense that such Lender may sustain or incur as a consequence of (i) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in such Lender receiving or being deemed to receive any amount on account of the principal of any Term Loan prior to the end of the Interest Period in effect therefor, (any of the events referred to in this <u>clause (i)</u> being called a "**Breakage Event**") or (ii) any default in the making of any payment or prepayment required to be made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its actual cost of obtaining funds for the Term Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Term Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this <u>Section 2.7(c)</u> shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive absent manifest error.

2.8    **Pro Rata Treatment**.  Except as required under <u>Section 2.7(b)</u>, (a) each borrowing of Effective Date Term Loans, each payment or prepayment of principal of the Effective Date Term Loans, each payment of interest on the Effective Date Term Loans, and the payment of the Upfront Fees on the Effective Date shall be allocated pro rata among the Lenders in accordance with (i) on or prior to the Effective Date, their respective applicable Maximum Effective Date Term Loan Amounts and (ii) after the Effective Date, the respective principal amounts of their outstanding Effective Date Term Loans, (b) each borrowing of Second

Disbursement Date Term Loans, each payment or prepayment of principal of the Second Disbursement Date Term Loans and each payment of interest on the Second Disbursement Date Term Loans shall be allocated pro rata among the Lenders in accordance with (i) on or prior to the Second Disbursement Date, their respective applicable Maximum Second Disbursement Date Term Loan Amounts and (ii) after the Second Disbursement Date, the respective principal amounts of their outstanding Second Disbursement Date Term Loans, (c) each borrowing of Third Disbursement Date Term Loans, each payment or prepayment of principal of the Third Disbursement Date Term Loans and each payment of interest on the Third Disbursement Date Term Loans shall be allocated pro rata among the Lenders in accordance with (i) on or prior to the Third Disbursement Date, their respective applicable Maximum Third Disbursement Date Term Loan Amounts and (ii) after the Third Disbursement Date, the respective principal amounts of their outstanding Third Disbursement Date Term Loans and (d) each payment or prepayment of principal of the Term Loans and each payment of interest on the Term Loans shall be allocated pro rata among the Lenders in accordance with the respective principal amounts of their outstanding Term Loans.  Each Lender agrees that in computing such Lender's portion of any borrowing of Term Loans to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such borrowing to the next higher or lower whole Dollar amount.

2.9    **Sharing of Setoffs**.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under the Bankruptcy Code or any other applicable bankruptcy, insolvency or similar law or otherwise, or by any other means, obtains payment (voluntary or involuntary) in respect of any Term Loan or Term Loans as a result of which the unpaid principal portion of its Term Loans shall be proportionately less than the unpaid principal portion of the Term Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Term Loans of such other Lender, so that the aggregate unpaid principal amount of the Term Loans and participations in Term Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Term Loans then outstanding as the principal amount of its Term Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Term Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; provided that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.9 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest and (ii) the provisions of this Section 2.9 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement.  Each Loan Party expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Term Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by any Loan Party to such Lender by reason thereof as fully as if such Lender had made a Term Loan directly to the Borrower in the amount of such participation.

OHSUSA:766765284

**2.10    Taxes**.

(a)    <u>Payments Free of Taxes</u>.    All payments by any Loan Party under this Agreement or any other Loan Document shall be made to each Recipient free and clear of any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires deduction or withholding of any Tax from any such payment by any Withholding Agent, then the Applicable Withholding Agent shall be entitled to make a deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.  If so requested by any Recipient, the applicable Loan Party shall deliver to the Administrative Agent the original or a certified copy of each receipt evidencing payment of any Taxes made pursuant to this <u>Section 2.10</u>.  If any Taxes are required to be withheld or deducted from any amount payable by any Loan Party under this Agreement or any other Loan Document, and if such Tax is an Indemnified Tax, then the amount payable by such Loan Party shall be increased so that after all such required deductions or withholdings are made (including deductions or withholdings applicable to additional amounts payable under this <u>Section 2.10</u>), each Recipient receives an amount equal to the amount it would have received had no such deduction or withholding been made.

(b)    <u>Status of Lenders</u>.    Any Lender that is legally entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than an executed IRS Form W-9, W-8BEN, W-8BEN-E or W-8IMY, as applicable) shall not be required if in any Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(c)    <u>Indemnification by Borrower</u>.    The Borrower shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.10</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

-27-

(d)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such DIP (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.1(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

## 3.     **CONDITIONS OF THE TERM LOAN**

3.1     The Lenders' obligations to make the Effective Date Term Loans are subject to the following conditions precedent:

(a)     The representations and warranties set forth in Section 4 and in each other Loan Document shall be true, accurate and complete in all material respects on the Effective Date, with the same effect as though made on and as of such date; provided that (i) such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof and (ii) those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

(b)     At the time of and immediately after the making of the Effective Date Term Loans, no Default or Event of Default shall have occurred and be continuing.

(c)     Immediately after the making of the Effective Date Term Loans and the application of the proceeds thereof (i) the DTA Ratio shall not exceed 45.0%, (ii) the DTA Total Ratio shall not exceed 65.0% and (iii) Total Net Worth shall exceed $125,000,000.

(d)     The Administrative Agent and the Lenders shall have received a certificate, dated the Effective Date and signed by the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (a), (b) and (c) of this Section 3.1.

(e)     The Administrative Agent and the Lenders shall have received a favorable written opinion of (i) Pillsbury Winthrop Shaw Pittman LLP, New York and Texas counsel for the Loan Parties, (ii) Robinson, Diss and Clowdus, P.C., Colorado counsel for the Trust and (iii) Oates, Knezevich, Gardenswartz, Kelly & Morrow, P.C., Colorado counsel for the Loan Parties, (A) dated the Effective Date, (B) addressed to the Administrative Agent and the Lenders and (C) covering such matters relating to the Loan Documents and the transactions contemplated

OHSUSA:766765284

hereunder as any Lender shall reasonably request, and the Borrower hereby request such counsel to deliver such opinion.

(f)    The Administrative Agent and the Lenders shall have received (i) a copy of the certificate of formation certified as of a recent date by the Secretary of State of the state of its organization or certificate of incorporation, as applicable, including all amendments thereto, of each Guarantor (other than the Trust and Ajax Cayman), and a certificate as to the good standing of each Guarantor (other than the Trust and Ajax Cayman) as of a recent date, from such Secretary of State, (ii) a certificate of a Responsible Officer of each Guarantor (other than the Trust and Ajax Cayman) dated the Effective Date and certifying (A) that attached thereto is a true and complete copy of the operating agreement of such Guarantor as in effect on the Effective Date (if applicable), (B) that attached thereto is a true and complete copy of resolutions duly adopted by the directors, members or managers, as applicable, of such Guarantor authorizing the execution, delivery and performance of the Loan Documents to which it is a party, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation of such Guarantor have not been amended since the date of the last amendment thereto shown on the certificate furnished pursuant to clause (i) above (if applicable) and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party, (iii) a certificate of another officer  (where applicable) as to the incumbency and specimen signature of the Responsible Officer executing the certificate pursuant to clause (ii) above, (iv) a certificate of the Borrower as to the incumbency and specimen signature of the Borrower and (v) such other documents as the Lenders or the Administrative Agent may reasonably request.

(g)    The Administrative Agent and the Lenders shall have received (i) a certificate of a Responsible Officer of Ajax Cayman dated the Effective Date and certifying (A) that attached thereto is a true and complete copy of the memorandum and articles of association of Ajax Cayman, (B) that attached thereto is a true and correct copy of the certificate of incorporation of Ajax Cayman and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Ajax Cayman and (ii) such other documents as the Lenders or the Administrative Agent may reasonably request.

(h)    The Administrative Agent and the Lenders shall have received (i) a certificate of the Trustee dated the Effective Date and certifying that (A) attached thereto is a true and complete copy of the Trust Agreement as in effect on the Effective Date, (B) the Trustee is the duly qualified, appointed and acting trustee of the Trust and (C) no action has been taken or threatened in writing by the Settlor, the Trustee, any Beneficiary or any other Person seeking to revoke the Trust or challenging (I) the existence of the Trust, (II) the right of the Trustee to hold the Trust Estate in trust for the benefit of the Beneficiaries or (III) the power and authority of the Trustee to execute, deliver and perform the Loan Documents to which the Trustee is a party and (ii) such other documents as the Administrative Agent or any Lender may reasonably request with respect to matters of the authorization of the Trust to enter into the Transaction.

(i)    The Security Documents (other than the Ship Mortgages and the Cayman Equitable Share Pledge) shall have been duly executed by each party thereto and shall be in full

-29-

force and effect on the Effective Date.  The Administrative Agent shall have a perfected security interest in the Collateral of the type and priority described in each such Security Document.

(j)       The Administrative Agent and the Lenders shall have received all fees (including the Upfront Fees) and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses required to be reimbursed or paid by the Borrower under any Loan Document.  The Administrative Agent shall have received a fully executed copy of the Administrative Agent Fee Letter.

(k)       The Administrative Agent and the Lenders shall have received a certificate from the Borrower certifying that each Loan Party is and, after giving effect to the Effective Date Term Loans and the application of the proceeds thereof, will be solvent.

(l)       All requisite Governmental Authorities and third parties shall have approved or consented to the transactions contemplated hereby to the extent required or not otherwise waived in writing by the Administrative Agent and the Lenders (in their respective sole discretions), all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the transactions contemplated hereby.

(m)       The Lenders shall have received all of the financial statements requested by the Lenders with respect to the Loan Parties.

(n)       The Administrative Agent and the Lenders shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(o)       (i) Each of the Security Documents, in form and substance satisfactory to the Lenders, relating to the Mortgaged Property shall have been duly executed by the parties thereto and delivered to the Administrative Agent and shall be in full force and effect and, with respect to each Mortgage and the Assignment of Entitlements, in proper form for recordation, (ii) the Mortgaged Property shall not be subject to any Lien other than those permitted under Section 6.2, (iii) each Mortgage, Assignment of Entitlements, any UCC financing statements relating to the foregoing and any other applicable Security Documents shall have been filed and recorded in the recording office as specified on Schedule 3.1(o) (or a lender's title insurance policy, in form and substance acceptable to the Lenders, insuring such Security Document as a lien on such Mortgaged Property (subject to the Alpine Intercreditor Agreement, the OCS Intercreditor Agreement and any Lien permitted by Section 6.2) shall have been received by the Administrative Agent) and, in connection therewith, the Administrative Agent shall have received evidence satisfactory to the Lenders of each such filing and recordation, (iv) the Administrative Agent shall have received a policy or policies of title insurance in form and substance reasonably satisfactory to the Lenders, dated as of the Effective Date, insuring each Mortgage as a valid lien on the Mortgaged Property, free and clear of Liens other than those permitted under Section 6.2, which policy or policies shall (A) provide coverage in the amount

-30-

of $70,000,000, (B) be issued by a nationally recognized title insurance company, (C) contain such endorsements, coinsurance, affirmative coverages and reinsurance as may be requested by the Lenders and (D) name as the insured party the Administrative Agent, together with its successors and assigns, for the benefit of the Lenders and (v) the Administrative Agent shall have received such other documents, including surveys, abstracts, appraisals, property condition reports, reports concerning applicable zoning approvals, copies of certificates of occupancy, permits, environmental protection approvals and other licenses, consents and approvals required from all applicable Governmental Authorities under all applicable laws (including Environmental Laws) and legal opinions, as are required to be furnished pursuant to the terms of the Mortgages or as are reasonably requested by the Lenders.

(p)     The Administrative Agent and the Lenders shall have received a limited waiver and consent from the administrative agent and the lenders under the Existing OCS Facility, duly executed and delivered by each party thereto, in form and substance satisfactory to the Administrative Agent and the Lenders.

(q)     The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.9 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Administrative Agent as additional insured, in form and substance satisfactory to the Lenders.

(r)     The Administrative Agent shall have received a copy of the Environmental Indemnity Agreement, duly executed by each party thereto, which Environmental Indemnity shall be in full force and effect on the Effective Date.

(s)     The Alpine Intercreditor Agreement shall have been duly executed and delivered by all parties thereto.

(t)     The OCS Intercreditor Agreement shall have been duly executed and delivered by all parties thereto.

(u)     The Administrative Agent and the Lenders shall have received a duly executed Perfection Certificate with respect to the Loan Parties.

(v)     The Securities Account Control Agreement in form and substance reasonably satisfactory to the Administrative Agent and the Lenders shall have been duly executed and delivered by all parties thereto.

(w)     Each Lender shall have received a duly completed and executed Federal Reserve Form G-3.

(x)     The Administrative Agent shall have received in form and substance reasonably satisfactory to the Administrative Agent and the Lenders the duly executed Trust Consents.

(y)     The Administrative Agent shall have received in form and substance reasonably satisfactory to the Lenders the duly executed Guarantee Fee Agreement.

(z)     The Administrative Agent shall have received a Notice of Borrowing in respect of the Effective Date Term Loans.

The extension of the Effective Date Term Loans shall be deemed to constitute a representation and warranty by the Borrower on the Effective Date as to the matters specified in paragraphs (a), (b) and (c) of this Section 3.1.

Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, consent to, and/or approval of, each document, agreement, instrument or other item required to be delivered to, consented to, and/or approved by, the Administrative Agent or any Lender, as applicable, pursuant to this Section 3.1 and to have acknowledged that each of the conditions set forth in this Section 3.1 has been satisfied to its satisfaction.

**3.2**     The Lenders' obligations to make the Second Disbursement Date Term Loans are subject to the following additional conditions precedent:

(a)     The representations and warranties set forth in Section 4 and in each other Loan Document shall be true, accurate and complete in all material respects on the Second Disbursement Date, with the same effect as though made on and as of such date; provided that (i) such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof and (ii) those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

(b)     At the time of and immediately after the making of the Second Disbursement Date Term Loans, no Default or Event of Default shall have occurred and be continuing.

(c)     Immediately after the making of the Second Disbursement Date Term Loans and the application of the proceeds thereof (i) the DTA Ratio shall not exceed 45.0%, (ii) the DTA Total Ratio shall not exceed 65.0% and (iii) Total Net Worth shall exceed $125,000,000.

(d)     The Administrative Agent and the Lenders shall have received a certificate, dated the Second Disbursement Date and signed by the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (a), (b) and (c) of this Section 3.2.

(e)     The Vessel Security Date shall have occurred.

(f)     The Administrative Agent and the Lenders shall have received statutory mortgages in a form satisfactory to the Administrative Agent and the Lenders covering each of the vessels set forth on Schedule 1.1(d) (the "**Ship Mortgages**") granting in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable

security interest in each such vessel under the foreign law applicable to such vessel, together with deeds of covenant, certificates, affidavits, instruments, legal opinions, consents, notices and other documents reasonably requested by the Administrative Agent and the Lenders.

(g)     Each Affiliate or subsidiary of the Borrower who is the owner of a vessel set forth on Schedule 1.1(d) shall, to the extent not already a party hereto, have become a Guarantor hereunder by way of execution of a joinder agreement in form and substance satisfactory to the Administrative Agent and the Lenders and, in connection with the foregoing, the Borrower shall have delivered to the Administrative Agent, with respect to each new Guarantor to the extent applicable, any documentation requested by any Lender  or the Administrative Agent with respect to Section 3.1(f), Section 3.1(g), Section 3.2(h) and Section 5.2(g).

(h)     The Administrative Agent and the Lenders shall have received (i) a certificate of incorporation, including all amendments thereto, of Ajax Cayman and a certificate as to the good standing of Ajax Cayman as of a recent date, from the Registrar of Companies in the Cayman Islands, (ii) a true and complete copy of resolutions duly adopted by the directors, members or managers, as applicable, of Ajax Cayman authorizing the execution, delivery and performance of the Loan Documents to which it is a party and (iii) such other documents, instruments and certificates as the Lenders or the Administrative Agent may reasonably request, including in respect of Ajax Cayman, its current register of directors, register of members and register of mortgages and charges (if any).

(i)     Each Lender shall have received a duly completed and executed Federal Reserve Form G-3.

(j)     The Administrative Agent shall have received a Notice of Borrowing in respect of the Second Disbursement Date Term Loans within the time period specified in Section 2.2(b)(i).

The extension of the Second Disbursement Date Term Loans shall be deemed to constitute a representation and warranty by the Borrower on the Second Disbursement Date as to the matters specified in paragraphs (a), (b) and (c) of this Section 3.2.

**3.3**     The Lenders' obligations to make the Third Disbursement Date Term Loans are subject to the following additional conditions precedent:

(a)     The representations and warranties set forth in Section 4 and in each other Loan Document shall be true, accurate and complete in all material respects on the Third Disbursement Date, with the same effect as though made on and as of such date; provided that (i) such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof and (ii) those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

(b)     At the time of and immediately after the making of the Third Disbursement Date Term Loans, no Default or Event of Default shall have occurred and be continuing.

(c)     Immediately after the making of the Third Disbursement Date Term Loans and the application of the proceeds thereof (i) the DTA Ratio shall not exceed 45.0%, (ii) the DTA Total Ratio shall not exceed 65.0% and (iii) Total Net Worth shall exceed $125,000,000.

(d)     The Administrative Agent and the Lenders shall have received a certificate, dated the Third Disbursement Date and signed by the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (a), (b) and (c) of this Section 3.3.

(e)     The volume weighted-average price of the shares of Tellurian Inc. (ticker: TELL) for the thirty consecutive trading days immediately preceding the Third Disbursement Date exceeds $7.50 per share.

(f)     Each Lender shall have received a duly completed and executed Federal Reserve Form G-3.

(g)     The Administrative Agent shall have received a Notice of Borrowing in respect of the Third Disbursement Date Term Loans within the time period specified in Section 2.2(b)(i).

The extension of the Third Disbursement Date Term Loans shall be deemed to constitute a representation and warranty by the Borrower on the Third Disbursement Date as to the matters specified in paragraphs (a), (b) and (c) of this Section 3.3.

## 4.     REPRESENTATIONS AND WARRANTIES

The Loan Parties jointly and severally represent and warrant to the Administrative Agent and each Lender as follows:

### 4.1     Organization; Power.

(a)     Each Loan Party (that is not a natural person or the Trust) (a) is duly organized or incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization/incorporation, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect. Each Loan Party has the power and authority to execute, deliver and perform such Loan Party's obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which such Loan Party is or will be a party and to borrow hereunder.

(b)     The Trust is duly formed and existing under the laws of the State of Colorado. Colorado law governs the validity, construction and administration of the Trust. The

OHSUSA:766765284

Trustee is the duly appointed and authorized trustee of the Trust and has all requisite power and authority to hold the Trust Estate in trust for the benefit of the Beneficiaries pursuant to the terms of the Trust Agreement. The Trust has the power and authority under the laws of the State of Colorado and under the Trust Agreement to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which the Trust is or will be a party with the Administrative Agent or any Lender pursuant to the terms of this Agreement. No action has been taken or threatened in writing by the Settlor, the Trustee, any Beneficiary or any other Person seeking to revoke the Trust or challenging (i) the existence of the Trust, (ii) the right of the Trustee to hold the Trust Estate in trust for the benefit of the Beneficiaries or (iii) the power and the authority of the Trustee to execute, deliver and perform her obligations under this Agreement and the other Loan Documents to which the Trustee is a party.

      **4.2**    **Authorization**. The execution, delivery and performance by each Loan Party of the Loan Documents to which such Loan Party is a party (a) with respect to each Loan Party (that is not a natural person) have been duly authorized by all requisite corporate, limited liability company, trust, Trustee and, if required, stockholder action or member action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the Trust Agreement or, if applicable, of the certificate or articles of formation or other constitutive documents or operating agreement of such Loan Party, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which such Loan Party is a party or by which such Loan Party or any of such Loan Party's property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by such Loan Party (other than any Liens created hereunder). To the extent required, each Loan Party has obtained such consents as may be required to affirm the authorizations set forth in this <u>Section 4.2</u>.

      **4.3**    **Enforceability**. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document when executed and delivered by such Loan Party will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally or general principles of equity.

      **4.4**    **Governmental Approvals**. No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the execution, delivery and performance by any Loan Party of the Loan Documents to which such Loan Party is a party, except for (a) the filing of Uniform Commercial Code financing statements, (b) the recordation of the Mortgage, and (c) such as have been made or obtained and are in full force and effect.

      **4.5**    **No Material Adverse Change**. No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

OHSUSA:766765284

**4.6    Title to Properties**.

(a)    Each Loan Party and each Ajax Entity has good and marketable title to, or valid leasehold interests in, all of such Person's material properties and assets (including the Trust Collateral), except for minor defects in title that do not interfere with such Person's ability to utilize such properties and assets for their intended purposes. All such material properties and assets (including the Trust Collateral) are free and clear of Liens, other than Liens expressly permitted by Section 6.2.

(b)    The Borrower owns, beneficially and of record 100% of the issued and outstanding Capital Stock of AVR and Strudel. The Trust owns, beneficially and of record 50% of the issued and outstanding Capital Stock of Ajax Holdings. Strudel owns, beneficially and of record 50% of the issued and outstanding Capital Stock of Ajax Holdings.

(c)    AVR has good and marketable direct title to the Mortgaged Property, except for minor defects in title that do not interfere with AVR's ability to utilize the Mortgaged Property for its intended purposes. Neither the Borrower nor AVR has received any notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Mortgaged Property or any sale of disposition thereof in lieu of condemnation. Neither the Borrower nor AVR is obligated under any right of first refusal, option or contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein.

(d)    The Borrower beneficially owns 25,000,000 shares of common stock, par value $0.01 per share, of Tellurian Inc. (the "**Shares**") in the Securities Account as of the Effective Date. The Shares are owned by the Borrower free and clear of any Liens, other than Liens pursuant to the Pledge Agreement and the Pledge Agreement (as defined in the Existing OCS Facility). The Shares were acquired by the Borrower on February 10, 2017 pursuant to an effective registration statement on Form S-4 under the Securities Act of 1933.

**4.7    Litigation**. There are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or Ajax Entity or any business, property, Trust Estate or rights of any Loan Party or Ajax Entity (a) that involve any Loan Document or the transactions contemplated thereunder or (b) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

**4.8    Agreements**. No Loan Party or Ajax Entity is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which such Loan Party or Ajax Entity is a party or by which such Loan Party or Ajax Entity or any of such Loan Party's or Ajax Entity's properties or assets (including the Trust Estate) are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

**4.9    Financial Condition**. All of the financial statements for each Loan Party and its subsidiaries delivered to the Administrative Agent or any Lender, including the financial statements delivered prior to the Effective Date and attached hereto as Schedule 4.9, are

OHSUSA:766765284

complete and correct in all material respects, list all assets and liabilities of the Loan Parties and their subsidiaries and do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.  There has not been any material deterioration in any Loan Party's or its subsidiaries' financial condition since the date of the most recent financial statements submitted to the Lenders.

**4.10    Solvency**.  Immediately after the consummation of the transactions contemplated hereunder and immediately following the making of the Term Loans and after giving effect to the application of the proceeds of the Term Loans, (a) the fair value of the assets of each Loan Party, at a fair valuation, will exceed such Loan Party's debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of such Loan Party's debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) each Loan Party will be able to pay such Loan Party's debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured and (d) each Loan Party (that is not a natural person) will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Effective Date.

**4.11    Regulatory Compliance**.

(a)    No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(b)    No Loan Party is engaged principally, or as one of such Loan Party's important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(c)    The borrowing of the Term Loans hereunder and the use of proceeds thereof will not violate or result in a violation of (i) the Securities Act or any regulations issued pursuant thereto, (ii) the Exchange Act (including Section 7 thereof) or any regulations issued pursuant thereto or (iii) the Margin Regulations.

(d)    No Loan Party or Ajax Entity, nor any Loan Party's or Ajax Entity's properties or assets, is in violation of, nor will the continued operation of such properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits), or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

(e)    Each Loan Party (that is not a natural person) and each Ajax Entity has obtained all permits, licenses, consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to maintain its assets and continue its businesses as currently conducted.

OHSUSA:766765284

**4.12**    **Tax Returns and Payments**.  Each Loan Party and each Ajax Entity has filed or caused to be filed all income and other Federal, state, local and foreign tax returns or materials required to have been filed by such Person and has paid or caused to be paid all income and other taxes due and payable by such Person and all assessments received by such Person (other than taxes, impositions, assessments, fees and charges currently being contested in good faith by appropriate proceedings, for which such Person has set aside adequate reserves in accordance with GAAP).

**4.13**    **Disclosure**.  Each Loan Party has disclosed to the Lenders all agreements, instruments and other restrictions to which such Loan Party is subject that purport to restrict (a) the ability of such Loan Party to incur Indebtedness or Liens or take any other actions, or engage in any other transactions, of the type contemplated by the Loan Documents, or (b) the sale, transfer, pledge or encumbrance of any of the Collateral.  None of the information, reports, financial statements, Perfection Certificate, exhibits or schedules furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in contemplation of, or in connection with the negotiation of, any Loan Document or included therein or delivered pursuant thereto contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading.

**4.14**    **Environmental Matters**.  Except with respect to any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or Ajax Entity (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received a notice of any claim with respect to any Environmental Liability and (iv) knows of any basis for any Environmental Liability.

**4.15**    **Security Documents**.

(a)    The Loan Parties are the direct, sole beneficial owners and sole holders of record of all of the Collateral and own all of the Collateral free and clear of Liens, other than Liens expressly permitted by Section 6.2.

(b)    The Pledge Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined in the Pledge Agreement) and the proceeds thereof, and when financing statements in appropriate form are filed in the office(s) specified on Schedule 4.15(b), the Lien created under the Pledge Agreement will constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral, in each case prior and superior in right to any other Person, other than with respect to Liens expressly permitted by Section 6.2.

(c)    The Mortgages are in proper form for recordation and are effective to create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Loan Parties' respective rights, title and interests in and to the Mortgaged Property thereunder and the proceeds thereof, and when each Mortgage is filed

-38-

in the appropriate office specified on Schedule 4.15(c), such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Property thereunder and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Liens expressly permitted by Section 6.2.

**4.16    Sanctioned Persons**.   No Loan Party, any subsidiary thereof nor, to the knowledge of any Loan Party, any director, officer, agent, employee or Affiliate of any Loan Party or any subsidiary thereof is an individual or entity that is, or is owned or controlled by Persons that are: (i) the subject of any sanctions ("**Sanctions**") administered or enforced by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"); (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including, currently, Crimea, Cuba, Iran and North Korea, and the Borrower will not directly or indirectly use the proceeds of any Term Loan or otherwise make available such proceeds to any Person for the purpose of financing the activities of any such Person.

**4.17    Foreign Corrupt Practices Act**.   The Loan Parties, their respective subsidiaries and their respective directors, officers, agents, employees and any Person acting for or on behalf of any Loan Party or any subsidiary thereof, have complied with, and will comply with, the U.S. Foreign Corrupt Practices Act, as amended from time to time (the "**FCPA**"), or any other applicable anti-bribery or anti-corruption law, and they have not made, offered, promised or authorized, and will not make, offer, promise or authorize, whether directly or indirectly, any payment, of anything of value to a Government Official while knowing or having a reasonable belief that all or some portion will be used for the purpose of: (a) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (b) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity or (c) securing an improper advantage, in each case in order to obtain, retain or direct business.

**4.18    Flood Hazard**.   With respect to each parcel comprising the Mortgaged Property, (i) the Administrative Agent has received such flood hazard certifications and searches, and, if such parcel is located in a special flood hazard area, copies of effective flood hazard insurance policies reasonably satisfactory to the Lenders, (ii) all flood hazard insurance policies required hereunder have been obtained and remain in full force and effect, and the premiums thereon have been paid in full, and (iii) there has been no redesignation of any portion of the Mortgaged Property into or out of a special flood hazard area.

**4.19    Mortgaged Property Boundaries**.   All of the Improvements lie wholly within the boundaries and building restriction lines of the Mortgaged Property and no improvements on adjoining properties encroach upon the Mortgaged Property, and no easements or other encumbrances upon the Mortgaged Property encroach upon any of the Improvements, so as to materially affect the value or marketability of the Mortgaged Property, except those which are insured against by the policy or policies of title insurance delivered to the Administrative Agent pursuant to Section 3.1(o).

**4.20    Leases**.   The Mortgaged Property is not subject to any Leases and no Person has any possessory interest in any portion of the Mortgaged Property or a right to occupy the same.

5.      **AFFIRMATIVE COVENANTS**

Each Loan Party covenants and agrees with the Administrative Agent and each Lender that so long as this Agreement shall remain in effect and until the principal of and interest on all of the Term Loans and all other Obligations shall have been paid in full, unless the Lenders shall otherwise consent in writing, such Loan Party will:

5.1     **Existence; Compliance with Laws**.

(a)      With respect to each Guarantor and Ajax Entity, do or cause to be done all things necessary to (i) preserve, renew and keep in full force and effect its legal existence and (ii) except for the Trust, maintain its good standing in its jurisdiction of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect.

(b)      With respect to each Guarantor and Ajax Entity, do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted; and at all times maintain and preserve all material property and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto.

(c)      Obtain all of the Governmental Approvals necessary for the performance by each Loan Party of such Loan Party's obligations under the Loan Documents to which such Loan Party is a party.   The Borrower shall promptly provide copies of any such obtained Governmental Approvals to the Administrative Agent.

(d)      Comply, and cause its subsidiaries to comply, with all Requirements of Law (including the Securities Act, the Exchange Act, the USA PATRIOT Act, all Sanctions, the FCPA and all applicable Environmental Laws) and all material Contractual Obligations.

5.2     **Financial Statements; Reports; Certificates**.  Provide the Administrative Agent (for distribution to the Lenders) with the following:

(a)      Monthly Financial Statements.  As soon as available, but not later than 30 days after the end of each fiscal month, each Loan Party's consolidated balance sheet, substantially in the form of Schedule 4.9 hereto, all certified by the Borrower as fairly presenting the financial condition of such Loan Party in accordance with GAAP consistently applied, subject to normal year-end audit adjustments.

(b)      [Reserved.]

OHSUSA:766765284

(c)     <u>Annual Financial Statements</u>.  As soon as available, but not later than 90 days after the end of each fiscal year, each Loan Party's balance sheet and related statements of income and cash flows, in a form reasonably acceptable to the Lenders, showing the financial condition of such Loan Party as of the close of such fiscal year, all certified by the Borrower as fairly presenting the financial condition and (if applicable) results of operations of such Loan Party in accordance with GAAP consistently applied.

(d)     <u>Certificate</u>. Concurrently with any delivery of financial statements under <u>paragraph (a)</u> or <u>(c)</u> above, a certificate executed by the Borrower in a form reasonably acceptable to the Lenders (a "**Compliance Certificate**") (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, (ii) setting forth computations in reasonable detail satisfactory to the Lenders demonstrating Total Net Worth and compliance with the covenants contained in <u>Section 6.6</u>, as of the end of such reporting period and (iii) certifying the balance in the Interest Reserve Account, specifying the Interest Reserve Requirement, and confirming that the amount on deposit in the Interest Reserve Account is not less than the Interest Reserve Requirement.

(e)     <u>Collateral</u>.  Promptly, but not later than seven Business Days after receipt by any Loan Party or Ajax Entity by mail, and not later than three Business Days after receipt by any Loan Party or Ajax Entity by facsimile, email or other electronic transmission, copies of any financial statements, account statements, reports, appraisals, valuations or other documents received by such Loan Party with respect to any Collateral or assets of an Ajax Entity that otherwise have not been made separately available to the Administrative Agent or the Lenders.

(f)     <u>Indebtedness</u>.  Promptly, but not later than seven Business Days after receipt by any Loan Party by mail and not later than three Business Days after receipt by any Loan Party by facsimile, email or other electronic transmission copies of any notices, consents, requests, approvals, demands or other communications received under (or in connection with) any Material Indebtedness of any Loan Party (including the Existing Alpine Facilities).

(g)     <u>KYC Documents</u>.  Promptly after the request by the Administrative Agent or any Lender, all documentation and other information that the Administrative Agent or such Lender, as applicable, reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(h)     <u>Other Information</u>.  Promptly, from time to time, such other information regarding the assets, liabilities and financial condition of any Loan Party, the Ajax Entities, the Collateral or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

**5.3     Litigation and Other Notices**.  Furnish to the Administrative Agent (for distribution to the Lenders) prompt written notice of the following:

OHSUSA:766765284

(a)     <u>Defaults</u>.  Any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto.

(b)     <u>Legal Action Notice</u>.  The filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against any Loan Party or Ajax Entity that (i) involves any of the Collateral or any Loan Document or (ii) could reasonably be expected to result in (A) a Material Adverse Effect or (B) damages or costs to any Loan Party or Ajax Entity of, individually or in the aggregate, $250,000 or more.

(c)     <u>Material Adverse Effect</u>.  Any development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

**5.4     Information Regarding Collateral**.  Promptly notify the Administrative Agent in writing if any material portion of any Collateral is damaged or destroyed.

**5.5     Obligations and Taxes**.  Pay each Loan Party's and Ajax Entity's Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all taxes, payments in lieu of taxes, if any filing, registration and recording fees, assessments and governmental charges or levies imposed upon any Loan Party or Ajax Entity or upon any Loan Party's or Ajax Entity's income or profits or in respect of any Loan Party's or Ajax Entity's property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; <u>provided</u> that such payment and discharge shall not be required with respect to any such tax, payment in lieu of taxes, filing, registration or recording fee, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and such Loan Party or Ajax Entity shall have set aside adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, tax, payment in lieu of taxes, filing, registration or recording fee, assessment or charge and enforcement of a Lien and, in the case of the Mortgaged Property, there is no risk of forfeiture of such property.

**5.6     Books and Records; Access to Properties and Inspections**.

(a)     With respect to each Loan Party (that is not a natural person) or Ajax Entity, at all times keep proper books of record and account in which full, true and correct entries will be made of such Loan Party's transactions in accordance with GAAP.

(b)     Permit any representatives designated by the Administrative Agent or any Lender to visit and inspect each Loan Party's or Ajax Entity's financial records and properties at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of such Loan Party or Ajax Entity with the independent accountants therefor.  The foregoing inspections shall be at the Borrower's sole expense.

OHSUSA:766765284

**5.7    Further Assurances**.  Execute (or cause to be executed) any and all further documents, financing statements, agreements and instruments, and take (or cause to be taken) all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust) that may be required under applicable law, or that the Administrative Agent or any Lender may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents.  Each Loan Party shall deliver (or cause to be delivered) to the Administrative Agent all such instruments and documents (including legal opinions and lien searches) as the Administrative Agent or any Lender shall reasonably request to evidence compliance with this Section 5.7.

**5.8    Interest Reserve Account**.  At all times maintain and preserve the Interest Reserve Account and the Administrative Agent's rights thereunder on behalf of the Secured Parties.  The Borrower shall at all times ensure that sufficient Cash is on deposit in the Interest Reserve Account to satisfy the Interest Reserve Requirement.

**5.9    Insurance.**

(a)    With respect to each Loan Party, keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law.

(b)    Cause all such policies covering any Collateral to be endorsed or otherwise amended to include a customary lender's loss payable endorsement, in form and substance satisfactory to the Required Lenders, which endorsement shall provide that, from and after the Effective Date, if the insurance carrier shall have received written notice from the Administrative Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the applicable Guarantor under such policies directly to the Administrative Agent or the Existing OCS Administrative Agent, as their interests may appear; deliver original or certified copies of all such policies to the Administrative Agent; cause each such policy to provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent (giving the Administrative Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent; deliver to the Administrative Agent, prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent) together with evidence satisfactory to the Required Lenders of payment of the premium therefor.

OHSUSA:766765284

(c)     If at any time the area in which the Premises (as defined in the Mortgages) are located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Required Lenders may from time to time require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as the Required Lenders may from time to time require.

(d)     With respect to any Mortgaged Property, carry and maintain comprehensive general liability insurance including the "broad form CGL endorsement" and coverage on an occurrence basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in no event for a combined single limit of less than that which is customary for similarly situated companies, naming the Administrative Agent as an additional insured, on forms satisfactory to the Lenders.

(e)     Notify the Administrative Agent in writing (who shall in turn notify the Lenders) promptly whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.9 is taken out by any Loan Party; and promptly deliver to the Administrative Agent a duplicate original copy of such policy or policies.

    **5.10     Title to the Mortgaged Property**.  Warrant and defend, subject only to Liens permitted pursuant to Section 6.2, (a) its title to the Mortgaged Property and every portion thereof and (b) the validity and priority of the Liens of each Mortgage and the Assignment of Entitlements on the Mortgaged Property, in each case, against the claims of all Persons whomsoever; and reimburse the Administrative Agent and the Lenders for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by the Administrative Agent or any Lender, as applicable, if an interest in the Mortgaged Property, other than as otherwise expressly permitted hereunder, is claimed by any Person, and such losses, costs, damages or expenses have not been reimbursed by the insurer of the title insurance obtained by the Administrative Agent over the Mortgaged Property.

    **5.11     Post-Effective Date Collateral**.  If at any time after the Effective Date and prior to the date upon which the principal of and interest on all of the Term Loans and all other Obligations have been paid in full, any Capital Stock owned by the Borrower in Cheniere Energy, Inc. (including the vested and unvested Restricted Stock granted to the Borrower pursuant to Cheniere Energy, Inc.'s 2011 Incentive Plan) ceases to be subject to enforceable restrictions on transfer or pledge that prohibit the grant of a security interest in such Capital Stock to the Administrative Agent, then the Borrower will, at its cost and expense, promptly (and in any event within 30 days) provide to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in all such Capital Stock as security for the Obligations pursuant to the actions contemplated by Section 5.7 or such other actions as reasonably requested by the Lenders.

    **5.12     Use of Proceeds**.  Use the proceeds of the Term Loans solely for (i) general purposes, including acquisition, renovation and improvement of certain properties (including

properties owned by AVR, Ajax Holdings and Ajax Entities), (ii) refinancing certain existing Indebtedness of the Loan Parties, (iii) funding of the Interest Reserve Account and (iv) payment of fees and expenses incurred in connection with the Transaction.

6. **NEGATIVE COVENANTS**

Each Loan Party covenants and agrees with the Administrative Agent and each Lender that, so long as this Agreement shall remain in effect and until the principal of and interest on all of the Term Loans and all other Obligations have been paid in full, unless the Lenders shall otherwise consent in writing, such Loan Party will not:

6.1    **Indebtedness**.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created hereunder and under the other Loan Documents;

(b)    Indebtedness created under the Existing Alpine Facilities in a collective aggregate amount (including all principal, interest, fees and other amounts outstanding) of up to $32,000,000;

(c)    Indebtedness set forth on Schedule 6.1(c);

(d)    Indebtedness of the Trust; provided that the Trust shall not incur, create, assume or permit to exist any Indebtedness secured by the Trust Collateral;

(e)    other Indebtedness of the Loan Parties (other than AVR), in each case, so long as (i) no Default or Event of Default shall have occurred and be continuing at the time of the incurrence of such Indebtedness and (ii) the Borrower shall be in compliance with the financial covenants set forth in Section 6.6 both prior to and after giving effect to the incurrence of such Indebtedness; and

(f)    Indebtedness created under the Existing OCS Facility in an aggregate principal amount of up to $25,000,000.

6.2    **Liens**.  Create, incur, assume or permit to exist any Lien on any property or assets (including Capital Stock or other securities of any Person) now owned or hereafter acquired by any Loan Party or on any income or revenues or rights in respect of any thereof, except:

(a)    any Lien created under the Loan Documents;

(b)    Liens for taxes not yet due or which are being contested in compliance with Section 5.5;

(c)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not due and payable or which are being contested in compliance with Section 5.5;

(d)    zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in

-45-

the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto;

(e)     Liens securing Indebtedness permitted by Section 6.1(b); provided that such Liens are subject to the Alpine Intercreditor Agreement;

(f)     Liens set forth on Schedule 6.2(f);

(g)     Liens securing Indebtedness permitted by Section 6.1(e), in each case, so long as (i) such Liens do not encumber any of the AVR Assets, (ii) no Default or Event of Default shall have occurred and be continuing at the time of the incurrence of such Lien and (iii) the Borrower shall be in compliance with the financial covenants set forth in Section 6.6 both prior to and after giving effect to the incurrence of such Lien;

(h)     judgment Liens securing judgments not constituting an Event of Default under Section 8;

(i)     Liens securing Indebtedness permitted by Section 6.1(f); provided that such Liens are subject to the OCS Intercreditor Agreement;

(j)     any Liens, obligations or restrictions set forth in documents listed in Schedule B of the title insurance policy issued to Administrative Agent by Commonwealth Land Title Insurance Company as Policy No. H0529806; and

(k)     any Permitted Vessel Liens;

provided that, notwithstanding the foregoing, no Loan Party shall create, incur, assume or permit to exist any Lien over the Capital Stock (or interest therein) of the Borrower in Cheniere Energy, Inc. now owned or hereafter acquired by any Loan Party or on any income or revenues or rights in respect of any thereof.

**6.3     Dispositions**. Make any Asset Sale unless (a) the Borrower (to the extent reasonably practicable) has provided at least three Business Days' prior written notice of such Asset Sale to the Administrative Agent and the Lenders, (b) no Default or Event of Default shall have occurred and be continuing, (c) such Asset Sale is for consideration solely in the form of Cash, (d) such consideration is at least equal to the fair market value of the assets subject to such Asset Sale (unless the Required Lenders have otherwise consented to the Asset Sale for a lesser consideration), (e) the Net Cash Proceeds of such Asset Sale are used to prepay the Term Loans if, and to the extent required under, Section 2.3(c) and (f) before and after giving effect to such Asset Sale and the prepayment of the Term Loans in accordance with Section 2.3(c), the Borrower shall be in compliance with the covenants contained in Section 6.6.

**6.4     Compliance; Use of Proceeds.**

(a)     Become an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(b)     Use the proceeds of the Term Loans, whether directly or indirectly, and whether immediately, incidentally or ultimately (i) in violation of any Margin Regulation or any other regulation of the Board, (ii) in contravention of any law or any Loan Document or (iii) to purchase or carry "margin stock" (as defined in the Margin Regulations) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

(c)     Take any action that violates or results in a violation of Section 7 of the Exchange Act or any regulations issued pursuant thereto.

(d)     The Borrower shall not use any proceeds of the Term Loans for personal, family, or household purposes, as such terms are defined under Federal law.

**6.5     No Impairment of Collateral**.

(a)     With respect to any Guarantor, permit any waiver, supplement, modification or amendment of such Loan Party's certificate of formation, operating, management or partnership agreement, Trust Agreement or other organizational documents, to the extent any such waiver, supplement, modification or amendment would be adverse to the Lenders.

(b)     Permit any waiver, supplement, modification or amendment of any of the Existing Mortgage Facilities, to the extent any such waiver, supplement, modification or amendment would be adverse to the Lenders.

(c)     Take (or consent or agree to) any other action that could impair the value of any Collateral or the Administrative Agent's (on behalf of the Secured Parties') security interest therein or their ability to sell or otherwise realize against such Collateral.

**6.6     Financial Covenants**.

(a)     <u>DTA Ratio</u>.  Permit the DTA Ratio at any time to exceed 45.0%.

(b)     <u>DTA Total Ratio</u>.  Permit the DTA Total Ratio at any time to exceed 65.0%.

(c)     <u>Total Net Worth</u>.  Permit Total Net Worth to be less than $125,000,000 at any time.

**6.7     Special Accounts**.

(a)     Withdraw any Cash from the Interest Reserve Account; <u>provided</u> that the Borrower may direct the Administrative Agent in writing to, and the Administrative Agent agrees that it shall, apply Cash from the Interest Reserve Account in order to make payments of principal on the Term Loans in accordance with the terms hereof if after giving effect to such payment, the Interest Reserve Requirement would continue to be satisfied in the reasonable determination of the Required Lenders (as evidenced by a written notice from the Required Lenders to the Administrative Agent).

-47-

(b)     Withdraw, sell, assign, convey, transfer or dispose of any of the Capital Stock from the Securities Account other than in accordance with <u>Section 6.3</u> of this Agreement.

**6.8     Control of Borrower**.  Permit any Person (pursuant to a court order or durable power of attorney) to take control of the management of all or a substantial portion of the financial affairs of the Borrower, unless such Person, within ten Business Days after such occurrence, provides the Administrative Agent and the Lenders such documents, and take such actions, as the Administrative Agent or any Lender may reasonably request to evidence the continued uninterrupted performance of each Loan Party's obligations hereunder and under all other Loan Documents.

**6.9     Change in Business**.  With respect to any Guarantor, (a) engage in any business other than the businesses engaged in by such Person as of the Effective Date or reasonably related thereto or (b) liquidate or dissolve.

**6.10     Mergers, Acquisitions, Etc.**

(a)     With respect to any Guarantor, (i) merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with such Guarantor or (ii) acquire all or substantially all of the Capital Stock or property of another Person.

(b)     With respect to the Borrower, cease to directly own, beneficially and of record 100% of the issued and outstanding Capital Stock of any of AVR, Strudel and Ajax Cayman.

(c)     With respect to Strudel, cease to directly own, beneficially and of record 50% of the issued and outstanding Capital Stock of Ajax Holdings.

(d)     With respect to the Trust, cease to directly own, beneficially and of record 50% of the issued and outstanding Capital Stock of Ajax Holdings.

**7.     <u>GUARANTY</u>**

**7.1     Guaranty of the Obligations**.  Each Guarantor, jointly and severally with the other Guarantors, hereby irrevocably and unconditionally guaranties to the Administrative Agent for the ratable benefit of the Secured Parties the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code) (collectively, the "**Guaranteed Obligations**"); <u>provided</u> that, notwithstanding the foregoing, the Guaranteed Obligations of the Trust shall be limited to not exceed the fair market value of the Trust Collateral.

**7.2     Payment by Guarantors**.  Each Guarantor jointly and severally hereby agrees, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against such Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Obligations when and as the same shall become due, whether at

OHSUSA:766765284

stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), such Guarantor will upon demand pay, or cause to be paid, in Cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Secured Parties as aforesaid; provided that the maximum amount payable by the Trust shall be limited to the fair market value of the Trust Collateral.

**7.3**    **Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, the Guarantors agree as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    the Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any of the Administrative Agent or Lenders with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge such Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any of the Administrative Agent or Lenders, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the

-49-

Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by the Administrative Agent for the benefit of the Secured Parties in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that the Administrative Agent or Lenders may have against any such security, in each case as the Administrative Agent or such Lender in its discretion may determine consistent herewith or any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of a Guarantor against the Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)      this Guaranty and the obligations of each Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not such Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Secured Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Secured Party's consent to the change, reorganization or termination of the corporate structure or existence of any subsidiaries of the Borrower and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses,

-50-

set-offs or counterclaims which the Borrower may allege or assert against any Secured Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.4 **Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from any Loan Party, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in <u>Section 7.3</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.5 **Guarantors' Rights of Subrogation, Contribution, etc.** Until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of their respective assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor

-51-

with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Secured Party now has or may hereafter have against the Borrower or any other Guarantor, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Secured Party.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor of the Guaranteed Obligations.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower, another Guarantor or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Secured Party may have against the Borrower, to all right, title and interest any Secured Party may have in any such collateral or security, and to any right any Secured Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.6    **Subordination of Other Obligations**.  Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.7    **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.8    **Authority of Guarantor or Borrower**.  It is not necessary for any Secured Party to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

7.9    **Financial Condition of Borrower**.  Any Term Loan may be made to the Borrower or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation.  No Secured Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or such Guarantor's assessment, of the financial condition of the Borrower.  Each Guarantor has adequate means to obtain information from the Borrower on a

-52-

continuing basis concerning the financial condition of the Borrower and the Borrower's ability to perform the Borrower's obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Secured Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Secured Party.

      **7.10**    **Bankruptcy, etc.**

      (a)    So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Administrative Agent acting pursuant to the instructions of Required Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against any Loan Party.  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Loan Party or by any defense which a Loan Party may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

      (b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Secured Parties that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations.  Each Guarantor will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

      (c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of each Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

OHSUSA:766765284

8.      **<u>EVENTS OF DEFAULT</u>**

In case of the happening of any of the following events (each, an "**Event of Default**"):

(a)      any representation or warranty made or deemed made in or in connection with any Loan Document or any Term Loan hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)      default shall be made in the payment of any principal of any Term Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)      default shall be made in the payment of any interest on any Term Loan or any fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d)      default shall be made in the due observance or performance by any Loan Party or Ajax Entity, as applicable, of any covenant, condition or agreement contained in (i) Section 5.1(a)(i), <u>5.2</u>, <u>5.3</u>, <u>5.8</u>, <u>5.11</u> or <u>5.12</u> or in <u>Section 6</u>, (ii) Section 4 of the Pledge Agreement or (iii) the undertakings in any of the Ship Mortgages relating to insurance or timely release from arrest;

(e)      default shall be made in the due observance or performance by any Loan Party or Ajax Entity, as applicable, of any covenant, condition or agreement contained in any Loan Document (other than those specified in (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days after the earlier of (i) notice thereof from the Administrative Agent or any Lender to the Borrower or (ii) knowledge thereof by any Loan Party;

(f)      (i) any Loan Party shall fail to pay any principal or interest, regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable, or (ii) any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; <u>provided</u> that this <u>clause (ii)</u> shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness or a voluntary early payment of the Material Indebtedness;

(g)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Loan Party or Ajax Entity or of a substantial part of the property or assets of any Loan Party or Ajax Entity under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency,

-54-

receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or Ajax Entity or for a substantial part of the property or assets of any Loan Party (excluding appointments of a trustee for the Trust) or Ajax Entity or (iii) the winding-up or liquidation of any Loan Party or Ajax Entity; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)     any Loan Party or Ajax Entity shall (i) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or Ajax Entity or for a substantial part of the property or assets of any Loan Party or Ajax Entity, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing;

(i)     the Borrower dies or is declared (by appropriate authority) incompetent or of unsound mind or a declaration of any similar nature is made;

(j)     one or more judgments shall be rendered against any Loan Party and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of any Loan Party to enforce any such judgment and such judgment (i) involves a material portion of the Collateral, (ii) is for the payment of money in an aggregate amount in excess of $250,000 and not covered by independent third-party insurance as to which the insurer does not deny coverage, unless the Loan Party bonds over the judgment to the satisfaction of the Secured Parties or (iii) is for injunctive relief and could reasonably be expected to result in a Material Adverse Effect;

(k)     (i) any security interest purported to be created by any Security Document shall cease to be a valid, perfected, first priority (except as otherwise expressly provided in this Agreement, the Alpine Intercreditor Agreement, the OCS Intercreditor Agreement, the Securities Account Control Agreement or such Security Document) security interest in the securities, assets or properties covered thereby, in each case for any reason other than the failure of the Administrative Agent or any Secured Party to take any action within its control or (ii) any Loan Party shall assert that any such security interest is not a valid, perfected, first priority (except as otherwise expressly provided in this Agreement, the Alpine Intercreditor Agreement, the OCS Intercreditor Agreement, the Securities Account Control Agreement or such Security Document) security interest in the securities, assets or properties covered by any Security Document;

(l)     any material provision of this Agreement or any other Loan Document ceases to be in full force and effect or any Loan Party shall assert that this Agreement or any other Loan Document is no longer in full force and effect;

OHSUSA:766765284

(m)      (i) the Settlor or any Trust Related Person revokes, or purports to revoke, the Trust, (ii) any court of competent jurisdiction shall order that the Trust be dissolved or wound-up or (iii) termination under Section 1-2.3 of the Trust Agreement occurs;

(n)      the Trustee, the Settlor or Trust Protector (as defined in the Trust Agreement) shall breach or disavow any of their respective obligations under the Guarantee Fee Agreement;

(o)      the Trustee shall die, become incapacitated or resign or be removed as Trustee under the Trust Agreement and a successor Trustee approved by the Required Lenders (such approval not to be unreasonably withheld, conditioned or delayed), shall not have been appointed within 60 calendar days of such resignation or removal;

then, and in every such event (other than an event described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith all commitments of the Lenders to make any loans or other extensions of credit hereunder and (ii) declare the Term Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Term Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees (including the Early Payment Fee and the Final Payment Fee) and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to the Borrower described in paragraph (g) or (h) above, all commitments of the Lenders to make any loans or other extensions of credit hereunder shall automatically terminate and the principal of the Term Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees (including the Early Payment Fee and the Final Payment Fee) and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

After the exercise of remedies provided for in in the immediately prior paragraph (or after the Term Loans have automatically become immediately due and payable, any amounts received on account of the Obligations, whether as proceeds of Collateral or otherwise, shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable law): *first*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to the Administrative Agent with respect to this Agreement, the other Loan Documents or the Collateral; *second*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any Lender with respect to this Agreement, the other Loan Documents or the Collateral; *third*, to accrued and unpaid interest on the Term Loans; *fourth*, to the unpaid principal of the Term Loans and any applicable fees or premiums with respect thereto; *fifth*, to any other indebtedness or obligations of the Borrower owing to the Administrative Agent or any Lender under the Loan Documents.  Any balance remaining shall

-56-

be delivered to the Borrower or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.  In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (ii) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its *pro rata* share of amounts available to be applied pursuant thereto for such category.

## 9.    THE ADMINISTRATIVE AGENT; ETC.

Each Lender hereby irrevocably appoints Wilmington Trust to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

The provisions of this Section 9 are solely for the benefit of the Administrative Agent and the Lenders and no Loan Party nor any other Person shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under this Agreement, the Administrative Agent does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency, fiduciary or trust with or for any Loan Party or any other Person.  The duties of the Administrative Agent shall be administrative in nature. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each Lender hereby further authorizes the Administrative Agent to act as the secured party under each of the Loan Documents that creates a Lien on any item of Collateral.

The institution serving as the Administrative Agent hereunder and its Affiliates may lend money to, invest in and generally engage in any kind of business with any Loan Party or any Affiliate thereof as if it were not the Administrative Agent hereunder.

Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied covenants, functions, duties, obligations or liabilities, regardless of whether a Default or Event of Default has occurred and is continuing, (b) whenever reference is made in this Agreement or any other Loan Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to

-57-

be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent, it is understood that in all cases the Administrative Agent shall have no duty to act, and shall be fully justified in failing or refusing to take any such action, if it shall not have received written instruction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) in respect of such action, (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to any Loan Party that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity and (d) the Administrative Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them). The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8 or Section 12.6) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender in accordance with the terms set forth in <u>Section 10</u>, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in <u>Section 3</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

In connection with any instruction from the Lenders to take or omit to take any action (other than any action that is expressly set forth in this Agreement), if the Administrative Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take or omitting or continuing to omit any such action. No provision of this Agreement or any other Loan Document shall require the Administrative Agent to take any action that it reasonably believes to be contrary to the Loan Documents or any Requirements of Law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in good faith in accordance with the advice of any such counsel, accountants or experts.

Without limitation of the generality of the foregoing, the Administrative Agent: (a) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (b) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Loan Party or to inspect the Collateral (including the books and records) of any Loan Party; (c) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (d) shall be entitled to assume the due authority of any signatory and genuineness of any signature appearing on and incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by email, telecopy, telegram, cable or telex or fax) believed by it to be genuine and signed or sent by the proper party or parties and (d) the Administrative Agent shall have no obligation whatsoever to any of the Lenders to (i) verify or assure that the Collateral exists or is owned by any Loan Party or any other Person or is cared for, protected, or insured or has been encumbered, (ii) verify or assure that the Administrative Agent's Liens in the Collateral have been or remain properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) impose, maintain, increase, reduce, implement or eliminate any particular reserve hereunder to determine whether the amount of any reserve is appropriate or not or (iv) exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent pursuant to any of the Loan Documents.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents or attorneys-in-fact appointed by it. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities as the Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects, so long as such selection was made in the absence of gross negligence or willful misconduct (as determined in the final non-appealable judgment of a court of competent jurisdiction).

OHSUSA:766765284

Any permissive grant of power to the Administrative Agent hereunder shall not be construed to be a duty to act.  Before acting hereunder, the Administrative Agent shall be entitled to request, receive and rely upon such certificates and opinions as it may reasonably determine appropriate with respect to the satisfaction of any specified circumstances or conditions precedent to such action.

The Administrative Agent shall not be responsible for the preparation or filing of any Uniform Commercial Code financing statements or the correctness of any financing statements filed in connection with any Loan Document or the validity or perfection of any Lien or security interest created pursuant to any Loan Document.

It is expressly agreed and acknowledged that the Administrative Agent is not guaranteeing performance of or assuming any liability for the obligations of the other parties hereto or any parties to the Loan Documents.

The Administrative Agent shall not be responsible or liable for delays or failures in performance resulting from acts beyond its control.  Such acts shall include acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters.  The Administrative Agent shall have no liability for losses arising from (i) any cause beyond its control, (ii) any delay, error, omission or default of any mail, telegraph, cable or wireless agency or operator or (iii) the acts or edicts of any government or governmental agency or other group or entity exercising governmental powers.  The Administrative Agent shall not be responsible for any special, exemplary, punitive or consequential damages.

The Administrative Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  If no successor Administrative Agent has been appointed by the 30th day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged, if not previously discharged pursuant to the foregoing provisions of this paragraph, from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Section 9 and Section 12.2 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking any action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Each Lender acknowledges and agrees that no Lender or any of their respective Affiliates, participants or assignees may rely on the Administrative Agent to carry out such Lender's, or their respective Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "**CIP Regulations**"), or any other anti-terrorism order, including any programs involving any of the following items relating to or in connection with any Loan Party, its Affiliates or agents, the Loan Documents or the transactions hereunder:  (1) any identity verification procedures, (2) any recordkeeping, (3) any comparisons with government lists, (4) any customer notices or (5) any other procedures required under the CIP Regulations or such other Requirements of Law.

The Administrative Agent shall not be responsible or liable for the environmental condition or any contamination of any property secured by any mortgage or deed of trust or for any diminution in value of any such property as a result of any contamination of the property by any hazardous substance, hazardous material, pollutant or contaminant.  The Administrative Agent shall not be liable for any claims by or on behalf of any Loan Party, the Lenders or any other person or entity arising from contamination of the property by any hazardous substance, hazardous material, pollutant or contaminant, and shall have no duty or obligation to assess the environmental condition of any such property or with respect to compliance of any such property under state or federal laws pertaining to the transport, storage, treatment or disposal of, hazardous substances, hazardous materials, pollutants, or contaminants or regulations, permits or licenses issued under such laws.

The Administrative Agent shall be under no obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by any Loan Party or any other person or entity, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made.

Each Lender from time to time party to this Agreement hereby confirms and reaffirms the irrevocable authority of the Administrative Agent to execute, deliver and act on its behalf in respect of the Alpine Intercreditor Agreement and the OCS Intercreditor Agreement, and each duly executed supplement, modification, amendment, restatement or extension thereto.  Each Lender agrees to be bound by the terms and provisions of the Alpine Intercreditor Agreement and the OCS Intercreditor Agreement.  Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent and each Lender hereby agree

-61-

that no Lender shall have any right individually to enforce the Alpine Intercreditor Agreement or the OCS Intercreditor Agreement, it being agreed that all powers, rights and remedies under the Alpine Intercreditor Agreement and the OCS Intercreditor Agreement may in each case be exercised solely by the Administrative Agent for the benefit of the Lenders in accordance with the terms thereof.  THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS IS SUBJECT TO THE ALPINE INTERCREDITOR AGREEMENT AND THE OCS INTERCREDITOR AGREEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND THE ALPINE INTERCREDITOR AGREEMENT OR THE OCS INTERCREDITOR AGREEMENT, THE ALPINE INTERCREDITOR AGREEMENT OR THE OCS INTERCREDITOR AGREEMENT, AS APPLICABLE, SHALL GOVERN AND CONTROL.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS AGREEMENT AND SECTIONS 6(b), 7(d) and 12 OF THE PLEDGE AGREEMENT, THE PLEDGE AGREEMENT SHALL GOVERN AND CONTROL.

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be (to the fullest extent permitted by mandatory provisions of applicable Law) entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.6 or Section 12.2) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, curator, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative and their respective agents and counsel, and any other amounts due the Administrative Agent under Section 2.6 or Section 12.2.

OHSUSA:766765284

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

### 10.    NOTICES

All notices, consents, requests, approvals, demands or other communication (each, a "**Communication**"), served, given or delivered by any party to this Agreement or any other Loan Document must be in writing and be delivered or sent by U.S. registered or certified mail, by reportable overnight courier, by electronic mail or by hand-delivery.   Each such Communication shall be deemed to have been validly served, given or delivered: (a) upon the earlier of actual receipt and three Business Days after deposit in the U.S. registered or certified mail, return receipt requested, with proper postage prepaid; (b) one Business Day after deposit with a reputable overnight courier with all charges prepaid; (c) when sent by electronic mail, upon confirmation of receipt or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number or electronic mail address indicated below.  The Administrative Agent, any Lender or any Loan Party may change its or his address, facsimile number or electronic mail address by giving the other party written notice thereof in accordance with the terms of this <u>Section 10</u>.   The Administrative Agent shall promptly deliver any notice, documentation or other information received from any Loan Party under this Agreement or any other Loan Document to each Lender at the address for such Lender set forth in this <u>Section 10</u> or in any Assignment and Assumption Agreement or by posting such notice, document or information to the Platform.

If to any Loan Party:                    Charif Souki
                                         P.O. Box 4068
                                         Aspen, CO 81612
                                         Email: charif.souki@ajax-holdings.com
                                         Tel. No.: 970-925-2619

                                         with copies to:
                                         Brooke Peterson
                                         P.O. Box 4068
                                         Aspen, CO 81612
                                         Email: brooke.peterson@ajax-holdings.com
                                         Tel. No.: 970-925-2619

If to the Administrative Agent:          Wilmington Trust, National Association
                                         Rodney Square North
                                         1100 North Market Street
                                         Wilmington, Delaware 19890
                                         Attn:   Jennifer Anderson
                                         Email: jkanderson@wilmingtontrust.com
                                         Tel. No.: 302-636-5048

-63-

with copies to:

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
Attn:   Alan Glantz
Email: alan.glantz@arnoldporter.com
Tel. No.: 212-836-7253

If to the Lenders:              Nineteen77 Capital Solutions A LP and Bermudez
                                Mutuari Ltd.
                                UBS Tower, One North Wacker Drive, Floor 32
                                Chicago, IL 60606
                                Attn:   Andrew Hollenbeck; Baxter Wasson and Rodrigo
                                        Trelles
                                Email: andrew.hollenbeck@ubs.com;
                                        baxter.wasson@ubs.com and
                                        rodrigo.trelles@ubs.com
                                Tel. No.: (312) 525-5713

Each Loan Party hereby acknowledges that the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of any Loan Party hereunder by posting such materials and/or information on Intralinks, DebtDomain or another similar electronic system (the "**Platform**").

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

OHSUSA:766765284

**11.**    **GOVERNING LAW; WAIVER OF JURY TRIAL; SUBMISSION TO JURISDICTION; ETC.**

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN THE OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

(b)    EACH OF THE PARTIES HERETO HEREBY WAIVES ANY AND ALL RIGHTS SUCH PARTY MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST THE ADMINISTRATIVE AGENT OR ANY LENDER WITH RESPECT TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL MATTERS RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN SUCH PARTY'S RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH SUCH PARTY'S LEGAL COUNSEL AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES SUCH PARTY'S JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 11(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TERM LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c)    EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY JUDICIAL PROCEEDING WITH RESPECT TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY MATTER RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT ONLY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN (AND EACH COURT WHERE APPEALS OF THE DECISIONS OF SUCH COURTS MAY BE SOUGHT).   EACH PARTY HERETO

(I) ACCEPTS THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY, (II) WAIVES PERSONAL SERVICE OF PROCESS, (III) AGREES THAT SERVICE OF PROCESS UPON SUCH PARTY MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, PURSUANT TO <u>SECTION 10</u> HEREOF AND (IV) WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT IN ACCORDANCE WITH THE FOREGOING AND AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION, VENUE, CONVENIENCE OR FORUM NONCONVENIENS.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

### 12. <u>GENERAL PROVISIONS</u>

**12.1    Successors and Assigns**.  (a) This Agreement binds and is for the benefit of the successors and permitted assigns of each party; <u>provided</u> that no Loan Party may assign this Agreement or any rights or obligations under it without the Administrative Agent's and each Lender's prior written consent (which may be granted or withheld in each Lender's and the Administrative Agent's sole discretion).  Each Lender may, with written notice to the Administrative Agent and the Borrower, sell, transfer or assign all or any part of, or any interest in, such Lender's obligations, rights and benefits under this Agreement and the other Loan Documents to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' or Subsidiaries); <u>provided</u> that any such assignment of an interest in the Term Loans (or any commitment to fund Term Loans) by any Lender shall be accomplished by (i) such Lender providing to the Administrative Agent an Assignment and Assumption Agreement executed and delivered by such Lender and the assignee, together with payment of an assignment fee in the amount of $3,500 to the Administrative Agent (unless such fee is otherwise waived or reduced by the Administrative Agent in its sole discretion) and (ii) the assignee, if it shall not already be a Lender, delivering to the Administrative Agent (x) an Administrative Questionnaire, (y) all applicable tax forms required pursuant to Section 2.10(b) and (z) if requested by the Administrative Agent, all documentation and other information about such assignee as shall have been reasonably requested by the Administrative Agent in connection with applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act.  Upon such execution, delivery and acceptance, and upon recording by the Administrative Agent of the assignment in the Register, from and after the effective date specified in each Assignment and Assumption Agreement, the assignee thereunder shall be a party hereto and to the other Loan Documents and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder and thereunder and the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption Agreement, relinquish its rights and be released from its obligations under this Agreement.  Any purported transfer or assignment in violation of the foregoing shall be null and void.

OHSUSA:766765284

(b)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitments of, and principal amounts (and stated interest) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(c)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Administrative Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment and/or the Term Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

**12.2    Indemnification; Expenses Reimbursement**.

(a)     Each Loan Party shall, jointly and severally, defend, indemnify and hold harmless the Administrative Agent, each Lender and each Related Party of any of the foregoing Persons (each, an "**Indemnified Person**") against:   (i) all obligations, demands, claims, damages, penalties, actions, judgments, suits, costs and liabilities claimed or asserted by any other party or Person in connection with the transactions contemplated by this Agreement or any other Loan Document or the Term Loans or the use of proceeds thereof and (ii) all losses or expenses in any way suffered, incurred or paid by an Indemnified Person as a result of or in any

OHSUSA:766765284

way arising out of, following or consequential to transactions under this Agreement or any other Loan Document or the Term Loans, or otherwise (including reasonable attorney's fees and expenses); provided that such indemnity shall not, as to any Indemnified Person, be available to the extent that such obligations, demands, claims, liabilities, losses or expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Person; provided, further, that such indemnity shall not apply to Taxes other than Indemnified Taxes of a Recipient.

(b)     Each Loan Party, jointly and severally, agrees to reimburse the Administrative Agent, each Lender and their respective Affiliates, from time to time on demand, for (i) all reasonable out-of-pocket fees and expenses (including reasonable attorneys' fees and expenses) incurred by the Administrative Agent, such Lender or such Affiliate in connection with the due diligence, the preparation, negotiation, execution, administration and delivery of this Agreement and the other Loan Documents, and the preparation, negotiation, execution and delivery of amendments, waivers, consents, modifications and supplements related to this Agreement or any other Loan Document and (ii) all out-of-pocket fees and expenses (including reasonable attorneys' fees and expenses), incurred by the Administrative Agent, such Lender or such Affiliate in the enforcement or attempted enforcement of any of the Obligations, this Agreement or the other Loan Documents or in preserving any of the Administrative Agent's or any Lender's rights and remedies (including all such fees and expenses incurred in connection with any "workout" or restructuring affecting this Agreement, the other Loan Documents or the Obligations or any bankruptcy or similar proceeding involving any Loan Party or any of its assets).

(c)     To the extent that the Loan Parties fail to pay any amount required to be paid by the Loan Parties to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or if such indemnity payment or unreimbursed amount is sought after the date on which the Term Loans have been paid in full and the commitments to make Term Loans have terminated, in accordance with their respective pro rata shares immediately prior to the date on which the Term Loans are paid in full and the commitments to make Term Loan have terminated)) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Term Loans and unused commitments in respect of the Term Loans at the time.  If any indemnity furnished to the Administrative Agent for any purpose shall, in the reasonable opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity or advance of funds and cease, or not commence, to do the acts indemnified against until such additional indemnity or advance of funds is furnished; provided that in no event shall this sentence require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share thereof.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan

Document or otherwise payable by the Administrative Agent to such Lender from any source against any amount due to the Administrative Agent under this clause (c).

(d)     The provisions of this Section 12.2 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Term Loans, the expiration of any of the commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, any investigation made by or on behalf of the Administrative Agent or any Lender or the resignation or removal of the Administrative Agent. All amounts due under this Section 12.2 shall be payable on written demand therefor.

**12.3    Time of Essence**.  Time is of the essence for the performance of all Obligations in this Agreement.

**12.4    Correction of Loan Documents**.  The Administrative Agent may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties, so long as the Administrative Agent provides the Lenders and the Borrower with written notice of such correction and allows each Lender and the Borrower at least ten days to object to such correction.  In the event of such objection, such correction shall not be made except by an amendment signed by the Borrower and each Lender and acknowledged by the Administrative Agent.

**12.5    Severability of Provisions**.  Any provision of this Agreement or any other Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**12.6    Amendments in Writing; Waiver; Integration**.  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and each Lender and acknowledged by the Administrative Agent; provided that (i) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent and (ii) any amendment or modification to the Administrative Agent Fee Letter, or waiver of any rights or privileges thereunder, shall only require the consent of the Borrower and the Administrative Agent.  Without limiting the generality of the foregoing, no oral promise or statement, nor any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document.  Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof and thereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.

OHSUSA:766765284

**12.7    Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.  Delivery of an executed signature page to this Agreement by facsimile or email (.pdf) transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

**12.8    Survival**.  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement) have been paid in full and satisfied.  The obligation of the Borrower in Sections 2.7(b), 2.10 and 12.2 shall survive and remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Term Loans, the expiration of any of the commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, any investigation made by or on behalf of the Administrative Agent or any Lender or the resignation or removal of the Administrative Agent.

**12.9    Waiver of Notice of Presentment**.  The Borrower hereby waives presentment, demand for performance, notice of non-performance, protest, notice of protest and notice of dishonor.

**12.10    Limitation of Liability**.  NEITHER THE ADMINISTRATIVE AGENT NOR ANY LENDER NOR ANY OF THEIR RESPECTIVE RELATED PARTIES SHALL HAVE ANY LIABILITY WITH RESPECT TO, AND EACH LOAN PARTY HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE UPON, ANY CLAIM FOR ANY SPECIAL, INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES SUFFERED BY SUCH LOAN PARTY IN CONNECTION WITH, ARISING OUT OF, OR IN ANY WAY RELATED TO THIS AGREEMENT ANY OTHER LOAN DOCUMENT, THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION HEREWITH OR THEREWITH.

**12.11    Compliance with Usury Laws**.  It is the intent of the Administrative Agent, each Lender and each Loan Party in the execution and performance of this Agreement and the other Loan Documents to contract in strict compliance with any and all applicable usury laws, including conflicts of law concepts, governing the loan described herein.  In furtherance thereof, the Administrative Agent, each Lender and each Loan Party stipulate and agree that none of the terms and provisions contained in this Agreement or any of the other Loan Documents shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the highest rate permitted by applicable law (the "**Highest Lawful Rate**") and that for purposes hereof "interest" shall include the aggregate of all charges which constitute interest under such laws that are contracted for, charged or received under this Agreement or any of the other Loan Documents; and in the event that, notwithstanding the foregoing, under any circumstances the aggregate amounts taken, reserved, charged, received or paid on any Term Loan include amounts which by applicable law are deemed interest which would exceed the Highest Lawful Rate, then such excess shall be deemed to be a mistake and the Administrative Agent and the Lenders shall credit the same on the principal balance of the

Obligations (or if all of the Obligations shall have been paid in full, refund said excess to the Borrower). The provisions of this section shall control over all other provisions of this Agreement and the other Loan Documents which may be in apparent conflict herewith.

**12.12    Right of Setoff.**    If an Event of Default shall have occurred and be continuing, each Lender or any of its Affiliates is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Affiliate to or for the credit or the account of any Loan Party against any of and all the obligations of any Loan Party now or hereafter existing under this Agreement and the other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender and its Affiliates under this Section 12.12 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent in writing promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

**12.13    Captions.**    The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**12.14    Construction of Agreement.**    The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement. In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**12.15    Relationship.**    The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement. The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract. Each Loan Party acknowledges that neither the Administrative Agent nor any Lender has advised such Loan Party in any manner regarding the purposes for which any Term Loan will be used.

**12.16    Third Parties.**    Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it, Indemnified Persons and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement or an Indemnified Person any right of subrogation or action against any party to this Agreement.

**12.17    No Waiver; Remedies Cumulative.**    The Administrative Agent's or any Lender's failure, at any time or times, to require strict performance by any Loan Party of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of the Administrative Agent or such Lender thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for

which it is given.  The rights and remedies of the Administrative Agent and the Lenders under this Agreement and the other Loan Documents are cumulative.  The Administrative Agent and the Lenders have all rights and remedies provided by law or in equity.  The Administrative Agent's or any Lender's exercise of one right or remedy is not an election and shall not preclude the Administrative Agent or such Lender from exercising any other remedy under this Agreement or other remedy available at law or in equity, and the Administrative Agent's or any Lender's waiver of any Event of Default is not a continuing waiver.  The Administrative Agent's or any Lender's delay in exercising any remedy is not a waiver, election or acquiescence.

**12.18  Full Recourse**.  The obligations of each Loan Party under this Agreement and the other Loan Documents are full recourse to such Loan Party and any and all assets and property of such Loan Party.

**12.19  USA PATRIOT Act**.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

**12.20  Lender Action**.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the other Lenders.  The provisions of this Section are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

[Signature page follows.]

OHSUSA:766765284

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

BORROWER:

_____
**CHARIF SOUKI**

GUARANTORS:

**AVR AH LLC**

By: _____
    Name:  Brooke A. Peterson
    Title: Manager

**STRUDEL HOLDINGS LLC**

By: _____
    Name:  Charif Souki
    Title:  Sole Member

**CHARIF SOUKI**, not in his individual capacity, but solely as Trustee of the SOUKI FAMILY 2016 TRUST

By: _____
    Name:  Charif Souki
    Title  Trustee

**AJAX**

By: _____
    Name:  Charif Souki
    Title:  Director and Sole Member

[Signature Page – Loan Agreement – Chiron]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

BORROWER:

_____

**CHARIF SOUKI**

GUARANTORS:

**AVR AH LLC**

By: _____
   Name: BROOKE A. PETERSON
   Title: MANAGER

**STRUDEL HOLDINGS LLC**

By: _____
   Name:
   Title:

**CHARIF SOUKI**, not in his individual capacity, but solely as Trustee of the SOUKI FAMILY 2016 TRUST

By: _____
   Name:
   Title:

**AJAX**

By: _____
   Name:
   Title:

ADMINISTRATIVE AGENT:

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Administrative Agent

By: _____
    Name: Jennifer Anderson
    Title:  Vice President

LENDERS:

**NINETEEN77 CAPITAL SOLUTIONS A LP**, as Lender

By:  UBS O'Connor LLC,
    as investment adviser

By:  _____
    Name: Andrew Hollenbeck
    Title: General Counsel

By:  _____
    Name: Nicholas Vagra
    Title: Manager, Chief Operating Officer

**BERMUDEZ MUTUARI LTD.**, as Lender

By:  UBS O'Connor LLC,
    as investment adviser

By:  _____
    Name: Andrew Hollenbeck
    Title: General Counsel

By:  _____
    Name: Nicholas Vagra
    Title: Manager, Chief Operating Officer

[Signature Page – Loan Agreement – Chiron]

**Schedule 1.1(d)**

<u>**Vessels**</u>

| Name | Type | Port of Registry | Registration ID |
|------|------|------------------|-----------------|
| Hobby Sea | Motor Yacht | London | 911635 |
| Tango G | Sailing Yacht | Cayman Islands | 911730 |
| TT to Tango | Motor Boat | Jersey | 745899 |
| Tango Baby 1 | Sailboat | Jersey | 746350 |
| Tango Baby 2 | Sailboat | Jersey | 746742 |
| TT to Tango Baby | Motor Boat | Jersey | 746762 |
| Tango | Sailing Yacht | Cayman Islands | 14800 |

4159-0528-8467