# EXHIBIT 4

*EXECUTION VERSION*

PLEDGE AGREEMENT

This **PLEDGE AGREEMENT**, dated as of April 27, 2017 (this "**Pledge Agreement**"), is made and executed by CHARIF SOUKI, in his individual capacity, with an address at 1201 Louisiana St., Suite 3100, Houston, Texas 77002 (the "**Borrower**"), CHARIF SOUKI as Trustee of the SOUKI FAMILY 2016 TRUST effective March 11, 2016, as amended (the "**Trust**"), AVR AH LLC, a Colorado limited liability company ("**AVR**") and STRUDEL HOLDINGS LLC, a Texas limited liability company ("**Strudel**" and, together with Trust and AVR and the Borrower, the "**Pledgors**"), WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent for the parties defined as the "Lenders" under the Loan Agreement referred to below (in such capacity, together with its successors and assigns, the "**Administrative Agent**"), and, solely with respect to the agreement set forth in Section 25, WILMINGTON TRUST, NATIONAL ASSOCIATION, as depository bank ("**Bank**").

WHEREAS, concurrently herewith, such Lenders shall make the Term Loans to the Borrower pursuant to the Loan Agreement, dated as of April 27, 2017 (as amended, restated or otherwise modified, the "**Loan Agreement**") among the Borrower, the Trust, AVR and Strudel, as Guarantors, the Lenders and the Administrative Agent.

WHEREAS, as a condition precedent to the Lenders making the Term Loans, the Lenders have required that the Pledgors execute and deliver this Pledge Agreement to the Administrative Agent (for the benefit of the Secured Parties) to secure the prompt and complete payment and performance of the Obligations.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Defined Terms**.  Capitalized terms used in this Pledge Agreement and not otherwise defined herein shall have the meanings set forth in the Loan Agreement. All terms defined in the UCC (as such term is defined herein) and not defined in this Pledge Agreement or the Loan Agreement shall have the meanings specified therein.  As used in this Pledge Agreement, the following terms shall have the following meanings:

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble.

"**Ajax**" shall mean Ajax Holdings LLC, a Colorado limited liability company.

"**AVR**" shall have the meaning assigned to such term in the preamble.

"**Bank**" shall have the meaning assigned to such term in the preamble.

"**Borrower**" shall have the meaning assigned to such term in the preamble.

"**Collateral**" shall have the meaning assigned to such term in Section 2.

"**Initial Pledged Shares**" means (i) the Capital Stock of AVR owned by the Borrower on the date hereof and identified in <u>Schedule A</u> hereto, (ii) the Capital Stock of Ajax owned by Strudel on the date hereof and identified in <u>Schedule A</u> hereto, (iii) the Capital Stock of Ajax owned by the Trust on the date hereof and identified in <u>Schedule A</u> hereto and (iv) the Tellurian Shares.

"**Interest Reserve Account**" shall mean that certain account # ▮▮▮▮▮▮▮▮ in the name of the Borrower maintained at, and under the control of, the Administrative Agent or any affiliate thereof.

"**Issuer**" shall mean, with respect to any Pledged Shares, the issuer of such Pledged Shares.

"**Loan Agreement**" shall have the meaning assigned to such term in the recitals.

"**Maximum Percentage**" shall have the meaning assigned to such term in <u>Section 12(a)</u>.

"**Pledged Shares**" shall mean, collectively, (a) the Initial Pledged Shares and (b) all other (w) Capital Stock of AVR now or hereafter owned by the Borrower, (x) Capital Stock now or hereafter owned by Strudel, (y) Capital Stock of Ajax now or hereafter owned by the Trust and (z) any additional Tellurian Shares, together in each case with (i) all certificates representing the same, (ii) all shares, securities, moneys or other property representing a dividend on or a distribution or return of capital on or in respect of the Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the Pledged Shares or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Shares and (iii) all Capital Stock of any successor entity (to the extent any Pledgor now or hereafter has any interest in such Capital Stock) of any such merger or consolidation.

"**Pledgors**" shall have the meaning assigned to such term in the preamble.

"**Proceeds**" shall mean "proceeds", as such term is defined in the UCC, and, in any event, shall include, without limitation, (a) any and all accounts, instruments, cash or other forms of money or currency or other proceeds payable to any Pledgor from time to time in respect of the Collateral, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Pledgor from time to time with respect to any of the Collateral, (c) any and all payments (in any form whatsoever) made or due and payable to any Pledgor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of governmental authority), (d) any claim of any Pledgor against third parties in respect of the Collateral, (e) all certificates, dividends, distributions, cash, instruments and other property received or distributed in respect of or in exchange for any of the Collateral and (f) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Strudel**" shall have the meaning assigned to such term in the preamble.

2

"**Tellurian Shares**" shall mean the Capital Stock of Tellurian Inc. owned, directly or indirectly, by the Borrower and held in or credited to the UBS Securities Account.

"**Trust**" shall have the meaning assigned to such term in the preamble.

"**UBS Securities Account**" shall mean that certain account # ███████ in the name of the Borrower maintained at, and under the control of, UBS Financial Services Inc. or any affiliate thereof.

"**UCC**" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York; <u>provided</u> that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of any Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2.      **Grant of Security Interest**.   Each Pledgor hereby grants to the Administrative Agent, its successors and assigns, for the ratable benefit of the Secured Parties, a security interest in all of such Pledgor's right, title and interest in and to the following assets and property, whether now owned or existing or hereafter acquired or arising (collectively, the "**Collateral**"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations:

(a)      all Accounts:

(b)      all Chattel Paper;

(c)      all cash and Deposit Accounts, including the Interest Reserve Account;

(d)      all Documents;

(e)      all Goods

(f)      all Equipment;

(g)      all Fixtures;

(h)      all General Intangibles;

(i)      all Instruments;

(j)      all Inventory;

(k)      all Investment Property;

(l)      the Pledged Shares and UBS Securities Account;

(m)     all Letter-of-Credit Rights;

(n)     all Commercial Tort Claims;

(o)     all other tangible and intangible personal property whatsoever of any Pledgor;

(p)     all books and records pertaining to the Collateral; and

(q)     to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing,

Notwithstanding the foregoing or any other provision of this Pledge Agreement: (A) the Borrower shall provide a security interest only in the Pledged Shares of AVR and Tellurian Inc., the UBS Securities Account and the Interest Reserve Account (and (i) all successor and replacement accounts, regardless of the numbers of such accounts or the offices at which such accounts are maintained, and any linked or related accounts or subaccounts held by Administrative Agent or any of its affiliates or any entity as clearing broker for any of the foregoing accounts, and (ii) all funds, cash, Capital Stock, instruments, financial assets, securities entitlements, investment property, securities and other property delivered to the Administrative Agent or held in or deposited or credited to any account, together with all funds, cash, Capital Stock, instruments, financial assets, securities entitlements, investment property, securities, and other property hereafter delivered to the Administrative Agent or held in or deposited or credited to any account in substitution therefor or in addition thereto), (B) the Trust shall provide a security interest only in the Pledged Shares of Ajax (and all funds, cash, Capital Stock, instruments, financial assets, securities entitlements, investment property, securities and other property delivered to the Administrative Agent or held in or deposited or credited to any account, together with all funds, cash, Capital Stock, instruments, financial assets, securities entitlements, investment property, securities, and other property hereafter delivered to the Administrative Agent or held in or deposited or credited to any account in substitution therefor or in addition thereto) and (C) in no event shall the security interest granted under this Section 2 attach to any lease, license, contract, property rights or agreement to which any Pledgor is a party (or to any of its rights or interests thereunder) if the grant of such security interest would constitute or result in either (i) the abandonment, invalidation or unenforceability of any right, title or interest of such Pledgor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term would be rendered ineffective by applicable law).

3.     **Representations and Warranties**.  The Pledgors jointly and severally represent and warrant to the Administrative Agent for the benefit of the Secured Parties that:

(a)     The Pledgors are the sole owners of each item of the Collateral, free and clear of any and all Liens and claims whatsoever except for Liens (i) granted pursuant to this Pledge Agreement and the other Loan Documents and (ii) expressly permitted by Section 6.2 of the Loan Agreement.

4

(b)     No security agreement, financing statement, assignment, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral is on file or of record in any public office except for any filing made in connection with any Lien expressly permitted by Section 6.2 of the Loan Agreement.

(c)     Upon the filing of the financing statements in appropriate form in the offices specified in Schedule 4.15 to the Credit Agreement and the execution of the Securities Account Control Agreement, all steps necessary to create and perfect the security interest created by this Pledge Agreement as a valid and continuing first lien on and first priority perfected security interest in the Collateral in favor of the Administrative Agent (for the benefit of the Secured Parties), prior to all other Liens, security interests and other claims of any sort whatsoever (subject to any Lien expressly permitted by Section 6.2 of the Loan Agreement) will have been taken.  This Pledge Agreement and the security interests created hereby are enforceable as such against creditors of and purchasers from each Pledgor.

(d)     The full and correct legal name, type of organization (if applicable), jurisdiction of organization (if applicable) and organizational ID number (if applicable) of each Pledgor as of the date hereof are correctly set forth in Schedule D.  Schedule D also correctly specifies the principal residence or the place of business, as applicable, of each Pledgor or, if any Pledgor has more than one place of business, the location of the chief executive office of such Pledgor.  No Pledgor has (a) within the period of four months prior to the date hereof, changed its location (as defined in Section 9-307 of the UCC), (b) except as specified in Schedule D, heretofore changed its name or (c) heretofore become a "new debtor" (as defined in Section 9-102(a)(56) of the UCC) with respect to a currently effective security agreement previously entered into by any other Person.

(e)     The copy of the Borrower's driver's license delivered to the Secured Parties prior to the date hereof is a true, correct and current copy of the Borrower's driver's license in the State of Texas.  Except for the State of Texas, the Borrower does not have a current driver's license or other identification card issued by any other State.

(f)     Except for restrictions and limitations imposed by the Loan Documents, the Collateral is and will continue to be freely transferable and assignable, and none of the Collateral is or will be subject to any contractual restriction of any nature that might prohibit, impair, delay or otherwise affect the pledge of such Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Administrative Agent or any other Secured Party of rights and remedies hereunder.

(g)     As of the date hereof, there are no certificates, instruments, notes or other documents evidencing any of the Pledged Shares.

(h)     Each Pledgor has the power and authority to pledge the Collateral pledged by it hereunder in the manner hereby done or contemplated.

(i)     No consent or approval of any governmental authority or any other Person was or is necessary to the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect).

OHSUSA:766767656

(j)     All information supplied by (or on behalf of) any Pledgor to the Administrative Agent or any other Secured Party with respect to any of the Collateral (in each case taken as a whole with respect to any particular Collateral) is accurate and complete in all material respects.

(k)     The Initial Pledged Shares (other than the Tellurian Shares) constitute 100% of the issued and outstanding Capital Stock of each Issuer on the date hereof, whether or not registered in the name of the Pledgors.  The Initial Pledged Shares are, and all other Pledged Shares in which the Pledgors shall hereafter grant a security interest pursuant to Section 2 will be, duly issued and outstanding, and none of such Pledged Shares are or will be subject to any contractual restriction, or any restriction under the partnership agreement or other organizational instrument of any Issuer, upon the transfer of such Pledged Shares (except for any such restriction contained herein or in the other Loan Documents).

(l)     A complete and correct list of all Deposit Accounts, Securities Accounts and Commodity Accounts of Strudel, AVR and, Borrower (solely with respect to the Interest Reserve Account and Securities Account) as of the date hereof are correctly set forth in <u>Schedule L</u>.

(m)     A complete and correct list of all Commercial Tort Claims of Strudel and AVR as of the date hereof are correctly set forth in <u>Schedule M</u>.

(n)     Strudel and AVR own no copyright registrations, patents, patent applications, trademark registrations and trademark applications as of the date hereof.

4.     <u>Covenants</u>.  The Pledgors jointly and severally covenant and agree with the Administrative Agent for the benefit of the Secured Parties that from and after the date of this Pledge Agreement and until the Obligations shall have been fully paid and satisfied (other than inchoate indemnity obligations that expressly survive termination of the Loan Documents):

(a)     <u>Further Documentation; Pledge of Instruments</u>.  At any time and from time to time, upon the written request of the Administrative Agent or any other Secured Party, and at the sole expense of the Pledgors, each Pledgor will promptly and duly execute and deliver any and all such further instruments and documents (including, without limitation, a current copy and renewal information for the Borrower's driver's license) and take such further actions as the Administrative Agent or any other Secured Party may reasonably deem necessary or desirable to obtain the full benefits of this Pledge Agreement and the full benefits of the rights and powers herein granted, including, without limitation, the execution and filing of any financing or continuation statements under the UCC in effect in any jurisdiction with respect to the security interest granted hereby and, if otherwise required hereunder, transferring Collateral to the Interest Reserve Account or to the possession of the Administrative Agent (if a security interest in such Collateral can be perfected by possession or control).  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, certificate or other instrument (other than an instrument which constitutes chattel paper under the UCC), such note, certificate or instrument shall be immediately pledged hereunder and a security interest therein hereby granted to the Administrative Agent (for the benefit of the Secured

6

Parties) and shall be duly endorsed in a manner satisfactory to the Administrative Agent and delivered to the Administrative Agent.

(b)     <u>Priority of Liens</u>.  Each Pledgor will defend the right, title and interest hereunder of the Secured Parties, as a first priority security interest (subject to any Lien expressly permitted by Section 6.2 of the Loan Agreement) in the Collateral, against the claims and demands of all Persons whomsoever.

(c)     <u>Notices</u>.  Each Pledgor will advise the Administrative Agent and each Lender promptly, and in any event no later than three Business Days after such Pledgor (including, if applicable, any officer of such Pledgor) obtains knowledge of the existence or occurrence thereof, in reasonable detail, of (i) any Lien, security interest, encumbrance or claim made or asserted against any of the Collateral (other than any Lien, security interest, encumbrance or claim permitted by Section 6.2 of the Loan Agreement), (ii) any distribution of cash or other property by any Issuer, whether in complete or partial liquidation or otherwise and any other change in the composition of the Collateral or any Issuer, (iii) any change or renewal in the driver's license of the Borrower in the Borrower's state of principal residence (including, in each case, a copy thereof) and (iv) the occurrence of any other event which would have a significant adverse effect on the aggregate value of the Collateral or on the security interest created hereunder, including the priority thereof.

(d)     <u>Continuous Perfection</u>.  No Pledgor shall (i) change its location (as defined in Section 9-307 of the UCC), (ii) change its name from the name shown as its current legal name on <u>Schedule D</u> or (iii) agree to or authorize any modification of the terms of any item of Collateral that would result in a change thereof from one UCC category to another such category, if the effect thereof would be to result in a loss of perfection of, or diminution of priority for, the security interests created hereunder in such item of Collateral, or the loss of control (within the meaning of Section 9-106 of the UCC) over such item of Collateral, in each case unless such Pledgor (at least 30 days prior to such change) notifies in writing the Administrative Agent and each Lender thereof and takes such action as is necessary or reasonably requested by the Administrative Agent to cause the security interest of the Secured Parties in the Collateral to continue to be perfected.  No Pledgor shall authorize the filing of any financing statement naming such Pledgor as debtor covering all or any portion of the Collateral other than financing statements to be filed pursuant to any Loan Document.

(e)     <u>Transfer of Assets</u>.  Except to the extent expressly permitted or required under the terms of the Loan Agreement (including Section 6.3 of the Loan Agreement), no Pledgor shall, without the prior written consent of the Administrative Agent (as directed by the Required Lenders), directly or indirectly sell, pledge, mortgage, assign, transfer or otherwise dispose of or create, assume, permit or suffer to exist any Lien, security interest, charging order or encumbrance on any of the Collateral.

(f)     <u>Modifications and Amendments</u>.  No Pledgor shall, without the prior written consent of the Administrative Agent (as directed by the Required Lenders), waive, release or compromise any rights or claims such Pledgor may have against any other party, which arise under any of the Collateral.  No Pledgor shall, without the Administrative Agent's prior written consent (as directed by the Required Lenders), grant any extension of the time of

OHSUSA:766767656

payment of any item of Collateral, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof or allow any credit or discount whatsoever thereon.

(g) <u>Stay or Extension Laws</u>.  To the extent permitted by applicable law, no Pledgor shall at any time claim, take, insist upon or invoke the benefit or advantage of or from any law now or hereafter in force providing for the valuation or appraisement of the Collateral prior to any sale or sales thereof to be made pursuant to the provisions hereof or pursuant to the decree, judgment or order of any court of competent jurisdiction; nor, after such sale or sales, claim or exercise any right under any statute now or hereafter made or enacted by any state to redeem the property so sold or any part thereof, and each Pledgor hereby expressly waives, on behalf of such Pledgor and each and every Person claiming by, through and under such Pledgor, all benefit and advantage of any such law or laws, and covenants that such Pledgor will not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any power, right or remedy herein or hereby granted and delegated to any Secured Party, but will authorize, allow and permit the execution of every such power, right or remedy as though no such law or laws had been made or enacted.

(h) <u>Delivery of Certificates, Etc.</u>  Each Pledgor agrees (i) immediately to deliver to the Administrative Agent or the Administrative Agent's designee all certificates, instruments, promissory notes or other documents evidencing any of the Collateral which may at any time come into the possession of such Pledgor (together with executed undated instruments of transfer or endorsements in form and substance reasonably acceptable to the Administrative Agent), (ii) that if any of the Pledged Shares (other than the Tellurian Shares) constitute uncertificated securities, such Pledgor shall cause the Issuer of such Pledged Shares to register the Administrative Agent as the registered owner, upon original issue or registration of transfer, (iii) if any of the Pledged Shares constitute security entitlements, such Pledgor shall cause each securities intermediary to indicate by book entry that such Pledged Shares have been pledged to the Administrative Agent hereunder and (iv) to execute and deliver a notice of the Secured Parties' security interest in the Collateral (which notice shall be reasonably satisfactory to the Lender in form and substance and which may request acknowledgment from the addressee) to any third party which either has possession of the Collateral or any certificates evidencing any of the Collateral or otherwise has the ability under applicable law or the terms of any agreement to record transfers or transfer ownership of any of the Collateral (whether at the direction of such Pledgor or otherwise).  Each Pledgor hereby appoints the Administrative Agent as such Pledgor's attorney-in-fact, coupled with an interest, with authority at any time or times to take any of the foregoing actions on behalf of such Pledgor.  Notwithstanding any other provision of this Pledge Agreement or any other agreement to which the Borrower is a party, the Borrower hereby directs UBS Securities and each other securities intermediary holding any Collateral to comply with entitlement orders with respect to the Pledged Shares originated by the Administrative Agent without further consent by the Borrower, subject to <u>Section 7(d)</u>.

(i) <u>Control</u>.  No Pledgor shall grant "control" (within the meaning of such term in Article 9 of the UCC) over any Collateral to any Person other than the Administrative Agent (for the benefit of the Secured Parties).

OHSUSA:766767656

(j)      Books and Records.  Each Pledgor will maintain, at its own cost and expense, such complete and accurate records with respect to the Collateral as is consistent with prudent and standard practices, but in any event to include complete accounting records indicating all distributions, payments and proceeds received with respect to any part of the Collateral.  Each Pledgor shall permit any Secured Party, upon reasonable prior written notice, to inspect such Pledgor's books and records concerning the Collateral, to make copies and extracts of information contained therein (and, following a Default or an Event of Default, to take possession, custody and control of such books and records wherever located and whether maintained by such Pledgor or any other Person), to obtain information regarding such Pledgor and the Collateral and to make inquiries to any Persons with respect to such Pledgor and the Collateral.  Any inspection, examination, review or audit of the records of any Pledgor allowed under this Pledge Agreement shall be conducted during normal business hours after at least one Business Day's prior written notice.

(k)      Deposit Accounts.  For each deposit account that Strudel or AVR opens or maintains with assets at any time in excess of $250,000, Strudel or AVR, as applicable, shall, upon the Lenders' request, cause the depositary bank to agree to comply at any time with instructions from the Administrative Agent to such depositary bank directing the disposition of funds from time to time credited to such Deposit Account, without further consent of Strudel or AVR, as applicable, or any other Person, pursuant to an agreement in form and substance satisfactory to the Lenders.  The Administrative Agent agrees with Strudel and AVR that the Administrative Agent shall not give any such instructions or withhold any withdrawal rights from Strudel or AVR, as applicable, unless an Event of Default has occurred and is continuing, or, after giving effect to any withdrawal, would occur.

(l)      Certain Securities.  If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by Strudel or AVR are held by such Pledgor or its nominee through a securities intermediary or commodity intermediary, such Pledgor shall promptly notify the Lenders thereof and, at the Lenders' request and option, pursuant to an agreement in form and substance satisfactory to the Lenders, either (i) cause such securities intermediary or commodity intermediary, as the case may be, to agree to comply with entitlement orders from the Administrative Agent to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by the Administrative Agent to such commodity intermediary, in each case without further consent of any Pledgor or such nominee, or (ii) in the case of financial assets (as governed by Article 8 of the UCC) or other investment property held through a securities intermediary, arrange for the Administrative Agent to become the entitlement holder with respect to such investment property, with the Pledgor being permitted, only with the consent of the Administrative Agent, to exercise rights to withdraw or otherwise deal with such investment property.  The Administrative Agent agrees with each such Pledgor that the Administrative Agent shall not give any such entitlement orders or instructions or directions to any such issuer, securities intermediary or commodity intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by any Pledgor, unless an Event of Default has occurred and is continuing, or, after giving effect to any such investment and withdrawal rights would occur.

OHSUSA:766767656

5.      Financing Statements.  Each Pledgor hereby irrevocably authorizes the Administrative Agent, each Lender and each of their respective designees at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto (without the signature of such Pledgor) that describe the Collateral in the same manner as described herein or contain a description of the Collateral that describes such property in any other manner as the Administrative Agent or such Lender may reasonably determine is necessary, advisable or prudent to ensure the perfection of the Secured Parties' security interest in the Collateral.  Each Pledgor also ratifies its authorization for the Administrative Agent, each other Secured Party and each of their respective designees to file in any relevant jurisdiction any financing statements or amendments thereto (without the signature of such Pledgor) if filed prior to the date hereof.  The Administrative Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office or any similar office in any other country) such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by each Pledgor, without the signature of any Pledgor, and naming any Pledgor or the Pledgors as debtors and the Administrative Agent as secured party.

6.      Pledgors' Powers.

(a)      So long as no Event of Default has occurred and is continuing, each Pledgor shall be the sole party entitled (i) to exercise for any purpose any and all voting rights and powers and (ii) to receive any and all distributions, in each case arising from or relating to the Collateral (other than the Interest Reserve Account and UBS Securities Account and other deposit accounts, securities accounts and commodity accounts subject to pledge hereunder); provided that (x) no Pledgor shall exercise such rights or powers, or consent to any action of any Issuer that would be in contravention of the provisions of, or constitute an Event of Default under, this Pledge Agreement or any of the other Loan Documents and (y) each Pledgor shall comply with the requirements of this Pledge Agreement and the other Loan Documents with respect to any distributions arising from or relating to the Collateral.

(b)      Upon the occurrence of an Event of Default, all rights of each Pledgor provided in Section 6(a) hereof shall cease, and all voting rights and powers and rights to distributions included in the Collateral or otherwise described in such Section 6(a) shall thereupon become vested in the Administrative Agent, and the Administrative Agent shall thereafter have the sole and exclusive right and authority to exercise such voting rights and powers; provided that, so long as Obligations owed to Nineteen77 Capital Solutions A LP or Bermudez Mutari Ltd. are secured by the Tellurian Shares, Pledgor shall be the sole party entitled to exercise for any purpose any and all voting rights and powers to the extent that the Tellurian Shares or the security into which such Tellurian Shares are convertible or for which such Tellurian Shares are exercisable (as the case may be) constitute an "equity security" (as such term is defined in Rule 13d-1(i) under the Exchange Act).  Each Pledgor shall execute such documents and instruments, including but not limited to, statements that such Pledgor no longer has the right to act as a shareholder or otherwise relating to such change as the Administrative Agent may reasonably request in furtherance of the foregoing.  Each Pledgor agrees that each Issuer and any holder of any Pledged Shares may rely conclusively upon any notice from the Administrative Agent that the Administrative Agent has the right and authority to exercise all rights and powers of such Pledgor with respect to any of the Pledged Shares, other than as set

OHSUSA:766767656

forth in the proviso above.  Each Pledgor irrevocably waives any claim or cause of action against each Issuer or any holder of any Pledged Shares who deals directly with the Administrative Agent following receipt of such notice from the Administrative Agent.

7.      Collection.  Each Pledgor hereby authorizes the Administrative Agent, at the Pledgors' sole cost and expense, to exercise at any time following the occurrence and during the continuance of an Event of Default in the Administrative Agent's sole discretion, all or any of the following powers, which powers are coupled with an interest and irrevocable until all of the Obligations have been paid in full and the Loan Agreement has been terminated (other than inchoate indemnity obligations that expressly survive termination of the Loan Documents):

(a)      Receive, take, endorse, assign, deliver, accept and deposit, in the name of the Administrative Agent, any other Secured Party or such Pledgor, any and all remittances on the Collateral or the Proceeds thereof;

(b)      Pay any sums necessary to discharge any Lien or encumbrance on the Collateral, which sums shall be added to the Obligations;

(c)      Exercise exclusive control over the Interest Reserve Account and the UBS Securities Account or other deposit accounts, securities accounts or commodity accounts subject to a security interest hereunder;

(d)      Exercise voting rights with respect to any of the Pledged Shares; provided that, so long as Obligations owed to Nineteen77 Capital Solutions A LP or Bermudez Mutari Ltd. are secured by the Tellurian Shares, Pledgor shall be the sole party entitled to exercise for any purpose any and all voting rights and powers over the Tellurian Shares to the extent that the Tellurian Shares or the security into which such Tellurian Shares are convertible or for which such Tellurian Shares are exercisable (as the case may be) constitute an "equity security" (as such term is defined in Rule 13d-1(i) under the Exchange Act);

(e)      Send requests (which may identify the sender by a pseudonym) for verification of the Collateral directly to any Issuer (or any of its affiliates) or any other Person in possession of any Collateral or any information relating to the Collateral; and

(f)      Liquidate, withdraw or sell all or any part of the Collateral (and, at the Administrative Agent's option (acting at the Lenders' request), apply the same, as well as the proceeds of any liquidation or sale, to the then outstanding principal amount of the Term Loans and all accrued and unpaid interest thereon).

8.      Administrative Agent's Appointment as Attorney-in-Fact.

(a)      Each Pledgor hereby irrevocably constitutes and appoints the Administrative Agent and each officer or agent of the Administrative Agent with full power of substitution, as such Pledgor's true and lawful attorney-in-fact, coupled with an interest, with full irrevocable power and authority in the place and stead of such Pledgor and in the name of such Pledgor or in such attorney-in-fact's own name, from time to time in the discretion of each such attorney-in-fact following the occurrence and continuation of an Event of Default, for the purpose of carrying out the terms of this Pledge Agreement, to take any and all appropriate

11

action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Pledge Agreement and, without limiting the generality of the foregoing, hereby gives each such attorney-in-fact the power and right, from and after an Event of Default, on behalf of such Pledgor, without notice to or assent by any Pledgor, to do the following:

> (i)    to collect and otherwise take possession of and title to any and all distributions of cash or other property due or distributable at any time after the date hereof to such Pledgor as a shareholder from any Issuer, whether in complete or partial liquidation or otherwise, and to prosecute or defend any action or proceeding in any court of law or equity and to convert any non-cash distributions to cash, and to apply any such cash distributions, interest or proceeds of conversion in the manner specified in Section 11(f) of this Pledge Agreement;

> (ii)    to ask, demand, collect, receive and give acceptances and receipts for any and all moneys due and to become due under any Collateral and, in the name of such Pledgor or such attorney-in-fact's own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by such attorney-in-fact for the purpose of collecting any and all such moneys due under any Collateral whenever payable;

> (iii)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral; and

> (iv)    (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due and to become due thereunder directly to the Administrative Agent or as such attorney-in-fact shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (D) to defend any suit, action or proceeding brought against such Pledgor with respect to any Collateral; (E) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as such attorney-in-fact may deem appropriate; and (F) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though such attorney-in fact were the absolute owner thereof for all purposes, and to do, at the option of such attorney-in-fact at the Pledgors' expense, at any time, or from time to time, all acts and things which such attorney-in-fact reasonably deems necessary to protect, preserve or realize upon the Collateral and the security interest of the Administrative Agent (for the ratable benefit of the Secured Parties) therein, in order to effect the intent of this Pledge Agreement, all as fully and effectively as such Pledgor might do.

Each Pledgor hereby ratifies, to the extent permitted by law, all that said attorney shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

(b)      The powers conferred on each attorney-in-fact hereunder are solely to protect the interest in the Collateral of the Administrative Agent and the other Secured Parties and shall not impose any duty upon any such attorney-in-fact to exercise any such powers.  Each such attorney-in-fact shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to any Pledgor for any act or failure to act unless such action or failure to act constitutes gross negligence.

(c)      Each Pledgor also authorizes the Administrative Agent and each officer or agent of the Administrative Agent at any time and from time to time upon the occurrence and continuation of any Event of Default, to execute, in connection with the sale provided for in Section 11 of this Pledge Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to any of the Collateral.

9.      Distributions.  At any time following the occurrence and continuation of an Event of Default, each Pledgor hereby grants the Administrative Agent full irrevocable power and authority to receive and hold cash and non-cash distributions by any Issuer on account of any of the Collateral (together with all interest, if any, earned thereon) and (x) to convert any such non-cash distributions to cash and (y) to apply any such cash distributions, interest or proceeds of conversion in the manner specified in Section 11(f) of this Pledge Agreement.

10.      Performance of Pledgors' Obligations.  If any Pledgor fails to perform or comply with any of such Pledgor's agreements contained herein and the Administrative Agent or any other Secured Party as provided for by the terms of this Pledge Agreement shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of the Administrative Agent or such Secured Party, as applicable, incurred in connection with such performance or compliance, together with interest thereon at the Default Rate shall be payable by the Pledgors to the Administrative Agent or such Secured Party, as applicable, on demand and shall constitute Obligations secured hereby.

11.      Remedies, Rights Upon Default.

(a)      Upon the occurrence of any Event of Default, the Administrative Agent or the Administrative Agent's designee may, at the Administrative Agent's option, elect to become a substituted shareholder in any Issuer with respect to the Collateral and each Pledgor shall execute or cause to be executed all documents necessary to evidence the Administrative Agent so becoming a substituted shareholder.  If any Event of Default shall occur, the Administrative Agent or the Administrative Agent's designee may exercise in addition to all other rights and remedies granted to them in this Pledge Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, each Pledgor expressly agrees that in any such event the Administrative Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified in Section 11(b) of time

OHSUSA:766767656

and place of public or private sale) to or upon any Pledgor or any other Person (all and each of which demands, advertisements and/or notices are hereby expressly waived), may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, at public or private sale or sales, at any exchange or broker's board or at any of the Administrative Agent's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without the assumption of any credit risk.  Each Pledgor expressly acknowledges that private sales may be less favorable to a seller than public sales but that private sales shall nevertheless be deemed commercially reasonable and otherwise permitted hereunder.  In view of the fact that federal and state securities laws and/or other applicable laws may impose certain restrictions on the method by which a sale of the Collateral may be effected, each Pledgor agrees that upon the occurrence of an Event of Default, the Administrative Agent may, from time to time, attempt to sell all or any part of the Collateral by means of a private placement, restricting the prospective purchasers to those who will represent and agree that they are purchasing for investment only and not for distribution and who otherwise satisfy all of the requirements of applicable federal and state securities laws.  In so doing, the Administrative Agent may solicit offers to buy the Collateral, or any part thereof, for cash, from a limited number of investors deemed by the Administrative Agent in its judgment, to be financially responsible parties who might be interested in purchasing the Collateral, and if the Administrative Agent solicits such offers, then the acceptance by the Administrative Agent of the highest offer obtained therefrom shall be deemed to be a commercially reasonable method of disposing of the Collateral.

Each Secured Party or any Secured Party's designee shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase (via cash, credit bid or other means permitted by applicable law) the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Pledgor hereby releases.  Without limiting the foregoing, each Pledgor expressly acknowledges that each Secured Party may purchase all or a portion of the Collateral by credit bidding its share of the Obligations.  Each Pledgor further agrees, at the request of the Administrative Agent or any Lender, to deliver to the Administrative Agent, such Lender or any purchaser or purchasers of the Collateral any agreements, instruments and other documents evidencing or relating to the Collateral.  The Administrative Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 11(f).  Only after so applying such net proceeds and after the payment by the Administrative Agent of any other amount required by any provision of law, need the Administrative Agent account for the surplus, if any, to any Pledgor.  To the extent permitted by applicable law, each Pledgor waives all claims, damages, and demands against the Administrative Agent and each other Secured Party arising out of the repossession, retention or sale of the Collateral.

Notwithstanding the foregoing, nothing in this Section 11(a) shall contravene the provisions of Section 11(b) or of Section 9-611(d) of the UCC regarding the sale of Collateral customarily sold on a recognized market.

(b)     Each Pledgor agrees that, with respect to any Collateral that is not sold on a recognized market, the Administrative Agent need not give more than ten days' notice (which

notification shall be deemed given when provided in accordance with the Loan Agreement) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.  Each Pledgor further agrees that, with respect to Collateral that is sold on a recognized market, no such notification is required pursuant to Section 9-611(d) of the UCC and that securities or security entitlements that are sold on any Exchange are property of a type "sold on a recognized market" for purposes of such Section 9-611(d).

(c)     In order to permit the Administrative Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant this Pledge Agreement with respect to the Collateral and to receive all dividends and other distributions which it may be entitled to receive under this Pledge Agreement with respect to the Collateral, (i) each Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to the Administrative Agent all such proxies, dividend payment orders and other instruments as the Administrative Agent may from time to time reasonably request and (ii) without limiting the effect of clause (i) above, each Pledgor hereby grants to the Administrative Agent an irrevocable proxy to vote all or any part of the Collateral (subject to the proviso to Section 7(d)) and to exercise all other rights, powers, privileges and remedies to which a holder of the Collateral would be entitled (including, without limitation, giving or withholding written consents of shareholders, partners or members, as the case may be, calling special meetings of shareholders, partners or members, as the case may be, and voting at such meetings), which proxy shall be effective automatically and without the necessity of any action (including, without limitation, any transfer of the Collateral on the record books of the issuer thereof) by any other person (including, without limitation, the issuer of the Collateral or any officer or agent thereof) during each period of time that an Event of Default has occurred and is continuing.  Each Pledgor acknowledges and agrees that the irrevocable proxy granted to the Administrative Agent by such Pledgor pursuant to the preceding sentence with respect to the Collateral held by such Pledgor is coupled with an interest and shall be exercisable by the Administrative Agent during each period of time that an Event of Default has occurred and is continuing, regardless of the length of any such period of time.  Each Pledgor hereby expressly authorizes and instructs each issuer of any Collateral pledged hereunder by such Pledgor to (i) comply with any instruction received by it from the Administrative Agent in writing that (A) states that an Event of Default has occurred and is continuing and (B) is otherwise in accordance with the terms of this Pledge Agreement, without any other or further instructions from any Pledgor, and each Pledgor agrees that such issuer shall be fully protected in so complying and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Collateral directly to the Administrative Agent in compliance with any such instructions.

(d)     Each Pledgor also jointly and severally agrees to pay all costs of each Secured Party, including reasonable attorneys' fees and expenses, incurred with respect to the enforcement of any of the Secured Parties' rights hereunder.

(e)     Each Pledgor hereby waives presentment, demand, or protest (to the extent permitted by applicable law) of any kind in connection with this Pledge Agreement or any Collateral.  Except for notices expressly provided for herein, each Pledgor hereby waives notice (to the extent permitted by applicable law) of any kind in connection with this Pledge Agreement.

15

(f)     The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Administrative Agent in the following order of priorities:

first, to the Administrative Agent in an amount sufficient to pay in full the fees, costs, indemnities, expenses and any other amounts owed to the Administrative Agent pursuant to the Loan Agreement and/or in connection with such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by the Administrative Agent in connection therewith, including reasonable attorneys' fees and expenses;

second, to the payment in full of the Obligations, in each case ratably in accordance with the respective amounts thereof then due and owing or as the Lenders holding the same may otherwise agree; and

finally, upon payment and satisfaction in full of all of the Obligations, to the Borrower, or its representative or as a court of competent jurisdiction may direct.

12.     Maximum Percentage.

(a)     Notwithstanding anything contained in this Pledge Agreement or the Loan Agreement to the contrary, so long as Obligations owed to Nineteen77 Capital Solutions A LP or Bermudez Mutari Ltd. are secured by the Tellurian Shares, the Administrative Agent may not acquire or dispose of, have the right to acquire or dispose of or cause the acquisition or disposition of any particular Tellurian Shares at any particular time to the extent (but only to the extent) that the Administrative Agent or any of its affiliates would as of such time beneficially own in excess of 4.9% (the "**Maximum Percentage**") of such Tellurian Shares or the security into which such Tellurian Shares are convertible or for which such Tellurian Shares are exercisable (as the case may be) to the extent that such Tellurian Shares or the security into which such Tellurian Shares are convertible or for which such Tellurian Shares are exercisable (as the case may be) constitute an "equity security" (as such term is defined in Rule 13d-1(i) under the Exchange Act).  No prior inability to acquire or dispose of any particular Tellurian Shares pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination. The Maximum Percentage limitation contained in this paragraph and any other similar beneficial ownership limitation contained in any other instrument held by the Administrative Agent or any of its affiliates that is convertible or exercisable into the particular Tellurian Shares or the security into which such Tellurian Shares are convertible or for which such Tellurian Shares are exercisable (as the case may be) shall be coordinated so that the aggregate beneficial ownership of the Administrative Agent (together with its affiliates) does not exceed the Maximum Percentage limitation.  For the purposes of this paragraph, beneficial ownership and all determinations and calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder.  The provisions of this paragraph shall be implemented in a manner otherwise than in strict conformity with the terms of this paragraph to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Maximum

OHSUSA:766767656

Percentage beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such Maximum Percentage limitation. This paragraph may not be waived or amended in any manner.

(b)      Notwithstanding anything contained in this Pledge Agreement or the Loan Agreement to the contrary (but subject to the immediately preceding paragraph), upon the occurrence of an Event of Default, only the Administrative Agent shall have "investment power" (as such term is used in Rule 13d-3 promulgated under the Exchange Act) with respect to any Tellurian Shares or the security into which such Tellurian Shares are convertible or for which such Tellurian Shares are exercisable (as the case may be) to the extent they constitute an "equity security," and no Lender shall have, or have any authority to exercise, any "investment power" with respect to any such Tellurian Shares or any security into which such Tellurian Shares are convertible or for which such Tellurian Shares are exercisable. This paragraph may not be waived or amended in any manner.

13.      <u>Limitation on the Secured Parties' Duty in Respect of Collateral</u>. Except as expressly provided in the UCC, no Secured Party shall have any duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of such Secured Party or as to any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

14.      <u>Administrative Agent's Actions</u>. Nothing in this Agreement shall be interpreted as giving the Administrative Agent responsibility for or any duty concerning the validity, perfection, priority or enforceability of the liens granted hereunder or giving the Administrative Agent any obligation to take any action to procure or maintain such validity, perfection, priority or enforceability. In the performance of any act, right or power hereunder, the Administrative Agent shall act only upon the direction of the Lenders (with respect to all such matters). The Administrative Agent shall be entitled to the protections, indemnities, rights and immunities set forth in the Loan Agreement, all of which are incorporated herein by reference mutatis mutandis, in the performance of any obligation under this agreement.

15.      <u>Notices</u>. All notices and other communications given hereunder shall be delivered in accordance with Section 10 of the Loan Agreement.

16.      <u>No Waiver; Cumulative Remedies</u>. No Secured Party shall, by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder. No waiver hereunder shall be valid unless in writing signed by the party to be charged with such waiver and then only to the extent therein set forth. A waiver of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which any Secured Party would otherwise have had on any future occasion. No failure to exercise nor any delay in exercising on the part of any Secured Party any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder and under the other Loan Documents provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law. The Administrative Agent and each Lender may resort to and realize on the Collateral simultaneously with any acts or proceedings initiated by the

OHSUSA:766767656

Administrative Agent or such Lender in its sole and conclusive discretion to resort to or realize upon any other sources of repayment of the Obligations, including, but not limited to, collateral granted by other security agreements and the personal liability of any Pledgor and any Person or corporation which has guaranteed repayment of the Obligations.  None of the terms or provisions of this Pledge Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by each Pledgor and the Administrative Agent (acting at the direction of the Required Lenders).

17.   Governing Law; Waiver of Jury Trial; Submission to Jurisdiction, etc.

(a)   THIS PLEDGE AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

(b)   EACH OF THE PARTIES HERETO HEREBY WAIVES ANY AND ALL RIGHTS SUCH PARTY MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST ANY SECURED PARTY WITH RESPECT TO THIS PLEDGE AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL MATTERS RELATING TO OR ARISING OUT OF THIS PLEDGE AGREEMENT OR ANY OTHER LOAN DOCUMENT.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS PLEDGE AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN SUCH PARTY'S RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH SUCH PARTY'S LEGAL COUNSEL AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES SUCH PARTY'S JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 17(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS. IN THE EVENT OF LITIGATION, THIS PLEDGE AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT

(c)   EACH PLEDGOR IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY JUDICIAL PROCEEDING WITH RESPECT TO THIS PLEDGE AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY MATTER RELATING TO OR ARISING OUT OF THIS PLEDGE AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT ONLY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT LOCATED

18

IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN (AND EACH COURT WHERE APPEALS OF THE DECISIONS OF SUCH COURTS MAY BE SOUGHT).  EACH PARTY HERETO (I) ACCEPTS THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY, (II) WAIVES PERSONAL SERVICE OF PROCESS, (III) AGREES THAT SERVICE OF PROCESS UPON SUCH PARTY MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, PURSUANT TO THE PROVISIONS OF THE LOAN AGREEMENT, AND (IV) WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT  IN ACCORDANCE WITH THE FOREGOING AND AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION, VENUE, CONVENIENCE OR FORUM NONCONVENIENS.  NOTHING IN THIS PLEDGE AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY OTHER SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS PLEDGE AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY PLEDGOR OR ANY PLEDGOR'S PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(d)     The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Pledge Agreement.  In cases of uncertainty this Pledge Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

18.     Entire Agreement.    This Pledge Agreement and the other Loan Documents, taken together, constitute and contain the entire agreement of the Pledgors and the Secured Parties and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

19.     Successors and Assigns.    Each Loan Document and the terms and conditions contained therein are solely for the benefit of the Pledgors and the Secured Parties (and each Indemnified Person) and their respective heirs, estates, successors and assigns; provided that no Pledgor may transfer or assign any Loan Document without the prior written consent of the Administrative Agent and each Lender.  Any purported transfer or assignment in violation of the foregoing shall be null and void.

20.     Severability.  Any provision of this Pledge Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

21.     Termination.

(a)     This Pledge Agreement, and the assignments, pledges and security interests created or granted hereby, shall terminate when the Obligations shall have been fully paid and satisfied (other than inchoate indemnity obligations that expressly survive termination

OHSUSA:766767656

of the Loan Documents), at which time the Administrative Agent shall release and reassign (without recourse upon, or any warranty whatsoever by, any Secured Party), and deliver to the Pledgors all Collateral then in the custody or possession of the Administrative Agent and termination statements under the UCC (if any), all without recourse upon, or warranty whatsoever, by any Secured Party and at the sole cost and expense of the Pledgors.

(b)     At any time and from time to time prior to the termination of this Pledge Agreement, the Administrative Agent may (i) release any of the Collateral to the extent expressly permitted hereby or by the Loan Agreement and (ii) otherwise release any of the Collateral with the prior written consent of each Lender.

22.     <u>Reinstatement</u>.  Each Pledgor agrees that the assignments, pledges and security interests created or granted under this Pledge Agreement (including, without limitation, the assignments, pledges and security interests with respect to the Collateral) shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by any Secured Party upon the bankruptcy or reorganization of any Pledgor, any other Loan Party, any other Person or otherwise.

23.     <u>Injunctive Relief</u>.  Each Pledgor recognizes that in the event such Pledgor fails to perform, observe or discharge any of such Pledgor's obligations hereunder, no remedy of law will provide adequate relief to the Secured Parties, and agrees that the Secured Parties shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

24.     <u>Waiver of Subrogation</u>.  No Pledgor shall have rights of subrogation as to any of the Collateral until full and complete performance and payment of the Obligations (other than inchoate indemnity obligations that expressly survive termination of the Loan Documents).

25.     <u>Perfection of Interest Reserve Account</u>.  This Pledge Agreement is intended to be an authenticated record to establish control within the meaning of Section 9-104(a)(2) of the UCC and is entered into to perfect the Administrative Agent's security interest in the Interest Reserve Account in accordance with Section 9-314(a) of the UCC.  Borrower, Administrative Agent on behalf of the Secured Parties and Bank hereby agree that Bank will comply with instructions originated by the Administrative Agent directing disposition of the funds in the Interest Reserve Account without further consent by the Borrower.  Notwithstanding anything to contrary in the Loan Documents, the parties hereto agree that the Borrower will not be able to make debits or withdrawals from or otherwise have access to the Interest Reserve Account or the funds on deposit therein, and that Administrative Agent will have exclusive access and control over the Interest Reserve Account and the funds on deposit therein and Bank will not comply with instructions or requests originated by the Borrower regarding the Interest Reserve Account or the funds on deposit therein without further consent in writing by the Administrative Agent.

*[The Signature Page Follows]*

OHSUSA:766767656

IN WITNESS WHEREOF, the parties hereto have executed this Pledge Agreement as of the date first above written.

PLEDGORS:

**CHARIF SOUKI**

**STRUDEL HOLDINGS LLC**

Name:  Brooke A. Peterson
Title:   Attorney-In-Fact

**AVR AH LLC**

Name:  Brooke A. Peterson
Title:   Manager

**CHARIF SOUKI**, not in his individual capacity, but solely as Trustee of the Souki Family 2016 Trust

By:  
Name:  Charif Souki
Title:   Trustee

[Signature Page – Pledge Agreement – Chiron]

**ADMINISTRATIVE AGENT:**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By: _____

Name: Jennifer Anderson
Title: Assistant Vice President


SOLELY WITH RESPECT TO THE
AGREEMENT SET FORTH IN SECTION 25
**BANK:**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By: _____

Name: Jennifer Anderson
Title: Assistant Vice President

[Signature Page – Pledge Agreement – Chiron]

SCHEDULE A

Initial Pledged Shares

| Holder | Stock Issuer | Class of Shares | Certificated (Y/N) | Stock Cert. No. | No. of Pledged Shares | % of Outstanding Shares Held by Holder that Pledged Shares Represent | % of Total Outstanding Shares of relevant Issuer that Pledged Shares Represent |
|---|---|---|---|---|---|---|---|
| Strudel Holdings LLC | Ajax Holdings LLC | N/A | N/A | N/A | N/A | 100% | 50% |
| Souki Family 2016 Trust | Ajax Holdings LLC | N/A | N/A | N/A | N/A | 100% | 50% |
| Charif Souki | AVR AH LLC | N/A | N/A | N/A | N/A | 100% | 100% |
| Charif Souki | TELLURIAN INC. | N/A | N/A | N/A | 20,000,000 | 69% | 9.87% |

Schedule A