# EXHIBIT 10

*Execution Version*

AGREEMENT

AMONG

CHARIF SOUKI,
as the Borrower,

THE GUARANTORS,

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent,

and

THE LENDERS PARTY HERETO

dated as of May 5, 2020

4140-5646-2116

**AGREEMENT**

This AGREEMENT (this "Agreement") dated as of May 5, 2020, among CHARIF SOUKI, with an address at 1201 Louisiana St., Suite 3100, Houston Texas 77002, in his individual capacity (the "Borrower"), CHARIF SOUKI, as Trustee of the SOUKI FAMILY 2016 TRUST effective March 11, 2016, as amended (the "Trust"), STRUDEL HOLDINGS LLC, a Texas limited liability company ("Strudel"), AVR AH LLC, a Colorado limited liability company ("AVR" and, together with the Trust, Strudel and Ajax Cayman, the "Guarantors"), each lender party hereto (each, a "Lender" and, collectively, the "Lenders") and WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent (in such capacity, including any successor thereto, the "Administrative Agent") for the Lenders.

Recitals

A.  The Borrower, the Guarantors, the Administrative Agent and the Lenders are parties to that certain Loan Agreement dated as of April 27, 2017 (as amended by Amendment, Consent and Waiver No. 1 dated as of January 30, 2018, Amendment No. 2 dated as of March 22, 2018, Amendment No. 3 dated as of January 30, 2019, Amendment No. 4 dated as of June 26, 2019, Amendment No. 5 dated as of March 30, 2020, Amendment No. 6 effective as of April 30, 2020, and as otherwise amended and in effect immediately prior to the date hereof, the "Loan Agreement"), pursuant to which the Lenders have made certain credit available to and on behalf of the Borrower.

B.  The Borrower has notified the Administrative Agent the Events of Default identified on Schedule I hereto (collectively, the "Specified Defaults") have occurred or will likely occur during the Agreement Period (as defined below).

C.  Notwithstanding the occurrence of the Specified Defaults, the Borrower has requested that the Lenders hereto forbear, and the Lenders party hereto are willing to forbear, from taking any remedial actions under the Loan Agreement and the Loan Documents on account of the Specified Defaults, but only on the terms and subject to the conditions provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.   Defined Terms.

1.1   As used in this Agreement, each of the terms defined in the opening paragraph and the Recitals above shall have the meanings assigned to such terms therein. Each term defined in the Loan Agreement and used herein without definition shall have the meaning assigned to such term in the Loan Agreement unless expressly provided to the contrary. The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "including" means "including, without limitation". Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement. Unless otherwise indicated, references herein to the Term Loans or 2018

4140-5646-2116

Facility Term Loans shall include any PIK Payments added to the outstanding principal amount of such Term Loans pursuant to Section 4.1(a) herein or the terms of a comparable Agreement with respect to such 2018 Facility Term Loans, as applicable.

1.2    The following terms shall have the following meanings:

"2018 Facility" means that certain Loan Agreement, dated as of March 30, 2018, by and among the Borrower, each Guarantor (as defined therein) and lender from time to time party thereto and Wilmington Trust, National Association, as administrative agent, as amended, restated, supplemented or otherwise modified.

"2018 Facility Aggregate Collateral Value" means, at any time, the "Aggregate Collateral Value" under the 2018 Facility at such time calculated by the lenders thereunder on the basis of the most recent financial statements and certificate delivered pursuant to Section 5.2(a) and Section 5.2(d) of the 2018 Facility and other information reasonably available to them.

"2018 Facility Term Loans" means the "Term Loans" as defined in the 2018 Facility.

"Agreement Period" means the period beginning on the Agreement Effective Date and ending on the earlier to occur of (i) the Outside Date and (ii) the Termination Date.

"Ajax Management Fee" has the meaning assigned to such term in Section 4.2(a) hereof.

"AVR Closing Date" has the meaning assigned to such term in Section 4.2(a) hereof.

"Gross Proceeds" has the meaning assigned to such term in Section 4.2(a) hereof.

"Net Proceeds" means an amount that is equal to Gross Proceeds less the sum of (i) all outstanding obligations of the Loan Parties under the Existing Alpine Facilities, (ii) accounts payable in respect of the Mortgaged Property as of the AVR Closing Date, including any deferred compensation of employees (provided that the amount in this clause (ii) may not exceed the lesser of $2,000,000 and 1.0% of Gross Proceeds), (iii) taxes and customary fees, commissions, costs and other out-of-pocket expenses incurred in connection with the AVR Sale (provided that the amount in this clause (iii) may not exceed 3.50% of the Gross Proceeds), and (iv) the Ajax Management Fee.

"Outside Date" means March 30, 2021; provided that the Borrower may, at its option, send a written notice to the Administrative Agent and the Lenders to extend the Outside Date to September 30, 2021 so long as, on the date such written notice is received by the Administrative Agent and the Lenders: (i) the sum of the outstanding principal amount of (x) Term Loans and (y) 2018 Facility Term Loans is less than $50,000,000 (the "Combined Term Loan Balance") and (ii) the quotient (expressed as a percentage) of (x) the Combined Term Loan Balance divided by (y) the sum of (1) the Aggregate Collateral Value on such date (calculated by the Lenders on the basis of the most recent financial statements and certificate delivered pursuant to Section 5.2(a) and Section 5.2(d) of the Loan Agreement and other information reasonably available to them) and (2) the 2018 Facility Aggregate Collateral Value on such date is less than 40%.

"PIK Payment" has the meaning assigned to such term in Section 4.1(a)(i) hereof.

"Termination Date" has the meaning assigned to such term in Section 3.2 hereof.

"Termination Event" means the occurrence of any of the following: (i) a Default or Event of Default (in each case other than the Specified Defaults) under any Loan Document, (ii) any breach by any Loan Party in the due observance or performance of any covenant in Section 4.2 or any other term, covenant or agreement set forth in this Agreement, (iii) any representation or warranty made or deemed made hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection herewith shall prove to have been false or misleading in any material respect when so made, deemed made or furnished, or (iv) the exercise of any remedy or enforcement action by any holder of Indebtedness of any Loan Party (other than the Lenders) against the Mortgaged Property or any other Collateral securing the Obligations under the Loan Documents.

Section 2.    Conditions Precedent.

This Agreement shall not become effective until the date on which the Administrative Agent shall have received (such date, the "Effective Date"): (i) from the Lenders, the Borrower and the Guarantors, counterparts of this Agreement and (ii) from each party thereto, counterparts of a comparable Agreement with respect to the 2018 Facility (the "2018 Facility Agreement").

The Administrative Agent is hereby authorized and directed to declare this Agreement to be effective and to declare the occurrence of the Effective Date when it has received documents confirming or certifying, to the satisfaction of the Administrative Agent, compliance with the conditions set forth in this Section 2 or the waiver of such conditions as permitted in Section 12.6 of the Loan Agreement.  Such declaration shall be final, conclusive and binding upon all parties for all purposes.

Section 3.    Agreement with respect to Specified Defaults.

3.1    Forbearance. Subject to the terms and conditions hereof, the parties hereto agree that the Loan shall be deemed to have been accelerated immediately prior to the Effective Date, and upon the Effective Date the Administrative Agent and the Required Lenders agree to forbear, during the Agreement Period, from the exercise of all rights or remedies under the Loan Agreement and the other Loan Documents and applicable law solely as a result of the occurrence of the Specified Defaults.  The Borrower acknowledges and agrees that, at the end of the Agreement Period, the provisions of this Section 3 shall become of no force and effect and the Administrative Agent and the Lenders will be free, in accordance with the applicable Loan Documents and applicable law, to exercise any rights and remedies available to them at that time on account of any Specified Defaults that have occurred (and, for the avoidance of doubt, and without prejudice to the reservation of rights in this Agreement, any other Defaults or Events of Default under the Loan Documents, that have occurred), as if this Agreement had not been entered into.

3.2    Termination of Forbearance.  Upon the occurrence of any Termination Event, this Agreement and the forbearance provided for herein shall immediately and automatically terminate (such date of termination, the "Termination Date"), as if this Agreement had not been entered into.

Section 4.     Additional Agreements.

    4.1     Additional Agreements.  The parties hereby agree as follows:

        (a)     Interest.

            (i)     On the Effective Date, all accrued interest shall be capitalized and added to the outstanding principal amount of the Term Loans.

            (ii)     Notwithstanding anything to the contrary in the Loan Agreement, commencing on the date hereof and at all times hereafter, (x) all Term Loans shall accrue interest at a fixed interest rate of 8% per annum and (y)  interest shall be paid on each Interest Payment Date by capitalizing such interest and adding it to the then outstanding principal amount of the Term Loans (each such amount so added, a "PIK Payment").  The outstanding principal amount of the Term Loans as of the Effective Date (after giving effect to Section 4.1(a)(i)) is $22,968,212.91.

        (b)     Exit Fee.  On such date that the Borrower prepays or otherwise repays all of the then outstanding Term Loans in full for any reason or the Term Loans are accelerated or become due and payable in accordance with the Loan Agreement (after giving effect to this Agreement), the Borrower shall pay to the Lenders, through the Administrative Agent, an amount equal to $574,205.32 (the "Exit Fee").  The Exit Fee shall be due and payable on the date of such prepayment, repayment, other payment or acceleration.  For the avoidance of doubt, the Exit Fee shall become immediately due and payable as detailed in this Section 4.1(b), shall constitute part of the Obligations and shall be in addition to all other fees and expenses due and payable to the Lenders and the Administrative Agent under this Agreement and the other Loan Documents and shall be due and payable by the Borrower immediately prior to, and notwithstanding, the automatic acceleration of the outstanding principal of the Term Loans and all other accrued Obligations.  The Exit Fee shall be part of the "Obligations" under the Loan Agreement and shall be in addition to the Early Payment Fee and the Final Payment Fee and all other fee and other Obligations due under the Loan Agreement.

    4.2     Covenants of the Borrower.  Each Loan Party hereby covenants and agrees with the Administrative Agent and each Lender that such Loan Party will:

        (a)     With respect to the Mortgaged Property, (i) accept a *bona fide* offer to purchase such property at a price of at least $90,000,000 in cash consideration (the "AVR Sale") by no later than September 15, 2020, (ii) consummate such AVR Sale and receive the Net Proceeds thereof by no later than December 15, 2020 and (iii) apply 100% of the Net Proceeds of such AVR Sale to prepay the Term Loans; provided that (x) Ajax Holdings shall be entitled to receive a management fee (the "Ajax Management Fee") equal to 4.0% of the gross cash proceeds for such AVR Sale (the "Gross Proceeds") and reimbursement of all reasonable and documented expenses related to the operation of the Mortgaged Property from the date of this Agreement through and including the date such AVR Sale is consummated (the "AVR Closing Date") and (y) the Borrower shall in each case provide written notice and evidence of the foregoing to the Administrative Agent and the Lenders satisfactory to them, along with calculations of Net Proceeds in reasonable detail.

(b) In furtherance of the foregoing clause (a), the Loan Parties will promptly provide copies to the Lenders of all marketing materials, requests for proposals and such other documentation as the Lenders may reasonably request, as well as regular updates as to their marketing efforts and any offers to purchase the Mortgaged Property or any of the vessels set forth in Schedule 1.1(d) of the Loan Agreement.

(c) With respect to Tellurian, Inc. ("Tellurian"), not disclose, or cause or permit any Affiliate to disclose, at any time:

(i) any non-public information regarding Tellurian or any of its subsidiaries to any Lender or the Administrative Agent, except to the extent such non-public information is communicated exclusively to all of the Persons identified on Schedule II (each, a "Legal and Compliance Member"); and

(ii) without limiting the restrictions set forth above with respect to non-public information, any other information about Tellurian or any of its subsidiaries to any Lender or the Administrative Agent, except to the extent such other information is communicated in the presence of one of more Legal and Compliance Members.

4.3 Enforcement Protocol. After the Agreement Period has elapsed or otherwise terminated, the Lenders hereby agree that any exercise of remedies by the Administrative Agent with respect to the Collateral will be subject to the following protocol:

(a) At any time, the Administrative Agent may exercise remedies against, foreclose upon and/or dispose any of the Collateral consisting of or relating to (i) the Capital Stock of Tellurian or Ajax Cayman (each, as defined in the 2018 Facility) or (ii) any of the vessels set forth on Schedule 1.1(d) to the 2018 Facility, at the time and in such manner that the Administrative Agent determines in its sole and absolute discretion; provided that the Administrative Agent and the Lenders will use their commercially reasonable efforts to avoid any material disruption of Tellurian's stock price during such process.

(b) No earlier than the date that is 60 days after the earlier of (i) the offer deadline specified in any formal marketing of the Mortgaged Property for sale (set forth in Section 4.2(a)(i)) and (ii) September 15, 2020, the Administrative Agent may exercise remedies against, foreclose upon and/or dispose of any of the Collateral consisting of or relating to (i) the Capital Stock of AVR or (ii) the Mortgaged Property.

(c) No earlier than the date that is 180 days after the Agreement Period has elapsed or otherwise terminated, the Administrative Agent may exercise remedies against, foreclose upon and/or sell any of the Collateral consisting of or relating to the Capital Stock of Ajax Holdings.

Notwithstanding anything herein to the contrary, (x) in the event that the Borrower or any other Loan Party seeks to contest or avoid such enforcement or any other exercise of remedies available to the Administrative Agent or the Lenders under any Loan Document, including by commencing any bankruptcy, reorganization or insolvency case or asserting any claim, right or remedy with respect to the Collateral, the agreements of the Lenders set forth in this Section 4 shall be null and void and neither the Lenders nor the Administrative Agent shall have any obligation to comply

with the enforcement protocol set forth herein and (y) the exercise of rights and remedies by the Administrative Agent and the Lenders with respect to any Collateral not specifically described in the preceding clauses (a)-(c) above is not subject to the enforcement protocol described in this Section.

4.4     Extended Timing.  If governmental actions prevent the marketing, exhibition or sale of the Mortgaged Property for any period of time extending beyond May 31, 2020, the parties agree to work in good faith to extend the deadlines set forth in Section 4.2(a) and Section 4.3(b) to allow for a comparable period for the Mortgaged Property to be marketed following the cessation of such governmental action.

Section 5.     Miscellaneous.

5.1     Acknowledgement of Indebtedness.  The Borrower and each other Loan Party acknowledges that on the date hereof all outstanding Indebtedness is payable in accordance with the terms of the Loan Documents and the Borrower and each other Loan Party waives any defense, offset, counterclaim or recoupment with respect thereto.  The Administrative Agent, on behalf of the Lenders, hereby expressly reserves all rights, remedies, and claims under the Loan Documents.  Except as expressly provided herein with respect to the Specified Defaults, nothing in this Agreement shall constitute a waiver or relinquishment of (i) any Default or Event of Default under any of the Loan Documents, (ii) any of the agreements, terms or conditions contained in any of the Loan Documents, (iii) any rights or remedies of any Secured Party with respect to the Loan Documents, or (iv) the rights of any Secured Party (as defined in the Security Agreement) to collect the full amounts owing to them under the Loan Documents.

5.2     Strict Performance.  Each Loan Party hereby agrees and acknowledges that the Secured Parties (as defined in the Security Agreement) require and will require strict performance by the Loan Parties of all of their respective obligations, agreements and covenants contained in the Loan Agreement and the other Loan Documents (including any action or circumstance which is prohibited or limited during the existence of a Default or Event of Default), and no inaction or action by any such Secured Party regarding any Default or Event of Default is intended to be or shall be a waiver thereof.  Each Loan Party hereby also agrees and acknowledges that no course of dealing and no delay in exercising any right, power or remedy conferred to any such Secured Party in the Loan Agreement or in any other Loan Documents or now or hereafter existing at law, in equity, by statute or otherwise shall operate as a waiver of or otherwise prejudice any such right, power or remedy.

5.3     No Course of Dealings. Furthermore, each party hereto hereby agrees that, in no event and under no circumstance shall any past or future discussions with the Administrative Agent or any other Secured Party, serve to (i) cause a modification of the Loan Documents, (ii) establish a custom or course of dealing with respect to any of the Loan Documents, (iii) operate as a waiver of any existing or future Default or Event of Default under the Loan Documents, (iv) entitle any Loan Party to any other or further notice or demand whatsoever beyond those required by the Loan Documents, as forborne hereby or (v) in any way modify, change, impair, affect, diminish or release any Loan Party's obligations or liability under the Loan Documents, as forborne hereby, or any other liability any Loan Party may have to any such Secured Party.

5.4     Confirmation.  The provisions of the Loan Agreement, as modified or forborne by this Agreement, shall remain in full force and effect following the Agreement Effective Date.

5.5     Ratification and Affirmation; Representations and Warranties.  Each Loan Party hereby (a) acknowledges the terms of this Agreement; (b) ratifies and affirms its obligations under, and acknowledges its continued liability under, each Loan Document to which it is a party and agrees that each Loan Document to which it is a party remains in full force and effect as expressly amended hereby; and (c) represents and warrants to the Lenders that as of the date hereof, after giving effect to the terms of this Agreement: (i) all of the representations and warranties contained in each Loan Document to which it is a party are true and correct, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, such representations and warranties shall continue to be true and correct as of such specified earlier date and (ii) no Default or Event of Default (other than the Specified Defaults) has occurred and is continuing.  Without limiting the foregoing, each Guarantor hereby ratifies, confirms, acknowledges and agrees that its obligations under the Loan Agreement are in full force and effect and that such Guarantor continues to unconditionally and irrevocably guarantee the full and punctual payment, when due, whether at stated maturity or earlier by acceleration or otherwise, all of the Guaranteed Obligations and its execution and delivery of this Agreement does not indicate or establish an approval or consent requirement by such Guarantor in connection with the execution and delivery of amendments, consents or waivers to the Loan Agreement or any of the other Loan Documents.  Each of the Pledgors have granted to the Administrative Agent, a valid, binding, perfected, enforceable, first priority (subject to any Liens expressly permitted by the Loan Agreement) Liens in the Collateral and all other assets described in the Security Documents and such Liens are not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, or defense of any kind.

5.6     Counterparts.  This Agreement may be executed by one or more of the parties hereto in any number of separate counterparts, and all of such counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of this Agreement by email or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

5.7     No Oral Agreement.  This Agreement, the Loan Agreement and the other Loan Documents executed in connection herewith and therewith represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or unwritten oral agreements of the parties.  There are no subsequent oral agreements between the parties.

5.8     GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

5.9     Payment of Expenses.  In accordance with Section 12.2 of the Loan Agreement and without limiting the rights of any Lender under Section 12.2 of the Loan Agreement, the Borrower agrees to pay or reimburse the Administrative Agent, each Lender and any of their respective Affiliates, for all reasonable out-of-pocket costs and reasonable expenses incurred, including, without limitation, the reasonable fees and disbursements of counsel to the Administrative Agent and all appraisal costs, legal, tax, accounting, audit, background checks, consulting and due diligence costs, including flights and hotels, associated with this Agreement and the transactions contemplated hereby, promptly upon receipt.

5.10     Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

5.11     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.12     Loan Document.  This Agreement is a "Loan Document" as defined and described in the Loan Agreement, and all of the terms and provisions of the Loan Agreement relating to Loan Documents shall apply hereto.  Without limiting the foregoing, any breach of representations, warranties, and covenants under Agreement shall be a Default or Event of Default, as applicable, under the Loan Agreement.

5.13     **RELEASE.**  FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, THE BORROWER AND EACH OTHER LOAN PARTY HEREBY, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, FULLY AND WITHOUT RESERVE, RELEASES AND FOREVER DISCHARGES EACH LENDER, THE ADMINISTRATIVE AGENT AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, TRUSTEES, ATTORNEYS, AGENTS, ADVISORS (INCLUDING ATTORNEYS, ACCOUNTANTS AND EXPERTS) AND AFFILIATES (COLLECTIVELY THE "RELEASED PARTIES" AND INDIVIDUALLY A "RELEASED PARTY") FROM ANY AND ALL ACTIONS, CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, EXECUTIONS, SUITS, DEBTS, LIABILITIES, COSTS, DAMAGES, EXPENSES OR OTHER OBLIGATIONS OF ANY KIND AND NATURE WHATSOEVER, KNOWN OR UNKNOWN, DIRECT AND/OR INDIRECT, AT LAW OR IN EQUITY, WHETHER NOW EXISTING OR HEREAFTER ASSERTED (INCLUDING, WITHOUT LIMITATION, ANY OFFSETS, REDUCTIONS, REBATEMENT, CLAIMS OF USURY OR CLAIMS WITH RESPECT TO THE NEGLIGENCE OF ANY RELEASED PARTY), FOR OR BECAUSE OF ANY MATTERS OR THINGS OCCURRING, EXISTING OR ACTIONS DONE, OMITTED TO BE DONE, OR SUFFERED TO BE DONE BY ANY OF THE RELEASED PARTIES, IN EACH CASE, ON OR PRIOR TO THE DATE HEREOF AND ARE IN ANY WAY DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED TO ANY OF THIS AGREEMENT, THE LOAN AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (COLLECTIVELY, THE "RELEASED MATTERS").  THE BORROWER AND EACH OTHER LOAN PARTY, BY EXECUTION HEREOF, HEREBY ACKNOWLEDGES AND AGREES THAT THE AGREEMENTS IN THIS SECTION 5.13 ARE INTENDED TO COVER AND BE IN FULL SATISFACTION FOR ALL OR ANY ALLEGED INJURIES OR DAMAGES ARISING IN CONNECTION WITH THE RELEASED MATTERS.  THE BORROWER AND EACH OTHER LOAN PARTY HEREBY FURTHER AGREES THAT IT WILL NOT SUE ANY RELEASED PARTY ON THE BASIS OF ANY RELEASED MATTER RELEASED, REMISED AND DISCHARGED BY THE BORROWER AND THE LOAN PARTIES PURSUANT TO THIS SECTION 5.13.  IN AGREEING TO THIS

**SECTION 5.13**, THE BORROWER AND EACH GUARANTOR CONSULTED WITH, AND HAS BEEN REPRESENTED BY, LEGAL COUNSEL AND EXPRESSLY DISCLAIM ANY RELIANCE ON ANY REPRESENTATIONS, ACTS OR OMISSIONS BY ANY OF THE RELEASED PARTIES AND HEREBY AGREES AND ACKNOWLEDGES THAT THE VALIDITY AND EFFECTIVENESS OF THE RELEASES SET FORTH HEREIN DO NOT DEPEND IN ANY WAY ON ANY SUCH REPRESENTATIONS, ACTS AND/OR OMISSIONS OR THE ACCURACY, COMPLETENESS OR VALIDITY HEREOF.  THE PROVISIONS OF THIS **SECTION 5.13**, SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT, THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS AND PAYMENT IN FULL OF THE INDEBTEDNESS.

5.14   Administrative Agent.  By their execution hereof, the Lenders hereby direct the Administrative Agent to execute and deliver this Agreement.

5.15   Agent Fees.  The Borrower and the Administrative Agent hereby agree that no later than May 12, 2020, the Borrower shall pay to the Administrative Agent, for its own account, (i) an amendment fee in the amount of $2,500 in connection with the additional agreements set forth herein and (ii) the annual administration fee of $17,500 that was payable in advance on April 27, 2020 in accordance with the Administrative Agent Fee Letter.

[SIGNATURES BEGIN NEXT PAGE]

4140-5646-2116

BORROWER: **CHARIF SOUKI**, in his individual capacity 

GUARANTORS: **AVR AH LLC**

By: _____

Name: Charif Souki
Title: Owner

**STRUDEL HOLDINGS LLC**

By: _____

Name: Charif Souki
Title: Owner

**TANGO 2**

By: _____

Name: Charif Souki
Title: Director

SIGNATURE PAGE TO AGREEMENT (2017 FACILITY)

**KARIM SOUKI**, not in his individual capacity, but solely as Co-Trustee of the **SOUKI FAMILY 2016 TRUST**

By: _____
Name: Karim Souki
Title: Co-Trustee

**LINA SOUKI RIZZUTO**, not in her individual capacity, but solely as Co-Trustee of the **SOUKI FAMILY 2016 TRUST**

By: _____
Name: Lina Souki Rizzuto
Title: Co-Trustee

**CHRISTOPHER SOUKI**, not in his individual capacity, but solely as Co-Trustee of the **SOUKI FAMILY 2016 TRUST**

By: _____
Name: Christopher Souki
Title: Co-Trustee

SIGNATURE PAGE TO AGREEMENT (2017 FACILITY)

**ADMINISTRATIVE AGENT**:  **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent

By: _____
Name:  Nicole Kroll
Title:  Assistant Vice President

SIGNATURE PAGE TO AGREEMENT (2017 FACILITY)

**LENDER**:  **BERMUDEZ MUTUARI LTD.**, as Lender

By: UBS O'Connor LLC,
as investment adviser

By: _____
Name: Baxter Wasson
Title: Managing Director

By: _____
Name: Rodrigo Trelles
Title: Managing Director

SIGNATURE PAGE TO AGREEMENT (2017 FACILITY)

## SCHEDULE I

## SPECIFIED DEFAULTS

1. The Borrower's failure to pay accrued interest on the Term Loans on April 15, 2020, resulting in an Event of Default under Section 8(c) of the Loan Agreement.

2. Any "Specified Defaults" defined in the 2018 Facility Agreement resulting in an Event of Default under Section 8(f) of the Loan Agreement.

## SCHEDULE II

## LEGAL AND COMPLIANCE MEMBERS

1. Chuck Mathys (Charles.mathys@ubs.com)
2. Connor Burke (Connor.burke@ubs.com)
3. Bill Lawlor (william.lawlor@ubs.com)