# EXHIBIT 18

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 2 of 26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
-------------------------------------------------------------------X

CHARIF SOUKI, Individually,
AVR AH LLC, KARIM SOUKI, CHRISTOPHER SOUKI,
and LINA SOUKI RIZZUTO, as Trustees
of the SOUKI FAMILY 2016 TRUST, and
STRUDEL HOLDINGS LLC,                                    Index No. 651164/2023

                    Plaintiffs,

        -against-

NINETEEN77 CAPITAL SOLUTIONS A LP,              **SECOND AMENDED**
BERMUDEZ MUTUARI, LTD, WILMINGTON               **COMPLAINT**
TRUST NATIONAL ASSOCIATION, and
UBS O'CONNOR LLC,

                    Defendants.
-------------------------------------------------------------------X

        Plaintiff Charif Souki ("Souki"), in his individual capacity, AVR AH LLC ("AVR"),

Karim Souki, Christopher Souki, and Lina Souki Rizzuto, in their capacities as trustees of the

Souki Family 2016 Trust ("Trust"), and Strudel Holdings LLC ("Strudel"), by and through their

attorneys Yetter Coleman LLP and Harris St. Laurent & Wechsler LLP, respectfully allege the

following, based upon personal knowledge as to themselves and their own actions and upon

information and belief as to all other persons and events.

## INTRODUCTION

        1.      This dispute arises out of the unconscionable, unreasonable, bad faith conduct of

lenders who have repeatedly violated their duties under certain loan agreements and New York

law, causing significant harm to their borrower, Souki. As a result of this misconduct, Souki is

entitled to significant damages, a declaration that he owes no further debt to Defendants and they

have no further right to exercise loan remedies, and injunctive relief regarding same.

1

## THE PARTIES

2.       Plaintiff Charif Souki resides in Colorado.

3.       Plaintiff AVR AH LLC ("AVR") is a Colorado limited liability company with a principal place of business at 514 East Hyman Avenue, Aspen, CO, 81611.

4.       Plaintiffs Karim Souki, Christopher Souki and Lina Souki Rizzuto (together, the "Trustees") are Trustees of the Trust. The Trust is organized under the laws of the state of Texas, with a principal place of business in Texas.

5.       Plaintiff Strudel Holdings LLC is a Texas limited liability company with a principal place of business in Colorado.

6.       Upon information and belief, Defendant Nineteen77 Capital Solutions A LP is a limited partnership organized under the laws of the state of Delaware with a principal place of business in New York, New York. Defendant Nineteen77 Capital Solutions A LP may be served at UBS Tower, One North Wacker Drive, Floor 32, Chicago, Illinois 60606 and via its registered agent Maples Fiduciary Services (Delaware Inc.) at 4001 Kennett Pike, Suite 302, Wilmington, Delaware, 19807.

7.       Upon information and belief, Defendant Bermudez Mutari, LTD is a corporation organized under the laws of the Cayman Islands, with a principal place of business in the Cayman Islands. Defendant Bermudez Mutari, LTD may be served at UBS Tower, One North Wacker Drive, Floor 32, Chicago, Illinois 60606.

8.       Upon information and belief, Defendant Wilmington Trust National Association is a financial institution organized under the laws of the state of Delaware, with a principal place of business in Delaware. Wilmington Trust National Association may be served at 50 South Sixth Street, Ste. 1290, Minneapolis, Minnesota 55402 and via its registered Agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

2

Case 23-90757  Document 75-19  Filed in TXSB on 08/24/23  Page 4 of 26

9.     Upon information and belief, Defendant UBS O'Connor LLC is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Chicago, Illinois. UBS O'Connor may be served via its registered agent Corporate Creations Network Inc. at 5444 Westheimer #1000, Houston, Texas 77056.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the Defendants pursuant to CPLR Section 302(a)(1) based upon their business activities within the state of New York.

11.     This venue is proper pursuant to CPLR Section 503 and pursuant to New York General Obligations Law § 5-1401 and 1402 based upon the Lenders' and the Agent's written consent to this Court's jurisdiction in the underlying loan agreements, including the pledge agreement.

12.     The loan agreements and the Pledge Agreement from which the claims in this lawsuit arise specify that New York law applies. The parties have also agreed in those agreements that judicial proceedings will be brought in Manhattan, New York, and that each party "accepts the exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby…and waives any objection to jurisdiction and venue of any action instituted hereunder…and agrees not to assert any defense based on lack of jurisdiction, venue, convenience, or forum non conveniens."

## FACTS COMMON TO ALL CLAIMS

**A.     Defendants loan nearly $150 million to Souki and Tellurian and require Souki to pledge his Tellurian stock as collateral.**

13.     Charif Souki is largely recognized as the founder of the domestic liquefied natural gas ("LNG") industry. In 1996, he founded Cheniere Energy, Inc. ("Cheniere"), which, due to his vision and leadership, ultimately became the first United States-based company to build a domestic

LNG liquefaction and export facility and to use that facility to manufacture and ship LNG to overseas markets. Today multiple domestic companies have built and begun operating LNG liquefaction and export facilities, and the model that Souki developed while at Cheniere is the basis on which the current industry is built.

14. In early 2016, after departing Cheniere, Souki co-founded Tellurian Inc. ("Tellurian") with his good friend and long-time LNG industry executive Martin Houston. Tellurian's plans included construction and operation of an LNG facility that would be roughly the same size as Cheniere's facility. It would require nearly $28 billion of financing to make this happen. This project is called Driftwood LNG ("Driftwood").

15. When Souki co-founded Tellurian, he became the Chairman of the company's Board of Directors; this was a non-executive position that did not require him to be involved in the day-to-day management or operations of the company. At the same time, Souki also invested millions of dollars of his own funds, in exchange for which Tellurian issued him 25 million shares of the company's stock. Souki's family trust also made a sizable investment and became a large shareholder. In light of his direct and indirect substantial investment, Souki was the largest beneficial owner of the company's stock. Moreover, given his stature in the industry and his position as Chairman of the Board, Souki was effectively the face of the company, and the market would certainly take notice of any trading activity by Souki in Tellurian stock.

16. On April 27, 2017, Souki entered into a loan for $50 million ("2017 Loan"). Defendants Nineteen77 Capital Solutions A LP and Bermudez Mutari, LTD (the "Lenders") and Defendant Wilmington Trust National Association (the "Agent") are signatories to the loan; Defendant UBS O'Connor LLC ("O'Connor") signed the 2017 Loan as investment adviser on

4

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 6 of 26

behalf of the Lenders. The Trust, Strudel, Ajax Cayman and AVR each signed the 2017 Loan as Guarantors.

17.     The same day, Souki entered into a Pledge Agreement with the Trust, Strudel and AVR by which they pledged collateral for Souki's loans that could be foreclosed upon in enumerated circumstances. Specifically, Paragraph 7(f) of the Pledge Agreement provides that the Administrative Agent may only exercise powers to "[l]iquidate, withdraw or sell all or any part of the Collateral" "following the occurrence and continuance of an Event of Default" and only "until all of the Obligations have been paid in full and the Loan Agreement has been terminated." In other words, Defendants may not continue exercising their remedies under the Loan Agreements after the obligations have been paid in full.

18.     Also on that same day, and at Defendants' insistence, Souki executed an Account Control Agreement with his broker that gave Defendants the right to take exclusive control of Souki's Tellurian Shares. Under the agreement's unambiguous language, if Defendants ever exercised this right, Souki's broker would immediately be required to "cease complying" with Souki's orders and instructions unless and until the broker "receives written notice from [Defendants] rescinding the Notice of Exclusive Control."

19.     A few months later, in January 2018, the loan was then paid down by approximately $30 million, leaving a balance of approximately $20 million. The parties then increased the loan by $70 million on March 30, 2018 ("2018 Loan"), bringing the total balance to approximately $90 million (collectively, the "Souki Loans"). Under the Souki Loans, Plaintiffs pledged the following as collateral: 25 million shares of Tellurian stock ("Souki's Tellurian Shares"), his family ranch outside of Aspen, Colorado ("Ranch"), and the equity interest in two family-owned companies, Ajax Holdings, LLC ("Ajax Shares") and Ajax Cayman, LLC. This collateral package

5

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 7 of 26

("Collateral") was more than sufficient to cover the value of the Loans. As amended in January of 2019, the Loan maturity date was March 30, 2020.

20.     In May 2019, Defendants entered into a separate loan agreement with Tellurian ("Tellurian Loan"). Other than making introductions, Souki was not involved in the negotiations of the Tellurian Loan. Once Defendants entered into the Tellurian Loan, in combination with the Souki Loans, Defendants were heavily exposed to Tellurian.

**B.      Defendants plead with Souki to take on an executive role at Tellurian.**

21.     In early 2020, Tellurian's stock was trading in the $7-$8 range. However, in late February 2020, trouble began to brew. Tellurian announced that one of its largest prospective customers, Petronet in India, had requested an extension of several weeks to finalize the parties' contract. This news was not well-received by the market, and Tellurian's stock price began to fall precipitously. Going into March 2020, the stock was trading at just over $2 per share.

22.     Tellurian's troubles were severely compounded in early March 2020, when the lockdowns associated with COVID-19 eviscerated oil and gas demand and devastated the international oil and gas markets. As a result, Tellurian's stock price went into a further tailspin, quickly falling below $1 per share. In short, the company was in a liquidity crisis and on the verge of bankruptcy. Also, the drop in value of Souki's Tellurian Shares complicated efforts to repay the Souki Loans, which by that point had grown to $102,763,266 (inclusive of interest).

23.     As a result of these extraordinary developments, Defendants were extremely concerned about Tellurian's ability to repay its loan. To address these concerns, Defendants' principal, Baxter Wasson, reached out to Souki personally. Through a series of discussions that began in March 2020 and continued for several weeks, Wasson made it clear that Defendants wanted Souki to focus on righting the ship at Tellurian, because absent him doing so, the stock price would likely continue to fall and the company would default on its loan.

6

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 8 of 26

24.     As a result, the parties moved forward on three key fronts. First, on May 5, 2020, Souki and the Lender Defendants entered into two Bridge Agreements – one related to the 2017 Loan and one related to the 2018 Loan. Under the Bridge Agreements, Defendants agreed that they would forbear from exercising any of their remedies under the Loan Agreements during the Agreement Period, which would end on March 30, 2021, unless a Termination Event ended it sooner. Also, the Bridge Agreements put in place a protocol for enforcement of the Lender Defendants' remedies after the Agreement Period expired. Under this protocol, captured in Section 4.3 of the Bridge Agreements, which was heavily negotiated by the parties, Defendants agreed that in the event they ever commenced disposing of Souki's Tellurian Shares, they would "use their commercially reasonable efforts to avoid any material disruption of Tellurian's stock price."

25.     Second, and also on May 5, 2020, Defendants provided notice that they were exercising exclusive control over Souki's Tellurian Shares under Section 3(a) of the Account Control Agreement. Under that agreement's unambiguous language, Souki's broker was required to "cease complying" with his orders and instructions unless and until the broker "receives written notice from [Defendants] rescinding the Notice of Exclusive Control." Defendants never rescinded their notice of exclusive control. Therefore, Souki never had the ability to sell his Shares after May 5, 2020; that exclusive right was held by Defendants.

26.     Third, with the Bridge Agreements in place, Souki agreed to re-engage with Tellurian. On June 22, 2020, Souki became the Executive Chairman of Tellurian's Board of Directors. Unlike his prior non-executive position on the Board, this new role effectively put Souki in charge of the company and required him to interface with investors and lenders to secure the funding Tellurian so desperately needed. It would also put him in a position to assist the company in righting its financial ship and in repaying expensive debt, including the Tellurian Loan.

27.     Based largely on Souki's efforts, as well as the efforts of many others on his team, Tellurian repaid the Tellurian Loan in full on March 12, 2021, more than a year before the maturity date. Shortly thereafter, on March 31, 2021, Tellurian fully repaid another significant loan that it had taken out in the early days of the COVID-19 pandemic. This repayment, which was nearly two months before the loan's maturity date, was also part of what Defendants asked Souki to focus on when they pleaded with him to re-engage in an executive capacity at Tellurian.

**C.      Throughout 2021, Defendants pressure Souki to accelerate repayment of his loan but repeatedly reject his attempts to do so.**

28.     Nearly immediately after Tellurian repaid its loan to Defendants, and despite Souki's extraordinary efforts to ensure Tellurian's full and early repayment of its loans, Defendants began pressuring Souki to quickly repay his loan in full. On March 22, 2021, just ten days after Tellurian had completed its repayment of the Tellurian Loan to Defendants, Defendants sent Souki a proposal that would have required Souki to make an immediate, upfront payment of $5 million and that would have required full repayment of his loan by October 30, 2021. Souki responded that the proposal was "unrealistic" in light of current circumstances, but that Defendants should take comfort in the fact that they were overcollateralized.

29.     The parties were well aware of Tellurian's financial condition at that time and the need to avoid selling Souki's Tellurian Shares. As such, efforts to reduce the debt at that time focused on selling the Ranch, but that proved challenging. Souki pivoted to a strategy that included (a) marketing and selling the Ranch's houses and undeveloped lots as separate properties, and (b) renting out the houses in the meantime in order to generate revenue that could be used to help cover the operating costs and potentially pay down some of the Loans. To execute this strategy, members of Souki's family, who had lived in the Ranch houses for five years, moved off the Ranch in early 2021 and Souki's broker began marketing the properties at market values.

8

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 10 of 26

30.     For this strategy to work, Souki would need Defendants' cooperation. This was, in part, because Defendants' lien for the entirety of the Souki Loans encumbered the Ranch. Therefore, to close on a sale of any of the individual pieces of the Ranch, there would need to be agreement by Defendants on "release prices" – i.e., the prices at which Defendants would release their lien as to a particular house or lot for the amount of the sale. Defendants would also need to agree on how to allocate the proceeds of the sales between repayment of the Souki Loans and other obligations, including commission to the realtors. Defendants knew this when they submitted their March 22, 2021 proposal, because Souki and his team had raised it with them multiple times before then. Nevertheless, Defendants' proposal completely ignored this and other critical issues, thus making it extremely difficult to convince prospective buyers to enter into contracts to acquire any of the Ranch properties. As a result, Souki had no choice but to reject Defendants' proposal.

31.     Defendants delivered their next proposal in May 2021, insisting that Souki begin selling his Tellurian Shares by arbitrary dates in the near term. Defendants also attempted to insert short term, share price thresholds that would trigger a default if not reached, potentially terminating the agreement less than six weeks after its effective date. While the proposal finally contained lien release prices, there was no agreement to establish separate liens per property and the releases were contingent on numerous, other unreasonable terms. For example, Defendants demanded that the Trust, which was not a party to the loans, continue to fund any operational shortfalls while also subordinating its repayment claims to Defendants' lien. Again, Souki had no choice but to reject Defendants' unreasonable proposal. Notably, Defendants also objected to reasonable attempts by Souki to obtain third-party financing that would have helped pay down a meaningful portion of the debt on reasonable terms.

9

32.     In the summer and fall of 2021, Souki's strategy and efforts began to pay off. He received offers to purchase three of the eleven Ranch properties and expressions of interest in other Ranch properties. Ultimately, Souki was able to reach agreement with a buyer on one of the properties and another buyer on two of the properties for a total of $46.5 million. The proceeds from these transactions would enable Souki to pay off a prior loan from Alpine Bank ("Alpine") of $30 million and to pay down more than $12.6 million of his debt to Defendants. To close on these transactions, however, Souki would need Defendants to agree that they would release their lien as to the subject properties and allow an amendment to the Ranch's HOA bylaws that would require any lender who foreclosed on the remaining Ranch properties to continue funding the Ranch's operations and amenities at the same level as before foreclosure.

33.     Souki asked for Defendants' cooperation in response to concerns specifically raised by prospective buyers whose due diligence revealed the lien against the Ranch as a whole. Not surprisingly, given Defendants' history of unreasonable positions, before they would agree to release the liens and amend the HOA bylaws, Defendants attempted to bully Souki into agreeing to additional, unfavorable terms, which he would not do. Only at the last minute and after extensive efforts by Souki did Defendants agree to these terms. Thankfully, the buyers had not walked away from the deals, so despite Defendants' intransigence and continued bad faith tactics, the transactions closed in August and November, respectively.

34.     Another example of Defendants' inconsistent and confusing behavior revolves around the sale proceeds from the transactions described above. Although Alpine was entitled to 100% of the net proceeds of all sales until its loan was paid down, Souki offered to negotiate with Alpine to accept partial prepayment so that Defendants could begin receiving proceeds from the very first transaction. Wasson's initial response was that this arrangement would bode very well

10

10 of 25

INDEX NO. 651164/2023
RECEIVED NYSCEF: 07/10/2023

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 12 of 26

for Souki's situation and that he should endeavor to negotiate such an arrangement. With no small effort, Souki was able secure an agreement in principle from Alpine that would have allocated $6 million in proceeds from each home sold and $3 million from each lot sold to Defendants. Souki then communicated this development to Defendants on multiple occasions, but Defendants failed to respond and ultimately chose to reverse their course and reject the arrangement altogether. Based on the three transactions that ultimately occurred, this would have resulted in an additional repayment to Defendants of $15 million; however, Defendants stated that they preferred more of the proceeds to go to the first lienholder, disposing of the first lien entirely and giving Defendants priority over Souki's assets going forward.

**D.    Defendants refuse to take commercially reasonable steps to eliminate the debt in its entirety, instead preferring to keep Souki's loans in place and increasing the interest rate they charge him.**

35.    In late 2021, after both transactions had closed, Souki once again approached Defendants with a plan to discharge his obligation. His proposal contemplated lien releases for each of the remaining properties, the ability for Souki to arrange third-party financing, as contemplated in the Bridge Agreement, and a plan to sell a sufficient number of his Tellurian Shares to discharge his obligation by June 2023 in an organized program.

36.    Defendants rejected Souki's plan and again pressured him repeatedly to sell his Tellurian Shares, which he was restricted from doing at that time due to Defendants' exclusive control of the Shares and because of applicable securities rules and regulations applicable to holders of material non-public information and restrictions placed on Souki by Tellurian's Board of Directors. In response, in late 2021, Souki's son and representative, Karim Souki, told Randal Johnson of Defendant O'Connor that Souki was not able to sell the Tellurian Shares himself and if Defendants believed that the Shares should be sold, Defendants should do so. (*See* Dkt. 102 at 5.).

11

INDEX NO. 651164/2023
RECEIVED NYSCEF: 07/10/2023

37.     On May 26, 2022, Defendants informed Souki that they were terminating the Bridge Agreements. The value of Souki's Tellurian Shares on May 27, 2022 was more than $120 million, which still exceeded Souki's purported debt to Defendants.[1] This is critical because, at that time, Defendants had had exclusive control of Souki's Tellurian Shares for nearly two years, and it had been nearly a year since the expiration of the term of the Bridge Agreements. Defendants have no commercially reasonable excuse for waiting to sell; no clairvoyance was needed— Defendants chose when to exercise exclusive control and when to terminate the Bridge Agreements. Upon terminating the Bridge Agreements and given the value of the Tellurian Shares and the length of time Defendants had held the Shares, it was incumbent upon Defendants to immediately liquidate Souki's Tellurian Shares and extinguish his debt without the need to dispose of any other Collateral.

38.     Shockingly, though, Defendants chose to continue holding Souki's Tellurian Shares and instead indicated that they would foreclose on the Ranch. But Defendants halted the foreclosure process a few weeks later after Souki informed them that Colorado law required them to submit a credit bid at or near fair market value. Because fair market value of the Ranch was or exceeded $100 million, submitting such a credit bid would almost certainly mean that Defendants would acquire the Ranch for that amount. This would largely wipe out Souki's debt but leave Defendants with a substantial asset that they would need to try to sell in order to recoup what they had loaned Souki. In the meantime, they would need to take on the substantial financial obligations

---

[1]     This figure included approximately $8 million of default interest, which Plaintiffs contest that Defendants could charge default interest for any period prior to issuance of the termination notice May 26, 2022. Additionally, even if the Tellurian Shares' value was slightly less than the total debt on May 26, 2022, any difference would have been made up by a $25 million financing that Plaintiffs had secured at that time related to houses on the Ranch but which Defendants rejected. (*See* Dkt. 23 at 12.)

associated with the operations of the Ranch. Ultimately, Defendants did not move forward with foreclosure, but by the time they made that decision, the window in which they should have sold the Tellurian Shares had closed, as prices had gone back down to significantly lower values.

39.     Rather than pursuing this commercially reasonable course and allowing Souki to eliminate his debt, Defendants pursued a bad faith course of conduct – they prevented Souki from taking steps to pay down his debt, started charging him 15% default interest rate, and manipulated his position so that he would be unable to reduce his debt and would continue to accrue interest at an exorbitantly high rate until whenever Defendants decide they have exacted their pound of flesh from Souki. This was a continuation of Defendants' refusal to work with Souki in good faith.

**E.     Apparently satisfied with the additionally accrued interest, Defendants begin seizing and selling Souki's assets in a wildly reckless and commercially unreasonable manner.**

40.     On December 22, 2022, Defendants notified Souki that they were seizing his sailboat, the Tango. At the time Defendants seized Tango, it was in a yard in Europe awaiting substantial repairs that Souki had planned to make. Investing the funds necessary to complete these repairs before making the boat available to prospective buyers would have resulted in a substantial increase in sale price possibilities. Defendants, however, did not do so. Instead, they made nominal repairs and otherwise put the sailboat on the market in an "as is, where is" condition. Additionally, Defendants refused to include Souki in the process to market and sell the sailboat, despite his vast knowledge of the market. They also refused to provide him any information whatsoever about the process, despite his status as borrower. Excluding Souki, as both borrower and a sophisticated market participant, from this process was unreasonable and failed to comply with industry standards. Furthermore, Defendants failed to conduct a comprehensive marketing campaign that is typical for a sale of this type of sailboat and failed to identify several prospective buyers who would have been interested in submitting bids to acquire the Tango. As a result of the shoddy

13

process run by Defendants, they ultimately entered into an agreement with a buyer for an amount far less than the market value of the Tango.

41.     Defendants' incompetence and unreasonableness turned into sheer recklessness in early February 2023. On February 6 and 7, Defendants forced a transfer of Souki's Tellurian Shares from Souki's account to theirs. At the time of this transfer, the Shares were worth approximately $51.5 million. Moreover, by effecting a transfer of ownership, Defendants triggered an obligation for Souki to file a Form 13-D with the Securities and Exchange Commission ("SEC"), yet Defendants failed to inform Souki of this critical development; instead, he learned of it through a contact at his bank.

42.     On February 8, again with no notice to Souki, Defendants began selling his Tellurian Shares. When the market opened that morning, the stock was trading at $2.05, still nowhere near where it had been during most of 2022. Finally, Defendants were in possession of material nonpublic information ("MNPI") – unlike the general investing public, Defendants were fully aware that Souki, the largest shareholder of the company and its Executive Chairman, no longer controlled his Tellurian Shares. Securities laws prohibit a party from trading in securities for which it was aware of MNPI, but that's exactly what Defendants did. That day, Defendants dumped nearly two million of Souki's Tellurian Shares on the market. This constituted a nearly 20% increase over the average daily volume of Tellurian stock sold in the prior ten days. Plus, the vast majority of Defendants' sales occurred within the first two hours of trading. Any sophisticated investor would know that such actions with respect to the stock of a company that is on uncertain financial footing is the opposite of taking commercially reasonable steps to avoid material disruption of the stock price. And the proof is in the results – as a result of Defendants' recklessness, Tellurian's stock price fell almost 10%, closing at $1.89 on February 8.

14

43.     But this was just the beginning of the recklessness and willful misconduct by Defendants. That evening, Souki, a seasoned investor, informed Defendants that their conduct was wholly unreasonable and pleaded with them to use an industry-accepted methodology if they were going to continue selling his shares. The methodology that Souki proposed would have called for Defendants to use an algorithm to ensure they did not sell more than 3% of the daily volume of Tellurian shares sold. The goal of using this methodology, of course, was to avoid any further material disruption in the stock price and to capture any gains that occur over the next several weeks.

44.     Also that evening, Souki advised Defendants that he would need to file a Form 13-D with the SEC as a result of the transfer and sale of his Shares but that he would not be able to file it until later the next day. In the meantime, Defendants should not sell his Shares because they were still in possession of MNPI. But Defendants took Souki's advice and threw it in the trash. The next morning, they continued recklessly selling millions of Souki's Tellurian Shares. This continued for the next five business days. By the end of these first six business days, Defendants had sold 8,837,798 shares for $15,431,502 and the price had dropped by more than 25% to $1.50 per share on February 15, a low point in the share price not seen since January 2021.

45.     Nevertheless, Defendants continued selling Souki's Tellurian Shares until they were all sold by early April 2023. By that time, the stock price was around $1.18 per share and Defendants had sold the Shares for $37,041,309.67 million, at an average of $1.37 per share. Additionally, every time Defendants sold more of Souki's Shares, he was obligated to disclose that sale in a public filing with the SEC. As a result, Tellurian's stock price was less than 50% of what it was before Defendants commenced their fire sale of Souki's shares.

15

**F.      Defendants' recklessness and bad faith continued, and worsened, after Souki filed his Original Complaint.**

46.      On March 13, 2023, a week after Souki originally filed suit, the receiver appointed by Defendants to sell the Tango refused to provide Souki information regarding the marketing and sales process related to the Tango.

47.      On March 15, 2023, Defendants gave notice that they also intended to foreclose on the Ajax Shares. Specifically, they gave notice that they intend to conduct a public auction of the interests at 12:00pm on June 13, 2023, or such later date as determined by the Administrative Agent in New York, New York. After providing that notice, and similar to the marketing process related to the Tango, Defendants wholly excluded Souki from the marketing of the Ajax Shares. Additionally, Defendants instructed all prospective bidders not to work with or provide information to Souki as a condition for having access to the data room set up for prospective bidders. Defendants agreed to allow Souki to participate in the process only after Plaintiffs filed a request for injunctive relief requiring Defendants to allow such participation. But despite these assurances to induce Souki to withdraw his request for a preliminary injunction, the bidding procedures prepared by Defendants still ask all prospective bidders to confirm, among other things, that they are "not prohibited from purchasing" the Ajax Shares and that they "will not engage in any collusion … with the Pledgors … with respect to the Auction." Clearly, Plaintiffs cannot avoid colluding with the Pledgors, as some of them are the Pledgors. Upon seeing this in the data room on June 5, 2023, Souki requested Defendants to confirm they will not use these conditions to disqualify Plaintiffs from bidding. Defendants have refused to confirm that they will not use this language in their bidding procedures to disqualify Plaintiffs from bidding at the auction.

48.      Additionally, once Defendants began to include Plaintiffs in the process for the Ajax Shares auction, Plaintiffs realized that Defendants were not sharing critically important

16

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 18 of 26

information with prospective buyers about the debt held by Ajax Holdings. Specifically, Ajax Holdings owes approximately $53 million to five lenders, and all of that debt would likely be immediately accelerated upon a change of control at Ajax Holdings. A sale of the Ajax Shares, as is contemplated by Defendants, would necessarily constitute a change of control of Ajax Holdings that would trigger immediate acceleration. It would also trigger other remedies by the company's lenders that would preclude the company from using its assets and cash on hand to fund operations. Inevitably, this would cause the destruction of any and all value at Ajax Holdings and would cause the company to file for bankruptcy. This cannot be described as anything other than irreparable harm.

49.     Finally, on May 19, 2023, Souki received an offer from a prospective buyer for the Ranch and forwarded it to Defendants for their consideration since, if the Loan Agreements are still effective, Souki cannot sell the Ranch without Defendants' prior approval. After waiting two weeks to respond, Defendants rejected the offer without explanation. Instead, as has been the case for nearly two years, Defendants simply blocked yet another attempt by Souki to reduce his debt.

### CAUSES OF ACTION

### Cause of Action One – Breach of UCC's Duty of Commercial Reasonableness and Duty of Care When In Possession of Collateral
**(Against the Lenders and Agent)**

50.     Plaintiffs repeat and reallege the allegations set forth above in Paragraph 1-49 above.

51.     The Loan Agreements and the Bridge Agreements are valid and enforceable agreements that are governed by New York law and therefore incorporate New York's version of the Uniform Commercial Code.

52.     Under NY UCC §9-610(b), the Lenders and the Agent must use commercial reasonableness in "every aspect of a disposition of collateral, including the method, manner, time,

17

place, and other terms." Defendants breached this clear obligation in multiple respects in connection with their disposition of Souki's Collateral.

53.     First, Defendants breached this obligation by selling the Shares at a commercially unreasonable time. The comments to NY UCC §9-610(b) are clear that a lender can breach this duty by holding shares for a protracted period of time and then selling at a low point in the market:

> It may, for example, be prudent not to dispose of goods when the market has collapsed … [I]f a secured party … holds collateral for a long period of time without disposing of it, and if there is no good reason for not making a prompt disposition, the secured party may be determined not to have acted in a 'commercially reasonable' manner.

54.     Here, Defendants held Souki's Tellurian Shares starting in May 2020 when they exercised their right to exclusive control under the Account Control Agreement. They continuously insisted that Souki sell the Shares even though he had no ability to do so, and starting in late 2021, Souki and his team instructed Defendants to sell the Shares to extinguish the debt. At that time, and particularly in April and May 2022, the stock was trading at prices high enough that Defendants could have sold most of the Shares and extinguished the debt. But they failed to do so. Instead, Defendants held the Shares for another eight months, waited for the stock price to go down to a two-year low, and then sold the stock for a fraction of the balance of the debt. Defendants therefore breached their duty to dispose of Souki's collateral at a commercially reasonable time.

55.     Additionally, Defendants breached their duty under NY UCC §9-610(b) to use a commercially reasonable method when selling the Tellurian Shares. Specifically, Defendants recklessly dumped massive amounts of Souki's Tellurian Shares on the market in a manner that drove the price down by nearly 50%, and continued doing so even after Souki advised them to use an industry-standard methodology that would help avoid any material disruption in the stock price.

18

56.     Defendants further breached their duty under NY UCC §9-610(b) by auctioning off the Ajax Shares at a time and under circumstances that make it inevitable that Ajax Holdings will need to file for bankruptcy as soon as the auction is complete. This is the opposite of maximizing value of collateral and therefore is, by definition, commercially unreasonable.

57.     Defendants also breached their duty under NY UCC §9-610(b) to use commercial reasonableness in connection with their sale of the Tango sailboat. Specifically, they excluded Souki from the marketing and sales process altogether, refusing multiple times to update him or to provide him any information regarding the process. Such exclusion of the borrower from the marketing and sales of his collateral is "per se unreasonable."

58.     Under NY UCC §9-207(a), the Lenders and the Agent "shall use reasonable care in the custody and preservation of collateral in [their] possession." Courts have held that a lender's failure to sell stock pledged as collateral at "points in time" when the collateral's price "substantially satisfied the debt" is commercially unreasonable. *See, e.g., LBO Capital Corp. v Home & City Sav. Bank*, 1992 WL 209310, [NDNY Aug. 18, 1992]; *Solfanelli v Corestates Bank, N.A.*, 203 F3d 197, 202 [3d Cir 2000].

59.     Here, Defendants held and controlled Souki's Tellurian Shares starting in May 2020 when they exercised their right to exclusive control under the Account Control Agreement. Starting in late 2021, Souki and his team instructed Defendants to sell the Shares to extinguish the debt. At that time, and particularly after Defendants terminated the Bridge Agreements on May 26, 2022, the stock was trading at prices high enough that Defendants could have sold most of the Shares and extinguished the debt. But they failed to do so. Instead, Defendants held the Shares for another eight months, waited for the stock price to go down to a two-year low, and then sold the

19

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 21 of 26

stock for a fraction of the balance of the debt. Defendants therefore breached their duty of care under NY UCC §9-207(a).

60.     Defendants' multiple breaches of the duty under NY UCC §9-610(b) and §9-207(a) to use commercial reasonableness and care when in possession of collateral caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

## Cause of Action Two – Breach of Bridge Agreements
### (Against All Defendants)

61.     Plaintiffs repeat and reallege the allegations set forth above in Paragraph 1-60 above.

62.     The Bridge Agreements are valid and enforceable agreements. Section 4.3 of the Bridge Agreements require Defendants to "use commercially reasonable efforts to avoid any material disruption of Tellurian's stock price during such process."

63.     Defendants breached that obligation when they recklessly dumped massive amounts of Souki's Tellurian Shares on the market in a manner that drove the price down by nearly 50%, and continued doing so even after Souki advised them to use an industry-standard methodology that would help avoid any material disruption in the stock price.

64.     Defendants' breach of the duty under Section 4.3 of the Bridge Agreements to use commercial reasonableness caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

## Cause of Action Three – Breach of Duty of Good Faith and Fair Dealing
### (Against All Defendants)

65.     Plaintiffs repeat and reallege the allegations set forth above in Paragraph 1-64 above.

66.     The Lenders and the Agent owed Souki a duty to act in good faith and not to engage in unfair dealing. This includes a duty not to deprive Souki of the fundamental benefits of the

Case 23-90757 Document 75-19 Filed in TXSB on 08/24/23 Page 22 of 26

Agreements and not to undermine Souki's reasonable economic expectations under the Agreements. In wanton violation of these duties, the Lenders and the Agent routinely, unreasonably, and in bad faith interfered with and hindered Souki's attempts to repay his debt and to reduce or eliminate additional interest owed under the Agreements. This included objecting to prospective buyers, objecting that list prices were too high and then later complaining they were too low, refusing to engage in discussions about release prices, and reneging on assurances made about how the Ranch would be operated so as to give comfort to prospective buyers.

67. Defendants' breach of the duty of good faith and fair dealing caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

### Cause of Action Four – Tortious Interference with Contract
**(Against O'Connor)**

68. Plaintiffs repeat and reallege the allegations set forth above in Paragraph 1-67 above.

69. As demonstrated above, the Lenders and the Agent breached express and implied obligations in the Loan Agreements and the Bridge Agreements. O'Connor knew at all relevant times of the existence of the Agreements and Souki's rights thereunder. Indeed, O'Connor, as "investment adviser," served as signatory for the Lenders on each of the Bridge Agreements. The Bridge Agreements are signed by Baxter Wasson and Rodrigo Trelles (each of whom had direct communications with Souki), acting in their capacity as Managing Directors of O'Connor. O'Connor improperly and intentionally assisted in, induced, and procured the Lenders' and the Agent's breaches of the Agreements by causing the Lenders and the Agents to engage in the misconduct described herein. Upon information and belief, O'Connor's advised the Lenders when and how to sell Souki's Tellurian Shares, the Tango sailboat, and the Ajax Shares.

Case 23-90757   Document 75-19   Filed in TxSB on 08/24/23   Page 23 of 26

70.    O'Connor's investment advice to the Lenders and Agent was not given to protect O'Connor's economic interest in the collateral, but rather to increase O'Connor's profit (in the form of increased interest) to the detriment of Souki and specifically the value of the Tellurian Shares, the Tango sailboat, and Ajax Holdings. O'Connor's interference was improper.

71.    O'Connor's conduct described herein was malicious and caused Plaintiffs to suffer damages in an amount not less than tens of millions of dollars.

## Cause of Action Five – Declaratory Judgment
### (Against All Defendants)

72.     Plaintiffs repeat and reallege the allegations set forth above in Paragraph 1-71 above.

73.     Moreover, Paragraph 7(f) of the Pledge Agreement provides that the Administrative Agent may only exercise powers to "[l]iquidate, withdraw or sell all or any part of the Collateral" … "following the occurrence and continuance of an Event of Default" and only "until all of the Obligations have been paid in full and the Loan Agreement has been terminated." But the Collateral already foreclosed on by the Lenders would have satisfied Souki's debt in full if the Lenders had acted in a commercially reasonable manner, as they are obligated. Therefore, Defendants have no right to liquidate, withdraw, or sell any additional collateral pledged under the Pledge Agreement.

74.     Based on the foregoing, Plaintiffs seek a declaration from this Court that there is no continuing Event of Default, the Obligations under the Souki Loans have been paid in full, the Souki Loans are terminated, and Defendants have no legal right to continue to foreclose upon additional collateral pledged by AVR, the Trust, or Strudel under the Pledge Agreement.

## Cause of Action Six – Injunctive Relief
### (Against All Defendants)

75.     Plaintiffs repeat and reallege the allegations set forth above in Paragraph 1-74 above.

76.     Defendants have already foreclosed on Collateral – Souki's Tellurian Shares – that would have satisfied Souki's debt in full if Defendants had acted in a commercially reasonable manner as they are obligated under the Souki Loans. Nonetheless, Defendants have made clear that they still intend to foreclose on the Ajax Shares.

23

77.    Because Strudel's and the Trust's interests in Ajax are of the nature of a unique, family-owned real estate business, similar to the sale of unique real property, if their interests are sold, they will suffer irreparable harm for which there could be no adequate compensation. In fact, if the auction is allowed to proceed, unless the Ajax Shares are sold to Plaintiffs, any sale will result in a change of control that will accelerate nearly $53 million of debt owed by the company at a time when the company will not be able to satisfy that massive debt. As a result, Ajax Holdings will have no choice but to file for bankruptcy.

78.    As a result, the Court should grant preliminary and permanent injunctive relief forbidding Defendants from foreclosing, liquidating, selling, or otherwise disposing of the Ajax Shares.

### PRAYER AND RELIEF

Wherefore, Plaintiffs demand that judgment be entered against Defendants Nineteen77 Capital Solutions A LP, Bermudez Mutari, LTD, Wilmington Trust National Association and UBS O'Connor LLC as follows:

79.    Awarding Souki compensatory and exemplary damages in an amount to be determined at trial, including but not limited to the difference between the fair market retail value of the Ranch and whatever proceeds (if any) are recovered through a foreclosure of the Ranch, as well as the cost to replace the Tango sailboat, together with pre-judgment interest at the maximum rate allowable by law;

80.    Awarding Souki shares of Tellurian stock in an amount to be determined at trial;

81.    Entering declaratory relief that as a result of the conduct described above, the Souki Loans have effectively been repaid in full, no further debt is owed by Souki, and the Lenders and the Agent have no further right to exercise remedies under the Loan Agreements or the Pledge Agreement;

24

Case 23-90757   Document 75-19   Filed in TXSB on 08/24/23   Page 26 of 26

82.     Entering declaratory relief that there is no continuing Event of Default under the Souki Loans, the Obligations under the Souki Loans have been paid in full, the Souki Loans are terminated, and Defendants have no legal right to continue to foreclose upon additional collateral pledged under the Pledge Agreement;

83.     Granting permanent injunctive relief forbidding Defendants from foreclosing, liquidating, selling, or otherwise disposing of the Ajax Shares; and

84.     Such other and further relief as the Court deems just and proper.

Dated:  June 9, 2023
        New York, New York

                            HARRIS, ST. LAURENT & WECHSLER LLP


                            By:   /s/ Megan Dubatowka
                                  Yonaton Aronoff
                                  Megan Dubatowka
                                  40 Wall Street, 53rd Floor
                                  New York, New York 10005
                                  (212) 397-3370

                                  YETTER COLEMAN LLP
                                  R. Paul Yetter
                                  Timothy S. McConn
                                  Autry Ross
                                  Jamie Aycock
                                  Amy C. Farish
                                  David Gutierrez
                                  (Admitted *Pro Hac Vice*)
                                  811 Main Street, Suite 4100
                                  Houston, TX 77002
                                  (713) 632-8000

                                  *Attorneys for Plaintiffs*