# EXHIBIT 19

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 2 of 29

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
-------------------------------------------------------------------X

CHARIF SOUKI, Individually,
AVR AH LLC, KARIM SOUKI, CHRISTOPHER SOUKI,
and LINA SOUKI RIZZUTO, as Trustees
of the SOUKI FAMILY 2016 TRUST, and
STRUDEL HOLDINGS LLC,                                         Index No. 651164/2023

                Plaintiffs,                           **Motion Sequence 1**

    -against-

NINETEEN77 CAPITAL SOLUTIONS A LP,
BERMUDEZ MUTARI, LTD, WILMINGTON
TRUST NATIONAL ASSOCIATION, and
UBS O'CONNOR LLC,

                Defendants.
-------------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR A
PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 3 of 29

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................................ 1

STANDARD OF REVIEW ......................................................................................................... 3

ARGUMENT ............................................................................................................................... 4

   I.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION. .......................... 4

      A.   Plaintiffs are Likely to Succeed on the Merits of their Claims. ...................................... 4

          1.  Souki is likely to succeed on his claim for breach of contract. ..................................... 5

          2.  Plaintiffs are likely to succeed on their claim for breach of duty of good faith and fair dealing. ..................................................................................................................... 8

          3.  Souki is likely to succeed on his claims for fraud. ....................................................... 9

          4.  Souki is likely to succeed on his claim for tortious interference with contract. ..........11

          5.  Plaintiffs are likely to succeed on their claim for declaratory judgment. .................. 12

      B.   Plaintiffs will suffer irreparable harm absent the requested relief. ............................... 13

          1.  Plaintiffs will be irreparably harmed if the Ranch is sold because it is irreplaceable real estate used by the family for personal purposes. .................................................. 14

          2.  Plaintiffs will be irreparably harmed if the ownership interests in Ajax are sold because they will lose control of a unique family-owned company. .......................... 15

          3.  Plaintiffs will be irreparably harmed if the Tango sailboat is sold because it is a rare, irreplaceable vessel that was custom-made specifically for Souki. ........................... 17

      C.   A balancing of the equities weighs in Plaintiffs' favor. ................................................. 18

   II.   Plaintiffs Are Entitled to Expedited Discovery. ............................................................... 18

Conclusion ................................................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Ameriprise Ins. Co. v. Hampton*
  2018 N.Y. Slip Op. 51207(U) (Sup. Ct., N.Y. Cnty 2018) ........................................ 4

*Anesthesia Assoc. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*
  59 A.D.3d 473 (2d Dep't 2009) .............................................................................11

*Arthur Glick Truck Sales, Inc. v. H.O. Penn Mach. Co., Inc.*
  No. 998–04, 2004 WL 2472475 (Sup. Ct., N.Y. Cnty. Nov. 3, 2004) ...................... 19

*Barbes Rest. Inc. v. ASRR Suzer 218, LLC*
  140 A.D.3d 430 (1st Dep't 2016) .............................................................................. 4

*Bass v. WV Preserv. Partners, LLC*
  209 A.D.3d 480 (1st Dep't 2022) .............................................................................. 3

*Bateman v. Ford Motor Co.*
  302 F.2d 63 (3d Cir. 1962) .................................................................................... 15

*Bel Geddes v. Zeiderman*
  228 A.D.2d 393 (1st Dep't 1996) ............................................................................ 19

*Cent. Budget Corp. v. Garrett*
  368 N.Y.S. 2d 268 (2d Dep't 1975) .......................................................................... 5

*Chase Manhattan Bank, N.A. v. Keystone Distributors, Inc.*
  873 F. Supp. 808 (S.D.N.Y. 1994) ........................................................................... 9

*Christie's Inc. v. Davis*
  247 F. Supp. 2d 414 (S.D.N.Y. 2002) .................................................................... 17

*Citibank, N.A. v. Solow*
  92 A.D.3d 569 (1st Dep't 2012) ............................................................................... 7

*Comerica Bank v. Mann*
  13 F. Supp. 3d 1262 (N.D. Ga. 2013) ...................................................................... 6

*Credit Index, LLC v. Riskwise Int'l. LLC*
  282 A.D.2d 246 (1st Dep't 2001) ............................................................................ 18

*D2 Mark LLC v. Orei VI Investments LLC*
  2020 N.Y. Slip Op. 32057(U) (Sup. Ct., N.Y. Cnty 2020) ....................................... 6

*Dalton v. Educational Testing Serv.*
  87 N.Y.2d 384 (1995) .............................................................................................. 8

ii

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 5 of 29

*Datwani v. Datwani*
   959 N.Y.S.2d 153 (1st Dep't 2013)............................................................ 16

*DoubleClick Inc. v. Henderson*
   No. 116914/97, 1997 WL 731413 (Sup. Ct., N.Y. Cnty. Nov. 7, 1997)................... 19

*Durham v. MTC Financial Inc.*
   No. CV-19-00238-PHX-DLR, 2019 WL 266374 (D. Ariz. Jan. 18, 2019) ............. 14

*East Fordham DE LLC v. U.S. Bank Nat'l Assoc.*
   170 A.D.3d 545 (1st Dep't 2019)............................................................... 13

*Enlarged City Sch. Dist. of Middletown v. City of Middletown*
   96 A.D.3d 840 (2d Dep't 2012) ................................................................ 13

*Epiphany Cmt'y. Nursery Sch. v. Levey*
   171 A.D.3d 1 (1st Dep't 2019)................................................................... 10

*F.D.I.C. v. Wrapwell Corp.*
   No. 93 CIV 859 (CSH), 2002 WL 14365 (S.D.N.Y. Jan. 3, 2002) ........................ 6

*Hertz Commercial Leasing Corp. v. Dynatron, Inc.*
   427 A.2d 872 (Conn. Super. Ct. 1980)......................................................... 7

*Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*
   No. 12 Civ. 2827 (NRB), 2016 WL 1267781 (S.D.N.Y. Mar. 30, 2016).............. 5, 8

*Holland Loader Co., LLC v. FLSmidth A/S*
   313 F. Supp. 3d 447 (S.D.N.Y. 2018) ......................................................... 6

*Horowitz v. Nat'l. Gas & Electric, LLC*
   No. 17-CV-7742 (JPO), 2018 WL 4572244 (S.D.N.Y. Sept. 24, 2018) ................11

*In re American Business Financial Services, Inc.*
   471 B.R. 354 (Bankr. D. Del. 2012) ........................................................... 9

*In re Bryan*
   20 UCC Rep. Serv. 571 (Bankr. S.D. Ohio June 29, 1976) ............................... 6

*In re Zsa Zsa Ltd.*
   352 F. Supp. 665 (S.D.N.Y. 1972) ............................................................ 6

*Jaffe v. Paramount Commc'ns Inc.*
   222 A.D.2d 17 (1st Dep't 1996)................................................................ 8

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 6 of 29

*Jenkins v. CitiMortgage, Inc.*
    No. 2:19-CV-719 JCM (VCF), 2019 WL 13254499 (D. Nev. June 13, 2019)..........................14

*John Paul Mitchell Sys. v. Quality King Distributors, Inc.*
    106 F. Supp. 2d 462 (S.D.N.Y. 2000) ........................................ 17

*Jones v. Morgan*
    228 N.W.2d 419 (Mich. Ct. App. 1975).......................................... 7

*Laker v. Ass'n. of Prop. Owners of Sleepy Hollow Lake, Inc.*
    172 A.D.3d 1660 (3d Dep't 2019) ........................................... 14

*Leasing Serv. Corp. v. Broetje*
    545 F. Supp. 362 (S.D.N.Y. 1982) ........................................... 5

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*
    838 N.Y.S.2d 536 (1st Dep't 2007)........................................... 9

*Matter of Excello Press, Inc.*
    890 F. 2d 896 (7th Cir. 1989) ............................................... 5

*Morse v. Penzimer*
    295 N.Y.S.2d 125 (Sup. Ct., Oneida Cnty. 1968) ........................... 17

*Nobu Next Door, LLC v. Fine Arts Hous., Inc.*
    4 N.Y.3d 839 (2005).......................................................... 3

*Ocean Hill Residents Ass'n v. City of N.Y.*
    2011 N.Y. Slip Op. 52179(U) (Sup. Ct., Kings Cnty. 2011) ................... 19

*Olympia House, Inc. v. Elghanayan*
    111 A.D.2d 674 (1st Dep't 1985)............................................. 17

*Rakosi v. Sidney Rubell Co., LLC*
    155 A.D.3d 564 (1st Dep't 2017 ............................................. 17

*Rational Strategies Fund v. Hill*
    2013 N.Y. Slip Op. 51181(U) (Sup. Ct., N.Y. Cnty. 2013) ................... 19

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.*
    749 F.2d 124 (2d Cir. 1984) ................................................ 15

*Samuel v. Boehringer Ingelheim Pharma., Inc.*
    2022 N.Y. Slip Op. 33891(U) (Sup. Ct., N.Y. Cnty. 2022) ................... 10

iv

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 7 of 29

*Semmes Motors, Inc. v. Ford Motor Co.*
429 F.2d 1197 (2d Cir. 1970) ........................................................... 15

*Spivak v. Bertrand*
48 N.Y.S.3d 348 (1st Dep't 2017) ..................................................... 16

*Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*
5 Misc. 3d 285 (Sup. Ct., N.Y. Cnty. 2004) ....................................... 19

*U.S. Ice Cream Corp. v. Carvel Corp.*
523 N.Y.S.2d 869 (2d Dep't 1988) .................................................... 15

*Velazquez v. Chase Home Fin. LLC*
No. CIV. S–12–0433 LKK/CKD PS, 2012 WL 671965 (E.D. Cal. Feb. 29, 2012).................14

*Witham v. vFinance Inves., Inc.*
52 A.D.3d 403 (1st Dep't 2008)........................................................... 4

*Yemini v. Goldberg*
876 N.Y.S.2d 89 (2d Dep't 2009) ....................................................... 16

**Statutes**
NY UCC § 9-109.................................................................................5

NY UCC § 9-610 ............................................................................. 5, 7

**Rules**
CPLR § 3001.................................................................................... 12

CPLR § 6301....................................................................................... 3

CPLR § 6312....................................................................................... 4

CPLR § 7109.................................................................................... 17

**Other Authorities**
Three-Part Test—Irreparable Injury, 3 NY Prac., Com. Litig. in New York State Courts § 20:9
(5th ed.) ......................................................................................... 17

v

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 8 of 29

Plaintiff Charif Souki ("Souki"), in his individual capacity, Karim Souki, Christopher Souki, and Lina Souki Rizzuto, in their capacities as trustees of the Souki Family 2016 Trust ("Trust"), Strudel Holdings LLC ("Strudel"), and AVR AH LLC ("AVR") respectfully submit this Memorandum of Law in support of their Order to Show Cause for a preliminary injunction and expedited discovery. Plaintiffs seek to enjoin Defendants Nineteen77 Capital Solutions A LP and Bermudez Mutari, LTD (the "Lenders"), Defendant Wilmington Trust National Association (the "Agent"), and Defendant UBS O'Connor LLC ("O'Connor") (together, the "Defendants") from seizing, foreclosing on, and/or disposing of any additional loan collateral beyond what has already been sold pending final resolution of the claims in this case and for such other relief as may be just, proper, and equitable.

## PRELIMINARY STATEMENT

Under their loan agreements with Souki, Defendants have a duty of good faith and fair dealing and an obligation to use commercial reasonableness if they sell any collateral. For nearly two years, however, Defendants have repeatedly violated these duties in ways that are destructive of the collateral's value. Now, in response to Plaintiffs' lawsuit, Defendants have initiated foreclosure proceedings that, if allowed to continue, will cause Plaintiffs irreparable harm. This must be stopped before it is too late.

In exchange for a multi-million dollar loan, Plaintiffs pledged four key pieces of collateral: (a) Souki's 25 million shares of the stock of Tellurian, Inc. ("Souki's Tellurian Shares"), (b) Souki's 800-acre, multi-home ranch outside Aspen, Colorado ("Ranch"), (c) the equity in Ajax Holdings LLC ("Ajax Shares"), the Souki family's real estate holding company and private office, and (d) Souki's rare, custom-made sailboat, the Tango (collectively the "Collateral"). In 2020, to induce Souki to help them secure repayment of a loan to Tellurian, Defendants promised Souki they would

1

Case 23-90757    Document 75-20    Filed in TXSB on 08/24/23    Page 9 of 29

take a flexible approach to using the Collateral as repayment and that they would not sell the Tellurian Shares until certain key milestones had been achieved. But after Souki held up his end of the bargain, Defendants reneged on those promises and demanded that Souki sell the Collateral in disorganized, reckless, and (in the case of the Tellurian Shares) improper ways.

Their demands made it clear that Defendants had no plan, and certainly not a commercially reasonable plan, to use the Collateral to satisfy the debt. If Defendants had such a plan, or if they had engaged with Souki on the multitude of proposals he made to them, they could have used any number of combinations of the Ranch and Tellurian Shares to extinguish the debt. In fact, in early 2022 when Defendants claimed the total debt was $119 million, the Ranch was worth at least $90 million (according to Defendants) and Souki's Tellurian Shares were worth $150 million (the stock was trading at $6 per share), for a total of $240 million, or twice the total purported debt. Yet, Defendants rejected every proposal Souki made and chose not to foreclose on any of the Collateral at that time.

Instead, they continued to make unreasonable demands of Souki and charged him millions in interest. Then, just days before Christmas 2022, Defendants seized the Tango sailboat, said they would sell it, but refused to share any information with Souki about the process, prospective buyers, or the asking price. A month later, when Tellurian's stock was trading at a two-year low, Defendants seized Souki's shares and recklessly sold them in large volumes, driving the price down from $2.05 to a low of $0.94 and destroying value for Tellurian's shareholders. Defendants' conduct was in bad faith and lacked any commercial reasonableness, therefore breaching their duties under the loan agreements and New York law. As a result, Souki filed suit on March 6, 2023.

A week later, on March 13, 2023, Defendants responded to the lawsuit by declaring they would foreclose on the Ranch and sell it on July 26, 2023. The Ranch is Souki's primary residence

2

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 10 of 29

and an extraordinarily unique property that has taken nearly two decades to develop and cannot be replicated. Two days later, on March 15, 2023, Defendants gave notice that on June 13, 2023, they will foreclose on and sell the Ajax Shares. Ajax Holdings manages the day-to-day lives of multiple family members, owns irreplaceable real estate assets, and employs more than 100 employees and contractors; as such, its loss cannot be compensated by money damages. These foreclosures and sales, as well as the sale of the Tango sailboat, will therefore cause irreparable harm to Plaintiffs. Conversely, maintaining the status quo will cause no harm to Defendants, who (if they are correct) are secured by the Collateral and who recently acknowledged that the outstanding debt ($88 million) is less than the value they ascribed to the Ranch ($90 million). For these reasons, the Court should enjoin the sales of the Ranch, the Ajax Shares, and the Tango sailboat until the merits of this case have been fully and finally litigated.

The facts giving rise to Souki's entitlement to injunctive relief are more fully set out in the Affidavit of Charif Souki ("Souki Aff.") and the First Amended Complaint ("Am. Compl.") attached to the Souki Aff. as Exhibit 1.

## STANDARD OF REVIEW

The purpose of a preliminary injunction is to maintain the *status quo* until there can be a full trial on the merits so as to prevent the dissipation of property that would or could render a judgment ineffectual. (*Bass v. WV Preserv. Partners, LLC*, 209 A.D.3d 480, 481 (1st Dep't 2022).) A movant must demonstrate: (1) a likelihood of success on the merits of its claims; (2) irreparable injury in the absence of preliminary injunctive relief; and (3) a balancing of the equities favoring its position. (*See, e.g.*, *Nobu Next Door, LLC v. Fine Arts Hous., Inc.*, 4 N.Y.3d 839, 840 (2005); CPLR § 6301.)

As discussed below, Plaintiffs can satisfy each of these elements. ***First***, Plaintiffs are likely to succeed on the merits of their claims. The evidence will demonstrate clearly that (a) the Lenders and the Agent breached their contractual duties of good faith and fair dealing and to dispose of the Collateral in a commercially reasonable manner, (b) O'Connor tortiously interfered with those contractual promises, (c) Defendants committed fraud, and (d) Plaintiffs are entitled to declaratory judgment that the Souki Loans have been effectively extinguished and Defendants have no further right to exercise remedies. ***Second***, the Ranch, the Ajax Shares, and the Tango sailboat are unique properties the loss of which cannot be cured by money damages; as a result, allowing those sales to proceed, rather than maintaining the status quo, would cause irreparable harm to Plaintiffs. ***Third and finally***, the equities weigh in Plaintiffs' favor since Plaintiffs would suffer irreparable harm if the Court does not maintain the status quo, whereas Defendants are secured by multiple pieces of extraordinarily valuable collateral that can be sold if Plaintiffs are wrong (which they are not). Accordingly, the Court should enjoin Defendants from seizing, foreclosing on, or otherwise disposing of the Ranch, the Ajax Shares, or the Tango sailboat.

## ARGUMENT

I.     **PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.**

   A.  **Plaintiffs are Likely to Succeed on the Merits of their Claims.**

A likelihood of success requires only that movant establish a *prima facie* right to relief. (*See, e.g.*, *Barbes Rest. Inc. v. ASRR Suzer 218, LLC*, 140 A.D.3d 430, 431 (1st Dep't 2016); *Witham v. vFinance Inves., Inc.*, 52 A.D.3d 403, 403-404 (1st Dep't 2008).) That there may be questions of fact requiring trial does not preclude a trial court from the exercise of discretion in granting an injunction. (*See, e.g.*, *Ameriprise Ins. Co. v. Hampton*, 2018 N.Y. Slip Op. 51207(U), *4 (Sup. Ct., N.Y. Cnty. 2018) (citing CPLR 6312(c)).)

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 12 of 29

## 1. Souki is likely to succeed on his claim for breach of contract.

The Complaint alleges that Defendants breached certain agreements between Souki, the Lenders, and the Agent (the "Souki Loans" and the "Bridge Agreements") (*see* Souki Aff. ¶¶ 13, 28, 69) by failing to dispose of assets in a commercially reasonable manner, as required by New York law. (*See* NY UCC § 9-109.) The Bridge Agreements provide that the Lenders and the Agent "will use commercially reasonable efforts to avoid any material disruption of Tellurian's stock price." (*See* NY UCC § 9-109; Souki Aff. ¶ 69, Ex. 4-5 to Souki Aff. § 4.3(a).)

"Commercial reasonableness" is construed "to mean that a qualifying disposition must be made in the good faith attempt to dispose of the collateral to the parties' mutual best advantage." (*Cent. Budget Corp. v. Garrett*, 368 N.Y.S. 2d 268, 270 (2d Dep't 1975) (quotation omitted).) "Whether a sale was commercially unreasonable is, like other questions about 'reasonableness', a fact-intensive inquiry; no magic set of procedures will immunize a sale from scrutiny." (*Matter of Excello Press, Inc.*, 890 F. 2d 896, 905 (7th Cir. 1989).) "Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." (NY UCC § 9-610.) (*See also Leasing Serv. Corp. v. Broetje*, 545 F. Supp. 362, 367 (S.D.N.Y. 1982) (same).) There is good reason for timing to be a key consideration: "It may, for example, be prudent not to dispose of goods when the market has collapsed. Or, it might be more appropriate to sell a large inventory in parcels over a period of time instead of in bulk." (Official Comment No. 3 to NY UCC § 9-610.)

A secured party violates the commercial reasonableness requirement when it acts in a self-serving, self-dealing manner. (*See, e.g.*, *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ. 2827 (NRB), 2016 WL 1267781 (S.D.N.Y. Mar. 30, 2016) (sales of securities on last trading day of year could be found to be "poorly timed" and "poorly executed" and not conducted "under normal business conditions"); *D2 Mark LLC v. Orei VI Investments*

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 13 of 29

*LLC*, 2020 N.Y. Slip Op. 32057(U) (Sup. Ct., N.Y. Cnty. 2020) (preliminary injunction granted where timing, method, and logistics of sale of historic hotel violated accepted business practices and UCC commercial reasonableness standard under which fact-intensive inquiry in which "no magic set of procedures" would make a sale immune from scrutiny); *see also In re Bryan*, 20 UCC Rep. Serv. 571 (Bankr. S.D. Ohio June 29, 1976) (sale of a mobile home within three weeks of the notice of sale was commercially unreasonable where expert testified that three to six months was normally needed to sell such collateral); *Comerica Bank v. Mann*, 13 F. Supp. 3d 1262, 1279 (N.D. Ga. 2013) (sale of a yacht was commercially unreasonable because, among other reasons, bank's material "delay in its handling of the [yacht] did not make complete business sense").)

Here, Defendants failed to act commercially reasonably or to use commercially reasonably efforts to avoid material disruption of Tellurian's stock price. "Merriam–Webster defines 'effort' as a 'conscious exertion of power,' 'a serious attempt,' or 'something produced by exertion or trying.' These definitions connote a conscious attempt to secure an outcome, or some affirmative action by the party required to exert efforts. In sum, compliance with a 'commercially reasonable efforts' clause requires at the very least some conscious exertion to accomplish the agreed goal...." (*Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (internal citations omitted).)

To determine commercial reasonableness, Defendants' actions must be viewed collectively, rather than in isolation. (*See, e.g.*, *In re Zsa Zsa Ltd.*, 352 F. Supp. 665, 670 (S.D.N.Y. 1972); *F.D.I.C. v. Wrapwell Corp.*, No. 93 CIV 859 (CSH), 2002 WL 14365, at *9 (S.D.N.Y. Jan. 3, 2002).)

Here, the Lenders paid no heed to the appropriate timing for sale of the stock, which was clearly "poorly timed" and "did not make complete business sense." First, Defendants had agreed

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 14 of 29

that Souki should focus on re-engaging with Tellurian so as to pay off its outstanding loans to the Lenders. (Souki Aff. ¶¶ 24-26.) Only when Souki had righted the ship at Tellurian, and Tellurian had reached the critical milestones of announcing its Final Investment Decision ("FID") and its Notice to Proceed ("NTP"), would it be likely that sales of Souki's Tellurian Shares would be commercially reasonable and not materially disrupt the stock price. (Souki Aff. ¶¶ 27-28.) Second, Defendants chose to commence selling the Shares in February 2023, when neither of these events had occurred and when the stock was trading at $2 per share, rather than selling at other periods when the stock was trading at much higher ranges, most notably April 2022 when it was trading at $6 per share. (Souki Aff. ¶ 46.) (*See also Hertz Commercial Leasing Corp. v. Dynatron, Inc.*, 427 A.2d 872, 876 (Conn. Super. Ct. 1980) (15-month delay from repossession to sale of collateral found unreasonable under New York law); *Jones v. Morgan*, 228 N.W.2d 419, 422 (Mich. Ct. App. 1975) (stating that "retention of depreciable collateral without sale for two years compels close scrutiny of the plaintiff's actions" and noting that sales are considered in their entirety).) Third, Defendants ignored the specific warning that a quick selloff of too large a volume of Souki's stock would precipitate a price decline. (Am. Compl. ¶ 40; *see also* Official Comment No. 3 to NY UCC § 9-610 (noting that commercial reasonableness may require selling collateral over a period of time as opposed to "in bulk").) Despite being warned and even after seeing that warning come to fruition, Defendants continued to sell a volume of stock far in excess of the volume that Souki had recommended be sold or that anyone with expertise in stock sales would regard as commercially reasonable. (Am. Compl. ¶¶ 42-43.) There should be little surprise that the stock experienced even further price declines as a result. (*Id.* ¶ 44.)

Defendants are "not bound to wait and undertake the risk of a declining market," (*Citibank, N.A. v. Solow*, 92 A.D.3d 569, 569 (1st Dep't 2012).) and they need not "risk[] inferior market

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 15 of 29

conditions," (*See Highland CDO, 2016 WL 1267781, at \*19*.) But waiting until after Tellurian

reached the FID and NTP milestones to which the Lenders had agreed did not subject them to any

risk. To the contrary, selling shortly before these milestones were met makes no sense particularly

given that a year before the shares were trading at materially higher prices. Thus, it was

commercially unreasonable for the Lenders to sell the Tellurian shares in the time and manner in

which the Lenders opted to do so.

### 2. *Plaintiffs are likely to succeed on their claim for breach of duty of good faith and fair dealing.*

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of

contract performance." (*Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389 (1995).*) A party

"may be in breach of the implied duty of good faith and fair dealing when it exercises a contractual

right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other

party of the fruit of the benefit of its bargain." (*Jaffe v. Paramount Commc'ns Inc., 222 A.D.2d 17,

22-23 (1st Dep't 1996).*)

Here, Defendants interfered with Souki's contractual rights in multiple respects and

deprived him of the fruit of the parties' bargain. For example, Defendants hindered Souki's

attempts to repay his debt and reduce the amount of interest owed under the Souki Loans by, among

other things, unreasonably objecting to prospective buyers of the Ranch properties, taking

inconsistent positions on list prices, refusing to consider the possibility of release prices for specific

properties on the Ranch, refusing to consider refinancing options that would have reduced at least

some of the debt, and reneging on assurances made about how the Ranch would be operated.

(Souki Aff. ¶¶ 37-44.)

While both the Bridge Agreements and the Pledge Agreement give the Administrative

Agent, who acts on behalf of and at the direction of the Lenders, discretion to undertake specified

INDEX NO. 651164/2023
RECEIVED NYSCEF: 04/03/2023

acts with respect to the Collateral, "the implied covenant of good faith and fair dealing obligated it to exercise such discretion in good faith, not arbitrarily or irrationally." (*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 838 N.Y.S.2d 536 (1st Dep't 2007).) Defendants' ever-changing and conflicting positions with respect to the properties on the Ranch were arbitrary, capricious, and not undertaken in good faith. In addition, Defendants' hindrance of Plaintiffs' ability to repay the Loans and their simultaneous pocketing of millions in interest payments is also the type of self-dealing fraudulent conduct New York courts have found violates the covenant, regardless of any contractual breach. (*See, e.g., Chase Manhattan Bank, N.A. v. Keystone Distributors, Inc.*, 873 F. Supp. 808, 815-816 (S.D.N.Y. 1994)* (allegations that defendant misrepresentations about cash flows and fund sales, if proven, stated violation of covenant).)

Like their conduct with respect to the Ranch, Defendants' disposition of Souki's Tellurian Shares also violates the covenant of good faith and fair dealing because it was arbitrary, capricious, and lacking in good faith. (*Maddaloni Jewelers, Inc.*, 838 N.Y.S.2d at 536.) New York law looks to both the amount of proceeds recovered and the procedures followed in assessing the reasonableness of the disposition of property. (*In re American Business Financial Services, Inc.*, 471 B.R. 354, 376 (Bankr. D. Del. 2012) (applying New York law).) But here, Defendants sold the stock at nonsensical times, at a reckless pace, and at prices far below market value utilizing fundamentally flawed procedures that advanced their own interests at the expense of Plaintiffs. The bargain-basement prices received by Defendants and the improper procedures they utilized are inconsistent with the fundamental benefits to which Souki is entitled and his reasonable expectations under the Agreements.

### 3. Souki is likely to succeed on his claims for fraud.

The elements of a claim for fraud are a "material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." (*Epiphany*

*Cmt'y. Nursery Sch. v. Levey*, 171 A.D.3d 1, 8 (1st Dep't 2019).) Conspiracy to commit fraud is established by allegations of "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." (*Samuel v. Boehringer Ingelheim Pharma., Inc.*, 2022 N.Y. Slip Op. 33891(U) (Sup. Ct., N.Y. Cnty. 2022) (cleaned up).)

O'Connor, acting through Baxter Wasson, made material misrepresentations to Souki that Defendants would be eminently flexible in their approach to repayment of the Souki Loans and would not materially disrupt Tellurian's stock price. (Souki Aff. ¶ 25.) Wasson agreed that a holistic approach was needed to address both the loans to Charif and to Tellurian, and that the best course of action was to address the Tellurian loan first to avoid any conflicts. (*Id*. ¶ 33.) Wasson further agreed to allow Souki time and flexibility to reorganize the rest of his assets in order to repay the Souki Loans and to seek third-party financing to fund operations of AVR. (*Id*. ¶ 25.) These misrepresentations were made in multiple conversations with Souki in late 2020 and early 2021. (*Id*. ¶¶ 24, 27, 33.) Those representations were false when Wasson made them, and he knew they were false. He made these misrepresentations to induce Souki to devote his time and attention to repayment of the Tellurian Loan. Souki justifiably relied on Wasson's misrepresentations and did not focus on efforts (including marketing his Ranch properties) to repay his personal Loan. (*Id*. ¶ 31.)

Almost immediately after Tellurian repaid its loan, Defendants demanded cash payments from Souki, threatened to foreclose on the Ranch, and pressured him to sell his Tellurian stock in ways that would likely violate federal securities laws' restrictions on insider trading because of his knowledge of highly confidential insider information. (*Id*. ¶¶ 34-35, 40, 45.) Wasson made the misrepresentations to Souki and promises on behalf of Defendants. But when Souki refused, it was

Defendants who had the ability to begin charging him a much higher interest rate, rejecting his proposals to use third-party financing and sales of his Ranch properties to reduce his debt, and refused to sell any of the Tellurian stock when it was trading at a historically high price. It may be inferred that Defendants colluded to defraud Souki in inducing him to facilitate the repayment of the Tellurian loan and then refusing flexibility and seeking higher payments on the Souki Loans.

If not for the misrepresentations, Souki would have devoted substantially more time and energy to reducing the debt on the Souki loans. (*Id.* ¶ 31.) As a result, Souki has been and will continue to be damaged in the form of millions of dollars in additional interest accrued. In focusing on repaying Tellurian's loans first, Souki left his loans ripe for an interest rate increase when Defendants demonstrated that they had no intent to honor their agreement to take a holistic approach to Souki's repayment, and instead made unreasonable demands and ultimately aggressively foreclosed on more collateral than required. Meanwhile, as Souki worked in good faith to negotiate with Defendants and find a solution within the parameters of what Wasson promised, Souki's debt continued to rise as the increased interest compounded. (*Id.* ¶¶ 48, 52.)

### 4. *Souki is likely to succeed on his claim for tortious interference with contract.*

"The elements of tortious interference with contractual relations are (1) the existence of a contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible, and (4) damages to the plaintiff." (*Anesthesia Assoc. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 59 A.D.3d 473, 476 (2d Dep't 2009)) (quotations omitted).) A showing of some form of malice, fraud, or illegality on the parent's part is necessary to hold a parent entity liable for tortiously interfering with its subsidiaries' contracts. (*See, e.g., Horowitz v. Nat'l. Gas & Electric, LLC*, No. 17-CV-7742 (JPO), 2018 WL 4572244, at *6 (S.D.N.Y. Sept. 24, 2018).).

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 19 of 29

As described above, the Lenders and the Agent breached express and implied obligations in the Souki Loans and the Bridge Agreements. And at all relevant times, O'Connor (as investment advisor to the Lenders) knew of the existence of the Agreements and Souki's rights thereunder, but nevertheless induced the Lenders to breach their agreements repeatedly. This inducement and assistance was based on O'Connor's fraud and with malice toward Souki.

O'Connor's false promise through Baxter Wasson to Souki that the Lenders and Agent would be eminently flexible in their approach to repayment of the Souki Loans and would not act in ways that materially disrupt Tellurian's stock price induced Souki to focus on repaying Tellurian's loans first before his loans (*see* II.E *infra*). Once Souki succeeded in helping Tellurian repay its loans, O'Connor, along with the Lenders and Agent, thereafter pressured Souki to accelerate payment of his loans culminating in the commercially unreasonable sale of the Tellurian shares in February 2023. (Souki Aff. ¶¶ 54-64.) The commercially unreasonable sale of the Tellurian shares was caused and rendered by O'Connor's instructions to the Lenders and Agent and O'Connor's disregard for Souki's pleas and proposed plan to sell the stock using a method that would not materially disrupt the stock price. (*Id.*) O'Connor's instructions and disregard of Souki's pleas and proposed plan caused its subsidiary Lenders' breach of contract. O'Connor's interference with the Souki Loans and Bridge Agreements—by falsely and deceptively promising flexibility to Souki but, in an intentional 180-degree turnaround, thereafter pressuring Souki to accelerate payment of his loans and rendering the commercially unreasonable sale of Tellurian stock—was fraudulent and thus improper.

### 5. *Plaintiffs are likely to succeed on their claim for declaratory judgment.*

This Court may "render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed." (CPLR § 3001.) A declaratory judgment "should only be granted

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 20 of 29

when it will have a direct and immediate effect upon the rights of the parties[.]" (*Enlarged City Sch. Dist. of Middletown v. City of Middletown*, 96 A.D.3d 840, 841 (2d Dep't 2012) (citations omitted).)

As discussed above, if the Defendants had acted in a commercially reasonable manner as they are obligated, there would be no continuing default because the collateral the Defendants have already seized would have satisfied the obligations under the Souki Loans and paid the Lenders in full. It follows as a result that Plaintiffs are also entitled to a declaration that the Souki Loans are terminated and that the Defendants have no legal right to foreclose on any additional collateral pledged by the Plaintiffs under the Souki Loans or the Pledge Agreement. These issues are ripe for determination by this Court because Defendants have provided notice that they intend to auction additional Collateral, namely the Ranch, the Ajax Shares, and the Tango sailboat. Certainly, a declaration by this Court on these issues will immediately affect the rights of the parties and be determinative of whether the Defendants can go forward with their intended auctions.

Accordingly, Plaintiffs are likely to succeed on their claim seeking a declaration from this Court that there is no continuing default under the Souki Loans, the obligations under the Souki Loans have been paid in full, the Souki Loans are terminated, and Defendants have no legal right to continue to foreclose upon additional collateral.

**B. Plaintiffs will suffer irreparable harm absent the requested relief.**

Without injunctive relief, Defendants will be free to go forward with their plans to sell the Ajax Shares in June, the Ranch in July, and the Tango sailboat, which could be sold at any moment. Plaintiffs clearly demonstrate they will suffer imminent, irreparable harm in the absence of a preliminary injunction. (*East Fordham DE LLC v. U.S. Bank Nat'l Assoc.*, 170 A.D.3d 545, 546 (1st Dep't 2019) (enjoining foreclosure).)

13

     **1. Plaintiffs will be irreparably harmed if the Ranch is sold because it is irreplaceable real estate used by the family for personal purposes.**

Under well-established caselaw, there is no question that Plaintiffs' loss of the Ranch would inflict irreparable harm. New York courts do not hesitate to find irreparable harm when the loss of a unique, personal residence is at stake because such a loss cannot be remedied through money damages. (*See, e.g.*, *Laker v. Ass'n of Prop. Owners of Sleepy Hollow Lake, Inc.*, 172 A.D.3d 1660, 1663 (3d Dep't 2019) (finding irreparable harm where loss of personal residence would occur without injunctive relief); *Durham v. MTC Financial Inc.*, No. CV-19-00238-PHX-DLR, 2019 WL 266374, at *8 (D. Ariz. Jan. 18, 2019) ("A person's home is unique, carries sentimental value."); *Jenkins v. CitiMortgage, Inc.*, No. 2:19-CV-719 JCM (VCF), 2019 WL 13254499, at *2 (D. Nev. June 13, 2019) ("Plaintiffs have shown that the pending foreclosure proceeding creates a likelihood of irreparable harm because plaintiffs risk losing their personal residence."); *Velazquez v. Chase Home Fin. LLC*, No. CIV. S–12–0433 LKK/CKD PS, 2012 WL 671965, at *1 (E.D. Cal. Feb. 29, 2012) ("The loss of one's personal residence is an irreparable harm.").)

The Ranch has been Souki's primary residence and an extraordinarily unique property that has taken nearly two decades to establish and maintain as his home. (Souki Aff. ¶ 16.) It cannot be replicated and there is nothing identical to it elsewhere in Aspen or in the country. (*Id*.) No amount of money could adequately compensate Souki for losing his family's personal residence. The two-decades' long effort the family has put in to make the Ranch their home, the uniqueness of the Ranch in one of the most desirable locations in the country, and the sentimental and familial value the Ranch has to Souki could never be replaced. (*Id*.) Thus, foreclosure of the Ranch would inflict irreparable harm and injunctive relief stopping such harm is warranted here.

14

> **2.  Plaintiffs will be irreparably harmed if the ownership interests in Ajax are sold because they will lose control of a unique family-owned company.**

It is well established that the "right to continue" a family-owned business "is not measured entirely in monetary terms." (*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970).) For example, a long-time Ford dealer that had been in operation for almost twenty years and whose son had recently joined the business would have been irreparably harmed if his dealership were to be terminated absent a temporary injunction. (*Id.*) Injunctive relief was warranted even though the dealership's "past profits would afford a basis for calculating damages for [the] wrongful termination" because the dealer's family "want[ed] to sell automobiles, not to live on the income from a damages award." (*Id.*)

"[J]udgment for damages acquired years after [a business] has been taken away and [such] business obliterated is a small consolation to one" who has had the business for "many years." (*Bateman v. Ford Motor Co.*, 302 F.2d 63, 66 (3d Cir. 1962).) The loss of such an enterprise, "an ongoing business representing many years of effort and the livelihood of its [family] owners, constitutes irreparable harm." (*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.*, 749 F.2d 124, 126 (2d Cir. 1984) (finding irreparable harm from the imminent closure of a husband-and-wife business in operation for 11 years due to termination of distributorship rights pending arbitration); *see also U.S. Ice Cream Corp. v. Carvel Corp.*, 523 N.Y.S.2d 869, 871 (2d Dep't 1988) (citing *Roso-Lino* and noting an attempt to terminate a plaintiff's business pending trial, "particularly one involving a unique product and an exclusive licensing and distribution arrangement, risks irreparable injury and is enjoinable").)

Courts have found irreparable harm even outside the family business context where, absent a preliminary injunction, a plaintiff will lose his voting power and decision-making rights in relation to a material decision the company may make. (*See Spivak v. Bertrand*, 48 N.Y.S.3d 348,

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 23 of 29

350 (1st Dep't 2017).) When "control and management" of an entity is "at stake," "money damages [are] not sufficient." (*Yemini v. Goldberg*, 876 N.Y.S.2d 89, 91 (2d Dep't 2009); *see also Datwani v. Datwani*, 959 N.Y.S.2d 153, 154 (1st Dep't 2013).)

In *Datwani*, one brother moved for a preliminary injunction to stop the sale of the shares of the other brother pending a final judgment in another lawsuit in India where the ownership of the shares was being litigated. (*See id.*) Rather than grant injunctive relief, the court chose to stay the action pending a decision of the court in India. The appellate court, however, reversed the decision, granting a preliminary injunction barring the sale of the defendant brother's shares because plaintiff "who is engaged in a battle for corporate control, has showed that he would be irreparably harmed by a sale of the shares to someone else." (*Id.* at 154.)

Here, Plaintiffs would be irreparably harmed if Defendants are permitted to move forward with sale of the Ajax Shares scheduled to occur in June 2023. Ajax is a family-owned enterprise, with Charif Souki and his relatives and children taking charge of its day-to-day operations. The Souki family, through the Trust and Strudel, has extensive roots in Aspen, Colorado, and Ajax is an integral part of that connection not only in a professional sense but also personally for the family. Indeed, Ajax is akin to a family heirloom: it is a true family operation in which Charif Souki and his relatives have taken part in developing. Like the families in *Semmes Motors* and *Roso-Lino*, Ajax represents years of hard work and effort, and a big part of the livelihood of the family through the Trust and Strudel.

In addition, losing Ajax would inflict irreparable harm because it is central to the Souki family in that it holds the books, records, and correspondence of the family, including the Trust's and Strudel's numerous business operations, and acts as the nerve center for the family's enterprises. The "loss of access to books, records, and accounts" of an enterprise is an irreparable

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 24 of 29

injury recognized in New York. (Three-Part Test—Irreparable Injury, 3 NY Prac., Com. Litig. in New York State Courts § 20:9 (5th ed.).)

Selling the Ajax Shares would irreparably harm the Plaintiffs by depriving them of the Souki family's years of family business records used in these enterprises' day-to-day operations. (*Cf. Rakosi v. Sidney Rubell Co., LLC*, 155 A.D.3d 564 (1st Dep't 2017) (enjoining managing agent's management of properties and directing it to turn over all books, records, and accounts for properties); *Olympia House, Inc. v. Elghanayan*, 111 A.D.2d 674 (1st Dep't 1985) (injunctive relief granted against defendant's management of property, ordering it to turn over books and records to plaintiffs' attorney).) Accordingly, injunctive relief should be granted to prevent imminent, irreparable injury to the Plaintiffs.

### 3. Plaintiffs will be irreparably harmed if the Tango sailboat is sold because it is a rare, irreplaceable vessel that was custom-made specifically for Souki.

Like the Ranch and Ajax, the Tango sailboat is unique and its loss would cause irreparable harm. A unique item "is something irreplaceable." (*John Paul Mitchell Sys. v. Quality King Distributors, Inc.*, 106 F. Supp. 2d 462, 478 (S.D.N.Y. 2000) (citing *Morse v. Penzimer*, 295 N.Y.S.2d 125 (Sup. Ct., Oneida Cnty. 1968)).) Unique items are "rare," may have "historical and artistic value," and are "impossible to replace through manufacturing." (*Christie's Inc. v. Davis*, 247 F. Supp. 2d 414, 424 (S.D.N.Y. 2002).) They are traditionally heirlooms, works of art, patents and inventions, and particular shares of stock with peculiar investment features and similar items. (*See Morse*, 295 N.Y.S.2d at 127.) A "'Ford truck' is not unique, but an antique Ferrari is 'sufficiently unique' to be protected by an injunction.'" (*John Paul Mitchell Sys.*, 106 F Supp 2d at 478.) The protection courts provide "unique chattel" is enshrined in New York law. (*See* CPLR § 7109 ("Where the chattel is unique, the court may grant a preliminary injunction or temporary

restraining order that the chattel shall not be removed from the state, transferred, sold, pledged, assigned, or otherwise disposed of until further order of the court.").)

Like a 1967 Ferrari or an original work of art, the Tango sailboat is of a "unique character and value." It is custom-made—Souki commissioned the construction of the sailboat with his personal specifications, details, and design in mind. (Souki Aff. ¶ 53.) Indeed, the loss of the Tango would be effectively impossible to replace with a new sailboat: the craftsmanship, the materials used, the engineering, and the overall design of the Tango cannot be simply replicated and reproduced like a common Ford truck. There is simply nothing like it in the market, which is especially true due to Souki's customizations. (*Id.*) And like all unique products, the Tango's value depends on "the purchaser's aesthetic sensibilities" and the "eye of the beholder" which in this case would be Souki himself, the Tango's owner. Accordingly, the potential loss of the Tango would be irreparable and injunctive relief is warranted.

### C.  A balancing of the equities weighs in Plaintiffs' favor.

Finally, a balancing of the equities in this case favors the Plaintiffs, who seek to maintain the *status quo* and ensure that their collateral that is the subject of this lawsuit is not sold while their claims are pending. (*See, e.g., Credit Index, LLC v. Riskwise Int'l. LLC*, 282 A.D.2d 246, 247 (1st Dep't 2001).) Here, without preliminary injunctive relief Plaintiffs face irreparable harm from the sale of their family business that cannot be adequately compensated with money damages. By contrast, even if the Defendants were to prevail in this suit, a preliminary injunction at most would slightly delay the time when Defendants could sell additional collateral, much of which is already being held by Defendants.

### II.     Plaintiffs Are Entitled to Expedited Discovery.

This Court has broad discretion to grant expedited discovery in connection with an application for preliminary injunction. (*See, e.g., Rational Strategies Fund v. Hill*, 2013 N.Y. Slip

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 26 of 29

Op. 51181(U) (Sup. Ct., N.Y. Cnty. 2013) ("The decision of whether to grant expedited discovery

is within the discretion of this Court"); *DoubleClick Inc. v. Henderson,* No. 116914/97, 1997 WL

731413, at *8 (Sup. Ct., N.Y. Cnty. Nov. 7, 1997) (granting expedited discovery).) Expedited

discovery is especially appropriate in cases where, like here, the requested discovery is necessary

for the preliminary injunction hearing and where the information sought is within the unique

possession of one party. (*See Arthur Glick Truck Sales, Inc. v. H.O. Penn Mach. Co., Inc.*, No.

998–04, 2004 WL 2472475, at *3 (Sup. Ct., N.Y. Cnty. Nov. 3, 2004) (granting expedited

discovery).)[1]

Moreover, Plaintiffs seek narrowly tailored information regarding Defendants' analysis and

actions with regard to foreclosing on Souki's collateral. *See* Affirmation of Megan Dubatowka ¶ ¶

10-12. This information will inform the Court as it considers whether to grant injunctive relief, as

it will confirm that because the Lenders were overcollateralized, Defendants acted without regard

to principles of commercial reasonableness in disposing of the collateral, committed fraud, and

violated their contractual duties under the Souki Loans. This information goes to the heart of

Plaintiffs' lawsuit and claim for injunctive relief and therefore it serves as appropriate subject

matter for discovery in anticipation of a preliminary injunction hearing. Specifically, Plaintiffs

respectfully request the Court to grant an expedited schedule as to a limited number of depositions

and narrowly tailored document requests. *See id.* ¶ ¶ 11-12.

---

[1] *See also Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 302 (Sup. Ct., N.Y. Cnty. 2004) (granting plaintiff's request for expedited discovery "in light of defendants' unique possession of the information necessary to determine the extent of their unlawful conduct"); *Bel Geddes v. Zeiderman*, 228 A.D.2d 393 (1st Dep't 1996) (expedited discovery appropriate when details of investment arrangement known only to defendants); *Ocean Hill Residents Ass'n v. City of N.Y.*, 2011 N.Y. Slip Op. 52179(U), *12 (Sup. Ct., Kings Cnty. 2011) (same).

Case 23-90757 Document 75-20 Filed in TXSB on 08/24/23 Page 27 of 29

## <u>CONCLUSION</u>

Defendants have breached their agreements with Plaintiffs and committed fraud. In the process, they have destroyed the value of Collateral, and if Defendants are permitted to move forward with foreclosure on the Ranch, the Ajax Shares, and the Tango, they will irreparably harm Plaintiffs by selling off unique, cherished property the loss of which cannot be satisfied by money damages. Accordingly, Plaintiffs respectfully request that this Court grant their request for a preliminary injunction to stop those sales until this case has been fully and finally litigated, and for expedited discovery.

INDEX NO. 651164/2023
RECEIVED NYSCEF: 04/03/2023

Case 23-90757   Document 75-20   Filed in TXSB on 08/24/23   Page 28 of 29

Dated:  New York, New York
        April 3, 2023

HARRIS ST. LAURENT & WECHSLER LLP
By: _____
Yonaton Aronoff
Megan Dubatowka
40 Wall Street, 53rd Floor
New York, New York 10005
(212) 397-3370

YETTER COLEMAN LLP
R. Paul Yetter
Timothy S. McConn
Autry Ross
Jamie Aycock
Amy C. Farish
David Gutierrez
(*Pro Hac Vice* applications forthcoming)
811 Main Street, Suite 4100
Houston, TX 77002
(713) 632-8000

*Attorneys for Plaintiffs Charif Souki,*
*The Souki Family 2016 Trust, and*
*Strudel Holdings LLC*

21

Case 23-90757   Document 75-20   Filed in TxSB on 08/24/23   Page 29 of 29

### Certification of Word Count Compliance

      I hereby certify that the word count of this memorandum of law complies with the word limit of 7,000 words permitted by the Court under 22 New York Codes, Rules and Regulations §202.8-b(f). According to the word-processing system used to prepare this memorandum of law, the total word count for all printed text exclusive of the material omitted under 22 N.Y.C.R.R. §202.8-b(b) is 6,313.

                                                   _____

                                                 Megan Dubatowka