# EXHIBIT 20

FILED: NEW YORK COUNTY CLERK 05/12/2023 03:53 PM
INDEX NO. 651164/2023
NYSCEF DOC. NO. 116
RECEIVED NYSCEF: 05/12/2023

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 2 of 68

1

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK - CIVIL TERM - PART 48
 2    - - - - - - - - - - - - - - - - - - - - -X
                                               |
 3    CHARIF SOUKI, Individually, AVR AH LLC,   |
      KARIM SOUKI, CHRISTOPHER SOUKI, and LINA  |
 4    SOUKI RIZZUTO, as Trustees of the SOUKI    |
      FAMILY 2016 TRUST, and STRUDEL HOLDINGS    |    INDEX NUMBER:
 5    LLC,                                       |    651164/2023
                                                 |
 6                          Plaintiffs,          |
                                                 |
 7          - against -                          |
                                                 |
 8    NINETEEN77 CAPITAL SOLUTIONS A LP,         |
      BERMUDEZ MUTUARI, LTD, WILMINGTON TRUST    |
 9    NATIONAL ASSOCIATION, and UBS O'CONNOR     |
      LLC,                                       |
10                                               |
                          Defendants.            |
11    - - - - - - - - - - - - - - - - - - - - -X

12                                Via Microsoft Teams
           Proceedings           New York, New York
13                                May 1, 2023

14
      B E F O R E :
15
               HONORABLE ANDREA MASLEY,
16
                     JUSTICE OF THE SUPREME COURT
17
      A P P E A R A N C E S :
18

19             HARRIS, ST. LAURENT & WECHSLER LLP
               Attorneys for the Plaintiffs
20             40 Wall Street, 53rd Floor
               New York, New York 10005
21             BY:  MEGAN DUBATOWKA, ESQ.

22
               YETTER COLEMAN LLP
23             Attorneys for the Plaintiffs
               811 Main Street, Suite 4100
24             Houston, Texas 77002
               BY:  TIMOTHY S. McCONN, ESQ.

25
```

ab

```
 1   A P P E A R A N C E S: (continued)

 2
                 ORRICK, HERRINGTON & SUTCLIFFE LLP
 3               Attorneys for the Defendants
                 51 West 52nd Street
 4               New York, New York 10019
                 BY:  DARRELL S. CAFASSO, ESQ.
 5                    LAURA METZGER, ESQ.
                      HARRY F. MURPHY, ESQ.
 6                    ZACH KUSTER, ESQ.
                      MEREDITH DAWSON, ESQ.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                ANNE BROWN, RPR
25                                SENIOR COURT REPORTER
```

ab

NYSCEF DOC. NO. 116

INDEX NO. 651164/2023

RECEIVED NYSCEF: 05/12/2023

Case 23-90757  Document 75-21  Filed in TXSB on 08/24/23  Page 4 of 68

3

Proceedings

1          THE COURT:  At 2:33, in the matter of Souki against

2     Nineteen77 Capital Solutions A LP.

3          Who is speaking for plaintiff?

4          MS. DUBATOWKA:  Good afternoon, Your Honor.

5          This is Megan Dubatowka with Harris, St. Laurent &

6     Wechsler.  My co-counsel, Tim McConn of Yetter Coleman --

7          (Reporter clarification.)

8          THE COURT:  Yeah.  Thank you, Ms. Brown.

9          I'll ask everyone to turn off their microphones,

10    unless you are speaking.

11         MS. DUBATOWKA:  And, Your Honor, Tim McConn will be

12    speaking on behalf of the plaintiffs.

13         THE COURT:  Okay.  Mr. McConn, can we just test

14    your microphone, because it's hard to hear Ms. Dubatowka.

15         MR. McCONN:  Yes, Your Honor.  Can you hear me

16    okay?

17         THE COURT:  Oh, yeah.  You're fine.

18         Okay.  And who is speaking on behalf of some of the

19    defendants, the Nineteen77 defendants?

20         MR. CAFASSO:  Good afternoon, Your Honor.

21         This is Darrell Cafasso from Orrick, Herrington &

22    Sutcliffe.  I will be speaking on behalf of all defendants

23    this afternoon.

24         THE COURT:  Where are you?  Are you in the

25    conference room?

ab

FILED: NEW YORK COUNTY CLERK 05/12/2023 03:53 PM          INDEX NO. 651164/2023
NYSCEF DOC. NO. 116   Case 23-90757  Document 75-21   Filed in TXSB on 08/24/23   Page 5 of 68   RECEIVED NYSCEF: 05/12/2023

4

Proceedings

1          MR. CAFASSO:  Correct.  I'm waving.  Do you see me?

2          THE COURT:  Oh, okay.  Got it.  All right.

3    Everyone else needs to have their microphones off.  And

4    yeah, now I have you.  Thank you.

5          So this is Plaintiffs' motion for a Preliminary

6    Injunction.  Mr. Cafasso, who else is with you?

7          MR. CAFASSO:  With me, Your Honor, I have my

8    partner, Laura Metzger, who has also filed an appearance in

9    this action, and other colleagues at Orrick, Harry Murphy,

10   Zach Kuster, and Meredith Dawson.

11         THE COURT:  Okay.  Everyone who is on should email

12   when we're done, Ms. Brown with their names and their

13   addresses.  And their affiliations and who you represent and

14   what law firm you work for.  Okay?

15         MR. CAFASSO:  Okay.

16         THE COURT:  So everyone who's on.  Although, I

17   understand we also have -- members of the public are

18   observing today as well.

19         Okay.  So, Mr. McConn, you want to get us started.

20         MR. McCONN:  Your Honor, I'd be happy to.  Can you

21   still hear me okay?

22         THE COURT:  Yes.

23         MR. McCONN:  If it's okay with the Court, I'd like

24   to use a PowerPoint to help guide us through the discussion.

25         THE COURT:  Did you share it with your adversary?

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 6 of 68

5

Proceedings

1    MR. McCONN:  I did not, Your Honor.  I didn't know

2    that I was supposed to.  I'm happy to do so right now.

3    THE COURT:  Well, welcome to my courtroom.  And

4    please read my rules in the future before you ever come in

5    my courtroom again --

6    MR. CAFASSO:  I missed that one, Your Honor.  I

7    apologize.

8    THE COURT:  -- number one.  Number two, courtesy,

9    to me and to your adversary.  So the answer is no.

10   MR. McCONN:  Okay.  Your Honor, I apologize.  I was

11   not trying to hide anything.  That is my fault for not

12   knowing the rules.

13   With that, Your Honor, if I may, may I proceed?

14   THE COURT:  Please.

15   MR. McCONN:  Thank you, Your Honor.

16   So, Your Honor, as you said, we are here today on

17   the plaintiffs' motion for a Preliminary Injunction.  I

18   represent all of the plaintiffs, including Mr. Souki, and

19   then the remainder of the plaintiffs are entities that are

20   affiliated with Mr. Souki.

21   What we're asking today, Your Honor, is for the

22   Court to simply maintain the status quo with respect to the

23   condition of the assets and the collateral that will be the

24   subject of the discussion and that are the subject of the

25   briefing that's been filed with the Court.

ab

Proceedings

1          We are talking about three elements here, as Your

2     Honor well knows.  We are talking about likelihood of

3     success on the merits.  We think we can show likelihood of

4     success on the merits with respect to various claims,

5     including our claim that the defendants breached their duty

6     to use good faith and commercial reasonableness, as well as

7     our declaratory judgment claim and our fraud claim.

8          And as Your Honor well knows, the law in New York

9     -- with respect to the element, the first element,

10    likelihood of success -- a prima facie showing of a

11    reasonable probability of success is sufficient.  And so

12    that's number one.

13         Number two, the irreparable harm element.  And of

14    course, we're talking about three pieces of collateral.  A

15    family residential ranch, a family-owned --

16         THE COURT:  Anything about the conflict in the

17    record between whether it is the family home?  I have your

18    client saying many different things.  So what am I to

19    believe?

20         MR. McCONN:  Thank you, Your Honor, for the

21    question.  And, yes, ma'am.  I understand that when we filed

22    our original Complaint, we identified him as a Texas

23    resident.  And as you'll see in his supplemental affidavit

24    that we filed on Friday, we clarified that he was a Texas

25    resident up until last year.  And because of how much time

ab

FILED: NEW YORK COUNTY CLERK 05/12/2023 03:53 PM
INDEX NO. 651164/2023
NYSCEF DOC. NO. 116
Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 8 of 68
RECEIVED NYSCEF: 05/12/2023

7

Proceedings

1   he's now spending back in Colorado, he is now a Colorado

2   resident.  But at all times relevant to the discussion, Your

3   Honor, his only home in the United States was the ranch and

4   is the ranch in Colorado.

5           So even when he was a Texas resident and spending

6   time here in Houston -- he'd live in a hotel or spend time

7   in a hotel -- his only home is the ranch.  And that is the

8   record in the case.  And we've clarified that now in Mr.

9   Souki's supplemental affidavit.

10          THE COURT:  Mm-hmm.  Okay.  Did you want to

11  proceed?

12          MR. McCONN:  I would, Your Honor.  I just wasn't

13  sure if you had another question.

14          THE COURT:  Oh, believe me.  When I have a

15  question, you'll know.

16          MR. McCONN:  Thank you, Your Honor.

17          THE COURT:  Yeah.  It's my courtroom.  I'm not

18  afraid to ask questions in my courtroom, but thank you so

19  much for the invitation.

20          MR. McCONN:  Thank you, Your Honor.  I'll keep

21  going.  I want to make good use of the Court's time.

22          So the second element is the irreparable harm.

23  We're talking about the ranch.  We're talking about the

24  family-owned company, Ajax Holdings.  And we're talking

25  about the sailboat that is a rare and unique piece of

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 9 of 68

8

Proceedings

1    personal property. Those are the three elements, Your

2    Honor. I'll just get right to it.

3         So a quick background to help guide the Court.

4    2017, Mr. Souki enters into the first loan with the

5    defendants. That loan was worth $50 million.

6         THE COURT: I mean, the bottom line is we're

7    talking about $138 million loan, correct?

8         MR. McCONN: We are talking -- when you add up all

9    the interest that they say has accrued, that is correct,

10   Your Honor.

11        THE COURT: Okay.

12        MR. McCONN: That was never the balance at any

13   given point in time, but that is the total.

14        THE COURT: I don't really care. But that's the

15   amount I have to deal with.

16        MR. McCONN: Okay. So we're dealing with that very

17   sizable loan. It came in two tranches in 2017 and 2018.

18   All these pieces of property that we're talking about were

19   pledged as collateral. Given the value of that collateral,

20   the defendants were certainly more than over-collateralized.

21        The final thing I'll say about that first agreement

22   in 2017 is that when we signed the loan agreement, the

23   defendants also required Mr. Souki to sign an account

24   control agreement, which gave them the right to exercise

25   control over the Tellurian stock, if they so chose. So that

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 10 of 68

Proceedings

1     was 2017.

2              2018, there's a supplemental loan agreement.  We

3     get to the amount that the Court described.

4              In 2019, the defendants entered into another loan

5     agreement with the company that Mr. Souki co-founded,

6     Tellurian.  That was for $75 million.  And so by the time

7     you get to the end of 2019, the defendants are very heavily

8     exposed to Tellurian under the two loans of Mr. Souki and

9     the loan with Tellurian itself.

10             In early 2020, this becomes a problem.  And the

11    reason it becomes a problem is because two very significant

12    things happen in the market and it severely impacted the

13    Tellurian stock cost.

14             The first is they ran into an issue with a

15    potential customer, a company called Petronet out of India.

16    The way these LNG facilities work, Your Honor, is they can't

17    be billed until they get the financing in place.  You can't

18    get the financing note for these multi-billion-dollar

19    facilities until customer contracts are signed.  Petronet

20    was going to be one of the primary customers of Tellurian,

21    and in February of 2020, they announced that they were

22    backing away from the table.  That sent the stock price down

23    very significantly.

24             The second thing that happened was in March of

25    2020, COVID occurred, and that just blew up the oil and gas

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 11 of 68

Proceedings

1    markets around the world.  That also strained very heavily

2    -- strained the Tellurian stock price.

3           So it's with that context, Your Honor, that in the

4    spring of 2020 when this was happening, the defendants

5    approached Mr. Souki.  At that time, Mr. Souki was the

6    chairman of the board of Tellurian, but he was not an

7    officer.  He was not actively involved in the day-to-day

8    business of the company.  But given their exposure to the

9    company at that point and the problems that were going on,

10   the defendants asked -- really, pleaded with Mr. Souki to

11   come back, re-engage with the company, and take over so that

12   he could ensure that the company -- that he could right the

13   ship at Tellurian.  And in doing so, help get these loans

14   paid off to the defendants, including the loan that

15   Tellurian had.

16          And what they did is they asked him -- and this is

17   in his affidavit.  They asked him to come back, get back in

18   charge, re-engage.  And if he did so, they would be very

19   flexible in their approach to his -- the repayment of his

20   loan.  They told him to focus on getting the Tellurian loan

21   paid, and if he did so, they would not touch his stock, his

22   Tellurian stock that was pledged as collateral under his

23   own --

24          THE COURT:  And where is that written agreement?

25          MR. McCONN:  It's not, Your Honor.  I fully confess

ab

Proceedings

1    that that is -- it's all oral.  There are emails that talk

2    about it, but there's no written agreement that says that.

3    We don't dispute that.

4         But what we do say, Your Honor, is that that

5    assurance, that promise -- what we call an agreement or

6    commitment by the defendants.  It spelled out what the

7    parties understood would be the reasonable time to sell his

8    stock if it ever had to be sold to pay off his debt -- it

9    would be after Tellurian achieved certain milestones in the

10   future.  That's what they understood would be the

11   commercially reasonable thing to do.  So that was 2020.

12        And as a result of that, Mr. Souki re-engaged.  He

13   came back in as the executive chairman of the company.

14   Devoted all of his time and resources to righting the ship

15   at Tellurian.  Getting the Tellurian loans paid off.  And in

16   doing so, he did enter into a written agreement -- actually

17   two -- with the defendants.  Both called bridge agreements.

18        The bridge agreements essentially were forbearance

19   agreements that lasted for about a year, and during that

20   period, they would not touch his stock.  But it also said

21   that at the end of that year when the agreements expire,

22   they would have the right to sell his stock if certain

23   things happened.  It said that we couldn't provide the

24   material nonpublic information so that it wouldn't impact

25   their ability to sell the stock.  But it also said that if

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 13 of 68

12

Proceedings

1    they, the defendants, decided to move forward with selling

2    the stock at any point after that, they would have to take

3    commercially reasonable steps not to disrupt the stock

4    price.  That was the agreement they made in writing.

5            On that same day, May 5th of 2020, when we entered

6    into those bridge agreements, the defendants also exercised

7    their right to take exclusive control of Mr. Souki's stock.

8    This is a letter attached as Exhibit 2 to Mr. Souki's

9    supplemental affidavit.

10            THE COURT:  What's the NYSCEF number?

11            MR. McCONN:  Pardon me?

12            THE COURT:  What's the NYSCEF number?

13            MR. McCONN:  I don't -- I don't know, Your Honor.

14    I'll have to find that for you.

15            THE COURT:  Again, please read my rules.  Please be

16    prepared with NYSCEF numbers.  I have 400 cases.  Would you

17    like to know how many Exhibit 2s I looked at today?

18            MR. McCONN:  I'm sure it was a lot.  I apologize.

19            THE COURT:  Would you like to see how many

20    Exhibit 2s are in this file?  "Exhibit 2" -- useless.

21    Completely useless.  Thank you.

22            MR. McCONN:  I apologize.  Your Honor, I'll get you

23    that number.

24            THE COURT:  Thanks so much.

25            MR. McCONN:  I apologize.

ab

Proceedings

1          So Exhibit 2 to Mr. Souki's supplemental affidavit

2     is Index Number 651164/2023.

3          THE COURT:  That's the Index number of the case.

4     Thank you so much.  The NYSCEF number is the document number

5     in the docket.

6          MR. McCONN:  I apologize.  It's 104, Your Honor.

7          THE COURT:  Got it.  Thank you.

8          MR. McCONN:  You're very welcome.  Apologies.

9          So the NYSCEF -- sorry, NYSCEF Number 104 is

10    Exhibit 2 to this supplemental affidavit.  This supplemental

11    affidavit is 102.  And that document clearly shows, Your

12    Honor, that on May 5, 2020, the defendants exercised their

13    right under that account control agreement that we talked

14    about earlier, and they sent a letter to Mr. Souki saying,

15    "We now have exclusive control over your stock," and under

16    the plain language of the agreement, the account control

17    agreement.

18          At that point, Mr. Souki ceased having any control

19    over his stock.  He could not do anything about it,

20    including selling it.  Only Defendants had the right at that

21    point, or the ability to sell the stock.  They were the only

22    ones who could do so.  So that's in May of 2020.

23          For the rest of 2020 and early 2021, things seemed

24    to be going okay.  That was -- Mr. Souki was running

25    Tellurian.  He was raising money for the company.  He

ab

Proceedings

1    eventually helped the company pay off both the loan to the

2    defendants as well as another loan.  It really helped the

3    company.  The stock price stabilized and it started to

4    recover.  That gets us into the spring of 2021.

5         Around the spring of 2021, in March or so of 2021,

6    the bridge agreements expire.  The loans have now been paid

7    off.  The Tellurian loan has been paid off.  So the only

8    loan that's left outstanding are Mr. Souki's personal loans,

9    which he was told they would be very flexible in how they

10   would deal with it.  And they wouldn't touch his Tellurian

11   stock until after Tellurian achieved these milestones.

12   Well, that promise went out the window.

13        And again, we understand.  It's not -- it was a

14   promise.  It was made.  It went out the window.  And in

15   March of -- sorry, May of 2021, the defendant started

16   insisting that Mr. Souki sell his stock, his Tellurian

17   stock; the 25 million shares that he pledged as collateral

18   under the loan.

19        At that point and at all points going forward, Your

20   Honor, why they were asking him or insisting that he sell

21   the stock is beyond us.  Because at that point, not only did

22   he have other kind of SEC-type restrictions on him from

23   selling, he didn't have the ability to sell.  The Account

24   Control Agreement gave the defendants the exclusive right to

25   do that.  Yet, during that time, they were asking Mr. Souki

ab

Proceedings

1    to sell his stock.

2         They were also insisting that he sell his ranch.

3    And so at that point, even though it's his residence, his

4    home, his children live there, he made the decision.  He

5    knew that he had obligations to the defendants.  And so he

6    made the decision to ask his children to move off the ranch.

7    He would put it on the market and try to sell it so he could

8    pay off the loans, which he couldn't do using the stock

9    because they had exclusive control.  So that -- that is

10   2021, spring, moving forward.

11        But once we get into the next 15 to 18 months, Your

12   Honor, there are repeated windows of time -- days, weeks of

13   time -- wherein the value of the stock, the Tellurian stock,

14   exceeded his debt.  We know from what they filed in the

15   papers that they believe his debt was $119 million in April

16   of 2022.

17        What we know, Your Honor, this is all public

18   information and it's included in Mr. Souki's affidavits.

19   That the value of his shares in June of '21, November of

20   '21, all throughout April and into May of '22 -- in March,

21   sorry -- further in May of 2022 and then again in August of

22   '22.  At all of those points in time, the value of his

23   shares that they controlled were more than his debt.

24        They had exclusive control of his shares.  They had

25   the right to sell his shares.  For whatever reason, they

ab

Proceedings

1    were insisting that he do it, but they wouldn't do it.  But

2    they knew that that was the right time to sell it because

3    they were asking him to do it.  Maybe they forgot they had

4    the right to do it or they sole right to do it, I don't

5    know.  But for whatever reason, over that many months of

6    time when they had reasonable opportunities to sell, they

7    did not do so.

8              And at one point, Your Honor -- and this is in Mr.

9    Souki's supplemental affidavit as well, which again is

10   NYSCEF Doc Number 102.  At some point in late 2021 and early

11   '22, as the defendants continued, repeatedly insisting that

12   Mr. Souki sell during these windows when the stock price

13   was -- the value was more than the debt, he finally said --

14   his representative finally said, "Look, guys.  We can't do

15   it.  And if you don't believe me, you got to sell.  You do

16   it."  And they still didn't do it.  And so this is going on

17   repeatedly throughout 2021 and 2022.

18             And during that same time frame -- it's somewhat

19   relevant to what we're talking about here -- they're also

20   insisting that he sell his ranch.  And he tried.  And he

21   made several good faith efforts to do so.  In 2021, he was

22   able to sell two of the properties -- actually, three of the

23   properties on the ranch.  And it took a lot of bidding and

24   negotiating and working with the defendants, who were being

25   nonresponsive to him, to get them to finally agree to

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 18 of 68

Proceedings

1    release the lien that they had over those particular

2    properties under these loans.  But they did.  No dispute

3    that they finally did.  But at that point in time, as of

4    late 2021, they then were the only lien holder on his ranch.

5    They had cleared out the other lien holder, the other

6    mortgagor.

7             And at that point they had a first lien position,

8    and at that point, throughout the rest of '21 and into

9    '22 -- all of '22, they refused multiple proposals by Mr.

10   Souki to either sell off parts of the ranch to other

11   bidders, including his family trust.  They rejected

12   refinancing proposals that he had made on parts of the loan

13   using the ranch.  And so this continues repeatedly.  And

14   they're still not selling his share.  None of this would

15   have been necessary on the ranch if they would've just taken

16   their own advice and used the exclusive right they had to

17   sell the shares.

18            They wouldn't even have had to sell all the shares,

19   Your Honor.  They could have sold a large portion of them

20   and wiped out the entire debt.  And for whatever reason,

21   they continued not to do so.

22            And so, Your Honor, we get to the end of 2022.  And

23   I appreciate you indulging me.  I know I'm going through a

24   lot of the background here, but I think it's important

25   context.

ab

Proceedings

1     In late 2022, after this two years of inaction and

2     interference, the defendants began to foreclose on some of

3     the collateral.

4     The first piece of collateral they foreclosed on

5     was the sailboat, the Tango sailboat.  We got notice of this

6     three days before Christmas in 2022.  And we had never

7     received any further information from the defendants, or the

8     receiver they appointed as to what is going on with the

9     Tango.  We have asked.  We've asked repeatedly.  And the

10    receiver that they appointed for selling that boat has

11    repeatedly refused to give us any information.

12    But what Mr. Souki has learned through

13    acquaintances out in the market cause he knows a lot of

14    people who deal with these sailboats, is that the boat has

15    been listed for sale for a fire-sale price, using a

16    marketing process that doesn't come close to complying with

17    the way it's done in the industry.

18    And the defendants, notably, do not dispute any of

19    this.  If you look at their briefing, their response, or the

20    opposition and the affirmation that was attached to it,

21    there's no dispute about Mr. Souki's testimony with respect

22    to how the Tango that's being marketed -- or the fact that

23    he is not being provided any information whatsoever.  So

24    that's the Tango.  That's at the end of '22.

25    At the beginning of this year, in February of '23,

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 19 of 68

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 20 of 68

Proceedings

1    they then seized the Tellurian shares.  They already had

2    exclusive control over the shares.  They took a step in

3    seizing the shares -- actually moving, directing the broker

4    to physically -- not physically, but electronically move the

5    shares of Mr. Souki's account to the defendants' account.

6         Now this is just a ministerial act because, as I've

7    said a few times now, at that point they controlled the

8    shares.  But that was the first time, in February of '23,

9    that they actually took their own advice and used the

10   exclusive right that they had and went ahead and started

11   selling the stock.  But they did so when the stock --

12   instead of when it was at 5 and $6 during those repeated

13   windows that I was telling you about earlier, at this point

14   it was trading below $2.  It had been trading right around

15   $2 going back to November or so, maybe October.  But by the

16   time they seized the shares on February 6th and 7th, the

17   stock is trading below $2.

18        And yet that next day, February 8th, I believe,

19   they started selling the stock.  And they didn't just start

20   selling it, Your Honor.  They dumped it on the market.

21        At that point in time, the average volume of

22   Tellurian stock being sold every day was roughly 10 to

23   $12 million -- or 10 to 12 million shares, I'm sorry.

24   Whereas back in 2021 and early 2022, during those windows of

25   time that I mentioned to, Your Honor, back during those

ab

Case 23-90757  Document 75-21  Filed in TXSB on 08/24/23  Page 21 of 68

Proceedings

1    periods, the shares were trading sometimes 80 to 90 million

2    per day.  In April of '22, it got up to 230 million shares

3    being traded in one day.  Those were the times to sell.

4            Yet, for whatever reason, they dumped his shares on

5    the market when it was at a two-year low, and the trading

6    volume was such that if the executive chairman's gets dumped

7    into the mix, it's going to move the price dramatically.

8    And yet they did it anyways.  And the very first day, they

9    dumped almost 2 million of his shares on the market, roughly

10   15 percent or so of the total volume for that day.  It drove

11   the price down by 10 percent, not surprisingly.

12           We then asked them -- we pleaded with them -- to

13   not sell any more, but if they were going to, to use an

14   industry-compliant methodology, which would be essentially

15   using these algorithms that traders use to make sure that

16   they're only putting 3 to 4, maybe 5 percent into the market

17   each day and as the market moves, the algorithm will adjust.

18   They clearly didn't do that at least in the first week cause

19   they kept dumping large, humongous volumes on to the market

20   to the point where at the end of the first six business

21   days, they had driven the price down by, I want to say

22   nearly 25 to 30 percent.

23           So they ignored our advice.  They ignored our

24   pleas.  They finished out selling all 25 million shares over

25   the next six weeks or so.  For the 25 million shares that

ab

Proceedings

1    they could've received $158 million for back in April of

2    2022, they received 37 million.

3         And that's also at a time when his debt -- because

4    of their interference and their inaction, Mr. Souki's debt

5    had increased to, according to them, $135 million.  So they

6    sold his shares a time when the volume of those shares was

7    almost a hundred million dollars less than the total debt.

8    So that gets us to this lawsuit.

9         March 6th we filed a lawsuit.  A week later,

10   March 13th, they react by initiating foreclosure on the

11   ranch, which they've now scheduled for July of this year.

12   Two days later, they react by initiating foreclosure on the

13   family company, Ajax Holdings.  They scheduled that for

14   June 13th.  So only six weeks from today.  And it was

15   because of that that we then moved for a Preliminary

16   Injunction on April 3rd.

17        Your Honor, as I mentioned earlier, the primary

18   claim that we are focused on today with respect to

19   likelihood of success on the merits is the duty that they

20   breached with regards to commercial reasonableness.

21   Commercial reasonableness is required in the disposition of

22   every piece of collateral under the New York UCC, which is

23   part of this contract.  The contract is made subject to New

24   York law.  No dispute about that.  Sections 9-6.1 -- sorry,

25   9-610 of the New York UCC, Sub B, requires commercial

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 23 of 68

Proceedings

1    reasonableness in every aspect of a disposition of

2    collateral, including the method, manner, place and time.

3         The Courts have defined commercial reasonableness

4    in this context to mean things like a good faith attempt to

5    dispose of the collateral to the parties' mutual best

6    advantage, or what a reasonable business would have done to

7    maximize the return on a collateral.  Those are the *Central*

8    *Budget v. Garrett* case and the *matter of Excello Press* cases

9    that we've cited in our briefing.  And this is a duty --

10   it's a requirement, Your Honor -- that can not be waived.

11   Section 9-602 Sub G of the New York UCC says that expressly.

12   It can not be waived.

13        So whatever discretion the loan agreements provide

14   the defendants, whatever rights they have vis-a-vis Mr.

15   Souki and the plaintiffs under these loan agreements, it's

16   all subject to this duty to use commercial reasonableness

17   under the UCC that can not be waived.  And they don't

18   dispute that in their papers.

19        THE COURT:  All right.  So why are we talking about

20   waiving?  Are they even trying to -- they're not even asking

21   to waive it.

22        MR. McCONN:  Your Honor, you're right.  They're not

23   asking to waive it.  But they're making several arguments

24   about how provisions in the agreement show that they have

25   all kinds of discretion and they can essentially do whatever

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 24 of 68

Proceedings

1    the heck they want with respect to collateral.  And that's

2    simply not true.

3              So I know they're not saying "waiver," but they're

4    making an argument that implies that there is no duty to use

5    commercial reasonableness under this contract, and by New

6    York law there clearly is.  And for that matter, Your Honor,

7    they also expressly agreed to use commercial reasonableness

8    under the bridge agreements in May of 2020.

9              Remember we talked about the provision that says

10   that if they're going to sell the Tellurian stock, which

11   they had the right to do, exclusively, as of that date, they

12   had to use commercially reasonable efforts to avoid material

13   disruption?

14             THE COURT:  Basically, you want me to take a leap

15   from the fact -- or your argument that it is a fact that

16   they did not use commercially reasonable methods to sell the

17   stock, and, therefore, they will not use commercially

18   reasonable methods to sell the ranch and to sell the boat,

19   correct?

20             MR. McCONN:  No, Your Honor.  Respectfully, it's a

21   little different than that.  And I'm sorry I haven't

22   articulated it better.  What we're asking Your Honor to do

23   is to find that we have a likelihood of success on our

24   commercially reasonableness claims.

25             THE COURT:  Hold on.  There's a feedback for some

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 25 of 68

24

Proceedings

1    reason.  Try again, please.

2              MR. McCONN:  Sure.  Thank you, Your Honor.

3              So what we are asking is that you find that we have

4    a likelihood of success on the merits of our claim, that

5    they breached their duty of commercially reasonableness as

6    to how they disposed of the Tellurian stock.  And had they

7    done it commercially reasonably -- what we think we have

8    previewed to the Court and the evidence that we put before

9    you is that had they done it commercially reasonably, they

10   would have used the stock to dispose of the entire debt.

11             And so -- and once they do that, once we use

12   commercially reasonable efforts to sell the stock and

13   dispose of the entire debt, they have no further right to

14   foreclose on the ranch or the company or the sailboat.  And

15   we have a declaratory judgment claim to that effect, or

16   action to that effect, Your Honor, in our first Amended

17   Complaint.

18             And so that is what we're asking the Court today to

19   find.  That there is a likelihood of success on the merits

20   of those claims such that there is no further right to

21   foreclose on this collateral, and, therefore, they should be

22   enjoined from doing so until we get to a trial on the

23   merits.

24             THE COURT:  Got it.  Thank you.

25             MR. McCONN:  Sure.  And so, Your Honor, just back

ab

Proceedings

1    to the commercial reasonableness claim.  As I mentioned, the

2    UCC Section 9-610 mentions time as one of the key elements

3    of the commercial reasonableness inquiry.  And if you go to

4    comment 3 of that section, it says, you know, quoting

5    here -- it's not the entire comment, but in relevant part.

6    It says "that if a secured party holds collateral for a long

7    period of time without disposing of it" -- excuse me -- "and

8    if there is no good reason for not making a prompt

9    disposition, the secured party may be determined not to have

10   acted in a commercially reasonable manner."  And that's

11   exactly what we're saying here, Your Honor, based on the

12   facts as I've laid them out to you.

13          But the Courts in New York have also construed this

14   to mean that, as part of this inquiry the Court must

15   consider the, quote, "reasonableness of choosing the date

16   that was chosen."  This is the *Highland CDO Opportunity*

17   *Master Fund v. Citibank* case that we cite in our briefing.

18   In fact, both sides cite that case.

19          THE COURT:  Mm-hmm.

20          MR. McCONN:  So it's clearly a requirement of this

21   inquiry and it's clearly something that if they're going to

22   get over the hurdle of commercial reasonableness, they have

23   to show that the date that they chose or the time that they

24   chose was commercially reasonable.

25          And just to kind of take you back to what we said a

ab

FILED: NEW YORK COUNTY CLERK 05/12/2023 03:53 PM INDEX NO. 651164/2023
NYSCEF DOC. NO. 116    Case 23-90757    Document 75-21    Filed in TXSB on 08/24/23    Page 27 of 68    RECEIVED NYSCEF: 05/12/2023

26

Proceedings

1    minute ago about how the Courts define "commercially

2    reasonable," it has to be to the parties' mutual best

3    advantage and has to be what a reasonable business would

4    have done to maximize a return on the collateral.

5         So that means that they are required -- the

6    defendants, when they are selling our stock -- Mr. Souki's

7    Tellurian shares, when they're selling that, they have to

8    sell it at a time when a reasonable business would have sold

9    it to maximize the return on the collateral.  And they just

10   simply failed in that regard -- miserably failed in our

11   view, Your Honor, for all of the reasons I've already

12   stated.  And I won't belabor the point.

13        THE COURT:  And why isn't this -- I understand that

14   the ranch is unique.  I understand the boat is unique.  But

15   as to the stock, you know, why -- how could there be

16   irreparable harm when, according to your own expert, all he

17   has to do is a calculation.  And can only be assessed -- I'm

18   reading from his page 7.  "Can only be assessed by

19   performing statistical analysis of the daily order flow."

20   But the bottom line with the report is that it can be

21   calculated.

22        MR. McCONN:  Your Honor, so we are -- we are not

23   claiming irreparable harm as to the sale of the stock.  We

24   understand that -- the stock has already been sold.  The

25   horse is out of the barn, as we might say in Texas.  We will

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 28 of 68

27

Proceedings

1    have a claim for money damages, or at least as to why

2    there's no deficiency left on the loan based on the sale of

3    the stock.  But the irreparable harm is going to come if

4    they sell off this unique property; the ranch, the family

5    business, and the sailboat.  That's where the irreparable

6    harm will come in.  And that's why we are now moving,

7    respectfully, for Your Honor to stop them from selling those

8    things.

9            We didn't seek an Injunction to stop the sale of

10   the shares, but we are now moving to enjoin the sale of

11   three very, very unique pieces of property.  And that's --

12   that's where the irreparable harm would come in.

13           THE COURT:  Okay.  Thanks.

14           And who's speaking for the defendants?  Mr.

15   Cafasso, where are you?

16           MR. CAFASSO:  Right here, Your Honor.  Can you hear

17   me?

18           THE COURT:  It's a little muffled.

19           MR. CAFASSO:  How about now?

20           THE COURT:  And all other microphones should be

21   off, please.

22           Go ahead.

23           MR. CAFASSO:  And let me know, Your Honor, if you

24   can not hear me.

25           THE COURT:  We will.

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 29 of 68

Proceedings

1          Won't we, Ms. Brown?

2          THE REPORTER:  Yes.

3          MR. CAFASSO:  So this motion, Your Honor, can and

4     should be resolved on the plain language of binding loan

5     agreements to which the sophisticated parties agreed and

6     controlling New York law from both the Court of Appeals and

7     the First Department.  And respectfully, Your Honor, they

8     can not establish any of the three requirements for the

9     drastic remedy of a Preliminary Injunction.

10          And as you heard my adversaries just go through and

11     you see it in their papers, they claim -- they try to claim

12     that this motion raises a bunch of fact-intensive questions.

13     That's just not true, Your Honor.  The undisputed facts,

14     which are all the Court needs to consider today, are as

15     follows:

16          Mr. Souki, a sophisticated business person,

17     borrowed approximately $138 million pursuant to binding loan

18     agreements in 2017 and 2018.  Mr. Souki, and the other

19     plaintiffs, pledged specific collateral to secure those

20     loans and granted Defendants perfected security interests in

21     that collateral.

22          Under the plain language of the loan agreements,

23     Your Honor, Defendants are permitted to foreclose on that

24     collateral at any time after a default, in their sole and

25     absolute discretion.

ab

Proceedings

1    The contracts, as Mr. McConn admits, say nothing

2    about waiting for certain milestones at Tellurian before

3    they could sell the stock.  Mr. Souki acknowledged in

4    May 2020 that he was in default, and he has been in default

5    ever since.

6    Defendants nonetheless agreed, Your Honor, to

7    forebear through the outside date of March 30, 2021 -- and

8    that's in so-called bridge agreements, which I would like to

9    walk Your Honor through in a moment.

10    Within those agreements the parties agreed, among

11    other things, that those written agreements could not be

12    contradicted by any evidence of prior or contemporaneous

13    oral promises and that there would not be any subsequent

14    oral modifications to the agreements.

15    When those agreements expired, Your Honor, in March

16    of 2021, even after that point, Defendants agreed to

17    forebear for another two years before they exercised their

18    contractual remedies.

19    On February 6th of this year, in 2023, Defendants

20    exercised their rights to take possession of the Tellurian

21    shares and began trading on February 8th.  Later that same

22    day, Mr. Souki's own lawyer, I believe it was Mr. McConn,

23    sent an email where he estimated and agreed that Mr. Souki's

24    outstanding debt obligation was $124 million.

25    Now, there's some debate over the price amounts,

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 31 of 68

Proceedings

1    Your Honor, but the point is that even after we took

2    possession of the shares, Mr. Souki was still acknowledging

3    that he owed us in excess of a hundred million dollars.

4           So what has happened since February 8th to bring us

5    before Your Honor today?  Mr. Souki still has not paid back

6    anything.  We sold the shares, as Mr. McConn alluded to,

7    over a two-month period on the New York Stock Exchange.  And

8    by the time Defendant started selling the shares,

9    Tellurian's stock price was in the midst of a precipitous 60

10   percent decline.  The stock was plummeting.  As a result --

11          THE COURT:  Well, they're saying that was your

12   fault.  They're saying you prompted that.

13          MR. CAFASSO:  That was not our fault, Your Honor.

14          THE COURT:  Okay.

15          MR. CAFASSO:  Yes.  I'll get to that.  As a result

16   of those sales, we recovered approximately $35 million.  We

17   have not recovered anything else since, and sitting here

18   today, Mr. Souki still owes almost a hundred million dollars

19   on these loans.  Those, Your Honor, are the undisputed and

20   controlling facts, and everything else Plaintiffs say in

21   their affidavits about supposed oral promises, negotiations,

22   expectations, is legally of no moment.

23          And so while we very much disagree and dispute what

24   they're saying -- we don't agree that that extra contractual

25   evidence has anything to do with this motion.  We're happy

ab

Case 23-90757  Document 75-21  Filed in TXSB on 08/24/23  Page 32 of 68

Proceedings

1    to engage on it at the appropriate time, but it's simply of

2    no consequence here in light of governing agreements and New

3    York law.

4          And to grant a Preliminary Injunction here, Your

5    Honor, you need to find merit to Plaintiffs' claim, which is

6    a rather remarkable claim.  That his entire outstanding debt

7    of a hundred million dollars should be deemed wiped out

8    because, in hindsight, Defendants mistimed the selling of

9    the Tellurian shares, either because they sold too early or

10   they sold too late.

11         Now, if Your Honor agrees with us that that claim

12   has no basis in either of the contracts or the law, then

13   there's simply no basis to stop the foreclosures efforts as

14   to the other pieces of the collateral.

15         So, Your Honor, I think that's sort of the kernel

16   of what's going on here.  All of his other arguments, at

17   most would go to reduce the amount of debt owed, not come

18   close to extinguishing it.  And in all events, would be

19   compensable by monetary damages.

20         And, Your Honor, Plaintiffs' position -- and to be

21   charitable, is a little bit incoherent to me.  On the one

22   hand they say that we sold too early because of some

23   supposed extra contractual promise not to sell the Tellurian

24   shares until certain milestones were met.  As Your Honor

25   observed, that's nowhere in the contracts.  The contracts

ab

Proceedings

1    say nothing about that.

2          But then they say, well, you also sold too late

3    because you should have sold when the stock was trading at a

4    brief three-year high in April 2022, even though the

5    contracts say we can sell at any time.  And as I'll get to,

6    the law does not place the risk of a declining market on the

7    defendants.

8          And telling, though, Your Honor, plaintiffs do not

9    cite a single case where a Court has upheld a commercial

10   reasonableness challenge, either to the timing or to the

11   manner of the sale of pledged securities on a public stock

12   exchange.  And that's perhaps not surprising because the UCC

13   establishes a safe harbor for sales of collateral on a

14   recognized market.

15         In fact, Your Honor, the cases they do cite -- the

16   *Highland CDO* case, your case in *D2 Mark*, the *Grace* case.

17   They're so different from this case.  None involve the

18   disposition of securities on the New York Stock Exchange, or

19   anything even remotely close to that.  That they only serve

20   to illustrate why Plaintiffs' claims here fail as a matter

21   of law.

22         And, Your Honor, let's be clear about what happened

23   here.  And to use Your Honor's own decision in *D2 Mark*,

24   we're not talking about the sale of a historic hotel in the

25   middle of the COVID pandemic where I believe they gave

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 34 of 68

33

Proceedings

1      36 days to make a market, 27 of which you couldn't access

2      the property because of the lockdowns.  That's not what's

3      happening here, Your Honor.  This case could not be more

4      different.  We're talking about sale of the common stock on

5      the New York Stock Exchange over a period of two months.

6              And as an aside, although we could have, we did not

7      try to foreclosure on any of the collateral during the

8      pandemic.  And I would submit to Your Honor, that a ruling

9      in favor of Plaintiffs here would set bad precedent because

10     it would penalize us for forbearing, and it would

11     disincentivize lenders from working with their borrowers to

12     avoid foreclosure.  And I don't think that's the policy that

13     New York should be adopting or promoting here.

14             At the end of the day, Your Honor, Plaintiffs are

15     just using hindsight to cherrypick a few dates and argue

16     that we could've timed the market better, but that's not the

17     law, Your Honor.

18             The mere fact that a greater amount could've been

19     obtained if we sold at a different time, that's not enough

20     to establish commercial unreasonableness.  That's straight

21     from the UCC, Section 9-627A.  And the case law makes clear

22     that the investment and market risk of pledged securities

23     rests with the borrower, not the lender.

24             And nothing in the law, Your Honor, puts that risk

25     on us with the lenders.  And I would point Your Honor to the

ab

Proceedings

1    *Bankers Trust* decision from the Court of Appeals, which is

2    very analogous and makes clear that the sale of pledged

3    collateral on a recognized market is immune from attack on

4    the grounds of commercial reasonableness.  And that as

5    secured lenders, we were entitled to act according to our

6    self-interest and discretion in disposing of the shares, and

7    we were not required to follow Mr. Souki's recommendations

8    as the borrower.  That's straight from the Court of Appeals

9    in the *Bankers Trust* decision.

10          THE COURT:  They use the word "immune"?  I don't

11   think they use the word "immune."  I'll do a search, but I

12   don't think they used the word "immune."

13          MR. CAFASSO:  Certainly, the First Department did,

14   Your Honor, in *Citibank v. Solow*.  They say you're immunized

15   from attack on the grounds of commercial reasonableness if

16   you sell pledged collateral through regular market channels.

17   And the *Solow* decision from the First Department cites to

18   *Bankers Trust* for that proposition.

19          And finally, Your Honor, the *Lane v. Bank One*

20   decision, I would admit and tell you it addresses Kentucky

21   law.  It's from the Sixth Circuit.  But it's perhaps the

22   most factually analogous here because it involved a

23   challenge both to the timing and sale -- timing and manner,

24   rather, of pledged securities on the New York Stock

25   Exchange.  And the Court made several apposite holdings

ab

FILED: NEW YORK COUNTY CLERK 05/12/2023 03:53 PM INDEX NO. 651164/2023
NYSCEF DOC. NO. 116 Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 36 of 68 RECEIVED NYSCEF: 05/12/2023

35

Proceedings

1    rejecting those challenges.  And it's really on all fours

2    here, Your Honor.  So I would point Your Honor to that

3    decision as well.

4           At the end of the day, Your Honor, there's simply

5    no basis in the contracts or the law for the Court to second

6    guess the timing of our sales.  And again, Plaintiffs do not

7    point to a single case where a Court has done so.

8           Your Honor, if you would indulge me, I'd like to

9    walk you through just a few provisions of the bridge

10   agreement because I think they're very important and they

11   tend to foreclose Plaintiffs' arguments.  And this would be

12   in NYSCEF 89.

13           THE COURT:  Sure.

14           MR. CAFASSO:  It's the 2018 bridge agreement.

15           THE COURT:  Okay.

16           MR. CAFASSO:  Just by way of background, as Mr.

17   McConn rightly said there were series of agreements that

18   pertained to these loans.  They're all described in the

19   Metzger affidavit we submitted with our opposition.

20           THE COURT:  You didn't -- I don't have anything

21   about the commercial reasonableness of the sales of the

22   other properties, the ranch and the boat.  But anyway -- you

23   know, all I have is an attorney affidavit, which is a little

24   odd, but go ahead.

25           MR. CAFASSO:  Well, part of the reason, yeah, Your

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 37 of 68

36

Proceedings

1    Honor, is they didn't challenge that.  Again, their whole

2    argument before you today is that if we sold the shares at a

3    different time, his entire debt would be extinguished and,

4    therefore, we cannot foreclosure on those additional

5    properties.

6          The bridge agreements, one was 2017, one was

7    2018 -- they're identical, or at least they're identical in

8    all relevant respects.  So let me just focus Your Honor on

9    the 2018 bridge agreement.  I also point out that in Mr.

10    Souki's -- in Plaintiffs' first Amended Complaint, they say

11    this was heavily negotiated.  They concede this was heavily

12    negotiated.  And let's look to see what those heavily

13    negotiated terms were.

14          First of all, Mr. Souki admits that he's in

15    default.  If you go to page 1, Your Honor --

16          THE COURT:  No, I do see that.  I don't need to go

17    anywhere.  I get it.  He's admitted it.

18          MR. CAFASSO:  He's admitted it.  He also waived any

19    defense to the debt, at least as of May of 2022.  And that's

20    in Section 5.1 of the bridge agreement.  And again, as

21    recently as February of this year, they conceded that he

22    still owed approximately $128 million.

23          Section 4.3, Your Honor, is an important one.

24    That's the enforcement protocol.  And the enforcement

25    protocol provides that at any time -- at any time, the

ab

Proceedings

1    administrative agent may exercise remedies against --

2    foreclose upon or dispose of any of the collateral,

3    including the shares, at the time and in such manner that

4    the administrative agent determines, in its sole and

5    absolute discretion, provided that they used commercially

6    reasonable efforts not to materially disrupt the stock

7    price.

8        So with respect to timing, Your Honor, all the

9    contract says is that they could sell at any time.  It makes

10    clear that they could foreclose on these shares at any time.

11    And notice, Your Honor, it says nothing about waiting until

12    Tellurian reached certain milestones.  You may think that's

13    a pretty material term that these sophisticated parties in a

14    heavily negotiated agreement would add.  It's not in there,

15    because that's not something the parties agreed so.

16        I'd also point out, Your Honor, that the

17    commercially reasonable clause -- we agreed to use

18    commercially reasonable efforts to avoid a material

19    disruption.  We did not agree never to cause a material

20    disruption and I think that's an important distinction.

21        I would then direct Your Honor to Section 5.3,

22    which says that each party agrees that in no event --

23        THE COURT:  Wait.  Hold on.  So, really?  That's

24    such an interesting argument.  So you agree to avoid a

25    material disruption.  You did not agree that you would not

Proceedings

1    cause a material disruption.  Is that your argument?

2            MR. CAFASSO:  We agreed to use commercially

3    reasonable efforts.  Yes, Your Honor.  I am not disputing

4    that.

5            THE COURT:  Okay.  Wow.

6            MR. CAFASSO:  Yes.

7            THE COURT:  Interesting argument.

8            MR. CAFASSO:  It's neither here nor there, as I'll

9    get to.

10            THE COURT:  Yeah.  It's not a great argument,

11    frankly.

12            MR. CAFASSO:  I can tell.

13            Section 5.3, Your Honor.  No course of dealings can

14    cause a modification of the loan agreements; establish a

15    custom or course of dealing; operate as a waiver, as so on.

16            Section 5.7, and I think this is particularly

17    devastating to their claims, Your Honor.  This is --

18            THE COURT:  Okay.  Go ahead.

19            MR. CAFASSO:  -- oral agreement.  It says that this

20    agreement, the loan agreement and the other documents

21    executed herewith are the final agreement between the

22    parties and may not be contradicted by evidence of prior

23    contemporaneous or unwritten oral agreements of the parties.

24    There are no subsequent oral agreement between the parties.

25    This is in both this bridge agreement and the 2017 bridge

ab

Proceedings

1    agreement, which are the final agreements between the

2    parties.

3          And finally, Your Honor, Section 5.13, which has a

4    release of all claims, at least as of the date of the bridge

5    agreements.  But what I want to point Your Honor to is the

6    representation that the borrower -- and this is on the last

7    page, page 9.  Each guarantor consulted with and has been

8    represented by legal counsel and disclaimed any reliance on

9    representations, acts, or admissions.

10          THE COURT:  Okay.

11          MR. CAFASSO:  So with those governing contracts in

12   mind, let me now walk you through what happened with the

13   sale of the Tellurian shares.  And to your point, Your

14   Honor, we did not cause a material disruption in the stock

15   price and let me show you.  And again, their entire motion

16   rises and falls on the argument that his entire debt should

17   be deemed extinguished because we breached some duty of

18   commercially reasonableness here.

19          First of all, Your Honor, let's be clear.

20   Defendants would prefer not to have foreclosed on his

21   collateral and that Mr. Souki would voluntarily pay his

22   loans back.  I think that would be in everybody's interest.

23   But we are where we are.

24          And Defendants had every incentive to sell this

25   stock at a high price and recover the full amount that they

ab

Proceedings

1    owed.  It would be commercially economically irrational for

2    them to take steps to impair their own collateral.  It just

3    doesn't make sense.  And in retrospect with perfect

4    hindsight, yes, I think Defendants would concede, we wish

5    sold at a different time.

6         But the fact that we waited from foreclosing is

7    actually a sign of Defendants' good faith, Your Honor, and

8    not bad faith.  And that's straight from the First

9    Department's decision in the *Gramercy Twins* case, which we

10   cite in our papers.  That the length of time here -- more

11   than three years of forbearance should not be used against

12   Defendants.  If anything, that tends to show Defendants'

13   good faith.

14        But with respect to the Tellurian shares, Your

15   Honor, here are the undisputed facts.  We sold the shares.

16   We didn't dump them on a single day.  We sold them over the

17   course of two months, from February 8th to April 5, 2023, on

18   the New York Stock Exchange.

19        And if I could direct Your Honor to our opposition

20   brief, which is NYSCEF 98, I believe there are three annexes

21   attached to the back of the brief, which I'd like to walk

22   Your Honor through, if I could.

23        THE COURT:  Mm-hmm.

24        MR. CAFASSO:  So, annex 1, Your Honor.  This shows

25   Tellurian's stock price over an approximately five-year

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 42 of 68

Proceedings

1    period.  And I think the takeaways from this, Your Honor --

2    and this is all public information.  This is not disputed.

3    This stock was highly volatile, and it was mostly in a

4    downward trajectory from when the loan agreements were

5    entered into in 2017 and 2018.  And if you look towards the

6    right, it shows the time that we finally foreclosed on the

7    shares.  And that -- that is sort of blown up in annex 2.

8         So if you look to annex 2, we're showing the stock

9    price movement from September of 2022 through April of 2023.

10   And as you can see -- and I think this is a very important

11   point, Your Honor, especially when you go back and look at

12   *Bankers Trust* and the *Solow* decision from the First

13   Department.  This stock was plummeting.  It had dropped

14   60 percent by the time Defendants started to sell the shares

15   on the New York Stock Exchange.  And it was for that reason

16   that Defendants decided that they had to sell.  They were

17   not clairvoyant.  There was no way to know whether the stock

18   was going to continue to fall or what was going to happen.

19   And they did so, again, Your Honor, over a two-month period.

20        And finally, on annex 3, Your Honor, it shows the

21   daily trading volume.  Our sales were relatively small

22   compared to the overall volume.  One day it was about

23   50 percent, but most days it was less than around 5 percent.

24   And as of today, Your Honor, last time I checked at about

25   12:00, the stock was trading at about 1.36, which is around

ab

Proceedings

1    the exact weighted average price when Defendants were

2    selling it.  So I don't think there's any reasonable

3    argument that Defendants materially depressed the stock

4    price here.  This stock was in the midst of a precipitous

5    decline and Defendants exercised their rights to sell the

6    collateral.

7           Now, again, Your Honor, let me focus on the

8    disposition of the Tellurian shares.  And I'm happy to take

9    any questions.

10          THE COURT:  Do you think part of -- I understand

11   the little yellow part of the annex 2, or annex 3 is your --

12   the shares that you were selling.  But isn't there --

13          MR. CAFASSO:  Right.

14          THE COURT:  -- added significance to the sale of

15   those shares because they are the principal shares?

16          MR. CAFASSO:  I think it is significant, Your

17   Honor.  And Mr. Souki, in an April 2019 proxy statement from

18   Tellurian, it was disclosed to the market that he had

19   pledged 25 million shares to secure a private loan.  So the

20   notion -- I know they say that we never disclosed at

21   Tellurian that we made this loan.  That was in their own

22   proxy statement.  I'm happy to send to this Court.  The

23   market knew that he had pledged these shares as collateral.

24          THE COURT:  Mm-hmm.

25          MR. CAFASSO:  Let me, Your Honor, focus first on

ab

Proceedings

1    the timing, and then I'll talk a little bit about the manner

2    of these sales.

3           As to the timing -- and again, this is really --

4    this is really the thrust of their argument, because if you

5    disagree with them on the timing, the request for

6    Preliminary Injunctive relief goes out the window because

7    everything else goes to quantum of damages and can't -- and

8    can be compensated by monetary damages.

9           Now on the one hand they say that we should have

10   sold in April of 2022, but they also claim in the next

11   breath, Your Honor, that we had some agreement never to sell

12   until Tellurian reached some milestones, which hasn't

13   happened, and to my knowledge may never happen.

14          The fact is, Your Honor, we delayed -- my clients

15   delayed so long in foreclosing to try to work with Mr. Souki

16   and give him additional opportunities to repay these loans

17   on his own, despite having no contractual obligation to do

18   so.

19          THE COURT:  So I'm just going to interrupt you just

20   because I heard you the first time or two that you -- you're

21   kind of repeating.

22          MR. CAFASSO:  I'm sorry.

23          THE COURT:  So I'm just going to jump back over to

24   Mr. McConn and we'll come back to you.

25          MR. CAFASSO:  Thank you, Your Honor.

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 45 of 68

44

Proceedings

1           THE COURT:  Okay.  Thanks.

2           Mr. McConn.

3           MR. McCONN:  Thank you, Your Honor.  Just very

4      briefly.

5           Kind of taking these things in order, going back to

6      the manner in which they sold the stock.  If you go to

7      page 17 of their opposition, NYSCEF Document 80, there's a

8      nice little chart, a table, that shows --

9           THE COURT:  17?

10          MR. McCONN:  Yes, Your Honor.  Page 17 of 22.

11          THE COURT:  Okay.

12          MR. McCONN:  I'm sorry.  This is Ms. Metzger's

13     affirmation.  I apologize.

14          THE COURT:  Oh, okay.

15          MR. McCONN:  But it's NYSCEF Number 80.

16          THE COURT:  Got it.  Yeah.

17          MR. McCONN:  And what you'll see in the NYSCEF

18     Number 80 is that, on page 17, if you look at the first few

19     days that they were trading, overall volume was -- the first

20     three days was 11 million; 11 million; 14 million.  They

21     sold almost 2 million; almost a million; and more than 2

22     million.  And they continued; a million the next day.  So

23     they are dumping literally millions of shares on the market

24     for the first few days, and that's when the stock price

25     starts to go down.

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 46 of 68

Proceedings

1          And what you see is at that point, they do start

2     selling -- well, a few days later, they do start selling;

3     300,000; 600,000; a few hundred thousand.  So that's the

4     point at which they start selling what we might say is a

5     reasonable amount if this is a good time to sell.  But by

6     that point, the damage is done.

7          They have shocked the market by dumping literally

8     millions of his shares on the market -- the executive chair;

9     the largest shareholder of the company -- and he's having to

10    disclose this now.  He's filing form 13Ds and F-4s, whatever

11    they are, with the SEC.  And so now the market knows that

12    Charif Souki's shares are being dumped on the market.  And

13    they know the volume that's being dumped on the market.

14         So, yes, maybe at some point they got wind of what

15    they were doing, they realized what they had told them was

16    right, and so they slowed down.  And they did drag it out to

17    April, but by that point, it's done.

18         And if you follow down their list here, they show

19    you average price per day.  What they don't show you is

20    where it opened, where it closed, where the low points were.

21    There were times during the trading where it got down below

22    a dollar.  So they destroyed 50 percent of the value of this

23    stock by trading it.  It was worth $51 million the day they

24    grabbed it.  They sold it for 35.  So they absolutely

25    damaged the stock.  And they did in a commercially

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 47 of 68

46

Proceedings

1     unreasonable manner.

2            Now, Your Honor, this -- there was a recurring

3     theme of -- from my colleague on the other side about how

4     we're asking the Court to impose hindsight or clairvoyance.

5     That is not the case.  I mean, I could see a situation where

6     if we came to the Court and said, "Oh, they should have sold

7     it at a different time."  You would say, "You can't require

8     them to be clairvoyant, Mr. McConn.  All they're required to

9     do is be reasonable."  We agree with that, but the facts of

10    this case are very different.

11           The facts of this case show -- and again, they

12    don't dispute this, that for months -- actually, more than a

13    year -- they were repeatedly insisting that he sell.  They

14    were telling Mr. Souki "sell your stock."

15           THE COURT:  That argument really doesn't work for

16    me because, I mean, as you say, they had control of the

17    stock at that point.  You didn't.  So who really cares what

18    they're telling your client to do.

19           And what's really confounding about it, about your

20    argument, is that you didn't turn around and say to them

21    right away -- according to your argument and according to

22    your papers, you waited for quite some time before bringing

23    to their attention that they had a document that said they

24    were in control of the shares.  Not you.  So that argument

25    just doesn't really work.

ab

Proceedings

1          MR. McCONN:  Well, let me -- thank you, Your Honor.

2     Let me see if I can kind of clarify things.  They required

3     us to sign that document.  They required us to say that they

4     had exclusive control of the stock.  Why they then turned

5     around and started telling us, like, "You need" -- "You need

6     to sell the stock" is unreasonable in and of itself.  Why

7     would they insist that we sell the stock that we can't sell,

8     that they have exclusive rights to?

9          And even if they forgot, when they come to us in

10    May and July of 2021 and say, "Sell the stock" and we say,

11    "We can't sell it," why don't they then at that point say,

12    "Oh, yeah.  That's right.  We're the ones who can sell it."

13         THE COURT:  So you didn't even tell them at that

14    point that "You all have the power to sell it," you know.

15    Not that "We don't have the power to sell it.  You have the

16    power to sell it."

17         MR. McCONN:  Well, we did --

18         THE COURT:  You don't even say that.  What you say

19    is "We can't."

20         MR. McCONN:  You're right.  And I wasn't there

21    for --

22         THE COURT:  So that's a little -- not entirely

23    truthful.

24         MR. McCONN:  Well, Your Honor, so what my client

25    told them was -- and I confess, maybe he didn't fully

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 49 of 68

48

Proceedings

1    appreciate the contracts at the time -- but what he was

2    telling them was "I can't sell and it's because I'm

3    restricted by my board and by securities regulations," which

4    he was.  And they dispute that.  But in his mind he was.

5            THE COURT:  But now you're telling me the reason he

6    couldn't do it wasn't because of the restriction on the

7    stock market, but restrictions that they had on it.

8            MR. McCONN:  It's all of that, Your Honor.  It all

9    adds up to mean he couldn't sell.

10           THE COURT:  This is a really interesting argument

11   that you have.  I mean, this is really interesting.  I love

12   UCC cases, I really do.  They're fascinating.  And this is a

13   really interesting argument.  Interesting spin on it.

14           MR. McCONN:  I've noted a lot of your UCC cases are

15   getting ready for this so I assumed you would be interested

16   in it.

17           I think the last thing I'll say about this is that,

18   we -- a lot of the cases they cite, the defendants cite, say

19   that, you know, "You can't really -- the Mr. Soukis of the

20   world can't avail themselves of these kinds of claims if

21   they never told the lender or the secured party to sell the

22   collateral."  That's a big point in their briefing.

23           And what Mr. Souki says in his supplemental

24   affidavit is -- he repeatedly told them on multiple

25   occasions that, "I can't sell.  I'm restricted from selling.

ab

Proceedings

1    I don't have the right to sell.  You sell."  And at that

2    point, they absolutely had the obligation.  And he said that

3    to them in late 2021 when the stock is trading upwards of

4    almost $5 a share.

5              THE COURT:  The problem with that argument is that

6    it contradicts your earlier argument that they have some

7    sort of an agreement, an oral agreement, not to sell until

8    certain milestones are achieved.  So which is it?  Because

9    you have to choose one of these arguments.  You can not have

10   both of them.

11             MR. McCONN:  Understood, Your Honor.  And my

12   response to that and I promise I'm trying to answer the

13   question -- the response is they absolutely should have

14   waited until after we achieved -- Tellurian achieved the

15   milestones.  That's what they committed to Mr. Souki

16   repeatedly.

17             But they clearly don't think that they made that

18   commitment, or they say it's not enforceable because it's

19   not in writing.  That's fine.  If they are going to

20   disregard the commitment they made, then they have to live

21   by what New York law says and what these contracts say about

22   commercial reasonableness.

23             If we're wrong about the commitment they made,

24   shame on us.  But that doesn't excuse them from the

25   requirement to exercise commercial reasonableness as to

ab

Proceedings

1    time.  The Courts are clear about that.  And they did not.

2    They absolutely did not use a reasonable time.  This isn't

3    about hindsight.  This is about them repeatedly telling us

4    to sell when it was reasonable, and they didn't do it.

5              THE COURT:  Okay.  All right.  Thanks so much.

6              And, Mr. Cafasso, did you want to say anything

7    else?  Because I kind of cut you off.

8              MR. CAFASSO:  That's perfectly fine, Your Honor.

9              THE COURT:  You need speak up, though, because I

10   can't hear you.

11             MR. CAFASSO:  Thank you, Your Honor.  I would just

12   make two quick points.

13             THE COURT:  Sure.

14             MR. CAFASSO:  And I appreciate your indulgence.

15             The notion that he was restricted from selling and

16   couldn't sell his stock, that exact argument, Your Honor,

17   was presented to the Sixth Circuit in the *Lane* case.  And I

18   would direct Your Honor to footnote 8 where they consider

19   and they reject that argument, saying that the

20   particularized facts of the borrower in a situation is

21   insufficient to alter the law and burden the lender with the

22   responsibility of being an investor and advisor.  And then

23   they go on to make the obvious point that there are ways for

24   insiders to sell stocks pursuant to 10b5 plans and the like.

25             And the last point I'd make, Your Honor, just

ab

Proceedings

1    looking at the equities here.  Mr. Souki still owes my

2    clients a hundred million dollars, and he's been in default

3    for several years.  And it just does not serve the public

4    interest to permit a borrower to avoid their contractual

5    obligations.

6         As Your Honor knows, the New York Courts are very

7    clear and adamant in enforcing the plain terms of contracts

8    between sophisticated parties.  And as I said at the outset,

9    I think a ruling in Plaintiffs' favor here really sets bad

10   precedent because it disincentivizes and punishes lenders

11   for trying to work with their borrowers.

12        And the reason we didn't sell the stock earlier,

13   Your Honor, is we were trying to work cooperatively with Mr.

14   Souki.  That's in everybody's interest.  And when that just

15   turned out to be impossible, Defendants exercised the

16   contractual rights to foreclose on the collateral.

17        And finally, Your Honor, a ruling in Plaintiffs'

18   favor here would upend and really turn on its head the whole

19   purpose of a secured lending.  The whole purpose of secured

20   lending is to provide a lender with the promise of repayment

21   in the event the borrower defaults through the pledged

22   collateral, which is exactly what this transaction was.

23        Thank you, Your Honor.

24        THE COURT:  Okay.  Thanks.

25        So, Ms. Brown, if you could mark the transcript for

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 53 of 68

Proceedings

1    the Court's decision, which is that I'm going to deny the

2    motion for the Preliminary Injunction, not because -- it's a

3    fascinating argument.  It's really a good argument, however,

4    you have to establish likelihood of success.  You have

5    breach of contract, a DJ, breach of good faith of fair

6    dealing which is also a breach of contract, fraud, tortious

7    interference.  And really we're all focusing on the sale of

8    the shares on the New York Stock Exchange.  And I don't

9    know, the plaintiffs might be able to show that there was a

10   dumping that happened on, you know, the first two or three

11   days and they might be able to show that.  But I am not

12   satisfied that the plaintiffs have established a likelihood

13   of success on the merits.

14          Their affidavit of their own expert says, "Well,

15   you know, if am given the opportunity to write an expert

16   report I might be able to show" -- or "I will," actually.

17   He doesn't say "I might."  I will show, he says, that, you

18   know, they depressed the stock, they dumped it, and so

19   forth.  But it's not -- I don't have what I need to make

20   that decision to find that it was commercially reasonable,

21   or commercially unreasonable, as -- not as a matter of law,

22   but as a matter of likelihood of success that the plaintiffs

23   have pushed it over into -- not 50/50, but more, you know --

24   that it's likely that they will succeed on that.  And quite

25   frankly, I can't make that conclusion based on this record.

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 54 of 68

Proceedings

1              Another strong factor militating against the

2      Preliminary Injunction is the irreparable harm, and while --

3      and this is where your argument is so interesting, Mr.

4      McConn.  The irreparable harm is the sale of these two

5      precious properties, right?  The ranch and the boat.  And

6      then, also, the other family stock in the family company

7      too, I'm sure is very precious to them.  But I am focusing

8      on the sale of the shares about which you are saying was

9      commercially unreasonable, and I just don't think that I can

10     find that selling shares on the New York Stock Exchange over

11     a two-month period, that it's commercially unreasonable.

12             Having said that, I mean, you may very well be able

13     to prove it with a good expert and, you know, a good expert

14     report.  You might.  But you just don't have it for the

15     purposes of an injunction today.

16             Balance of the equities too -- I have to say that I

17     -- you know, look, it's a commercial division, a mere

18     Supreme Court.  And, you know, we're here to, you know,

19     enforce contracts.  And I think Mr. Cafasso makes a very

20     good argument about secured lenders needing to have some

21     certainty that Courts are going to, you know, allow them to

22     do what they do.

23             I understand Mr. McConn's argument that, you know,

24     lenders can not just do whatever they want and sell whenever

25     they want and sell as much as they want, but that's not the

ab

Case 23-90757   Document 75-21   Filed in TXSB on 08/24/23   Page 55 of 68

54

Proceedings

1    record that I have here.  And I agree that it's not

2    unmitigated, I don't think is the right word.  But they

3    can't just do anything they want.  That's true.  They have

4    to do it in a commercially reasonable way.  But I just don't

5    have before me enough facts to find that it is more

6    likelihood -- likely than not that it was commercially

7    unreasonable to sell the stock when they sold it.

8           And I will say, there is a certain amount of

9    clairvoyance in this argument that the plaintiff is making.

10   But there's no written -- there's no written agreement

11   admittedly, as to the holding off on selling.  So that part

12   of the plaintiffs' argument doesn't work because, you know,

13   you can't say that they didn't sell soon enough because

14   you're saying that they weren't supposed to sell until

15   certain milestones were met, number one.

16          Number two, we do want to encourage parties to work

17   together not to foreclose and to, you know, give some time.

18   And I can't punish -- which is what it would be to issue a

19   Preliminary Injunction at this time.

20          And then the second half of this timing argument --

21   well, then they sold.  You know, they sold too late -- also

22   doesn't work, again because you don't want to punish lenders

23   for working or trying to work with parties.  But you

24   definitely can't -- under this framework of this argument,

25   you can not say that they should have sold sooner when your

ab

Case 23-90757 Document 75-21 Filed in TXSB on 08/24/23 Page 56 of 68

Proceedings

1    argument is that they couldn't sell sooner because they made

2    an agreement to wait for milestones. I mean, that just

3    doesn't work.

4              Anyway, unfortunately, when the defendant lender

5    sees the market going down -- and according to the documents

6    I have, the market was going down. Oh, and just for the

7    record, if you attach -- this is not in the rules, actually

8    it might be in my rules. If you attach instead of annexes

9    to the memos of law, it's a lot easier to use them if you

10   file them separately. Just a thought.

11             Anyway, the defendants are not required to wait for

12   a market to go down further. I mean, they can't -- it's not

13   unreasonable to start selling when you see the market

14   starting to go down and you're worried about it tanking and

15   then you wouldn't have anything.

16             Okay. So that's the Court's decision. You can get

17   the transcript for me, Mr. McConn, and I will so order it.

18   You will have an appealable order. As soon I get that from

19   you, we will issue a one-page decision that just says it was

20   decided on the record.

21             Where are we with the answer or motion to -- sorry,

22   I didn't look at that part of this.

23             MR. CAFASSO: I believe we have 28 days, Your

24   Honor, to file our motion to dismiss, which we intend to do.

25             THE COURT: Okay. Okay. Well, then I guess I'll

ab

Case 23-90757  Document 75-21  Filed in TXSB on 08/24/23  Page 57 of 68

Proceedings

1    see you when you argue that.

2              MR. McCONN:  Your Honor, may I -- I know you made

3    your ruling.  I do want to make -- ask one question.  We

4    also had a motion for expedited discovery.

5              THE COURT:  Oh, yeah.  Absolutely no reason for

6    that.  Sorry.

7              MR. McCONN:  Okay.

8              THE COURT:  I mean, I have the record that I have.

9              MR. McCONN:  And that's why I raised it, Your

10   Honor.  I thought, with discovery, I think we will be able

11   to develop the record in a way that could change your mind.

12             THE COURT:  And you will -- oh, here it is.  Sorry.

13   No expedited discovery.  You haven't demonstrate that such

14   discovery is necessary for the Preliminary Injunction and,

15   indeed, you have all the information.  That's what's so

16   extraordinary about this argument.  You know, it's all

17   within your client's -- it's his information.  So --

18             MR. McCONN:  Respectfully --

19             THE COURT:  -- I don't see it.  Well, a) it's

20   within his control, and, b) the other part is, you know,

21   it's public information about when it was sold, how it was

22   sold.  And the rest of it just goes to the rest of the case.

23   I mean, it's just regular old discovery.  So I don't see how

24   that would have helped, given your argument which is based

25   on them tanking the price.  I mean, it's all based on, you

ab

Proceedings

1    know, your expert, and what -- and the little charts and

2    things.  So I have that.  I don't really need anything else.

3    So yeah, that's denied too.

4            So thanks so much.  Have a nice day.  And please

5    get me the transcript.

6                        *      *      *

7

8            The foregoing is hereby certified to be a true and

9    accurate transcript of the proceedings as transcribed from

10   the stenographic notes.

11

12   _____
         ANNE BROWN, RPR
13       SENIOR COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$119** [1] - 15:15
**$12** [1] - 19:23
**$124** [1] - 29:24
**$128** [1] - 36:22
**$135** [1] - 21:5
**$138** [2] - 8:7, 28:17
**$158** [1] - 21:1
**$2** [2] - 19:14, 19:17
**$35** [1] - 30:16
**$50** [1] - 8:5
**$51** [1] - 45:23
**$75** [1] - 9:6

## '

**'21** [3] - 15:19, 15:20, 17:8
**'22** [7] - 15:20, 15:22, 16:11, 17:9, 18:24, 20:2
**'23** [2] - 18:25, 19:8

## 1

**1** [3] - 1:13, 36:15, 40:24
**1.36** [1] - 41:25
**10** [3] - 19:22, 19:23, 20:11
**10005** [1] - 1:20
**10019** [1] - 2:4
**102** [2] - 13:11, 16:10
**104** [2] - 13:6, 13:9
**10b5** [1] - 50:24
**11** [2] - 44:20
**12** [1] - 19:23
**12:00** [1] - 41:25
**13Ds** [1] - 45:10
**13th** [2] - 21:10, 21:14
**14** [1] - 44:20
**15** [2] - 15:11, 20:10
**17** [4] - 44:7, 44:9, 44:10, 44:18
**18** [1] - 15:11

## 2

**2** [11] - 12:8, 12:20, 13:1, 13:10, 19:15, 20:9, 41:7, 41:8, 42:11, 44:21
**2016** [1] - 1:4
**2017** [8] - 8:4, 8:17, 8:22, 9:1, 28:18, 36:6, 38:25, 41:5
**2018** [7] - 8:17, 9:2, 28:18, 35:14, 36:7, 36:9, 41:5

**2019** [3] - 9:4, 9:7, 42:17
**2020** [11] - 9:10, 9:21, 9:25, 10:4, 11:11, 12:5, 13:12, 13:22, 13:23, 23:8, 29:4
**2021** [15] - 13:23, 14:4, 14:5, 14:15, 15:10, 16:10, 16:17, 16:21, 17:4, 19:24, 29:7, 29:16, 47:10, 49:3
**2022** [12] - 15:16, 15:21, 16:17, 17:22, 18:1, 18:6, 19:24, 21:2, 32:4, 36:19, 41:9, 43:10
**2023** [4] - 1:13, 29:19, 40:17, 41:9
**22** [1] - 44:10
**230** [1] - 20:2
**25** [5] - 14:17, 20:22, 20:24, 20:25, 42:19
**27** [1] - 33:1
**28** [1] - 55:23
**2:33** [1] - 3:1
**2s** [2] - 12:17, 12:20

## 3

**3** [4] - 20:16, 25:4, 41:20, 42:11
**30** [2] - 20:22, 29:7
**300,000** [1] - 45:3
**35** [1] - 45:24
**36** [1] - 33:1
**37** [1] - 21:2
**3rd** [1] - 21:16

## 4

**4** [1] - 20:16
**4.3** [1] - 36:23
**40** [1] - 1:20
**400** [1] - 12:16
**4100** [1] - 1:23
**48** [1] - 1:1

## 5

**5** [6] - 13:12, 19:12, 20:16, 40:17, 41:23, 49:4
**5.1** [1] - 36:20
**5.13** [1] - 39:3
**5.3** [2] - 37:21, 38:13
**5.7** [1] - 38:16
**50** [2] - 41:23, 45:22
**50/50** [1] - 52:23
**51** [1] - 2:3
**52nd** [1] - 2:3

**53rd** [1] - 1:20
**5th** [1] - 12:5

## 6

**6** [1] - 19:12
**60** [2] - 30:9, 41:14
**600,000** [1] - 45:3
**651164/2023** [2] - 1:5, 13:2
**6th** [3] - 19:16, 21:9, 29:19

## 7

**7** [1] - 26:18
**77002** [1] - 1:24
**7th** [1] - 19:16

## 8

**8** [1] - 50:18
**80** [4] - 20:1, 44:7, 44:15, 44:18
**811** [1] - 1:23
**89** [1] - 35:12
**8th** [4] - 19:18, 29:21, 30:4, 40:17

## 9

**9** [1] - 39:7
**9-6.1** [1] - 21:24
**9-602** [1] - 22:11
**9-610** [2] - 21:25, 25:2
**9-627A** [1] - 33:21
**90** [1] - 20:1
**98** [1] - 40:20

## A

**ability** [3] - 11:25, 13:21, 14:23
**able** [6] - 16:22, 52:9, 52:11, 52:16, 53:12, 56:10
**absolute** [2] - 28:25, 37:5
**absolutely** [5] - 45:24, 49:2, 49:13, 50:2, 56:5
**access** [1] - 33:1
**according** [6] - 21:5, 26:16, 34:5, 46:21, 55:5
**account** [5] - 8:23, 13:13, 13:16, 19:5
**Account** [1] - 14:23
**accrued** [1] - 8:9
**accurate** [1] - 57:9

**achieved** [5] - 11:9, 14:11, 49:8, 49:14
**acknowledged** [1] - 29:3
**acknowledging** [1] - 30:2
**acquaintances** [1] - 18:13
**act** [2] - 19:6, 34:5
**acted** [1] - 25:10
**action** [2] - 4:9, 24:16
**actively** [1] - 10:7
**acts** [1] - 39:9
**adamant** [1] - 51:7
**add** [2] - 8:8, 37:14
**added** [1] - 42:14
**additional** [2] - 36:4, 43:16
**addresses** [2] - 4:13, 34:20
**adds** [1] - 48:9
**adjust** [1] - 20:17
**administrative** [2] - 37:1, 37:4
**admissions** [1] - 39:9
**admit** [1] - 34:20
**admits** [2] - 29:1, 36:14
**admitted** [2] - 36:17, 36:18
**admittedly** [1] - 54:11
**adopting** [1] - 33:13
**advantage** [2] - 22:6, 26:3
**adversaries** [1] - 28:10
**adversary** [2] - 4:25, 5:9
**advice** [3] - 17:16, 19:9, 20:23
**advisor** [1] - 50:22
**affidavit** [12] - 6:23, 7:9, 10:17, 12:9, 13:1, 13:10, 13:11, 16:9, 35:19, 35:23, 48:24, 52:14
**affidavits** [2] - 15:18, 30:21
**affiliated** [1] - 5:20
**affiliations** [1] - 4:13
**affirmation** [2] - 18:20, 44:13
**afraid** [1] - 7:18
**afternoon** [3] - 3:4, 3:20, 3:23
**agent** [2] - 37:1, 37:4
**ago** [1] - 26:1
**agree** [7] - 16:25, 30:24, 37:19, 37:24, 37:25, 46:9, 54:1

**agreed** [9] - 23:7, 28:5, 29:6, 29:10, 29:16, 29:23, 37:15, 37:17, 38:2
**agreement** [31] - 8:21, 8:22, 8:24, 9:2, 9:5, 10:24, 11:2, 11:5, 11:16, 12:4, 13:13, 13:16, 13:17, 22:24, 35:10, 35:14, 36:9, 36:20, 37:14, 38:19, 38:20, 38:21, 38:24, 38:25, 39:1, 43:11, 49:7, 54:10, 55:2
**Agreement** [1] - 14:24
**agreements** [25] - 11:17, 11:18, 11:19, 11:21, 12:6, 14:6, 22:13, 22:15, 23:8, 28:5, 28:18, 28:22, 29:8, 29:10, 29:11, 29:14, 29:15, 31:2, 35:17, 36:6, 38:14, 38:23, 39:1, 39:5, 41:4
**agrees** [2] - 31:11, 37:22
**AH** [1] - 1:3
**ahead** [4] - 19:10, 27:22, 35:24, 38:18
**Ajax** [2] - 7:24, 21:13
**algorithm** [1] - 20:17
**algorithms** [1] - 20:15
**allow** [1] - 53:21
**alluded** [1] - 30:6
**almost** [6] - 20:9, 21:7, 30:18, 44:21, 49:4
**alter** [1] - 50:21
**Amended** [2] - 24:16, 36:10
**amount** [7] - 8:15, 9:3, 31:17, 33:18, 39:25, 45:5, 54:8
**amounts** [1] - 29:25
**analogous** [2] - 34:2, 34:22
**analysis** [1] - 26:19
**ANDREA** [1] - 1:15
**ANNE** [2] - 2:24, 57:12
**annex** [6] - 40:24, 41:7, 41:8, 41:20, 42:11
**annexes** [2] - 40:20, 55:8
**announced** [1] - 9:21
**answer** [3] - 5:9, 49:12, 55:21
**anyway** [3] - 35:22, 55:4, 55:11

ab

**anyways** [1] - 20:8
**apologies** [1] - 13:8
**apologize** [7] - 5:7, 5:10, 12:18, 12:22, 12:25, 13:6, 44:13
**appealable** [1] - 55:18
**Appeals** [3] - 28:6, 34:1, 34:8
**appearance** [1] - 4:8
**appointed** [2] - 18:8, 18:10
**apposite** [1] - 34:25
**appreciate** [3] - 17:23, 48:1, 50:14
**approach** [1] - 10:19
**approached** [1] - 10:5
**appropriate** [1] - 31:1
**April** [11] - 15:15, 15:20, 20:2, 21:1, 21:16, 32:4, 40:17, 41:9, 42:17, 43:10, 45:17
**argue** [2] - 33:15, 56:1
**argument** [32] - 23:4, 23:15, 36:2, 37:24, 38:1, 38:7, 38:10, 39:16, 42:3, 43:4, 46:15, 46:20, 46:21, 46:24, 48:10, 48:13, 49:5, 49:6, 50:16, 50:19, 52:3, 53:3, 53:20, 53:23, 54:9, 54:12, 54:20, 54:24, 55:1, 56:16, 56:24
**arguments** [4] - 22:23, 31:16, 35:11, 49:9
**articulated** [1] - 23:22
**aside** [1] - 33:6
**aspect** [1] - 22:1
**assessed** [2] - 26:17, 26:18
**assets** [1] - 5:23
**ASSOCIATION** [1] - 1:9
**assumed** [1] - 48:15
**assurance** [1] - 11:5
**attach** [2] - 55:7, 55:8
**attached** [3] - 12:8, 18:20, 40:21
**attack** [2] - 34:3, 34:15
**attempt** [1] - 22:4
**attention** [1] - 46:23
**attorney** [1] - 35:23
**Attorneys** [3] - 1:19, 1:23, 2:3
**August** [1] - 15:21
**avail** [1] - 48:20
**average** [3] - 19:21, 42:1, 45:19
**avoid** [5] - 23:12,

33:12, 37:18, 37:24, 51:4
**AVR** [1] - 1:3

**B**

**background** [3] - 8:3, 17:24, 35:16
**backing** [1] - 9:22
**bad** [3] - 33:9, 40:8, 51:9
**balance** [2] - 8:12, 53:16
**Bank** [1] - 34:19
**Bankers** [4] - 34:1, 34:9, 34:18, 41:12
**barn** [1] - 26:25
**based** [5] - 25:11, 27:2, 52:25, 56:24, 56:25
**basis** [3] - 31:12, 31:13, 35:5
**becomes** [2] - 9:10, 9:11
**began** [2] - 18:2, 29:21
**beginning** [1] - 18:25
**behalf** [3] - 3:12, 3:18, 3:22
**belabor** [1] - 26:12
**below** [3] - 19:14, 19:17, 45:21
**BERMUDEZ** [1] - 1:8
**best** [2] - 22:5, 26:2
**better** [2] - 23:22, 33:16
**between** [5] - 6:17, 38:21, 38:24, 39:1, 51:8
**beyond** [1] - 14:21
**bidders** [1] - 17:11
**bidding** [1] - 16:23
**big** [1] - 48:22
**billed** [1] - 9:17
**billion** [1] - 9:18
**binding** [2] - 28:4, 28:17
**bit** [2] - 31:21, 43:1
**blew** [1] - 9:25
**blown** [1] - 41:7
**board** [2] - 10:6, 48:3
**boat** [6] - 18:10, 18:14, 23:18, 26:14, 35:22, 53:5
**borrowed** [1] - 28:17
**borrower** [5] - 33:23, 34:8, 39:6, 50:20, 51:4, 51:21
**borrowers** [2] - 33:11, 51:11

**bottom** [2] - 8:6, 26:20
**breach** [3] - 52:5, 52:6
**breached** [4] - 6:5, 21:20, 24:5, 39:17
**breath** [1] - 43:11
**bridge** [14] - 11:17, 11:18, 12:6, 14:6, 23:8, 29:8, 35:9, 35:14, 36:6, 36:9, 36:20, 38:25, 39:4
**brief** [3] - 32:4, 40:20, 40:21
**briefing** [5] - 5:25, 18:19, 22:9, 25:17, 48:22
**briefly** [1] - 44:4
**bring** [1] - 30:4
**bringing** [1] - 46:22
**broker** [1] - 19:3
**Brown** [4] - 3:8, 4:12, 28:1, 51:25
**BROWN** [2] - 2:24, 57:12
**Budget** [1] - 22:8
**bunch** [1] - 28:12
**burden** [1] - 50:21
**business** [7] - 10:8, 20:20, 22:6, 26:3, 26:8, 27:5, 28:16
**BY** [3] - 1:21, 1:24, 2:4

**C**

**cafasso** [1] - 53:19
**CAFASSO** [33] - 2:4, 3:20, 4:1, 4:7, 4:15, 5:6, 27:16, 27:19, 27:23, 28:3, 30:13, 30:15, 34:13, 35:14, 35:16, 35:25, 36:18, 38:2, 38:6, 38:8, 38:12, 38:19, 39:11, 40:24, 42:13, 42:16, 42:25, 43:22, 43:25, 50:8, 50:11, 50:14, 55:23
**Cafasso** [4] - 3:21, 4:6, 27:15, 50:6
**calculated** [1] - 26:21
**calculation** [1] - 26:17
**cannot** [1] - 36:4
**CAPITAL** [1] - 1:8
**Capital** [1] - 3:2
**care** [1] - 8:14
**cares** [1] - 46:17
**case** [19] - 7:8, 13:3, 22:8, 25:17, 25:18, 32:9, 32:16, 32:17, 33:3, 33:21, 35:7, 40:9, 46:5, 46:10,

46:11, 50:17, 56:22
**cases** [6] - 12:16, 22:8, 32:15, 48:12, 48:14, 48:18
**CDO** [2] - 25:16, 32:16
**ceased** [1] - 13:18
**Central** [1] - 22:7
**certain** [8] - 11:9, 11:22, 29:2, 31:24, 37:12, 49:8, 54:8, 54:15
**certainly** [2] - 8:20, 34:13
**certainty** [1] - 53:21
**certified** [1] - 57:8
**chair** [1] - 45:8
**chairman** [2] - 10:6, 11:13
**chairman's** [1] - 20:6
**challenge** [3] - 32:10, 34:23, 36:1
**challenges** [1] - 35:1
**change** [1] - 56:11
**channels** [1] - 34:16
**charge** [1] - 10:18
**Charif** [1] - 45:12
**CHARIF** [1] - 1:3
**charitable** [1] - 31:21
**chart** [1] - 44:8
**charts** [1] - 57:1
**checked** [1] - 41:24
**cherrypick** [1] - 33:15
**children** [2] - 15:4, 15:6
**choose** [1] - 49:9
**choosing** [1] - 25:15
**chose** [3] - 8:25, 25:23, 25:24
**chosen** [1] - 25:16
**Christmas** [1] - 18:6
**CHRISTOPHER** [1] - 1:3
**Circuit** [2] - 34:21, 50:17
**cite** [7] - 25:17, 25:18, 32:9, 32:15, 40:10, 48:18
**cited** [1] - 22:9
**cites** [1] - 34:17
**Citibank** [2] - 25:17, 34:14
**CIVIL** [1] - 1:1
**claim** [14] - 6:5, 6:7, 21:18, 24:4, 24:15, 25:1, 27:1, 28:11, 31:5, 31:6, 31:11, 43:10
**claiming** [1] - 26:23
**claims** [7] - 6:4, 23:24, 24:20, 32:20, 38:17,

39:4, 48:20
**clairvoyance** [2] - 46:4, 54:9
**clairvoyant** [2] - 41:17, 46:8
**clarification** [1] - 3:7
**clarified** [2] - 6:24, 7:8
**clarify** [1] - 47:2
**clause** [1] - 37:17
**clear** [7] - 32:22, 33:21, 34:2, 37:10, 39:19, 50:1, 51:7
**cleared** [1] - 17:5
**clearly** [6] - 13:11, 20:18, 23:6, 25:20, 25:21, 49:17
**client** [3] - 6:18, 46:18, 47:24
**client's** [1] - 56:17
**clients** [2] - 43:14, 51:2
**close** [3] - 18:16, 31:18, 32:19
**closed** [1] - 45:20
**co** [2] - 3:6, 9:5
**co-counsel** [1] - 3:6
**co-founded** [1] - 9:5
**Coleman** [1] - 3:6
**COLEMAN** [1] - 1:22
**collateral** [33] - 5:23, 6:14, 8:19, 10:22, 14:17, 18:3, 18:4, 21:22, 22:2, 22:5, 22:7, 23:1, 24:21, 25:6, 26:4, 26:9, 28:19, 28:21, 28:24, 31:14, 32:13, 33:7, 34:3, 34:16, 37:2, 39:21, 40:2, 42:6, 42:23, 48:22, 51:16, 51:22
**collateralized** [1] - 8:20
**colleague** [1] - 46:3
**colleagues** [1] - 4:9
**Colorado** [3] - 7:1, 7:4
**comment** [2] - 25:4, 25:5
**commercial** [19] - 6:6, 21:20, 21:21, 21:25, 22:3, 22:16, 23:5, 23:7, 25:1, 25:3, 25:22, 32:9, 33:20, 34:4, 34:15, 35:21, 49:22, 49:25, 53:17
**commercially** [26] - 11:11, 12:3, 23:12, 23:16, 23:17, 23:24, 24:5, 24:7, 24:9, 24:12, 25:10, 25:24,

ab

26:1, 37:5, 37:17, 37:18, 38:2, 39:18, 40:1, 45:25, 52:20, 52:21, 53:9, 53:11, 54:4, 54:6
**commitment** [4] - 11:6, 49:18, 49:20, 49:23
**committed** [1] - 49:15
**common** [1] - 33:4
**company** [15] - 7:24, 9:5, 9:15, 10:8, 10:9, 10:11, 10:12, 11:13, 13:25, 14:1, 14:3, 21:13, 24:14, 45:9, 53:6
**compared** [1] - 41:22
**compensable** [1] - 31:19
**compensated** [1] - 43:8
**Complaint** [3] - 6:22, 24:17, 36:10
**completely** [1] - 12:21
**compliant** [1] - 20:14
**complying** [1] - 18:16
**concede** [2] - 36:11, 40:4
**conceded** [1] - 36:21
**conclusion** [1] - 52:25
**condition** [1] - 5:23
**conference** [1] - 3:25
**confess** [2] - 10:25, 47:25
**conflict** [1] - 6:16
**confounding** [1] - 46:19
**consequence** [1] - 31:2
**consider** [3] - 25:15, 28:14, 50:18
**construed** [1] - 25:13
**consulted** [1] - 39:7
**contemporaneous** [2] - 29:12, 38:23
**context** [3] - 10:3, 17:25, 22:4
**continue** [1] - 41:18
**continued** [4] - 2:1, 16:11, 17:21, 44:22
**continues** [1] - 17:13
**contract** [6] - 21:23, 23:5, 37:9, 52:5, 52:6
**contracts** [12] - 9:19, 29:1, 31:12, 31:25, 32:5, 35:5, 39:11, 48:1, 49:21, 51:7, 53:19
**contractual** [6] -

29:18, 30:24, 31:23, 43:17, 51:4, 51:16
**contradicted** [2] - 29:12, 38:22
**contradicts** [1] - 49:6
**control** [14] - 8:24, 8:25, 12:7, 13:13, 13:15, 13:16, 13:18, 15:9, 15:24, 19:2, 46:16, 46:24, 47:4, 46:16
**Control** [1] - 14:24
**controlled** [2] - 15:23, 19:7
**controlling** [1] - 28:6, 30:20
**cooperatively** [1] - 51:13
**correct** [4] - 4:1, 8:7, 8:9, 23:19
**cost** [1] - 9:13
**could've** [3] - 21:1, 33:16, 33:18
**counsel** [2] - 3:6, 39:8
**COUNTY** [1] - 1:1
**course** [6] - 6:14, 38:13, 38:15, 40:17
**COURT** [82] - 1:1, 1:16, 2:25, 3:1, 3:8, 3:13, 3:17, 3:24, 4:2, 4:11, 4:16, 4:22, 4:25, 5:3, 5:8, 5:14, 6:16, 7:10, 7:14, 7:17, 8:6, 8:11, 8:14, 10:24, 12:10, 12:12, 12:15, 12:19, 12:24, 13:3, 13:7, 22:19, 23:14, 23:25, 24:24, 25:19, 26:13, 27:13, 27:18, 27:20, 27:25, 30:11, 30:14, 34:10, 30:13, 35:15, 35:20, 36:16, 37:23, 38:5, 38:7, 38:10, 38:18, 39:10, 40:23, 42:10, 42:14, 42:24, 43:19, 43:23, 44:1, 44:9, 44:11, 44:14, 44:16, 46:15, 47:13, 47:18, 47:22, 48:5, 48:10, 49:5, 50:5, 50:9, 50:13, 51:24, 55:25, 56:5, 56:8, 56:12, 56:19, 57:13
**Court** [20] - 4:23, 5:22, 5:25, 8:3, 9:3, 24:8, 24:18, 25:14, 28:6, 28:14, 32:9, 34:1, 34:8, 34:25, 35:5, 35:7, 42:22, 46:4,

46:6, 53:18
**Court's** [3] - 7:21, 52:1, 55:16
**courtesy** [1] - 5:8
**courtroom** [4] - 5:3, 5:5, 7:17, 7:18
**Courts** [6] - 22:3, 25:13, 26:1, 50:1, 51:6, 53:21
**COVID** [2] - 9:25, 32:25
**custom** [1] - 38:15
**customer** [2] - 9:15, 9:19
**customers** [1] - 9:20
**cut** [1] - 50:7

# D

**D2** [2] - 32:16, 32:23
**daily** [2] - 26:19, 41:21
**damage** [1] - 45:6
**damaged** [1] - 45:25
**damages** [4] - 27:1, 31:19, 43:7, 43:8
**DARRELL** [1] - 2:4
**Darrell** [1] - 3:21
**date** [5] - 23:11, 25:15, 25:23, 29:7, 39:4
**dates** [1] - 33:15
**DAWSON** [1] - 2:6
**Dawson** [1] - 4:10
**day-to-day** [1] - 10:7
**days** [12] - 15:12, 18:6, 20:21, 21:12, 33:1, 41:23, 44:19, 44:20, 44:24, 45:2, 52:11, 55:23
**deal** [3] - 8:15, 14:10, 18:14
**dealing** [3] - 8:16, 38:15, 52:6
**dealings** [1] - 38:13
**debate** [1] - 29:25
**debt** [17] - 11:8, 15:14, 15:15, 15:23, 16:13, 17:20, 21:3, 21:4, 21:7, 24:10, 24:13, 29:24, 31:6, 31:17, 36:3, 36:19, 39:16
**decided** [2] - 12:1, 41:16, 55:20
**decision** [14] - 15:4, 15:6, 32:23, 34:1, 34:9, 34:17, 34:20, 35:3, 40:9, 41:12, 52:1, 52:20, 55:16, 55:19
**declaratory** [2] - 6:7, 24:15

**decline** [2] - 30:10, 42:5
**declining** [1] - 32:6
**deemed** [2] - 31:7, 39:17
**default** [5] - 28:24, 29:4, 36:15, 51:2
**defaults** [1] - 51:21
**defendant** [2] - 14:15, 55:4
**Defendant** [1] - 30:8
**Defendants** [17] - 1:10, 2:3, 13:20, 28:20, 28:23, 29:16, 29:19, 31:8, 39:24, 40:4, 40:12, 41:14, 41:16, 42:1, 42:3, 42:5, 51:15
**defendants** [33] - 3:19, 3:22, 6:5, 8:5, 8:20, 8:23, 9:4, 9:7, 10:4, 10:10, 10:14, 11:6, 11:17, 12:1, 12:6, 13:12, 14:2, 14:24, 15:5, 16:11, 16:24, 18:2, 18:7, 18:18, 22:14, 26:6, 27:14, 29:6, 32:7, 39:20, 48:18, 55:11
**defendants'** [1] - 19:5
**Defendants'** [2] - 40:7, 40:12
**defense** [1] - 36:19
**deficiency** [1] - 27:2
**define** [1] - 26:1
**defined** [1] - 22:3
**definitely** [1] - 54:24
**delayed** [2] - 43:14, 43:15
**demonstrate** [1] - 56:13
**denied** [1] - 57:3
**deny** [1] - 52:1
**Department** [4] - 28:7, 34:13, 34:17, 41:13
**Department's** [1] - 40:9
**depressed** [2] - 42:3, 52:18
**described** [2] - 9:3, 35:18
**despite** [1] - 43:17
**destroyed** [1] - 45:22
**determined** [1] - 25:9
**determines** [1] - 37:4
**devastating** [1] - 38:17
**develop** [1] - 56:11
**devoted** [1] - 11:14
**different** [9] - 6:18,

23:21, 32:17, 33:4, 33:19, 36:3, 40:5, 46:7, 46:10
**direct** [3] - 37:21, 40:19, 50:18
**directing** [1] - 19:3
**disagree** [2] - 30:23, 43:5
**disclaimed** [1] - 39:8
**disclose** [1] - 45:10
**disclosed** [2] - 42:18, 42:20
**discovery** [5] - 56:4, 56:10, 56:13, 56:14, 56:23
**discretion** [5] - 22:13, 22:25, 28:25, 34:6, 37:5
**discussion** [3] - 4:24, 5:24, 7:2
**disincentivize** [1] - 33:11
**disincentivizes** [1] - 51:10
**dismiss** [1] - 55:24
**dispose** [4] - 22:5, 24:10, 24:13, 37:2
**disposed** [1] - 24:6
**disposing** [2] - 25:7, 34:6
**disposition** [5] - 21:21, 22:1, 25:9, 32:18, 42:8
**dispute** [9] - 11:3, 17:2, 18:18, 18:21, 21:24, 22:18, 30:23, 46:12, 48:4
**disputed** [1] - 41:2
**disputing** [1] - 38:3
**disregard** [1] - 49:20
**disrupt** [2] - 12:3, 37:6
**disruption** [6] - 23:13, 37:19, 37:20, 37:25, 38:1, 39:14
**distinction** [1] - 37:20
**division** [1] - 53:17
**DJ** [1] - 52:5
**Doc** [1] - 16:10
**docket** [1] - 13:5
**Document** [1] - 44:7
**document** [4] - 13:4, 13:11, 46:23, 47:3
**documents** [2] - 38:20, 55:5
**dollar** [2] - 9:18, 45:22
**dollars** [5] - 21:7, 30:3, 30:18, 31:7, 51:2
**done** [9] - 4:12, 18:17, 22:6, 24:7, 24:9,

26:4, 35:7, 45:6, 45:17
**down** [11] - 9:22, 20:11, 20:21, 44:25, 45:16, 45:18, 45:21, 55:5, 55:6, 55:12, 55:14
**downward** [1] - 41:4
**drag** [1] - 45:16
**dramatically** [1] - 20:7
**drastic** [1] - 28:9
**driven** [1] - 20:21
**dropped** [1] - 41:13
**drove** [1] - 20:10
**DUBATOWKA** [3] - 1:21, 3:4, 3:11
**Dubatowka** [2] - 3:5, 3:14
**dump** [1] - 40:16
**dumped** [7] - 19:20, 20:4, 20:6, 20:9, 45:12, 45:13, 52:18
**dumping** [4] - 20:19, 44:23, 45:7, 52:10
**during** [9] - 11:19, 14:25, 16:12, 16:18, 19:12, 19:24, 19:25, 33:7, 45:21
**duty** [7] - 6:5, 21:19, 22:9, 22:16, 23:4, 24:5, 39:17

### E

**early** [6] - 9:10, 13:23, 16:10, 19:24, 31:9, 31:22
**easier** [1] - 55:9
**economically** [1] - 40:1
**effect** [2] - 24:15, 24:16
**efforts** [7] - 16:21, 23:12, 24:12, 31:13, 37:6, 37:18, 38:3
**either** [4] - 17:10, 31:9, 31:12, 32:10
**electronically** [1] - 19:4
**element** [4] - 6:9, 6:13, 7:22
**elements** [3] - 6:1, 8:1, 25:2
**email** [2] - 4:11, 29:23
**emails** [1] - 11:1
**encourage** [1] - 54:16
**end** [7] - 9:7, 11:21, 17:22, 18:24, 20:20, 33:14, 35:4
**enforce** [1] - 53:19

**enforceable** [1] - 49:18
**enforcement** [2] - 36:24
**enforcing** [1] - 51:7
**engage** [3] - 10:11, 10:18, 31:1
**engaged** [1] - 11:12
**enjoin** [1] - 27:10
**enjoined** [1] - 24:22
**ensure** [1] - 10:12
**enter** [1] - 11:16
**entered** [3] - 9:4, 12:5, 41:5
**enters** [1] - 8:4
**entire** [8] - 17:20, 24:10, 24:13, 25:5, 31:6, 36:3, 39:15, 39:16
**entirely** [1] - 47:22
**entities** [1] - 5:19
**entitled** [1] - 34:5
**equities** [2] - 51:1, 53:16
**especially** [1] - 41:11
**ESQ** [7] - 1:21, 1:24, 2:4, 2:5, 2:5, 2:6, 2:6
**essentially** [3] - 11:18, 20:14, 22:25
**establish** [4] - 28:8, 33:20, 38:14, 52:4
**established** [1] - 52:12
**establishes** [1] - 32:13
**estimated** [1] - 29:23
**event** [2] - 37:22, 51:21
**events** [1] - 31:18
**eventually** [1] - 14:1
**evidence** [4] - 24:8, 29:12, 30:25, 38:22
**exact** [2] - 42:1, 50:16
**exactly** [2] - 25:11, 51:22
**exceeded** [1] - 15:14
**Excello** [1] - 22:8
**excess** [1] - 30:3
**exchange** [2] - 32:12
**Exchange** [8] - 30:7, 32:18, 33:5, 34:25, 40:18, 41:15, 52:8, 53:10
**exclusive** [10] - 12:7, 13:15, 14:24, 15:9, 15:24, 17:16, 19:2, 19:10, 47:4, 47:8
**exclusively** [1] - 23:11
**excuse** [2] - 25:7, 49:24

**executed** [1] - 38:21
**executive** [3] - 11:13, 20:6, 45:8
**exercise** [3] - 8:24, 37:1, 49:25
**exercised** [6] - 12:6, 13:12, 29:17, 29:20, 42:5, 51:15
**Exhibit** [6] - 12:8, 12:17, 12:20, 13:1, 13:10
**expectations** [1] - 30:22
**expedited** [2] - 56:4, 56:13
**expert** [6] - 26:16, 52:14, 52:15, 53:13, 57:1
**expire** [2] - 11:21, 14:6
**expired** [1] - 29:15
**exposed** [1] - 9:8
**exposure** [1] - 10:8
**expressly** [2] - 22:11, 23:7
**extinguished** [2] - 36:3, 39:17
**extinguishing** [1] - 31:18
**extra** [2] - 30:24, 31:23
**extraordinary** [1] - 56:16

### F

**F-4s** [1] - 45:10
**facie** [1] - 6:10
**facilities** [2] - 9:16, 9:19
**fact** [9] - 18:22, 23:15, 25:18, 28:12, 32:15, 33:18, 40:6, 43:14
**fact-intensive** [1] - 28:12
**factor** [1] - 53:1
**facts** [5] - 25:12, 28:13, 30:20, 40:15, 46:9, 46:11, 50:20, 54:5
**factually** [1] - 34:22
**fail** [1] - 32:20
**failed** [2] - 26:10
**fair** [1] - 52:5
**faith** [7] - 6:6, 16:21, 22:4, 40:7, 40:8, 40:13, 52:5
**fall** [1] - 41:18
**falls** [1] - 39:16
**family** [9] - 6:15, 6:17, 7:24, 17:11, 21:13,

27:4, 53:6
**FAMILY** [1] - 1:4
**family-owned** [2] - 6:15, 7:24
**fascinating** [2] - 48:12, 52:3
**fault** [3] - 5:11, 30:12, 30:13
**favor** [3] - 33:9, 51:9, 51:18
**February** [10] - 9:21, 18:25, 19:8, 19:16, 19:18, 29:19, 29:21, 30:4, 36:21, 40:17
**feedback** [1] - 23:25
**few** [7] - 19:7, 33:15, 35:9, 44:18, 44:24, 45:2, 45:3
**file** [3] - 12:20, 55:10, 55:24
**filed** [6] - 4:8, 5:25, 6:21, 6:24, 15:14, 21:9
**filing** [1] - 45:10
**final** [3] - 8:21, 38:21, 39:1
**finally** [9] - 16:13, 16:14, 16:25, 17:3, 34:19, 39:3, 41:6, 41:20, 51:17
**financing** [2] - 9:17, 9:18
**fine** [3] - 3:17, 49:19, 50:8
**finished** [1] - 20:24
**fire** [1] - 18:15
**fire-sale** [1] - 18:15
**firm** [1] - 4:14
**first** [20] - 6:9, 8:4, 8:21, 9:14, 17:7, 18:4, 19:8, 20:8, 20:18, 20:20, 24:16, 36:10, 36:14, 39:19, 42:25, 43:20, 44:18, 44:19, 44:24, 52:10
**First** [5] - 28:7, 34:13, 34:17, 40:8, 41:12
**five** [1] - 40:25
**five-year** [1] - 40:25
**flexible** [2] - 10:19, 14:9
**Floor** [1] - 1:20
**flow** [1] - 26:19
**focus** [4] - 10:20, 36:8, 42:7, 42:25
**focused** [1] - 21:18
**focusing** [2] - 52:7, 53:7
**follow** [2] - 34:7, 45:18
**follows** [1] - 28:15

**footnote** [1] - 50:18
**forbearance** [2] - 11:18, 40:11
**forbearing** [1] - 33:10
**forebear** [2] - 29:7, 29:17
**foreclose** [9] - 18:2, 24:14, 24:21, 28:23, 35:11, 37:2, 37:10, 51:16, 54:17
**foreclosed** [3] - 18:4, 39:20, 41:6
**foreclosing** [2] - 40:6, 43:15
**foreclosure** [5] - 21:10, 21:12, 33:7, 33:12, 36:4
**foreclosures** [1] - 31:13
**foregoing** [1] - 57:8
**forgot** [2] - 16:3, 47:9
**form** [1] - 45:10
**forth** [1] - 52:19
**forward** [3] - 12:1, 14:19, 15:10
**founded** [1] - 9:5
**fours** [1] - 35:1
**frame** [1] - 16:18
**framework** [1] - 54:24
**frankly** [2] - 38:11, 52:25
**fraud** [2] - 6:7, 52:6
**Friday** [1] - 6:24
**full** [1] - 39:25
**fully** [2] - 10:25, 47:25
**Fund** [1] - 25:17
**future** [2] - 5:4, 11:10

### G

**Garrett** [1] - 22:8
**gas** [1] - 9:25
**given** [5] - 8:13, 8:19, 10:8, 52:15, 56:24
**governing** [2] - 31:2, 39:11
**grabbed** [1] - 45:24
**Grace** [1] - 32:16
**Gramercy** [1] - 40:9
**grant** [1] - 31:4
**granted** [1] - 28:20
**great** [1] - 38:10
**greater** [1] - 33:18
**grounds** [2] - 34:4, 34:15
**guarantor** [1] - 39:7
**guess** [2] - 35:6, 55:25
**guide** [2] - 4:24, 8:3
**guys** [1] - 16:14

## H

half [1] - 54:20
hand [2] - 31:22, 43:9
happy [5] - 4:20, 5:2, 30:25, 42:8, 42:22
harbor [1] - 32:13
hard [1] - 3:14
harm [9] - 6:13, 7:22, 26:16, 26:23, 27:3, 27:6, 27:12, 53:2, 53:4
Harris [1] - 3:5
HARRIS [1] - 1:19
Harry [1] - 4:9
HARRY [1] - 2:5
head [1] - 51:18
hear [6] - 3:14, 3:15, 4:21, 27:16, 27:24, 50:10
heard [2] - 28:10, 43:20
heavily [6] - 9:7, 10:1, 36:11, 36:12, 37:14
heck [1] - 23:1
help [3] - 4:24, 8:3, 10:13
helped [3] - 14:1, 14:2, 56:24
hereby [1] - 57:8
herewith [1] - 38:21
HERRINGTON [1] - 2:2
Herrington [1] - 3:21
hide [1] - 5:11
high [2] - 32:4, 39:25
Highland [2] - 25:16, 32:16
highly [1] - 41:3
hindsight [5] - 31:8, 33:15, 40:4, 46:4, 50:3
historic [1] - 32:24
hmm [4] - 7:10, 25:19, 40:23, 42:24
hold [2] - 23:25, 37:23
holder [2] - 17:4, 17:5
holding [1] - 54:11
Holdings [2] - 7:24, 21:13
holdings [1] - 34:25
HOLDINGS [1] - 1:4
holds [1] - 25:6
home [4] - 6:17, 7:3, 7:7, 15:4
Honor [134] - 3:4, 3:11, 3:15, 3:20, 4:7, 4:20, 5:1, 5:6, 5:10, 5:13, 5:15, 5:16, 5:21, 6:2, 6:8, 6:20,
7:3, 7:12, 7:16, 7:20, 8:2, 8:10, 9:16, 10:3, 10:25, 11:4, 12:13, 12:22, 13:6, 13:12, 14:20, 15:12, 15:17, 16:8, 17:19, 17:22, 19:20, 19:25, 21:17, 22:10, 22:22, 23:6, 23:20, 23:22, 24:2, 24:16, 24:25, 25:11, 26:11, 26:22, 27:7, 27:16, 27:23, 28:3, 28:7, 28:13, 28:23, 29:6, 29:9, 29:15, 30:1, 30:5, 30:13, 30:19, 31:5, 31:11, 31:15, 31:20, 31:24, 32:8, 32:15, 32:22, 33:3, 33:8, 33:14, 33:17, 33:24, 33:25, 34:14, 34:19, 35:2, 35:4, 35:8, 36:1, 36:8, 36:15, 36:23, 37:8, 37:11, 37:16, 37:21, 38:3, 38:13, 38:17, 39:3, 39:5, 39:14, 39:19, 40:7, 40:15, 40:19, 40:22, 40:24, 41:1, 41:11, 41:19, 41:20, 41:24, 42:7, 42:17, 42:25, 43:11, 43:14, 43:25, 44:3, 44:10, 46:2, 47:1, 47:24, 48:8, 49:11, 50:8, 50:11, 50:16, 50:18, 50:25, 51:6, 51:13, 51:17, 51:23, 55:24, 56:2, 56:10
Honor's [1] - 32:23
HONORABLE [1] - 1:15
horse [1] - 26:25
hotel [3] - 7:6, 7:7, 32:24
Houston [2] - 1:24, 7:6
humongous [1] - 20:19
hundred [6] - 21:7, 30:3, 30:18, 31:7, 45:3, 51:2
hurdle [1] - 25:22

## I

identical [2] - 36:7
identified [1] - 6:22
ignored [2] - 20:23
illustrate [1] - 32:20

immune [4] - 34:3, 34:10, 34:11, 34:12
immunized [1] - 34:14
impact [1] - 11:24
impacted [1] - 9:12
impair [1] - 40:2
implies [1] - 23:4
important [5] - 17:24, 35:10, 36:23, 37:20, 41:10
impose [1] - 46:4
impossible [1] - 51:15
inaction [2] - 18:1, 21:4
incentive [1] - 39:24
included [1] - 15:18
including [7] - 5:18, 6:5, 10:14, 13:20, 17:11, 22:2, 37:3
incoherent [1] - 31:21
increased [1] - 21:5
indeed [1] - 56:15
INDEX [1] - 1:4
Index [2] - 13:2, 13:3
India [1] - 9:15
Individually [1] - 1:3
indulge [1] - 35:8
indulgence [1] - 50:14
indulging [1] - 17:23
industry [2] - 18:17, 20:14
industry-compliant [1] - 20:14
information [9] - 11:24, 15:18, 18:7, 18:11, 18:23, 41:2, 56:15, 56:17, 56:21
initiating [2] - 21:10, 21:12
Injunction [10] - 4:6, 5:17, 21:16, 27:9, 28:9, 31:4, 52:2, 53:2, 54:19, 56:14
injunction [1] - 53:15
Injunctive [1] - 43:6
inquiry [3] - 25:3, 25:14, 25:21
insiders [1] - 50:24
insist [1] - 47:7
insisting [7] - 14:16, 14:20, 15:2, 16:1, 16:11, 16:20, 46:13
instead [2] - 19:12, 55:8
insufficient [1] - 50:21
intend [1] - 55:24
intensive [1] - 28:12
interest [5] - 8:9, 34:6, 39:22, 51:4, 51:14
interested [1] - 48:15

interesting [7] - 37:24, 38:7, 48:10, 48:11, 48:13, 53:3
interests [1] - 28:20
interference [3] - 18:2, 21:4, 52:7
interrupt [1] - 43:19
investment [1] - 33:22
investor [1] - 50:22
invitation [1] - 7:19
involve [1] - 32:17
involved [1] - 10:7, 34:22
irrational [1] - 40:1
irreparable [9] - 6:13, 7:22, 26:16, 26:23, 27:3, 27:5, 27:12, 53:2, 53:4
issue [3] - 9:14, 54:18, 55:19
itself [2] - 9:9, 47:6

## J

judgment [2] - 6:7, 24:15
July [2] - 21:11, 47:10
jump [1] - 43:23
June [2] - 15:19, 21:14
JUSTICE [1] - 1:16

## K

KARIM [1] - 1:3
keep [1] - 7:20
Kentucky [1] - 34:20
kept [1] - 20:19
kernel [1] - 31:15
key [1] - 25:2
kind [6] - 14:22, 25:25, 43:21, 44:5, 47:2, 50:7
kinds [2] - 22:25, 48:20
knowing [1] - 5:12
knowledge [1] - 43:13
knows [5] - 6:2, 6:8, 18:13, 45:11, 51:6
KUSTER [1] - 2:6
Kuster [1] - 4:10

## L

laid [1] - 25:12
Lane [2] - 34:19, 50:17
language [3] - 13:16, 28:4, 28:22
large [2] - 17:19, 20:19
largest [1] - 45:9

last [5] - 6:25, 39:6, 41:24, 48:17, 50:25
lasted [1] - 11:19
late [7] - 16:10, 17:4, 18:1, 31:10, 32:2, 49:3, 54:21
Laura [1] - 4:8
LAURA [1] - 2:5
LAURENT [1] - 1:19
Laurent [1] - 3:5
law [18] - 4:14, 6:8, 21:24, 23:6, 28:6, 31:3, 31:12, 32:6, 32:21, 33:17, 33:21, 33:24, 34:21, 35:5, 49:21, 50:21, 52:21, 55:9
lawsuit [2] - 21:8, 21:9
lawyer [1] - 29:22
leap [1] - 23:14
learned [1] - 18:12
least [5] - 20:18, 27:1, 36:7, 36:19, 39:4
left [2] - 14:8, 27:2
legal [1] - 39:8
legally [1] - 30:22
lender [5] - 33:23, 48:21, 50:21, 51:20, 55:4
lenders [7] - 33:11, 33:25, 34:5, 51:10, 53:20, 53:24, 54:22
lending [2] - 51:19, 51:20
length [1] - 40:10
less [2] - 21:7, 41:23
letter [4] - 12:8, 13:14, 17:1, 17:4, 17:5, 17:7
lien [2] - 17:4, 17:4
light [1] - 31:2
likelihood [11] - 6:2, 6:3, 6:10, 21:19, 23:23, 24:4, 24:19, 52:4, 52:12, 52:22, 54:6
likely [2] - 52:24, 54:6
LINA [1] - 1:3
line [2] - 8:6, 26:20
list [1] - 45:18
listed [1] - 18:15
literally [2] - 44:23, 45:7
live [3] - 7:6, 15:4, 49:20
LLC [3] - 1:3, 1:5, 1:9
LLP [3] - 1:19, 1:22, 2:2
LNG [1] - 9:16
loan [28] - 8:4, 8:5, 8:7, 8:17, 8:22, 9:2,

ab

9:4, 9:9, 10:14, 10:20, 14:1, 14:2, 14:7, 14:8, 14:18, 17:12, 22:13, 22:15, 27:2, 28:4, 28:17, 28:22, 38:14, 38:20, 41:4, 42:19, 42:21

**loans** [12] - 9:8, 10:13, 11:15, 14:6, 14:8, 15:8, 17:2, 28:20, 30:19, 35:18, 39:22, 43:16

**lockdowns** [1] - 33:2

**Look** [1] - 16:14

**look** [8] - 18:19, 36:12, 41:5, 41:8, 41:11, 44:18, 53:17, 55:22

**looked** [1] - 12:17

**looking** - 51:1

**love** [1] - 48:11

**low** [2] - 20:5, 45:20

**LP** [2] - 1:8, 3:2

**LTD** [1] - 1:8

## M

**ma'am** [1] - 6:21

**Main** [1] - 1:23

**maintain** [1] - 5:22

**manner** [8] - 22:2, 25:10, 32:11, 34:23, 37:3, 43:1, 44:6, 46:1

**March** [8] - 9:24, 14:5, 14:15, 15:20, 21:9, 21:10, 29:7, 29:19

**mark** [1] - 51:25

**Mark** [2] - 32:16, 32:23

**market** [29] - 9:12, 15:7, 18:13, 19:20, 20:5, 20:9, 20:16, 20:17, 20:19, 32:6, 32:14, 33:1, 33:16, 33:22, 34:3, 34:16, 42:18, 42:23, 44:23, 45:7, 45:8, 45:11, 45:12, 45:13, 48:7, 55:5, 55:6, 55:12, 55:13

**marketed** [1] - 18:22

**marketing** [1] - 18:16

**markets** [1] - 10:1

**MASLEY** [1] - 1:15

**Master** [1] - 25:17

**material** [8] - 11:24, 23:12, 37:13, 37:18, 37:19, 37:25, 38:1, 39:14

**materially** [2] - 37:6, 42:3

**matter** [6] - 3:1, 22:8, 23:6, 32:20, 52:21, 52:22

**maximize** [3] - 22:7, 26:4, 26:9

**McConn** [55] - 1:24, 3:6, 3:11, 3:13, 3:15, 4:19, 4:20, 4:23, 5:1, 5:10, 5:15, 6:20, 7:12, 7:16, 7:20, 8:8, 8:12, 8:16, 10:25, 12:11, 12:13, 12:18, 12:22, 12:25, 13:6, 13:8, 22:22, 23:20, 24:2, 24:25, 25:20, 26:22, 29:1, 29:22, 30:6, 35:17, 43:24, 44:3, 44:10, 44:12, 44:15, 44:17, 47:1, 47:17, 47:20, 47:24, 48:8, 48:14, 49:11, 53:4, 55:17, 56:2, 56:7, 56:9, 56:18

**mcConn** [2] - 44:2, 46:8

**mcConn's** [1] - 53:23

**mean** [13] - 8:6, 22:4, 25:14, 46:5, 46:16, 48:9, 48:11, 53:12, 55:2, 55:12, 56:8, 56:23, 56:25

**means** [1] - 26:5

**MEGAN** [1] - 1:21

**Megan** [1] - 3:5

**members** [1] - 4:17

**memos** - 55:9

**mentioned** [3] - 19:25, 21:17, 25:1

**mentions** [1] - 25:2

**mere** [2] - 33:18, 53:17

**MEREDITH** [1] - 2:6

**Meredith** [1] - 4:10

**merit** [1] - 31:5

**merits** [7] - 6:3, 6:4, 21:19, 24:4, 24:19, 24:23, 52:13

**met** [2] - 31:24, 54:15

**method** [1] - 22:2

**methodology** [1] - 20:14

**methods** [2] - 23:16, 23:18

**METZGER** [1] - 2:5

**Metzger** [2] - 4:8, 35:19

**Metzger's** [1] - 44:12

**microphone** [1] - 3:14

**microphones** [3] - 3:9, 4:3, 27:20

**Microsoft** [1] - 1:12

**middle** [1] - 32:25

**midst** [2] - 30:9, 42:4

**might** [8] - 26:25, 45:4, 52:9, 52:11, 52:16, 52:17, 53:14, 55:8

**milestones** [10] - 11:9, 14:11, 29:2, 31:24, 37:12, 43:12, 49:8, 49:15, 54:15, 55:2

**militating** [1] - 53:1

**million** [33] - 8:5, 8:7, 9:6, 14:17, 15:15, 19:23, 20:1, 20:2, 20:9, 20:24, 20:25, 21:1, 21:2, 21:5, 21:7, 28:17, 29:24, 30:3, 30:16, 30:18, 31:7, 36:22, 42:19, 44:20, 44:21, 44:22, 45:23, 51:2

**millions** [2] - 44:23, 45:8

**mind** [3] - 39:12, 48:4, 56:11

**ministerial** [1] - 19:6

**minute** [1] - 26:1

**miserably** [1] - 26:10

**missed** [1] - 5:6

**mistimed** [1] - 31:8

**mix** [1] - 20:7

**modification** [1] - 38:14

**modifications** [1] - 29:14

**moment** [2] - 29:9, 30:22

**monetary** [2] - 31:19, 43:8

**money** [2] - 13:25, 27:1

**month** [3] - 30:7, 41:19, 53:11

**months** [5] - 15:11, 16:5, 33:5, 40:17, 46:12

**mortgagor** [1] - 17:6

**most** [3] - 31:17, 34:22, 41:23

**mostly** [1] - 41:3

**motion** [10] - 4:5, 5:17, 28:3, 28:12, 30:25, 39:15, 52:2, 55:21, 55:24, 56:4

**move** [4] - 12:1, 15:6, 19:4, 20:7

**moved** [1] - 21:15

**movement** [1] - 41:9

**moves** [1] - 20:17

**moving** [4] - 15:10,

19:3, 27:6, 27:10

**MR** [75] - 3:15, 3:20, 4:1, 4:7, 4:15, 4:20, 4:23, 5:1, 5:6, 5:10, 5:15, 6:20, 7:12, 7:16, 7:20, 8:8, 8:12, 8:16, 10:25, 12:11, 12:13, 12:18, 12:22, 12:25, 13:6, 13:8, 22:22, 23:20, 24:2, 24:25, 25:20, 26:22, 27:16, 27:19, 27:23, 28:3, 30:13, 30:15, 34:13, 35:14, 35:16, 35:25, 36:18, 38:2, 38:6, 38:8, 38:12, 38:19, 39:11, 40:24, 42:13, 42:16, 42:25, 43:22, 43:25, 44:3, 44:10, 44:12, 44:15, 44:17, 47:1, 47:17, 47:20, 47:24, 48:8, 48:14, 49:11, 50:8, 50:11, 50:14, 55:23, 56:2, 56:7, 56:9, 56:18

**MS** [2] - 3:4, 3:11

**muffled** [1] - 27:18

**multi** [1] - 9:18

**multi-billion-dollar** [1] - 9:18

**multiple** [2] - 17:9, 48:24

**Murphy** [1] - 4:9

**MURPHY** [1] - 2:5

**must** [1] - 25:14

**mutual** [2] - 22:5, 26:2

**MUTUARI** [1] - 1:8

## N

**names** [1] - 4:12

**NATIONAL** [1] - 1:9

**nearly** [1] - 20:22

**necessary** [2] - 17:15, 56:14

**need** [7] - 31:5, 36:16, 47:5, 50:9, 52:19, 57:2

**needing** [1] - 53:20

**needs** [2] - 4:3, 28:14

**negotiated** [4] - 36:11, 36:12, 36:13, 37:14

**negotiating** [1] - 16:24

**negotiations** [1] - 30:21

**never** [7] - 8:12, 18:6, 37:19, 42:20, 43:11, 43:13, 48:21

**NEW** [2] - 1:1, 1:1

**New** [26] - 1:12, 1:20, 2:4, 6:8, 21:22, 21:23, 21:25, 22:11, 23:5, 25:13, 28:6, 30:7, 31:2, 32:18, 33:5, 33:13, 34:24, 40:18, 41:15, 49:21, 51:6, 52:8, 53:10

**next** [5] - 15:11, 19:18, 20:25, 43:10, 44:22

**nice** [2] - 44:8, 57:4

**Nineteen77** [2] - 3:2, 3:19

**NINETEEN77** [1] - 1:8

**none** [2] - 17:14, 32:17

**nonetheless** [1] - 29:6

**nonpublic** [1] - 11:24

**nonresponsive** [1] - 16:25

**notably** [1] - 18:18

**note** [1] - 9:18

**noted** [1] - 48:14

**notes** [1] - 57:10

**nothing** [4] - 29:1, 32:1, 33:24, 37:11

**notice** [2] - 18:5, 37:11

**notion** [2] - 42:20, 50:15

**November** [2] - 15:19, 19:15

**nowhere** [1] - 31:25

**NUMBER** [1] - 1:4

**Number** [5] - 13:2, 13:9, 16:10, 44:15, 44:18

**number** [12] - 5:8, 6:12, 6:13, 12:10, 12:12, 12:23, 13:3, 13:4, 54:15, 54:16

**numbers** [1] - 12:16

**NYSCEF** [12] - 12:10, 12:12, 12:16, 13:4, 13:9, 16:10, 35:12, 40:20, 44:7, 44:15, 44:17

## O

**O'CONNOR** [1] - 1:9

**obligation** [3] - 29:24, 43:17, 49:2

**obligations** [2] - 15:5, 51:5

**observed** [1] - 31:25

**observing** [1] - 4:18

**obtained** [1] - 33:19

**obvious** [1] - 50:23

**occasions** [1] - 48:25

ab

occurred [1] - 9:25
October [1] - 19:15
odd [1] - 35:24
OF [4] - 1:1, 1:1, 1:16
officer [1] - 10:7
oil [1] - 9:25
old [1] - 56:23
once [3] - 15:11, 24:11
one [17] - 5:6, 5:8, 6:12, 9:20, 16:8, 20:3, 25:2, 31:21, 36:6, 36:23, 41:22, 43:9, 49:9, 54:15, 55:19, 56:3
One [1] - 34:19
one-page [1] - 55:19
ones [2] - 13:22, 47:12
opened [1] - 45:20
operate [1] - 38:15
opportunities [2] - 16:6, 43:16
opportunity [1] - 52:15
Opportunity [1] - 25:16
opposition [4] - 18:20, 35:19, 40:19, 44:7
oral [8] - 11:1, 29:13, 29:14, 30:21, 38:19, 38:23, 38:24, 49:7
order [4] - 26:19, 44:5, 55:17, 55:18
original [1] - 6:22
Orrick [2] - 3:21, 4:9
ORRICK [1] - 2:2
outset [1] - 51:8
outside [1] - 29:7
outstanding [3] - 14:8, 29:24, 31:6
over-collateralized [1] - 8:20
overall [2] - 41:22, 44:19
owed [4] - 30:3, 31:17, 36:22, 40:1
owes [2] - 30:18, 51:1
own [10] - 10:23, 17:16, 19:9, 26:16, 29:22, 32:23, 40:2, 42:21, 43:17, 52:14
owned [2] - 6:15, 7:24

P

page [8] - 26:18, 36:15, 39:7, 44:7, 44:10, 44:18, 55:19
paid [6] - 10:14, 10:21, 11:15, 14:6, 14:7, 30:5

pandemic [2] - 32:25, 33:8
papers [5] - 15:15, 22:18, 28:11, 40:10, 46:22
pardon [1] - 12:11
part [9] - 21:23, 25:5, 25:14, 35:25, 42:10, 42:11, 54:11, 55:22, 56:20
PART [1] - 1:1
particular [1] - 17:1
particularized [1] - 50:20
particularly [1] - 38:16
parties [1] - 11:7, 28:5, 29:10, 37:13, 37:15, 38:22, 38:23, 38:24, 39:2, 51:8, 54:16, 54:23
parties' [2] - 22:5, 26:2
partner [1] - 4:8
parts [2] - 17:10, 17:12
party [4] - 25:6, 25:9, 37:22, 48:21
pay [4] - 11:8, 14:1, 15:8, 39:21
penalize [1] - 33:10
people [1] - 18:14
per [2] - 20:2, 45:19
percent [9] - 20:10, 20:11, 20:16, 20:22, 30:10, 41:14, 41:23, 45:22
perfect [1] - 40:3
perfected [1] - 28:20
perfectly [1] - 50:8
performing [1] - 26:19
perhaps [2] - 32:12, 34:21
period [7] - 11:20, 25:7, 30:7, 33:5, 41:1, 41:19, 53:11
periods [1] - 20:1
permit [1] - 51:4
permitted [1] - 28:23
person [1] - 28:16
personal [2] - 8:1, 14:8
pertained [1] - 35:18
petronet [1] - 9:19
Petronet [1] - 9:15
physically [2] - 19:4
piece [3] - 7:25, 18:4, 21:22
pieces [4] - 6:14, 8:18, 27:11, 31:14
place [3] - 9:17, 22:2,

32:6
plain [4] - 13:16, 28:4, 28:22, 51:7
plaintiff [2] - 3:3, 54:9
plaintiffs [9] - 3:12, 5:18, 5:19, 22:15, 28:19, 32:8, 52:9, 52:12, 52:22
Plaintiffs [7] - 1:6, 1:19, 1:23, 30:20, 33:9, 33:14, 35:6
Plaintiffs' [8] - 4:5, 31:5, 31:20, 32:20, 35:11, 36:10, 51:9, 51:17
plaintiffs' [2] - 5:17, 54:12
plans [1] - 50:24
pleaded [2] - 10:10, 20:12
pleas [1] - 20:24
pledged [12] - 8:19, 10:22, 14:17, 28:19, 32:11, 33:22, 34:2, 34:16, 34:24, 42:19, 42:23, 51:21
plummeting [2] - 30:10, 41:13
point [40] - 8:13, 10:9, 12:2, 13:18, 13:21, 14:19, 14:21, 15:3, 16:8, 16:10, 17:3, 17:7, 17:8, 19:7, 19:13, 19:21, 20:20, 26:12, 29:16, 30:1, 33:25, 35:2, 35:7, 36:9, 37:16, 39:5, 39:13, 41:11, 45:1, 45:4, 45:6, 45:14, 45:17, 46:17, 47:11, 47:14, 48:22, 49:2, 50:23, 50:25
points [4] - 14:19, 15:22, 45:20, 50:12
policy [1] - 33:12
portion [1] - 17:19
position [2] - 17:7, 31:20
possession [2] - 29:20, 30:2
potential [1] - 9:15
power [3] - 47:14, 47:15, 47:16
PowerPoint [1] - 4:24
precedent [2] - 33:9, 51:10
precious [2] - 53:5, 53:7
precipitous [2] - 30:9, 42:4

prefer [1] - 39:20
Preliminary [10] - 4:5, 5:17, 21:15, 28:9, 31:4, 43:6, 52:2, 53:2, 54:19, 56:14
prepared [1] - 12:16
presented [1] - 50:17
Press [1] - 22:8
pretty [1] - 37:13
previewed [1] - 24:8
price [21] - 9:22, 10:2, 12:4, 14:3, 16:12, 18:15, 20:7, 20:11, 20:21, 29:25, 30:9, 37:7, 39:15, 39:25, 40:25, 41:9, 42:1, 42:4, 44:24, 45:19, 56:25
prima [1] - 6:10
primary [2] - 9:20, 21:17
principal [1] - 42:15
private [1] - 42:19
probability [1] - 6:11
problem [3] - 9:10, 9:11, 49:5
problems [1] - 10:9
proceed [2] - 5:13, 7:11
Proceedings [1] - 1:12
proceedings [1] - 57:9
process [1] - 18:16
promise [1] - 11:5, 14:12, 14:14, 31:23, 49:12, 51:20
promises [2] - 29:13, 30:21
promoting [1] - 33:13
prompt [1] - 25:8
prompted [1] - 30:12
properties [6] - 16:22, 16:23, 17:2, 35:22, 36:5, 53:5
property [5] - 8:1, 8:18, 27:4, 27:11, 33:2
proposals [2] - 17:9, 17:12
proposition [1] - 34:18
protocol [2] - 36:24, 36:25
prove [1] - 53:13
provide [3] - 11:23, 22:13, 51:20
provided [2] - 18:23, 37:5
provides [1] - 36:25
provision [1] - 23:9

provisions [2] - 22:24, 35:9
proxy [2] - 42:17, 42:22
public [6] - 4:17, 15:17, 32:11, 41:2, 51:3, 56:21
punish [2] - 54:18, 54:22
punishes [1] - 51:10
purpose [2] - 51:19
purposes [1] - 53:15
pursuant [2] - 28:17, 50:24
pushed [1] - 52:23
put [2] - 15:7, 24:8
puts [1] - 33:24
putting [1] - 20:16

Q

quantum [1] - 43:7
questions [3] - 7:18, 28:12, 42:9
quick [2] - 8:3, 50:12
quite [2] - 46:22, 52:24
quo [1] - 5:22
quote [1] - 25:15
quoting [1] - 25:4

R

raised [1] - 56:9
raises [1] - 28:12
raising [1] - 13:25
ran [1] - 9:14
ranch [20] - 6:15, 7:3, 7:4, 7:7, 7:23, 15:2, 15:6, 16:20, 16:23, 17:4, 17:10, 17:13, 17:15, 21:11, 23:18, 24:14, 26:14, 27:4, 35:22, 53:5
rare [1] - 7:25
rather [2] - 31:6, 34:24
re [3] - 10:11, 10:18, 11:12
re-engage [2] - 10:11, 10:18
re-engaged [1] - 11:12
reached [2] - 37:12, 43:12
react [2] - 21:10, 21:12
read [2] - 5:4, 12:15
reading [1] - 26:18
ready [1] - 48:15
realized [1] - 45:15
really [21] - 8:14, 10:10, 14:2, 35:1,

37:23, 43:3, 43:4, 46:15, 46:17, 46:19, 46:25, 48:10, 48:11, 48:12, 48:13, 48:19, 51:9, 51:18, 52:3, 52:7, 57:2
**reason** [12] - 9:11, 15:25, 16:5, 17:20, 20:4, 24:1, 25:8, 35:25, 41:15, 48:5, 51:12, 56:5
**reasonable** [26] - 6:11, 11:7, 11:11, 12:3, 16:6, 22:6, 23:12, 23:16, 23:18, 24:12, 25:10, 25:24, 26:2, 26:3, 26:8, 37:6, 37:17, 37:18, 38:3, 42:2, 45:5, 46:9, 50:2, 50:4, 52:20, 54:4
**reasonableness** [21] - 6:6, 21:20, 21:21, 22:1, 22:3, 22:16, 23:5, 23:7, 23:24, 24:5, 25:1, 25:3, 25:15, 25:22, 32:10, 34:4, 34:15, 35:21, 39:18, 49:22, 49:25
**reasonably** [2] - 24:7, 24:9
**reasons** [1] - 26:11
**received** [3] - 18:7, 21:1, 21:2
**receiver** [2] - 18:8, 18:10
**recently** [1] - 36:21
**recognized** [2] - 32:14, 34:3
**recommendations** [1] - 34:7
**record** [8] - 6:17, 7:8, 52:25, 54:1, 55:7, 55:20, 56:8, 56:11
**recover** [2] - 14:4, 39:25
**recovered** [2] - 30:16, 30:17
**recurring** [1] - 46:2
**reduce** [1] - 31:17
**refinancing** [1] - 17:12
**refused** [2] - 17:9, 18:11
**regard** [1] - 26:10
**regards** [1] - 21:20
**regular** [2] - 34:16, 56:23
**regulations** [1] - 48:3
**reject** [1] - 50:19
**rejected** [1] - 17:11

**rejecting** [1] - 35:1
**relatively** [1] - 41:21
**release** [2] - 17:1, 39:4
**relevant** [4] - 7:2, 16:19, 25:5, 36:8
**reliance** [1] - 39:8
**relief** [1] - 43:6
**remainder** [1] - 5:19
**remarkable** [1] - 31:6
**remedies** [2] - 29:18, 37:1
**remedy** [1] - 28:9
**remember** [1] - 23:9
**remotely** [1] - 32:19
**repay** [1] - 43:16
**repayment** [2] - 10:19, 51:20
**repeated** [2] - 15:12, 19:12
**repeatedly** [9] - 16:11, 16:17, 17:13, 18:9, 18:11, 46:13, 48:24, 49:16, 50:3
**repeating** [1] - 43:21
**report** [3] - 26:20, 52:16, 53:14
**REPORTER** [3] - 2:25, 28:2, 57:13
**Reporter** [1] - 3:7
**represent** [2] - 4:13, 5:18
**representation** [1] - 39:6
**representations** [1] - 39:9
**representative** [1] - 16:14
**represented** [1] - 39:8
**request** [1] - 43:5
**require** [1] - 46:7
**required** [8] - 8:23, 21:21, 26:5, 34:7, 46:8, 47:2, 47:3, 55:11
**requirement** [3] - 22:10, 25:20, 49:25
**requirements** [1] - 28:8
**requires** [1] - 21:25
**residence** [1] - 15:3
**resident** [4] - 6:23, 6:25, 7:2, 7:5
**residential** [1] - 6:15
**resolved** [1] - 28:4
**resources** [1] - 11:14
**respect** [8] - 5:22, 6:4, 6:9, 18:21, 21:18, 23:1, 37:8, 40:14
**respectfully** [4] - 23:20, 27:7, 28:7,

56:18
**respects** [1] - 36:8
**response** [3] - 18:19, 49:12, 49:13
**responsibility** [1] - 50:22
**rest** [4] - 13:23, 17:8, 56:22
**restricted** [3] - 48:3, 48:25, 50:15
**restriction** [1] - 48:6
**restrictions** [2] - 14:22, 48:7
**rests** [1] - 33:23
**result** [3] - 11:12, 30:10, 30:15
**retrospect** [1] - 40:3
**return** [3] - 22:7, 26:4, 26:9
**righting** [1] - 11:14
**rightly** [1] - 35:17
**rights** [5] - 22:14, 29:20, 42:5, 47:8, 51:16
**rises** [1] - 39:16
**risk** [3] - 32:6, 33:22, 33:24
**RIZZUTO** [1] - 1:4
**room** [1] - 3:25
**roughly** [2] - 19:22, 20:9
**RPR** [2] - 2:24, 57:12
**rules** [5] - 5:4, 5:12, 12:15, 55:7, 55:8
**ruling** [4] - 33:8, 51:9, 51:17, 56:3
**running** [1] - 13:24

## S

**safe** [1] - 32:13
**sailboat** [5] - 7:25, 18:5, 24:14, 27:5
**sailboats** [1] - 18:14
**sale** [16] - 18:15, 26:23, 27:2, 27:9, 27:10, 32:11, 32:24, 33:4, 34:2, 34:23, 39:13, 42:14, 52:7, 53:4, 53:8
**sales** [6] - 30:16, 32:13, 35:6, 35:21, 41:21, 43:2
**satisfied** [1] - 52:12
**scheduled** [2] - 21:11, 21:13
**search** [1] - 34:11
**SEC** [2] - 14:22, 45:11
**SEC-type** [1] - 14:22
**second** [4] - 7:22,

9:24, 35:5, 54:20
**Section** [9] - 22:11, 25:2, 33:21, 36:20, 36:23, 37:21, 38:13, 38:16, 39:3
**section** [1] - 25:4
**sections** [1] - 21:24
**secure** [2] - 28:19, 42:19
**secured** [7] - 25:6, 25:9, 34:5, 48:21, 51:19, 53:20
**securities** [5] - 32:11, 32:18, 33:22, 34:24, 48:3
**security** [1] - 28:20
**see** [15] - 4:1, 6:23, 12:19, 28:11, 36:12, 36:16, 41:10, 44:17, 45:1, 46:5, 47:2, 55:13, 56:1, 56:19, 56:23
**seek** [1] - 27:9
**sees** [1] - 55:5
**seized** [2] - 19:1, 19:16
**seizing** [1] - 19:3
**self** [1] - 34:6
**self-interest** [1] - 34:6
**sell** [67] - 11:7, 11:22, 11:25, 13:21, 14:16, 14:20, 14:23, 15:1, 15:2, 15:7, 15:25, 16:2, 16:6, 16:12, 16:15, 16:20, 16:22, 17:10, 17:17, 17:18, 20:3, 20:13, 23:10, 23:16, 23:18, 24:12, 26:8, 27:4, 29:3, 31:23, 32:5, 34:16, 37:9, 39:24, 41:14, 41:16, 42:5, 43:11, 45:5, 46:13, 46:14, 47:6, 47:7, 47:11, 47:12, 47:14, 47:15, 47:16, 48:2, 48:9, 49:7, 50:4, 50:16, 50:24, 51:12, 53:24, 53:25, 54:7, 54:13, 54:14, 55:1
**Sell** [1] - 47:10
**selling** [24] - 12:1, 13:20, 14:23, 17:14, 18:10, 19:11, 19:19, 19:20, 20:24, 26:6, 26:7, 27:7, 30:8, 31:8, 42:2, 42:12, 45:2, 45:4, 48:25, 50:15, 53:10, 54:11,

55:13
**send** [1] - 42:22
**SENIOR** [2] - 2:25, 57:13
**sense** [1] - 40:3
**sent** [3] - 9:22, 13:14, 29:23
**separately** [1] - 55:10
**September** [1] - 41:9
**series** [1] - 35:17
**serve** [2] - 32:19, 51:3
**set** [1] - 33:9
**sets** [1] - 51:9
**several** [4] - 16:21, 22:23, 34:25, 51:3
**severely** [1] - 9:12
**shame** [1] - 49:24
**share** [3] - 4:25, 17:14, 49:4
**shareholder** [1] - 45:9
**shares** [52] - 14:17, 15:19, 15:23, 15:24, 15:25, 17:17, 17:18, 19:1, 19:2, 19:3, 19:5, 19:8, 19:16, 19:23, 20:1, 20:2, 20:4, 20:9, 20:24, 20:25, 21:6, 26:7, 27:10, 29:21, 30:2, 30:6, 30:8, 31:9, 31:24, 34:6, 36:2, 37:3, 37:10, 39:13, 40:14, 40:15, 41:7, 41:14, 42:8, 42:12, 42:15, 42:19, 42:23, 44:23, 45:8, 45:12, 46:24, 52:8, 53:8, 53:10
**ship** [2] - 10:13, 11:14
**shocked** [1] - 45:7
**show** [12] - 6:3, 22:24, 25:23, 39:15, 40:12, 45:18, 45:19, 46:11, 52:9, 52:11, 52:16, 52:17
**showing** [2] - 6:10, 41:8
**shows** [5] - 13:11, 40:24, 41:6, 41:20, 44:8
**side** [1] - 46:3
**sides** [1] - 25:18
**sign** [3] - 8:23, 40:7, 47:3
**signed** [2] - 8:22, 9:19
**significance** [1] - 42:14
**significant** [2] - 9:11, 42:16
**significantly** [1] - 9:23

**simply** [6] - 5:22, 23:2, 26:10, 31:1, 31:13, 35:4
**single** [3] - 32:9, 35:7, 40:16
**sitting** [1] - 30:17
**situation** [2] - 46:5, 50:20
**six** [3] - 20:20, 20:25, 21:14
**Sixth** [2] - 34:21, 50:17
**sizable** [1] - 8:17
**slowed** [1] - 45:16
**small** [1] - 41:21
**so-called** [1] - 29:8
**sold** [28] - 11:8, 17:19, 19:22, 21:6, 26:8, 26:24, 30:6, 31:9, 31:10, 31:22, 32:2, 32:3, 33:19, 36:2, 40:5, 40:15, 40:16, 43:10, 44:6, 44:21, 45:24, 46:6, 54:7, 54:21, 54:25, 56:21, 56:22
**sole** [3] - 16:4, 28:24, 37:4
**Solow** [1] - 34:14, 34:17, 41:12
**Solutions** [1] - 3:2
**SOLUTIONS** [1] - 1:8
**sometimes** [1] - 20:1
**somewhat** [1] - 16:18
**soon** [2] - 54:13, 55:18
**sooner** [2] - 54:25, 55:1
**sophisticated** [4] - 28:5, 28:16, 37:13, 51:8
**sorry** [11] - 13:9, 14:15, 15:21, 19:23, 21:24, 23:21, 43:22, 44:12, 55:21, 56:6, 56:12
**sort** [3] - 31:15, 41:7, 49:7
**Souki** [35] - 3:1, 5:18, 5:20, 8:4, 8:23, 9:5, 9:8, 10:5, 10:10, 11:12, 13:14, 13:18, 13:24, 14:16, 14:25, 16:12, 17:10, 18:12, 22:15, 28:16, 28:18, 29:3, 30:2, 30:5, 30:18, 36:14, 39:21, 42:17, 43:15, 46:14, 48:23, 49:15, 51:1, 51:14

**SOUKI** [5] - 1:3, 1:3, 1:4
**Souki's** [16] - 7:9, 12:7, 12:8, 13:1, 14:8, 15:18, 16:9, 18:21, 19:5, 21:4, 26:6, 29:22, 29:23, 34:7, 36:10, 45:12
**Soukis** [1] - 48:19
**speaking** [6] - 3:3, 3:10, 3:12, 3:18, 3:22, 27:14
**specific** [1] - 28:19
**spelled** [1] - 11:6
**spend** [1] - 7:6
**spending** [2] - 7:1, 7:5
**spin** [1] - 48:13
**spring** [4] - 10:4, 14:4, 14:5, 15:10
**St** [1] - 3:5
**ST** [1] - 1:19
**stabilized** [1] - 14:3
**start** [5] - 19:19, 45:1, 45:2, 45:4, 55:13
**started** [8] - 4:19, 14:3, 14:15, 19:10, 19:19, 30:8, 41:14, 47:5
**starting** [1] - 55:14
**starts** [1] - 44:25
**STATE** [1] - 1:1
**statement** [2] - 42:17, 42:22
**States** [1] - 7:3
**statistical** [1] - 26:19
**status** [1] - 5:22
**stenographic** [1] - 57:10
**step** [1] - 19:2
**steps** [2] - 12:3, 40:2
**still** [8] - 4:21, 16:16, 17:14, 30:2, 30:5, 30:18, 36:22, 51:17
**stock** [75] - 8:25, 9:13, 9:22, 10:2, 10:21, 10:22, 11:8, 11:20, 11:22, 11:25, 12:2, 12:3, 12:7, 13:15, 13:19, 13:21, 14:3, 14:11, 14:16, 14:17, 14:21, 15:1, 15:8, 15:13, 16:12, 19:11, 19:17, 19:19, 19:22, 23:10, 23:17, 24:6, 24:10, 24:12, 26:6, 26:15, 26:23, 26:24, 27:3, 29:3, 30:9, 30:10, 32:3, 32:11, 33:4, 37:6, 39:14, 39:25, 40:25, 41:3,

41:8, 41:13, 41:17, 41:25, 42:3, 42:4, 44:6, 44:24, 45:23, 45:25, 46:14, 46:17, 47:4, 47:6, 47:7, 47:10, 48:7, 49:3, 50:16, 51:12, 52:18, 53:6, 54:7
**Stock** [8] - 30:7, 32:18, 33:5, 34:24, 40:18, 41:15, 52:8, 53:10
**stocks** [1] - 50:24
**stop** [3] - 27:7, 27:9, 31:13
**straight** [3] - 33:20, 34:8, 40:8
**strained** [2] - 10:1, 10:2
**Street** [3] - 1:20, 1:23, 2:3
**strong** [1] - 53:1
**STRUDEL** [1] - 1:9
**Sub** [2] - 21:25, 22:11
**subject** [4] - 5:24, 21:23, 22:16
**submit** [1] - 33:8
**submitted** [1] - 35:19
**subsequent** [2] - 29:13, 38:24
**succeed** [1] - 52:24
**success** [11] - 6:3, 6:4, 6:10, 6:11, 21:19, 23:23, 24:4, 24:19, 52:4, 52:13, 52:22
**sufficient** [1] - 6:11
**Suite** [1] - 1:23
**supplemental** [9] - 6:23, 7:9, 9:2, 12:9, 13:1, 13:10, 16:9, 48:23
**supposed** [4] - 5:2, 30:21, 31:23, 54:14
**SUPREME** [2] - 1:1, 1:16
**Supreme** [1] - 53:18
**surprising** [1] - 32:12
**surprisingly** [1] - 20:11
**Sutcliffe** [1] - 3:22
**SUTCLIFFE** [1] - 2:2

**T**

**table** [2] - 9:22, 44:8
**takeaways** [1] - 41:1
**Tango** [4] - 18:5, 18:9, 18:22, 18:24
**tanking** [2] - 55:14,

56:25
**Teams** [1] - 1:12
**Tellurian** [38] - 8:25, 9:6, 9:8, 9:9, 9:13, 9:20, 10:2, 10:6, 10:13, 10:15, 10:20, 10:22, 11:9, 11:15, 13:25, 14:7, 14:10, 14:11, 14:16, 15:13, 19:1, 19:22, 23:10, 24:6, 26:7, 29:2, 29:20, 31:9, 31:23, 37:12, 39:13, 40:14, 42:8, 42:18, 42:21, 43:12, 49:14
**Tellurian's** [2] - 30:9, 40:25
**tend** [1] - 35:11
**tends** [1] - 40:12
**TERM** [1] - 1:1
**term** [1] - 37:13
**terms** [2] - 36:13, 51:7
**test** [1] - 3:13
**testimony** [1] - 18:21
**Texas** [5] - 1:24, 6:22, 6:24, 7:5, 26:25
**THE** [81] - 1:1, 1:16, 3:1, 3:8, 3:13, 3:17, 3:24, 4:2, 4:11, 4:16, 4:22, 4:25, 5:3, 5:8, 5:14, 6:16, 7:10, 7:14, 7:17, 8:6, 8:11, 8:14, 10:24, 12:10, 12:12, 12:15, 12:19, 12:24, 13:3, 13:7, 22:19, 23:14, 23:25, 24:24, 25:19, 26:13, 27:13, 27:18, 27:20, 27:25, 28:2, 30:11, 30:14, 34:10, 35:13, 35:15, 35:20, 36:16, 37:23, 38:5, 38:7, 38:10, 38:18, 39:10, 40:23, 42:10, 42:14, 42:24, 43:19, 43:23, 44:1, 44:9, 44:11, 44:14, 44:16, 46:15, 47:13, 47:18, 47:22, 48:5, 48:10, 49:5, 50:5, 50:9, 50:13, 51:24, 55:25, 56:5, 56:8, 56:12, 56:19
**theme** [1] - 46:3
**themselves** [1] - 48:20
**therefore** [3] - 23:17, 24:21, 36:4
**they've** [1] - 21:11
**thousand** [1] - 45:3
**three** [12] - 6:1, 6:14, 8:1, 16:22, 18:6,

27:11, 28:8, 32:4, 40:11, 40:20, 44:20, 52:10
**three-year** [1] - 32:4
**throughout** [3] - 15:20, 16:17, 17:8
**thrust** [1] - 43:4
**Tim** [2] - 3:6, 3:11
**timed** [1] - 33:16
**timing** [9] - 32:10, 34:23, 35:6, 37:8, 43:1, 43:3, 43:5, 54:20
**TIMOTHY** [1] - 1:24
**today** [13] - 4:18, 5:16, 5:21, 12:17, 21:14, 21:18, 24:18, 28:14, 30:5, 30:18, 36:2, 41:24, 53:15
**together** [1] - 54:17
**took** [4] - 16:23, 19:2, 19:9, 30:1
**tortious** [1] - 52:6
**total** [3] - 8:13, 20:10, 21:7
**touch** [3] - 10:21, 11:20, 14:10
**towards** [1] - 41:5
**traded** [1] - 20:3
**traders** [1] - 20:15
**trading** [13] - 19:14, 19:17, 20:1, 20:5, 29:21, 32:3, 41:21, 41:25, 44:19, 45:21, 45:23, 49:3
**trajectory** [1] - 41:4
**tranches** [1] - 8:17
**transaction** [1] - 51:22
**transcribed** [1] - 57:9
**transcript** [4] - 51:25, 55:17, 57:5, 57:9
**trial** [1] - 24:22
**tried** [1] - 16:20
**true** [4] - 23:2, 28:13, 54:3, 57:8
**TRUST** [2] - 1:4, 1:8
**trust** [1] - 17:11
**Trust** [4] - 34:1, 34:9, 34:18, 41:12
**Trustees** [1] - 1:4
**truthful** [1] - 47:23
**try** [5] - 15:7, 24:1, 28:11, 33:7, 43:15
**trying** [6] - 5:11, 22:20, 49:12, 51:11, 51:13, 54:23
**turn** [3] - 3:9, 46:20, 51:18
**turned** [2] - 47:4, 51:15

ab

**Twins** [1] - 40:9
**two** [21] - 5:8, 6:13, 8:17, 9:8, 9:11, 11:17, 16:22, 18:1, 20:5, 21:12, 29:17, 30:7, 33:5, 40:17, 41:19, 43:20, 50:12, 52:10, 53:4, 53:11, 54:16
**two-month** [3] - 30:7, 41:19, 53:11
**two-year** [1] - 20:5
**type** [1] - 14:22

## U

**UBS** [1] - 1:9
**UCC** [9] - 21:22, 21:25, 22:11, 22:17, 25:2, 32:12, 33:21, 48:12, 48:14
**under** [13] - 9:8, 10:22, 13:13, 13:15, 14:18, 17:2, 21:22, 22:15, 22:17, 23:5, 23:8, 28:22, 54:24
**understood** [3] - 11:7, 11:10, 49:11
**undisputed** [3] - 28:13, 30:19, 40:15
**unfortunately** [1] - 55:4
**unique** [5] - 7:25, 26:14, 27:4, 27:11
**United** [1] - 7:3
**unless** [1] - 3:10
**unmitigated** [1] - 54:2
**unreasonable** [7] - 46:1, 47:6, 52:21, 53:9, 53:11, 54:7, 55:13
**unreasonableness** [1] - 33:20
**unwritten** [1] - 38:23
**up** [7] - 6:25, 8:8, 9:25, 20:2, 41:7, 48:9, 50:9
**upend** [1] - 51:18
**upheld** [1] - 32:9
**upwards** [1] - 49:3
**useless** [2] - 12:20, 12:21

## V

**value** [6] - 8:19, 15:13, 15:19, 15:22, 16:13, 45:22
**various** [1] - 6:4
**Via** [1] - 1:12

**view** [1] - 26:11
**vis** [2] - 22:14
**vis-a-vis** [1] - 22:14
**volatile** [1] - 41:3
**volume** [8] - 19:21, 20:6, 20:10, 21:6, 41:21, 41:22, 44:19, 45:13
**volumes** [1] - 20:19
**voluntarily** [1] - 39:21

## W

**wait** [3] - 37:23, 55:2, 55:11
**waited** [3] - 40:6, 46:22, 49:14
**waiting** [2] - 29:2, 37:11
**waive** [2] - 22:21, 22:23
**waived** [4] - 22:10, 22:12, 22:17, 36:18
**waiver** [2] - 23:3, 38:15
**waiving** [1] - 22:20
**walk** [4] - 29:9, 35:9, 39:12, 40:21
**Wall** [1] - 1:20
**waving** [1] - 4:1
**ways** [1] - 50:23
**WECHSLER** [1] - 1:19
**Wechsler** [1] - 3:6
**week** [2] - 20:18, 21:9
**weeks** [3] - 15:12, 20:25, 21:14
**weighted** [1] - 42:1
**welcome** [2] - 5:3, 13:8
**West** [1] - 2:3
**whatsoever** [1] - 18:23
**whereas** [1] - 19:24
**wherein** [1] - 15:13
**whole** [3] - 36:1, 51:18, 51:19
**WILMINGTON** [1] - 1:8
**wind** [1] - 45:14
**window** [3] - 14:12, 14:14, 43:6
**windows** [4] - 15:12, 16:12, 19:13, 19:24
**wiped** [2] - 17:20, 31:7
**wish** [1] - 40:4
**word** [4] - 34:10, 34:11, 34:12, 54:2
**world** [2] - 10:1, 48:20
**worried** [1] - 55:14
**worth** [2] - 8:5, 45:23

**would've** [1] - 17:15
**wow** [1] - 38:5
**write** [1] - 52:15
**writing** [2] - 12:4, 49:19
**written** [6] - 10:24, 11:2, 11:16, 29:11, 54:10

## Y

**year** [11] - 6:25, 11:19, 11:21, 18:25, 20:5, 21:11, 29:19, 32:4, 36:21, 40:25, 46:13
**years** [4] - 18:1, 29:17, 40:11, 51:3
**yellow** [1] - 42:11
**YETTER** [1] - 1:22
**Yetter** [1] - 3:6
**YORK** [2] - 1:1, 1:1
**York** [26] - 1:12, 1:20, 2:4, 6:8, 21:22, 21:24, 21:25, 22:11, 23:6, 25:13, 28:6, 30:7, 31:3, 32:18, 33:5, 33:13, 34:24, 40:18, 41:15, 49:21, 51:6, 52:8, 53:10

## Z

**ZACH** [1] - 2:6
**Zach** [1] - 4:10