**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **STRUDEL HOLDINGS LLC and** | § | **Case No. 23-90757 (CML)** |
| **AVR AH LLC,** | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND
(IV) GRANTING RELATED RELIEF**

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 14 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

---

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")

respectfully state the following in support of this motion (this "**DIP Motion**"):

**PRELIMINARY STATEMENT**

1.      The Debtors require additional liquidity to fund operations and administrative

expenses through these chapter 11 cases (the "**Chapter 11 Cases**").  Maintaining both is vital to

maximizing the value of the Debtors' estates for the benefit of all parties-in-interest.  Accordingly,

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AVR AH LLC (0148) and Strudel Holdings LLC (5426).  The Debtors' service address is:  PO Box 4068, Aspen, CO 81612.

the Debtors seek authority to obtain postpetition financing on the terms and conditions set forth herein.

2.     The Debtors have commenced the Chapter 11 Cases to market and sell their assets in a value-maximizing transaction for the benefit of all stakeholders.  In particular, the Debtors seek to continue their prepetition marketing process and consummate a sale of the 813 acre property owned by debtor AVR AH, LLC ("**AVR**") commonly known as Aspen Valley Ranch and certain related assets (the "**Ranch**").  As set forth below, the Court has entered an order [Docket No. 53] establishing bidding procedures and scheduling a hearing to approve a sale of the Ranch.

3.     The filing of the Chapter 11 Cases was necessitated by the bad-faith and unreasonable actions of the O'Connor Defendants (defined below) alleged secured creditors of the Debtors.  The Debtors and certain related parties have commenced an adversary proceeding in this Court [Adv. Pro. No. 23-9003] (the "**Adversary Proceeding**") by filing a complaint (as amended, the "**Complaint**") against the O'Connor Defendants.  The Adversary Proceeding seeks, among other things, disallowance of any claims held by the O'Connor Defendants against the Debtors as well as a declaration that the O'Connor Defendants have no security interests in, or liens on, any of the property of the Debtors' estates, including the Ranch and equity owned by Strudel Holdings, LLC ("**Strudel**").  The Debtors have also filed a motion to preclude the O'Connor Defendants from submitting a credit bid for the Ranch premised on, among other things, the bad acts of the O'Connor Defendants and disputed, alleged secured claims the Debtors believe should be disallowed in full.

4.     To facilitate the sale process, non-debtor affiliate Ajax Holdings, LLC (the "**DIP Lender**") has agreed to provide up to $3.7 million under the DIP Facility (defined below) to fund the Debtors' operations and the administrative expenses of the Chapter 11 Cases. Access to the

2

DIP Facility will allow the Debtors to maintain operations at the Ranch, which will preserve its value and operation during the sale process which is being conducted for the benefit of all stakeholders.  The DIP Facility will allow the Debtors to conduct a robust marketing process pursuant to the Court-approved bidding procedures and otherwise fund the administrative expenses of these cases.

5.      Approval of the DIP Facility is squarely within the Debtors' business judgment (even if the Court applies a heightened standard for approval of a DIP loan from an affiliate of the Debtors) and represents the best path forward for maximizing the value of the Debtors' estates. Without access to the DIP Facility, the Debtors will not have sufficient funds to complete the sale process, pay the administrative costs of the Chapter 11 Cases, and continue to fund their operations. Accordingly, the DIP Motion should be granted and the court should authorize the Debtors to enter into the DIP Facility.

### RELIEF REQUESTED

6.      By this DIP Motion, the Debtors seek entry of an order (substantially in the form attached hereto) (the "**DIP Order**"):[2]

(i)     authorizing the Debtors to obtain postpetition financing (the "**DIP Financing**") pursuant to a secured, superpriority debtor-in-possession multi-draw term loan credit facility (the "**DIP Facility**" and, the loans thereunder, the "**DIP Loans**") in an aggregate principal amount of approximately $3.7 million, subject to the terms and conditions set forth in that certain Secured Debtor-in-Possession Term Loan Credit Agreement attached in draft form as **Exhibit A** to the DIP Order (the "**DIP Credit Agreement**")[3] and certain related security and ancillary documentations (together with the DIP Credit Agreement and the DIP Order, the "**DIP**

---

[2]     The summaries contained herein are qualified in their entirety by the provisions of the documents referenced herein, including the DIP Credit Agreement and the proposed DIP Order.  To the extent of any inconsistencies between this DIP Motion and such referenced documents, the terms of the applicable referenced documents shall control.

[3]     The DIP Credit Agreement attached to the Order is in draft form, is still being finalized, and is subject to change.

**Documents**" and, all obligations arising thereunder, the "**DIP Obligations**");[4]

(ii)    authorizing the Debtors to (a) execute and enter into the DIP Credit Documents, (b) pay fees and reimburse expenses under the DIP Documents, as and in the amounts described in the DIP Documents, and (c) perform such other and further acts as may be required in connection with the DIP Documents;

(iii)    granting to the DIP Lender DIP Superpriority Claims in respect of all DIP Obligations and the DIP Liens on the DIP Collateral to secure the DIP Obligations with the relative priorities set forth in the DIP Order and subject to the terms set forth therein and in the other DIP Documents;

(iv)    authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the DIP Order and the other DIP Documents (including the Initial Budget (defined below));

(v)    modifying the automatic stay to the extent necessary to implement and effectuate the terms of the DIP Order, subject to the terms set forth therein; and

(vi)    granting related relief.

7.    In support of this DIP Motion, the Debtors submit the *Declaration of Douglas Brickley in Support of the DIP Motion* (the "**Brickley Declaration**") (filed contemporaneously herewith).

## JURISDICTION AND VENUE

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

9.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4]    Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement, the DIP Order, or the Brickley Declaration (defined below), as applicable.

4

10.     The bases for the relief requested herein are Sections 105, 362, 363, 364, 503, 507, 1107, and 1108 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "**Bankruptcy Code**"),  Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**").

## BACKGROUND

11.     On July 27, 2023 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and commenced these Chapter 11 Cases.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official statutory committees have been appointed or designated by the Office of the United States Trustee.

12.     As noted above, the Debtors have commenced the Chapter 11 Cases to achieve an orderly sale of certain of their assets to maximize the value of their estates.  Specifically, the Debtors plan to continue the extensive prepetition marketing process and consummate a sale pursuant to section 363 of the Bankruptcy Code of the Ranch (the "**Sale Transaction**").  On the Petition Date, the Debtors filed a motion (together with all exhibits, annexes and related documents, the "**Sale Motion**") [Docket No. 5] seeking entry of orders (i) establishing bidding procedures (the "**Bidding Procedures**") for the Sale Transaction (the "**Bidding Procedures Order**") and (ii) approving the Sale Transaction (the "**Sale Order**").  On August 10, 2023, the Court entered the Bidding Procedures Order [Docket No. 53].

13.     As set forth more fully in the Complaint, the Chapter 11 Cases were necessitated by the bad faith and unreasonable actions of certain alleged secured creditors of the Debtors.  In 2017, Charif Souki, the owner and principal of the Debtors, took out a loan in the original principal amount of $50 million (the "**2017 Loan**") from affiliates of UBS O'Connor LLC ("**O'Connor**"). The Debtors and another affiliate of Souki guaranteed the 2017 Loan.  The 2017 Loan is governed by that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Loan Agreement**"), dated as of April 27, 2017, by and among Charif Souki, as borrower; the Debtors and Charif Souki as trustee of the Souki Family 2016 Trust (the "**Trust**"),[5] as guarantors; Nineteen77 Capital Solutions A LP and Bermudez Mutari, LTD (together, the "**Lenders**"), as lenders; and Wilmington Trust National Association (the "**Agent**"), as administrative agent.[6]   The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Pledge Agreement**"), dated as of April 27, 2017, by and among, Souki, the Debtors, the Trust, and the Agent.  AVR also executed a deed of trust (the "**2017 Deed of Trust**" and, together with the 2017 Loan Agreement and the 2017 Pledge Agreement, the "**2017 Loan Documents**"), dated as of April 27, 2017, in favor of the Agent.  Under the 2017 Loan Documents, the Debtors pledged certain assets as collateral, including the Ranch, for the obligations due under the 2017 Loan Documents that could be foreclosed upon in enumerated circumstances.

14.     In 2018, Souki took out an additional loan from the Lenders in the original Principal amount of $70 million (the "**2018 Loan**" and together with the 2017 Loan, the "**O'Connor Loans**").  The 2018 Loan is governed by that certain Loan Agreement (as may be amended,

---

[5]     The current trustees of the Souki Family 2016 Trust are Karim Souki, Christopher Souki, and Lina Souki Rizzuto.

[6]     O'Connor executed the 2017 Loan Agreement on behalf of the Lenders as investment adviser.

supplemented, restated, or otherwise modified from time to time, the "**2018 Loan Agreement**" and together with the 2017 Loan Agreement, the "**O'Connor Loan Agreements**"), dated as of March 30, 2018, by and among Souki, as borrower; the Debtors, the Trust, and AJAX,[7] as guarantors; the Lenders, as lenders; and the Agent, as administrative agent.[8]  The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Pledge Agreement**"), by and among Souki, the Debtors, the Trust, and the Agent.  AVR also executed a deed of trust (the "**2018 Deed of Trust**" and together with the 2018 Loan Agreement and the 2018 Pledge Agreement, the "**2018 Loan Documents**" and collectively with the 2017 Loan Documents, the "**O'Connor Loan Documents**"), dated as of March 30, 2018, in favor of the Agent.  Under the 2018 Loan Documents, the Debtors pledged certain assets as collateral, including the Ranch, for the obligations due under the 2018 Loan Documents that could be foreclosed upon in enumerated circumstances.

15.    On the Petition Date, the Debtors, Souki, and the Trust commenced the Adversary Proceeding against the Lenders, the Agent, and O'Connor (collectively, the "**O'Connor Defendants**").  The Adversary Proceeding seeks, among other things, disallowance of any claims held by the O'Connor Defendants against the Debtors as well as a declaration that the O'Connor Defendants have no security interests in, or liens on, any of the property of the Debtors' estates, including the Ranch.  Accordingly, the Debtors are not aware of any valid liens or security interests encumbering the Ranch.

---

[7]    AJAX is an exempted company incorporated in the Cayman Islands with limited liability.

[8]    O'Connor executed the 2018 Loan Agreement on behalf of the Lenders as investment adviser.

## I.     The DIP Facility

16.     To fund the marketing and sale process and the other costs of administering the Debtors' estates, the Debtors require access to the funding provided by the DIP Facility.  Under the DIP facility, the DIP Lender will provide access to a loan facility up to $3.7 million to fund the administration of the Chapter 11 Cases pursuant to the initial budget (the "**Initial Budget**") attached in draft form to the DIP Order as **Schedule 1**, as such budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement and approved by the DIP Lender.[9]

17.     The terms of the DIP Facility were negotiated at arm's length by Douglas J. Brickley, the Debtors' Chief Restructuring Officer (CRO), and the DIP Lender and are, taken as a whole, reasonable, fair, and representative of market standards under the circumstances of these Chapter 11 Cases.  Further, the Debtors do not believe that more favorable or comparable financing is available in light of (a) their evaluation of other potential alternatives (b) their weak liquidity position and need to move quickly to complete the marketing process, and (c) the ongoing disputes with the O'Connor Defendants as to the extent and validity of their claims and liens (if any) against the Ranch.

## II.    Concise Statements Pursuant to Complex Case Procedures and Bankruptcy Rules[10]

18.     Pursuant to paragraph 8 of the Complex Case Procedures, the proposed DIP Facility and/or DIP Order contain the following provisions:

---

[9]     The Initial Budget attached to the Order is in draft form, is still being finalized, and is subject to change.

[10]    The summaries contained in this DIP Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this DIP Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the DIP Order, as applicable.

14171179v1

| Material Provision | Summary |
|---|---|
| **Sale or Plan Confirmation Milestones**<br><br>Complex Case Procedures, ¶ 8(a) | (i) Not later than September 27, 2023, an auction for the Ranch shall have occurred or been completed, unless such auction is canceled pursuant to the terms of the Bidding Procedures Order.<br><br>(ii) Not later than October 6, 2023, the Court shall have entered the Sale Order.<br><br>(iii) Not later than 15 days following after entry of the Sale Order, the Sale Transaction shall have closed.<br><br>*DIP Order ¶ 11(d)* |
| **Cross-Collateralization**<br><br>Complex Case Procedures, ¶ 8(b) | N/A |
| **Roll-Ups / Refinance**<br><br>Complex Case Procedures, ¶ 8(c) | The DIP Facility does not include the roll up of any prepetition debt. However, following the Petition Date, Ajax Holding or Charif Souki made certain payments to third parties, including AVR HOA, Inc., for the benefit of the Debtors. Repayment of these post-petition payments are included in the Initial Budget under the line item "Accrued Post-Petition Member Advances."<br><br>*Initial Budget* |
| **Liens on Avoidance Actions or Proceeds Thereof**<br><br>Complex Case Procedures, ¶ 8(d) | The DIP Facility shall be secured by first priority liens on proceeds of Avoidance Actions.<br><br>*DIP Order ¶ 9(a)* |
| **Default Provisions and Remedies**<br><br>Complex Case Procedures, ¶ 8(e) | Upon the occurrence and during the continuation of an Event of Default that has not been waived by the DIP Lender and following delivery of written notice (a "**Termination Notice**") (including by e-mail), on not less than five (5) business days' notice (such five (5) business day period, the "**Remedies Notice Period**") to counsel for the Debtors, the Creditors' Committee (if any), and the U.S. Trustee, (the "**Remedies Notice Parties**"), the DIP Lender may (and any stay otherwise applicable to the DIP Lender, whether arising under section 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of the DIP Order (including this paragraph) is hereby modified for such purpose), without further notice to, hearing of, or order from this Court, to:<br><br>(i) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Lender but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations;<br><br>(ii) declare all DIP Obligations to be immediately due and payable; and<br><br>(iii) invoke the right to charge interest at the default rate under the DIP Documents.<br><br>Upon delivery of such Termination Notice by the DIP Lender, without further notice or order of the Court, the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the Remedies Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Lender will have no obligation to provide any DIP Loans or other financial accommodations. As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket. During the Remedies Notice Period, the Debtors, the Creditors' Committee (if |

9

| Material Provision | Summary |
|---|---|
| | appointed), or any party in interest shall be entitled to seek an emergency hearing with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing.  If a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto. |
| | During the continuation of an Event of Default and following the delivery of a Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in paragraph [7(d)]), the DIP Lender shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less than five (5) business days' notice to the Remedies Notice Parties (which may run concurrently with the Remedies Notice Period) for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Lender to, subject to the Carve-Out and related provisions |
| | (i) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and |
| | (ii) take any other actions or exercise any other rights or remedies permitted under the DIP Order, the DIP Documents or applicable law; |
| | *provided* that the Debtors' rights to contest any such relief are reserved. The rights and remedies of the DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties have under the DIP Documents or otherwise. |
| | If the DIP Lender is permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Lender in its efforts to enforce its security interest in the DIP Collateral, and shall not take or direct any person or entity to take any action designed or intended to hinder or restrict in any respect the DIP Lender from enforcing its security interests in the DIP Collateral.  Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of Event of Default to fund operations in accordance with the Approved Budget and the terms of the DIP Documents. |
| | *DIP Order ¶¶ 11(b)–(c)* |

10

| Material Provision | Summary |
|---|---|
| **Releases of Claims**<br><br>Complex Case Procedures, ¶ 8(f) | Effective as of the date of entry of this DIP Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Lender and each of its subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such, (collectively, the "**Released Parties**") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the DIP Documents, the negotiation thereof, or of the transactions and agreements reflected thereby, or the financial or other obligations owing or made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this DIP Order.  For the avoidance of doubt, nothing in this release shall relieve the DIP Lender or the Debtors of their obligations under the DIP Documents.<br><br>*DIP Order ¶ 21* |
| **Limitations on Use of Cash Collateral or DIP Proceeds**<br><br>Complex Case Procedures, ¶ 8(g) | The Debtors are authorized to use the proceeds of the DIP Financing only in accordance with, and the for the purposes described in, the DIP Order and the Approved Budget (subject to any permitted variances).<br><br>*DIP Order ¶ 3* |
| **Non-Consensual Priming Liens**<br><br>Complex Case Procedures, ¶ 8(h) | N/A |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties**<br><br>Complex Case Procedures, ¶ 8(i) | N/A |

19.     Each of the foregoing provisions are appropriate under the circumstances, were negotiated in good faith and at arm's length, and are part of the overall deal with respect to the DIP Facility.  Accordingly, the foregoing provisions should be approved.

14171179v1

20.     Additionally, the following chart contains a summary of the material terms of the proposed DIP Facility, with references to the applicable sections of the relevant documents:[11]

| Material Provision | Summary |
| --- | --- |
| **Parties to the DIP Credit Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Borrowers</u>:  Strudel Holdings LLC and AVR AH LLC<br><br><u>Lender</u>: Ajax Holdings, LLC<br><br>*DIP Credit Agreement, Preamble* |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | "**Termination Date**" shall mean, unless otherwise waived or extended in writing by the Lender, the earliest of (a) the closing of the Sale Transaction or another sale of the Real Property providing for the indefeasible payment in full in cash of the Obligations; (b) one hundred twenty (120) days after the Closing Date; (c) (i) the filing of a motion by the Borrowers seeking dismissal of the Cases, (ii) the dismissal of any of the Cases, (iii) the filing of a motion by the Borrowers seeking to convert the Cases to cases under Chapter 7 of the Bankruptcy Code or (iv) the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code, (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility or such treatment that is otherwise acceptable to the Lender in its sole discretion; (e) acceleration of the obligations under the DIP Facility; (f) the filing of a motion or other pleading requesting (or the entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers which the Debtors fail to timely oppose without the prior written consent of the Lender; (g) the filing or support by any Debtor of a plan of reorganization that (x) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (y) is not otherwise acceptable to the Lender in its sole discretion.<br><br>*DIP Credit Agreement § 1.2* |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Aggregate principal amount of $3,700,000.<br><br>*DIP Credit Agreement, Preamble.* |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Customary conditions for debtor-in-possession financing, including the delivery of certain documents, payment of fees, accuracy of representations and warranties, approval of the Initial DIP Budget, and entry of the DIP Order, among other things. Any borrowings shall be subject to and only as necessary to pay items set forth in the Budget.<br><br>*DIP Credit Agreement § 3.1 and 3.2* |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall pay interest at a rate of the Wall Street Journal Prime rate (currently 8.25%) plus 2.00% per annum, which shall be in paid in kind up to the Termination Date.<br><br>*DIP Credit Agreement § 1.2* |
| **Use of Proceeds** | The Borrowers shall not directly or indirectly, use or permit the use of all or any portion of the Loans for any purpose other than the Approved Purposes.  The Borrowers will not |

---

[11]     All terms remain subject to the final version of the DIP Credit Agreement which will be filed within seven days.

| Material Provision | Summary |
|---|---|
| Bankruptcy Rule 4001(b)(l)(B)(ii) | directly or indirectly use the proceeds of the Term Loans, or otherwise make available such proceeds to any person, (a) to permit the Borrowers, any or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the Lender, or (ii) the enforceability of the obligations of the Borrowers under the DIP Facility, (b) to investigate (except as may be required by the Bankruptcy Court), commence, prosecute or defend any claim, motion, proceeding or cause of action against any the Lender and its respective agents, attorneys, advisors or representatives including, without limitation, any lender liability claims, subordination claims or any claims attempting to invalidate any of the Loan Documents, (c) to fund acquisitions, capital expenditures or any other expenditure other than as set forth in the Budget, (d) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Terrorism Laws, (e) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Blocked Person, or (f) in a manner that would otherwise violate any Anti-Terrorism Law.<br><br>*DIP Credit Agreement § 6.19* |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | 1% origination fee, deferred until maturity.<br><br>*DIP Credit Agreement § 2.4* |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B) | The use of DIP Facility proceeds is subject to a customary 4-week budget, which is attached to the DIP Order as <u>Schedule 1</u>.<br><br>*DIP Order Schedule 1* |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Customary reporting for chapter 11 cases.<br><br>*DIP Credit Agreement § 5.17* |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Cumulative variance of less than or equal to ten percent (10%) in the aggregate of the expense line items set forth on the Budget.<br><br>*DIP Credit Agreement § 6.18* |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | (i) Not later than September 27, 2023, an auction for the Ranch shall have occurred or been completed, unless such auction is canceled pursuant to the terms of the Bidding Procedures Order.<br><br>(ii) Not later than October 6, 2023, the Court shall have entered the Sale Order.<br><br>(iii) Not later than 15 days following after entry of the Sale Order, the Sale Transaction shall have closed.<br><br>*DIP Credit Agreement § 5.19.* |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i) | <u>DIP Superpriority Claims</u>. Pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) |

13

| Material Provision | Summary |
| --- | --- |
|  | of the Bankruptcy Code and any and all administrative expenses or other claims arising under section 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under section 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) in accordance with this DIP Order and the other DIP Documents.. |
|  | Liens on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first-priority senior security interest (subject only to the Carve-Out) in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors or their estates, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date is not subject to (i) a valid, perfected, and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (such liens described in clause (i) and (ii), collectively, "**Prior Liens**") including, without limitation, any and all unencumbered cash of the Debtors and any investment of cash, inventory, accounts receivable, accounts, investment property, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "**DIP Collateral**") in each case other than the Avoidance Actions (but, for the avoidance of doubt, DIP Collateral shall include Avoidance Proceeds). |
|  | Liens Subordinate to Certain Secured Parties' Liens.  To the extent there are any valid, perfected, unavoidable, and enforceable Prior Liens, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected lien upon the Ranch, which lien shall be:  (i) junior and subordinate to the Carve-Out and (ii) immediately junior and subordinate to any Prior Liens. |
|  | Liens Senior to Certain Other Liens. The DIP Liens shall not be subject or subordinate to or made *pari passu* with (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (ii) unless otherwise provided for in this DIP Order or the other DIP Documents, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, (iii) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (iv) any other lien or security interest under section 361, 363 or 364 of the Bankruptcy Code. |

14

| Material Provision | Summary |
|---|---|
| | *DIP Order ¶¶ 8-9* |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | As used in the DIP Order, the term "**Carve-Out**" means the sum of:<br><br>(i)    all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below);<br><br>(ii)    all reasonable and documented fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);<br><br>(iii)    subject, in each case, to the Approved Budget, to application of any retainers that may be held and to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise, all unpaid fees and expenses of persons or firms retained by the Debtors or the Creditors' Committee (if any) pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code (collectively, the "**Estate Professionals**") (in each case, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "**Allowed Professional Fees**") incurred at any time before the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined herein), subject in all respects to the Approved Budget, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii), the "**Pre-Carve-Out Trigger Notice Cap**") and<br><br>(iv)    Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $50,000 incurred on or after the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise (the amount set forth in this clause (iv), the "**Post-Carve-Out Trigger Notice Cap**" and, together with the Pre-Carve-Out Trigger Notice Cap and the amounts set forth in clauses (i) through (ii), the "**Carve-Out Cap**"); *provided that*, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in paragraph [4(a)] thereof on any grounds.<br><br>*DIP Order ¶ 5* |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement provides for customary events of default, including (i) non-payment, (ii) failure to comply with certain covenants, (iii) the inaccuracy of a representation or warranty, (v) the entry of certain judgments exceeding $250,000, (vi) a change of control, (vii) the entry of an order appointing a chapter 11 trustee or an examiner with enlarged powers, (viii) the filing of a motion by the Debtors seeking dismissal or conversion of these chapter 11 cases, (ix) the failure to abide by the milestones in the DIP Credit Agreement or any of the provisions in the DIP Order, and (x) entry of a final order holding that the O'Connor Defendants hold valid, enforceable, perfected, and unavoidable liens on and security interests in the assets of the Debtors, among other things.<br><br>*DIP Credit Agreement § 7.1* |

14171179v1

| Material Provision | Summary |
|---|---|
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay will be waived and modified to the extent set forth in the DIP Order and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Order and the other DIP Documents, and to deliver any notices of termination and exercise remedies, subject to the procedures in the DIP Order (set forth above in the *Default Provisions and Remedies* summary).<br><br>*DIP Order ¶¶ 10(b), 11(b)-(c), 28* |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Liens will be effective and automatically and properly perfected upon the date of the DIP Order and without the necessity of the execution, recordation or filing by the Debtors or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, any collateral, without any further action by the DIP Lender.<br><br>*DIP Order ¶ 10* |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Indemnify and hold each Indemnitee harmless from and against any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees and expenses, incurred by or asserted against any Indemnitee arising out of, in any way connected with or as a result of (a) the execution and delivery of this Agreement and the other Loan Documents, the performance by the parties hereto and thereto of their respective obligations hereunder and thereunder and consummation of the transactions contemplated hereby and thereby, (b) the use of proceeds of the Term Loan, or (c) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, including any such loss, claim, damage, liability or expense arising from the negligence, whether sole or concurrent, of any Indemnitee, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's gross negligence or willful misconduct; with the foregoing indemnity surviving satisfaction of all Obligations and the termination of this Agreement.  All amounts due under this Section 5.16 shall be payable on written demand therefor.<br><br>*DIP Credit Agreement § 5.16 and DIP Order ¶ 17* |

## III.    The Debtors Have a Need for Debtor-In-Possession Financing

21.     The Debtors require access to the DIP Facility to fund their operations and to pay the administrative costs of the Chapter 11 Cases.  In particular, the Debtors need funds to maintain operations at the Ranch and to pay the expenses of the marketing and sale process necessary to maximize the value of their estates.  The Debtors do not have sufficient cash on hand to fund their operations and the marketing and sale process and pay the administrative costs of the Chapter 11 Cases.

22.     Operations of the Ranch are conducted by Aspen Valley Ranch Homeowners Association, Inc. ("**AVR HOA**"), a non-debtor entity, which is controlled by the owners of the Ranch.   AVR is the "Declarant" under the Amended and Restated Declaration of Protective Covenants for Aspen Valley Ranch dated August 20, 2021 and recorded August 20, 2021 as Reception No. 679960, Pitkin County, Colorado (the "**HOA Declaration**").   AVR HOA administers the HOA Declaration.   Under the terms of the HOA Declaration, the owners of the Ranch are required to pay quarterly dues to AVR HOA to fund operations and upkeep of the Ranch and provide for capital reserves.   AVR HOA currently has 19 employees who maintain the Ranch and provide services to the owners.   Prior to the Petition Date, the only source of revenue for AVR HOA, and, thus, the only source of revenue to fund operations at the Ranch, was the dues it received from owners of the Ranch, primarily AVR.[12]   As set forth in more detail in the Brickley Declaration, without immediate access to the DIP Facility, AVR will not have sufficient funds to pay to AVR HOA to fund current operations, including paying the employees who maintain the Ranch.

23.     Thus, the Debtors do not believe it would be prudent, or even possible, to administer the Chapter 11 Cases solely with cash on hand.   The Debtors require access to the DIP Facility to continue operations and maintenance at the Ranch, preserve value, and avoid irreparable harm. Without financing, the Debtors would be unable to pay expenses, which could result in a value-destructive interruption to the Ranch operations and, simultaneously, eliminate their best chance for consummating the Sale Transaction—to the detriment of the Debtors and their estates, creditors, equity holders, and other stakeholders.   In particular, failure to maintain operations and maintenance at the Ranch will significantly reduce its value to prospective bidders, who will be

---

[12]   In 2021, AVR sold 3 of the 11 parcels of land comprising the Ranch to third party buyers.

seeking to acquire a fully operational facility that will not require excessive costs to restore. Additionally, the DIP Facility will provide the Debtors with the funding necessary to conduct a robust marketing in the context of these Chapter 11 Cases, free from the bad-faith interference of the O'Connor Defendants and the depressed value that comes from foreclosure proceedings. The Debtors believe that access to DIP Facility to fund the marketing process will ultimately increase the value of the Ranch more than the cost of the DIP Facility by producing a higher sales price than the Debtors would be able to realize without the DIP Facility.

**IV.  Alternative Financing Is Not Available on Better Terms**

24.     Given the closely-held nature of the Debtors' business and the cloud hanging over their operations as a result of the O'Connor Defendants' bad faith and unreasonable actions, the DIP Facility represents the best and only available postpetition financing. Prior to the Petition Date, the Debtors, with the aid of their advisors, reviewed and considered several potential strategic and financial alternatives with the goal of maximizing enterprise value. None of these alternatives proved actionable—except for the Sale Transaction and the DIP Facility.

25.     The DIP Facility is the best postpetition financing option currently available to the Debtors under the circumstances and will allow the Debtors to complete the marketing process and consummate the Sale Transaction. The liens to be granted under the DIP Facility will be junior to any valid, enforceable, perfected, and unavoidable liens on the DIP Collateral in existence as of the Petition Date. Further, the Debtors will not be required to pay any interest or fees in cash until the Maturity Date. Accordingly, the DIP Facility is in the best interests of the Debtors' estates and should be approved.

14171179v1

**BASIS FOR RELIEF**

I.      **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

   A.      Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.

26.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Courts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").  While the DIP Lender is an affiliate of the Debtors, the DIP Facility was negotiated at arms-length between the DIP Lender and the Debtors' CRO.  Accordingly, the Court should apply the business judgment standard to evaluate the Debtor's decision to enter into the DIP Facility.[13]

27.      Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

---

[13]    Even if the Debtors' decision to enter into the DIP Facility and were held to a higher standard of review, for the reasons discussed herein, including the substantial benefits of the DIP Facility, the Debtors' decision would also meet that higher standard of review as the DIP Facility resulted from fair dealings and reflects a fair price for the cost to the Debtors of the DIP Facility (i.e., the interest rate, fees, and other conditions of the loan).  *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020)

the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

28.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a careful evaluation of alternatives. With no value-maximizing, actionable proposals arising from any of those processes, the Debtors ultimately determined that pursuing the Sale Transaction in the Chapter 11 Cases was the best path forward to maximize the value of their assets. The DIP Facility is essential to this process, as the Debtors would not otherwise have the liquidity to fund their operations and the marketing process, consummate the Sale Transaction, and pay professionals.

29.     The terms and conditions of the DIP Facility reflect a fair process and a fair cost for the credit being extended, are favorable to the Debtors, and in the best interests of their estates. Specifically, the DIP Facility:

a)   is being funded by a non-debtor affiliate that has a vested interest in the success of the Chapter 11 Cases;

b)   does not include broad releases or stipulations regarding prepetition debt or other onerous terms favoring the DIP Lender or certain creditors;

c)   provides for junior liens on the Debtors' assets subordinate to any valid, enforceable, perfected, and unavoidable liens on the DIP Collateral in existence as of the Petition Date;

d)   is structured to not include cash payments of fees or interest during the marketing and sale process and has a low interest rate; and

e)   provides sufficient liquidity to the Debtors during the Chapter 11 Cases and demonstrates stability of operations to creditors and potential bidders for the Debtors' assets.

20

30.     Overall, the Debtors, through their CRO, negotiated the DIP Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors.  The Debtors believe that they have obtained the best financing available, given the circumstances.  Absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lender.

31.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and junior liens pursuant to section 364(c) of the Bankruptcy Code. As set forth above, the Debtors believe no valid, perfected, and enforceable liens currently encumber the Ranch, and they will litigate those issues to judgment, as needed.  To the extent any such liens do exist, however, the Debtors propose to grant only subordinate liens on the DIP Collateral to the DIP Lender.

32.     Section 364(c) provides that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a court:

> May authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c)).

33.     First, the Debtors are not able to obtain unsecured credit.  Despite reviewing their available options, the Debtors do not have any other actionable financing or restructuring solutions. The best path forward to maximize the value of the Debtors' estates is to pursue the Sale Transaction—which requires entry into the DIP Facility.  And the DIP Lender was not willing to provide postpetition financing on an unsecured basis, nor has any third party presented such a proposal.  Following arm's-length negotiations, the Debtors, through their CRO, determined that the DIP Facility is the best, and only, actionable alternative available to fund these Chapter 11 Cases under the circumstances.

34.     Second, in the event the O'Connor Defendants do have valid, enforceable, perfected, and unavoidable liens on any of the DIP Collateral, the proposed liens to be granted to the DIP Lender will be junior to such liens.  Thus, the Debtors are not required to provide any protection to the O'Connor Defendants as a condition of approval of the DIP Motion.

35.     Third, the DIP Facility is being used to preserve the value of the Ranch as, absent necessary funding, operations and maintenance at the Ranch would be disrupted, potentially leading to degradation of the property.  This could, in turn, significantly reduce the amount potential bidders will be willing to bid for the Ranch.  Further, the Debtors believe that conducting a robust marketing process in the Chapter 11 Cases will ultimately increase the sale price for the Ranch beyond the cost of the DIP Facility.  Absent the Chapter 11 Cases, the Ranch will be sold under the cloud of foreclosure after protracted legal proceedings.  Here, the Ranch will be sold pursuant to the Court-approved Bidding Procedures, with buyer protections to the fullest extent provided for under the Bankruptcy Code, designed to maximize its value and without the cloud of foreclosure proceedings.  Nor do buyers have to wait until all legal proceedings are concluded before closing the Sale Transaction as the sale process can be conducted under this Court's

supervision with the proceeds held until all legal disputes have been resolved. The DIP Facility and the Chapter 11 Cases will only serve to benefit stakeholders, including the O'Connor Defendants if it is determined they have valid claims or liens.

36.    Overall, the DIP Facility is the only actionable financing under the circumstances and will provide the Debtors with liquidity to administer these Chapter 11 Cases, pursue the marketing process, and consummate the Sale Transaction for the benefit of all stakeholders. Accordingly, the Debtors submit that the DIP Facility (including the superpriority claims and subordinate liens provided thereunder) is both warranted and appropriate under the circumstances.

**II.    The Debtors Should Be Authorized to Pay the Interest and Fees Required under the DIP Documents.**

37.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Lender:

     a.    ***Interest Rate***. The Debtors shall pay interest at a rate of the Wall Street Journal Prime Rate (currently 8.25%) plus 2.00% per annum, which shall be payable in kind until the closing of the Sale Transaction or other termination of the DIP Facility.

     b.    ***Fees***. The Debtors will pay a 1% origination fee with payment of such fee deferred until maturity.

38.    As set forth in the Brickley Declaration, the interest rate and fees were the subject of arm's-length and good-faith negotiations between the Debtors' CRO and the DIP Lender, are integral components of the overall terms of the DIP Facility, and were required by the proposed DIP Lender as consideration for the extension of postpetition financing. The interest rate and fees, taken as a whole, are reasonable and appropriate under the circumstances and are within the range of other postpetition interest rates and financing fees. The benefits to the Debtors and their estates provided by the DIP Facility significantly outweigh the fees incurred by the Debtors thereunder.

In light of the review and negotiation process described herein, the proposed DIP Facility is the Debtors' best—and in fact only—currently available postpetition financing option.

39.     Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

**III.     The DIP Lender Should Be Afforded Good-Faith Protection Under Section 364(e).**

40.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

41.     The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing to allow the Debtors to continue the marketing process and consummate the Sale Transaction and (ii) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lender.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**IV.     The Automatic Stay Should Be Modified on a Limited Basis.**

42.     The DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to validate and perfect the liens and security interests granted to it under the DIP Order.  The proposed DIP Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the DIP Order.  Finally, the proposed DIP Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Lender to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents, subject to the procedures set forth in the proposed DIP Order. These modifications are customary, reasonable, and integral to the DIP Facility.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

43.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  The relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and to allow the Debtors to proceed with the Stalking Horse Purchase Agreement, the marketing process, and the Sale Transaction.  Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## RESERVATION OF RIGHTS

44.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of any Debtor's or any other party in

25

interest's rights to dispute any claim on any grounds; (c) an assumption, adoption, or rejection of any agreement, contract, or lease under Section 365 of the Bankruptcy Code; (d) an implication or admission that any particular claim is of a type specified or defined in the DIP Motion, or any order granting the relief requested by the DIP Motion; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of any Debtor's estate; (f) a waiver of any Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) waiver of any claims or causes of action which may exist against any entity.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Order, granting the relief requested in the DIP Motion and such other and further relief as may be just and proper.

Dated: September 8, 2023

Respectfully submitted,

*/s/ Joshua W. Wolfshohl*
**PORTER HEDGES LLP**
Joshua W. Wolfshohl (TX Bar No. 24038592)
Aaron J. Power (TX Bar No. 24058058)
Michael B. Dearman (TX Bar No. 24116270)
1000 Main St., 36th Floor
Houston, TX 77002
Tel: (713) 226-6000
Fax: (713) 226-6248
jwolfshohl@porterhedges.com
apower@porterhedges.com
mdearman@porterhedges.com

*Proposed Counsel for the Debtors and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 8, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and by U.S. first-class mail on the parties listed on the attached service list.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

27

SERVICE LIST

U.S. Trustee
Attn: Ha Minh Nguyen
Office of the US Trustee
515 Rusk Ave, Ste. 3516
Houston, TX 77002
Email: ha.nguyen@usdoj.gov

U.S. Trustee
Attn: Andrew Jimenez
615 E. Houston Street, Suite 533
San Antonio, TX 78205
Email: andrew.jimenez@usdoj.gov

Internal Revenue Service
Insolvency Section
1919 Smith MAIL STOP HOU 5022
Houston, TX 77002

Internal Revenue Service
P O Box 7346
Philadelphia, PA 19101-7346

Office of the Attorney General Texas
PO Box 12548
Austin, TX 78711-2548

Office of the Attorney General Colorado
Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203

Ajax Holdings LLC
Attn: Will Herndon- Manager
514 E. Hyman Ave.
Aspen CO 81611
Email: will.herndon@ajax-holdings.com

Aspen Valley Ranch HOA Inc.
Attn: Simon Chen VP
P.O. Box 421
Woody Creek CO 81656
Email: simon@avrresidences.com

Pitkin County Treasurer
530 E. Main St
Aspen CO 81611
Email: treasruer@pitkincounty.com

CPS Distributors, Inc
Heritage Landscape Supply Grp.
P.O. Box 841382
Dallas TX 75284
Email: credit@heritageLSG.com

Aspen Valley Downs HOA
Attn: Laura Barbieur, Reese Henry CPA,
P.O. Box 145
Woody Creek CO 81656
Email lbarbieur@reesehenry.com

Glenwood Veterinary Clinic
Attn: Alejandro-Admin
2514 Grand Av.
Glenwood Spgs, CO 81601
Attn: gvc@glenwoodvet.com

Holy Cross
3799 Highway 82
P.O. Box 2150
Glenwood Spgs CO 81602-2150

Mountain West Insurance
Attn: Jess Westley, Agent
201 Centennial St. 4th Floor
Glenwood Spgs CO 81601
Email: jessw@mtnwst.com

Crystal River Spas
1197 Main St.
Carbondale CO 81623
Email: sales@crystalriverspas.com

L.T. Clear Solutions LLC
Attn: Keila Olave
P.O. Box 1985
Carbondale CO 81623
Email: ltclearsolutions@gmail.com

Black Hills Energy - Rapid City SD
Corporate
P.O. Box 6001
Rapid City SD 57709
Email: help@support.blackhillsenergy.com

14105661

SERVICE LIST

Apex Security
Attn: Billing Dept.
410 SW Columbia St., Ste. 120
Bend OR 97702
Email: contact@vyanet.com

Comcast Xfinity
9602 S. 300 W. Ste. B
Sandy UT 84070-3302

Coldwell Banker Mason Morse
Attn: Wendy Bontempo
0290 Highway 133
Carbondale CO 81623
Email: wendyb@masonmorse.com

Aspen Waterwise Ltd
Attn: Kellen Whitworth
50 N. 4th St.
Carbondale CO 81623
Email: sarah@aspenwaterwise.com

Nineteen77 Capital Solutions A LP
One North Wacker Drive, Floor 32
Chicago, IL 60606

Maples Fiduciary Services (Delaware Inc.)
4001 Kennet Pike, Suite 302
Wilmington, DE 19807
RETURNED  MAIL

Bermudez Mutari, Ltd.
UBS Tower
One North Wacker Drive, Floor 32
Chicago, IL 60606

UBS O'Conner LLC
Attn: Corporate Creations Network Inc
5444 Westheimer #1000
Houston, TX 77056

Wilmington Trust National Association
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402

Wilmington Trust National Association
Attn: Agent Corporation Service Company
211 E. 7thSt., Suite 620
Austin, TX 78701

UBS O'Conner LLC
Attn: Darrell S. Cafasso
Harry F. Murphy
Laura Metzger
Mark Franke
Monica Perrigino
Ryan Wooten
David Litterine-Kaufman
Nicholas Poli
Orrick, Herrington & Sutcliffe, LLP
51 West 52nd Street
New York, New York 10019
RETURNED MAIL
Email: dcafasso@orrick.com
hmurphy@orrick.com
lmetzger@orrick.com
mfranke@orrick.com
mperrigino@orrick.com
rwooten@orrick.com
dlitterinekaufman@orrick.com
npoli@orrick.com

Wilmington Trust National Association
Alexander S. Lorenzo
Morgan M. Meyer
90 Park Avenue, 15th Floor
New York, New York 10016
Email: alexander.lorenzo@alston.com
morgan.meyer@alston.com

Wilmington Trust National Association
c/o Snell & Wilmer, LLP
Michael E. Lindsey
James Snow
1200 Seventeenth St, Ste. 1900
Denver, CO 80202
Email: mlindsay@swlaw.com
jsnow@swlaw.com

14105661

SERVICE LIST

Sam Bragg
ALSTON & BIRD LLP
2200 Ross Avenue
Dallas, Texas 75201
Email: Sam.Bragg@alston.com

William Hao
ALSTON & BIRD LLP
90 Park Avenue, 15th Floor
New York, New York 10016
Email: William.Hao@alston.com

Chris Riley
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Email: Chris.Riley@alston.com

R. Paul Yetter
Timothy S. McConn
Jamie A. Aycock
Amy C. Farish
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Email: pyetter@yettercoleman.com
        tmcconn@yettercoleman.com
        jamieaycock@yettercoleman.com
        afarish@yettercoleman.com

Donald L. Turbyfill
Email: dturbyfill@dntlaw.com

Lance Henry
Patrick D. Vellone
Jeffrey A. Weinman
Allen Vellone Wolf Helfrich & Factor P.C.
1600 Stout Street, Suite 1900
Denver, Colorado 80202
Email: lhenry@allen-vellone.com
        pvellone@allen-vellone.com
        jweinman@allen-vellone.com

John J. Sparacino
S. Margie Venus
McKool Smith, PC
600 Travis Street, Suite 7000
Houston, Texas 77002
Email: jsparacino@mckoolsmith.com
        Email: mvenus@mckoolsmith.com

14105661