UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| STRUDEL HOLDINGS LLC and AVR AH LLC, | § § | Case No. 23-90757 (CML) |
| | § | (Jointly Administered) |
| Debtors.[1] | § § | |

# DECLARATION OF DOUGLAS J. BRICKLEY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

I, Douglas J. Brickley, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am over the age of 18 and I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying Automatic Stay; and (IV) Granting Related Relief* (the "DIP Motion").[2]

2. I am a Managing Director with the firm Stout Risius Ross, LLC ("Stout"), which has its principal office located at One South Wacker Drive, 38th Floor, Chicago, IL 60606. The Firm also maintains an office at 1000 Main Street, Suite 3200, Houston, TX 77002. Except where otherwise specifically noted, I have personal knowledge of the facts set forth below.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AVR AH LLC (0148) and Strudel Holdings LLC (5426). The Debtors' service address is: PO Box 4068, Aspen, CO 81612.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed in the DIP Motion.

14171181v1

3.  Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Stout employees working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and (e) my opinion based upon my experience. If called to testify, I could and would testify to each of the facts set forth herein.

## Qualifications

4.  I hold a Bachelor's Degree from Texas A&M University and an M.B.A. from Baylor University School of Business. I, along with Stout's professionals, have assisted and provided financial advisory, restructuring, investment banking, and managerial services to companies and lenders of all sizes, including debtors in possession and other bankruptcy constituencies in the Southern District of Texas.

5.  On July 10, 2023, I was retained as the Debtors' Chief Restructuring Officer ("CRO") and Stout was retained as financial advisor. I have previously served as CRO in numerous chapter 11 cases in a variety of industries and, in that capacity, I have substantial experience negotiating the terms of post-petition debtor-in-possession financing.

6.  Members of my team and I have worked closely with the Debtors and their other advisors to analyze the Debtors' capital structure and liabilities, financial position and liquidity needs, assets and business operations, contractual arrangements, and various proposed strategic transactions. I, and the Stout team, have become familiar with each of these items.

7.  I have provided the Debtors with advice on transaction alternatives, including with respect to a potential sale of the 813 acre property owned by debtor AVR AH, LLC ("AVR") commonly known as Aspen Valley Ranch and certain related assets (the "Ranch"). I have

communicated directly with the Debtors' lenders. I have participated in numerous discussions with the Debtors and their other advisors regarding the Debtors' forecasted liquidity and need for debtor in possession financing ("DIP Financing") to fund these chapter 11 cases.

## Debtors' Prepetition Capital Structure

8. In 2017, Charif Souki, the owner and principal of the Debtors, took out a loan in the original principal amount of $50 million (the "2017 Loan") from affiliates of UBS O'Connor LLC ("O'Connor"). The Debtors and another affiliate of Souki guaranteed the 2017 Loan. The 2017 Loan is governed by that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "2017 Loan Agreement"), dated as of April 27, 2017, by and among Charif Souki, as borrower; the Debtors and Charif Souki as trustee of the Souki Family 2016 Trust (the "Trust"),[3] as guarantors; Nineteen77 Capital Solutions A LP and Bermudez Mutari, LTD (together, the "Lenders"), as lenders; and Wilmington Trust National Association (the "Agent"), as administrative agent.[4] The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "2017 Pledge Agreement"), dated as of April 27, 2017, by and among, Souki, the Debtors, the Trust, and the Agent. AVR also executed a deed of trust (the "2017 Deed of Trust" and, together with the 2017 Loan Agreement and the 2017 Pledge Agreement, the "2017 Loan Documents"), dated as of April 27, 2017, in favor of the Agent. Under the 2017 Loan Documents, the Debtors pledged certain assets as collateral, including the Ranch, for the obligations due under the 2017 Loan Documents that could be foreclosed upon in enumerated circumstances.

---

[3] The current trustees of the Souki Family 2016 Trust are Karim Souki, Christopher Souki, and Lina Souki Rizzuto.
[4] O'Connor executed the 2017 Loan Agreement on behalf of the Lenders as investment adviser.

14171181v1

9. In 2018, Souki took out an additional loan from the Lenders in the original Principal amount of $70 million (the "2018 Loan" and together with the 2017 Loan, the "O'Connor Loans"). The 2018 Loan is governed by that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "2018 Loan Agreement" and together with the 2017 Loan Agreement, the "O'Connor Loan Agreements"), dated as of March 30, 2018, by and among Souki, as borrower; the Debtors, the Trust, and AJAX,[5] as guarantors; the Lenders, as lenders; and the Agent, as administrative agent.[6] The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "2018 Pledge Agreement"), by and among Souki, the Debtors, the Trust, and the Agent. AVR also executed a deed of trust (the "2018 Deed of Trust" and together with the 2018 Loan Agreement and the 2018 Pledge Agreement, the "2018 Loan Documents" and collectively with the 2017 Loan Documents, the "O'Connor Loan Documents"), dated as of March 30, 2018, in favor of the Agent. Under the 2018 Loan Documents, the Debtors pledged certain assets as collateral, including the Ranch, for the obligations due under the 2018 Loan Documents that could be foreclosed upon in enumerated circumstances.

10. On the Petition Date, the Debtors, Souki, and the Trust commenced an adversary proceeding [Adv. Pro. No. 23-9003] (the "Adversary Proceeding") against the Lenders, the Agent, and O'Connor (collectively, the "O'Connor Defendants"). The Adversary Proceeding seeks, among other things, disallowance of any claims held by the O'Connor Defendants against the Debtors as well as a declaration that the O'Connor Defendants have no security interests in, or liens on, any of the property of the Debtors' estates, including the Ranch.

---

[5] AJAX is an exempted company incorporated in the Cayman Islands with limited liability.
[6] O'Connor executed the 2018 Loan Agreement on behalf of the Lenders as investment adviser.

14171181v1

**Debtors' Need for DIP Financing**

11. Pursuant to the DIP Motion, the Debtors request entry of an order (the "DIP Order") authorizing the Debtors to, among other things, (a) obtain from the DIP Lender the DIP Financing, which consists of a secured, superpriority debtor-in-possession multi-draw term loan credit facility (the "DIP Facility") in an aggregate principal amount not to exceed $3.7 million on the terms and conditions set forth in the DIP Order and the DIP Documents, (b) enter into the DIP Documents, and (c) grant the DIP Lender DIP Superpriority Claims in respect of all DIP Obligations and the DIP Liens on the DIP Collateral to secure the DIP Obligations with the relative priorities set forth in the DIP Order and subject to the terms set forth therein and in the other DIP Documents.

12. The Debtors require access to the DIP Facility to fund their operations and to pay the administrative costs of the Chapter 11 Cases. In particular, the Debtors need funds to maintain operations at the Ranch and to pay the expenses of the marketing and sale process necessary to maximize the value of their estates. The Debtors do not have sufficient cash on hand to fund their operations and the marketing and sale process and pay the administrative costs of the Chapter 11 Cases. The Debtors' cash balance has been less than $72,000 since the Petition Date.

13. Operations of the Ranch are conducted by Aspen Valley Ranch Homeowners Association, Inc. ("AVR HOA"), a non-debtor entity, which is controlled by the owners of the Ranch. The owners are required to pay dues to AVR HOA to fund operations and upkeep of the Ranch and provide for capital reserves. AVR HOA currently has 19 employees who maintain the Ranch and provide services to the owners. Prior to the Petition Date, the only source of revenue for AVR HOA, and, thus, the only source of revenue to fund operations at the Ranch, was the dues it received from owners of the Ranch, primarily AVR.

14. I believe the proposed DIP Facility is essential to fund these chapter 11 cases and provides significant benefit to the Debtors and their estates. The DIP Facility provides the Debtors with the liquidity and time to effectuate a sale of the Debtors' assets. Thus, the DIP Facility provides a degree of certainty regarding the funding and direction of these chapter 11 cases.

15. I believe that (i) the DIP Facility will satisfy the Debtors' post-petition liquidity needs; (ii) will provide the Debtors with sufficient time to market and sell the Ranch; and (iii) is in the best interests of the Debtors and their estates.

### DIP Facility Was Negotiated in Good Faith and at Arm's Length

16. My team and I, along with the Debtors' other advisors, actively negotiated the terms and provisions of the DIP Facility on behalf of the Debtors. I believe the process was rigorous and marked by hard bargaining. This process culminated in the DIP Facility, which I observed to be negotiated in good faith and at arm's-length.

17. I believe, based on my observation and professional experience, that the terms of the DIP Facility are reasonable under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors.

18. I reviewed the fees being charged under the DIP Facility, and believe they are reasonable under the circumstances of these cases. I note that the interest will be paid-in-kind, which provides additional liquidity relief to the Debtors.

19. The original terms proposed by the DIP Lender included a priming lien which would have been vigorously opposed by the O'Connor Defendants. After several weeks of negotiations, the DIP Lender agreed to provide the DIP Facility on a subordinate basis to the liens held by the O'Connor Defendants. If the Debtors prevail in the Adversary Proceeding and defeat

6

or subordinate the claims and/or liens of the O'Connor Defendants, the DIP Facility would become the most senior lien on all assets of the Debtors.

20. I believe that the case milestones included in the DIP Facility provide the Debtors with adequate time to implement a value-maximizing sales transaction. These milestones were negotiated by the DIP Lender as an explicit condition to providing the DIP Facility. Accordingly, I believe that agreeing to include these milestones in the DIP Facility is reasonable and in the Debtors' best interests.

21. In sum, it is my professional opinion that (i) the terms of the DIP Facility are reasonable under the circumstances and were the product of good faith arm's-length negotiations; (ii) the DIP Facility provides for an expeditious and value-maximizing outcome by providing a degree of certainty regarding the funding and direction of these chapter 11 cases; and (iii) the DIP Facility will benefit all stakeholders in these chapter 11 cases.

### **DIP Facility Is Best Postpetition Financing Arrangement Available to the Debtors**

22. Prior to and after the Petition Date, Stout approached more than six (6) capital providers seeking proposals for debtor-in-possession financing. This effort resulted in three (3) executed NDA's with corresponding access to a data repository, however, it did not result in any actionable proposals because all third-party lenders contacted would have required a priming lien. Ultimately, the DIP Lender provided the only actionable proposal once it agreed to provide the DIP Facility without a priming lien.

23. Based on my experience, I believe (i) the Debtors are not able to borrow funds on an unsecured or more junior basis, nor funds secured solely by the Debtors' unencumbered assets, in an amount sufficient to fund these chapter 11 cases; and (ii) the DIP Facility is the best financing option available to the Debtors at this time.

**Conclusion**

24. The DIP Facility is the product of good-faith, arm's-length negotiations.

25. The DIP Facility represents the best financing option available to the Debtors. I do not believe alternative sources of DIP financing with terms as favorable as or better than the DIP Facility are available to the Debtors.

26. The DIP Facility provides for a value-maximizing outcome by providing a degree of certainty regarding the funding and direction of these chapter 11 cases.

27. I submit it would be appropriate for the Court to approve the DIP Facility as contemplated by the DIP Motion, as it would be in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' business judgment.

Dated: September 8, 2023.
Houston, Texas

By: */s/ Douglas J. Brickley*
Name: Douglas J. Brickley
Chief Restructuring Officer