**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **STRUDEL HOLDINGS LLC and** | § | **Case No. 23-90757 (CML)** |
| **AVR AH LLC,** | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**DEBTORS' EMERGENCY MOTION TO TERMINATE CONSULTATION RIGHTS AND IMMEDIATELY DISQUALIFY CREDIT BID**
[Relates to Dkt. Nos. 5, 6, 53, 94, 108]

> **Emergency relief has been requested. Relief is requested not later than September 11, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") respectfully submit this *Emergency Motion to Terminate Consultation Rights and Immediately Disqualify Credit Bid* (the "Motion").

**PRELIMINARY STATEMENT**

1. The O'Connor Defendants' disrespect for the bankruptcy process and this Court's authority appears to know no bounds. The Debtors were forced to seek the drastic relief sought in this Motion on an emergency basis because the O'Connor Defendants intentionally interfered with the Debtors' confidential marketing process. Their Objection to the Debtors' Motion Seeking

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AVR AH LLC (0148) and Strudel Holdings LLC (5426). The Debtors' service address is: PO Box 4068, Aspen, CO 81612.

14172125

Entry of an Order Precluding Certain Alleged Secured Parties From Submitting Credit Bids Pursuant to Sections 105(a) and 363(k) of the Bankruptcy Code (the "Objection to Preclusion Motion") [Main Case Dkt. No. 108][2] overtly, and incorrectly, disclosed the status of the Debtors' ongoing negotiations with multiple potential stalking horse bidders. The O'Connor Defendants obtained this highly sensitive and confidential information through disclosures made to them in their capacity as a consultation party under this Court's approved bid procedures and a deposition of the Debtors' chief restructuring officer that was confidential pursuant to the parties' protective order.  The O'Connor Defendants' eagerness to falsely take credit for a stalking horse bid that has not been executed (and may never be executed) led them to wantonly violate the protective order and abuse their consultation rights in violation of the bidding procedures order.  The O'Connor Defendants are represented by highly sophisticated counsel who could have easily filed the Objection to Preclusion Motion under seal, but they chose not to because public disclosure of its contents furthers the O'Connor Defendants' objective in these cases.  There is absolutely no excuse for a consultation party filing a pleading disclosing specific details about potential bidders and their level of interest in the middle of a marketing process. The O'Connor Defendants' egregious conduct is intentional and deliberate and, because there is no way to "un-ring the bell," has likely tainted the marketing process.  But that is apparently of no consequence to the O'Connor Defendants, who continue to brazenly pursue their own reckless agenda with no regard for these cases or the Court's clear direction to the parties to *focus their efforts on a value-maximizing sale transaction.*

---

[2] Debtors' Motion Seeking Entry of An Order Precluding Certain Alleged Secured Parties From Submitting Credit Bids Pursuant to Sections 105(a) and 363(k) of the Bankruptcy Code (the "Preclusion Motion") is at Main Case Docket No. 6.

14172125

2. Wholly ignoring the Court's admonishment, to date, the O'Connor Defendants (i) have continued to seek adjudication of their tenuous motion to dismiss *before* the auction date set by the Court and *agreed to by the parties*, creating significant confusion in the Debtors' marketing efforts, and even worse, (ii) disclosed the terms of potential stalking horse bids in a public filing before any such bids have been finalized and agreed. *See* Docket No. 108. While the extent of the damage the O'Connor Defendants have caused may not be fully ascertained until the sale process is concluded, the Court should stop them from any further bad faith attempts to de-rail the Debtors' efforts to maximize value for these estates.

3. By this Motion, the Debtors seek an order (i) immediately terminating the O'Connor Defendants' consultation rights under the Bidding Procedures Order; (ii) enjoining the O'Connor Defendants from having any further contact with prospective bidders; (iii) precluding the O'Connor Defendants from credit bidding in the Debtors' sale process; and (iv) abating the O'Connor Defendants' Motion to Dismiss the Bankruptcy Cases until no less than 45 days after the Debtors' sale process is complete. The Debtors further ask that the Court reserve for hearing after the conclusion of the sale process issues related to damages suffered by the estates as a result of the O'Connor Defendants' intentional and bad faith interference with the Debtors' sale efforts.

## BRIEF FACTUAL AND PROCEDURAL BACKGROUND

**I.    The O'Connor Defendants' Prepetition Conduct Forces the Debtors to Seek Bankruptcy Protection**

4. As the Court is familiar, the Debtors, as well as the remaining Adversary Plaintiffs, entered into various loan agreements and related guarantees with the O'Connor Defendants. For purposes of this Motion, it is unnecessary to revisit the events leading to the filing of the Bankruptcy Cases or this dispute. However, it bears repeating that, as alleged in the Preclusion Motion, the O'Connor Defendants have consistently engaged in bad faith, commercially

3

14172125

unreasonable behavior when foreclosing on Collateral. That conduct is at the heart of this Motion, the Preclusion Motion, the Adversary Proceeding, and the Bankruptcy Cases generally.

## II. Immediately upon Learning of the Bankruptcy Cases, the O'Connor Defendants Seek to Frustrate the Debtors' Efforts at Every Turn

5. The Debtors' filed the Bankruptcy Cases on July 27, 2023. Five days later, on August 1, 2023, counsel for the O'Connor Defendants appeared and filed a six-page, single-spaced letter with this Court [Dkt. No. 16], launching a scatter-shot attack on the Motion and the Bankruptcy Cases generally. Although the arguments made therein are flawed, the filing succeeded in demonstrating the O'Connor Defendants' strategy with respect to the Bankruptcy Cases: mischaracterize, distract, and disrupt.

6. Nevertheless, the Debtors sought to find common ground and resolve disputes amicably in hopes that the parties could work together to achieve the primary goal of the Bankruptcy Cases: a sale of the Debtors' assets for the best price possible. To that end, the Debtors negotiated with the O'Connor Defendants in good faith regarding the sales process and incorporated many of the Lenders' requests into what became the Bidding Procedures Order [Dkt. No. 53]. Among other things, this included granting the O'Connor Defendants extensive "consultation rights," which the Debtors naturally assumed would be exercised responsibly and in a manner consistent with the spirit of this Court's Bidding Procedures Order and the standards of practice in the Southern District of Texas.

7. However, as the Bankruptcy Cases and the Adversary Proceeding progressed, it quickly appeared that there was little room for diplomacy. After reaching an impasse over the O'Connor Defendants' demand that final trial occur in Adversary Proceeding in a mere thirty (30) days, the Debtors were forced to seek this Court's assistance. The Court held a status conference on August 15, 2023 (the "Status Conference") to address scheduling related to the Credit Bid

4

14172125

Motion and Adversary Proceeding at which the Court, among other things, (i) rejected the O'Connor Defendants proposed schedule with respect to the Adversary Proceeding; and (ii) directed the parties to negotiate a scheduling order for the Adversary Proceeding separate from the Credit Bid Motion that contemplated a pretrial conference for the Adversary Proceeding in mid-November.

8. Unable to accept defeat and in flagrant disregard for the Court's ruling on scheduling for the Adversary Proceeding, the O'Connor Defendants filed the "O'Connor Action" in state court in New York six days after the Status Conference. The events giving rise to the alleged claims asserted in the O'Connor Action are the same operative events at issue in both the Adversary Proceeding and the New York Action. The legal issues raised by the O'Connor Action also overlap with the legal issues raised in the Adversary Proceeding and in the New York Action, specifically, whether Souki and the Trust owe obligations to the O'Connor Defendants. In other words, the O'Connor Defendants are attempting an end run around the consequences of the automatic stay, this Court's ruling on scheduling in the Adversary Proceeding, and the stay order issued in the New York Action by seeking a separate adjudication of the same issues raised in the Adversary Proceeding and in the New York Action against Souki and the Trust in state court in New York six days after the Status Conference.

9. The O'Connor Defendants followed this up by filing a Motion to Dismiss the Bankruptcy Cases [Dkt. No. 75], and (unilaterally) purporting to set the same for hearing at the same time and date as the Preclusion Motion (i.e., September 21, 2023).

10. Meanwhile, pursuant to an agreed schedule (which eventually became the *[Proposed] Order Regarding Coordinated Schedule for Contested Matter and Adversary Proceeding* [Dkt. No. 100-1]), the parties began the discovery process with written discovery.

Shortly thereafter, the parties once again required the Court's assistance, this time due to the O'Connor Defendants' surprising views regarding their discovery obligations. This resulted in the Court issuing an *Order Granting, in Part, Plaintiffs' Emergency Motion to Compel Discovery and Request for Status Conference* [Dkt. No. 92].

**III.   After Agreeing to a Protective Order, the O'Connor Defendants Jeopardize the Sales Process by Divulging Confidential Information**

11.   The O'Connor Defendants were made privy to highly sensitive material regarding the Debtors' sale. For one, the O'Connor Defendants occupy a position of trust with respect to the sales process by virtue of their consultation rights under the Bidding Procedures Order. Additionally, the Debtors have taken a very liberal approach in favor of disclosure in responding to the O'Connor Defendants' discovery requests. Given the potentially harmful nature of the information disclosed, the parties agreed to a September 1, 2023 Stipulated Protective Order [Dkt. No. 91-4] (the "Protective Order") governing the exchange of information in connection with the Adversary Proceeding and the Preclusion Motion.

12.   The Protective Order is sweeping in scope and carefully crafted to minimize the potential that the free flow of information could harm the parties and the sale process. This includes a period of seven (7) days after a deposition during which the substance thereof is presumptively confidential and does not require designation of such by either party. *See* Protective Order § 14. Therefore, during the O'Connor Defendants' September 6, 2023 deposition of the Debtors' Chief Restructuring Officer ("CRO") and expert, Douglas Brickley, the Debtors did not object when the O'Connor Defendants began asking detailed questions about the Debtors' ongoing sales efforts.

13.   However, to the Debtors' shock, on September 8, 2023 (only two days after Mr. Brickley's deposition), the O'Connor Defendants disclosed critical, highly sensitive confidential

information about the ongoing marketing and sale process in their Objection to Preclusion Motion. At no point did the O'Connor Defendants seek, much less receive, permission to include this highly confidential information in a public filing. In particular, the information regarding stalking horse bids—which are still simply potential and not subject to any binding agreement—has never before been made public. The Debtors were likewise surprised to see that their settlement communications had been weaponized against them in the Objection to Preclusion Motion.

14. This Motion has been necessitated by the O'Connor Defendants' bad faith, inequitable scheme aimed at preventing the Debtors from successfully selling their assets for the best price available under the circumstances.

## ARGUMENT

### I. This Court Has Broad Authority to Fashion Appropriate Relief with Respect to the O'Connor Defendants' Misconduct

15. In a sweeping grant of powers, the Bankruptcy Code imbues courts with significant statutory and inherent authority to manage proceedings:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). Bankruptcy courts thus enjoy broad general equitable authority, including the ability to amend their orders or to issue sanctions and hold parties in contempt. *See, e.g.*, *Yaquinto v. Ward (In re of Ward)*, 978 F.3d 298, 303 (5th Cir. 2020) (observing that § 105(a) allows bankruptcy courts to amend previously issued orders); *Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 815 (5th Cir. 2017) (noting that "the bankruptcy court has numerous tools by which to sanction the conduct of individuals," including the inherent power "to sanction a party or attorney

7

when necessary to achieve the orderly and expeditious disposition of their dockets" (quotation omitted)).

16. Indeed, "[t]here can be little doubt that bankruptcy courts have the inherent power to sanction vexatious conduct [under§ 105]." *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 612–13 (5th Cir. 1997) (quotation omitted)). A bankruptcy court's equitable powers extend to matters pertaining to rights to place credit bids: "[T]he language of § 363(k), 'unless the court for cause orders otherwise,' allows the bankruptcy court to exercise its inherent equitable powers to modify or deny the rights otherwise provided under § 363(k)." *In re RML Dev., Inc.*, 528 B.R. 150, 155–56 (Bankr. W.D. Tenn. 2014) (citing 11 U.S.C. §§ 105(a), 363(k)).

17. The Court therefore has the authority to grant the relief requested herein.

## II. The Court Must Immediately Terminate the O'Connor Defendants' Consultation Rights and Preclude them from Credit Bidding in Order to Maintain the Integrity of the Sale Process

### A. The Bidding Procedures Orders Should Be Amended to Exclude Any Consultation Rights in Favor of the O'Connor Defendants and to Preclude them from Further Contact with Potential Bidders

18. At the O'Connor Defendants' insistence, the Debtors agreed to revise the draft Bidding Procedures Order to grant various "consultation rights" to the O'Connor Defendants. Initially, the Debtors granted the O'Connor Defendants the benefit of the doubt with respect to that request, believing they simply desired to participate in the sale process so that they could facilitate it while also protecting their rights. In compliance with their obligations under this Court's Bidding Procedures Order, the Debtors have provided regular updates to the O'Connor Defendants and endeavored to keep them apprised of the sale process. This has included supplying the O'Connor Defendants with information regarding *potential* stalking horse bids. However, it has

8

since become clear that the O'Connor Defendants do not wish to see a sale take place and are instead actively working against it so that they may foreclose on the property.

19. Indeed, it is bad enough that a consultation party such as the O'Connor Defendants filed a motion to dismiss the entire bankruptcy proceeding (and attempted to set such motion for hearing one week before the Court-ordered auction in this case), objected to the employment of the Debtors' representatives conducting the sale, and refused to clarify whether, and to what extent, it will place a credit bid. The O'Connor Defendants have, at every turn, called into question the legitimacy of the Chapter 11 Cases. This, naturally, sows seeds of doubt in the mind of potential bidders evaluating whether to engage in the sales process. But the O'Connor Defendants' public disclosure of the amount of potential stalking horse bids—that have not been consummated and may never be finalized—is beyond the pale. The O'Connor Defendants have abused their consultation rights under the Bidding Procedures Order and demonstrated that they cannot be trusted with the information they have gained in connection therewith. The O'Connor Defendants' inequitable, improper conduct severely hampers the Debtors' sales efforts and threatens to fatally undermine the Chapter 11 Cases as a whole.

20. For these reasons, the Court cannot allow the O'Connor Defendants to continue occupying a position of trust with respect to the Debtors' sale. The Bidding Procedures Order should therefore be amended to strip the O'Connor Defendants of their consultation rights and to excuse the Debtors from any requirement of involving the O'Connor Defendants in the process.

14172125

**B. The Court Should Immediately Grant the Motion on a Summary Basis Before the O'Connor Defendants Can Further Disrupt the Sales Proceeding[3]**

21. "Cause" in the context of limiting or eliminating credit bid rights under § 363(k) creates a "flexible" standard that allows courts to "determine whether cause exists on a case-by-case basis." *In re: Aéropostale, Inc.*, 555 B.R. 369, 414–15 (Bankr. S.D.N.Y. 2016). For instance, courts have precluded credit bidding due to the inherent conflict between a party's consultation rights and a party's credit bid rights. *In re Fam. Christian, LLC*, 533 B.R. 600, 631 (Bankr. W.D. Mich. 2015) (refusing to approve a credit-bid sale to a party that, as a "consultation party" to the auction, had been privy to certain information that allowed it to gain an unfair advantage over other bidders, tantamount to insider trading). However, the conflict here goes well past the O'Connor Defendants simply having inside knowledge—at every turn, the O'Connor Defendants have sought to disrupt the sales process.

22. "Courts will deny a secured creditor's right to credit bid due to inequitable conduct." *Id.* Such relief is particularly appropriate where, as here, the conduct at issue "directly impacts the estate or the bidding process." *See id.*; *see also In re Free Lance-Star Publishing Co.*, 512 B.R. 798, 804–07 (Bankr. E.D. Va. 2014) (limiting credit bid from the acquirer of a defaulted loan engaged in inequitable conduct aimed at ensuring it would be the winning bidder in a section 363 sale).

---

[3] The arguments herein are without prejudice to, and solely in supplementation of, the Preclusion Motion. This includes, without limitation, the Preclusion Motion's argument (contrary to the O'Connor Defendants' mischaracterizations) that the O'Connor Defendants have no lien on the Debtors' property because their claims have been fully satisfied. Further, this Motion does not constitute, nor waive, the substantive response on the merits to the Objection to Preclusion Motion contemplated in the *[Proposed] Order Regarding Coordinated Schedule for Contested Matter and Adversary Proceeding* [Dkt. No. 100-1]. The Debtors' expressly reserve all rights.

1.  **The O'Connor Defendants Cannot Be Permitted to Credit Bid While Simultaneously Dissuading Potential Bidders by Calling the Legitimacy of the Chapter 11 Cases into Question**

23. Courts have disallowed or limited credit bidding for inequitable conduct geared at gaining a competitive advantage, like that of the O'Connor Defendants. For example, in *In re Free Lance-Star Publishing Co.*, the court limited credit bidding from a creditor that "engaged in inequitable conduct that has damped interest in the auction and depressed the potential sales price the Debtors' otherwise might have realized from the sale of the business." 512 B.R. at 804–07. More specifically, the creditor had attempted unilaterally to expand the scope of its liens after the debtor declined to do so, recorded UCC financing statements it was not authorized to record, failed to disclose those filings during cash collateral hearings in which the lender sought liens on those assets, pressured the debtors to shorten the marketing period for the sale of the business, and insisted on the insertion of language in the marketing materials prominently advertising its credit bid rights in order to dissuade competitive bidders. *Id.*

24. In this case, the O'Connor Defendants have done everything they can to thwart the Debtors' efforts to sell their assets and to chill interest in those assets.[4] This includes (i) a motion to dismiss the Bankruptcy Cases and refusal to remove the same from the docket despite this Court's admonition, (ii) objections to the Debtors' retention of the professionals conducting the sales process, (iii) a post-petition state court lawsuit aimed at circumventing this Court's authority, and (iv) disclosure of confidential information regarding interest from potential bidders that has a material adverse effect on the Debtors' sales efforts. It is beyond any serious dispute that the O'Connor Defendants' conduct has sowed seeds of doubt in potential bidders, who may conclude

---

[4] Indeed, while the O'Connor Defendants seek to take credit for "delivering" a stalking horse bidder, the party they refer to was known to the Debtors' principals well before the O'Connor Defendants ever became involved in the sale process.

11

that it is not worth the due diligence and legal fees to engage in a bankruptcy sale that consultation parties are determined to prevent from taking place. Yet, there is nothing stopping the O'Connor Defendants from ultimately withdrawing their objections and motions after the Bid Deadline and proceeding to an auction with significantly less competition or scaring away all potential bidders in an effort to bolster their motion to dismiss.

25. The O'Connor Defendants cannot have it both ways. They cannot be allowed to credit bid while simultaneously eliminating the potential of a competitive bidding process through the implementation of a vexatious litigation strategy.

### 2. The O'Connor Defendants Have Disclosed Confidential Information in Violation of the Agreed Protective Order

26. In the Protective Order, the O'Connor Defendants agreed that deposition testimony would be subject to a seven-day period of presumptive confidentiality. *See* Protective Order § 14. The O'Connor Defendants further agreed that absent agreement by the Producing Party, all Designated Material filed with the Court would be filed under seal. *Id.* at § 12. However, in their September 8, 2023 Objection to Preclusion Motion, the O'Connor Defendants directly quoted and otherwise disclosed testimony from Mr. Brickley's deposition, which took place just two days earlier. *See, e.g.*, Objection ¶¶ 2, 3, 52, 59. While this is itself inexcusable, the disclosure of details regarding "two potential stalking horse bidders," including the price at which one potential stalking horse bidder expressed an interest but did not finalize a stalking horse bid, is particularly egregious. *Id.* at ¶ 59.

27. Courts have disallowed parties from credit bidding for similar misconduct. *See, e.g.*, *In re Aloha Airlines*, No. 08-00337, 2009 WL 1371950, at *8–9 (Bankr. D. Haw. May 14, 2009) (precluding credit bidding from a creditor that had, among other things, misused information subject to confidentiality agreements in connection with its scheme to force the debtor out of

business). Indeed, far from being harmless, the O'Connor Defendants' violation of their agreement both further undermines bidder confidence in the sales process and significantly impacts the bidding landscape by disclosing potential stalking horse bids that, as of yet, have not come to fruition.

28. Accordingly, the Court should eliminate any potential right of the O'Connor Defendants to credit bid.

## BASIS FOR EMERGENCY RELIEF

29. Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion. The O'Connor Defendants are immediately impacting the Debtors' ongoing efforts to sell their assets. Although the Debtors are mindful that the Preclusion Motion is set for final hearing on September 21, 2023, the Court's intervention is unfortunately required well in advance of that date to prevent the O'Connor Defendants from further disclosing confidential information and continuing to chill the bidding process. The Debtors thus respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## CONCLUSION

30. WHEREFORE the Debtors respectfully request that the Court (a) enter an order, substantially in the form of the Proposed Order, enforcing the Bankruptcy Protections of the Bankruptcy Code, including by (i) amending the Bidding Procedures Order [Dkt. No. 53] to exclude any "consultation rights" in favor of the O'Connor Defendants, (ii) precluding O'Connor Defendants from having further contact with third parties regarding the Debtors' sale process, and (iii) forbidding the O'Connor Defendants from placing a credit bid in connection with any sale of the Debtors' assets, and (b) grant such other and further relief as may be just and proper.

Dated: September 10, 2023　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　*/s/ Joshua W. Wolfshohl*
　　　　　　　　　　　　　　　　　　　　**PORTER HEDGES LLP**
　　　　　　　　　　　　　　　　　　　　Joshua W. Wolfshohl (TX Bar No. 24038592)
　　　　　　　　　　　　　　　　　　　　Aaron J. Power (TX Bar No. 24058058)
　　　　　　　　　　　　　　　　　　　　Heather K. Hatfield (TX Bar No. 24050730)
　　　　　　　　　　　　　　　　　　　　Michael B. Dearman (TX Bar No. 24116270)
　　　　　　　　　　　　　　　　　　　　Jordan T. Stevens (TX Bar No. 24106467)
　　　　　　　　　　　　　　　　　　　　1000 Main St., 36th Floor
　　　　　　　　　　　　　　　　　　　　Houston, TX 77002
　　　　　　　　　　　　　　　　　　　　Tel: (713) 226-6000
　　　　　　　　　　　　　　　　　　　　Fax: (713) 226-6248
　　　　　　　　　　　　　　　　　　　　jwolfshohl@porterhedges.com
　　　　　　　　　　　　　　　　　　　　apower@porterhedges.com
　　　　　　　　　　　　　　　　　　　　mdearman@porterhedges.com
　　　　　　　　　　　　　　　　　　　　jstevens@porterhedges.com

　　　　　　　　　　　　　　　　　　　　*Proposed Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF ACCURACY

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief. This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

## CERTIFICATE OF SERVICE

I certify that on September 10, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

14172125