IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: <br><br> STRUDEL HOLDINGS LLC and AVR AH LLC, <br><br> Debtors. | Chapter 11 <br><br> Case No. 23-90757 (CML) <br><br> (Jointly Administered) |

**DEBTORS' RESPONSE IN OPPOSITION TO LENDER PARTIES' MOTION TO DISMISS DEBTORS' CHAPTER 11 CASES PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE**
**(Relates to No. 75)**

AVR AH LLC ("**AVR**") and Strudel Holdings, LLC ("**Strudel**") (the "**Debtors**"), file their Response (the "**Response**") in opposition to *Lender Parties' Motion to Dismiss the Chapter 11 Cases Pursuant to Section 1112(b) of the Bankruptcy Code* (the "**Motion to Dismiss**") [Dkt. No. 75], and in support thereof respectfully state as follows:

**PRELIMINARY STATEMENT**

1.     These cases were filed for two legitimate bankruptcy purposes. *First*, to avoid a foreclosure which would have significantly reduced the value of AVR's real property and instead conduct an orderly marketing process culminating in a Section 363 sale that will maximize the value of AVR's real property. *Second*, to seek a determination from this Court regarding the extent of claims, if any, held by the Lender Parties against the Debtors. These are ordinary and common uses of the rights granted to debtors under the Bankruptcy Code, and are indicative of the Debtors' good faith in filing these cases.

2.     A simple, clear review of the plain language of Section 1112(b) shows that the Motion to Dismiss has no merit and none of the enumerated grounds for cause contained in Section

1

14181221

1112(b) are present here—and the Lender Parties do not contend otherwise. Plainly, these cases were filed in good faith. It is axiomatic that a bankruptcy case filed to pursue an orderly sale of the debtor's assets through a process designed to maximize value is filed in good faith, and there is no credible dispute to the contrary. The Motion to Dismiss relies heavily on the gross mischaracterization that the Debtors' chapter 11 cases are "paradigmatic bad faith filings" as the primary grounds for dismissal, a judicially created concept that relies on facts not present here. [Dkt. No. 75 at ¶ 1]. Indeed, nowhere in Section 1112(b)(4)—which enumerates several examples of "cause" for dismissal—is the term "bad faith" or anything related to the at issue foreclosure proceeding, nor does the Motion to Dismiss point to the existence of any of the enumerated examples of "cause" for dismissal, nor can it, because none exist here. A bankruptcy filing to stay a foreclosure proceeding and pursue a value maximizing sale process is without question filed in good faith and constitutes more than a sufficient basis to overcome any claims to the contrary.

3.      *Four (4) weeks* after the bankruptcy filing, and a mere *two (2) weeks* after the Court entered an order approving bid procedures to maximize the proceeds from a sale of AVR's real property, in an ill-fated attempt to frustrate the Debtors' efforts, Nineteen77 Capital Solutions A LP, Bermudez Mutuari, LTD (the "**Lenders**"), and Wilmington Trust National Association (the "**Agent**," and together with the Lenders, the "**Lender Parties**") filed their motion seeking dismissal of the Debtors' bankruptcy cases in their entirety pursuant to Section 1112(b) of the Bankruptcy Code. [Dkt. No. 75]. The crux of this baseless motion is that Debtors filed these chapter 11 cases in bad faith, yet it is the Lender Parties' bad faith and unreasonable pre-petition conduct which caused the Debtors to file these cases.

4.      The chapter 11 cases are in the best interest of the Debtors' creditors and the estates. These cases will allow a single process to maximize the value of the Debtors' assets through an

14181221

organized sale of certain real property and related assets owned by AVR and located in a development commonly known as Aspen Valley Ranch (the "**Ranch Properties**"), while also resolving ongoing disputes between Debtors and the Lenders Parties that will ultimately determine the proper recipient of the sale proceeds.  The sale of assets through an auction and sale process and pursuing estate claims through litigation are commonplace in, and valid purposes for, a good faith bankruptcy proceeding.

5. The Lender Parties' contention that these chapter 11 proceedings are an attempt by the Debtors to "restart their litigation away from the State Court" [Dkt. No. 75 at ¶ 3] is disingenuous at best.  The Lender Parties' reckless, commercially unreasonable, bad faith conduct continued—and in fact worsened—after the Debtors and other Plaintiffs commenced the New York State Court litigation.  Unlike the New York State Court, this Court is uniquely positioned to ensure an orderly and efficient sale of the Debtors' assets and resolve the parties' dispute while also staying further value-destructive actions by the Lender Parties.

6. The Lender Parties also contend that AVR "lacked the requisite authority" to file its chapter 11 petition.  [*Id*. at ¶ 56]. But this is incorrect and misstates the parties' agreements and general corporate law.

7. The Lender Parties have asserted no proper basis to dismiss the Debtors' chapter 11 cases.  The Court should deny the Motion to Dismiss.

## BACKGROUND

8. In 2017, Charif Souki ("**Souki**") took out a loan in the original principal amount of $50 million (the "**2017 Loan**") from affiliates of UBS O'Connor LLC ("**O'Connor**").  The Debtors and another affiliate of Souki guaranteed the 2017 Loan.  The 2017 Loan is governed by that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Loan Agreement**") dated as of April 27, 2017, by and among Souki

as borrower; the Debtors and Souki as trustee of the Souki Family 2016 Trust (the "**Trust**")[1] as guarantors; the Lenders as lenders; and the Agent as administrative agent.[2]  The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2017 Pledge Agreement**") dated as of April 27, 2017, by and among Souki, the Debtors, the Trust, and the Agent.  AVR also executed a deed of trust (the "**2017 Deed of Trust**" and, together with the 2017 Loan Agreement and the 2017 Pledge Agreement, the "**2017 Loan Documents**") dated as of April 27, 2017, in favor of the Agent.

9. In 2018, Souki took out an additional loan from the Lenders in the original principal amount of $70 million (the "**2018 Loan**," and together with the 2017 Loan, the "**O'Connor Loans**").  The 2018 Loan is governed by that certain Loan Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Loan Agreement**," and together with the 2017 Loan Agreement, the "**O'Connor Loan Agreements**") dated as of March 30, 2018, by and among Souki as borrower; the Debtors, the Trust, and AJAX[3] as guarantors; the Lenders as lenders; and the Agent as administrative agent.[4]  The Debtors are also party to that certain Pledge Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "**2018 Pledge Agreement**") by and among Souki, the Debtors, the Trust, and the Agent.  AVR also executed a deed of trust (the "**2018 Deed of Trust**," and together with the 2018 Loan Agreement and the 2018 Pledge Agreement, the "**2018 Loan Documents**," and collectively with the 2017 Loan Documents, the "**O'Connor Loan Documents**") dated as of March 30, 2018, in favor of the Agent.

---

[1] Souki was the original trustee of the Souki Family 2016 Trust.  The current trustees are Karim Souki, Christopher Souki, and Lina Souki Rizzuto.

[2] O'Connor executed the 2017 Loan Agreement on behalf of the Lenders as their investment adviser.

[3] AJAX is an exempted company incorporated in the Cayman Islands with limited liability.

[4] O'Connor executed the 2018 Loan Agreement on behalf of the Lenders as their investment adviser.

14181221

10. Under the O'Connor Loan Documents, the Debtors pledged certain collateral as security for the O'Connor Loans (the "**Collateral**"). This included, among other things, 25 million shares in Tellurian, Inc. (the "**Tellurian Shares**") (owned by Souki),[5] the Ranch Properties (owned by AVR) and the equity interests in non-debtor affiliate Ajax Holdings, LLC (the "**Ajax Shares**") (50% of which are owned by Strudel and 50% of which are owned by the Trust). Under the O'Connor Loan Documents, the Debtors agreed to guarantee all of Souki's obligations.

11. After declaring a default under the O'Connor Loan Documents, the Lender Parties began exercising remedies against the Collateral. As set forth in more detail in the Debtors' Complaint and the Credit Bid Motion, rather than proceeding to monetize the Collateral in an efficient and commercially reasonable manner, the Lender Parties recklessly disposed of the Tellurian Shares and other Collateral in violation of New York State law. So, the Debtors were left with no choice but to commence these chapter 11 proceedings to stay the foreclosure sale and prevent the Lender Parties from exercising remedies in a chaotic manner that would not maximize the sale of the Debtors' assets.

12. On July 27, 2023 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and commenced these cases (the "**Chapter 11 Cases**"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. There has been no request for the appointment of a trustee or examiner in these chapter 11 proceedings, and there have been no official statutory committees appointed or designated by the Office of the United States Trustee.

---

[5] Souki was the co-founder and chairman of the board of Tellurian, which was founded to construct and operate a facility to manufacture and ship LNG to overseas markets.

13. At the outset of these cases, the Debtors filed their (i) *Emergency Motion for Entry of an Order (i) Approving the Bidding Procedures; (ii) Approving Bid Protections; (iii) Scheduling Certain Dates with Respect Thereto; (iv) Approving the Form and Manner of Notice Thereof; (v) Approving Contract Assumption and Assignment Procedures; (vi) Authorizing the Debtors to Enter into Definitive Purchase Agreements, and (vii) Granting Related Relief* (the **"Sale and Bid Procedures Motion"**) [Dkt. No. 5]; (ii) *Motion Seeking Entry of an Order Precluding Certain Alleged Secured Parties from Submitting Credit Bids Pursuant to Sections 105(a) and 636(k) of the Bankruptcy Code* (the "**Credit Bid Motion**") [Dkt. No. 6]; and (iv) their *Objection to Claims and First Amended Complaint* (the "**Debtors' Complaint**") in Adv. Pro. No. 23-9003 (the "**Adversary Proceeding**").

14. The Sale and Bid Procedures Motion sought to establish a process for a value-maximizing sale of the Ranch Properties and approve such sale at the conclusion of the process. On August 10, 2023, after hearing on the Sale and Bid Procedures Motion and agreement between the Debtors and the Lender Parties, the Court entered the *Order (i) Approving the Bidding Procedures; (ii) Scheduling Certain Dates with Respect Thereto; (iii) Approving the Form and Manner of Notice Thereof; (v) Approving Contract Assumption and Assignment Procedures; and (v) Granting Related Relief* (the "**Bid Procedures Order**") [Dkt. No. 53].

15. The Credit Bid Motion and Adversary Proceeding raise issues and assert claims related to the validity of the Lender Parties' alleged liens and claims, and seeks to resolve these issues on both (i) a final basis in the Adversary Proceeding, and (ii) in the context of the Debtors' sale process through the Credit Bid Motion. Together, these pleadings seek to liquidate the Debtors' primary assets through a value-maximizing sale of the Ranch Properties and resolution of the Debtors' claims against the Lender Parties through the Adversary Proceeding.

14181221

I.     **The First New York Action**

16.    Prior to the Petition Date, on March 6, 2023, the Debtors, Souki, and the Trust commenced an action in the Supreme Court of New York, New York County under Index No. 651164/2023 (the "**New York Action**").  The New York Action is against the Lender Parties, and seeks relief from their bad faith, reckless, and commercially unreasonable conduct, and corresponding damages.  The complaint in the New York Action was amended twice, and the Lender Parties filed a motion to dismiss the second amended complaint on July 25, 2023.  The facts and claims at issue in the New York Action are substantially the same as those at issue in the Adversary Proceeding.

17.    Upon the commencement of these chapter 11 cases, the Debtors served notice on the Lender Parties and filed a suggestion of bankruptcy in the New York Action.  The Court in the New York Action then issued an order staying those proceedings.[6]

18.    By way of the New York Action before and the Adversary Proceeding now, the Debtors, Souki, and the Trust seek (i) a declaration that they no longer have any obligation to the Lender Parties as a result of the Lender Parties' reckless and unreasonable conduct, and that any claims against and liens on the assets of the Debtors, Souki, or the Trust are disallowed; (ii) injunctive relief to prevent the Lender Parties from further harming the Debtors, Souki, and the Trust; and (iii) damages.

19.    On September 9, 2023, the Debtors, Souki, and the Trust filed a notice of removal of the New York Action in the United States District Court for the Southern District of New York.  The New York Action is now pending in that Court under case number 23-cv-07982.  The Debtors, Souki, and the Trust also filed a motion to transfer venue of the New York Action to this Court.

---

[6] Attached hereto as **Exhibit A** is a copy of the order staying the New York Action.

## II.   The Second New York Action

20.    On August 21, 2023, despite the stay order entered in the New York Action, and only *six days after* the August 15, 2023 status conference (the "**Status Conference**") this Court held to address scheduling related to the Credit Bid Motion and Adversary Proceeding at which the preferred schedule of the Lender Parties was rejected, the Lender Parties filed a new action in the Supreme Court of New York against Souki and the Trust (the "**O'Connor Action**").  This new lawsuit, which is clearly an attempt to avoid the consequences of this Court's ruling with respect to scheduling in the Adversary Proceeding, was commenced by the Lender Parties filing a motion for summary judgment in lieu of a complaint seeking recovery against Souki and the Trust for amounts allegedly owed under the O'Connor Loan Documents—a judgment that could have the effect of liquidating their claims in these bankruptcy cases.

21.    The events giving rise to the claims asserted in the O'Connor Action are the same operative events at issue in both the Adversary Proceeding and the New York Action.  The legal issues raised by the O'Connor Action also overlap with the legal issues raised in the Adversary Proceeding and the New York Action, specifically, whether Souki and the Trust owe *any* obligation to the Lender Parties.  In other words, the Lender Parties are themselves forum shopping in another venue in a blatant attempt to skirt the consequences of the automatic stay, this Court's ruling on scheduling in the Adversary Proceeding, and the stay order issued in the New York Action, by seeking a separate adjudication of the same issues raised in the Adversary Proceeding and the New York Action.

22.    On September 9, 2023, as they did with the New York Action, Souki and the Trust filed a notice of removal of the O'Connor Action in the United States District Court for the Southern District of New York.  The O'Connor Action is now pending in that Court under case

8

number 23-cv-23-cv-07984. Souki and the Trust have also filed a motion to transfer venue of the O'Connor Action to this Court.

## RESPONSE

### I. The Lender Parties Have Not Met Their Heavy Burden of Demonstrating Bad Faith

24. Dismissal of a chapter 11 case is a drastic measure, and the burden is on the movant to prove that the relief requested is warranted and not premature. *See In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995). The harshness of dismissal "mandates that it result only upon a strong evidentiary showing." *Id*. The Motion to Dismiss relies primarily on the judicially created concept of "bad faith" because of the timing with respect to the chapter 11 filings as it relates to Lender Parties' attempts to foreclose on the Debtors' assets. This is despite the fact that bankruptcy cases are routinely filed to pursue asset sales and liquidate litigation claims while taking advantage of the automatic stay to do so efficiently, and that such cases are unquestionably filed for valid purposes and in good faith. The Lender Parties have made no "bad faith" showing. In fact, the Motion to Dismiss includes ***no evidence*** demonstrating "bad faith" by the Debtors that would warrant dismissal of the chapter 11 cases or otherwise. *See generally* Dkt. No. 75.

### A. Dismissal Must Be Denied Because the Debtors Filed these Chapter 11 Cases for Valid Bankruptcy Purposes

25. The Motion to Dismiss principally relies on *Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.)*, 779 F.2d 1068 (5th Cir. 1986). The Lender Parties are correct that *Little Creek* provides various factors to aid courts in determining whether "cause" exists to dismiss a bankruptcy case. However, contrary to the Lender Parties' characterizations, *Little Creek* does ***not*** prescribe a mechanical inquiry. Instead, it requires a court to first conduct a thorough "examination of all the particular facts and circumstances in each case." *Id*. at 1074 (quotation omitted). The mere presence of ***some*** of the *Little Creek* factors

9

is not alone sufficient to warrant a finding of bad faith or lack of good faith, which instead requires a thorough analysis of the debtor's condition. *Id.*

26. Moreover, "the oft-cited laundry list of factors is not always relevant or dispositive on the facts of a given case, and the Fifth Circuit has noted that 'determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.'" *In re Briggs-Cockerham, L.L.C.*, 2010 WL 4866874, at *5 (Bankr. N.D. Tex. Nov. 23, 2010) (quoting *Little Creek*, 779 F.2d at 1072). Instead, many courts evaluate "cause" using the "valid bankruptcy purpose" test, which asks whether a given case furthers a valid bankruptcy purpose. *See In re Ozcelebi*, 639 B.R. 365, 396–97 (Bankr. S.D. Tex. 2022); *see also In re Mirant Corp.*, 2005 WL 2148362, at *7 (Bankr. N.D. Tex. Jan. 26, 2005) (collecting cases and determining that the "valid bankruptcy purpose" test is more useful than the factors). Valid bankruptcy purposes include (i) preserving going concerns, including by "providing breathing space to reorganize";[7] (ii) maximizing property available to satisfy creditors;[8] and (iii) "restructuring . . . through a [section] 363 sale followed by a plan."[9] Thus, "a good faith petition must seek to preserve or create some value that would otherwise be lost outside of bankruptcy and . . . it is not bad faith to seek to gain

---

[7] *See In re Antelope Technologies, Inc.*, 2010 WL 2901017 at *4 (Bankr. S.D. Tex. July 21, 2010); *see also In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (noting that merely evincing the debtor's desire to "frustrate creditors" does not alone demonstrate "bad faith" because the Code recognizes the need for a "breathing spell" as a proper purpose to file a petition); *In re Althaus Fam. Invs. Ltd.*, 2019 WL 5588828, at *6 (Bankr. N.D. Ohio Oct. 29, 2019) (refusing to dismiss a case, even though it was filed on the eve of a foreclosure sale, because "it was not unreasonable for [the debtor] to seek a different forum and different procedures to promote maximization of value of the real estate, particularly one that provides for assumption and rejection of leases, while still protecting the interests of all parties").

[8] *In re Ozcelebi*, 639 B.R. at 396–97 (quotation omitted).

[9] *In re EHT US1, Inc.*, 630 B.R. 410, 431–32 (Bankr. D. Del. 2021); *see also In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 303 (Bankr. D. Del. 2011) (disagreeing that "chapter 11 is not available to a debtor to conduct an orderly liquidation as opposed to a piecemeal foreclosure process" because "[t]he Code expressly contemplates the use of a bankruptcy case to sell the assets of the estate in such a manner").

14181221

an advantage from declaring bankruptcy." *In re Roman Cath. Church of Archdiocese of New Orleans*, 632 B.R. 593, 599 (Bankr. E.D. La. 2021)

27.     The Lender Parties decry the Debtors for "admittedly 'tak[ing] advantage of the breathing spell afforded by the automatic stay.'" [Dkt. No. 75 ¶ 47]. Yet, as the foregoing authorities explain, this is undoubtedly a valid bankruptcy purpose. So too is the Debtors' stated goal of selling their assets so as to maximize value for all creditors, ***including*** the Lender Parties. The filing of these cases is not a bad faith attempt to avoid the consequences of an outcome determinative ruling in the New York Action, as the Lender Parties repeatedly suggest (as explained more fully below). *Cf. In re Stephens*, 2022 WL 534011, at *10 (Bankr. N.D. Tex. Feb. 22, 2022) (rejecting claims of forum shopping after viewing the alleged bad faith conduct in context). The Debtors are simply trying to resolve the claims against them and their property in an orderly manner and for the benefit of all.

28.     Even if the Court were inclined to engage in a factor-by-factor application of the *Little Creek* factors, the result remains the same.

**B.     *Little Creek* Does Not Compel Dismissal of the Debtors' Chapter 11 Cases**

29.     *Little Creek* is easily distinguishable from the Debtors' cases. The *Little Creek* debtor obtained an injunction against a foreclosure sale in state court but was unable to bond the amount required to continue. *Little* Creek, 779 F.2d at 1070–71. As such, the debtor initiated a chapter 11 proceeding in an attempt to transfer the litigation from state court to bankruptcy court where the protections of the automatic stay would allow the debtor to escape the state court's bond requirement. *Id.* at 1071. The bankruptcy court held that such action rendered the debtor's chapter 11 petition a "'bad faith' proceeding." *Id*. However, in reviewing the bankruptcy court's decision, the Fifth Circuit explained that filing a bankruptcy petition to prevent "a scheduled foreclosure sale is not, by itself, sufficient to constitute bad faith." *Id*. at 1073 (citing *In re Route 202 Corp.*,

11

37 B.R. 367, 373 (Bankr. E.D. Pa. 1984)).  The court reasoned that such facts simply "do not rise to the level of egregiousness necessary to conclude that the reorganization process is being perverted."  *Id*. (citations omitted).

30.  The basic gist of the Lenders Parties' argument is that the Debtors were unsuccessful in the New York Action and thus filed these chapter 11 proceedings in order to obtain a second bite at the apple.  This interpretation of events falls apart when the portion of the transcript from the New York Action cherry-picked by the Lender Parties is placed in its procedural context. [*See* Dkt. No. 70 at ¶¶ 1–5, 35–36, 46, 50–51].  Justice Masley did not make the statements relied upon by the Lender Parties at a bench trial or even a motion for summary judgment hearing—instead, those statements were made during her ruling on an application for preliminary injunction. The New York Action was (and remains) at an early stage and had not even progressed to the discovery stage when these chapter 11 cases were filed.  Justice Masley stated that her findings were based on the record before her, and emphasized that although the plaintiffs had not made the showings necessary for a preliminary injunction, that did not mean they could never prove the merits of their claims.  *See* Transcript of May 1, 2023 Hearing in New York Action [Dkt. No. 75-21] [hereinafter, "**N.Y. Transcript**"] at 52:8–25, 53:12–15, 54:4–7.  The Lender Parties' view of Justice Masley's comments as a fatal indictment (approaching *res judicata*) rings hollow because those comments were made at a preliminary injunction hearing.

31.  Instead, the Debtors filed their chapter 11 cases with the intent of maximizing the value received for the Ranch Properties and efficiently resolving their claims against the Lender Parties.  Indeed, the Sale and Bid Procedures Motion was filed, and the Adversary Proceeding initiated, on the Petition Date.  A hearing to approve the sale of the Ranch Properties is scheduled for October 5, 2023, and the current proposed schedule in the Adversary Proceeding would have

a pretrial conference in mid-November with trial potentially at the end of the year. Far from an alleged "bad faith" attempt to frustrate the sale of the Ranch Properties or delay resolution of the claims in dispute, the Debtors filed these cases and proposed a schedule that would see both the Ranch Properties sold and the parties' claims resolved by the end of this year, a mere four months after their filing chapter 11 cases were filed and far faster than would have occurred outside of bankruptcy.

### C.  The Lender Parties Remaining Authorities Are Readily Distinguishable

32.  The Lender Parties' remaining cases, *In re Triumph Christian Center, Inc.* and *In re Walter*, are similarly inapposite. [*See* Dkt. No. 70 at ¶¶ 48–51].

33.  *First*, the *Triumph Christian Center* debtors obtained a temporary restraining order in state court thereby preventing the creditor's scheduled foreclosure sale but, because the debtor passed on a hearing set to determine whether the temporary restraining order should be made a temporary injunction, the temporary restraining order expired with no temporary restraining injunction in place. *In re Triumph Christian Center Inc*., 493 B.R. 479, 484–85 (Bankr. S.D. Tex. 2013). When the creditor again initiated a foreclosure sale, the debtor filed a second chapter 11 case in attempt to stop the rescheduled foreclosure sale. *Id*. at 487. The court found that the debtor initiated the second bankruptcy proceeding in bad faith because, among other things, the timing of the filing evidenced the debtor's intent to "delay or frustrate the legitimate efforts of [the creditor] to enforce the rights it bargained for and preserved" under a plan previously approved in the debtor's first chapter 11 filing. *Id*. at 495. In addition, the court determined that the debtor failed to demonstrate that "dismissal was not in the best interests of the creditors or the estate." *Id*. at 496. That is not the situation before this Court. Unlike the chapter 11 case at issue in *Triumph Christian Center*, these are the Debtors' first chapter 11 cases. Also unlike *Triumph Christian Center*, Debtors here sought the protection of the automatic stay for the purpose of executing an

13

orderly, value-maximizing sale of the very assets upon which the Lender Parties seek to foreclose while simultaneously resolving their disputes with the Lender Parties so that sale proceeds may be appropriately distributed. Thus, unlike the circumstances in *Triumph Christian Center*, dismissal here is ***not*** in the best interests of the creditors and the estates.

34. *Second*, the *Walker* court found that the debtor's bankruptcy petition was filed in bad faith on the basis that, among other things, there existed no evidence that the debtor had sought, or would seek, to sell the property upon which its creditor initiated a foreclosure sale. *See In re Walker*, 108 B.R. 244, 249 (Bankr. C.D. Cal. 1989). The court also noted that an orderly liquidation of assets is among the legitimate reorganization objectives achievable via a chapter 11 filing. *Id*. at 250. Here, the Debtors filed the Sale and Bid Procedures Motion at the outset of the cases clearly evidencing their intent of commencing these chapter 11 cases for the legitimate purpose of taking "advantage of the breathing spell afforded by the automatic stay to allow for proper marketing of their assets without the threat of foreclosure proceedings from Defendants." [Adv. P. Dkt. No. 1 at ¶ 51].

35. *Finally*, none of circumstances presented in the cases cited in footnote 10 of the Motion to Dismiss are present here. *See Inv'rs Group, LLC v. Pottorff.*, 518 B.R. 380 (N.D. Tex. 2014) (bad faith found where debtor's chapter 11 petition was not filed in response to pressure from creditors); *In re Antelope Techs., Inc.*, 431 F. App'x 272 (5th Cir. 2011) (bad faith finding appropriate where chapter 11 petition not filed in response to debtor's financial crisis); *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262 (Bankr. N.D. Tex. 2021) (chapter 11 proceeding dismissed because case was filed to deprive New York state of its ability to regulate not-for-profit corporations); *In re Kickapoo Kennels, LLC*, 2013 WL 3148656 (Bankr. S.D. Tex. June 19, 2013) (chapter 11 proceeding dismissed for lack of financial need and debtor having sought only to gain

an unfair advantage in two-party dispute); *In re Sherwood Enters., Inc.*, 112 B.R. 165 (Bankr. S.D. Tex. 1989), judgment entered, (Bankr. S.D. Tex. Jan. 27, 1989) (chapter 11 petitions dismissed as bad faith filings where filed in lieu of debtor posting state court supersedeas bonds and debtor's ability to pay its debts); *In re Davis*, 93 B.R. 501 (Bankr. S.D. Tex. 1987) (chapter 11 proceeding dismissed as bad faith filings when made in attempt to avoid debtor posting supersedeas bond on appeal from adverse state court judgment).  None of these fact patterns are applicable to the Debtors or these chapter 11 cases.

## II.     The Debtors Had Authority to Initiate the Chapter 11 Cases

34.     In a desperate attempt to persuade this Court to dismiss the Debtors' chapter 11 cases, the Lender Parties also claim, "AVR's chapter 11 case should be dismissed because its petition is ultra vires." [Dkt. No. 75 at 19].  But the Lender Parties overlook that their dispute over authority must be adjudicated in an adversary proceeding and cannot serve as the grounds for dismissal.  *See In re Cadiz Properties, Inc.*, 278 B.R. 744, 746 (Bankr. N.D. Tex. 2002) (declining to resolve ownership dispute in the context of a motion to dismiss, instead reserving that issue for the pending adversary proceeding relating to the same).[10]

35.     Specifically, by suggesting that the Lender Parties possess the sole authority to exercise voting rights with respect to AVR (including with respect to filing bankruptcy), the Motion to Dismiss relies on a portion of the Pledge Agreement that is inoperative where "no Event of Default has occurred ***and is continuing***."  Pledge Agreement § 6(a) (emphasis added); *see also*

---

[10] *See also In re Player Wire Wheels, Ltd.*, 421 B.R. 864 (Bankr. N.D. Ohio 2009) (following *Cadiz* in holding that "[t]o the extent there is a dispute about who actually has authority to exercise control of Debtor, that issue must be resolved in an adversary proceeding, rather than through a motion to dismiss under 11 U.S.C. § 1112(b)"); *accord In re Quad-C Funding LLC*, 496 B.R. 135, 141–44 (Bankr. S.D.N.Y. 2013) (placing the burden on the movant to establish that the debtor lacked authority to file bankruptcy and recognizing that additional investigation of the debtor's authority for filing was "wrong as a matter of federal policy because it would permit parties to obstruct a bankruptcy filing, damage creditor interests, possibly doom a chance at rehabilitation, and possibly allow a creditor to escape liability on a potential preference").

15

14181221

*id.* § 7(a) (providing for the exercise of voting rights "at any time following the occurrence ***and during the continuance of an Event of Default***") (emphasis added). The Lender Parties' argument, therefore, rises or falls with whether there is a continuing Event of Default, which in turn directly implicates the dispute in the Adversary Proceeding—whether the Lender Parties' claim has been satisfied and their lien released due to their foreclosure of Collateral that, if disposed of in a commercially reasonable manner, would have satisfied the Lender Parties' claim. Moreover, for the reasons set forth fully in the Adversary Complaint, the Lender Parties are simply incorrect that Souki was not permitted to authorize AVR to file its chapter 11 petition merely because the occurrence of an ***alleged*** event of default vested in the Agent "the sole and exclusive right and authority to exercise such voting rights and powers." [Dkt. No. 70 at ¶¶ 48–51].

36. Separately, the Lender Parties' argument must be rejected as a matter of federal bankruptcy policy. The Lender Parties' reading of the Pledge Agreements effectively transforms the Pledge Agreements into a "pre-petition waiver of the benefits of bankruptcy," which, even cases relied upon by the Lenders Parties recognize is "***contrary to federal law and therefore void***." *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 205 (5th Cir. 2018) (emphasis added). Indeed, unlike the investor in *Franchise Services*, who made a $15 million equity investment in return for stock and accompanying voting rights, the facts here are on all fours with those cases that have rejected a creditor's ability to block a debtor's bankruptcy filing on account of the creditor obtaining a trivial number of shares.[11] In fact, the Lender Parties have obtained ***no*** shares in AVR

---

[11] *Compare In re Franchise Servs. of N. Am., Inc.*, 891 F.3d at 205–09, with *In re Lexington Hosp. Grp., LLC*, 577 B.R. 676, 679–81, 684–86, 688 (Bankr. E.D. Ky. 2017) (denying motion to dismiss where lender conditioned financing on grant of equity interest and appointment of non-fiduciary blocking director with right to prevent bankruptcy); *In re Intervention Energy Holdings*, 553 B.R. 258, 261, 266 (Bankr. D. Del. 2016) (denying motion to dismiss where lender conditioned forbearance on issuance of single common unit in exchange for $1 and amendment of operating agreement to require unanimous consent for bankruptcy); *In re Lake Mich. Beach Pottawattamie Resort*, 547 B.R. 899, 903–04, 911–15 (Bankr. N.D. Ill. 2016) (denying motion to dismiss where lender conditioned forbearance on appointment of lender as non-fiduciary "special member" with right to prevent bankruptcy but without right to distributions or obligation to make capital contributions); *In re Bay Club Partners–472, LLC*, 2014 WL

16

and instead assert a naked voting right.  The Lender Parties' attempt to completely foreclose AVR's ability to unilaterally declare bankruptcy runs contrary to constitutional authority as well as public policy and, therefore, must be rejected.  *See, e.g.*, *In re Intervention Energy Holdings, LLC*, 553 B.R. at 265 (rejecting creditor's consent rights, stating, "The federal public policy to be guarded here is to assure access to the right of a person, including a business entity, to seek federal bankruptcy relief as authorized by the Constitution and enacted by Congress.").

37. Because the Lender Parties have asserted no proper basis to dismiss these chapter 11 cases, the Court should deny their Motion to Dismiss.

## CONCLUSION

WHEREFORE, Debtors' respectfully request that—because the Debtors filed these chapter 11 cases for legitimate purposes, namely to conduct an orderly marketing process that maximizes the value of AVR's real property and to seek a determination from this Court regarding the extent of claims, if any, held by the Lender Parties against the Debtors—the Court (i) deny the Lender Parties' Motion to Dismiss; (ii) allow the Debtors' chapter 11 cases to proceed on their merits; and (iii) grant the Debtors' such other and further relief in law and equity to which the Debtors are justly entitled.

---

1796688, at *3–6 (Bankr. D. Or. May 6, 2014) (denying motion to dismiss where lender requested provision in operating agreement prohibiting filing voluntary bankruptcy petition before all debts were paid in full); *see also* Patrick J. Archambault and Marie A. MacCune, *Coal Instead of Golden Shares: The Enforceability of Bankruptcy Filing Consent Rights*, 95 AM. BANKR. L.J. 1, 12–17 (2021) (describing a spectrum, with cases involving bona fide investors, such as *Franchise Servs.* on one end, and cases with lenders and trivial ownership interests on the other).

Dated: September 14, 2023

Respectfully submitted,

*/s/ Jamie A. Aycock*
R. Paul Yetter
State Bar No. 22154200
Timothy S. McConn
State Bar No. 24032713
Jamie A. Aycock
State Bar No. 24050241
Amy C. Farish
State Bar No. 24097818
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com
tmcconn@yettercoleman.com
jamieaycock@yettercoleman.com
afarish@yettercoleman.com

*Counsel to Charif Souki and Karim Souki, Christopher Souki, and Lina Souki Rizzuto, in their capacities as trustees of the Souki Family 2016 Trust and Proposed Special Counsel for the Debtors and Debtors in Possession*

and

*/s/ Joshua W. Wolfshohl*
**PORTER HEDGES LLP**
Joshua W. Wolfshohl (TX Bar No. 24038592)
Heather K. Hatfield (TX Bar No. 24050730)
Aaron J. Power (TX Bar No. 24058058)
1000 Main St., 36th Floor
Houston, TX 77002
Tel: (713) 226-6000
Fax: (713) 226-6248
jwolfshohl@porterhedges.com
hhatfield@porterhedges.com
apower@porterhedges.com

*Proposed Bankruptcy Counsel for the Debtors and Debtors in Possession*

18

14181221

**CERTIFICATE OF SERVICE**

      I certify that on September 14, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                          */s/ Joshua W. Wolfshohl*
                                          Joshua W. Wolfshohl

14181221