United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 27, 2023

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **STRUDEL HOLDINGS LLC and** | § | **Case No. 23-90757 (CML)** |
| **AVR AH LLC,** | § |  |
|  | § | **(Jointly Administered)** |
| **Debtors.**[1] | § |  |
|  | § |  |

**ORDER (I) AUTHORIZING THE DEBTORS TO**
**OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND**
**SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND**
**(IV) GRANTING RELATED RELIEF**
**[Relates to Docket No. 111]**

Upon the motion (the "**Motion**")[2] of Strudel Holdings LLC and AVR AH LLC (together,

the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") seeking entry of this DIP

order (the "**DIP Order**"), among other things:

(i)      authorizing the Debtors to obtain postpetition financing up to an aggregate principal
         amount of $5.0 million (the "**DIP Financing**") pursuant to that certain Superpriority
         Subordinated Secured Debtor-in-Possession Credit Agreement dated as of September
         8, 2023 attached hereto as <u>**Exhibit A**</u> (the "**DIP Credit Agreement**"), and such other
         agreements, documents, certificates and instruments delivered or executed from time
         to time in connection therewith, including the agreements related to the Financing,
         (the "**DIP Documents**"), among the Debtors, as borrowers and Ajax Holdings, LLC,
         as lender (the "**DIP Lender**");

(ii)     authorizing the Debtors to (a) execute and enter into the DIP Credit Documents, (b)
         pay fees and reimburse expenses under the DIP Documents, as and in the amounts
         described in the DIP Documents, and (c) perform such other and further acts as may be
         required in connection with the DIP Documents;

(iii)    granting (a) to the DIP Lender the DIP Liens on the DIP Collateral to secure all amounts
         owed under the DIP Documents (the "**DIP Obligations**"), and (b) to the DIP Lender

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
       AVR AH LLC (0148) and Strudel Holdings LLC (5426).  The Debtors' service address is:  PO Box 4068, Aspen,
       CO 81612.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Motion or the DIP Credit
       Agreement (as defined below), as applicable.

the DIP Superpriority Claims (as defined below) in respect of the DIP Obligations, subject to the Prior Liens and other terms and conditions hereof;

(iv)    authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with this DIP Order and the other DIP Documents; and

(v)    modifying the automatic stay to the extent provided for herein.

The hearing on the Motion having been held by this Court (the "**Hearing**"), and this Court having considered the relief requested in the Motion, the exhibits attached thereto, the *Declaration of Douglas Brickley in Support of the DIP Motion* (the "**Brickley Declaration**"), the available DIP Documents, the evidence submitted, and arguments made at the Hearing; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.    *Petition Date*.  On July 27, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").  The Chapter 11 Cases are being jointly administered.

B.    *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

C.    *Jurisdiction and Venue*.  This Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern*

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

*District of Texas*, dated May 24, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. § 1408.  The predicates for the relief sought herein are sections 105, 362, 363(b), 363(c), 363(m), 364(c), 364(e), 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**") and the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**").

D.      *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E.      *Notice*.  Proper, timely, adequate and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice is required to enter this DIP Order.

F.      *Findings Regarding the DIP Financing*.

(i)      Good and sufficient cause has been shown for the entry of this DIP Order and for authorization of the Debtors to obtain financing pursuant to the DIP Documents.

(ii)      The Debtors need to obtain the DIP Financing to, among other things, continue the orderly operation of their business, to fund expenses of these Chapter 11 Cases, and conduct an orderly sales process for the Debtors' assets.  The access of the Debtors to sufficient

liquidity through the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents is necessary to preserve and maintain the value of the Debtors' assets and fund expenses of these Chapter 11 Cases.

(iii)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under section 364(c)(1) or 364(c)(2) of the Bankruptcy Code without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (each as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in the DIP Order and in the other DIP Documents.

(iv)     The DIP Financing, has been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Financing and DIP Documents, including, without limitation, all loans made to the Debtors pursuant to DIP Documents and any other DIP Obligations shall be deemed to be extended by the DIP Lenders in good faith (as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code) and at arm's length among the Debtors and the DIP Lender.  The DIP Lender (and any successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this DIP Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

(v)     The Debtors have prepared and delivered to the advisors to the DIP Lender an initial budget (the "**Initial DIP Budget**"), attached as __**Schedule 1**__ to this DIP Order.  The Initial

DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, operating disbursements, non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby, in form and substance acceptable to the DIP Lender.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement, and such modified, amended, extended and/or updated budget, once approved by the DIP Lender in accordance with the DIP Credit Agreement, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget shall constitute, without duplication, an "**Approved Budget**"); provided that any proposed modifications to the Approved Budget shall be provided to, and the Debtors shall consult with, the Prepetition Secured Parties[4] regarding such modifications.  The Debtors believe that the Initial DIP Budget is reasonable under the circumstances.  The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to permitted variances), this DIP Order and the other DIP Documents in determining to enter into the postpetition financing arrangements provided for in this DIP Order.

G.     *Relief Essential; Best Interest*.  Consummation of the DIP Financing in accordance with this DIP Order and the other DIP Documents is therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The Motion and this DIP Order comply with the requirements of Local Rule 4001-1(b).

H.     *Prepetition Prior Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prior Lien (as defined herein) is valid, senior, enforceable, prior, perfected,

---

[4]    "Prepetition Secured Parties" as used herein shall mean, collectively, Wilmington Trust National Association, as administrative agent (the "**Administrative Agent**"), Nineteen77 Capital Solution A LP, and Bermudez Mutuari, Ltd.

or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors or the DIP Lender, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prior Lien.  The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a Prior Lien, as used herein, and is expressly subject to the DIP Liens.  The DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens.

I.      The DIP Lender, the Debtors, and the Prepetition Secured Parties acknowledge the dispute between the Debtors and the Prepetition Secured Parties in the adversary proceeding captioned *AVR AH LLC, et al. v. Nineteen77 Capital Solutions A LP, et al.* pending in this court under Adv. Pro. No. 23-9003 (the "**Adversary Proceeding**"), whereby the Debtors are seeking to, among other things, disallow the Prepetition Secured Parties' secured claims (the "**Prepetition Secured Claims**") and liens (the "**Prepetition Liens**").   Nothing in this Order constitutes an admission of any defect in the Prepetition Secured Claims or the Prepetition Liens or impairs or otherwise impacts or affects the validity or extent of the Prepetition Secured Claims and Prepetition Liens, and all parties rights with respect to the validity or extent of the Prepetition Secured Claims and Prepetition Liens are expressly reserved and preserved.

J.      The Prepetition Secured Parties raised objections to the proposed DIP Loan and this Order memorializes a settlement of those objections, including the Prepetition Secured Parties' objection filed at Docket No. 155.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted*.  The relief sought in the Motion is granted, and the DIP Financing

is authorized and approved, in each case as set forth herein, subject to the terms and conditions set forth in this DIP Order and the other DIP Documents. All objections to the Motion and this DIP Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.        *Authorization of the DIP Financing and the DIP Documents*.  The Debtors are hereby authorized to execute, deliver, enter into, and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Debtors are authorized to comply with and perform all of the terms and conditions contained in the DIP Documents, and directed to repay amounts borrowed, together with interest and fees thereon, as well as any other outstanding DIP Obligations to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Documents and this DIP Order.

3.        *Authorization to Borrow*.  Upon entry of this DIP Order and finalizing and executing the DIP Credit Agreement and the other DIP Documents, the Debtors are immediately authorized to borrow from the DIP Lender initial borrowings under the DIP Financing in the amount set forth in the Initial Budget and any other Approved Budget.  The Debtors are authorized to use the proceeds of the DIP Financing only in accordance with, and for the purposes described in, this DIP Order and the Approved Budget (subject to any permitted variances).  The Debtors may not borrow under the DIP Financing amounts in excess of those set forth in the Initial Budget or Approved Budget.

4.        *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable against each Debtor and their estates in accordance with the terms of this DIP Order

and the DIP Documents, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing. Upon execution and delivery of the DIP Documents, the DIP Obligations shall include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by either of the Debtors to the DIP Lender under the DIP Documents (including this DIP Order). The Debtors shall be jointly and severally liable for the DIP Obligations. Except as permitted by this DIP Order, no obligation, payment, transfer, or grant of security hereunder or under the other DIP Documents to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under any of sections 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any similar applicable state statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.    *Carve-Out*.

(a)    As used in this DIP Order, the term "**Carve-Out**" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) subject, in each case, to the amounts set forth in the Initial Budget or any Approved Budget and to application of any retainers that may be

8

held, and to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise, all unpaid fees and expenses of persons or firms retained by the Debtors or the Creditors' Committee (if any) pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code (collectively, the "**Estate Professionals**") (in each case, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "**Allowed Professional Fees**") incurred at any time before the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined herein), subject to the Approved Budget, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii), the "**Pre-Carve-Out Trigger Notice Cap**"); and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $50,000 incurred on or after the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise (the amount set forth in this clause (iv), the "**Post-Carve-Out Trigger Notice Cap**" and, together with the Pre-Carve-Out Trigger Notice Cap and the amounts set forth in clauses (i) through (ii), the "**Carve-Out Cap**"); *provided that*, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in this paragraph 5(a) on any grounds.

(b)      Notwithstanding anything to the contrary in this DIP Order or the other DIP Documents, following delivery of a Carve-Out Trigger Notice, the DIP Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until such amounts owed pursuant to the Carve-Out are paid in full.

(c)      For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email by the DIP Lender to the Debtors, their counsel, the U.S. Trustee,

the Prepetition Secured Parties, and counsel to the Creditors' Committee (if any), which notice may only be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(d)     The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or expenses of any Estate Professionals incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursement has been allowed by the Court.  Nothing in this DIP Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or reimburse expenses of any Estate Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or expense reimbursement.

6.     *Budget Maintenance*.  The Debtors shall be permitted to use the proceeds of the DIP Financing solely for the purposes set forth in the Approved Budget, and only up to the respective aggregate amount of disbursements set forth in the Approved Budget for any week during the term of this DIP Order, subject to the permitted Variance (as defined below).  The Debtors may not use, sell, or expend, directly or indirectly, the proceeds of the DIP Financing except pursuant to the Approved Budget, subject to the permitted Variance and upon the terms and conditions set forth in this DIP Order.  The Approved Budget shall be updated, modified, or supplemented by the Debtors from time to time, but in any event, and upon written request to counsel for the Debtors, the Approved Budget shall be updated by the Debtors and delivered to the DIP Lender and the Prepetition Secured Parties on or before the Friday ending every consecutive four (4) week period.  Such amended budget will be deemed accepted unless the DIP Lender timely provides written notice setting forth a specific objection to the new budget within

10

three (3) business days of service of the proposed amended budget by the Debtors.  In the event of a disagreement between the DIP Lender and the Debtors regarding any updated, modified, or supplemented budget, the most recent Approved Budget will continue to stay in place and the Debtors may continue to use proceeds of the DIP Financing in accordance with such Approved Budget and this DIP Order unless and until an updated, modified, or supplemented budget is approved by, and is in a form and substance satisfactory to both the Debtors and the DIP Lender.

7.      *Budget Compliance*.  The Debtors shall at all times comply with the Approved Budget, subject to an allowed cumulative variance of less than or equal to twenty percent (20%) in the aggregate of the expense line items set forth on the Approved Budget (the "**Variance**").  On or before 5:00 p.m. (prevailing Central Time) beginning with the first Friday following the entry of this DIP Order and each Friday thereafter, the Debtors shall prepare and deliver to the DIP Lender a Variance report setting forth in reasonable detail actual cash receipts and disbursements for the prior week.

8.      *Section 506(c) Waiver*.   Retroactive to the Petition Date, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of the Prepetition Secured Lenders' Collateral) shall be charged against the Prepetition Secured Lenders or the Prepetition Secured Lenders' Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the Prepetition Secured Lenders, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors.

9. *DIP Superpriority Claims*. Pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors (except the DIP Superpriority Claims shall be junior to the Prepetition Secured Claims, with respect to rights against any collateral on which the Prepetition Liens are asserted, unless and until there is a final resolution of the Adversary Proceeding determining that the Prepetition Secured Parties liens and/or claims are invalid, disallowed, avoided, released or set to be set aside), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under section 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under section 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code and any proceeds or property recovered, unencumbered or otherwise from such claims and causes of action, whether by judgement, settlement, or otherwise, (collectively, "**Avoidance Actions**") in accordance with this DIP Order and the other DIP Documents. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event

12

that this DIP Order or any provision hereof or thereof is vacated, reversed or modified, on appeal or otherwise.

10.     *DIP Liens*.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of this DIP Order and without the necessity of the execution, recordation or filing by the Debtors or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing, or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, any collateral, without any further action by the DIP Lender, the following valid, binding, continuing, enforceable, and non-avoidable security interests and liens (all security interests and liens granted to the DIP Lender pursuant to this DIP Order and the other DIP Documents, the "**DIP Liens**") are hereby granted to the DIP Lender:

(a)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first-priority senior security interest (subject to the Carve-Out) in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors or their estates, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date is not subject to (i) a valid, perfected, and non-avoidable lien held by a creditor that has a valid claim against such Debtor's estate or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code held by a creditor that has a valid claim against such Debtor's estate (such liens described in clause (i) and (ii), collectively, "**Prior Liens**") including, without limitation, any and all unencumbered cash of the Debtors and any investment of cash, inventory, accounts

receivable, accounts, investment property, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "**DIP Collateral**").  The DIP Collateral expressly excludes Avoidance Actions and the proceeds of Avoidance Actions.

(b)      *Liens Subordinate to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon the DIP Collateral, which lien shall be: (i) junior and subordinate to the Carve-Out and (ii) immediately junior and subordinate to any Prior Liens.  Until and unless there is a final resolution of the Adversary Proceeding determining that the Prepetition Secured Parties do not hold Prior Liens or that such Prior Liens are otherwise disallowed, avoided, released or set aside, the liens of the Prepetition Secured Parties shall be deemed Prior Liens for the purposes of this Order, provided that all of the Debtors' and other parties' rights and claims in the Adversary Proceeding, and such parties' rights and claims to otherwise challenge such liens and claims, are fully reserved.

(c)      *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be subject or subordinate to or made *pari passu* with (i) any lien or security interest that is avoided and preserved

for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (ii) unless otherwise provided for in this DIP Order or the other DIP Documents, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (iii) any other lien or security interest under section 361, 363 or 364 of the Bankruptcy Code.

(d)     For the avoidance of doubt, the DIP Liens granted pursuant to this Order shall not "prime," and shall be immediately junior and subordinate to, any Prior Liens on the DIP Collateral, including any Prior Liens that may be held by the Prepetition Secured Parties.  To the extent, however, that any such liens and/or claims of the Prepetition Secured Parties are determined not to be Prior Liens and/or are otherwise disallowed, avoided, released, or set aside, the DIP Liens and DIP Obligations shall be first priority liens and claims on all of the DIP Collateral including, without limitation, the Ranch.

11.     *Perfection of DIP Liens*.

(a)     Without in any way limiting the automatically valid and effective perfection of the DIP Liens granted pursuant to paragraph 10 of this DIP Order, the DIP Lender is hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of securities, or to amend or modify security documents, or enter into intercreditor agreements, or to subordinate existing liens and any other similar action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them

hereunder the ("**Perfection Actions**").  Whether or not the DIP Lender takes such Perfection

Actions, such liens and security interests granted are deemed valid, perfected, allowed,

enforceable, non-avoidable, and not subject to challenge, dispute or subordination, at the time and

on the date of entry of this DIP Order.  Upon the request of the DIP Lender, the Debtors, without

any further consent of any party, and at the sole cost of the Debtors as set forth herein, are hereby

authorized to take, execute, deliver and file such actions, instruments and agreements (in each case,

without representation or warranty of any kind) to enable the DIP Lender to further validate,

perfect, preserve, and enforce the DIP Liens in all jurisdictions required under the DIP Credit

Agreement, including all local law documentation therefor determined to be reasonably necessary

by the DIP Lender.  All such documents will be deemed to have been recorded and filed as of the

Petition Date.

       (b)     A certified copy of this DIP Order may be filed with or recorded in filing or

recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien

or similar instruments by the DIP Lender, and all filing offices are hereby authorized and directed

to accept a certified copy of this DIP Order for filing and/or recording, as applicable.  The

automatic stay shall be modified to the extent necessary to permit the DIP Lender to take all

actions, as applicable, referenced in this subparagraph (b) and the immediately preceding

subparagraph (a).

       12.    *Protection of DIP Lender's Rights*.

       (a)     To the extent any entity has possession of any DIP Collateral or has control

with respect to any DIP Collateral, or has been noted as a secured party on any certificate of title

for a titled good constituting DIP Collateral, then such entity shall be deemed to maintain such

possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for

perfection for the benefit of the DIP Lender, and such entity, as applicable, shall comply with the instructions of the DIP Lender with respect to such notation or the exercise of such control or possession.

(b)        Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) that has not been waived by the DIP Lender and following delivery of written notice (a "**Termination Notice**") (including by e-mail), on not less than five (5) business days' notice (such five (5) business day period, the "**Remedies Notice Period**") to counsel for the Debtors, the Prepetition Secured Parties, the Creditors' Committee (if any), and the U.S. Trustee, (the "**Remedies Notice Parties**"), the DIP Lender may (and any stay otherwise applicable to the DIP Lender, whether arising under section 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this DIP Order (including this paragraph) is hereby modified for such purpose), without further notice to, hearing of, or order from this Court, to: (i) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Lender but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (ii) declare all DIP Obligations to be immediately due and payable; and (iii) invoke the right to charge interest at the default rate under the DIP Documents, which shall be an interest rate equal to the Contract Rate plus three percent (3%) per annum (the "**Default Rate**").  Upon delivery of such Termination Notice by the DIP Lender, without further notice or order of the Court, the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the Remedies Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Lender will have no obligation to provide any DIP Loans or other financial accommodations. As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket.  During the Remedies Notice Period, the Debtors, the Creditors'

Committee (if appointed), or any party in interest shall be entitled to seek an emergency hearing

with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and

is continuing.  If a request for such hearing is made prior to the end of the Remedies Notice Period,

then the Remedies Notice Period shall be continued until the Court hears and rules with respect

thereto.

        (c)      During the continuation of an Event of Default and following the delivery

of a Termination Notice, but prior to exercising the remedies set forth in this sentence below or

any other remedies (other than those set forth in paragraph 12(b)), the DIP Lender shall be required

to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less

than five (5) business days' notice to the Remedies Notice Parties (which may run concurrently

with the Remedies Notice Period) for a further order of the Court modifying the automatic stay in

the Chapter 11 Cases to permit the DIP Lender to, subject to the Carve-Out and related provisions:

(i) freeze or sweep monies or balances in the Debtors' accounts; (ii) enforce any and all rights

against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the

DIP Collateral, occupying the Debtors' premises, or sale or disposition of the DIP Collateral; and

(iii) take any other actions or exercise any other rights or remedies permitted under this DIP Order,

the DIP Documents, or applicable law; *provided* that (i) the DIP Lender shall not seek to enforce

remedies against the DIP Collateral until and unless there is a final resolution of the Adversary

Proceeding determining that the Prepetition Secured Parties do not hold Prior Liens and/or that

such Prior Liens are otherwise disallowed, avoided, released or set aside; and (ii) the Debtors' and

the Prepetition Secured Parties' rights to contest any such relief are reserved.  The rights and

remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or

remedies that the DIP Lender has under the DIP Documents or otherwise.  If the DIP Lender is

permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Lender in its efforts to enforce its security interest in the DIP Collateral, and shall not take or direct any person or entity to take any action designed or intended to hinder or restrict in any respect the DIP Lender from enforcing its security interests in the DIP Collateral.  Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of Event of Default to fund operations in accordance with the Approved Budget and the terms of the DIP Documents.

(d)       As additional protection for the DIP Lender, the Debtors shall pursue a sale (the "**Sale Transaction**") of the Ranch pursuant to the following milestones (the "**Milestones**"). The Milestones may be extended upon the mutual agreement of the Debtors and the DIP Lender. Unless waived in writing by the DIP Lender (and subject to the requirements of the Court's order approving bidding procedures relating to the Ranch, including, without limitation, the Prepetition Secured Parties consultation rights thereunder), a failure by the Debtors to comply with the Milestones shall constitute an Event of Default under the terms of the DIP Credit Agreement:

i.       Not later than October 3, 2023, an auction for the Ranch shall have occurred or been completed, unless such auction is canceled pursuant to the terms of the Bidding Procedures Order.

ii.       Not later than October 6, 2023, the Court shall have entered the Sale Order.

iii.       Not later than 15 days following after entry of the Sale Order, the Sale Transaction shall have closed.

(e)       During the Chapter 11 cases, as additional protection of the DIP Lender's rights, all reasonable and documented fees, costs, expenses, and charges, including, without limitation, attorneys' fees and expenses, that are incurred by Hunton Andrews Kurth LLP as counsel to the DIP Lender incurred after the Petition Date (collectively, the "**DIP Lender**

19

**Professional Fees and Expenses**") may be charged by the DIP Lender and shall be paid by the Debtors out of any DIP Facility advances. The Debtors are hereby authorized to pay such DIP Lender Professional Fees and Expenses without notice, motion, or application to, order of, or hearing before the Court. All DIP Lender Professional Fees and Expenses shall be paid within ten (10) calendar days of delivery of an invoice in summary form (which shall not be required to include time entry detail and may be redacted for privileged information) to counsel for the Debtors, the Creditors' Committee (if any), and the U.S. Trustee (collectively, the "**DIP Lender Fees and Expenses Remedies Notice Parties**". If any of the DIP Lender Fees and Expenses Remedies Notice Parties object to the reasonableness of such fees and expenses and cannot resolve such objection within five (5) business days of service of such invoice(s), such DIP Lender Fees and Expenses Remedies Notice Party shall file and serve upon the DIP Lender an objection with the Bankruptcy Court (a "**Fee Objection**") limited to the issue of the reasonableness of the disputed fees and expenses within ten (10) calendar days of the delivery of such invoice(s). If the DIP Lender Fees and Expenses Remedies Notice Parties do not object to the reasonableness of such fees and expenses within ten (10) calendar days of service of an invoice, any objection of the DIP Lender Fees and Expenses Remedies Notice Parties with respect to such invoice shall be waived. In the event the DIP Lender Fees and Expenses Remedies Notice Parties timely file a Fee Objection, the Debtors shall pay the undisputed portion of such invoice(s) subject to a Fee Objection within ten (10) calendar days of service of such invoice(s). All DIP Lender Professional Fees and Expenses shall constitute obligations under the DIP Facility, shall be secured by the DIP Collateral, and afforded all priorities and protections afforded to the DIP Lender under this DIP Order and the DIP Documents. Hunton Andrews Kurth LLP shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approvals of, the

Court for the payment of any of its fees or out-of-pocket expenses (other than with respect to disputed amounts).

13. *DIP Lender Proofs of Claim Not Required.* Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, the DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases for any claim allowed herein in or otherwise in relation to the DIP Credit Agreement or the DIP Documents.

14. *Prohibition on Additional Liens.* Except as provided in the DIP Documents or this DIP Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the DIP Obligations have been indefeasibly paid in full, granting liens on or security interests in the DIP Collateral or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are junior to, senior to, or *pari passu* with the DIP Liens.

15. *Payments Free and Clear.* Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this DIP Order, the other DIP Documents, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

16. *Reimbursement of Advances.* The advances made to the Debtors by the DIP Lender after the Petition Date to fund the Debtors' operating expenses in the amount of $642,934.00 shall be treated as administrative expenses of the Debtors' estates, shall be part of the DIP Obligations, and shall be reimbursed pursuant to the DIP Documents and the Approved Budget

17.     *Disposition of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents.

18.     *Subsequent Reversal or Modification*.  This DIP Order is entered pursuant to, *inter alia*, section 364 of the Bankruptcy Code, and Bankruptcy Rule 4001(c), granting the DIP Lender all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this DIP Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Lender prior to the date of receipt by the DIP Lender of written notice of the effective date of such action, (ii) the payment of any fees required under this DIP Order or the DIP Documents, or (iii) the validity and enforceability of any lien, claim, obligation, right, remedy or priority authorized or created under this DIP Order or pursuant to the DIP Documents as of such date.

19.     *Indemnification*.  Without limitation to any other right to indemnification, the DIP Lender shall be and hereby is indemnified as provided in the DIP Documents, as applicable.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this DIP Order to any obligation set forth, as the case may be, in this paragraph 19 or otherwise in the DIP Documents to indemnify and/or hold harmless any DIP Secured Party or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

20.     *Order Governs*.  In the event of any inconsistency between the provisions of this DIP Order and the DIP Documents, the provisions of this DIP Order shall govern.  Notwithstanding the relief granted in any other order by this Court, (a) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this DIP Order, including compliance with the Approved Budget (subject to permitted variances) and all other

terms and conditions hereof, and (b) to the extent there is any inconsistency between the terms of such other order and this DIP Order, this DIP Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

21.     *Modifications of the Approved Budget*.  Without further order of the Court, the Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms hereof and upon the consent of the DIP Lender in its reasonable discretion and subject to the Prepetition Secured Parties' consultation rights, any modifications to the Approved Budget with such modification being in writing.

22.     *Chief Restructuring Officer Authority*.  The Debtors' Chief Restructuring Officer, Douglas J. Brickley (the "**CRO**"), shall have exclusive decision-making authority on behalf of the Debtors with respect to all matters related to the DIP Facility, including without limitation, the negotiation of this DIP Order and amendments thereto, request for borrowings thereunder and the use of proceeds thereof, compliance with the covenants (including reporting covenants), and any agreement of the Debtors to any amendments, waivers or modifications of the DIP Documents (including all budgets) shall be vested solely in the CRO.

23.     *Adequate Protection*.  Nothing herein shall limit or impair the Prepetition Secured Parties' right to seek adequate protection in these cases, pursuant to sections 361 and 363 of the Bankruptcy Code, or the Debtors' or any other parties' rights to contest such request and all rights of the Prepetition Secured Parties to seek adequate protection are without prejudice to this DIP Order and expressly reserved.

24.     *Binding Effect; Successors and Assigns*.  The DIP Documents, including the provisions of this DIP Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Lender, any statutory or

23

non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Debtors and their respective successors and assigns; *provided* that the DIP Lender shall have no obligation to permit the use of the DIP Collateral by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed for the estates of the Debtors.

25.     *Release*.  Effective as of the date of entry of this DIP Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Lender and each of its subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such, (collectively, the "**Released Parties**") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable)

24

the DIP Documents, the negotiation thereof, or of the transactions and agreements reflected thereby, or the financial or other obligations owing or made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this DIP Order. For the avoidance of doubt, (i) nothing in this release shall relieve the DIP Lender or the Debtors of their obligations under the DIP Documents; (ii) nothing herein shall release any claims held by the Prepetition Secured Parties; and (iii) nothing herein shall release any claims against the DIP Lender for any claim, act or omission occurring after the entry of this DIP Order.

26.     *Exculpation*.  Nothing in this DIP Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The DIP Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the DIP Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP shall be borne by the Debtors.

27.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or in exercising any rights or remedies as and when permitted pursuant to this DIP Order, the DIP Documents, or any other documents related to the transactions contemplated hereby, the DIP Lender shall not (a) have any

liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).

28.     Notwithstanding anything to the contrary in the DIP Credit Agreement or the DIP Order (including without limitation paragraphs 25-27 above), the Prepetition Secured Parties shall not be deemed to have provided any releases to, or waived any claims against, any party (including the Released Parties or the Debtors), and all rights, remedies, claims and defenses of the Prepetition Secured Parties are expressly reserved.

29.     *Miscellaneous*.  The DIP Documents shall be modified prior to Closing to reflect the following:

      a.     The upfront fee set forth in Article 2.4 of the DIP Credit Agreement is waived and shall not constitute a DIP Obligation.

      b.     Pursuant to Article 2.8 of the DIP Credit Agreement, any proceeds from insurance claims shall be held by the Debtors pending the final disposition of the Adversary Proceeding or further order of the Court.

      c.     Any advances made by the DIP Lender pursuant to Article 2.9 shall not exceed five percent (5%) of the total DIP Financing unless otherwise authorized by further Court order.

30.     *Effectiveness*.  Notwithstanding Bankruptcy Rule 4001(a)(3) and 6004(h), any Bankruptcy Local Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this DIP Order.

31. *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this DIP Order.

32. *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

33. *No Third-Party Rights*. Except as explicitly provided for herein, this DIP Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

34. *Necessary Action*. The Debtors and the DIP Lender are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this DIP Order. In addition, the automatic stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this DIP Order.

35. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this DIP Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.


Signed: September 27, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

27

# EXHIBIT A

*DRAFT 9/8/2023*

SECURED DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT

AMONG

AVR AH, LLC,
STRUDEL HOLDINGS, LLC,
EACH AS DEBTOR AND DEBTOR-IN-POSSESSION UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE,
AS BORROWERS

AND

AJAX HOLDINGS, LLC,
AS LENDER

September [__], 2023

14169224

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETATION.................................................................. 1
    1.1    Terms Defined Above.................................................................................1
    1.2    Additional Defined Terms ..........................................................................2
    1.3    Undefined Financial Accounting Terms.................................................13
    1.4    References ...............................................................................................13
    1.5    Articles and Sections...............................................................................14
    1.6    Number and Gender.................................................................................14
    1.7    Incorporation of Schedules and Exhibits ................................................14
    1.8    Negotiated Transaction ...........................................................................14

ARTICLE II TERMS OF DIP FACILITY ................................................................................ 14
    2.1    Term Loans..............................................................................................14
    2.2    Use of Loan Proceeds..............................................................................15
    2.3    Repayment of Term Loans.......................................................................15
    2.4    Fees .........................................................................................................15
    2.5    Outstanding Amounts ..............................................................................15
    2.6    Taxes and Time, Place, and Method of Payments ...................................15
    2.7    Voluntary Prepayments............................................................................17
    2.8    Mandatory Prepayments ..........................................................................17
    2.9    Loans to Satisfy Obligations of Borrowers.............................................18
    2.10    General Provisions Relating to Interest ...................................................18
    2.11    Yield Protection ......................................................................................19
    2.12    Security Interest in Accounts; Right of Offset.........................................20
    2.13    Illegality..................................................................................................20
    2.14    Regulatory Change...................................................................................20
    2.15    Joint and Several Liability .......................................................................20
    2.16    Termination of the DIP Facility ..............................................................21
    2.17    Priority and Liens....................................................................................21
    2.18    Payment of Obligations...........................................................................23

ARTICLE III CONDITIONS ................................................................................................ 23
    3.1    Conditions of the Closing Date................................................................23
    3.2    Conditions to All Term Loans .................................................................25

ARTICLE IV REPRESENTATIONS AND WARRANTIES ......................................................... 26
    4.1    Due Authorization...................................................................................26
    4.2    Existence .................................................................................................26
    4.3    Valid and Binding Obligations ................................................................27
    4.4    Security Documents .................................................................................27
    4.5    Title to the Property.................................................................................27

- i -

| | | |
|---|---|---|
| 4.6 | No Material Adverse Effect or Default | 27 |
| 4.7 | No Material Misstatements | 27 |
| 4.8 | [Intentionally Omitted] | 27 |
| 4.9 | Authorizations; Consents | 27 |
| 4.10 | Compliance with Laws | 28 |
| 4.11 | ERISA | 28 |
| 4.12 | Environmental Laws | 28 |
| 4.13 | Compliance with Federal Reserve Regulations | 28 |
| 4.14 | Investment Company Act Compliance | 28 |
| 4.15 | Proper Filing of Tax Returns; Payment of Taxes Due | 28 |
| 4.16 | Casualties or Taking of Property | 28 |
| 4.17 | Location of the Borrowers | 29 |
| 4.18 | Compliance with Anti-Terrorism Laws | 29 |
| 4.19 | Bankruptcy Order | 30 |
| 4.20 | Budget | 30 |
| 4.21 | Anti-Bribery and Anti-Corruption | 30 |

| | | |
|---|---|---|
| ARTICLE V AFFIRMATIVE COVENANTS | | 31 |
| 5.1 | Maintenance and Access to Records | 31 |
| 5.2 | Financial Reporting | 31 |
| 5.3 | Notices of Certain Events | 31 |
| 5.4 | Tax Returns | 32 |
| 5.5 | Additional Information | 32 |
| 5.6 | Compliance with Laws | 32 |
| 5.7 | Payment of Assessments and Charges | 32 |
| 5.8 | Maintenance of Existence or Qualification and Good Standing | 33 |
| 5.9 | Payment of the Note; Performance of Obligations | 33 |
| 5.10 | Further Assurances | 33 |
| 5.11 | Initial Expenses of the Lender | 33 |
| 5.12 | Subsequent Expenses of the Lender | 33 |
| 5.13 | Maintenance and Inspection of Properties | 34 |
| 5.14 | Maintenance of Insurance | 34 |
| 5.15 | Environmental Indemnification | 34 |
| 5.16 | General Indemnification | 35 |
| 5.17 | Budget Variance Report, Cash Forecasts & Lender Conference Calls. | 35 |
| 5.18 | Certain Other Bankruptcy Orders | 36 |
| 5.19 | Certain Case Milestones | 36 |

| | | |
|---|---|---|
| ARTICLE VI NEGATIVE COVENANTS | | 36 |
| 6.1 | Indebtedness | 36 |
| 6.2 | Liens | 37 |
| 6.3 | Sales of Assets | 37 |
| 6.4 | Leasebacks | 37 |
| 6.5 | Loans or Advances | 37 |

- ii -

| | | |
|---|---|---|
| 6.6 | Investments | 37 |
| 6.7 | Dividends and Distributions | 37 |
| 6.8 | Issuance of Equity; Changes in Corporate Structure | 37 |
| 6.9 | Transactions with Affiliates and Certain Other Person | 37 |
| 6.10 | Lines of Business | 38 |
| 6.11 | Plan Obligation | 38 |
| 6.12 | Anti-Terrorism Laws | 38 |
| 6.13 | Amendment of Material Contracts | 38 |
| 6.14 | Deposit Accounts | 38 |
| 6.15 | Organizational Documents | 38 |
| 6.16 | Capital Expenditures | 38 |
| 6.17 | Prepayments of Certain Indebtedness | 38 |
| 6.18 | Budget Variances | 39 |
| 6.19 | Use of Proceeds | 39 |
| 6.20 | Additional Bankruptcy Matters | 39 |
| **ARTICLE VII EVENTS OF DEFAULT** | | **40** |
| 7.1 | Enumeration of Events of Default | 40 |
| 7.2 | Remedies | 43 |
| **ARTICLE VIII MISCELLANEOUS** | | **44** |
| 8.1 | Assignments; Participations | 44 |
| 8.2 | Survival of Representations, Warranties, and Covenants | 45 |
| 8.3 | Notices and Other Communications | 45 |
| 8.4 | Parties in Interest | 46 |
| 8.5 | Rights of Third Parties | 46 |
| 8.6 | Renewals; Extensions | 46 |
| 8.7 | No Waiver; Rights Cumulative | 47 |
| 8.8 | Survival Upon Unenforceability | 47 |
| 8.9 | Amendments; Waivers | 47 |
| 8.10 | Controlling Agreement | 47 |
| 8.11 | Disposition of Collateral | 47 |
| 8.12 | Governing Law | 47 |
| 8.13 | Forum Selection and Consent to Non-Exclusive Jurisdiction; Waiver of Jury Trial. | 47 |
| 8.14 | Integration | 49 |
| 8.15 | Waiver of Punitive and Consequential Damages | 49 |
| 8.16 | Counterparts | 49 |
| 8.17 | USA Patriot Act Notice | 49 |
| 8.18 | Tax Shelter Regulations | 49 |
| 8.19 | Inconsistencies with Other Documents | 50 |

DMS 303644570v6

14169224

LIST OF SCHEDULES

Schedule 4.5(B)     –      Real Property

DMS 303644570v6

14169224

# SECURED DEBTOR-IN-POSSESSION
# TERM LOAN CREDIT AGREEMENT

This **SECURED DEBTOR-IN-POSSESSION TERM CREDIT LOAN AGREEMENT** is dated as of September [__] 2023, by and among AVR AH LLC, a Colorado limited liability company ("AVR"), and STRUDEL HOLDINGS LLC, a Texas limited liability company ("Strudel"), each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (each a "Borrower" and, collectively, the "Borrowers"), and AJAX HOLDINGS LLC, a Colorado limited liability company ("Lender").

## PRELIMINARY STATEMENTS

WHEREAS, on July 27, 2023 (the "Petition Date"), AVR and Strudel filed voluntary petitions with the Bankruptcy Court (such entities filing such petitions, together with any other Affiliates that become debtors in the Cases, are hereinafter referred to as the "Debtors"), initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the case of each Debtor, each, a "Case" and collectively, the "Cases");

WHEREAS, the Debtors have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, for their general working capital and other corporate needs, the Borrowers have requested the Lender provide a multiple delayed draw term loan facility denominated in Dollars in the aggregate principal amount at any time outstanding not in excess of $3,700,000.00 (the "DIP Facility");

WHEREAS, the Lender is willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein;

WHEREAS, the priority of the DIP Facility with respect to the Collateral shall be as set forth in the Order, upon entry thereof by the Bankruptcy Court and in the Security Documents;

WHEREAS, all of the claims and the Liens granted under the Order and the Loan Documents to the Lender and for the benefit of the Lender in respect of the DIP Facility shall be subject to the Carve-Out; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

1.1     Terms Defined Above.  As used in this Agreement, each of the terms "Borrower," "AVR," "Case," "Cases," "Debtors," "DIP Facility," "Lender," "Petition Date" and "Strudel," shall have the meaning assigned to such term hereinabove.

1.2     <u>Additional Defined Terms</u>.  As used in this Agreement, each of the following terms shall have the meaning assigned thereto in this <u>Section 1.2</u> or in Sections referred to in this <u>Section 1.2</u>, unless the context otherwise requires:

"<u>Additional Amount</u>" shall have the meaning set forth for such term in <u>Section 2.6</u>.

"<u>Additional Costs</u>" shall mean costs which are attributable to the obligation of the Lender to maintain the Term Loans, or any reduction in any amount receivable by the Lender in respect of any such obligation or any Term Loan, resulting from any Regulatory Change which (a) changes the basis of taxation of any amounts payable to the Lender under this Agreement or any Note in respect of any Term Loan (other than taxes imposed on the overall net income of the Lender or its lending office (including franchise or similar taxes) for the Term Loans), or (b) imposes any other condition affecting this Agreement or any Note or any of such extensions of credit, liabilities or Commitments, in each case with respect to the Term Loans.

"<u>Affiliate</u>" shall mean, as to any Person, any other Person directly or indirectly, controlling, or under common control with, such Person and includes, as to the Borrowers, any Subsidiary of the Borrowers and any "affiliate" of the Borrowers within the meaning of Rule 12b-2 promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, with "control," as used in this definition, meaning possession, directly or indirectly, of the power to direct or cause the direction of management, policies or action through ownership of voting securities, contract, voting trust, or membership in management or in the group appointing or electing management or otherwise through formal or informal arrangements or business relationships.

"<u>Agreement</u>" shall mean this Secured Debtor-In-Possession Term Loan Credit Agreement, as it may be amended, supplemented, restated, or otherwise modified from time to time.

"<u>Anti-Corruption and Anti-Bribery Laws</u>" means anti- corruption statutes of all jurisdictions (including, the Foreign Corrupt Practices Act of 1977, the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions, and any similar national or local law or regulation in the United Kingdom or elsewhere where any of the Borrowers and any Subsidiary conducts business), the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency or any such jurisdiction.

"<u>Anti-Terrorism Laws</u>" shall mean any laws relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"<u>Approved Purposes</u>" shall mean the Operating Disbursements, the Other Disbursements, and any disbursements approved by the Lender during the term of this Agreement.

"<u>Avoidance Actions</u>" shall have the meaning assigned to such term in <u>Section 2.17(a)</u>.

14169224

"Bankruptcy Code" shall mean the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Cases from time to time.

"Bankruptcy Plan" shall mean any plan of reorganization or liquidation proposed under the Bankruptcy Code.

"Blocked Person" shall have the meaning assigned to such term in Section 4.18.

"Borrowing Request" shall mean a written borrowing request in the form of and substance satisfactory to the Lender.

"Budget" shall mean the four (4) week rolling operating budget and cash flow forecast which shall reflect the good faith projection of the Borrowers in the cases of all weekly cash receipts and disbursements in connection with the operation of the Borrowers' business during such four (4) week period, including but not limited to, collections, payroll, capital expenditures and other major cash outlays, in form and substance satisfactory to the Lender in its sole discretion and certified by a Responsible Officer of the Borrowers in form and substance satisfactory to the Lender in its sole discretion.

"Budget Variance Report" shall mean a report, in each case certified by a Financial Officer of the Borrowers, in form reasonably satisfactory to the Lender, delivered in accordance with Section 5.17(a), showing the amount, if any, by which projected cash receipts and expenditures set forth for the applicable week in the Budget exceed actual cash receipts and expenditures in such week, expressed as a percentage.

"Business Day" shall mean any day other than a Saturday, Sunday, legal holiday for commercial banks under the laws of the State of Texas, or any other day when banking is suspended in the State of Texas.

"Business Entity" shall mean a corporation, partnership, joint venture, limited liability company, joint stock association, business trust, or other business entity.

"Capital Expenditures" shall have the meaning assigned to such term by GAAP.

"Carve-Out" shall mean the sum of (i) any fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930 of title 28 of the United States Code; (ii) all reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $25,000 (iii) subject, in each case, to the Initial Budget or any successor Budget, to application of any retainers that may be held and to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise, all unpaid fees and expenses of persons or firms retained by the Borrowers or the Creditors' Committee (as defined in the Order) (if any) pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code (collectively, the "Estate Professionals") (in each case, other than any restructuring, sale, success, or other

- 3 -

transaction fee of any investment bankers or financial advisors) (the "Allowed Professional Fees") incurred at any time before the first business day following delivery by the Lender of a Carve-Out Trigger Notice, subject in all respects to the Initial Budget or any successor Budget, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii), the "Pre-Carve-Out Trigger Notice Cap"); and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $50,000 incurred on or after the first business day following delivery by the Lender of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise (the amount set forth in this clause (iv), the "Post-Carve-Out Trigger Notice Cap" and, together with the Pre-Carve-Out Trigger Notice Cap and the amounts set forth in clauses (i) through (ii), the "Carve-Out Cap"); *provided that*, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in paragraph 5(a) of the Order on any grounds.

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Lender or its respective officers, directors, employees, agents, advisers and counsel, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Loan Documents in favor of the Lender.

Subject to the Order, for the avoidance of doubt and notwithstanding anything to the contrary herein, or in any Loan Documents, the Carve-Out shall be senior to all liens and claims securing the Obligations and any and all other forms of adequate protection, liens or claims securing the Obligations.

"Carve-Out Trigger Notice" shall mean the written notice delivered by the Lender to the Debtors, their lead counsel, the U.S. Trustee, and counsel to the Creditors' Committee (if any) which notice may be delivered following the occurrence and continuation of an Event of Default.

"Change of Control" shall mean Charif Souki shall fail to own one hundred percent (100%) of the Equity Interests of each of the Borrowers.

"Closing Date" shall mean the Effective Date of this Agreement.

"Collateral" shall mean the Real Property and any other Property of any Person now or at any time used or intended as security for the payment or performance of all or any portion of the Obligations.

"Commitment" shall mean the Lender's obligation to make the Term Loans in an aggregate amount not exceeding $3,700,000.

"Commonly Controlled Entity" shall mean any Person which is under common control with the Borrowers within the meaning of Section 4001 of ERISA.

- 4 -

"Contract Rate" shall mean the sum of the (a) Prime Rate, plus (b) two percent (2.00%) per annum, but in no event shall such rate exceed, as to the Lender, the Highest Lawful Rate.

"Creditors' Committee" shall mean any official committee of unsecured creditors appointed by the Unites States Trustee pursuant to section 1102 of the Bankruptcy Code.

"Default" shall mean any event or occurrence, which with the lapse of time or the giving of notice or both would become an Event of Default.

"Default Rate" shall mean an interest rate equal to the Contract Rate plus five percent (5%) per annum, but in no event shall such rate exceed the Highest Lawful Rate.

"Disbursement Date" shall mean the date upon which the Lender makes disbursements of the Term Loans to the Borrowers pursuant to the terms and conditions of this Agreement.

"Dispute" shall mean any claim, dispute or controversy with respect to this Agreement or any other Loan Document.

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

"Effective Date" shall mean the date on which the conditions specified in Section 3.1 are satisfied.

"Entry Date" shall mean the date on which the Order is entered by the Bankruptcy Court.

"Environmental Complaint" shall mean any written or oral complaint, order, directive, claim, citation, notice of environmental report or investigation, or other notice by any Governmental Authority or any other Person with respect to (a) air emissions, (b) spills, releases, or discharges to soils, any improvements located thereon, surface water, groundwater, or the sewer, septic, waste treatment, storage, or disposal systems servicing any Property of the Borrowers, (c) solid or liquid waste disposal, (d) the use, generation, storage, transportation, or disposal of any Hazardous Substance, or (e) other environmental, health, or safety matters affecting any Property of the Borrowers or the business conducted thereon.

"Environmental Laws" shall mean (a) the following federal laws as they may be cited, referenced, and amended from time to time:  the Clean Air Act, the Clean Water Act, the Safe Drinking Water Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Endangered Species Act, the Resource Conservation and Recovery Act, the Hazardous Materials Transportation Act, the Occupational Safety and Health Act, the Oil Pollution Act, the Resource Conservation and Recovery Act, the Superfund Amendments and Reauthorization Act, and the Toxic Substances Control Act; (b) any and all equivalent environmental statutes of any state in which Property of any Borrower is situated, as they may be cited, referenced and amended from time to time; (c) any rules or

- 5 -

regulations promulgated under or adopted pursuant to the above federal and state laws; and (d) any other equivalent federal, state, or local statute or any requirement, rule, regulation, code, ordinance, or order adopted pursuant thereto, including those relating to the generation, transportation, treatment, storage, recycling, disposal, handling, or release of Hazardous Substances.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, and the regulations thereunder and interpretations thereof.

"Event of Default" shall mean any of the events specified in Section 7.1.

"Excluded Assets" shall have the meaning assigned to such term in Section 2.17(d).

"Excluded Taxes" shall mean, with respect to any and all payments to the Lender or any recipient of any payment to be made by or on account of any Obligation, net income taxes, branch profits taxes, franchises and excise taxes (to the extent imposed in lieu of net income taxes), and all interest, penalties and liabilities with respect thereto, imposed on the Lender.

"Executive Order No. 13224" shall mean Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Financial Officer" shall mean, for any Business Entity, the chief financial officer, principal accounting officer, treasurer, manager or controller of such Business Entity.

"GAAP" shall mean generally accepted accounting principles established by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants and in effect in the United States of America from time to time.

"Governmental Authority" shall mean any nation, country, commonwealth, territory, government, state, county, parish, municipality, or other political subdivision and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government.

"Hazardous Substances" shall mean flammables, explosives, radioactive materials, hazardous wastes, asbestos, or any material containing asbestos, polychlorinated biphenyls (PCBs), toxic substances or related materials, petroleum, petroleum products, associated oil or natural gas exploration, production, and development wastes, or any substances defined as "hazardous substances," "hazardous materials," "hazardous wastes," or "toxic substances" under the Comprehensive Environmental Response, Compensation and Liability Act, the Superfund Amendments and Reauthorization Act, the Hazardous

- 6 -

Materials Transportation Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, or any other Requirement of Law.

"Highest Lawful Rate" shall mean, the maximum non-usurious interest rate, if any (or, if the context so requires, an amount calculated at such rate), that at any time or from time to time may be contracted for, taken, reserved, charged or received under laws applicable to the Lender, as such laws are presently in effect or, to the extent allowed by applicable law, as such laws may hereafter be in effect and which allow a higher maximum non-usurious interest rate than such laws now allow.

"Indebtedness" shall mean, as to any Person, without duplication, (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services; (c) all unreimbursed material reimbursement or payment obligations with respect to letters of credit, banker's acceptances and similar instruments; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all guaranty obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (e) above; and (g) all indebtedness referred to in clauses (a) through (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 5.15.

"Initial Budget" shall mean the Budget setting forth the projected financial operations of the Debtors for the 4-week period commencing with the week in which the Entry Date occurs, approved and in form and substance satisfactory to the Lender in its sole discretion.

"Interest Payment Date" shall mean, with respect to any Term Loan, the first Business Day of each calendar month.

"Investment" in any Person shall mean any stock, bond, note or other evidence of Indebtedness, or any other security (other than current trade and customer accounts) of, investment or partnership interest in or loan to, such Person.

"Lien" shall mean any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute, or contract, and including, but not limited to, the lien or security interest arising from a mortgage, ship mortgage, encumbrance, pledge, security agreement,

conditional sale or trust receipt, or a lease, consignment, or bailment for security purposes (other than true leases or true consignments), liens of mechanics, materialmen, and artisans, maritime liens and reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Property which secure an obligation owed to, or a claim by, a Person other than the owner of such Property (for the purpose of this Agreement, the Borrowers shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, financing lease, or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes).

"Limitation Period" shall mean, any period while any amount remains owing on the Note payable to the Lender and interest on such amount, calculated at the Contract Rate, plus any fees or other sums payable to the Lender under any Loan Document and deemed to be interest under applicable law, would exceed the amount of interest which would accrue at the Highest Lawful Rate.

"Loan Balance" shall mean, at any point in time, the aggregate outstanding principal balance of the Term Loans at such time.

"Loan Date" shall mean the Order Funding Date or any Funding Date, as context may require.

"Loan Documents" shall mean this Agreement, the Note, the Security Documents, and all other documents and instruments now or hereafter delivered pursuant to the terms of or in connection with any of the foregoing, and all renewals and extensions of, amendments and supplements to, and restatements of, any or all of the foregoing from time to time in effect.

"Material Adverse Effect" shall mean (a) any adverse effect on the business, operations, properties, liabilities or financial condition of the Borrowers and their Subsidiaries, on a consolidated basis, which increases, in any material respect, the risk that any of the Obligations will not be repaid as and when due, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and commencement of the Cases, (b) any material and adverse effect upon the Collateral, including any material and adverse effect upon the value or impairment of any Borrowers' or any other Person's ownership of any material portion of the Collateral, (c) any material adverse effect on the validity or enforceability of any Loan Document or (d) any material adverse effect on the rights or remedies of the Lender under an Loan Document.

"Mortgages" shall mean, collectively, the deed or deeds of trust executed by the Borrowers to the Lender providing a lien on all Real Property owned or leased by the Borrowers.

"Note" shall mean, collectively, the promissory note executed by the Borrowers and payable to the Lender in the face amount of the amount of the Term Loan, together with all renewals, extensions for any period, increases and rearrangements thereof.

14169224

"Obligations" shall mean, without duplication of the same amount in more than one category, (a) all Indebtedness of the Borrowers under this Agreement and as evidenced by the Note, and (b) all other obligations and liabilities of the Borrowers to the Lender, now existing or hereafter incurred, under, arising out of or in connection with any other Loan Document.

"O'Connor Defendants" shall mean Nineteen77 Capital Solutions A LP and Bermudez Mutari, Ltd.

"OFAC" shall mean the Office of Foreign Assets Control of the United States of America Department of the Treasury, or any other any successor Governmental Authority.

"Operating Account" shall mean the deposit account ending [____] maintained by one or more of the Borrowers with [_____], which deposit account shall be subject to a Deposit Account Control Agreement with shifting control among the applicable Borrower, financial institution counterparty and the Lender.

"Operating Disbursements" shall mean disbursements for post-petition operating expenses and working capital needs of the Borrowers, including, but not limited to, those required to remain in, or return to compliance with the laws in accordance with 28 U.S.C. § 959, and such general and administrative expenses as are contained within the Initial Budget and any applicable successor Budget.

"Order" shall mean an order of the Bankruptcy Court acceptable to the Lender authorizing the DIP Facility, on a final basis (as the same may be amended, supplemented or modified from time to time after entry thereof with the written consent of the Lender, in its sole discretion), approving this Agreement and entry into the Loan Documents, which Order shall, among other things (i) have been entered on such prior notice as approved in the Order, (ii) authorize the extensions of credit in respect of the DIP Facility, each in the amounts and on the terms set forth herein, (iii) grant the Superpriority Claim status and other Collateral and Liens, subject to the Lien subordination provisions of such order, referred to herein and in the other Loan Documents, and (iv) approve the payment by the Borrowers of the fees provided for herein.

"Other Disbursements" shall mean disbursements other than Operating Disbursements, as are contained within the Initial Budget and any applicable successor Budget, including those to pay (i) interest, fees and expenses (including attorneys' fees) to the Lender in accordance with the DIP Facility; (ii) to fund fees and expenses incurred in connection with the Sale Transaction; (iii) Professional Fees and expenses, (iv) income Taxes, (v) deposits made to utilities pursuant to an order of the Bankruptcy Court, (vi) checks outstanding on the Petition Date that are re-issued in accordance with an order of the Bankruptcy Court, and (vii) fees due the Office of the United States Trustee.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

14169224

"<u>Permitted Liens</u>" shall mean (a) Liens for taxes, assessments, or other governmental charges or levies not yet due or which (if foreclosure, distraint, sale, or other similar proceedings shall not have been initiated) are being contested in good faith by appropriate proceedings, and such reserve as may be required by GAAP shall have been made therefor, (b) Liens in connection with workers' compensation, unemployment insurance or other social security (other than Liens created by Section 4068 of ERISA), old-age pension, employee benefits, or public liability obligations which are not yet due or which are being contested in good faith by appropriate proceedings, if such reserve as may be required by GAAP shall have been made therefor, (c) Liens in favor of vendors, carriers, warehousemen, repairmen, mechanics, workmen, materialmen, constructors, laborers, landlords or similar Liens arising by operation of law in the ordinary course of business in respect of obligations that are not yet due or which are being contested in good faith by appropriate proceedings, if such reserve as may be required by GAAP shall have been made therefor, (d) Liens securing leases of equipment, provided that, as to any particular lease, the Lien covers only the relevant leased equipment and secures only amounts which are not yet due and payable under the relevant lease or are being contested in good faith by appropriate proceedings and such reserve as required by GAAP shall have been made therefor, (e) Liens arising by operation of law which are not yet due and payable or are being contested in good faith by appropriate proceedings, if such reserve as may be required by GAAP shall have been made therefor, (f) Liens in favor of the Lender securing the Obligations and other Liens expressly permitted hereunder or in the Security Documents and (g) and any Permitted Prior Liens, including, as applicable, any such Permitted Prior Liens in favor of the O'Connor Defendants.

"<u>Permitted Prior Liens</u>" shall have the meaning assigned to such term in <u>Section 2.17(a)</u>.

"<u>Person</u>" shall mean an individual, corporation, partnership, limited liability company, trust, unincorporated organization, government, any agency or political subdivision of any government or any other form of entity.

"<u>Plan</u>" shall mean, at any time, any employee benefit plan which is covered by Title IV of ERISA and in respect of which any Borrower, or any Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Prime Rate</u>" means, as of any date of determination, the rate of interest most recently published by *The Wall Street Journal* and designated as the "National Prime Rate", as selected by the Lender, as of any date of determination (in this definition called the "<u>Index</u>").

"<u>Principal Office</u>" shall mean the principal office of the Lender or such other location as the Lender may designate from time to time.

"<u>Professional Fees</u>" shall mean attorneys' fees and expenses and the fees and expenses of any other professionals.

14169224

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

"Real Property" shall mean all of each Borrower's right, title and interest in and to the "Aspen Valley Ranch" property as more particularly described on Schedule 4.5(B) hereto.

"Receipts" shall mean all cash or other collections received from operations in the ordinary course of business, other than cash proceeds or collections from dispositions of Property, any insurance claims or the proceeds of any Term Loans.

"Regulatory Change" shall mean, with respect to any Lender, the passage, adoption, institution, or amendment of any federal, state, local, or foreign Requirement of Law, or any interpretation, directive, or request (whether or not having the force of law) of any Governmental Authority or monetary authority charged with the enforcement, interpretation, or administration thereof, occurring after the Closing Date and applying to a class of lenders including the Lender.

"Release of Hazardous Substances" shall mean any emission, spill, release, disposal, or discharge, except in accordance with a valid permit, license, certificate, or approval of the relevant Governmental Authority, of any Hazardous Substance into or upon (a) the air, (b) soils or any improvements located thereon, (c) surface water or groundwater, or (d) the sewer or septic system, or the waste treatment, storage, or disposal system servicing any Property of the Borrowers.

"Requirement of Law" shall mean, as to any Person, the certificate or articles of incorporation and by-laws, the certificate or articles of organization and regulations, operating agreement or limited liability company agreement, the agreement of limited partnership or other organizational or governing documents of such Person, and any applicable law, treaty, ordinance, order, judgment, rule, decree, regulation or determination of an arbitrator, court or other Governmental Authority, including rules, regulations, orders and requirements for permits, licenses, registrations, approvals or authorizations, in each case as such now exist or may be hereafter amended and are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer" shall mean, as to any Business Entity, its President, any of its Vice Presidents, its Financial Officer, or any other Person duly authorized, in accordance with the applicable organizational documents, bylaws, regulations or resolutions, to act on behalf of such Business Entity.

"Sale Transaction" means the prepetition marketing process and consummation of a sale of the Real Property pursuant to Section 363 of the Bankruptcy Code.

"Sanctions" means any laws or regulations or restrictive measures relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by a Sanctions Authority.

- 11 -

"Sanctions Authority" means (i) the United Nations Security Council; (ii) the United States government; (iii) the European Union; (iv) the United Kingdom government; (v) the respective governmental institutions and agencies of any of the foregoing, including without limitation, OFAC, the United States Department of State and Department of Commerce, and Her Majesty's Treasury; and (vi) any other governmental institution or agency with responsibility for imposing, administering or enforcing Sanctions with jurisdiction over the Borrower or any of its Subsidiaries.

"SEC" shall mean the Securities and Exchange Commission or any successor Governmental Authority.

"Security Documents" shall mean, collectively, (a) the security documents executed and delivered by the Borrowers securing the Obligations, including, without limitation, any deeds of trust, Mortgage, pledge agreement, security agreement, collateral agreement or deposit account control agreement, and (b) other documents and instruments at any time executed as security for all or any portion of the Obligations, as such instruments may be amended, supplemented, restated or otherwise modified from time to time.

"Subsidiary" shall mean, as to any Person, any Business Entity of which shares of stock or other Equity Interests having ordinary voting power (other than stock having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other governing body or managers of such Business Entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Superfund Site" shall mean those sites listed on the Environmental Protection Agency National Priority List and eligible for remedial action or any comparable state registries or list in any state of the United States of America.

"Superpriority Claims" shall have the meaning assigned to such term in Section 2.17(a).

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, fees, deductions, charges or withholdings imposed by any Governmental Authority.

"Term Loans" shall mean the loans made by the Lender to or for the benefit of the Borrowers pursuant to this Agreement.

"Termination Date" shall mean, unless otherwise waived or extended in writing by the Lender, the earliest of (a) the closing of the Sale Transaction or another sale of the Real Property providing for the indefeasible payment in full in cash of the Obligations; (b) one hundred twenty (120) days after the Closing Date; (c) (i) the filing of a motion by the Borrowers seeking dismissal of the Cases, (ii) the dismissal of any of the Cases, (iii) the filing of a motion by the Borrowers seeking to convert the Cases to cases under Chapter 7 of the Bankruptcy Code or (iv) the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code, (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the

- 12 -

DIP Facility or such treatment that is otherwise acceptable to the Lender in its sole discretion; (e) acceleration of the obligations under the DIP Facility; (f) the filing of a motion or other pleading requesting (or the entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers which the Debtors fail to timely oppose without the prior written consent of the Lender; (g) the filing or support by any Debtor of a plan of reorganization that (x) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (y) is not otherwise acceptable to the Lender in its sole discretion.

"Testing Date" shall have the meaning assigned to such term in Section 5.17(a).

"Transfer" shall mean the issuance, sale, assignment, alienation, conveyance, divestment, transfer, disposition (including through a plan of division), hypothecation, mortgage or encumbrance of any ownership interest in any Borrower or in any entity having an ownership interest in any Borrower, whether direct or indirect) (or entering into any agreement or contract to do any of the foregoing that is not conditioned on compliance with the terms of the Loan Documents), or undertaking, suffering or causing any of the foregoing to occur voluntarily, involuntarily or by operation of law.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the State of Texas.

"USA Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

1.3     Undefined Financial Accounting Terms.  Financial accounting terms used in this Agreement without definition are used herein with the respective meanings assigned thereto in accordance with GAAP at the time in effect.

1.4     References.  References in this Agreement to Schedule, Exhibit, Article or Section numbers shall be to Schedules, Exhibits, Articles or Sections of this Agreement, unless expressly stated to the contrary.  References in this Agreement to "hereby," "herein," "hereinafter," "hereinabove," "hereinbelow," "hereof," "hereunder" and words of similar import shall be to this Agreement in its entirety and not only to the particular Schedule, Exhibit, Article or Section in which such reference appears.  Specific enumeration herein shall not exclude the general and, in such regard, the terms "includes" and "including" used herein shall mean "includes, without limitation," or "including, without limitation," as the case may be, where appropriate.  Except as otherwise indicated, references in this Agreement to statutes, sections or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending, replacing, succeeding or supplementing the statute, Section or regulation referred to.  References in this Agreement to (i) a matter or item being "approved" "consented to" or words of similar import shall mean such action is taken in writing and (ii) "writing" shall include printing, typing, lithography, facsimile reproduction and other means of reproducing words in a tangible visible form. References in this Agreement to agreements and other contractual instruments shall be deemed to include all exhibits and appendices attached thereto and all subsequent amendments and other

- 13 -

modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement. References in this Agreement to Persons include their respective successors and permitted assigns.

1.5     Articles and Sections. This Agreement, for convenience only, has been divided into Articles and Sections; and it is understood that the rights and other legal relations of the parties hereto shall be determined from this instrument as an entirety and without regard to the aforesaid division into Articles and Sections and without regard to headings prefixed to such Articles or Sections.

1.6     Number and Gender. Whenever the context requires, reference herein made to the single number shall be understood to include the plural; and likewise, the plural shall be understood to include the singular. Definitions of terms defined in the singular or plural shall be equally applicable to the plural or singular, as the case may be, unless otherwise indicated. Words denoting sex shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be construed as cumulative.

1.7     Incorporation of Schedules and Exhibits. The Schedules and Exhibits attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for all purposes.

1.8     Negotiated Transaction. Each party to this Agreement affirms to the others that it has had the opportunity to consult, and discuss the provisions of this Agreement with, independent counsel and fully understands the legal effect of each provision.

ARTICLE II

TERMS OF DIP FACILITY

2.1     Term Loans.

(a)     Subject to the terms and conditions of this Agreement, the Lender agrees to make Term Loans (i) within one (1) Business Day following the Order Entry Date (such date the "Order Funding Date", and such Term Loan made on the Order Funding Date, the "Order Funding Loan") in an amount not to exceed $1,000,000; and (ii) whether one or more, following the Order Entry Date but prior to the Termination Date (each such date a "Funding Date", and each such Term Loan made on a Funding Date, each a "Funding Date Loan") in an aggregate amount, together with the Order Funding Loan, not to exceed the Lender's Commitment. Any amount of the Order Funding Loan or any Funding Date Loan that is subsequently repaid or prepaid may not be re-borrowed. The Lender's Commitment shall be permanently reduced without further action upon the making of any Term Loan by the Lender.

(b)     The Borrowers may request the Term Loans from the Lender by providing at least three (3) Business Days prior written notice thereof to the Lender, in the form of a Borrowing Request, including (i) the date of the requested disbursement (which shall be a Business Day), (ii) the principal amounts requested to be borrowed (which shall be in a

principal amount of $200,000 or a whole multiple of $100,000 in excess thereof) and (iii) a Budget setting forth the basis for such Term Loan, which shall be subject to the Lender's approval in accordance with paragraph 6 of the Order.

2.2   Use of Loan Proceeds.  The Borrowers shall use the proceeds of the Term Loans solely for the following purposes (and to the extent identified in the Budget): (a) to fund Operating Disbursements, (b) to fund Other Disbursements, (c) to fund any other purpose approved by the Lender in its sole discretion, and (d) to fund any other purpose set forth in the Order or otherwise directed by the Bankruptcy Court.

2.3   Repayment of Term Loans.

(a)   Principal.  The Borrowers hereby agree to repay the outstanding principal amount of all Term Loans in full on the Termination Date, together with all other amounts due under this Agreement or the other Loan Documents.

(b)   Interest.  Each Term Loan shall bear interest on the principal amount thereof from the applicable Loan Date at a rate per annum equal to the Contract Rate payable in kind on each Interest Payment Date.  Accrued cash interest on each Term Loan shall be paid in kind in arrears on each Interest Payment Date applicable to such Term Loan. Interest on past-due principal and, to the extent permitted by applicable law, past-due interest, shall accrue at the Default Rate and shall be payable upon demand by the Lender. Notwithstanding the foregoing, during the existence of any Event of Default, such interest shall be payable upon demand by the Lender.  While any Event of Default exists or after acceleration, interest shall accrue and the Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on any amount payable by the Borrowers hereunder, at a per annum rate equal to the lesser of (A) the Default Rate and (B) the Highest Lawful Rate.

2.4   Fees.  The Borrowers shall pay to the Lender a non-refundable upfront payment equal to $37,000, which payment shall be earned on the Closing Date and due and payable on the Termination Date.

2.5   Outstanding Amounts.  The outstanding principal balance of the Note reflected by the notations of the Lender on its records shall be deemed presumptive evidence of the principal amount owing on such Note.  The liability for payment of principal and interest evidenced by each Note shall be limited to principal amounts actually advanced and outstanding pursuant to this Agreement and interest on such amounts calculated in accordance with this Agreement.  The Lender shall maintain accounts in which it will record (i) the amount of each Term Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to the Lender hereunder; and (iii) the amount of any sum received by the Lender.  The entries made in the accounts maintained pursuant to this paragraph shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Term Loans in accordance with their terms.

2.6   Taxes and Time, Place, and Method of Payments.

(a)      All payments required pursuant to this Agreement or the Note shall be made without set-off or counterclaim in Dollars and in immediately available funds free and clear of, and without deduction for, any Indemnified Taxes or Other Taxes; provided, however that if any Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased by the amount (the "Additional Amount") necessary so that after making all required deductions (including deductions applicable to additional sums described in this Section 2.6(a)) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) each Borrower shall make any such deductions and (iii) each Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.  In addition, to the extent not paid in accordance with the preceding sentence, each Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(b)      The Borrowers, on a joint and several basis with any other Borrower, shall indemnify the Lender for Indemnified Taxes and Other Taxes payable by such Person, provided, however, that no Borrower shall be obligated to make payment to the Lender in respect of penalties, interest and other similar liabilities attributable to such Indemnified Taxes or Other Taxes if such penalties, interest or other similar liabilities are attributable to the gross negligence or willful misconduct of the Person seeking indemnification; provided further, that the Lender shall not be entitled to indemnification for Indemnified Taxes and Other Taxes paid by such Person more than nine months prior to the date the Lender gives notice and demand thereof to the Borrowers (except that, if the indemnification is based on a Regulatory Change giving rise to such Indemnified Taxes or Other Taxes the effect of which is retroactive, then the nine month period referred to above shall be extended to include the period of retroactive effect thereof).

(c)      If the Lender shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by any Borrower pursuant to this Section 2.6, including Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrowers, or with respect to which any Borrower has paid Additional Amounts pursuant to the Loan Documents, it shall promptly notify the relevant Borrower of the availability of such refund claim and, if the Lender determines in good faith that making a claim for refund will not have an adverse effect to its taxes or business operations, it shall, within 10 days after receipt of a request by the Borrowers, make a claim to such Governmental Authority for such refund at the expense of the Borrowers.  If the Lender receives a refund in respect of any Indemnified Taxes or Other Taxes paid by any Borrower pursuant to the Loan Documents, it shall within 30 days from the date of such receipt pay over such refund to the relevant Borrower (but only to the extent of Indemnified Taxes or Other Taxes paid pursuant to the Loan Documents, including indemnity payments made or Additional Amounts paid, by the relevant Borrower under this Section 2.6 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out of pocket expenses of the Lender, and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund).

- 16 -

(d)     If the Lender is or becomes eligible under any applicable law, regulation, treaty or other rule to a reduced rate of taxation, or a complete exemption from withholding, with respect to Indemnified Taxes or Other Taxes on payments made to it by the Borrowers or any of them, the Lender shall, upon the request, and at the cost and expense, of the Borrowers, complete and deliver from time to time any certificate, form or other document demanded by the Borrowers, the completion and delivery of which as a precondition to obtaining the benefit of such reduced rate or exemption, provided that the taking of such action by the Lender would not, in the reasonable judgment of the Lender be disadvantageous or prejudicial to the Lender, or inconsistent with its internal policies or legal or regulatory restrictions.  For any period with respect to which the Lender has failed to provide any such certificate, form or other document requested by any Borrower, the Lender shall not be entitled to any payment under this Section 2.6 in respect of any Indemnified Taxes or Other Taxes that would not have been imposed but for such failure.

(e)     All payments by any Borrower hereunder shall be made not later than 12:00 p.m., Houston, Texas time, on the date specified for payment under this Agreement to the Lender at the Principal Office in Dollars, in immediately available funds and shall be made without any set off, counterclaim or deduction whatsoever.  Any payment received after 12:00 p.m., Houston, Texas time, may, in the Lender's discretion, be deemed to have been made on the next succeeding Business Day for all purposes.  Except as provided to the contrary herein, if the due date of any payment hereunder or under any Note would otherwise fall on a day which is not a Business Day, such date shall be extended to the next succeeding Business Day, and interest shall be payable for any principal so extended for the period of such extension.

2.7     Voluntary Prepayments.  Subject to applicable provisions of this Agreement, the Borrowers shall have the right to prepay the Loan Balance in full or in part without premium or penalty; provided, however, that (x) the Borrowers shall give the Lender written notice of each such prepayment no less than three (3) Business Days prior to prepayment, (y) the Borrowers shall pay all accrued and unpaid interest on the amounts prepaid, and (z) no such prepayment shall serve to postpone the repayment when due of any Obligation or any installments thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date set forth in such notice.  Any prepayment under this Section 2.7(c) shall be applied to the Obligations in the inverse order of maturity.

2.8     Mandatory Prepayments.  Unless otherwise ordered by the Bankruptcy Court, in addition to payments in reduction of the Loan Balance provided for in Section 2.3, the Borrowers shall immediately pay to the Lender, for application to reduce the amount of the payment due at the Termination Date to repay the then existing Loan Balance in full all proceeds (net of reasonable and customary transaction costs) from:

(a)     the occurrence at any time when the Loan Balance exceeds the Commitment,

(b)     the incurrence of any Indebtedness not permitted by the proviso to Section 6.1 (without waiving or modifying in any way remedies available to the Lender  as

a result of any Event of Default arising from such incurrence of Indebtedness by any one or more of the Borrowers), and

(c)     asset sales, whether or not permitted by the proviso in Section 6.3 (without waiving or modifying in any way remedies available to the Lender as a result of any Event of Default arising from such asset sales by any one or more of the Borrowers), and any insurance claim, except as to any proceeds allowed by the Lender to repair or replace damaged Property giving rise to the relevant insurance claim; provided that no prepayment shall be required pursuant to this Section 2.8(c) to the extent the net cash proceeds from such asset sales and insurance claims do not exceed $50,000 in a single transaction or related series of transactions or $150,000 in the aggregate for the term of this Agreement (and only such excess shall be required to be prepaid).

The Borrowers shall provide one (1) Business Day's prior written notice of any mandatory prepayment required hereunder.

2.9     Loans to Satisfy Obligations of Borrowers.  Upon the occurrence and during the continuation of a Default or an Event of Default, the Lender may, but shall not be obligated to, make loans for the benefit of the Borrower or any of them and apply proceeds thereof to the satisfaction of any condition, warranty, representation or covenant of any Borrowers contained in this Agreement or any other Loan Document.  Such loans shall be and shall bear interest at the Contract Rate, subject, however, to the provisions of Section 2.3 regarding the accrual of interest at the Default Rate, which provisions shall be applicable to any loan made for the benefit of one or more of the Borrowers pursuant to the preceding sentence of this Section 2.9.

2.10     General Provisions Relating to Interest.

(a)     It is the intention of the parties hereto to comply strictly with the usury laws of the State of Texas and the United States of America.  In this connection, there shall never be collected, charged or received on the sums advanced hereunder plus the amount of the original issue discount interest in excess of that which would accrue at the Highest Lawful Rate.

(b)     Notwithstanding anything herein or in the Note to the contrary, during any Limitation Period, the interest rate to be charged on amounts evidenced by the Note shall be the Highest Lawful Rate, and the obligation, if any, of the Borrowers for the payment of fees or other charges deemed to be interest under applicable law shall be suspended. During any period or periods of time following a Limitation Period, to the extent permitted by applicable laws of the State of Texas or the United States of America, the interest rate to be charged hereunder shall remain at the Highest Lawful Rate until such time as there has been paid to each applicable Lender (i) the amount of interest in excess of that accruing at the Highest Lawful Rate that the Lender would have received during the Limitation Period had the interest rate remained at the otherwise applicable rate and (ii) all interest and fees otherwise payable to the Lender but for the effect of such Limitation Period.

(c)     If, under any circumstances, the aggregate amounts paid on the Note or under this Agreement or any other Loan Document include amounts which by law are

- 18 -

deemed interest and which would exceed the amount permitted if the Highest Lawful Rate were in effect, the Borrowers stipulate that such payment and collection will have been and will be deemed to have been, to the extent permitted by applicable laws of the State of Texas or the United States of America, the result of mathematical error on the part of the Borrowers, the Lender; and the party receiving such excess shall promptly refund the amount of such excess (to the extent only of such interest payments in excess of that which would have accrued and been payable on the basis of the Highest Lawful Rate) upon discovery of such error by such party or notice thereof from the Borrowers.  In the event that the maturity of any Obligation is accelerated, by reason of an election by the Lender or otherwise, or in the event of any required or permitted prepayment, then the consideration constituting interest under applicable laws may never exceed that payable on the basis of the Highest Lawful Rate, and excess amounts paid which by law are deemed interest, if any, shall be credited by the Lender on the principal amount of the Obligations, or if the principal amount of the Obligations shall have been paid in full, refunded to the Borrowers.

(d)     All sums paid, or agreed to be paid, to the Lender for the use, forbearance and detention of the proceeds of any advance hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term hereof until paid in full so that the actual rate of interest is uniform but does not exceed the Highest Lawful Rate throughout the full term hereof.

2.11    Yield Protection.

(a)     The Borrowers shall pay to the Lender, from time to time on request, such amounts as the Lender may reasonably determine are necessary to compensate the Lender for any costs attributable to the maintenance by the Lender, pursuant to any Regulatory Change, of its interest in the Loan Balance, including costs attributable to the maintenance of capital in respect of its interest in the Loan Balance, as well as for any reduction of the rate of return on assets or equity of the Lender to a level below that which the Lender could have achieved but for such Regulatory Change.

(b)     Determinations by the Lender for purposes of this Section 2.11 of the effect of any Regulatory Change on capital maintained, its costs or rate of return, its obligation to make and maintain its interest in the Loan Balance or on amounts receivable by it in respect of its interest of the Loan Balance or such other obligations and the additional amounts required to compensate the Lender under this Section 2.11 shall be conclusive, absent manifest error, provided that such determinations are made on a reasonable basis. The Lender shall furnish the Borrowers with a certificate setting forth in reasonable detail the basis and amount of any loss, cost or expense incurred as a result of any such event, and the statements set forth therein shall be conclusive, absent manifest error.  The Lender shall notify the Borrowers, as promptly as practicable after the Lender obtains knowledge of any sums payable pursuant to this Section 2.11 and determines to request compensation therefor, of any event occurring after the Closing Date which will entitle the Lender to compensation pursuant to this Section 2.11.  Any compensation requested by the Lender pursuant to this Section 2.11 shall be due and payable within 30 days of receipt by the Borrowers of any such notice.

- 19 -

(c)     The Lender agrees not to request, and the Borrowers shall not be obligated to pay, any sums payable pursuant to this <u>Section 2.11</u> unless similar sums payable are also generally assessed by the Lender against other customers, if any, similarly situated where such customers are subject to documents providing for such assessment.

2.12     <u>Security Interest in Accounts; Right of Offset</u>.  As security for the payment and performance of the Obligations, the Borrowers hereby transfer, assign and pledge to the Lender and grant to the Lender a security interest in all funds of such Borrower now or hereafter or from time to time on deposit with the Lender, with such interest of the Lender to be retransferred, reassigned and/or released at the expense of the Borrowers upon payment in full and complete performance by the Borrowers of all Obligations.  All remedies as secured party or assignee of such funds shall be exercisable by the Lender upon the occurrence of any Event of Default, regardless of whether the exercise of any such remedy would result in any penalty or loss of interest or profit with respect to any withdrawal of funds deposited in a time deposit account prior to the maturity thereof.  Furthermore, the Borrowers hereby grant to the Lender the right, exercisable at such time as any Obligation shall mature, whether by acceleration of maturity or otherwise, of offset or banker's lien against all funds of such Borrowers now or hereafter or from time to time on deposit with the Lender, regardless of whether the exercise of any such remedy would result in any penalty or loss of interest or profit with respect to any withdrawal of funds deposited in a time deposit account prior to the maturity thereof.  If the foregoing provisions conflict with the provisions of any of the Security Documents, the relevant provision of the relevant Security Document shall control.

2.13     <u>Illegality</u>.  Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for the Lender to maintain loans bearing interest at a rate determined by the Lender to exceed the Highest Lawful Rate, then the Lender shall charge an interest rate with respect to the Term Loans that will approximate the Contract Rate or Default Rate, as applicable, that was initially agreed to in this Agreement by the parties hereto as reasonably determined by the Lender such that the interest no longer Exceeds the Highest Lawful Rate.

2.14     <u>Regulatory Change</u>.  In the event that by reason of any Regulatory Change or any other circumstance arising after the Closing Date affecting the Lender, the Lender (a) incurs Additional Costs based on or measured by the excess above a level, as prescribed from time to time by any Governmental Authority with jurisdiction, of the amount of a category of deposits or other liabilities of the Lender which included deposits by reference to which the interest rate applicable to the Loan Balance owed to the Lender is determined as provided in this Agreement or a category of extensions of credit or other assets of the Lender or (b) becomes subject to restrictions on the amount of such a category of liabilities or assets which it may hold, then, at the election of the Lender with notice to the Borrowers, the obligation of the Lender to maintain loans bearing interest at the Contract Rate shall be suspended until such time as such Regulatory Change or other circumstance ceases to be in effect, and the Lender shall charge an interest rate with respect to the Term Loans that will approximate the Contract Rate or Default Rate, as applicable, that was initially agreed to in this Agreement by the parties hereto as reasonably determined by the Lender.

2.15     <u>Joint and Several Liability</u>.  The Borrowers acknowledge and agree that each Borrower shall be jointly and severally liable for all obligations of the Borrowers or any of them hereunder or under any other Loan Document.

- 20 -

2.16   <u>Termination of the DIP Facility</u>.  The DIP Facility and the Commitments shall terminate on the Termination Date.

2.17   <u>Priority and Liens.</u>

(a)   Each Borrower hereby covenants and agrees that, subject to Bankruptcy Court approval, the Order shall provide that its obligations hereunder and under the Loan Documents, including all Term Loans, shall, at all times: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several super-priority administrative expense claim status in the case of each Borrower (the "<u>Superpriority Claims</u>"); (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable perfected first priority security interest and Lien on the Collateral of each Borrower (A) to the extent such Collateral is not subject to valid, perfected and non-avoidable Liens as of the Petition Date and (B) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 or 553  of the Bankruptcy Code (collectively "<u>Avoidance Actions</u>") but including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise; and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable junior perfected security interest and Lien on the Collateral of each Borrower to the extent that such Collateral is subject to (A) valid, perfected and unavoidable Liens in favor of third parties that were in existence immediately prior to the Petition Date, subject as to priority to such Liens in favor of such third parties, or (B) valid and unavoidable Liens (or rights to such Liens) in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, subject as to priority such Liens in favor of such third parties (the foregoing clauses (A) and (B) being referred to collectively as the "<u>Permitted Prior Liens</u>"), subject as to priority to such Liens in favor of such third parties ((i) through (iii) above, subject in each case to the Carve-Out and as set forth in the Order).  For the avoidance of doubt, in accordance with and subject to the Order, any such foregoing Liens granted pursuant to the Order and the Loan Documents in favor of Lender shall not "prime," and shall be immediately junior and subordinate to, any Permitted Prior Liens on the Collateral of each Borrower, including any Permitted Prior Liens that may be held by the O'Connor Defendants.  To the extent, however, that any such liens or claims held by the O'Connor Defendants are determined by the Bankruptcy Court not to be Permitted Prior Liens or are otherwise disallowed, avoided, released, or set aside, such foregoing Liens granted pursuant to the Order and the Loan Documents in favor of Lender and the Obligations shall be first priority liens and claims on all of the Collateral of each Borrower, including, without limitation, the Real Property.

(b)   Each Borrower hereby confirms and acknowledges that, subject to Bankruptcy Court approval and entry of the Order, (x) the Liens in favor of the Lender on behalf of and for the benefit of the Lender in the DIP Collateral (as defined in the Order), which includes, without limitation, all of such Borrower's Real Property, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, deed of trust, assignment or similar instrument and (y) without limiting the foregoing clause (x), subject to <u>Section 2.17(d)</u> below, to secure the full and timely

- 21 -

payment and performance of the Obligations, each Borrower hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Lender, the Real Property, TO HAVE AND TO HOLD by the Lender, and such Borrower does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Lender.

(c)      Subject to Bankruptcy Court approval and entry of the Order, all of the Liens described in this <u>Section 2.17</u> shall be effective and perfected upon the Entry Date without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Lender of, or over, any Collateral, as set forth in the Order.

(d)      Notwithstanding anything to the contrary herein, except as set forth in the Order, in no event shall the Collateral include (A) if and to the extent invoked pursuant to the Order, proceeds in an amount equal to the Carve-Out (provided that Collateral shall include residual interest in the Carve-Out), (B)(i) any General Intangibles (as defined in the UCC in effect in the State of Texas) or other rights arising under any contracts, instruments, licenses or other documents to the extent the grant, assignment, transfer, creation, attachment, perfection or enforcement of a security interest would (x) constitute a violation of a valid and enforceable restriction in favor of a third party on such grant, assignment, transfer, creation, attachment, perfection or enforcement, unless and until any required consents shall have been obtained, which the applicable Borrower shall use commercially reasonable efforts to obtain or (y) give any other party to such contract, instrument, license or other document a valid and enforceable right to terminate its obligations thereunder or to take any other default remedy thereunder, unless and until any required consents shall have been obtained, which the applicable Borrower shall use commercially reasonable efforts to obtain; provided, that in any event any money or other amounts due or to become due under any such General Intangible, contract, agreement, instrument or license shall not be Excluded Assets (as defined below) and (ii) any property to the extent that the Borrowers are prohibited from granting a security interest in, pledge of, or lien upon any such property by reason of (x) an existing and enforceable negative pledge provision to the extent such provision does not violate the terms of this Agreement, unless and until any required consents shall have been obtained, which the applicable Borrower shall use commercially reasonable efforts to obtain or (y) applicable law or regulation to which such Borrowers are subject, except (in the case of either of the foregoing clauses (ii)(x) and (ii)(y)) to the extent such restriction, termination right or prohibition is rendered unenforceable or ineffective under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC or other applicable law (including the Bankruptcy Code or any order of the Bankruptcy Court entered in connection with the Cases), and (C) Avoidance Actions (but including proceeds thereof) (the items referred to in clauses (A) through (C) above being collectively referred to as the "<u>Excluded Assets</u>"); provided that any proceeds of Excluded Assets (that do not otherwise constitute Excluded Assets) shall be Collateral.

(e)      Unless the obligations hereunder and under the Loan Documents are indefeasibly paid in full in cash and completely satisfied, or the Lenders agree to such other treatment in its sole discretion, each of the Borrowers agree that (i) its obligations under

the Loan Documents shall not be discharged by the entry of an order confirming a Bankruptcy Plan (and each of the Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the Order and the Liens granted to the Lender pursuant to the Order shall not be affected in any manner by the entry of an order confirming a Bankruptcy Plan.

2.18    Payment of Obligations.

(a)     Subject to Section 7.2, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Borrowers under this Agreement or any of the other Loan Documents, the Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

(b)     Each Borrower agrees that to the extent that the Obligations hereunder have not been satisfied in full in cash (other than contingent indemnity or expense reimbursement obligations that are cash collateralized) (i) its Obligations arising hereunder shall not be discharged by the entry of any order of the Bankruptcy Court, including but not limited to an order confirming any Bankruptcy Plan filed in any or all of the Cases and (ii) the Superpriority Claims granted to the Lender pursuant to the Order and described in Section 2.17 and the Liens granted to Lender pursuant to the Order and described in Section 2.17 shall not be affected in any manner by the entry of any order of the Bankruptcy Court, including, but not limited to, any order confirming such Bankruptcy Plan.

ARTICLE III

CONDITIONS

3.1    Conditions of the Closing Date.   The obligations of the Lender to close this Agreement and to make the Order Funding Loan, if any, is subject to the satisfaction of each of the following conditions:

(a)     Loan Documents.   This Agreement, the Note in favor of the Lender, together with any other applicable Loan Documents, shall have been duly authorized, executed and delivered to the Lender by the parties thereto, shall be in full force and effect and no Default or Event of Default shall exist hereunder or thereunder;

(b)     Security Documents.   To the extent requested by the Lender, the Lender shall have received a counterpart of all other agreements, documents or instruments required by the Lender in its sole discretion to evidence that first-priority (or second priority, as applicable) security interests in all of the Borrowers' assets have been granted to the Lender pursuant to the Loan Documents, included without limitation, the Security Documents;

(c)     Order.   The Entry Date of the Order shall have occurred, and the Order shall contain provisions granting the Superpriority Claims and Liens and other Liens described under Section 2.17, which Order shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Lender;

- 23 -

14169224

(d)     Appointment of Trustee or Examiner.   No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases;

(e)     Initial Budget.  The Lender shall have received the Initial Budget certified by a Responsible Officer of the Borrowers as having been prepared in good faith based upon assumptions believed by the Borrowers to be reasonable at the time made;

(f)     Other Agreements.  The Lender shall be satisfied in its reasonable judgment that there shall not occur as a result of, and after giving effect to, the initial extension of credit hereunder (other than resulting from the filing of the Cases), a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrowers' material debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis;

(g)     [Intentionally Omitted].

(h)     Approvals.   All government and third party approvals (including any consents) necessary in connection with continuing operations of the Borrowers and the transactions contemplated by the Loan Documents shall have been obtained and be in full force and effect (without the imposition of any adverse conditions that are not reasonably acceptable to the Lender), and no law or regulation shall be applicable in the judgment of the Lender that restrains, prevents or imposes materially adverse conditions upon this Agreement, the extension of credit thereunder or the transactions contemplated thereby;

(i)     Insurance.  The Lender shall have received (i) a certificate of insurance coverage of the Borrower evidencing that the Borrower is carrying insurance in accordance with Section 5.14.

(j)     Organizational Documents.  The Lender shall have received:

(i)     copies of the organizational documents of the Borrowers, accompanied by a certificate dated the Closing Date issued by the secretary or an assistant secretary or another authorized representative of the Borrowers, to the effect that each such copy is correct and complete;

(ii)     a certificate of incumbency dated the Closing Date, including specimen signatures of all officers or other representatives of the Borrowers, who are authorized to execute Loan Documents on behalf of the Borrowers, such certificate being executed by the secretary or an assistant secretary or another authorized representative of the relevant Borrower;

(iii)     copies of resolutions adopted by the relevant governing body of the Borrowers approving the Loan Documents to which the relevant Borrower is a party and authorizing the transactions contemplated herein and therein, accompanied by a certificate dated the Closing Date issued by the secretary or an assistant secretary or another authorized representative of the Borrowers, to the

- 24 -

effect that such copies are true and correct copies of resolutions duly adopted at a meeting or by unanimous consent and that such resolutions constitute all the resolutions adopted with respect to such transactions, have not been amended, modified or rescinded in any respect and are in full force and effect as of the date of such certificate; and

(iv)    certificates dated as of a recent date from the appropriate Governmental Authority evidencing the existence or qualification and, if applicable, good standing of the Borrowers in its jurisdiction of organization and in each jurisdiction in which it owns material assets or conducts material operations;

(k)    Searches.  The Lender shall have received results of searches of the uniform commercial code records of the Secretary of State of the State of organization of each Borrower, such search reports reflecting no Liens, other than Permitted Liens, against the Borrowers, or any of the Collateral as to which perfection of a Lien is accomplished by the filing of a financing statement;

(l)    Due Diligence. The Lender shall have completed, to its satisfaction, all legal, tax, environmental, business and other due diligence with respect to the business, assets, liabilities, operations and conditions (financial or otherwise) of each Borrower in scope and determination satisfactory to the Lender in its sole discretion; and

3.2    Conditions to All Term Loans.   The obligation of the Lender to make any disbursement from and after the Closing Date until the Termination Date is subject to the satisfaction of the following conditions precedent on the relevant Disbursement Date:

(a)    Borrowing Request.  The Lender shall have received a Borrowing Request from the Borrowers in accordance with Section 2.1(b).

(b)    Representations and Warranties.    The representations and warranties contained in Article IV and in the other Loan Documents shall be true and correct in all material respects on and as of the Disbursement Date with the same force and effect as if made on and as of such date (except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date);

(c)    No Material Adverse Effect.   Since July 27, 2023, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect;

(d)    No Existing Default.   No Default or Event of Default shall exist and be continuing or shall result from such Term Loan or proposed or actual use of the proceeds of such Term Loan;

(e)    No Violation of Law.  The making of such Term Loan shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

- 25 -

(f) <u>Aggregate Exposure</u>. After giving effect to such Term Loan, the aggregate outstanding principal amount of Term Loans shall not exceed the amount authorized by the Order;

(g) <u>Compliance with the Budget</u>. Immediately before and after giving effect to the requested disbursement, the Borrower shall be in pro forma compliance with the Budget;

(h) <u>Payment of Fees</u>. The Lender shall have received evidence of payment by the Borrowers to the Lender of all accrued and unpaid fees, costs and expenses payable thereto or to the Lender pursuant to the Loan Documents or otherwise required to be paid to the Lender, and in the case of costs and expenses, an invoice for which has been received by the Borrowers at least one Business Day before the date of such Term Loan, including any such costs, fees and expenses arising under or referenced in <u>Section 2.4</u>;

(i) <u>Other Documents</u>. The Lender shall have received such other agreements, documents, instruments, opinions, certificates, waivers, consents and evidences as the Lender may reasonably request; and

(j) <u>Order</u>. The Order shall be in full force and effect, unstayed, and shall not have been reversed, modified, amended, or vacated without the prior written consent of the Lender, and shall not be subject to an outstanding objection, appeal or motion to reconsider.

ARTICLE IV

<u>REPRESENTATIONS AND WARRANTIES</u>

To induce the Lender to enter into this Agreement and to induce the Lender to make the Term Loans, the Borrowers represent and warrant to the Lender (which representations and warranties shall survive the delivery of the Note) that:

4.1 <u>Due Authorization</u>. Subject to the entry of the Order and subject to the terms thereof, the execution and delivery by the Borrowers of this Agreement and the borrowing hereunder, the execution and delivery by the Borrowers of the Note, the repayment of the Note, payment of interest and fees provided for in the Note and this Agreement, the execution and delivery by each Borrower of the Security Documents to which it is a party and the performance by each Borrower of its obligations under the Loan Documents to which it is a party are within the power of the relevant Borrower, have been duly authorized by all necessary action by the relevant Borrower, and do not and will not (a) require the consent of any Governmental Authority, (b) contravene or conflict with any Requirement of Law, (c) contravene or conflict with any indenture, instrument or other agreement to which the relevant Borrower is a party or by which any Property of the relevant Borrower may be presently bound or encumbered or (d) result in or require the creation or imposition of any Lien in, upon or on any Property of the relevant Borrower under any such indenture, instrument or other agreement, other than under any of the Loan Documents to which it is a party.

4.2 <u>Existence</u>. Each Borrower is a limited liability company duly organized, legally existing and, if applicable, in good standing under the laws of its jurisdiction of organization and

- 26 -

is duly qualified as a foreign corporation, foreign limited partnership, or foreign limited liability company, as the case may be, and, if applicable, is in good standing in all jurisdictions wherein the ownership of Property or the operation of its business necessitates same, other than those jurisdictions wherein the failure to so qualify would not have a Material Adverse Effect.

4.3     <u>Valid and Binding Obligations</u>.  Subject to the entry of the Order and subject to the terms thereof, all Loan Documents to which a Borrower is a party, when duly executed and delivered by the relevant Borrower, constitute the legal, valid and binding obligations of the relevant Borrower enforceable against such Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.4     <u>Security Documents</u>.  Subject to the entry of the Order and subject to the terms thereof, the provisions of each Security Document executed by the Borrowers are effective to create, in favor of the Lender, legal, valid and enforceable Liens in all right, title and interest of the relevant Borrower in the Property of such Borrower described therein, which Liens have the priority set forth in Section 2.17.

4.5     <u>Title to the Property</u>.  With respect to all of Borrower's material Property (including the Real Property), except for such encumbrances, preferential rights, whether vested or otherwise, the Borrowers have good and defensible title to all such Property, free and clear of all encumbrances, preferential rights, whether vested or otherwise, and Liens (except Permitted Liens) related to such Property.

4.6     <u>No Material Adverse Effect or Default</u>.  No event or circumstance has occurred since July 27, 2023, which could reasonably be expected to have a Material Adverse Effect, and no Default has occurred and is continuing.

4.7     <u>No Material Misstatements</u>.  No information, exhibit, statement or report furnished to the Lender by or at the direction of the Borrowers in connection with this Agreement or any other Loan Document contains any material misstatement of fact or omits to state a material fact or any fact necessary to make the statements contained therein not misleading as of the date made or deemed made; <u>provided</u> that, with respect to projected financial information, it represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

4.8     <u>[Intentionally Omitted]</u>.  .

4.9     <u>Authorizations; Consents</u>.  Subject to the entry of the Order and subject to the terms thereof, no authorization, consent, approval, exemption, franchise, permit or license of, or filing with, any Governmental Authority or any other Person is required to authorize or is otherwise required in connection with the valid execution and delivery by the Borrowers of the Loan Documents to which it is a party or any instrument contemplated hereby, the repayment of the Note, payment of interest and fees provided in the Note and this Agreement or the performance by the Borrowers of the Obligations.

14169224

4.10   Compliance with Laws.  Subject to the entry of the Order and subject to the terms thereof, each Borrower and, to the knowledge of the Borrowers, the Property of the Borrowers, is in compliance in all material respects with all applicable Requirements of Law, including Environmental Laws and ERISA.

4.11   ERISA.  No Borrowers maintain, nor have the Borrowers maintained, any Plan.  No Borrowers currently contribute to or have any obligation to contribute to or otherwise have any liability with respect to any Plan.

4.12   Environmental Laws.

(a)     To Borrowers' knowledge, no Property of the Borrowers is currently on or has ever been on any federal or state list of Superfund Sites;

(b)     To Borrowers' knowledge, no Hazardous Substances have been generated, transported and/or disposed of by the Borrowers at a site which was, at the time of such generation, transportation, and/or disposal, or has since become, a Superfund Site;

(c)     To Borrowers' knowledge, except in accordance with applicable Requirements of Law or the terms of a valid permit, license, certificate or approval of the relevant Governmental Authority, no Borrower has caused a Release of Hazardous Substances and, to the knowledge of such Borrower, no Release of Hazardous Substances has occurred on the Real Property;  and

(d)     no Environmental Complaint has been received by the Borrowers.

4.13   Compliance with Federal Reserve Regulations.  No transaction contemplated by the Loan Documents is in violation of any regulations promulgated by the Board of Governors of the Federal Reserve System, including Regulations T, U or X.

4.14   Investment Company Act Compliance.  None of the Borrowers are, nor is any Borrower directly or indirectly controlled by or acting on behalf of any Person which is, an "investment company" or an "affiliated person" of an "investment company" within the meaning of the Investment Company Act of 1940.

4.15   Proper Filing of Tax Returns; Payment of Taxes Due.  Each Borrower has duly and properly filed its United States of America income tax returns or income tax information returns, and all other tax returns which are required to be filed by the Borrowers, as applicable and has paid all taxes, if any, shown as due from the Borrowers, as applicable, except (i) where appropriate extensions have been filed, (ii) such taxes need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, (iii) such taxes are being contested in good faith and as to which adequate provisions and disclosures have been made or (iv) such taxes as could not reasonably be expected to have a Material Adverse Effect.  The respective charges and reserves on the books of the Borrowers with respect to Taxes and other governmental charges, if any of such are required by applicable law or GAAP, are adequate.

4.16   Casualties or Taking of Property.  To Borrowers' knowledge, neither the business nor any Property of any Borrower has been materially adversely affected as a result of any casualty

or taking of Property or cancellation of contracts, permits or concessions by any Governmental Authority, riot, activities of armed forces or acts of God.

4.17    <u>Location of the Borrowers</u>.  The principal place of business and chief executive office of each Borrower is located at the address of such Borrower set forth in <u>Section 8.3</u> or at such other location as such Borrower may have, by proper written notice hereunder, advised the Lender, <u>provided</u> that such other location is within a state in which appropriate financing statements naming such Borrower as debtor and naming the Lender as secured party, have been filed, if required by applicable law.

4.18    <u>Compliance with Anti-Terrorism Laws</u>.  No Borrower or any Affiliate of any Borrower is in violation of any Anti-Terrorism Law or knowingly engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(a)    No Borrower nor any Affiliate of a Borrower is any of the following (each a "<u>Blocked Person</u>"):

(i)    a Person that is listed in the annex, to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)    a Person or entity with which any bank or other financial institution is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v)    a Person or entity that is named as a "specially designated national" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list; or

(vi)    a Person or entity who is affiliated with a Person or entity listed above.

(b)    No Borrower or any Affiliate of a Borrower (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or (ii) deals in, or otherwise engages in any transaction relating to, any Property or interests in Property blocked pursuant to Executive Order No. 13224.

(c)    No Borrower or any Affiliate of a Borrower is in violation of any rules or regulations promulgated by OFAC or of any economic or trade Sanctions administered and enforced by any Sanctions Authority or conspires to engage in any transaction that evades

- 29 -

or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any rules or regulations promulgated by any Sanctions Authority.

4.19    Bankruptcy Order.  The Orders and the transactions contemplated thereby are in full force and effect, are not subject to a stay and have not been vacated, reversed, modified or amended in any respect adverse to the Lender.

4.20    Budget.  The Budget was prepared in good faith by the management of the Borrowers, based on assumptions believed by the management of the Borrowers to be reasonable at the time made and upon information believed by the management of the Borrowers to have been accurate based upon the information available to the management of the Borrowers at the time such Budget was furnished.

4.21    Anti-Bribery and Anti-Corruption.

(a)    Each of the Borrower, any of its Subsidiaries and Affiliates and their respective directors, officers, employees and, to the knowledge of each Borrower, agents and any other person or entity acting on behalf of any Borrower, has complied with the Anti-Corruption and Anti-Bribery Laws, in each case as applicable to them, and no action, suit or proceeding by or before any court or any arbitrator or any governmental agency, authority or body involving any Borrower and any of its Subsidiaries or their respective directors or officers and, to the knowledge of each Borrower, the employees, agents, or representatives of each of them, is pending or threatened with respect to Anti-Corruption and Anti-Bribery Laws.

(b)    Neither the Borrower nor any of its Subsidiaries nor their respective directors or officers, nor, to the knowledge of each Borrower, the employees or agents of any of them has:

(i)    used any corporate funds (nor will it use any proceeds from the issuance of the Term Loans) for any unlawful contribution, gift, entertainment or unlawful expense relating to political activity;

(ii)    taken any action in furtherance of an unlawful offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for public office) or made any other bribe, rebate, payoff, influence payment or kickback intended, in each case, to improperly influence official action or secure an improper advantage

(iii)    nor will it use any proceeds from the issuance of the Term Loans in furtherance of any such unlawful payment or violation of Sanctions or Anti-Corruption and Anti-Bribery Laws.

- 30 -

(c)     Each Borrower and each Subsidiary thereof has instituted and maintained, and each Borrower and each Subsidiary thereof will continue to maintain policies, procedures designed to promote and ensure compliance with Anti-Corruption and Anti-Bribery Laws in all jurisdictions where they operate and with the representations and warranties contained herein.

ARTICLE V

AFFIRMATIVE COVENANTS

So long as any Obligation remains outstanding or unpaid, the Borrowers shall:

5.1     Maintenance and Access to Records.  Keep adequate records, in accordance with GAAP, of all transactions so that at any time, and from time to time, the Borrowers' true and complete financial condition may be readily determined, and promptly following the request of the Lender, provide information regarding the operations, business affairs and financial condition of the Borrowers or compliance with the terms of this Agreement, make available for inspection by the Lender records of the foregoing and, at the expense of the Borrowers, allow the Lender to make and take away copies thereof.

5.2     Financial Reporting.  Keep adequate records, in accordance with GAAP, of all transactions so that at any time, and from time to time, the Borrowers' true and complete financial condition may be readily determined, and promptly following the reasonable request of the Lender, make such records available for inspection by the Lender and, at the expense of the Borrowers, allow the Lender to make and take away copies thereof.

5.3     Notices of Certain Events.  Deliver to the Lender, immediately upon having knowledge of the occurrence of any of the following events or circumstances, a written statement with respect thereto, signed by a Responsible Officer of the Borrowers, and setting forth the relevant event or circumstance and the steps being taken by the relevant Borrower with respect to such event or circumstance:

(a)     any Default or Event of Default;

(b)     any default or event of default under any contractual obligation of the Borrowers, or any litigation, investigation or proceeding between the Borrowers and any Governmental Authority which, in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)     other than the Adversary Proceeding (as defined in the Order), any litigation or proceeding involving any Borrower as a defendant or in which any Property of any Borrower is subject to a claim and in which the amount involved is $25,000 or more and which is not covered by insurance or in which injunctive or similar relief is sought;

(d)     the receipt by the Borrowers of any Environmental Complaint, which if adversely determined could reasonably be expected to have a Material Adverse Effect;

(e)     any actual, proposed or threatened testing or other investigation by any Governmental Authority or other Person concerning the environmental condition of, or relating to, any Property of the Borrowers following any allegation of a violation of any Requirement of Law;

(f)     any Release of Hazardous Substances by the Borrowers or from, affecting or related to any Property of the Borrowers or Property of others adjacent to Property of the Borrowers which could reasonably be expected to have a Material Adverse Effect, except in accordance with applicable Requirements of Law or the terms of a valid permit, license, certificate or approval of the relevant Governmental Authority, or the violation of any Environmental Law, or the revocation, suspension or forfeiture of or failure to renew, any permit, license, registration, approval or authorization which could reasonably be expected to have a Material Adverse Effect; and

(g)     any other event or condition which could reasonably be expected to have a Material Adverse Effect.

5.4     <u>Tax Returns</u>.  Furnish to the Lender, promptly upon, but in no event more than 30 days after, each filing of the annual federal income tax return of the Borrowers with the Internal Revenue Service, a copy thereof.

5.5     <u>Additional Information</u>.  Furnish to the Lender, promptly upon the request of the Lender, such additional financial or other information concerning the assets, liabilities, operations and transactions of the Borrowers as the Lender may from time to time reasonably request; and notify the Lender not less than ten (10) Business Days prior to the occurrence of any condition or event that may change the proper location for the filing of any financing statement or other public notice or recording for the purpose of perfecting a Lien in any Property of the Borrowers, including any change in its name or the location of the jurisdiction of organization, principal place of business or chief executive office of the relevant Borrower; and upon the request of the Lender, execute such additional Security Documents as may be necessary or appropriate in connection therewith.

5.6     <u>Compliance with Laws</u>.  Except as otherwise excused by the Bankruptcy Court, comply, in all material respects, with all applicable Requirements of Law, including (a) ERISA, (b) Environmental Laws, (c) Anti-Terrorism Laws and (d) all permits, licenses, registrations, approvals and authorizations (i) related to any natural or environmental resource or media located on, above, within, related to or affected by any Property of the Borrowers, (ii) required for the performance of the operations of the Borrowers, or (iii) applicable to the use, generation, handling, storage, treatment, transport, or disposal of any Hazardous Substances; and use its best efforts to cause all employees, agents, contractors, subcontractors and future lessees (pursuant to appropriate lease provisions) of the Borrowers, while such Persons are acting within the scope of their relationship with the relevant Borrower, to comply with all such Requirements of Law as may be necessary or appropriate to enable the Borrowers to so comply.

5.7     <u>Payment of Assessments and Charges</u>.  In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay all Taxes, assessments, governmental charges, rent and solely to the extent arising post-petition, other

Indebtedness which, if unpaid, might become a Lien against any Property of the Borrowers, except any of the foregoing being contested in good faith and as to which an adequate reserve in accordance with GAAP has been established or unless failure to pay would not have a Material Adverse Effect.

5.8     Maintenance of Existence or Qualification and Good Standing.  Maintain its corporate, limited liability company or limited partnership, as the case may be, existence or qualification and, if applicable, good standing in its jurisdiction of organization and in all jurisdictions wherein any material Property now owned or hereafter acquired or business now or hereafter conducted by it necessitates same.

5.9     Payment of the Note; Performance of Obligations.  Pay the Note according to the reading, tenor and effect thereof, as modified hereby, and do and perform every act and discharge all of the other Obligations.

5.10     Further Assurances.

(a)     The Borrowers shall promptly (and in no event later than twenty (20) days after becoming aware of the need therefor) do all acts and things, and execute and file or record, all instruments, documents, or agreements reasonably requested by the Lender, to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrowers in the Loan Documents including the Note, to further evidence and more fully describe the Collateral as security for the Obligations, as to correct any omissions in this Agreement or the Security Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement, the Security Documents or the Order or the priority thereof or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Lender, in connection therewith.

(b)     In addition to the foregoing, the Borrowers shall, within thirty (30) days following request by the Lender, execute and deliver, mortgages, deeds of trust or any other agreements, documents or instruments with respect to the Real Property to evidence the first-priority security interests granted to the Lender pursuant to the Loan Documents.

5.11     Initial Expenses of the Lender.  Upon request by the Lender, promptly reimburse the Lender for, or pay directly, all reasonable fees and expenses of counsel (including, without limitation, local counsel) and financial advisors to the Lender, in connection with the preparation of this Agreement and all documentation contemplated hereby, the satisfaction of the conditions precedent set forth herein, the filing and recordation of Security Documents, and the consummation of the transactions contemplated in this Agreement.

5.12     Subsequent Expenses of the Lender.  Promptly reimburse (a) all third party out-of-pocket amounts reasonably expended, advanced or incurred by or on behalf of the Lender (i) to satisfy any obligation of the Borrowers under any of the Loan Documents; (ii) to ratify, amend, restate or prepare additional Loan Documents, as the case may be; (iii) in connection with the filing and recordation of Security Documents; and which amounts shall include all reasonable attorney's fees, together with interest at the Contract Rate on each such amount from the date of

- 33 -

notification by the Lender that the same was expended, advanced or incurred by the Lender until the date it is repaid to the Lender; and (iv) costs and expenses with respect to any aspect of the Cases; and (b) following an Event of Default, all out-of-pocket costs and expenses, if any, of the Lender (i) to enforce or protect their respective rights under any of the Loan Documents, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of the Term Loans; and which amounts in (a) and (b) shall include all reasonable attorney's fees (including, without limitation, local counsel), together with interest at the Contract Rate or Default Rate, as applicable, on each such amount from the date of notification by the Lender that the same was expended, advanced or incurred by the Lender until the date it is repaid to the Lender.

5.13    Maintenance and Inspection of Properties.  Maintain or, to the extent that the right or obligation to do so rests with another Person, exercise commercially reasonable efforts to cause such other Person to maintain all of the tangible Properties of the Borrowers in good repair and condition, ordinary wear and tear excepted; make or, to the extent that the right or obligation to do so rests with another Person, exercise commercially reasonable efforts to cause such other Person to make all necessary replacements thereof and operate such Properties in a good and workmanlike manner; and permit any authorized representative of the Lender, upon prior notice to the Borrowers, to visit and inspect, at reasonable times, any tangible Property of the Borrowers.

5.14    Maintenance of Insurance.  Maintain or cause to be maintained insurance with respect to its Properties and businesses against such liabilities, casualties, risks and contingencies as is customary in the relevant industry and sufficient to prevent a Material Adverse Effect, all such insurance to be in amounts and from insurers reasonably acceptable to the Lender and name the Lender as an additional insured and loss payee.

5.15    Environmental Indemnification.    Indemnify and hold the Lender and its shareholders, officers, directors, employees, agents, attorneys-in-fact and Affiliates and each trustee for the benefit of the Lender under any Security Document (each of the foregoing an "Indemnitee") harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial actions, requirements and enforcement actions of any kind, and all reasonable costs and expenses incurred in connection therewith (including attorneys' fees and expenses), arising directly or indirectly, in whole or in part, from (a) the presence of any Hazardous Substances on, under, or from any Property of the Borrowers, whether prior to or during the term hereof, (b) any activity carried on or undertaken on any Property of the Borrowers, whether prior to or during the term hereof, and whether by the Borrowers or any of the predecessors in title, employees, agents, contractors or subcontractors of or any other Person at any time occupying or present on such Property, in connection with the handling, treatment, removal, storage, decontamination, cleanup, transportation or disposal of any Hazardous Substances at any time located or present on or under such Property, (c) any residual contamination on or under any Property of the Borrowers, (d) any contamination of any Property or natural resources arising in connection with the generation, use, handling, storage, transportation or disposal of any Hazardous Substances by the Borrowers or any employees, agents, contractors or subcontractors of the Borrowers while such Persons are acting within the scope of their relationship with the Borrowers, irrespective of whether any of such activities were or will be undertaken in accordance with applicable Requirements of Law or (e) the performance and enforcement of any Loan Document or any other act or omission in connection with or related to any Loan Document or the transactions contemplated thereby, including any

- 34 -

such claim, loss, damage, liability, fine, penalty, charge, administrative or judicial proceeding, order, judgment, remedial action, requirement, enforcement action, cost or expense, arising from the negligence (but not the gross negligence or willful misconduct), whether sole or concurrent, of any Indemnitee; with the foregoing indemnity surviving satisfaction of all Obligations and the termination of this Agreement, unless all such Obligations have been satisfied wholly in cash and not by way of realization against any Collateral or the conveyance of any Property in lieu thereof, provided that such indemnity shall not extend to any act or omission by the Lender with respect to any Property subsequent to the Lender becoming the owner of such Property and with respect to which Property such claim, loss, damage, liability, fine, penalty, charge, proceeding, order, judgment, action or requirement arises subsequent to the acquisition of title thereto by the Lender. All amounts due under this Section 5.15 shall be payable on written demand therefor by the Lender.

5.16    General Indemnification.  Indemnify and hold each Indemnitee harmless from and against any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees and expenses, incurred by or asserted against any Indemnitee arising out of, in any way connected with or as a result of (a) the execution and delivery of this Agreement and the other Loan Documents, the performance by the parties hereto and thereto of their respective obligations hereunder and thereunder and consummation of the transactions contemplated hereby and thereby, (b) the use of proceeds of the Term Loan, or (c) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, including any such loss, claim, damage, liability or expense arising from the negligence, whether sole or concurrent, of any Indemnitee, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's gross negligence or willful misconduct; with the foregoing indemnity surviving satisfaction of all Obligations and the termination of this Agreement.  All amounts due under this Section 5.16 shall be payable on written demand therefor.

5.17    Budget Variance Report, Cash Forecasts & Lender Conference Calls.

(a)    On or before the last Business Day of each calendar week following the end of the calendar week in which Closing Date occurs (the "Testing Date"), the Borrowers shall prepare and deliver to the Lender a report as of the end of each prior calendar week certified by a Responsible Officer of the Borrowers as to compliance with the covenant set forth in Section 6.18, together with, in each case, a reconciliation between actual and projected cash receipts and disbursements for such prior calendar week and a written summary of the causes for any material variations.

(b)    No later than the Friday ending every consecutive four (4) week period included in the then-effective Budget, the Borrowers shall deliver to the Lender a proposed updated Budget for next four (4) week period for the approval of the Lender in its sole discretion,  Such update Budget will be deemed accepted unless the Lender timely provides written notice setting forth a specific objection to the new budget within three (3) business days of service of the proposed updated Budget by the Borrowers.  In the event of a disagreement between the Lender and the Borrowers regarding any updated, modified, or supplemented Budget, the most recent Budget approved by the Lender will continue to stay in place and the Borrowers may continue to use proceeds of the Term Loans in accordance

with such Budget and the Order unless and until an updated, modified, or supplemented Budget is approved by, and is in a form and substance satisfactory to both the Borrowers and the Lender.

5.18    Certain Other Bankruptcy Orders.  As soon as practicable in advance of filing with the Bankruptcy Court, but in no event less than two (2) days before filing (or such shorter period reasonably agreed to by Lender under emergency circumstances), the Borrowers shall furnish to the Lender (i) the motion seeking approval of and proposed form of the Order, which motion shall be in form and substance satisfactory to the Lender in its sole discretion, (ii) all other proposed orders and pleadings related to this Agreement, which orders and pleadings shall be in form and substance reasonably satisfactory to the Lender, (iii) any plan of reorganization, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), (iv) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code, (v) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a related bidding procedures order and sale order, (vi) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any material contract; and (vii) any other pleadings to be filed by Borrowers with the Bankruptcy Court.

5.19    Certain Case Milestones.    The following "Milestones" shall apply to this Agreement, subject to extension by the Lender in its sole discretion:

(a)    Not later than September 27, 2023, an auction for the Real Property shall have occurred or been completed, unless such auction is canceled pursuant to the terms of the Bidding Procedures Order (as defined in the Order);

(b)    Not later than October 6, 2023, the Debtors shall obtain entry of an order of the Bankruptcy Court approving the Sale Transaction (the "Sale Order"); and

(c)    Not later than 15 days following after entry of the Sale Order, the Sale Transaction shall have closed.

ARTICLE VI

NEGATIVE COVENANTS

So long as any Obligation remains outstanding or unpaid, none of the Borrowers will:

6.1    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, whether by way of loan or otherwise; provided, however, the foregoing restriction shall not apply to (a) the Obligations, (b) unsecured accounts payable incurred in the ordinary course of business and authorized by the Budget, which are not unpaid in excess of forty-five (45) days beyond invoice date or are being contested in good faith and as to which such reserve as is required by GAAP has been made, and (c) Indebtedness associated with Permitted Liens permitted pursuant to clauses (a) and (d) of the definition thereof.

- 36 -

6.2     Liens.  Create, incur, assume or suffer to exist any Lien on any of its Property, whether now owned or hereafter acquired; provided, however, the foregoing restriction shall not apply to Permitted Liens.

6.3     Sales of Assets.  Sell, transfer or otherwise dispose of, any of its Property, whether now owned or hereafter acquired, or enter into any agreement to do so; provided, however, the foregoing restriction shall not apply to (a) the sale or other disposition of Property destroyed, lost, worn out, damaged or having only salvage value or no longer used or useful in the business in which it is used, or (b) sales or other dispositions of Property approved by the Lender.

6.4     Leasebacks.  Enter into any agreement to sell or transfer any Property and thereafter rent or lease as lessee such Property or other Property intended for the same use or purpose as the Property sold or transferred.

6.5     Loans or Advances.  Make or agree to make or allow to remain outstanding any loans or advances to any Person

6.6     Investments.  Make or acquire Investments in, or purchase or otherwise acquire all or substantially all of the assets of, any Person; provided, however, the foregoing restriction shall not apply to Investments in the form of (i) debt securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof, with maturities of no more than one year, (ii) commercial paper of a domestic issuer rated at the date of acquisition at least P-2 by Moody's Investor Service, Inc. or A-2 by Standard & Poor's Corporation and with maturities of no more than one year from the date of acquisition, (iii) repurchase agreements covering debt securities or commercial paper of the type permitted in this Section 6.6, or (iv) certificates of deposit, demand deposits, eurodollar time deposits, overnight bank deposits and bankers' acceptances, with maturities of no more than one year from the date of acquisition, issued by or acquired from or through any Lender or any bank or trust company organized under the laws of the United States of America or any state thereof and having capital surplus and undivided profits aggregating at least $100,000,000, (b) other short-term Investments similar in nature and degree of risk to those described in clause (b) of this proviso to this Section 6.6, (c) Investments in money-market funds sponsored or administered by Persons acceptable to the Lender and which funds invest in short-term Investments similar in nature and degree of risk to those described in clause (a) of this proviso to this Section 6.6, or (d) evidences of loans or advances not prohibited by the provisions of Section 6.5.

6.7     Dividends and Distributions.  Declare, pay or make, whether in cash or Property of the relevant Borrower, any dividend or distribution on, or purchase, redeem or otherwise acquire for value, any of its Equity Interests other than distributions to another Borrower.

6.8     Issuance of Equity; Changes in Corporate Structure.  Issue or agree to issue any Equity Interest in any Borrower; enter into any transaction of consolidation, merger or amalgamation (including through a plan of division), form or acquire any Subsidiary or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution).

6.9     Transactions with Affiliates and Certain Other Person.  Directly or indirectly, enter into any transaction (including the sale, lease or exchange of Property or the rendering of service)

- 37 -

with any of its Affiliates or with any Person directly or indirectly related to any Borrower or any manager or officer of such Borrower, other than: (a) upon fair and reasonable terms no less favorable than could be obtained in an arm's length transaction with a Person which was not an Affiliate and (b) upon terms approved by the Lender in writing.

6.10   <u>Lines of Business</u>.  Engage in any line of business other than those in which the relevant Borrower is engaged as of the Closing Date.

6.11   <u>Plan Obligation</u>.   Assume or otherwise become subject to an obligation to contribute to or maintain any Plan or acquire any Person which has at any time had an obligation to contribute to or maintain any Plan.

6.12   <u>Anti-Terrorism Laws</u>.   Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person; Deal in, or otherwise engage in any transaction relating to, any Property or interests in Property blocked pursuant to Executive Order No. 13224; Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate (i) any of the prohibitions set forth in Executive Order No. 13224 or the USA Patriot Act or (ii) any prohibitions set forth in the rules or regulations issued by OFAC or any Sanctions against targeted foreign countries, terrorism sponsoring organizations and international narcotics traffickers based on United States of America foreign policy.

6.13   <u>Amendment of Material Contracts</u>.   Amend, supplement, restate or otherwise modify, in any material respect, any material contract or agreement to which the relevant Borrower is a party in each case, without express written consent from the Lender.

6.14   <u>Deposit Accounts</u>.  Establish or maintain funds on deposit in a deposit account with any financial institution other than in the Operating Account.

6.15   <u>Organizational Documents</u>.  Enter into any amendment or permit any modification of, or waive any material right or obligation of any Person under, any Borrower's applicable certificate or articles of incorporation, certificate of formation, bylaws, limited liability company agreement or equivalent or comparable document, in each case in a manner that is materially adverse to the Lender.

6.16   <u>Capital Expenditures</u>.  Make or commit or agree to make, in any fiscal quarter, Capital Expenditures except as permitted by the Budget.

6.17   <u>Prepayments of Certain Indebtedness</u>.  No Borrower shall, nor shall it permit any of its Affiliates to, directly or indirectly, purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness of any Borrower or any of its Subsidiaries prior to its scheduled maturity, other than as permitted in this Agreement or the Order.

6.18    Budget Variances.

(a)    The Budget shall be tested on a weekly basis (of Monday through Sunday) on the last Business Day of each week as required under Section 5.19.  Any deviation from the Budget in excess of the Permitted Variances (as described below in Section 6.18(b)) shall constitute non-compliance with the Budget and the terms of the Loan Documents and an Event of Default; provided that the Lender shall have the authority to provide written pre-approval for any deviations in excess of the Permitted Variances.

(b)    The Borrowers shall at all times comply with the Budget, subject to an allowed cumulative variance of less than or equal to ten percent (10%) in the aggregate of the expense line items set forth on the Budget (the "Permitted Variance").  On or before 5:00 p.m. (prevailing Central Time) beginning with the first Friday following the entry of the Order and each Friday thereafter, the Borrowers shall prepare and deliver to the Lender a Variance report setting forth in reasonable detail actual cash receipts and disbursements for the prior week.

(c)    For the purposes of the above calculations, it is agreed that to the extent that the Professional Fees incurred by counsel to the Lender exceed the amounts for such line items in the Budget, such excess amounts shall be disregarded when calculating the Permitted Variance.

6.19    Use of Proceeds.  The Borrowers shall not directly or indirectly, use or permit the use of all or any portion of the Loans for any purpose other than the Approved Purposes.  The Borrowers will not directly or indirectly use the proceeds of the Term Loans, or otherwise make available such proceeds to any person, (a) to permit the Borrowers, any or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the Lender, or (ii) the enforceability of the obligations of the Borrowers under the DIP Facility, (b) to investigate (except as may be required by the Bankruptcy Court), commence, prosecute or defend any claim, motion, proceeding or cause of action against any the Lender and its respective agents, attorneys, advisors or representatives including, without limitation, any lender liability claims, subordination claims or any claims attempting to invalidate any of the Loan Documents, (c) to fund acquisitions, capital expenditures or any other expenditure other than as set forth in the Budget, (d) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Terrorism Laws, (e) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Blocked Person, or (f) in a manner that would otherwise violate any Anti-Terrorism Law.

6.20    Additional Bankruptcy Matters.  The Borrowers shall not do any of the following:

(a)    assert or prosecute any claim or cause of action against the Lender, unless such claim or cause of action is in connection with the enforcement or defense of the Loan Documents against the Lender;

(b)    subject to Section 7.2(b), object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Lender with respect to

- 39 -

the Collateral following the occurrence of an Event of Default (provided that any Borrower may contest or dispute whether an Event of Default has occurred);

(c)      except as expressly provided or permitted hereunder or as provided pursuant to any other Order of the Bankruptcy Court which is in form and substance satisfactory to the Lender, make any payment or distribution to any non-Debtor Affiliate or insider of the Borrowers outside of the ordinary course of business; or

(d)      without the consent of the Lender, file a motion (or support any motion) seeking to amend or otherwise modify any Order in any manner adverse to the Lender.

## ARTICLE VII

## EVENTS OF DEFAULT

7.1      <u>Enumeration of Events of Default</u>.  Any of the following events shall constitute an Event of Default:

(a)      default shall be made in the payment when due of any installment of principal or interest under this Agreement or the Note or in the payment when due of any fee or other sum payable under any Loan Document to which the relevant Borrower is a party;

(b)      default shall be made by the Borrowers in the due observance or performance of any of its obligations under the Loan Documents, and, as to compliance with the obligations of the Borrowers under <u>Article V</u> (other than <u>Sections 5.9</u>), such default shall continue for five (5) days after the earlier of (i) notice thereof to the relevant Borrower or Borrowers by the Lender or (ii) knowledge thereof by the relevant Borrower or any of the other Borrowers;

(c)      any representation or warranty made by the Borrowers in any of the Loan Documents to which the relevant Borrower is a party proves to have been untrue in any material respect or any representation, statement, certificate or data furnished or made to the Lender in connection herewith proves to have been untrue in any material respect as of the date the facts therein set forth were stated or certified;

(d)      default shall be made by any Borrower (as principal or guarantor or other surety) in the payment or performance of any bond, debenture, note or other Indebtedness in excess of $50,000 in the aggregate as to the relevant Borrower or under any credit agreement, loan agreement, indenture, promissory note or similar agreement or instrument executed in connection with any of the foregoing, and such default shall remain unremedied for in excess of the period of grace, if any, with respect thereto; provided that this clause (d) shall not apply to any Indebtedness outstanding hereunder and any Indebtedness of any Borrower that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor);

(e)      the levy against any significant portion of the Property of the Borrowers, or any execution, garnishment, attachment, sequestration or other writ or similar proceeding

- 40 -

post-petition in an amount in excess of $50,000 as to the relevant Borrower which is not permanently dismissed or discharged within 60 days after the levy;

(f)     a final and non-appealable order, judgment or decree shall be entered against any Borrower post-petition for money damages and/or Indebtedness due that accrued post-petition in an amount in excess of $250,000, and such order, judgment or decree shall not be paid, dismissed or stayed within 60 days or is not fully covered by insurance;

(g)     any charges are filed or any other action or proceeding is instituted by any Governmental Authority against any Borrower under the Racketeering Influence and Corrupt Organizations Statute (18 U.S.C. §1961 et seq.), the result of which could be the forfeiture or transfer of any material Property of the relevant Borrower subject to a Lien in favor of the Lender without (i) satisfaction or provision for satisfaction of such Lien or (ii) such forfeiture or transfer of such Property being expressly made subject to such Lien;

(h)     any Borrower shall have (i) concealed, removed or diverted, or permitted to be concealed, removed or diverted, any part of its Property, with intent to hinder, delay or defraud its creditors or any of them, (ii) made or suffered a transfer of any of its Property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law with intent to hinder, delay or defraud its creditors, (iii) made any transfer of its Property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid with intent to hinder, delay or defraud its creditors or (iv) shall have suffered or permitted, while insolvent, any creditor to obtain a Lien upon any of its Property through legal proceedings or distraint which is not vacated within 60 days from the date thereof;

(i)     any Security Document shall for any reason not, or cease to, create valid and perfected first-priority Liens against the Property of any Borrower which is a party thereto purportedly covered thereby, except to the extent permitted by this Agreement or to the extent Liens against such Property are otherwise validly created and perfected pursuant to the Order;

(j)     any Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the payment in full in cash of the Obligations in accordance with the terms hereof) or any Borrower contests in any manner the validity or enforceability of any provision of any Loan Document to which it is a party, or denies that it has any liability under any Loan Document to which it is a party;

(k)     any Borrower purports to revoke, terminate or rescind any Loan Document or any provision of any Loan Document;

(l)     a Change of Control occurs;

(m)     any Borrower (or any direct or indirect parent of any Borrower) or any Person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Lender regarding the DIP Facility, unless such

- 41 -

suit or other proceeding is in connection with the enforcement of the Loan Documents against the Lender;

(n)      a plan of reorganization shall be confirmed in any of the Cases, or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Commitments under this Agreement and indefeasible payment in full in cash of the Obligations under the Loan Documents or provide such treatment that is otherwise acceptable to the Lender in its sole discretion, or any of the Borrowers or any of their Subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(o)      any Borrower or any of its Subsidiaries shall file any motion seeking authority to consummate the sale of assets of any Borrower or any of its Subsidiaries (other than as permitted under the Loan Documents) pursuant to Section 363 of the Bankruptcy Code, without prior written consent of the Lender;

(p)      the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by the Borrowers or any of their Subsidiaries of a motion or other pleading seeking entry of such an order or supporting entry of such an order;

(q)      a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the any of the Cases, any Borrower or any of its Subsidiaries applies for, consents to, or fails to contest in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Lender in its sole discretion;

(r)      the entry of an order or the filing by any Borrower or any of its Subsidiaries of an application, motion or other pleading seeking entry of an order staying, reversing, vacating or otherwise modifying the Order, in each case in a manner adverse in any material respect to the Lender;

(s)      the entry of an order in any of the Cases holding that the O'Connor Defendants hold valid, enforceable, perfected and unavoidable Liens on, and security interests in, the assets of the Borrowers;

(t)      the entry of an order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Borrowers or any of their Subsidiaries;

(u)      the entry of a final non-appealable order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lender or the commencement of any other actions by the Borrowers or any of their Subsidiaries (or any direct or indirect parent thereof), that challenges the rights and remedies of the Lender under this Agreement in any of the Cases or that is inconsistent with the Loan Documents;

- 42 -

(v)    the entry of an order in any of the Cases seeking authority to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facility);

(w)    the entry of an order in any of the Cases granting adequate protection to any other person (other than the Order and "first day" orders), to the extent such adequate protection is senior or pari passu to the Liens and Superpriority Claims granted to the Lender in the Order;

(x)    the filing or support by the Borrowers or any of their Subsidiaries of a Bankruptcy Plan that (a) does not provide for the indefeasible payment in full, in cash of all obligations owing under this Agreement or such other treatment that is acceptable to Lender in its sole discretion; and (b) is not otherwise acceptable to the Lender in its sole and reasonable discretion;

(y)    the filing or support of any pleading by any Borrower or any of its Subsidiaries (or any direct or indirect parent thereof), seeking, or otherwise consenting to, any of the matters set forth in clauses (q) through (x) above;

(z)    the making of any Prepetition Payments other than (i) as permitted by the Order, (ii) as permitted by any "first day" orders reasonably satisfactory to the Lender, or (iii) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Lender;

(aa)    the entry of an order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Lender under the DIP Facility, or the filing by the Borrowers or any of their Subsidiaries of a motion or application seeking entry of such an order;

(bb)    other than with respect to the Carve-Out and the Liens permitted to have such priority under Section 2.17, and subject to the Order and "first day" orders, the Company shall create or incur, or the Bankruptcy Court enters an order granting, any Lien which is pari passu with or senior to any Liens under the Loan Documents or the adequate protection Liens granted under the Order;

(cc)    noncompliance by any Borrower or any of its Subsidiaries with the terms of the Order;

(dd)    the making of any payments not expressly provided for in the Budget; or

(ee)    failure by Debtors to comply with the "Milestones" set forth is Section 5.19.

7.2    Remedies.

(a)    Subject to the provisions of the Order, upon the occurrence of any Event of Default, the Lender may by notice in writing to any Borrower, terminate all Commitments under this Agreement and declare all Obligations immediately due and payable, without

- 43 -

presentment, demand, protest, notice of protest, default or dishonor, notice of intent to accelerate maturity, notice of acceleration of maturity or other notice of any kind, except as may be provided to the contrary elsewhere herein, all of which are hereby expressly waived by each Borrower.

(b)    Subject to the provisions of the Order, upon the occurrence of any Event of Default and the giving of five (5) Business Days' notice to the Borrowers (the "Remedies Notice Period"), the Lender may, in addition to the foregoing in this Section 7.2, exercise any or all of its rights and remedies provided by law or pursuant to the Loan Documents, including without limitation, the ability of Lender to credit bid up to 100% of the Obligations then outstanding.  During the Remedies Notice Period, the Borrowers and any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

(c)    Should the Obligations under the Loan Documents become immediately due and payable in accordance with any of the preceding subsections of this Section 7.2, following the Remedies Notice Period and subject to the Order of the Bankruptcy Court, the Lender shall be entitled to proceed against the Collateral.

(d)    Proceeds received by the Lender from realization against the Collateral and any other funds received by the Lender from any Borrower when an Event of Default has occurred and is continuing shall be applied (i) first, to fees and expenses due pursuant to the terms of this Agreement or any other Loan Document with a Lender, (ii) second, to accrued interest on the Obligations under the Loan Documents with a Lender and (iii) third, to the Loan Balance and any other Obligations then due and payable, pro rata in accordance with the ratio of the Loan Balance or such other Obligations, as the case may be, to the sum of the Loan Balance and such other Obligations.

## ARTICLE VIII

## MISCELLANEOUS

8.1    Assignments; Participations.

(a)    No Borrower may assign any of its rights or obligations under any Loan Document without the prior written consent of the Lender.

(b)    The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement pursuant to an assignment agreement reasonably acceptable to the Lender (the "Assignment Agreement").  Promptly following receipt of an executed Assignment Agreement, the Lender shall send to the Borrowers a copy of such executed Assignment Agreement.  Promptly following receipt of such executed Assignment Agreement, the Borrowers shall execute and deliver, at their own expense, a new Note to the assignee and, if applicable, the assignor, in accordance with their respective interests, whereupon the prior Note of the assignor and, if applicable, the assignee, shall be canceled and returned to the Borrowers.  If the assignor no longer holds

- 44 -

any rights or obligations under this Agreement, such assignor shall cease to be a "Lender" hereunder, except that its rights under Section 5.12, Section 5.16 and Section 5.20, shall not be affected.

(c)     The Lender may transfer, grant or assign participations in all or any portion of its interests hereunder to any Person pursuant to this Section 9.1(c), In the case of any such participation, the participant shall not have any rights under any Loan Document, the rights of the participant in respect of such participation to be against the granting Lender as set forth in the agreement with the Lender creating such participation, and all amounts payable by the Borrowers hereunder shall be determined as if the Lender had not sold such participation.

(d)     The Lender may furnish any information concerning the Borrowers in the possession of the Lender from time to time to assignees and participants and prospective assignees and participants.

(e)     Notwithstanding any other provisions of this Section 8.1, no transfer or assignment of the interests or obligations of any Lender or grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrowers to file a registration statement with the Securities and Exchange Commission or any successor Governmental Authority or qualify the Term Loans under the "Blue Sky" laws of any state.

8.2     Survival of Representations, Warranties, and Covenants.  All representations and warranties of the Borrowers and all covenants and agreements herein made by the Borrowers shall survive the execution and delivery of the Note and shall remain in force and effect so long as any Obligation is outstanding.

8.3     Notices and Other Communications.  Except as to oral notices expressly authorized herein, if any, which oral notices shall be promptly confirmed in writing, all notices, requests and communications hereunder shall be in writing (including by facsimile or electronic mail).  Unless otherwise expressly provided herein, any such notice, request, demand or other communication shall be deemed to have been duly given or made when delivered personally, or, in the case of delivery by mail, when deposited in the mail, certified mail with return receipt requested, postage prepaid, in the case of facsimile notice, when receipt thereof is acknowledged orally or by written confirmation report or, in the case of electronic mail, when sent and no undeliverable notification is received, addressed as follows:

(a)     if to the Lender, to:

Ajax Holdings LLC
[_____]
[_____]
[_____]
Attention:  [_____]
E-mail:  [_____].com

With a copy to:

14169224

> Hunton Andrews Kurth LLP
> 600 Travis, Suite 4200
> Houston, Texas 77002
> Attention: Timothy A. "Tad" Davidson II
> E-mail:  taddavidson@huntonak.com

(b)     if to any Borrower, to:

> AVR AH LLC
> 514 E. Hyman Avenue
> Aspen, Colorado 81611
> Attention:  [_____]
> E-mail:  [_____].com

> Strudel Holdings LLC
> 1201 Louisiana Street, Suite 3100
> Houston, Texas 77002
> Attention:  [_____]
> E-mail:  [_____].com

With a copy to:

> Porter Hedges LLP
> 1000 Main Street, 36th Floor
> Houston, Texas 77005
> Attention: Aaron Power
> E-mail: APower@porterhedges.com

Any party may, by proper written notice hereunder to the others, change the individuals or addresses to which such notices to it shall thereafter be sent.

8.4     Parties in Interest.  Subject to the restrictions on changes in structure set forth in Section 6.8 and other applicable restrictions contained herein, all covenants and agreements herein contained by or on behalf of the Borrowers, the Lender shall be binding upon and inure to the benefit of the Borrowers, the Lender, as the case may be, and their respective legal representatives, successors and assigns.

8.5     Rights of Third Parties.  All provisions herein are imposed solely and exclusively for the benefit of the Lender and the Borrowers and no other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of provisions hereof in accordance with their terms.

8.6     Renewals; Extensions.  All provisions of this Agreement relating to the Note shall apply with equal force and effect to each promissory note hereafter executed which in whole or in part represents a renewal or extension of any part of the Indebtedness of the Borrowers under this Agreement, the Note or any other Loan Document.

- 46 -

8.7     No Waiver; Rights Cumulative.  No course of dealing on the part of the Lender or their officers or employees, nor any failure or delay by the Lender with respect to exercising any of their rights under any Loan Document shall operate as a waiver thereof.  The rights of the Lender under the Loan Documents shall be cumulative and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.  The making of the Term Loans shall not constitute a waiver of any of the covenants, warranties or conditions of the Borrowers contained herein.  In the event any of the Borrowers are unable to satisfy any such covenant, warranty or condition, the making of the Term Loans shall not have the effect of precluding the Lender from thereafter declaring such inability to be an Event of Default as hereinabove provided.

8.8     Survival Upon Unenforceability.  In the event any one or more of the provisions contained in any of the Loan Documents or in any other instrument referred to herein or executed in connection with the Obligations shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of any Loan Document or of any other instrument referred to herein or executed in connection with such Obligations.

8.9     Amendments; Waivers.  Neither this Agreement nor any provision hereof may be amended, waived, discharged or terminated orally, except by an instrument in writing signed by the Lender and the party against whom enforcement of the amendment, waiver, discharge or termination is sought.

8.10     Controlling Agreement.  In the event of a conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control.

8.11     Disposition of Collateral.  Notwithstanding any term or provision, express or implied, in any of the Security Documents, the realization, liquidation, foreclosure or any other disposition on or of any or all of the Property of the Borrowers subject to the Security Documents shall be in the order and manner and determined in the sole discretion of the Lender; provided, however, that in no event shall the Lender violate applicable law or exercise rights and remedies other than those provided in such Security Documents or otherwise existing at law or in equity.

8.12     Governing Law.  This Agreement and the Note shall be deemed to be contracts made under and shall be construed in accordance with and governed by the laws of the State of Texas, without giving effect to principles thereof relating to conflicts of law.

8.13     Forum Selection and Consent to Non-Exclusive Jurisdiction; Waiver of Jury Trial.

(a)     EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF TEXAS SITTING IN HARRIS COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF TEXAS, AND ANY APPELLATE COURT FROM ANY THEREOF IN ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE,

- 47 -

AGAINST ANY BORROWER, THE LENDER, ANY OTHER PARTY HERETO OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO.   EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED EXCLUSIVELY IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, SUCH TEXAS STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT AT THE LENDER'S OPTION IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.   EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.   EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF TEXAS AT THE ADDRESS FOR NOTICES SPECIFIED IN SECTION 8.3, IF APPLICABLE; PROVIDED THAT NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.   EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   TO THE EXTENT THAT ANY OF THE PARTIES HERETO HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH SUCH PARTY HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.   IN SUCH REGARD, EACH BORROWER HEREBY SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED IN HOUSTON, HARRIS COUNTY, TEXAS, AND HEREBY WAIVES ANY RIGHTS IT MAY HAVE TO TRANSFER OR CHANGE THE JURISDICTION OR VENUE OF ANY LITIGATION BROUGHT AGAINST IT BY THE LENDER.

(b)      EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY

- 48 -

OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND CONSENT AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.13(b)</u>.

8.14    <u>Integration</u>.  This Agreement and the other Loan Documents constitute the entire agreement among the parties hereto and thereto with respect to the subject hereof and thereof and shall supersede any prior agreement among the parties hereto and thereto, whether written or oral, relating to the subject matter hereof and thereof, including any term sheet or summary of principal terms provided to the Borrowers by the Lender.  Furthermore, in this regard, this Agreement and the other written Loan Documents represent, collectively, the final agreement among the parties thereto and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of such parties.  There are no unwritten oral agreements among such parties.

8.15    <u>Waiver of Punitive and Consequential Damages</u>.  Each Borrower and the Lender hereby knowingly, voluntarily, intentionally and irrevocably (a) waives, to the maximum extent it may lawfully and effectively do so, any right it may have to claim or recover, in any Dispute based hereon or directly or indirectly at any time arising out of, under or in connection with the Loan Documents or any transaction contemplated thereby or associated therewith, before or after maturity, any special, exemplary, punitive or consequential damages, or damages other than, or in addition to, actual damages and (b) acknowledge that it has been induced to enter into this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby by, among other things, the mutual waivers and certifications contained in this <u>Section 8.15</u>.

8.16    <u>Counterparts</u>.  For the convenience of the parties, this Agreement may be executed in multiple counterparts and by different parties hereto in separate counterparts, each of which for all purposes shall be deemed to be an original, and all such counterparts shall together constitute but one and the same Agreement.  In this regard, each of the parties hereto acknowledges that a counterpart of this Agreement containing a set of counterpart execution pages reflecting the execution of each party hereto shall be sufficient to reflect the execution of this Agreement by each party hereto.

8.17    <u>USA Patriot Act Notice</u>.  The Lender (for itself and not on behalf of any Lender) hereby notifies each Borrower that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of the relevant Borrower and other information that will allow the Lender to identify each Borrower in accordance with the USA Patriot Act.

8.18    <u>Tax Shelter Regulations</u>.  None of the Borrowers intends to treat the Term Loans and related transactions hereunder and under the other Loan Documents as a "reportable

- 49 -

transaction" (within the meanings under current Treasury Regulation Section 1.6011-4 and Proposed Treasury Regulation Section 1.6011-4, promulgated on November 1, 2006). In the event the Borrowers determines to take any action inconsistent with the foregoing statement, it will promptly notify the Lender thereof. If the Borrowers so notifies the Lender, the Borrowers acknowledge that the Lender may treat the Term Loan and the related transactions hereunder and under the other Loan Documents as part of a transaction that is subject to current Treasury Regulation Section 301.6112-1 or Proposed Treasury Regulation Section 301.6112-1, promulgated on November 1, 2006, and, in such case, the Lender will maintain the lists and other records required, if any, by such Treasury Regulations.

8.19 <u>Inconsistencies with Other Documents</u>. In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Security Documents which imposes additional burdens on the Borrower or any of its Subsidiaries or further restricts the rights of Borrower or any of its respective Subsidiaries or gives the Lender additional rights shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect. To the extent any provision herein or in any other Loan Document is inconsistent with any term of the Orders, the Orders shall control.

**(Signatures appear on following pages)**

14169224

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**<u>BORROWERS</u>**:

AVR AH LLC,
a Colorado limited liability company


By:_____
Name:_____
Title:_____


STRUDEL HOLDINGS, LLC,
a Texas limited liability company


By:_____
Name:_____
Title:_____




**(Signatures continue on following pages)**




*SIGNATURE PAGE TO SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION*
*TERM LOAN CREDIT AGREEMENT*

DMS 303644570v6

14169224

**LENDER**:

AJAX HOLDINGS, LLC,
a [_____] limited liability company


By:_____
Name:_____
Title:_____


**(End of signature pages)**

*SIGNATURE PAGE TO SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT*

**Schedule 1**

**AVR AH LLC & STRUDEL HOLDINGS, LLC**
**7-WEEK DIP BUDGET**

| | Forecast 1 Week Ending 9/10/2023 | Forecast 2 Week Ending 9/17/2023 | Forecast 3 Week Ending 9/24/2023 | Forecast 4 Week Ending 10/1/2023 | Forecast 5 Week Ending 10/8/2023 | Forecast 6 Week Ending 10/15/2023 | Forecast 7 Week Ending 10/22/2023 | Total |
|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | |
| **Receipts** | | | | | | | | |
| AVR Rental Sales | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - |
| **TOTAL CASH RECEIPTS** | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - |
| **Cash Disbursements** | | | | | | | | |
| **Operating Disbursements** | | | | | | | | |
| HOA Dues | $  - | $  - | $  - | $  - | $ 250,000 | $  - | $ 217,737 | $ 467,737 |
| Homestead Sale Obligations | - | - | - | 87,000 | - | - | - | $ 87,000 |
| Insurance Expense | - | - | - | 6,040 | 6,040 | - | 6,040 | $ 18,119 |
| Payroll & Benefits | - | - | - | - | - | - | - | $  - |
| Ranch Maintenance, Equipment, and Supplies | - | - | - | 13,000 | 13,000 | - | 13,000 | $ 39,000 |
| Utilities | - | - | - | 7,250 | 7,250 | - | 7,250 | $ 21,750 |
| Landscape services | - | - | - | 9,000 | - | - | - | $ 9,000 |
| Miscellaneous Ranch Expenses | - | - | - | 10,587 | 7,887 | - | 12,887 | $ 31,361 |
| **Total Operating Disbursements** | $  - | $  - | $  - | $ 132,877 | $ 284,177 | $  - | $ 256,913 | $ 673,967 |
| **OPERATING CASH FLOW** | $  - | $  - | $  - | $ (132,877) | $ (284,177) | $  - | $ (256,913) | $ (673,967) |
| **Other Disbursements** | | | | | | | | |
| Professional Fees - Estate | $  - | $  - | $  - | $ 480,000 | $  - | $  - | $ 1,306,857 | $ 1,786,857 |
| Professional Fees - DIP Lender Legal | - | - | - | 200,000 | 150,000 | - | 150,000 | $ 500,000 |
| DIP Interest and Fees | - | - | - | - | - | - | - | $  - |
| CAPEX | - | - | - | - | - | - | - | $  - |
| Adequate Protection | - | - | - | - | - | - | - | $  - |
| **Total Other Disbursements** | $  - | $  - | $  - | $ 680,000 | $ 150,000 | $  - | $ 1,456,857 | $ 2,286,857 |
| **TOTAL DISBURSEMENTS** | $  - | $  - | $  - | $ 812,877 | $ 434,177 | $  - | $ 1,713,770 | $ 2,960,824 |
| **NET CASH FLOW** | $  - | $  - | $  - | $ (812,877) | $ (434,177) | $  - | $ (1,713,770) | $ (2,960,824) |
| **Cash Reconciliation** | | | | | | | | |
| Beginning Cash Balance | $ 71,538 | $ 71,538 | $ 71,538 | $ 71,538 | $ 508,661 | $ 324,484 | $ 574,484 | $ 71,538 |
| DIP Advance/(Paydown) | - | - | - | 1,250,000 | 250,000 | 250,000 | 1,434,427 | 3,184,427 |
| Net Cash Flow | - | - | - | (812,877) | (434,177) | - | (1,713,770) | (2,960,824) |
| **Ending Cash Balance** | $ 71,538 | $ 71,538 | $ 71,538 | $ 508,661 | $ 324,484 | $ 574,484 | $ 295,141 | $ 295,141 |
| **DIP Reconciliation** | | | | | | | | |
| Undrawn DIP Balance | $  - | $  - | $ 3,700,000 | $ 3,184,427 | $ 1,934,427 | $ 1,684,427 | $ 1,434,427 | |
| Accrued Post-Petition Member Advances | $  - | $  - | 515,573 | - | - | - | - | |
| DIP Advance/(Paydown) | $  - | $  - | - | 1,250,000 | 250,000 | 250,000 | 1,434,427 | |
| **Ending Undrawn DIP Balance** | $  - | $  - | $ 3,184,427 | $ 1,934,427 | $ 1,684,427 | $ 1,434,427 | $  - | |
| **Estimated Accrual of Professional Fees (Estate & DIP Lender Legal)** | | | | | | | | |
| Stout Risius Ross, LLC | $ 60,000 | $ 60,000 | $ 60,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 340,000 |
| Porter Hedges LLP | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 630,000 |
| DIP Lender Legal | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 262,500 |
| **Estimated Accrued Total** | $ 187,500 | $ 187,500 | $ 187,500 | $ 167,500 | $ 167,500 | $ 167,500 | $ 167,500 | $ 1,232,500 |
| **Professional Fees Reconciliation (Estate & DIP Lender Legal)** | | | | | | | | |
| Beginning Balance | $ 1,030,357 | $ 1,217,857 | $ 1,405,357 | $ 1,592,857 | $ 1,080,357 | $ 1,097,857 | $ 1,265,357 | |
| Accrual/(Disbursements) | 187,500 | 187,500 | 187,500 | (512,500) | 17,500 | 167,500 | (1,265,357) | |
| **Ending Balance** | $ 1,217,857 | $ 1,405,357 | $ 1,592,857 | $ 1,080,357 | $ 1,097,857 | $ 1,265,357 | $  - | |
| **Accrued DIP Interest & Fees** | | | | | | | | |
| DIP Interest | $  - | $  - | $  - | $ 1,246 | $ 2,740 | $ 3,239 | $ 4,917 | $ 12,142 |
| Origination Fee | - | - | - | 37,000 | - | - | - | $ 37,000 |
| **Total DIP Interest & Fees** | $  - | $  - | $  - | $ 38,246 | $ 2,740 | $ 3,239 | $ 4,917 | $ 49,142 |

**AVR AH LLC & STRUDEL HOLDINGS, LLC**
*7-WEEK DIP BUDGET*

<u>*Notes:*</u>

1)   *This DIP Budget presents a $3.7M DIP Commitment.*
2)   *Beginning the 1st week of Ch. 11 filing, check disbursements will be recognized as cash outflow in the week in which they are distributed.*
3)   *Professional fees payment timing is subject to interim compensation procedure.*
4)   *Estimated Accrual of Professional Fees does not impact the cash flow and it presented for budget reporting purposes.  Order approving use of cash collateral to provide carve out for full amount of accrued professional fees shown.  Accrued professional fees excludes fees related to U.S. Trustee.*
5)   *DIP Interest & Fees are PIK'd and will be paid in full at closing of sale of ranch.  Terms: Interest - WSJ Prime (8.25% as of July 26) + 2%; Fees - Origination fee of 1%.*
6)   *Accrued Post-Petition Member Advances are payments made by Charif Souki to AVR HOA and various vendors for the benefit of the Debtors.  Post-petition advances are subject to review.*