IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90757-11 |
| | § | HOUSTON, TEXAS |
| STRUDEL HOLDINGS, LLC, | § | FRIDAY, |
| ET AL, | § | OCTOBER 27, 2023 |
| DEBTORS. | § | 10:00 A.M. TO 3:03 P.M. |

**EMERGENCY MOTIONS (VIA ZOOM)**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281--277--5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM):**

FOR THE DEBTOR:                    Joshua W. Wolfshohl
                                  Jordan Stevens
                                  Aaron James Power
                                  Porter Hedges LLP
                                  1000 Main, 36th Floor,
                                  Houston TX, 77002
                                  713-226-6000

FOR BEYOND THE BEACH:             Michael D. Warner
                                  Benjamin Wallen
                                  Pachulski Stang Ziehl
                                  $ Jones LLP
                                  440 Louisiana Street
                                  Suite 900
                                  Houston, TX 77002
                                  713-691-9385

FOR US TRUSTEE:                   Andrew Jimenez

FOR CHARIF SOUKI AND AJAX
HOLDINGS:                         Tad Davidson

FOR PLAINTIFF IN THE
ADVERSARY:                        Tim McConn
                                  Yetter Coleman

FOR THE LENDER PARTIES:           Laura Metzger
                                  Orrick Herrington & Sutcliffe

3

INDEX

<u>EXHIBITS</u>:                          <u>Admitted</u>

Exhibit No. 1 and 12 through 33    12

Exhibit No. 1 through 22           14

***

**HOUSTON, TEXAS; FRIDAY, OCTOBER 27, 2023; 10:00 A.M.**

THE COURT:  Okay.  Good morning, everyone.  This is Judge Lopez.  Today is October 27th.  I'm going to call the 10:00 a.m. case 23-90757, Strudel Holdings, in connection with an emergency motion to approve a sale and in connection with a motion to dismiss the Chapter 11 case.  There are a number of parties here.

Why don't we take appearances in the courtroom, and then we will take appearances for folks on the line?

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Aaron Power, and Jordan Stevens on behalf of the Debtors.  And then also Mr. Brickley is in the courtroom, the CRO for the Debtors.

THE COURT:  Okay.  Good morning.

MR. WARNER:  Good morning, Your Honor.  Michael Warner, Benjamin Wallen, Pachulski Stang Ziehl & Jones on behalf of Beyond the Beach, LLC.

THE COURT:  Thank you.

MR. WARNER:  Thank you.

THE COURT:  Mr. Davidson.  Good morning.

MR. DAVIDSON:  Good morning, Your Honor.  Tad Davidson for Charif Souki and Ajax Holdings, LLC.

THE COURT:  Okay.  Good morning.

MR. MCCONN:  Good morning, Your Honor.  Tim McConn from Yetter Coleman here on behalf of the plaintiffs in the

5

adversary proceeding.

THE COURT: Okay.

MR. MCCONN: Good to see you.

THE COURT: Good to see you. Good morning.

MS. METZGER: Good morning, Your Honor. Laura Metzger from Orrick Herrington and Sutcliffe on behalf of the lender parties, and with me in the courtroom today are my partners, David Litterine--Kaufman and Darrell Cafasso, as well as a representative from our client, Randall Johnson.

THE COURT: Good morning to all of you.

Okay. For folks on the line, does anyone wish to make an appearance? You'll need to hit five star.

All right, 202 number.

MR. JIMENEZ: Good morning, Your Honor. Andrew Jimenez for the United States Trustee.

THE COURT: Good morning, Mr. Jimenez.

Anyone else?

(No audible response.)

THE COURT: Okay. Good morning.

MR. WOLFSHOHL: Thank you, Your Honor. Josh Wolfshohl for the Debtors.

Unfortunately, despite the herculean effort that we have put toward trying to get a sale put in place that involves both the lenders as the lead bidder, and a backup

bidder who has committed to stick with us through November 30th, the lenders remain interested in prosecuting their motion to dismiss.  We are not going to proceed with the sale until we've had the motion to dismiss disposed of.

THE COURT:  Okay.

MR. WOLFSHOHL:  I think I've reflected that in our Agenda.

THE COURT:  The Agenda, yeah.

MR. WOLFSHOHL:  And so that's the order that we are going in, and we will, you know -- so long as the Court denies the motion to dismiss, we'll proceed with the sale after that, the sale motion after that.

THE COURT:  Okay.  And if we do take up, just -- I'm talking at the 10,000 foot level here.  If there is a motion, if I deny the motion and we proceed, I'm not saying I will, or I won't.  I'm just trying to -- there was a flurry of paper filed late.  I just want to know what the parties are proposing.  And I know that Beyond the Beach -- I just wanted to say the name -- objection.  I just want to know where things stand with all of that as well.

MR. WOLFSHOHL:  Fair question, Your Honor.  My understanding is that Beyond the Beach objection has not been resolved.  I think the requests that have been made by Beyond the Beach are things that the Debtor is willing to agree to, the lender parties have not been willing to agree

to.  And so I think that we will end up taking up some of the Court's time in connection with that to try to resolve that.

The other thing that's on the Agenda, Your Honor, is the motion to dismiss the adversary.  My understanding is that, that is being withdrawn.  Mr. McConn is here.  I think he was going to address that.  Frankly, leaving him in here during the entire hearing may not be necessary if -- since that's the one thing that I think is essentially being removed from the docket.  I think he did have some questions and maybe was going to talk about possible trial scheduling.  We can do that at the end, but I'm just saying, I don't know that he needs to be here for the entirety of the evidence, so.

THE COURT:  So from just a housekeeping standpoint, I agree.  Let's go forward with the motion to dismiss first.  Let's go till about 12:30.  And then we need to -- or maybe see if we can work through lunch or maybe find a good stopping point.

I have two status conferences in cases in which I need to get a little smarter on between 1:00 to 2:00, and we can take a break there.  That's why I figured kind of a late lunch, go for a couple of hours, see where we are.  And then I need to take that status conference, and then maybe we can pick back up at 2:00 and then just go till we're done.

MR. WOLFSHOHL:  Works for me, Your Honor.

THE COURT:  Okay.  Ms. Metzger, does that work for you?

MS. METZGER:  Yes, Your Honor.  Thank you.

THE COURT:  Okay, perfect.  In terms of exhibits for the motion to dismiss, let me ask you this:  With respect to the sale motion who do you all intend to sell to?  Who's the ultimate party?

MR. WOLFSHOHL:  Your Honor, the proposed sale is going -- the order that we're going to ask the Court to enter is going to provide for the sale to the lender party with the Fleegers (phonetic), which is -- they were always in the mix.  They were the ones that we had previously asked to close with as the backup bidder.

THE COURT:  Okay.

MR. WOLFSHOHL:  So it's a $34.5 million credit bid with a bond that is backing the credit bid.  And then if they don't close by November 22nd, then we would pivot to the Fleeger bid, which is a $30 million cash bid.

THE COURT:  Okay.  All right.  I will -- thank you.

Let me, then I don't want to -- the only reason I -- Mr. Warner, you are more than welcome to stay, but if -- I probably won't take up in any event.  Well, how long do y'all plan on going this morning?  Maybe that's the better

question.  In terms of exhibits, it's not -- I just want to give people options.

So if they only wanted to listen in or stay for the sale portion, assuming we get there, then I suspect I got to get to the point where I can rule on one and then see if -- in other words, if somebody just wants to see how this ends, I just need to give them a heads up if they have other stuff to do.

MR. KAUFMAN:  Yes, Your Honor, David Litterine-Kaufman.

THE COURT:  Yes, sir.

MR. KAUFMAN:  I'll be arguing the motion to dismiss.  From our perspective, this is not really a factually heavy motion.  We attached the number of documents to our opening, our reply brief to say good order.  We'd like to admit them into evidence.  But I don't intend to make really any use of those documents during my presentation.

THE COURT:  Okay.

MR. KAUFMAN:  I'd also note the same is true of some deposition testimony.  We attached some deposition excerpts to our reply brief.  We're happy to present that deposition testimony and some of it is from Mr. Brickley, so we can certainly elicit it from Mr. Brickley live if the Court prefers.

10

THE COURT:  No.  I --

MR. KAUFMAN:  We're also happy to rely on the excerpt.

THE COURT:  If you're willing to use that.  But what I would ask then is in your presentation, and I'll turn to them, point me to the stuff that you absolutely want me to focus on in connection with your argument, which I know you're doing.  I'm just going to ask specifically.  Because sometimes they're really big binders and people think, you know, I've read the whole -- every page of everything.  But if there's something you want me to hyper-focus on, I've read your pleadings, obviously, and I've read your briefing. So are you planning on putting anyone live?

MR. KAUFMAN:  It is not our intention to, if Your Honor is asking to --

THE COURT:  No, I'm not asking to it.  I'm just trying to get a sense of timing just to --

MR. KAUFMAN:  Yeah.

THE COURT:  More than anything else.

MR. KAUFMAN:  Yeah.  If Your Honor is satisfied with the deposition transcripts that we attached to our briefs, then we don't see any need to put anyone on live.

THE COURT:  Okay.  Mr. Wolfshohl, what's your client's position?

MR. WOLFSHOHL:  Your Honor, if they're not, I'd

like to hear their presentation, their live presentation, and I'll determine whether we're going to put anybody on. I had planned on putting Mr. Brickley on, but frankly, I just -- I think it's their motion, I think they move forward. You know, if I put Mr. Brickley on, it's not going to be fair to everyone. So I think we'll be -- I think we'll be finished by 12:30, yes definitely.

THE COURT: Okay. I'm just thinking, does it make sense if anyone wants to -- well, I don't know how the motion to dismiss is going to go, but if I take up the sale motion, it'll be at 2:00, and that way anybody, or if anybody wants to talk about motions to dismiss adversary stuff, I'm not going to do that until at least 2:00 p.m.

I'm going to focus -- we're going to -- I'm going to try to work through here, and if we got to pick back up in the afternoon, and that's completely fine. But if anybody's just staying around for anything else that may or may not get taken up, I won't take it up until 2:00 p.m.

MS. METZGER: Your Honor, Laura Metzger. To the extent it's helpful, we do not plan on moving forward with the motion to dismiss the adversary proceeding today.

THE COURT: Okay. Perfect. Well, so I think it's just the sales stuff, and I'm only mentioning that for the parties who wish to proceed online. So at this point, with respect to exhibits, is there -- do we have agreement on

exhibits, or is there anything from a housekeeping standpoint?

MR. KAUFMAN:  Yeah, on the motion to dismiss we would just ask that all of the exhibits listed on our exhibit list, which are just the documents that were attached to our two briefs, be admitted into evidence.

THE COURT:  You just give me a docket number just so I have a clean record.

MR. KAUFMAN:  Sure.  Our exhibit list is docket number 213.

THE COURT:  Mr. Wolfshohl, any objection?

MR. WOLFSHOHL:  You said that exhibit list is 213?

MR. KAUFMAN:  It is, yes.

MR. WOLFSHOHL:  Your Honor, I have no objection to -- on their exhibit list.

MR. KAUFMAN:  Exhibit 1.

THE COURT:  Hold on a second.  Let me just write this down.  One --

MR. KAUFMAN:  And 12 through 33, Your Honor.

THE COURT:  One and 12 through 33.  So you're -- Okay.  That is Lender Exhibit 1 and 12 through 33 at docket number 213.  So you want to get 2 through 11.  Somebody's going to --

[Lender's Exhibit No. 1 and 12 through 33 was received in evidence]

MR. KAUFMAN:  Your Honor, so 2 through 11 are just the various contractual agreements that govern the parties' relationship.  I think that they are a matter of record in these proceedings already.  They're certainly referred to in the adversary complaint among other places.  That said, I don't believe that they're critical for this motion, so I don't know that it makes sense to spend a lot of the Court's time arguing about their admissibility here.

THE COURT:  Okay.  All righty.  And Mr. Wolfshohl, in terms of your exhibits?

MR. WOLFSHOHL:  In terms of my exhibits, we did communicate about this ahead of time.  I think they're all court pleadings.  I think my understanding is that you guys don't have any objection to them.

MR. KAUFMAN:  That's correct.  Yeah --

THE COURT:  What's the docket number?

MR. WOLFSHOHL:  That is 216.

THE COURT:  216.

MR. WOLFSHOHL:  And it's Exhibits 1 through 22.

THE COURT:  Counsel, are you okay with those?  Just want to make sure.

MR. KAUFMAN:  I am, Your Honor.  I mean, it of course, depends on whether they try to make some impermissible use of it in a particular instance, but generally, yes, we're okay with that.

THE COURT: Okay. One through -- All right. Sometimes people try to sneak in any other pleading filed by the Court or any, you know, the home -- you know, take judicial and those other -- you know, try to sneak in the whole docket on there. So these are actual documents. So okay. Counsel, how do you intend to proceed with your presentation? Do you want me to -- if there's a binder here with some exhibits, which one is yours?

[Debtor's Exhibit No. 1 through 22 was received in evidence.]

MR. KAUFMAN: There is. Ours is the one with no label on the top, but a label on the spine.

THE COURT: Okay, perfect.

MR. KAUFMAN: Yes. But I don't really expect to direct, Your Honor.

THE COURT: Okay. No, no. I just wanted to grab the right one just in case I do. I slipped to something, I just want to know where you're going. Okay. Counsel, you may proceed.

MR. KAUFMAN: All right. Good morning again, Your Honor. Again, for the record, I'm David Litterine--Kaufman from Orrick for the lender parties. I want to begin today by acknowledging the Court's comments during the hearing last week that the Court expects the adversary proceeding to go to trial, notwithstanding today's motion.

THE COURT:  So let me clear that up for everyone. Let me just clear that up.  That's the Court -- and I guess that's me sizing things up where they go.  But today's the day I make decisions, and today is the day that I take up evidence and I consider the record, right?

So I wouldn't -- you know, I would view that as much as I view when someone files a pleading.  Today's the day we consider evidence.  Today's the day we consider documents.  I have a question that I'm going to ask you in the middle of your presentation, and it'll allude to where I'm going.

MR. KAUFMAN:  Okay.

THE COURT:  I really want to clear that up.  I don't -- it's really important to me.  I'm looking at an entire case and I'm looking at two parties who clearly don't like each other.  And clearly someone needs to decide the issue.  That ultimately, now whether it's me or someone else, someone's going to have to decide the dispute.  And it's clear.  It's not really just the lawyer.  I don't know if the lawyers don't like each other or not.  From what I see today, everybody was really kind today.  But I can tell your clients don't like each other, and that's fine.

I really, really want you to understand and it's really important for me to have faith in the system and have faith in the judiciary, to have faith in the process, to

have faith in this Court, to have faith -- And I'm going to call it like I see it.  And I've studied really hard, where I was going with the comment is, I got a case where someone's proposing to sell an asset to a party, so the question then became if I approved a sale, right?

Theoretically, if I would've signed an order approving a sale to your client with an adversary tagged to it, it gets really hard to win that case, right?  So that's where I'm going, but we're taking this one up first.  So maybe I dismiss the case and there is no sale hearing.  But if I would've approved the sale to a lender party and the parties just couldn't agree on language in the order, right?

Then it gets really hard to win a motion to dismiss in my eyes, because then the process is moving along in connection with the case.  And so I wouldn't want a position where the lender parties, you know, took it -- took the benefit of a sale transaction, purchased an asset, and then said, you know, thanks.  Now get us out of here, right?  And where I was last hearing was, there was language about whether I should include preference language in there, or findings of facts and things like that.  Parties couldn't agree on an order.

Quite frankly I was -- I didn't know before then and today, whether I was even going to get an agreed order on the sale stuff, like we finally agreed on it.  That's

where I was going with that.  You should read nothing into it as we relate today.  Today all eyes are on you, and the focus is on the facts and the law.

MR. KAUFMAN:  Understood, Your Honor.

THE COURT:  And I -- no, I needed to tell you that, because I appreciate -- because I made the comment and I need to clarify what I said.  So I appreciate you raising it.  And I'm glad we aired it out early.

MR. KAUFMAN:  Thank you very much, Your Honor.  And that's a very helpful clarification and I'll get to this in a bit, but I'll say at the outset that the lender parties are agnostic about whether a sale order gets confirmed or whether we go and do a sale in Colorado following dismissal.

So I think that's really more the Debtor's call, but we can talk about that later.  So, but we decided to push forward with this motion, Your Honor, and given those comments, I'm very glad we did.  Because we believe that these are exactly the type of proceedings that don't belong in bankruptcy court.  And I'm optimistic that maybe by the end of today, you may agree with me.

So stepping back for a minute, the reason we're here is that Charif Souki, who is not a Debtor, borrowed $138 million from my clients and caused the Debtors AVR and Strudel to pledge their assets as collateral.  When Mr. Souki later defaulted on these loans, the lender party

spent years trying to work with him to effect an orderly and consensual sale of assets without having to foreclose.

But after three years of forbearance, Mr. Souki still had not sold most of the collateral.  The debt remained largely unpaid, and the lender parties concluded they had no choice but to begin foreclosing on some of the collateral packages.  So the real dispute here is between the lender parties and Charif Souki, not the Debtors.

And the real dispute here is about collateral that was -- that never belonged to the Debtors, and that was sold before the Debtors filed their petitions.  So now, when the lender parties began exercising their foreclosure remedies, Mr. Souki responded by filing the New York action, and he filed in New York, because that's the forum where the parties had contractually agreed disputes over those contracts would be heard.

In New York, he attempted to get a preliminary injunction against the foreclosure and he repeatedly failed to do so.  So on the literal eve of foreclosure, Mr. Souki put the Debtors into bankruptcy.  The Debtors filed in this district, specifically based solely on Strudel, because AVR is a Colorado entity with no presence in Texas.  So, now with that background I'm going to turn to the legal analysis.

In our view, the starting point and the ending

point for this motion has to be the Fifth Circuit's opinion in Little Creek.  That opinion did two important things.

First, it recognized that lack of good faith constitutes cause for dismissal under Section 1112 (b), even though it's not one of the enumerated grounds in the statute.  I would say that principle is now well established and in fact, it's recognized in many of the cases that the Debtor cite in their opposition.  The second important aspect of the Fifth Circuit's holding in Little Creek is that it identified several factors that are often present when a filing is made not in good faith, or when it lacks a valid bankruptcy purpose.

According to the Fifth Circuit, cause for dismissal typically exists when a case satisfies several, but not necessarily all of those factors.  Here, the Debtors go significantly beyond what Little Creek said was required for dismissal because they satisfy every single one of the Fifth Circuit's factors.  And indeed, the Debtors don't even really dispute as a factual matter that those factors are satisfied.  So I'm going to try to very briefly walk through those factors and how they're satisfied here.

First, the Debtors engaged in several unsuccessful attempts to prevent foreclosure on the ranch and on Strudel Ajax shares across two different state courts.  In New York, the Debtors and other affiliated plaintiffs moved for a

preliminary injunction three times.  The New York Court denied the first motion because the plaintiffs had failed to show a likelihood of success on the merit.

The New York Court denied the second motion because they found there was no grounds for reconsidering the original denial.  And the court pocket vetoed the third motion by never responding to it.  The Debtors also filed objections in the California foreclosure proceedings, and in those objections, they argued that the underlying dispute should be decided by the New York Court because that was the law and the forum that the parties selected in their contracts.

Now this factor matters here because it underscores that the Debtors are trying to use bankruptcy to get a second bite at the apple, and honestly, a fifth bite at the apple in a new forum.  That clearly is not a valid bankruptcy purpose.  The next factor; Debtors are effectively single asset entities and the secured parties' liens encumber all of those assets.  As to AVR, its only material asset is the ranch, and that accounted for over 99 percent by value of the assets listed in its schedules.

Likewise, Strudel's only material asset is the Ajax shares, and they also account for over 99 % of the value in Strudel.  Now, these factors are particularly noteworthy when they're combined with another one of the

Little Creek factors, which is that Debtors have only a few unsecured creditors whose claims are relatively small. Indeed, Strudel has zero unsecured creditors.

And for AVR, the vast majority of the value of the unsecured claims listed in its petition are insider debt to Mr. Souki's real estate company Ajax, and to members of the Souki family.  So AVR's petition lists just 12 non--insider general unsecured creditors, and the claims of those non-- insider creditors total less than one percent of the lender party's claims.

Now, what these factors taken together show is that this is in reality a two--party dispute.  It's between the lenders and the Debtors and in reality, Mr. Souki, behind the scenes.  If the lenders prevail on the state law claims, there will be nothing left to distribute to any creditor.  On the other hand, if the Debtors prevail, there would be no reason for them to be in bankruptcy because all claims will be debt paid, pardon me, because all claims will get paid in full with money left over to make distributions to equity holders.

So there was -- there will never be any need to allocate scarce Debtor resources among competing creditor claims.  And indeed, the proposed plan that AVR filed earlier this week says exactly that.

THE COURT:  It says exactly what?  I just want to

make sure that we're clear.

MR. KAUFMAN:  It says exactly that if the lender parties win in the state law dispute, then there will be no distributions to any creditors.  And conversely, if the Debtors and the other plaintiffs in the state law dispute win that all claims will be paid in full and distributions will be made to equity holders.

THE COURT:  Crystallize for me how you see the adversary proceeding.  Like what's the core issue?

MR. KAUFMAN:  The core issue in the adversary --

THE COURT:  In the adversary proceeding.

MR. KAUFMAN:  -- The core issue in the adversary proceeding, I believe, is whether the disposition of the Tellurian shares that were not held by either of these Debtors was done in a commercially reasonable manner.  We contend that it was for a variety of reasons.  I won't burden Your Honor with that now.  But that -- when you look at the dollar figures involved in the different allegations, the disposition of the Tellurian shares and in particular, the timing is where the action is.

THE COURT:  Okay.  Thank you.

MR. KAUFMAN:  So turning to the final Little Creek factor, Debtors both have minimal employees and operations. Regarding employees, the Debtors disclosed in their monthly operating reports that neither AVR nor Strudel had any

employees at all.  That was also true when they filed, because Mr. Brickley testified in the deposition testimony that we attached to our brief that the Debtors did not make a standard first day motion to pay employee wages because there were no employees to pay.

Regarding operations, Mr. Brickley also testified that Strudel has, and I believe I'm quoting here, "no revenue generating operations."  The Debtor's monthly operating reports also show that both of them are generating essentially zero net income.  The reason this matters here is that the Debtors have no employees and no operations to protect.  So from the beginning, there was nothing here to reorganize, no value to protect.

So in some -- the Little Creek factors make clear that this is a two party dispute over New York Law State causes of action, and one that's primarily with Mr. Souki.

If these proceedings were to continue, they're not going to involve the allocation of scarce resources among competing creditor claims, and they never were given the structure of the debts.

While the Court does have discretion in deciding a motion to dismiss, it's hard to imagine a case that more clearly calls for dismissal under Little Creek than this one where every single one of the factors are satisfied.  So, I'm now going to turn briefly to the Debtor's arguments and

opposition.

THE COURT:  Okay.

MR. KAUFMAN:  Because the Debtors can't and don't really dispute that --

THE COURT:  Before we go there.  So, I agree with you Little Creek Judge Fifth Circuit threw out some factors that they were analyzing in connection with that case.  You recall the facts of Little Creek, though?  I mean, are we -- in other words, Fifth Circuit also said that the bankruptcy courts got to make an on the spot determination, right?

Because we're really talking about cause and one of the factors in cause could be a lack of good faith if it's in the umbrella of stuff that you can throw in for the purposes of cause.  So, as I analyze Little Creek and all the other cases, quite frankly and then think about this case -- this is just me poking and prodding.  Don't read too much into it.  I'm trying to -- I got it.  It may satisfy Little Creek factors, but is this a Little Creek kind of case where those factors make sense to apply?

MR. KAUFMAN:  Well, I'll confess, Your Honor, that I don't have the specific facts of Little Creek at my fingertips, although I will say that the Fifth Circuit's opinion was a remand for further consideration.  So the Fifth Circuit was not saying the facts of this case necessarily satisfy these factors.  It was saying, here, let

me provide guidance to this Court and to Courts going forward about what -- about what factors you should look at in determining whether or not cause exist.

THE COURT:  Okay.

MR. KAUFMAN:  So I think the facts are actually maybe less important than the guidance.

THE COURT:  How do you then balance the valid bankruptcy purpose?

MR. KAUFMAN:  Right, so --

THE COURT:  The term is thrown around and then, you know, obviously there are other cases that talk about valid reorganization purpose.  In your mind, what's the difference between a bankruptcy purpose and a reorganization purpose, if any?

MR. KAUFMAN:  We do not see a difference between a bankruptcy purpose and a reorganization purpose.  And frankly, we don't see a difference between either of those things and good faith under Little Creek.  And I'd like to explain why.  So the Fifth Circuit itself actually in Little Creek said that those factors were intended to provide guidance on how to determine whether or not a Debtor has a valid bankruptcy purpose.

So here, the fact that the Debtors satisfy each and every one of the Little Creek factors, I would say, is dispositive evidence that they lack a valid bankruptcy

purpose.  I'd also note that the cases that Debtor sites for the --

THE COURT:  If any.

MR. KAUFMAN:  We do not see a difference between a bankruptcy purpose and a reorganization purpose.  And frankly, we don't see a difference between either of those things and good faith under Little Creek.  And I'd like to explain why.  So, the Fifth Circuit itself actually in Little Creek said that those factors were intended to provide guidance on how to determine whether or not a Debtor has a valid bankruptcy purpose.

So here, the fact that the Debtors satisfy each and every one of the Little Creek factors, I would say, is dispositive evidence that they lack a valid bankruptcy purpose.  I'd also note that the cases, the Debtor sites for the valid bankruptcy purpose test are district court cases.  And so, you know, while of some kind of instructive value, they certainly can't overrule Little Creek itself from the Fifth Circuit.

THE COURT:  Yeah, but I think they're all kind of heading towards the same goal, right?  Are you here to accomplish something for which the bankruptcy court was -- can provide assistance to or are you just here to hinder or delay facts?

MR. KAUFMAN:  I agree with that, Your Honor.  And,

but I guess I would take it a step further and say what the Fifth Circuit has instructed is when you have these it depends on how you count them, six, seven, nine, 11 factors. When you have the Little Creek factors even just some, not all, that is very strong evidence that there is no valid bankruptcy purpose.  And I would say the evidence is --

THE COURT:  It's like badges of fraud, right?  You get about three or four of them and it starts to look like something.  And the question is, does that tip the scale?

MR. KAUFMAN:  Precisely, Your Honor.

THE COURT:  Okay.

MR. KAUFMAN:  Precisely.  But the idea that Little Creek is somehow over here and bankruptcy purpose test is over here.  I think --

THE COURT:  No, I think they're all intended to try to accomplish the same thing, because if you're -- Yeah, we're in agreement on that.

MR. KAUFMAN:  So then let me turn to the Debtor's next argument, which is they say that filing to prevent foreclosure is not, quote "by itself an invalid bankruptcy purpose." That argument, in my view, entirely misses the point because here the Debtor's admitted goal of avoiding foreclosure is not by itself.  Instead, we have a case where every single one of the Little Creek factors has been satisfied.  And so in those circumstances, Little Creek

itself recognizes that unsuccessful attempts to avoid foreclosure are one of the, as Your Honor said, badges of an invalid bankruptcy purpose.

So whether or not filing to avoid foreclosure is permissible by itself, Little Creek says it certainly isn't permissible when accompanied by other factors. And there's actually an out of circuit case that we find very instructive on this point. It's one that the parties discussed in both of their briefing. This is In re Walter from California. So just like the Debtors here, the Debtors in Walter had only one asset, which was a piece of real property, only one secured creditor whose lien encumbered that asset.

The Debtors attempted to obtain preliminary injunction relief in state court to prevent the foreclosure and they were unsuccessful. The Debtors admitted they had no intention to implement a reorganization plan until after their dispute with the secured creditor was resolved. And the Debtors admitted that their purpose in filing for bankruptcy was to prevent foreclosure. All exactly the same as in these cases.

And based on those factors, what the California Court determined was that the filing was, and I'm quoting here, quote, "a forum shopping device filed to obtain the equivalent of a preliminary injunction from federal court

after being denied a preliminary injunction in state court. This course of conduct constitutes a bad faith use of the bankruptcy process for which dismissal is the proper remedy."

THE COURT:  So let me -- here's the question that I promised I was going to ask you, and I think it's probably good timing.  I got questions for them too.  Don't worry about it.  So let's assume there's a creditor who is owed. Let's say the Debtor owes the creditor a $1,000 or well let's say a million.  Let's just -- the Debtor owes the creditor a million dollars.  Let's just say that there's no dispute that the money is owed, okay?  The creditor has a right to foreclose on an asset to collect on that judgment, okay?  Which is undisputed.

Debtor files for -- I'm going to give you two different scenarios.  Debtor files for bankruptcy to stop the foreclosure.  That was going to happen and really starts to make arguments about, you know, they really should own it.  Let's see if I can put you up with a payment plan to then keep the asset.  I'll give you a take back debt and pay the judgment, and I'll see if we can come up with some other arguments.  But really, I don't -- the Debtor still wants to keep the stuff and just doesn't want to let their foreclosure.

There's another version, another Debtor two then

files bankruptcy and says, I got it.  I owe a million bucks, but that foreclosure's going to -- that foreclosure, you know, the creditor's going to own the asset and I'm still going to -- and you know -- and they're going to credit bid. I'm afraid they're going to credit bid, you know, a $100 and I'm still going to owe 999,900.  I'm going to go to bankruptcy to try to maximize the value of the sale of that asset.

I don't want to keep it, and I'm going to try to sell it so that at the end of the day, I just owe the creditor a lot less.  And let's just say the creditor is the IRS, right?  There's a bunch of tax debt there I want to owe less than what -- is there a difference between those two cases, right?  They both satisfy Little Creek, but in one case, someone's trying to delay and is really trying to keep it and really trying to avoid the foreclosure.

There's another one saying, you know, I owe a million bucks.  I got it.  But boy, if we do this foreclosure, I'm going to owe a lot less.  Maybe if I go through bankruptcy and I sell the asset, I'm just going to owe a hell of a lot less to that creditor.

MR. KAUFMAN:  Well, I would say that the -- and I'm actually going to talk a little about --

THE COURT:  That's what I'm thinking about, does this case fit those factors?  A lot of those cases are

thinking about things in one way, and I'm not saying the Debtor is, but the way I'm thinking about it is you got to look at every case based on the facts.  And so I think you're correct to quote all the cases that you have.

I'm just wondering, I've got questions for them too, does this case look a little different because they went into bankruptcy with the intent to sell the asset, and quite frankly, it sounds like there -- at least there was an auction to do it and it happened.  So they don't own this stuff anymore so they're not trying to stay the foreclosure, but maybe it was to maximize an asset.  Is that a valid bankruptcy purpose?

MR. KAUFMAN:  Right.  So I have a few responses to that, Your Honor.  The first is just kind of just a point of clarification, which is and I'll talk about this a little more in a minute.  There wasn't, isn't, and I suspect will never be any plan to sell any asset of Strudel.  So we're talking here solely about AVR and its asset, the ranch.

THE COURT:  Right.

MR. KAUFMAN:  But the idea that Strudel was put into bankruptcy to maximize value in a 363 sale, so far we've seen no evidence of that.

THE COURT:  Okay.

MR. KAUFMAN:  And it's a little surprising because they had a fully baked sale process the day they filed for

AVR 90 days later we still have nothing on Strudel, but, so --

THE COURT: Right. But, if -- let's just say me and an affiliate entity owe this one creditor a bunch of money, can I put both of them in to just lower the amount of money and have the automatic stay in effect so that I can just keep things at ice for a second while I can give you as much money as I can and reduce my overall liability?

MR. KAUFMAN: Well, I think you would have to --

THE COURT: In other words, but is that -- is that different than few creditors? You know, litigation tactic, sale assets. In other words? I think -- I don't know if there's a difference and I'm asking you.

MR. KAUFMAN: Yeah. So I think that each Debtor really needs to be assessed on the merits of its own file.

THE COURT: I think that's right.

MR. KAUFMAN: Okay. So putting that aside, so the -- but the point I'd make going back to the original hypotheticals, and hopefully I still have them clear in my mind. In neither case am I hearing that there were any other creditors. So in neither case, does it seem like the bankruptcy process is needed to serve any of its purposes. There can be a foreclosure sale.

THE COURT: Isn't maximizing value of an asset in a sale process in giving someone free and clear? Isn't that

a bankruptcy?

MR. KAUFMAN:  But if it's a two--party dispute, then that can be litigated in state court as it often is. If --

THE COURT:  The question is, can you maximize the value through a state foreclosure proceeding, or can you maximize the value through a bankruptcy across 363 sale?

MR. KAUFMAN:  Yeah.  I don't believe there's evidence in the record either way.  I have no reason to think that you could not maximize value through a foreclosure sale as opposed to a 363 sale.  And I know that --

THE COURT:  You think your client would've bid $30 million under state foreclosure sale?

MR. KAUFMAN:  I can't comment on that, Your Honor --

THE COURT:  Because I don't know, it depends on who would've showed up, right?

MR. KAUFMAN:  But --

THE COURT:  I'm not going to bid a dollar more than they have to, right?  That's not the way the world works.

MR. KAUFMAN:  Yeah.  But it be that as it made, I think the idea that a 363 process was necessary to maximize value here doesn't hold up for a couple of reasons.  First

is, as you heard Mr. Wolfshohl saying, they're now trying to walk away from the 363 sale that they conducted.  So if they really thought that that was a value maximizing sale --

THE COURT:  I didn't hear that.  I didn't hear that.  I heard I have to decide this first.

MR. WOLFSHOHL:  That's not what I said, Your Honor.

THE COURT:  I heard I have to decide this first and then -- because if I decide it, then there's -- I can't sign a sale order if I dismiss the case.  That's what I heard.

MR. WOLFSHOHL:  That's correct, Your Honor.

MR. KAUFMAN:  I would push back on that a little, Your Honor, I think Your Honor could sign a sale order and then dismiss the case.

THE COURT:  I know.  I'm sure that's what you'd like.  But then that's the whole -- that that's what I'm saying.  That gets me back to my comment from the other day, right?  Then it's got to -- either I dismiss the case and there's no sale, or if I would've granted the order, it would've been difficult for me to say that there's not a valid bankruptcy purpose when there was a sale, right?  Just -- and now we just get to the plan purpose.

MR. KAUFMAN:  Well, and I'll also -- I'll point out too, that we would've been happy to argue this motion

earlier in this process.

THE COURT:  No, no.  And I agree with you.  And I think you had the right, and they better not argue that you didn't have the right to come in here and argue it, because -- right?  Creditors get to file motions and they have the right to do that.

And so I've got no issues with where we are today and why we're here, and if they argue that I'll shut that down in a minute.  I'm not saying they will or won't, but it's just -- that didn't make any sense to me.  People can file motions.  You have the right, party and interest.

MR. KAUFMAN:  Yeah.  So, Your Honor it's been pointed out to me that my client would be happy to credit the $30.5 million in a foreclosure sale just as it did here.  So --

THE COURT:  I'm sure they would.  And just the question is, would they've had another -- in other words, maybe they would've.

MR. KAUFMAN:  And there was --

THE COURT:  But in other words, but is it wrong to -- the question is, is it wrong to file for bankruptcy to ensure that you can have a maximizing value process, right?  Or are you going to hope that someone's going to show up at the courthouse steps?  Maybe that's the case.  I'm not saying they would.

They would've been happy to.  I'm not saying they wouldn't have been.  I have no reason to question that.  The question is what the pro -- is the Debtor wrong for filing to try to maximize, to create a value so that they could ultimately pay a creditor or creditors more money?

MR. KAUFMAN:  I think, Your Honor, if that were in fact the true purpose and --

THE COURT:  I'm not saying it is.  I'm just thinking differently.

MR. KAUFMAN:  Yeah.  I think you would still have to look at the Little Creek factors.

THE COURT:  Agreed.

MR. KAUFMAN:  Yeah.

THE COURT:  Agreed.

MR. KAUFMAN:  And I think that the Little Creek factors actually identify avoiding a foreclosure as a factor that militates in favor of dismissal at least when other factors are present.  So I think under Fifth Circuit precedent, the answer to your question has to be that avoiding a foreclosure when standing alone possibly could be a valid bankruptcy purpose.  But when it's accompanied by all these other badges of improper purpose, then it actually flips and it becomes another badge of improper purpose.

THE COURT:  Okay.

MR. KAUFMAN:  I'd note too that these proceedings

have actually risked reducing credit or recoveries in this case. As Your Honor is well aware, there have been costly fights over procedural issues that would not have existed in a foreclosure sale.

THE COURT: Yeah. That's both of y'all's fault. And I'll just tell you now. I'm sure it wasn't me. I attribute that to -- No, I attribute that to -- I agree with you, but y'all are -- I cannot understand the level of fighting that's been going on here certainly hadn't been because of me. We're running an efficient process out here.

MR. KAUFMAN: Absolutely --

THE COURT: And I'm just saying, but you can't be part of the driving of the cost. And I got it. Both of your clients are spending a lot of money, and I've been saying this, but y'all are -- I've been trying to create an efficient process even as we got to this fight, and parties have been fighting and wanting to take depositions about everything, which you're entitled to, but y'all are driving -- everybody's driving up the cost here.

MR. KAUFMAN: And Your Honor, I in no way meant to suggest that it was the Court's doing there.

THE COURT: Oh, no, I'm not saying it was my doing. Oh, no. I'm happy to say it wasn't me. I just show up to work. I just think --

MR. KAUFMAN: No.

THE COURT:  You know.

MR. KAUFMAN:  But Your Honor, I would say that that process was really driven by the very aggressive stances that the Debtors took.  I mean, first day they move to preclude my client from credit bidding.  What were we supposed to do?  We had to fight that motion in order to protect our interest.

THE COURT:  I'm not saying I agree.

MR. KAUFMAN:  And again, you know, they tried to reopen the sale process after the auction had closed for a popping bid over my client's bid.  And so again, we had to negotiate to protect that interest.

THE COURT:  Got it.  And you draft -- and your client drafted an order talking about preferences and releases and stuff in that nature, and they had to do something.  It goes both ways, but I get the point.

MR. KAUFMAN:  Yeah.  Understood Your Honor.  The last point I would make on this question of, you know, is a sale, a valid bankruptcy process, is you know, just to underscore, once again, there is not, and appears never will there be a sale for Strudel's assets.  And so maybe that's a -- if that were a purpose for AVR, then we can talk about that in the context of AVR.  But just on the facts as they exist, that can't possibly have been the purpose for Strudel.

And while we're on Strudel, I mean, it bears underscoring here.  Mr. Souki actually testified that the Debtors have no intention to sell Strudel's Ajax shares.  So it's not just me saying it hasn't happened yet.  It's Mr. Souki saying it's not going to happen.  And again, as I mentioned, Strudel is a holding company.

It has no employees, it has no operations, it has no creditors other than the lender parties.  So while we think the case for dismissal is compelling as to both Debtors we think the case is particularly compelling as to Strudel.  And again, as I mentioned, Strudel is the only reason that we're in this court because AVR has no connection to the [Indiscernible].

So in short, our view is under binding Fifth Circuit precedent, the proceedings must be dismissed for lack of good faith and a valid bankruptcy purpose.  And I will now just very briefly touch on the ultra vires argument.

THE COURT:  Yes, sir.

MR. KAUFMAN:  So AVR doesn't seem to dispute that the pledge agreements say all managerial authority vest in the administrative agent when there's any continuing event default.  They don't dispute that that's in there.  They also don't dispute that the administrative agent didn't authorize AVR's filing.  Their only real argument is that

Mr. Souki's debt was extinguished, and therefore there isn't a continuing event to default.

But that ignores that the New York Court found that that argument and those claims were unlikely to succeed on the merits.  So AVR's filing was unauthorized and should be dismissed for that separate and additional reason as well.  So just to very briefly sum up, Your Honor, these proceedings are at bottom a two--party dispute between Mr. Souki and the lender parties.

THE COURT:  So here's a question for you.  If I find -- let's say I agree with you with Strudel, does AVR stay in?

MR. KAUFMAN:  I think at that point there would be grounds for a motion to transfer venue.  I have not discussed with my team or my client what that would look like but --

THE COURT:  No, no.  The question is, do they stay in, or are they automatically dismissed as well?

MR. KAUFMAN:  I think the two Debtors are analyzed separately.  So I don't think that dismissal as the Strudel necessarily requires a dismissal as the AVR.  Now, I do think AVR should be dismissed for all of the other reasons we've talked about.  But I don't think that --

THE COURT:  Just poking and prodding in all different directions, as you can see.  I got it.

MR. KAUFMAN:  Yeah.

THE COURT:  Got it.

MR. KAUFMAN:  So I guess I'll just conclude by saying, Your Honor, we see no valid bankruptcy purpose here. And we'd ask that, Your Honor, grant, the motion to dismiss.

THE COURT:  Thank you very much.

MR. KAUFMAN:  Thank you.

MR. WOLFSHOHL:  The lender party address.

MR. KAUFMAN:  Well, I would ask for rebuttal to the extent that any is necessary.

THE COURT:  Okay.

MR. WOLFSHOHL:  Your Honor, as you know, Mr. Brickley is in the courtroom, but a lot of what you just heard was not evidence, it was argument.  I'm going to take things a little out of order just based on some of the most recent comments that were made.  First of all --

THE COURT:  You mean I don't have actual debt documents into evidence?

MR. WOLFSHOHL:  Well, you don't have -- the debt documents is the pledge issue.  Those are not in evidence.

THE COURT:  Right.  So I can't even consider the ultra vires issue, really because I have no evidence there.

MR. WOLFSHOHL:  I don't believe you can, Your Honor.  But regardless, I think that they are getting the cart before the horse on that issue.  The debt is clearly in

dispute.  We have an adversary proceeding that is, you know, close to going to trial.  Your Honor, rules in our favor that issue is gone.  And I think that that is what matters.  But those documents are not in evidence.  And all you've heard is counsel argument about it.

THE COURT:  Who's the debt with?  Let's just be -- I want a clean record.  Who's -- where does the debt that you're disputing, at what entity level does it lie with it?

MR. WOLFSHOHL:  Charif Souki, and then there's a number of guarantors.

THE COURT:  Right.

MR. WOLFSHOHL:  Including the Debtor entities.

THE COURT:  I'm sorry, the Debtor entities.  Which Debtor -- who -- which Debtor has guaranteed the debt?

MR. WOLFSHOHL:  Both.

THE COURT:  Both Debtors guarantee the debt?

MR. WOLFSHOHL:  Both Debtors guarantee the debt and both Debtors have significant collateral that backs the debt, which we believe the debt has been extinguished.  Addressing the Strudel issue, Your Honor, the fundamental problem is that both assets of both Debtors were posted for foreclosure.  And we have a disputed claim.

The valid bankruptcy purpose for filing this case was exactly what Your Honor hit on, which is that the prospect of going to a state foreclosure process as to AVR

and even as to Strudel risks getting substantially less than the value of those assets at a time, whenever we have a valid dispute as to the claim.

THE COURT:  But what's wrong with going to State court?  That's their argument.  Why don't you just go to state court?  State courts can handle these kind of issues all the time if there's a debt, you can't -- in other words, challenging the foreclosure saying you don't have a -- you don't have valid debt.  What's wrong with the State court process?

MR. WOLFSHOHL:  Your Honor, the State court process is slow and would've taken potentially --

THE COURT:  That's not an answer, right?

MR. WOLFSHOHL:  -- A year plus.

THE COURT:  That's not going to -- that's -- I got it.  That may be true, but just because we're faster here doesn't mean that it's not the right place to go.  In other words, everybody would file then for those reasons.  So what --

MR. WOLFSHOHL:  That's right, Your Honor. Everybody does file for those reasons.

THE COURT:  No, I didn't say that.  I didn't say that.  I said everybody would file for that reason.

MR. WOLFSHOHL:  Well, why --

THE COURT:  My courts would be -- courts would be

flooded with, you know, the attempt to resolve something faster. And so that can't be the -- well, can't file for bankruptcy just because it's faster.

MR. WOLFSHOHL: It's that coupled with the fact that there could be a foreclosure before you have a determination of the actual underlying claims, Your Honor. And I think that's what bankruptcy gives you that is unique. That is not something that you can get in state court. There is no question that there was a risk of them foreclosing on assets before there was a determination as to the claim amounts. And let me just also point out, Your Honor. There are creditors in the AVR state. Those creditors risk losing everything if you proceed with the foreclosure and you have to wait a year, two years to get adjudication of the claims.

This is why, Your Honor, in this process, in the bankruptcy process, we have created through agreement a situation where if we win, we have something to look to. We either have cash with a backup bid or a bond with the lender. That's the sale that we are intending to go forward with if Your Honor doesn't dismiss the case.

In a state court foreclosure situation, you absolutely do not have that. And so you can call them insignificant because they're smaller, but they are creditors. We scheduled 12. We're asking the Court to set

a bar date of the end of the year.  We expect other creditors to file claims in this case.

In addition to that, Your Honor, and this is another important factor, there is a significant carry cost with AVR.  It was being funded by the Souki's leading up to the case.  This was an opportunity to go into bankruptcy and have a transparent marketing and sale process open to everybody that ensured that the lender's bid was consistent with the fair market value and allowed for a pool of proceeds to satisfy other claims in the event that we prevail in the adversary proceeding.

So it's not just that the adversary proceeding -- that we knew the adversary proceeding had the potential to move faster than a state court proceeding.  It's also that we had the ability to protect the rights of other parties and maximize value on the assets.  So that's fundamentally important to the decision that the Debtor made to bring these cases Your Honor.

As to the Little Creek issue, Your Honor, I believe that this case is not about a rigid application of the Little Creek factors.  I don't think it could possibly be.  This case is about 111112 and 3632D3.  Little Creek -- that there's no question that none of the enumerated factors in 111112 apply here.

I am not disputing that the Debtor has to file a

case in good faith, but they've shown nothing other than just adherence to a bunch of rigid factors that I believe are largely obsolete in light of 362D3. Because you got to understand, Your Honor, if you look at the Little Creek factors through the lens of 3632D3, 362D3 specifically provides, it was 1994. It was post Little Creek. It provides an avenue for single asset real estate cases. These are the cases with no employees. These are the cases where foreclosure is attempting to get stopped. These are the cases where Debtors are trying to go forward with the sale.

You know what the balance that the Congress struck, Your Honor? What they were trying to prevent, and Your Honor hit on it whenever you asked about the actual facts of Little Creek. Let's think about when that was. That was in the 1980s. People were filing bankruptcy and sitting on assets because they wanted to hold them.

They wanted to wait out the market. The market had crashed, and they didn't want to lose the upside of their value of their asset. That is what Little Creek was trying to stop from happening, Your Honor. The balance that Congress struck was it said 362D3 says the Debtor can't just do that. They can file these types of cases, but they have the -- but they are going to have to come in and do something within 90 days.

And I would say first, Your Honor, we did file a plan as to AVR because of the statutory requirement.  But we have also done a lot in the first 90 days of the case.  I think Your Honor alluded to the fact that this is a very, in your hypothetical, this is a very different situation of somebody that's saying, you know what?  I don't want the lender to foreclose.  I want the opportunity to stretch them out, you know, apply different payment terms, you know, ask the Court to, you know, cram them down or cram them up, or whatever it is you want to call it, under rights that are given to Debtors in bankruptcy.

That is not what we are doing here.  What we are doing her, we came out of the box right at the beginning of the case and said, Judge, enter bidding procedures.  We negotiated heavily with the lenders.  We got bid procedures entered.  Those bid procedures the Debtors have been operating under for the last several months.  We ran a sale process.  We had parties that showed up to bid.

We held an auction.  At the conclusion of the auction we continued to negotiate and managed to push the price up simply because the initial bids didn't end up turning out to be -- Well, the initial bid of the lender didn't turn out to be what we thought it was, but ultimately it resulted in an additional $2 million of value on both the primary bid and the backup bid.  We have a sale order.  I

mean, it's subject to an objection no doubt, and Your Honor would have to resolve it.  But we have a sale order that contemplates further -- potential, further actions of the Court.

If we actually go forward with the sale order, Your Honor, which we intend to proceed with getting the sale order entered.  But if Your Honor enters the sale order, there are reasons for the Court, this is why you cannot -- absolutely cannot dismiss the case after the sale order is entered.  We are going to have to come back to your court -- to Your Honor's court to have this determined.

We had two primary goals in this case.  It was to run a transparent and value maximizing sale process.  I don't think that you can argue that that is something that happens in a state court foreclosure proceeding.

THE COURT:  And I think what they're really getting at is, you know, this case is really not about these Debtors.  This is Mr. Souki's attempt to litigate and get a federal court -- bankruptcy court to take it right?  He didn't want to litigate.  And it was -- this case is really about Mr. Souki and how do I factor that into what you're saying?  I got it.  But Mr. Souki was funding this before.

Maybe Mr. Souki is the one that's pulling all the strings.  And this case is really about Mr. Souki and really not about the Debtors.  And maybe I should just send you all

to state court to go let Mr. Souki have his day in court, just not in front of me.  What's the answer to that?

MR. WOLFSHOHL:  Your Honor, the answer to that is I don't have assurance, I the Debtor, that Mr. Souki is going to keep writing blank checks to keep these assets afloat.

THE COURT:  But they're saying that he's the one that's really been behind all this for delays and for stalling.  And you know, that this is really a dispute between two -- between non--Debtors, right?  The lender parties and Souki and that the Debtors are just kind of folks in the way.

MR. WOLFSHOHL:  Well, I have other creditors, Your Honor.  Mr. Souki may be involved in this case, but I have other creditors.  I have a CRO, who Your Honor appointed and said, you are a fiduciary to the estate.  You have seen that we have come into court at times not lockstep with the Souki's.  We are running this case for the benefit of the estate.  Even if they -- all the complaints that they have about the pre--petition, things that -- the fight between the parties that is litigation.  That is parties that disagree with each other's positions.

What we did and what was important to the Debtor was finding a process where we could get all of this resolved.  We could get a pot of cash and figure out how to

get it distributed.  Not just for them, because they are not the only party in this case.  There's lots of parties in this case.  We've got DIP financing.  We're in the process of proceeding with -- pursuant to orders that were entered by the Court, other parties have relied on this.  The Fleegers have participated in the bid process.

I think Your Honor doesn't -- you know, I would encourage Your Honor to not just look at what they're pointing out, which I don't think support dismissal pre-- petition conduct.  You have a decision to file bankruptcy.  The Debtor came into the case with two goals and we are -- two primary goals and we are well on our way of accomplishing them.

And they are goals that are consistent with a bankruptcy purpose, Your Honor.  Sell assets, maximize value in a transparent way and adjudicate claims so that you have a place to pay, -- you know, you have a determination as to where those claims -- you know, what claims get paid and how those proceeds get distributed.  And we have the added benefit of securing a pot of cash that absolutely would not be there.

If they go and foreclose and a year later we have a State court determine that we are correct on the claims, we are chasing some UBS entity that's overseas to try to collect that.  That is for the benefit of creditors, and

it's also for the benefit of equity, because some of that would go to equity.  And in this -- and at this point in time, now that we're this far into the case, it would also be for the benefit of the DIP lender.  And so you would dismiss this case and you suddenly put these creditors in a position of having to chase an overseas entity, a year and a half from now after a judgment is finally adjudicated.

You're going to talk -- I hope -- if Your Honor denies this motion later today, I suspect that you'll talk to Mr. McConn and opposing counsel about setting a trial date.  But I expect that to be in December or January.  We are on the cusp of hitting some very important milestones in this case that we set out to achieve at the beginning.  And I would submit, Your Honor, those are clearly good faith basis for filing a chapter 11.

I think that when you look at Little Creek through the lens of 3632D3, I think Your Honor has to understand, that Congress decided single asset, real estate cases were okay.  Congress decided that they were appropriate.  Both Debtors have assets to protect, both Debtors have disputed claims, and all of those claims are in front of Your Honor, and they're going to get adjudicated in the next two to three months.  And we will know where the cash goes and we will have had a successful process.

Not only was this a valid bankruptcy purpose when

we filed, it has played out, and I think you can look at the post--petition conduct.  Not the fighting.  I get it, Your Honor.  You know, and I apologize for my part in that.  We have had a hard time agreeing on things, but for the most part, not withstanding the fighting, we've come to you with resolutions and where we're at now, when Your Honor denies the motion to dismiss this, we're going to go forward with a sale hearing that is doing exactly what Your Honor's, I think expressed some concern about.

It's establishing a price that may not have been the price we wanted, but is at least closer to the fair market value than I think we ever would've gotten in the context of foreclosure sale, Your Honor.  That's a valid bankruptcy purpose. Maximizing value is a value -- is a valid bankruptcy purpose.  Streamlining the process of adjudicating claims, so you know where to distribute those funds.  That's a valid bankruptcy purpose.

THE COURT:  Why does Strudel need to stay in this case?  What is the bankruptcy purpose for Strudel being in a bankruptcy?

MR. WOLFSHOHL:  There's several reasons, Your Honor.  First of all, Strudel's assets are also subject to the litigation.  We were -- the determination of the claims against Strudel is going to be relevant to the -- to determining how those proceeds get distributed.  The other

thing, Your Honor, and this is important for purposes of just understanding what impact it has on AVR, Ajax is a subsidiary of Strudel.

Ajax is our DIP lender.  If Your Honor grants just a motion to dismiss as to Strudel, first of all, that's a immediate termination, right under the DIP.  The DIP can get terminated and we could lose funding in the AVR case, the funding that is helping pay to keep the assets afloat and to pay HOA fees until a sale occurs at the end of November.

Even if that termination right wasn't exercised as a result of that, you suddenly are giving the lender parties control over the stock of Ajax, which is our DIP lender. And I'm just thinking that -- it's a hypothetical, but I can't imagine that they're going to continue funding the DIP if they suddenly have control over the DIP lender.  So the whole thing is intertwined, Your Honor.

It's not just intertwined because of the litigation.  It's not just intertwined because of the both parties having collateral for the same claims.  It's intertwined because the -- it's absolutely critical that we have -- the Ajax DIP, Your Honor, was a subordinated DIP. We got it approved, Your Honor, signed an order.  It provided -- there's nobody in the world that would've provided us a subordinated DIP and said, you know what?  I like the Debtor's arguments in this case, I'm going to give

you a $5 million DIP in hopes that you win. And if you lose, I'll just get nothing out of it.

So it was critical to the Debtor's bankruptcy process to have Ajax there funding a DIP, willing to do it on a subordinated basis and allowing the Debtor's cases, both cases, to go forward Your Honor. You can't -- I don't think you can untangle that. And I think it's critical to the ultimate success of these bankruptcy cases, Your Honor.

Your Honor, look, my position is that I don't think that any real evidence has been presented other than just a bunch of documents and argument of counsel. I think Your Honor understands the issues. I would reiterate that I don't think you can possibly apply. And I think most cases, if you look at the case law, and we've cited to a lot of the cases do not apply this mechanical approach that they're advocating. This approach of ticking off factors under Little Creek. Because the problem with applying that, Your Honor, is that they made the argument that we -- that our position turns Little Creek on its head. Their arguments turn 362D3 on its head. And that's Congress, Your Honor. That's the bankruptcy code.

I'm not saying that you don't have to have good faith. I'm not saying that that part of Little Creek is gone, but the rigid application of the factors of Little Creek is obsolete given what Congress has done subsequent to

Little Creek.  And that's why the bankruptcy courts that have looked at this issue post Little Creek, vast majority of them, have applied this bankruptcy purpose test.

And I think that's the test that Your Honor has to apply.  And I think that for that reason, and because we have established that there -- I think it's unquestionable. I think the record in front of you establishes that there's a valid bankruptcy purpose.  I think Your Honor has to deny the motion to dismiss.

THE COURT:  Thank you.  Mr. Warner.

MR. WARNER:  Thank you, Your Honor.  I really was going to sit back, Your Honor -- well, let me make it official.  Michael Warner Pachulski, staying on behalf of Beyond the Beach.  I was going to sit back and watch.  I have throughout the whole case.  We've gotten to the stage in the case where I thought it was necessary to bring to the Court's attention issues that are important to my client when we get to the sale hearing, which I hope we will.

THE COURT:  Okay, I was going to say that's an if.

MR. WARNER:  And I said if we get to the sale hearing, I'm going to tell you a little bit about who my client is, and maybe I ought to do it now so you get a feel for it, but -- and why I'm standing here, but I rose to give you a couple facts.

One, my client is a creditor of both Debtors.  We

have no idea which or if both may have misrepresented facts to us as we became buyers of this property, of two parcels in the development.  So I was going to give you a little bit of history about that when we -- if we get to the sale hearing.  I may have to do it now, just so that you can feel what I'm feeling, what my client is feeling.  We were sucked.

THE COURT:  It may not factor into my analysis, but it would at least help me understand kind of -- Mr. Warner I mean, 10,000 foot level stuff.  It --

MR. WARNER:  I will.

THE COURT:  In other words, it doesn't go to a Little Creek factor, it just helps me understand kind of who your client is and how they fit into this case.

MR. WARNER:  And I appreciate that.

THE COURT:  I want to make sure we're really clear about that.

MR. WARNER:  And I want to give you -- and I'll give it -- maybe it's not 10,000, maybe it's 5,000 foot, but I will give you some detail.  In all the hearings up until now, there's been a lot of legal argument, historical, factual argument.  There's really no human reality.  And that's what you need, I think, to consider in connection with the motion to dismiss and I hope in connection with the sale.

These are real people.  Beyond the Beach is a LLC created by Seth and Jodi Brufsky.  The Brufskys have worked their whole life to buy what is their dream home in Aspen. They bought two lots from this Debtor for a sign or the -- from the Debtor that owned the real property.  A significant amount of money was spent.  And they're now preparing to build a home on the lot, on one of the two lots.  You need to understand what this is.  This is multimillion dollar pieces of property.

And what we're going to build, is a show place, a masterpiece, the centerpiece of this development.  Because this will be the house to end all houses.  But this is also where they want to spend their time, their retirement time. That's why they bought this.  This is humans that are being affected.  These are humans that have been sucked into -- I was going to use the word war and it's probably inappropriate in this day and age to say that, but we've been sucked into a fight.

THE COURT:  So tell me --

MR. WARNER:  And here's --

THE COURT:  Tell me where you fit into the -- how these --

MR. WARNER:  So here's how we fit in.  The development was 22 parcels of land in the entire development.  We bought two of them.  One was bought by a

third party, 11 of them were transferred to the HOA, the homeowners' association.  The transfer was done before we bought.  The transfer was done so that the HOA could take common area, develop it, maintain it, and provide its value to someone who comes in and spends massive amount of money on real estate.

Think of the simple example of the condo.  The pool and the walkway are common areas.  They are deeded over to an HOA, the HOA manages and maintains, and I, as a resident in the condominium, pay my fees.  This is an 800 plus acre development for only 11 homes.  The rest of it is the common area.  It was put into the HOA.  What you need to think about, or I hope you appreciate, is the loan made by these lenders to Mr. Souki or his entities was not made to the Debtors, to the developer.  The developer guaranteed it and what it did in the guarantee is it gave a lien on its assets.

So you have a developer who has 800 some acres, deeds over certain portions, 11 parcels to the HOA.  Sells off three and has eight more to sell, the motion to sell.  That's your 22.  The parcels that were deeded over to the HOA as any developer does in a development.  Those parcels that were deeded over, unfortunately have liens against them in favor of the bank.  Now, in contrast, when I bought my parcels, my client, the bank released its lien and I now

have free and clear parcels.  But it didn't release its lien.  I don't know why.

God willing, we will never have to get into those facts.  But the bank never released its lien against the 11 parcels that the HOA owns.  What are those?  It's the pool. The bank released its lien, and I now have free and clear parcels, but it didn't release its lien.  I don't know why. God willing, we will never have to get into those facts. But the bank never released its lien against the 11 parcels that the HOA owns.  What are those?  It's the pool, it's the barns, it's the horse arenas.  It's the beautiful clubhouses.  It's all the stuff that when we bought property, we expected to be there, maintained and operated, clearly not subject to liens.

Now, why does this case need to stay in?  We have negotiated through an auction, a sale to a high bidder and a backup bidder, and I'm pleased to report that the lien issue has been cleaned up significantly in the sale.  These lenders have cleaned that up.  I appreciate it.  The representative knows I appreciate it.  I filed an objection because we need to wordsmith the document, but as this Court said at the last hearing, you can handle those things.

So what we want and want this case to remain in a chapter 11, so that I, who's a member of a homeowner's association, can assure that the HOA assets are cleaned up.

Free and clear of the liens, which will occur under the sale order. If the case is dismissed, we will have a foreclosure under Colorado Law on 19 parcels. The eight that the Debtor owns, and the 11 owned by the HOA, because the notice of foreclosure that was filed by the lenders includes all 19 parcels.

Whereas, if this Court approves the sale and the sale order is entered, even as it's written today, the liens against the HOA parcels will ultimately be released. I'd like some wordsmithing, we'll get to it later, but you now need to understand why it's important to my client that this case needs to stay in chapter 11, both cases. Because frankly, Your Honor, if it was dismissed, I'm not going to get all of the wonderful things that we've gotten so far. I've worked on this order with counsel for the lenders, with the Debtor's counsel, and I've done it on behalf of my clients.

And I need to make another point. My clients are two members of an 11 member, HOA. Excuse me, two members of an 11. There's a third person who bought one parcel, and there's eight other parcels that are owned by the Debtors. There is no counsel sitting here today saying, I represent the HOA. My client out of its pocket is paying my fees because it cares. It's only one of two homeowners in this development because the other eight haven't been sold.

And so shame on all these parties for fighting because what they're doing is they're hurting my client's vision that his investment and his future home on this property will not be effected.  Think about it this way.  In the condominium example I gave the court a moment ago, if someone foreclosed on the pool and said, guess what?  I own the pool by foreclosure.  Oh, no, you can't come into my pool.  It's now a $1,000 to swim every day.

But wait a minute, I pay $500 a month HOA fees.  Too darn bad.  I foreclosed on that real estate.  And that's what's happening.  My client can't take that risk.  We want the sale, which won't happen, if the sale is via a foreclosure.  I have more to say about the underlying order, but I think -- I hope you've gotten the feel for where we are and what's important to us.

THE COURT:  Thank you very much.

MR. WARNER:  Thank you, sir.

MR. KAUFMAN:  Your Honor, may I be heard in response?

THE COURT:  Just a second.  Mr. Davidson, and then I'm going to give you kind of an opportunity to respond to everything in whichever order you see fit.

MR. KAUFMAN:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. DAVIDSON:  Good morning, Your Honor.

THE COURT:  Good Morning.

MR. DAVIDSON:  I look at the relief that's being sought today and look at the Bankruptcy Code 111112 or 1112(b).  And it's their burden.  They need to show cause.  And I listen very carefully to the evidence that was introduced this morning, there's no depositions, there's no transcripts as evidence.  Only evidence that's here is pleadings that were filed.  There's no loan documents.

So when people talk about Mr. Souki's intent or this two party dispute, there is pleadings you can look at from the New York action, and you can figure out from those pleadings what happened there.  But there's no evidence in the record at all about Mr. Souki or the Souki's intent.  So I think from a simple evidentiary burden, they haven't met their burden.  And that's why the relief should be denied, Your Honor.

THE COURT:  Thank you.  Counsel.

MR. KAUFMAN:  Thank you, Your Honor.  So I'd like to start with Mr. Wolfshohl's characterization of the state court process and how slow it is.  I think Mr. Wolfshohl somewhat unfairly painted as a sort of Mad Max Thunderdome and that has not been mined.  I would also say that Mr. Wolfshohl offered no evidence that state court is somehow too slow or not up to the task of resolving this dispute.  And in fact --

THE COURT:  I don't think that's persuasive either.

MR. KAUFMAN:  Okay.  Thank you, Your Honor.  I'll move on then.  I'd also like to bear in mind here that the plaintiffs in the state court action, if it is determined at the end of the day that they succeed on their claims, they will have the remedy of money damage.  And indeed, my client offered and agreed in the sale order that was submitted to post a bond in the amount of the credit bid or to escrow that money.

And we do think there's a way that the sale order can be entered and then the case dismissed.  So that is a protection that could be provided, but regardless there's no reason to think that UBS and the lenders will not be able to make good on a money damages award, which is what they would ultimately get, were they to prevail in a state court proceeding.

I want to turn now to this idea that Little Creek is somehow obsolete.  I would say that if Congress wanted to get read -- get rid of Little Creek, it could have amended elect section 1112(b).  It certainly is presumed to be aware of rulings about it.  And so I think the idea that Congress somehow intended to change the Court's interpretations of 1112(b) without an actual amendment is not supported.  But you don't have to take my word for it.

I will -- I'd like to direct Your Honor to language in a case which is In re (Indiscernible). It's from this court from last year, and it's a case that the Debtors actually cited in their papers. It wasn't one of the authorities that we cited. And I'm reading here from page 397 to 398. It's 639 BR, 397 to 398.

And what this district found was, "as this course stated in In re Zamora-- Quezada, whilst section 1112B4 does not specify bad faith conduct as a cause for conversion or dismissal, Bankruptcy Codes nevertheless routinely treat dismissal for bad faith conduct as implicitly authorized by the words for cause" the internal quote that is. Continuing in Little Creek, the Fifth Circuit said that "every bankruptcy statute since 1898 as authorized by the words for cause, -- excuse me, has authorized by the word -- in Little Creek -- let me start over there.

The Fifth Circuit said that every bankruptcy statute since 1899 has incorporated literally or by judicial interpretation, a standard of good faith for the commencement prosecution and confirmation bankruptcy proceedings. The implicit good faith requirement prevents abuse of the bankruptcy process by Debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes.

And this is where Mr. Wolfshohl argued that the

factors have somehow become obsolete.  So I want to focus on this next sentence and then I'll stop reading.  But I think this next sentence clearly robust that.  Lack of good faith findings are typically quote -- and this is quoting from Little Creek "predicated on certain recurring, but non-- exclusive patterns.  And they are based on a conglomerate of factors rather than any single datum." And that's precisely the language that the Fifth Circuit used in Little Creek to introduce the list of factors that all militate in favor of dismissal here.  So I think Oste Levy (phonetic), which is a case from this district from last year, shows that the Little Creek factors are alive and well and kicking here and elsewhere too.

The reason that this cases the Debtor cite, Oste Levy and Moran (phonetic) focus on the bankruptcy purpose test instead of on the Little Creek factors specifically, is that they involved very different facts from Little Creek. Neither involved a single asset Debtor, neither involved a secured creditor with a lien on that asset.

THE COURT:  But the Fifth Circuit say in every case, you can only consider these things.  In other words, can I consider more?

MR. KAUFMAN:  You can consider more.  It was a non--exclusive list.

THE COURT:  You're just saying I should think

about these things.

MR. KAUFMAN:  The Fifth Circuit identified them as indicia of recurring patterns that arise in bad --

THE COURT:  Did the Fifth Circuit say, when you find these four things you must dismiss?

MR. KAUFMAN:  No, Your Honor has discretion.  But I would again submit that when every single one of those factors that the Fifth Circuit identified is met, that's pretty strong evidence of a bad case filing under the logic of Little Creek.

THE COURT:  Okay.  I agree.  Okay.

MR. KAUFMAN:  Mr. Wolfshohl also argued that, well, there are other parties in interest here.  There's a CRO now, there's DIP financing.  There are other parties who relied on these bankruptcy proceedings.  But I mean, if that were enough to establish a good faith filing, then the test would entirely disappear.

You could bootstrap good faith just out of getting people involved in a bankruptcy process.  So I think that you can't retroactively make a bad faith filing good simply by retaining a CRO or getting DIP financing -- [Indiscernible].

THE COURT:  But in Little Creek -- in Little Creek, the Fifth Circuit noted that all they were doing were making the same arguments that they made in the pre-petition

state court litigation, right?  So at some point you do look to see what's happening in the case and in Little Creek, the Fifth Circuit noted all you're doing is making the same arguments that you were making there.

So there's some -- Look I agree with you can't just bootstrap something and just manufacture good faith. You do take a look on the filing date.  Was this filed in good faith?  But I think it's -- I think it's just comprehensive.  But I agree with you.  I can't just look at these four things and say that if you do A, B and C, you know, just because you have a CRO doesn't mean that you filed a case in good faith.  I'm with you on that.

MR. KAUFMAN:  Okay.  Last point I'll make is, Mr. Wolfshohl mentioned that we are on the cusp of a lot of important milestones here.  We are finishing up fact discovery in the adversary proceeding.  We have impending summary judgment deadlines.  I would suggest that if Your Honor dismissed here, we could port all of the existing discovery over to the New York action.

We could adopt the same close of fact discovery, close of expert discovery deadlines, the same briefing schedule for summary judgment.  And while I can't speak to Justice Masley's trial docket, we could proceed immediately essentially into dispositive motion briefing and then to a trial as quickly thereafter as the Court's available.

THE COURT:  Maybe.  Right?  I mean, I think the Judge has a say, but I --

MR. KAUFMAN:  Well, right.  But as between the parties, we can agree to the dates for a fact discovery where summary [indiscernible].

THE COURT:  Got it.  No, I'm just messing with you.

MR. KAUFMAN:  Yeah.  And then lastly, as to the point made by counsel for Ajax there were deposition transcripts attached to our filings.  I had understood our colloquy at the beginning to mean that those transcripts would be part of the evidentiary record here.  I apologize if I misunderstood.  I'm happy to kind of have those read into the record or have them [indiscernible].

THE COURT:  I think 1 and 12 through 33 are admitted.  That's what I admitted.

MR. KAUFMAN:  Those are on the exhibits.  This is also -- there is a certain deposition testimony that we quoted in our reply and the --

THE COURT:  That's not -- I haven't admitted that, if that's what you're asking.

MR. KAUFMAN:  Okay.  I would ask that it be admitted.

MR. DAVIDSON:  Objection, Your Honor.  They rested.

THE COURT:  Yeah.  Facts closed, I can't consider it.  You --

MR. KAUFMAN:  Well, I would say that that testimony is not critical in any event, the factual record as it exists currently, the evidentiary record supports dismissal and then Ms. Metzger I believe is going to respond to the comments by the gentleman representing Beyond the Beach.

THE COURT:  I don't think you need to Ms. Metzger, but if you want to, I'll certainly give you an opportunity to do so.

MS. METZGER:  Thank you, Your Honor.  I'll rest and raise it if we get to set order.

THE COURT:  Okay, yeah.  I want to go back and read some of these exhibits.  Can you all give me about 15 minutes?  Can we just take a 15--minute break?  I want to consider a couple of things and then kind of I'll come back in 15 minutes and give you a reply.  Thank you. Give me just a second, folks.  We'll get started in a minute.

Okay.  So before the Court is consideration of motion to dismiss the chapter 11 cases under section 1112(b) of the Bankruptcy Code.  It was brought by the lender parties.  The motion is at docket number 75.  The Court notes that the Debtors filed two Debtors files for bankruptcy, Strudel and AVR filed for bankruptcy on July

27th of 2023.  Well just a few short months ago.  And at docket 75 about a month later on August 24th the lender parties filed a motion to dismiss.  There's been proper notice of today's hearing and service of the motion.  There's no issues there.

I'll read down the evidentiary predicate, I should say the legal predicate.  This is a court proceeding on the 28 USC 157, right?  The dismissal of the cases, court has jurisdiction on the 28 USC 1334.  I think I'll start off by just a general comment.  The motion was filed about in August and we're here about 60 days into the motion.  I think it's been appropriate to hold the hearing today.  I think lender parties had every right to file motions as well as every creditor has a right to file a motion seeking relief that they believe is appropriate.  And sometimes Debtors don't like these motions, but it's not really the issue.  Question is it's based on the facts in the law, whether a motion should be -- whether should be considered.  And absolutely this motion should have been considered.

I think these parties have been fighting for quite some time pre--petition involved in state court litigation in New York City.  The lender parties, have a dispute belief that they're entitled to have a lien on assets and that there was a default under certain credit agreements.  The lender parties also argue these cases should be dismissed

because It's really not a fight about -- between the lender parties and these Debtors.

It's really kind of a dispute with Mr. Souki, who is kind of a sole member in the Debtors. And that really -- this litigation is really -- I should say this case is really driven by Mr. Souki and that this case really should -- has no involvement before this Court. And that this Court should just allow the process to continue in state court.

There were some general comments about state courts and their effectiveness and efficiency. I don't think it's appropriate for me to comment one way or the other on the efficiency. So I don't say anything negative about state courts. I think they just, like I, have a job to do and they do it to the best of their abilities. And I've gotten no reason to consider one way or the other. And I'm not really sure I should consider whether something is faster one way or the other in state court as opposed to federal bankruptcy court. Sometimes it's important. But for purposes of today, I think in New York State Court is -- I make no finding one way or the other, other than it's a sister court and it's certainly capable of handling what you can handle in accordance with, just like I can.

There certainly was pre--petition litigation. Property was posted for foreclosure, and that preempted

these chapter 11 filings.  The lender parties think it's the latest in a series of efforts by Mr. Souki and these Debtors basically acting under his control, right?  To avoid the consequences of Mr. Souki defaulting under a loan, which then gave rise to guarantees, triggering guarantees by the Debtors and the Debtors filed for bankruptcy.

So how do -- what's then the eyes?  You start in every case with the text, right?  Because interpreting the Bankruptcy Code begins with analyzing the text always.  We always start with the text.  We never look at cases first.  You look at the text and then you see.  You need to look at cases how they construe the text.  Whitlock versus Lowe. I'll give you 945 F.3d 943947.  Case that I like to certainly quote is Bedrock, LTDV, United States, 541 US 176, 2004 case, right?  The preeminent canon of statutory interpretation requires to presume that the legislature in a statute says what it means and means what it says there, right?  And it was quoting Connecticut National Bank v. Germain, 503 US 249253354, 1992 case.

So, what is the applicable section that we're looking at today?  That is section 1112 of the Bankruptcy Code.  1112B says that accept is provided in paragraph 2, which we'll talk about in a second.  And subsection (c) on request of a party in interest, which we have here.  And after notice of a hearing, which we have here, the Court

shall convert a case under this chapter to a case under chapter 7, or dismiss whichever's in the best interest of creditors and for the estate for cause.

Unless the Court determines that an appointment of a trustee or an examiner's in the best interest of the estate.

It says that accept is provided in subparagraph 2 and subsection ©.  So what do those things say?  Paragraph 2 says, "the Court can't dismiss a case if it finds and specifically identifies unusual circumstances establishing that dismissing the case is not in the best interest of creditors and the estate."

That's where we are.  That's the statute, and that's what we work for.  We start there.  So what does it say?  The text says that I've got to convert, I shall dismiss a case for cause.  We have to figure out what cause means.  And that's where Little Creek kicks in.  Unless the Court determines that either a trustee should be appointed or an examiner in the best interest of creditor and says, I can't.  So what does cause mean?  We got to determine what that means.  And so that for there, I think we do look at Little Creek, which is what the Fifth Circuit -- and I still binding on me.

And I know Mr. Wolfshohl says I should look at the 2005 amendments and look at 362D3, but I think 362D stands

on its own and so does 1112.  They're two separate statutes. And you interpret statutes based upon what they wrote. Congress had an opportunity to amend 1112 in 2005, and it didn't do it.  It stayed the same.  So you look at Little Creek.

But what does Little Creek actually say?  Little Creek points to -- here's what Little Creek says; 779 F.2d 1068 says that "every bankruptcy statute since 1898 has incorporated literally by judicial interpretation, a standard of good faith for the commencement prosecution and confirmation of a bankruptcy proceeding.

The standard furthers the balancing between the interest of creditors -- the Debtors, and creditors, which characterizes so many provisions of the bankruptcy laws as necessary to legitimize the delay in cost imposed upon parties to a bankruptcy.

Requirement of good faith prevents abuse of the bankruptcy process by Debtors whose overriding (phonetic) motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes.  That's what good faith is after.  So in other words, the Little Creek factors are intended to determine whether this stuff is what's going -- really going on in a case.  Is there a motive here?  An ulterior motive?  Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by

rendering their powerful, equitable weapons available only to those Debtors and creditors with clean hands.

That's what -- that's the issue. That's the focus. Everybody talked about the other stuff. This is the stuff that you got to look. What is the purpose of the determining whether there's cause to dismiss? What does good faith mean? Good faith means, did this Debtor file, has the Court -- is the Court going to be able to determine, you know, is the integrity of the judicial there? You know, is the powers that are afforded under the Bankruptcy Code immediately providing a stay of all issues, right?

Debtors got to come in with clean hands. You know, is there a balancing interest of creditors and Debtors, right? Is it necessary to legitimize the delay in cost imposed? Is there something really happening in this case or is the case really just about delay? Is there abuse? Is the overriding motive there to delay creditors without benefiting them in any way or to achieve a reprehensible purpose? Are you just here to delay or do you have some other reason and you're asking the bankruptcy process and the bankruptcy court to play a role in it.

Determining whether it is, depends largely upon the bankruptcy court's on the spot evaluation of the Debtor's financial conditions, motive and the local financial realities. You see, you can't look at -- you

can't pay attention to the on the spot evaluation. I've got to reevaluate it based upon the overall purpose of what good faith is intended to accomplish here, which is, you know, is there really something else going on and the Court's smoking it out? Is there some judicial motive? Is there some, you know -- are we ruining the integrity of judicial process? Are we delaying? Is there some reprehensible motive?

It's really what Little Creek is going after. And Little Creek then says, okay, court, bankruptcy court, there's a bunch of causes, right? And I'm not going to limit you to any, because you got to make an on the spot evaluation, and I'm not going to give you a rigid set of factors, but it's going to say, hey, if you start to look at some of these factors, go back and consider this stuff, you can't not consider the fact that there's a two party dispute. That there are minimal assets that the parties have been litigating in a state court proceeding.

You can't act like you didn't look, you can not pay attention to this. And this in and of itself, if you find this stuff in and of itself, it may consider cause, but you've got to make the on the spot evaluation bankruptcy court remand, and then you go back and consider what's going on. That's Little Creek. It's still alive. But the factors themselves have to be considered within the context of what is intended to accomplish.

The Fifth Circuit, as I read it, said, go back and think about this, but go in on the spot evaluation, consider the Debtor's motives, consider their financial condition and the local financial realities.  Because again, we're going back, the standard has been going on since 1898 to determine whether there's really a real purpose for being in the bankruptcy case or is there something reprehensible?  Is the Debtor not having an -- is -- does the Debtor have unclean hands?  Is this really just a state court litigation that the parties really want to proceed, right?

And so you've had a number of cases all throughout the country and cases that really -- don't really -- with facts that don't really bear and courts are trying to figure that out, right?  You know, is it a reorganization purpose?  Is it a bankruptcy purpose?  I personally, like -- you know, I think the right answer is what the Fifth Circuit said here, right?  And it's really going to a bankruptcy purpose.  Rehabilitation purpose is tricky because Debtors get to liquidate in chapter 11 and the Bankruptcy Code expressly authorizes a plan of reorganization to liquidate all assets.

So the concept of rehabilitation, the concept of reorganization, I think has to be viewed within the very context in which bankruptcy liquidating plans happen all the time.  And they're entirely permissible.  1123 says you can absolutely do it.  The purpose of every chapter 11 case

sometimes isn't to just emerge as a reorganized Debtor. Liquidation -- liquidating trust get established all the time. So you got to look at that. But the question is, you've -- it's right.

And I think, cause, the question is, what do we look at for cause? And Little Creek is saying, hey, Judge, you've got to make an on the spot determination as to, you know, why -- you know, before we start imposing people on large costs and making people spend a bunch of money and really staying rights, right? The powerful, the bankruptcy court, the code itself imposes large -- the Bankruptcy Code itself, not even the Court, but the code itself, by simply filing a petition, an automatic state goes into effect.

That's really powerful stuff because it applies nationwide and it stops everything. That's -- so the bankruptcy court has to stop, hey, before we continue, hey, if somebody wants somebody -- the Court after notice in a hearing, like, hey, we got to find out if this is -- if -- you know, before this continues. And sometimes cases can last for a really long time and a lot of money gets spent and lawyers start incurring a lot of fees, let's figure out if this is the right place this case should be, and whether this was really, really a good reason to use bankruptcy.

That's Little Creek. I agree. I embrace Little Creek, but I think when you look at what Judge Hale did in

NRA, right?  He acknowledged Little Creek was there, but it's not a rigid, you look at three factors and if you reach the three factors, you're gone.  It's to say, hey, on the spot evaluation.  What am I evaluating?

The very stuff that bankruptcy courts have implied for since eight -- you know, since the 1800s.  What's the purpose here?  What are you doing here?  Are you trying to -- are trying to just come into bankruptcy to just forestall a liquid and a foreclosure?  If the entire reason that you're here Debtor, is to forestall, liquidate, you know, a foreclosure, that's not the place to be.

If all you're doing is trying to forestall and delay the inevitable shouldn't be here.  362, right?  You can lift a state for cause, you can dismiss a case for cause that's really what's going on.  And the Court is saying -- you know, in Little Creek all -- one of the things that the Court found was that the Debtor in that case, all they were doing was litigating exactly what they were arguing in the state court case, right?  It was like a continuation of state court litigation.

You filed state court litigation and now you're coming into bankruptcy court making the same arguments that you were doing over there and there's really not a whole lot of evidence of other stuff they were doing.  And Judge Jones is saying, go back down there and look at all this stuff and

really figure out if this is really a good purpose for what the bankruptcy court's hear.

So that's the lens, that's the way you look at Little Creek.  That's the way you think about it.  You think about it -- you know, NRA considered them, but it really didn't kind of go down the Little Creek factors.  And I think that's the right thing to do.  And I think, you know, I've heard a lot over the past couple of days, and not in this case, but in other cases where people cite cases, it's the reasoning in the cases and based upon the facts that really matter.  Celebici (phonetic) was decided on its facts.

NRA was decided on its facts.  LTL was decided on -- right?  And it doesn't really matter what district it was in.  Sometimes I've got -- in the Fifth Circuit, you certainly have to confront and face Little Creek.  But it's the reasoning.  What was going on in that case that made the bankruptcy court one way or the other, and the bankruptcy court get it right, you know, or some of these factors.

So when I look at the factors, I think the lenders parties brought this motion in good faith.  I think it's right.  Hey, there's a two party you know, there's not many creditors in this case.  This litigation, we had property posted for foreclosure.  I think we have the right to this. I think Mr. Souki is just controlling this Judge.  That's

the evidence.  Well, that's the -- that's the allegation. So what's the evidence?  I don't really know what Mr. Souki is doing.  Mr. Souki is not here.

Nobody crossed -- nobody examined Mr. Souki.  I don't know what Mr. Souki is doing or what he did.  I know that there's allegations in the state court, they're not in evidence.  State court pleadings.  What's the evidentiary value of a state court pleading, right?  Does it mean that the allegations in there are all true or it just mean this is the state court pleading where people allege stuff.  I don't have any evidence of actual debt.  The debt documents aren't in.  It could have been proven up today.  This motion has been set for 60 days.

But what's the evidence that I do have?  I have -- I got -- Little Creek is saying, can't avoid it.  It smells like one, right?  You got to look.  Hey, not many creditors. Look at the schedules.  Hey, look at what -- we're the biggest dog in the house, right?  We're the biggest creditor here.  This case is really going on.  It's really a two--party fight.  How do I counter that?  I think you don't just look at the petition date, right?  It's the petition was filed in good faith, well, how are you supposed to make an on the spot determination of the motive without seeing what they do in the connection with the case, right?

Little Creek says, hey, these folks are still

arguing the same stuff that they did in the prior case.  So what's happened in this case, it's a 363 sale bidding procedures.  If you sell the very asset that people came in -- one of the biggest assets that people came in fighting about.  And actually, somebody was willing to put real money on the table, like a lot of money on the table in connection with the sale of a ranch, right?

It was a large property, somebody showed up and is willing to be a backup bidder, right?  So in other words, is there a bankruptcy purpose?  Is there a -- is there unclean hands?  I don't think so.  I don't have any evidence of it.  I don't think that this process was made for delay because very early on, in this case, this case was filed in July, right?  So you're talking over the course of three months, there's been a multimillion dollar asset sale.

It hasn't been approved yet, because I haven't done it.  I haven't taken it up yet.  But I have a party who's willing to put like $30 million on the table.  Real money, right?  The lender parties could have accepted cash.  They would -- they could -- and the credit, they could have been, I don't know who -- you know, there was disputes about who they were going to go forward with.  And I do know that somebody's willing to put $30 million on the table, right?  That's not insignificant.  That could have paid down debt.

And I think -- and I go back to the very hypo that

I said, I think there's a difference between what appears to be happening in Little Creek which is, you know, forestall, delay unclean, you know, look at these factors, go back and consider, make sure to someone coming -- a Debtor coming in and selling a multimillion dollar asset and saying, Judge, we think we can sell an asset for $30 million.  You know, is it a improper bankruptcy purpose?  Is there an improper bad faith filing that I should dismiss a chapter 11 case because a Debtor wants to owe a creditor less money and wants to maximize the value of that.  What's wrong with that?

You know, if creditors -- again I go back to my hypo, if at the end of the day, and I am making up a hypothetical, a creditor came in and if a Debtor came in and was concerned about the foreclosure, not the state court litigation, but the foreclosure and what could be maximized in a state court foreclosure as to running a process that is public where parties can get contacted and provide information and maximize value.  That didn't sound like a bad bankruptcy process at all.  It didn't sound like a bankruptcy reason for filing at all.  And I've got to balance that.

There's a CRO in place.  I agree.  The fact that there's a CRO in and of itself doesn't mean that.  But it does take away this thing.  And what's happening in Little Creek does take away this face that Mr. Souki is controlling

this.  I don't have any evidence that Mr. Brickley isn't running the show.  I know there's a CRO in place.  I know that the Debtors have filed a -- you know, I know that there's litigation pending in an adversary proceeding.

I know the Debtors are asking for a hearing in 60 days, you know, to go try the case.  You're talking about getting a company in and out in six months with an adversary proceeding litigated?  That's the delay that we're talking about here.  That's the delay that I -- that's the improper judicial motive going out and seeking financing to then come up with it and not -- I mean, I don't -- I think Debtors have a right to fight for their lives too.  That's not an improper bankruptcy purpose.  I think Debtors have a right to say, if this goes away, I have nothing and I need a chance to have a fight.

So when you look at the Little Creek factors, I do agree some of them do exist.  You can't act like there aren't other factors.  And I don't think Little Creek didn't say, don't just look at these three things.  It just says, hey, this could mean it.  But look at the other things that are going on here.  DIP financing, planning, sale and actual auction took place, which a lender party and a third party participated in and real money was put on the table.  Like $30 million?  You're just going to act like that didn't happen?  Do I just say, well, it's a two party dispute, but

there's $30 million that can actually pay a creditor?  And that the lender party actually wanted to participate in it and the elected to.  And I made sure they had the -- I made sure they had the right to.

I don't know.  That's unclean hands, that's the disruption of the bankruptcy process.  But I -- that being said, I don't think today was wasteful at all.  I think it was a check on the system and I think the integrity of the system and the process, I think you got to air out.  But I don't think -- I think it's -- you know, I don't think in terms of the burdens, you know, I think it's their burden to raise the issue.  But I think the Debtor has the burden to show that they filed in good faith.  I think they have to prove it.  You know, somebody can -- somebody has to raise a prima facie case that the Court should consider it.

But I think at some point the Debtor has to come in and say, yeah, can't just sit back on their hands and say nothing.  But I think they've satisfied that burden today too.

I don't know where this case goes.  I don't know where it goes in terms of the adversary proceeding.  I think when you look at the factors and you consider the law, I think Little Creek certainly applies.  Could a monetary judgment?  Could an asset?  I mean, how many bankruptcy cases are filed with the very existence of the Debtor is at

issue, in terms of what they have and what they own. Everything.  You take this, I have nothing.  It happens all the time.  Large judgments get filed, Debtors file because they're a large judgment.

But there's something about dealing with the judgment as opposed to avoiding it.  Delay, unclean hands. That's cause, right?  That's cause, and keep in mind -- look at what the Court said.  And listen -- look at this.  I mean, we can't forget the text.  I can dismiss the case for cause unless I find that the appointment of an examiner or a trustee is appropriate, right?  That's really what Brickley is doing, right?  If the concern was I can keep this case, I don't have to dismiss this case.

I could just appoint a Trustee is appropriate, right?  That's really what Brickley is doing, right?  If the concern was, I can keep this case, I don't have to dismiss this case.  I could just appoint a chapter 11 trustee in this case and keep this case going.  If it was in the best interest of creditors and the estate, and it's in the best interest of the estate.  There's real money on the table. There's real litigation, there's real money on the table. There's -- a secure creditor could gain up to -- could own an asset that they came in saying they want to own for $30 million.

If I approve it, I'm not saying I will or I won't,

but there's real issues going on.  There's real litigation. There's someone, another creditor coming in.  Another party in interest is coming in saying we want to -- you know, there's issues with title to that land.  We got to be able to proceed.  There's a DIP lender in place that's concerned about issues.  There are other creditors, and I don't care if there's a creditor that's owed a dollar.  A creditor is a creditor.  What is in the best interest of the estate?

Oh, I'm not going to start putting, you know, folks who provide small services and, you know, maybe non dean, non--critical vendors -- all right, they're important too.  Just because you have big dollar, it means, you know, you may be able to hire a lawyer, but it doesn't mean you don't have a voice.  And that doesn't mean that the Court shouldn't consider who these other creditors are.  They have a voice.  Sometimes that's why creditors committees sometimes get formed, right?  Because people need a voice. So I'm not going to just dismiss the fact that there are only 12.  I don't know.  You put some real money in someone's pocket and you're one of the 11 that's really important.

So I can't really say that there's cause here, there isn't.  The burden has not been satisfied that there's cause.  I believe that this case was filed in good faith. And I certainly can't determine that the appointment of a

trustee or an examiner is in the best interest.  I certainly can't.  I can't find this.  Because I think there's a CRO in place and I've heard no evidence that the CRO is essentially the puppet of Mr. Souki.

So I think the Court considers the Little Creek factors, but I don't structure my discussion around them. But I certainly acknowledge that they certainly exist.  But Little Creek was never intended to just provide a, you know, a one, two, three issue.  It's not -- read the cases.  Court sent it back.  I think the Debtor filed the case.  I've got no evidence that this case was filed in bad faith.

So I don't find sufficient cause to dismiss this chapter 11 case.  I think there's certainly fights between the parties and the Court has expressed its frustration with that.  I got it.  I think there's a way to be a strong advocate for your client, I think there's also fighting about everything.  It may not be in the best interest and this Court is certainly prepared to deal with that.

So, what else can I say?  The Court has considered the evidence that has been submitted.  Exhibits 1 through 22 and 1 and 12 through 33.  Court has -- I believe, stayed true to the text in terms of what the text requires.  As Fifth Circuit standards in Little Creek and I think I've run a -- I think I've -- everything I've done is an on the spot determination based on the facts and based -- considering

the purpose of good faith and what it was intended to accomplish. The court has considered the Little Creek factors and the court notes -- considers them and weighs them in its decision, but ultimately finds that this -- there's not sufficient cause, which is the standard. Because I don't believe that this case was filed for a lack of good faith.

And that's my court -- that's the Court's ruling. And I'll enter a short order denying the relief requested for the reasons stated on the record. I'm going to make a couple of other points. That's my ruling. And that's based on -- the record is closed. I'll make a couple of other points. There's going to be litigation in here in this case, I don't know where it goes. Really, really stressing to the parties who are going to be involved in that litigation. It's staunch to advocate as you can for your clients. That's what they're paying you to do. And that's your job to do. And you have an ethical duty to do it. I'm going to have a close eye towards needless delay and waste.

There are two of the best law firms -- well, several of the best law firms in the country that are here. And they know how to go really hard. And that doesn't mean you have to agree on exhibits. I don't care if you agree on any of them. That's not what I'm talking about. I think at some point everybody ought to just kind of wait, what's

really going on in this case.  And I'm not asking parties to settle, I don't force people to mediate.  I don't force parties to do anything.  People may file motions and it's my job to take them up and decide the issues, but there's a sale order that's got to get entered.  I think I will just say on the record, the thought of me approving a sale, if I do, and someone filing a preference action later, would make me revisit what I did today.  If it was just done to start undoing what I just signed.  But don't ask me to sign a sale order.  Somebody's going to then put everything on the table.

If you -- somebody wants to file a preference, file the preference, but don't file and start attacking.  Because somebody needs to -- people need confidence in what they buy, if that's what they're going to do.  And if the buyer is the lender parties and they need confidence and they're not going to get collaterally attacked by some other tool.  Put everything on the table now, but don't ask me to sign an order if that's what -- if that's the strategy.  Because I will -- I assure you, I will revisit the very decision that I made today and I reserve the right to do so.  And I can certainly do it on my own.

I just want there to be full transparency.  If their intention is to have a case in which the lender parties purchase an asset and there's a bond and there's a

backup bidder, and then there's litigation about, you know, very discreet legal issues under some documents, then we can have that fight.  If the purpose is to then come out and subject the lender parties to you know -- I mean if somebody's going to start claiming, you know, collusion, you better have a really good reason.  Someone's going to say, lack of good faith, you better have a good reason. Someone's going to come in and start filing, you know, some secret ulterior motive, put it on the table today.  Don't make me sign that order.  Because if I sign that order, it's going to mean something.  And I'm going to be really upset to find out that there was something else on the table.

If some other litigation strategy is related to those assets, free and clear in my mind means free and clear.  And we can, you know, can nibble with Beyond the Beach in terms of, you know, what those things mean and how they play out.  That's a language issue.  But that's not a litigation strategy issue.  That's just to make sure people have what they need.  And maybe I give Mr. Warner some of it.  Maybe I give him, you know -- he may not get all of it, but he may get some of the language in there.  I don't know. But I don't want any surprises.  That's what I mean.

And I'm being really serious about kind of where things are going.  So if there's any surprises that I'm coming and surprises in my mind, I mean anything other than

walking in and trying a case and then figuring out an exit, right?

In my mind, this case ought to be done by the end -- by the end of January. I'll decide the issue in December and or sometime, right? And then something happens in January and this case is done. That's the way I see it. If there's any surprises about that, I better find out and I better find out now. And I'm not saying there is, I'm just saying it before anyone. I'm saying it so that it's said, and I'm saying it with the full ignorance, but I am also saying it in terms of what my expectations are for the duration of the case. That's what I mean.

I think DIP orders mean things. I think sale orders mean things. And I would -- I don't want this buyer to come back six months, even after the case to come back and say, Lopez, you've signed this order and you made all these statements and look what happened. We're not doing that. So if that's the case I won't -- I'll deny the motion to dismiss for the reasons stated on the record.

I'm going to go grab a sandwich and I encourage y'all to do as well and let's come back -- maybe if you want, we can come back at 1:00. Maybe I'll have an agreed order. If you don't we'll come back at 2:00 because I can't do anything about those 1:00 hearings. They are matters in which I have to deal with. I'm not going to take up the

adversary today. Timing on it, you know, figure it out in light of what I've said. I've got dates in December that I haven't touched yet. If you want to start it there, you can, I'll give you the dates. Well, quite frankly, Ms. Saldana will give you the dates. Whatever y'all agree upon will work for me.

But I'm just telling you, you hear me, you hear me reading cases, I can assure you facts and law will dominate. The rules of evidence will evident.

I don't care who wins or who loses. I really don't. My job is to just make the decision and I'm prepared to do it. And I'll do it in the context of the adversary. But again, no one needs to tell me there are no surprises. I'm just telling you, if there is one, tell me. If not, we'll take up a sale order and we can, you know, tinker with language. I'm really good at that. Don't leave it to me though, because I'll do it. [Indiscernible] the order, but I won't -- I'll play with it. I'm just kidding. He's got a -- my keyboard doesn't sound as cool as his though, so it's not as intimidating. So anyway, go ahead and grab a sandwich, folks. We'll come back at 2:00 if you need to.

Thank you.

[Court in lunch recess from 12:30 p.m. to 2:00 p.m.]

THE COURT: Go back on the Record in Strudel Holdings. Taking up now the sale motion.

Mr. Wolfshohl.

MR. WOLFSHOHL:  Thank you, Your Honor.  Joshua Wolfshohl, Aaron Power, Jordan Stevens on behalf of the Debtors, as well as Mr. Brickley in the courtroom still.

So Your Honor, I may have to have others explain to you kind of where we're at.  I think that a couple things.  One, Mr. Warner and Ms. Metzger have been talking about trying to resolve their objection.  I think that they've gotten there on some issues, but not all.

THE COURT:  Okay.

MR. WOLFSHOHL:  I think they're going to ask to speak to the Court about those.  One thing that I want to go ahead and get done is in connection with the good faith findings and the non--collusion findings in the sale order. I would like to proffer -- it's going to take me just a couple minutes, but I just want to proffer Mr. Brickley's testimony.

I think it supports the findings in that document. I think that Ms. Metzger's in agreement to exercise the process that we do it that way.  So that, Your Honor, whenever you make the findings, you actually have some evidentiary record for that.  I can do that now, or they can explain their issues.  It doesn't matter to me.

THE COURT:  Okay, let's do it now.  Okay, Mr. Brickley, why don't you stand up?  Have you raise your

right hand?  Do you swear to tell the truth, the whole truth, and nothing but the truth?

WITNESS 1:  I do.

THE COURT:  Okay.  And you understand that we're going to proceed by proffer.  When counsel is done I ask that you please listen carefully, and when he is done, I'm going to ask you if the statements he made are true and correct, and if there's any corrections you would make to anything he said, because you would be adopting that proffer as your testimony.

WITNESS 1:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Wolfshohl, you may proceed.

MR. WOLFSHOHL:  Thank you, Your Honor.  And just to be clear, I am only covering the good faith and the non-- exclusive issues.  Everything, I mean, everything's agreed to, that's agreed to as well.  I just want to make sure that you understand.

THE COURT:  I understand.

MR. WOLFSHOHL:  Okay.  If called to testify, Mr. Brickley would testify that based on information available to him and his knowledge, he believes that the APA and the order -- both APAs, the primary bid as well as the backup bid and the order that we are proposing were negotiated in good faith without collusion.  And from an arm's length bargaining position as to all parties.  He

would testify that based on his knowledge that the purchaser is not an insider or an affiliate of the Debtor.

And that's as to both purchasers, both the primary purchaser as well as the backup bidder.  He would testify that the parties acted in good faith with the -- in connection with the sale process.  That there was a -- based on his knowledge, there was a competitive process in accordance with the bid procedures and at the auction.  And that the parties disclosed to him all payments to be made by the purchaser in connection with the sale which he's aware of none.  And I think that that would close his proffer as well.

THE COURT:  Okay.  Mr. Brickley, you've heard the statements.  Do you believe they're true and accurate?

WITNESS 1:  Yes.

THE COURT:  Any corrections you would make?

WITNESS 1:  No.

THE COURT:  Okay.  The proffer is accepted.

MR. WOLFSHOHL:  Thank you, Your Honor.  And I think with that, I'll turn it over to, I guess Ms. Metzger about -- I don't know where you guys are, Mr. Warner?

MS. METZGER:  Good afternoon, Your Honor.  Laura Metzger.

THE COURT:  Afternoon.

MS. METZGER:  On behalf of the lender parties.  If

it's all right with the Court, I would like to proffer the testimony of Randall Johnson as well in a similar manner.

THE COURT:  Okay.

MS. METZGER:  As Mr. Wolfshohl did.

THE COURT:  Is Mr. Johnson in the -- can you please stand up?  I got to -- don't you come on up.  Can you please raise your right hand?  Do you swear to tell the truth, the whole truth, and nothing but the truth?

WITNESS 2:  I do.  Okay.

THE COURT:  You can put your hand down and we're going to proceed by proffer and I'll ask you the same questions.

MS. METZGER:  Sure.  Your Honor, if called to testify today, the lender parties would tell you that they acted in good faith in negotiating the APA, the order and with respect to the auction.  Mr. Johnson would also testify that no other party is part of its bid, that it has not colluded with any bidders during the auction process.  He would also testify that he has no agreement to sell the property to any other party, and that he has no agreement.

And at no point during the auction did he have any agreement with any other party.  He currently has no agreement written or unwritten with respect to the property with any other bidders, and he did not in any way coordinate his bids with any potential bidders.  Thank you, Your Honor.

THE COURT: Thank you very much. Mr. Johnson you heard the statements. Do you believe they're true and accurate?

WITNESS 2: I do.

THE COURT: Any corrections you would make to anything you said?

WITNESS 2: No.

THE COURT: Okay. I'm accepting the proffer. Thank you.

MR. WARNER: Your Honor.

THE COURT: Yes.

MR. WARNER: If I may?

MS. METZGER: Go ahead.

MR. WARNER: Michael Warner, on behalf of Beyond the Beach, we just heard his proffer. I didn't hear the Court ask if anybody had any cross exam of the proffer.

THE COURT: Yeah.

MR. WARNER: And I don't. Assuming that a deal gets agreed to we're still working on wordsmithing language and concepts, and so I'd like to reserve my right if necessary to cross examine.

THE COURT: I think everybody has the right to cross examine. It's just direct or offered. Let me ask you this. How much time do you think you all need, or do you need or are we there?

MS. METZGER:  It's not clear to me where we are, Your Honor.  With all due respect the goalposts keep moving. And I -- you know, I would --

THE COURT:  Okay.

MS. METZGER:  I'm happy to chat with him --

THE COURT:  I'm looking at paragraphs 18 and 19. And let me just tell you, let me -- let's just do this.  I think I can -- let's see.

MS. METZGER:  May I have -- Your Honor, may I have an opportunity if you're going to jump into the order to be heard in response to what Mr. Warner said on earlier today?

THE COURT:  Oh, of course.

MS. METZGER:  Okay.  I hope it's not lost on the Court that Mr. Warner is concerned with property that is not property of the estate.  The HOA property belongs to the HOA and is just quite simply not property of the estate.  So I think I'm confused already as to why we're here in the context of the sale order.

I would also inform the Court that in 2021, when Beyond the Beach purchased the property, they did so with full knowledge of the liens.  They did so presumably with knowledge that the loan was in default, or at most certainty, they had the opportunity to diligence that.  They were extremely sophisticated parties.

They negotiated documents, they had full knowledge

of the terms of the transfer between the HOA.  They had an opportunity to negotiate with the lenders.  They had the Debtors put requests into the lenders, and they negotiated certain carve--outs and certain terms.

This sale order in no way is imposing any restrictions or changes on their rights.  And nor should it chain -- put any restrictions and changes on their rights.  Not withstanding all that, I think in an exercise of the good faith of the lenders, and not to be self--serving in saying this, I'm going to prove to you with evidence legally why we did that.  We agreed to language in the proposed sale order that would enable the liens to be released.  In the event it goes to the backup bidder, or in the event it goes to us and the adversary proceeding is resolved.

We went pretty far.  There was a point in this process where we were not willing to do that, and that would've created a lot of challenges for the backup bidder as well as some of the other bidders.  And I would -- I would offer this Court that we've gone far enough to the extent that the HOA assets or even within the jurisdiction of this Court, we don't think that we look forward to dealing with his client, negotiating with them, managing, being co--tenants of the same real property.  We have a long life ahead of ourselves and we know that that has to go well.  But nothing here should implicate that in any way.

THE COURT:  Can I see at least what you're offering or what the parties are offering?  Is there a way I could see where things stand?

MS. METZGER:  Sure.  I mean, we, in the proposed sale order have offered, I believe it's in paragraph 12 of the sale order, that upon -- with respect to the HOA property, that upon a resolution of the adversary proceeding, we -- I'm sorry, it's paragraph -- I'm quoting to the wrong paragraph.

THE COURT:  Paragraph 13?

MS. METZGER:  Yes, 13.  We would agree that upon -- that we would not foreclose at any time, basically until after a final order is entered with respect to the adversary proceeding, we then later agree in that paragraph that once the entry of a final order is in place that we would go ahead and release the liens.  We then also agree, and the Debtors agreed that -- I'm sorry, the Debtors agreed that they would not pursue any avoidance actions with respect to the liens.

And we are willing to agree there that neither nor would the lenders or its assignee, but that's really it.  This order doesn't need to get recorded.  It's part of the public record.  We're willing to agree that we would provide a copy of it to any potential purchaser, but we've gone far enough in releasing what is a property right we currently

have.

We respect all the property rights they have. Their contractual agreements among the parties that may or may not, you know, be enforceable on our client. Those documents speak for themselves. It's not a matter for this Court, and it's a matter for these two parties going forward.

THE COURT: Okay. Thank you.

MS. METZGER: Thank you, Your Honor.

THE COURT: Mr. Warner?

MR. WARNER: Your Honor, I think we're closer than we were two hours ago.

THE COURT: Okay.

MR. WARNER: For what that's worth. And I'm wondering if a few moments of time might make sense if the Court can indulge us. Alternatively, I can tell you where we are or where I think my client is

THE COURT: By a few moments in time, what do you mean by that, Mr. Warner?

MR. WARNER: With counsel.

THE COURT: You mean, we step off for a few minutes?

MR. WARNER: Yes.

THE COURT: How much time do you think you would need?

MR. WARNER: I think it's five minutes because I thought we were making progress before the Court took the bench.

THE COURT: Okay. How about this, at 2:30, I start and I decide something.

MR. WARNER: Fine by me.

THE COURT: All right. That's seven minutes.

MR. WARNER: Seven minutes is perfect.

THE COURT: All righty. Thank you.

MR. WARNER: Thank you.

THE COURT: All righty, Mr. Warner?

MR. WARNER: Your Honor, I'm I guess a bit distressed that I can't say that there's an order to settle at this point.

THE COURT: Okay.

MR. WARNER: There are open issues. Primarily paragraph number 13 of the sale order which I address in my paragraph number 18. And then in my objection and then the two inserts, I want to do the inserts in reverse order. I want to do those first.

THE COURT: All right. Well I can tell you you're not going to get the second one. So why don't we just start with the first.

MR. WARNER: I was about to tell you I will be filing a motion for relief from stay. I expected that you

would say that.  I'll file an expedited motion.  I'd like to get it heard as quickly as possible on the Court's calendar. I'll deal with the Court's clerk, but we'll file a motion for relief to address the recording.

THE COURT:  Okay.  I think it's fair.

MR. WARNER:  As to the filing of the sale order, for the life of me, I can't understand why an order that's on the bankruptcy court's docket can't be also on a court -- on the recorder's docket in Colorado.

THE COURT:  Okay.

MR. WARNER:  So I'd ask that that be included in the sale order.

THE COURT:  Okay.

MR. WARNER:  All right.  Let's get to the substance of paragraph 13, if you will.  I'm going to hand you and Mr. Wallen will, if he can get presenter rights, put on the screen some four or five pages of the --

THE COURT:  Mr. Wallen, there you go.

MR. WARNER:  And I will -- if I may approach.

THE COURT:  Thank you.

MR. WARNER:  I have it in printed out form and I'll give counsel.  It's demonstratives that'll help us demonstrate to you our issues.

MS. METZGER:  Your Honor, we would object to these demonstrative being used at this time.  Counsel had ample

time to provide them to us within advance, and he made no effort to do so.

THE COURT:  I don't even know what it says.  Why -- can we just use the language at 226 what's already in the objection?

MR. WARNER:  Your Honor, we can do it however the Court would like.  I think that I've taken the changes that we proposed to 13 and I have broken them down in sections so that the Court can really just see what we're doing.  If the Court looks at the -- past the title page, paragraph 12 of the -- paragraph 12 of the --

THE COURT:  Here's the initial question.  Who are the assignees of the loans?

MR. WARNER:  Who are the assignees of the loans?  Great question.  Have no idea.  And don't know who could be tomorrow an assignee of the loans.

THE COURT:  But if it says neither the lenders, any as assignee of the loans, nor the purchaser shall foreclose on the HOA assets prior to entry of final order in the adversary.

MR. WARNER:  Your Honor, if you'll let me, I think I can walk you through where this is going.  There's two comments that we've heard from them.  One, we will release liens at the conclusion of the adversary and two, we will not foreclose until after the conclusion of the adversary.

While those are different concepts, that's what they've said and we just sort of call those the axioms.  If you look and go to paragraph -- the first changes we suggest, which is the fourth page of this, we suggest two inserts.  One, neither the lender parties, an assignee of the loans and or the lender's claims, an assignee of the lender's claims -- lender's claims is a defined term in here.

THE COURT:  But who's an assignee of the claims?

MR. WARNER:  We don't know.  And here's the concern.

THE COURT:  I guess what I'm saying is do they exist?

MR. WARNER:  What if they exist tomorrow morning?  What if they exist today?  What if they exist at any time?  And what we've been told by counsel is, hey, we'll give a copy of this sale order to anybody we sell to.  Well, what if they forget?  What if the buyer of the property doesn't know the two axioms or the buyer of the -- or an assignee --

THE COURT:  Hold on a second.  Sorry about that.

MR. WARNER:  No problem.  The assignee of their loans or the lender's claims.  Lender's claims is a defined term in here.  It's right in paragraph 12.  It's anybody who has a lien, a deed of trust, a claim security interest encumbrance.  It's right in paragraph 12.  It's a defined

term.  And so we're sticking it in in paragraph 13 in two places.  And I can't imagine that that's controversial.  And the reason we're sticking it in there, is we want any buyer of whatever the lenders have to know of the two axioms.  The liens will be released after the litigation is over and there'll be no foreclosure until the litigation is over.

So if someone were to come in and to pick up the lender's claims tomorrow morning, and they don't know, this sale order says that, the HOA runs a risk that someone could go ahead and start foreclosure.  Sure, I'll run back to this Court.  Someone will, but now we have to run back.  And if it's a recorded document, everybody knows it exists.  So I don't think there's a problem with these first set of changes.  If the Court will go to our second set of changes.

THE COURT:  Here's what we're going to do.  Here's the order, I've thought about this.  Here's what you're going to get and here's what I'm willing to put in the order.  First change is fine and or the lender's claims.  And without further order of the Court, fine with me.  Debtors and their estates, that's not getting in.  It's the same thing to me.

MR. WARNER:  And can I explain where that comes from?

THE COURT:  No, I know where it comes from, but the Debtor -- Mr. Wolfshohl would be nuts, or Mr. Brickley

would be nuts to start something without me.

MR. WARNER:  Oh, it's not that.

THE COURT:  Or their estates.  They control the estates.

THE COURT:  The CRO controls this or Souki any -- they'd be nuts.  They'd be nuts to start something.

MR. WARNER:  It's a third party seeking standing to pursue a claim.

THE COURT:  I would deny it in a minute.

MR. WARNER:  Thank you.  Needed to hear it.

THE COURT:  Well, the other change -- I'm okay with adding or closing of the sale to the backup bidder. Because that means that there's something else happened in the adversary.  And I'm okay with having Brickley record this.  Somebody can always come in, ask me to remove it. But that's what you're -- that's what everybody's going to get.  If parties are so afraid, I am telling everyone, if anyone who's listening to me should understand, I'm going to try an adversary proceeding.

And if anyone does anything in any way, or if Mr. Brickley gets word that someone is planning something in any way, it is his duty to come to me and make sure that I know.  Because I will shut it down immediately.  Everything is going to remain on ice.  No foreclosures on that property until I decide the adversary.  And I'm doing it on an

expedited basis.  And that's what we're going to do.

MR. WARNER:  Your Honor, we struck the language, and you'll see it in north three-quarters the way down.  The reason it struck, it's completely inconsistent with paragraph 12.  12 says, the liens will be released when the adversary is over.  This 13 language says finding that the Debtors owe money.  There is no condition in 12 to releasing the lien other than the end of the adversary.  This makes a condition that the lenders win.  Therefore we struck it. It's completely inconsistent with paragraph 12.

THE COURT:  Ms. Metzger, what are your thoughts on that?

MR. WARNER:  I'm sorry?

THE COURT:  Ms. -- I was asking Ms. Metzger what her thoughts were.  Hey, I just -- go ahead.

MS. METZGER:  Sure.  Thank you, Your Honor.  I don't think that we have an issue with striking the language in the sentence that begins upon entry of a final order in the adversary proceeding or closing of the sale, the backup bidder, and then striking the findings that that's there.

THE COURT:  That works for me.

MS. METZGER:  That is fine with us.  I do want to just push back for a moment.  This sale order is a public record.  We are -- have even agreed to suggest that we covenant to provide a copy of it to any purchaser there.

The reason just for Your Honor's benefit as to why we are concerned about having it filed is that in the event, you know, the property transfer is later and the title company for some reason doesn't quite understand it. And it creates an issue with clean title that we have to come expend resources to cut --

THE COURT: No, no. And I got it. And to really -- what I'm going to do at the end of the adversary proceeding is have something filed there that cleans up everything that happened before we get to where we are. So if this is there, it's really just keeping something on ice for 60 days and whatever you are going to have -- you're going to have to hold me to it. If you win the adversary, that final order in the adversary proceeding should have language to clean this up and anything else that happens in there.

So it's really clear what you can do. And if you have to release the liens that the liens are released, it will be very -- the final order should just not resolve the disputed. It's going to need to figure out and sort out all the -- everything in connection with the -- or the sale to the backup bidder. Or something's going to be -- have to really clean this issue up between now and the next 60 days. But no one would -- people would be nuts to go try to foreclose right now in light of everything that I've said.

But if somebody tries me, they'll find out.

MS. METZGER:  Your Honor, we appreciate that.
That's why we agreed to this language.

THE COURT:  No.

MS. METZGER:  I just wanted to be clear that the
second paragraph that they requested would not be included.

THE COURT:  Correct.

MS. METZGER:  Okay.  Thank you very much, Your
Honor.

THE COURT:  Correct.  All right.  I'm not sure if
who's got the pen, but that's how we're rolling.  That's
what happens when you come -- when I come back on at 2:30,
we make decisions really fast.

MR. WARNER:  Your Honor, I did not hear how the
Court focused on the insert, which starts, which order shall
not be sought if a sale closes, which was fine by the
Debtor.  I'm okay dropping the lease closer.

THE COURT:  No, no, no.  What I said goes in and
that's it.

MR. WARNER:  Okay.

THE COURT:  That's it.  But -- and I assure you
the intent is there.

MR. WARNER:  Well, I've heard this Court since
it's been this Court.  I know when he says something, what
it means.  I appreciate that.

THE COURT:  I think you're protected because we're going to put something in there and this should trigger anyone, if I put it in the public record, it should trigger that there's something going on.  And that's Mr. Brickley doing that within three business days.  So I guess next Wednesday or so, then that'll get it.  But what I'm asking is that the parties upload something that I can sign today. I'm not sure who's got pen.

MS. METZGER:  Your Honor, I have a hand marked up of it and I can either insert it, get someone on my team to insert it or ask Mr. Powers if he would be so gracious to do so.  So I can get home at some point.

THE COURT:  Let's -- yeah, let's get Powers to do it and he can upload it and you can --

MS. METZGER:  Yeah.

THE COURT:  -- get it.  Sign it on the dock -- we can get him.  Because that way we can get it electronically. And I can just pull it, sign it on the docket, and let folks travel wherever they need to go.

MR. WARNER:  Right.  So, if the Court wants to sit there while we stand over his shoulders and look at the red lining he's going to do, would that make sense?

THE COURT:  You can just -- no, you can just --

MR. POWERS:  You guys both agree what's on the piece of paper.  Just say that.

MR. WARNER:  I want to see it.

MR. POWERS:  Okay.

THE COURT:  Yeah.  No, no, no.  I'm -- I'll just be back there.  If anybody needs me, just text Ms. Saldana and I'll come back out.  If not, then I'll just wait for the parties to upload an order and I'll sign it.  But I'm not going anywhere.  I'm just going back.

MR. POWERS:  Yeah, I can do it from here.

MR. WARNER:  We can just [Indiscernible].

THE COURT:  I'm just going back into chambers if anybody needs me.  Just --

MR. WARNER:  We'll come now.

THE COURT:  Yeah, you'll come now.  You can email Ms. Saldana.  Yes, sir.

MR. WOLFSHOHL:  Your Honor, if we're pausing on that discussion, could we speak for a minute just about trial dates?

THE COURT:  I know that -- what I'm going to tell you is I think Ms. Saldana told me December 11th and 12th or something, or if she gave you the dates they work.  Because she kicked someone else out who asked for the dates or I offered them and she told me that no, that she had you all penciled in for those dates.  So why don't you do -- why don't we start with December 11th and 12th and if it works, then we'll keep it going.

MR. WOLFSHOHL: Your Honor, that's great. And so we have talked about those dates and I think we are in agreement. We do think, correct me if I'm wrong, but I think we're in agreement that this is probably going to be a four--day trial maybe. And at one point we were told that that whole week --

THE COURT: You got the whole -- we got the whole week there. If you need it, I just need to make sure I know that there were some other dates we were probably going to start. So maybe I need to give -- Rosario, maybe we need to give them 11th through the 14th and then the other matter, will get like the 19th and the 20th if they want it.

MR. WOLFSHOHL: That'd be great.

THE COURT: Okay. I will -- if you get a thumbs up from Ms. Saldana it's golden. But I think we can do that. I think we can -- yeah. I tried to offer some dates and she shut me down. So I think y'all should have the 11th through the 14th.

MR. WOLFSHOHL: Okay.

THE COURT: And then we will -- I'll offer but really at that point I am going to ask, maybe it makes sense kind of, right -- I don't want to do it around Thanksgiving, but maybe early December we can just kind of touch base on logistics and just have a kind of a conversation as to kind of where we are, how many witnesses you're -- make sure that

115

the order of the witnesses is going to appear, everybody's okay.

Just in case people need to kind of come in and out if there's going to be agreement on the exhibits and stuff like that, and technology, if anybody wants to take a crack at using the technology and all that stuff to present. Just let us know.  Sometimes people come in all the time and my case manager, my clerks will come out and they'll just turn everything on and I won't be here and people can kind of play with it the day before and that kind of stuff and just get used to it.  Okay?

MR. WOLFSHOHL:  Okay.

THE COURT:  All right folks.  Thank you very much. Have a good weekend.

MR. WARNER:  Thank you.

MR. WOLFSHOHL:  All right.

THE COURT:  All righty.

MR. WOLFSHOHL:  All right.  Judge, I'm going to give you an update, something that we just hadn't really thought about before we let you leave the bench.  I think we've gotten there on the actual language of the order based on what you -- the -- what you told the parties.

We realized that there's some exhibits that we don't have completed and there are exhibits that everybody wants to be able to look at before we upload the order.  So

what we'd ask is that we have an opportunity over the weekend to try to get the exhibits together and make sure everybody's okay with what they're --

THE COURT:  Everybody's okay with it.  I've got no issues.

MR. WOLFSHOHL:  Yeah.  We -- so hopefully we're hoping that we'll be able to upload an order Monday, Tuesday at the latest, but we do want to get it entered as soon as we possibly can.  I just think it's fair to everybody to be able to look at these exhibits just to understand what they are.

THE COURT:  I've got zero issues with that and I appreciate it.  I think that makes perfect sense to me.

MR. WOLFSHOHL:  These are exhibits that like list personal property and things like that.  So that just to, you know --, there are a couple places if you saw in the order where there were blanks and I think in the midst of all of us trying to get the language of the order right we realize, wait, we've got --

THE COURT:  I've got no issues, but let's just see if we can get it done on Monday, just so we don't just lose any momentum on it.

MR. WOLFSHOHL:  Absolutely, Your Honor.

THE COURT:  Okay, perfect.  Thank you very much. You all have a wonderful weekend.

MR. WARNER:  Thank you, Your Honor.

MS. METZGER:  Thank you.  You, too.

MR. WARNER:  You asked me to let you know when.

(Proceeding adjourned at 3:03 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the ZOOM/telephonic proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #67824*

*DATE FILED:  NOVEMBER 7, 2023*