United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 09, 2023

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **STRUDEL HOLDINGS LLC and** | § | **Case No. 23-90757 (CML)** |
| **AVR AH LLC,** | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |
| | § | |

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
OTHER INTERESTS, (B) APPROVING THE PURCHASE AND SALE AGREEMENT,
(C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(D) GRANTING RELATED RELIEF**
(Relates to Doc. No. 5)

This matter is before the Court on the motion (the "***Sale Motion***") filed by the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") for entry of an order (this "***Order***") (a) authorizing and approving the sale (the "***Sale***") of the Property[2] free and clear of all Liens, claims and interests of any kind or nature whatsoever pursuant to that certain Purchase and Sale Agreement (the "***Agreement***"), in substantially the form attached as Exhibit A to this Order, by and among AVR AH, LLC ("***Seller***") and Chiron AVR LLC, a Delaware limited liability company (as assignee of the Loans (as defined in the Agreement) and the Highest and Best Bid and, together with any of its affiliates that are assignees under the Agreement, the "***Purchaser***"); (b) approving the Agreement; (c) authorizing the assumption and assignment of the Assigned

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  AVR AH LLC (0148) and Strudel Holdings LLC (5426).  The Debtors' service address is:  PO Box 4068, Aspen, CO 81612.

[2]     All capitalized terms not otherwise defined herein shall have the meanings ascribed in the Sale Motion or the Agreement, as applicable.

Contracts; (d) approving the bid received from Fleeger Family First LP (the "**Back-Up Bidder**") as the Back-Up Bidder and authorizing the Debtors to close a sale to the Back-Up Bidder pursuant to an agreement in substantially the form attached as <u>Exhibit B</u> to this Order, without further order from this Court, in the event that the Purchaser fails to close; and (e) granting certain related relief; and the Court having entered the *Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* on August 10, 2023 (Doc. No. 53) (the "**Bid Procedures Order**"); and the Debtors having determined, after an extensive marketing process, that the Purchaser has submitted the highest or otherwise best bid for the Property and that the Back-Up Bidder submitted the second highest or otherwise best bid for the Property; and upon adequate and sufficient notice of the hearing before the Court on October 27, 2023 (the "**Sale Hearing**"); and the Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the objections thereto, if any, and (z) the statements of counsel and evidence presented in support of the relief requested by the Debtors at the Sale Hearing; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested is in the best interests of the Debtors, their estates and creditors and other parties-in-interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in these chapter 11 cases, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefor, the Court hereby FINDS AND DETERMINES THAT:[3]

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are

**Jurisdiction, Final Order and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. § 1408.

B.      The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363 and 365 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

**Notice of the Sale**

C.      Notice of the sale of the Debtors' assets and the Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and Sale Hearing.

D.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Sale Hearing, Sale and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assigned Contracts to the Purchaser, was provided in accordance with the orders previously entered by this Court, sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008.  The notices described herein were good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing, Sale or the assumption and assignment of the Assigned Contracts to the Purchaser is or shall be required.

---

incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.      A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the Assigned Contracts to the Purchaser and any Cure Costs related thereto), has been afforded to all interested persons and entities.

**Purchaser Credit Bid Rights**

F.      Pursuant to the *Stipulation and Agreed Order Regarding Motion Seeking Entry of an Order Precluding Certain Alleged Secured Parties From Submitting Credit Bids Pursuant to Sections 105(a) and 363(k) of the Bankruptcy Code* [Docket No. 143] (the "***Stipulation***"), the Debtors and the Lenders (as defined in the Agreement) agreed that the Lender Parties[4] would not exercise any right to credit bid at the Auction provided that the Debtors receive a bona fide third-party bid (that otherwise meets the Qualified Bidder requirements set forth in the Bid Procedures Order) from an entity that is not an insider or affiliate of the Debtors that would result in net cash sales proceeds of not less than $40 million.

G.      The Debtors did not receive a bona fide third-party bid (that met the Qualified Bidder requirements set forth in the Bid Procedures Order) that would result in net cash sales proceeds of not less than $40 million.

H.      The Lender Parties submitted a bid (such bid, the "***Credit Bid***") under section 363(k) of the Bankruptcy Code consistent with the terms of the Stipulation to purchase the Property, and the Credit Bid was a valid, proper, bona fide, and arm's length offer.  The aggregate purchase price to be paid by the Purchaser for the Property by its Credit Bid is $30.5 million (the "***Purchase Price***").

---

[4] "Lender Parties" refers collectively to Wilmington Trust National Association, as administrative agent, Nineteen77 Capital Solution A LP, and Bermudez Mutuari, Ltd.

I.     The Purchaser is the assignee of certain Loans made by the Lenders (as defined in the Agreement) in an amount equal to the Purchase Price (the "*Credit*").

**Good Faith Purchaser**

J.     This Order was negotiated and proposed by the Seller and the Purchaser without collusion, in good faith and from arms'-length bargaining positions.  The Agreement was negotiated, proposed and entered into by the Seller and the Purchaser without collusion, in good faith and from arms'-length bargaining positions.

K.     The Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code.  Upon the record at the Sale Hearing, the Court finds that the Purchaser has not acted in a collusive manner with any person, and the Purchase Price was not controlled by any agreement among the bidders and that there was no evidence presented at the hearing that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code; provided, however, that the findings in this paragraph shall be subject to paragraph 46.

L.     The Purchaser participated in the Auction in good faith and is a good faith buyer for purposes of section 363(m) of the Bankruptcy Code. The Purchaser (i) subjected its bids to the competitive bidding procedures set forth in the Bid Procedures Order and at the Auction; and (ii) disclosed all payments to be made by the Purchaser in connection with the Sale. Upon the record at the Sale Hearing, the Court finds that the Purchaser and the Lender Parties proceeded in good faith in connection with all material aspects of the Sale.  Accordingly, the Purchaser is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code; provided, however, that any finding of good faith in this Order shall be subject to paragraph 46.

**Winning Bid and Back-Up Bid**

M.      The Purchaser submitted the highest and best offer for the Property.  In accordance with the Bid Procedures Order, as amended by the Second Notice of Amended Bid Deadlines (Doc. No. 145), potential bidders were afforded a reasonable opportunity to submit bids by September 29, 2023.  In accordance with the terms of the Bid Procedures Order, the Debtors received two Qualified Bids and the Lender Parties Credit Bid.  Accordingly, the Debtors conducted the Auction on October 4, 2023.

N.      At the conclusion of the Auction, the Debtors designated the Credit Bid from the Purchaser as Highest and Best Bid pursuant to the Bid Procedures Order.  No other entity or group of entities offered to purchase the Property on higher and better terms to the Debtors' estates than the Purchaser at the auction.

O.      On October 16, 2023, the Back-Up Bidder submitted a bid to the Debtors increasing its purchase price to $30 million.  On October 18, 2023, the Purchaser submitted a bid to the Debtors increasing its purchase price to $30.5 million.  The Debtors' determined that the Purchaser's revised bid is the Highest and Best Bid.  The Debtors' determination that the Agreement constitutes the highest and best offer for the Property is a good, valid and sound exercise of the Debtors' business judgment.

P.      The Debtors designated the bid from the Back-Up Bidder as the Back-Up Bid pursuant to the Bid Procedures Order.  Except for the Purchaser, no other entity or group of entities offered to purchase the Property on higher and better terms to the Debtors' estates than the Back-Up Bidder at the auction.  The Debtors' designation of the Back-Up Bidder is a good, valid and sound exercise of the Debtors' business judgment.

**No Fraudulent Transfer**

Q.      The consideration provided by the Purchaser pursuant to the Agreement (i) is the highest or otherwise best offer for the Property, (ii) will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, and (iii) constitutes fair consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code and any other similar statute or common law rule) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Debtors' determination that the Agreement constitutes the highest or otherwise best offer for the Property constitutes a valid and sound exercise of the Debtors' business judgment.  Approval of the Sale Motion and the Agreement, and the consummation of the transactions contemplated thereby and by this Order, is in the best interests of the Debtors, their estates, creditors and other parties-in-interest.

R.      The Purchaser is not a mere continuation of any of the Debtors or their estates and there is no continuity of enterprise between the Purchaser and any of the Debtors.  The Purchaser is not holding itself out to the public as a continuation of any of the Debtors.  The Purchaser is not a successor to any of the Debtors or their estates and the Sale does not amount to a consolidation, merger or de facto merger of Purchaser and any of the Debtors.

**Validity of Transfer**

S.      The Debtors have (i) full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Agreement and (iii) taken all corporate and partnership action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary

corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtors to consummate the Sale, Agreement or transactions contemplated thereby.  The sole member of the Seller has approved the Sale and the Agreement.

T.    The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor the Purchaser are fraudulently entering into the transaction contemplated by the Agreement.

U.    The Debtors have good and marketable title to the Property and are lawful owners of the Property.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Property to the Purchaser will be, as of the Closing Date (as defined below), a legal, valid and effective transfer of the Property, which transfer vests or will vest the Purchaser with all right, title, and interest of the Seller to the Property free and clear of (i) all liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims, encumbrances, and interests (including any right of first offer or refusal regarding or option to purchase any real property) relating to, accruing or arising any time prior to the Closing Date (collectively, the "*Liens*") and (ii) all debts arising under, relating to or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (defined below) and Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, the Debtors'

or the Purchaser's interests in the Property, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), "*Claims*"), relating to, accruing or arising any time prior to the Closing Date, except as expressly provided in this Order or the Agreement.

### Section 363(f) Is Satisfied

V.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Property free and clear of any Liens, Claims, and/or interests in the Property.

W.      The Debtors may sell the Property free and clear of all Liens, Claims and other interests of any kind or nature whatsoever against the Debtors, their estates or any of the Property (except as otherwise provided in this Order or the Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens or Claims against the Debtors, their estates or any of the Property who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

### Compelling Circumstances for an Immediate Sale

X.      Good and sufficient reasons for approval of the Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.  The Debtors have demonstrated (i) good, sufficient and sound business purposes and justifications for approving the Agreement and (ii) compelling circumstances for the Sale outside of the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code.

Y.     Given all of the circumstances of these chapter 11 cases, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

Z.     The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

AA.    The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 thereof.

### Adequate Assurance of Future Performance

BB.    The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### General Provisions

1.     The relief requested in the Sale Motion, including the Sale, is granted and approved to the extent and as set forth in this Order.

2.     Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled by announcement to the Court during the Sale Hearing, the provisions of this Order, or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise (except the reservations of right and objections expressly preserved in this Order), are hereby denied and overruled with prejudice.  Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented

pursuant to section 363(f)(2) of the Bankruptcy Code to the Sale of the Property in accordance with the terms of this Order.

**Approval of the Agreement**

3.      The Agreement as modified by this Order and all of the terms and conditions thereof are hereby approved.

4.      Subject to paragraph 46, the sale of the Property and the consideration provided by the Purchaser under the Agreement as determined by the Auction shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, (ii) close the Sale as contemplated in the Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the Agreement, including the assumption and assignment of the Assigned Contracts to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other Sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

6.      This Order shall be binding in all respects upon (a) the Debtors, (b) their estates, (c) all creditors of, and holders of equity interests in, the Debtors, (d) all holders of Liens, Claims or other interests (whether known or unknown) in, against or on all or any portion of the Property,

(e) the Purchaser and all successors and assigns of the Purchaser, (f) the Property and (g) any trustees, if any, subsequently appointed in the Debtors' chapter 11 cases or upon a conversion of these cases to cases under chapter 7 under the Bankruptcy Code.  This Order and the Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser and the respective successors and assigns of each of the foregoing.  The findings with respect to the Purchaser shall be deemed findings with respect to the Lender Parties and the findings with respect to the Lender Parties shall be deemed findings with respect to the Purchaser.

## Approval of the Back-Up Bidder

7.     In the event Purchaser fails to close the sale on or before November 22, 2023, the Debtors shall, in accordance with the terms of the Agreement and in this Order, to terminate the Agreement, retain the Deposit (as defined in the Agreement and on the terms set forth in paragraph 2(d) of the Agreement), and shall accept the bid of the Back-up Bidder and proceed to close a sale based on the terms of the Purchase and Sale Agreement with the Back-up Bidder dated October 24, 2023.  The Debtors shall file a notice with the Court, no later than November 23, 2023, that they intend to close a sale to the Back-Up-Bidder.  The Debtors shall close a sale to the Back-Up Bidder without further order from this Court, the Back-Up Bidder shall automatically be entitled to all rights and protections of the Purchaser under the terms of this Order and all findings of fact contained herein shall apply to the Back-Up Bidder to the same extent as set forth regarding the Purchaser in the event that the Purchaser fails to Close on or before November 23, 2023.  However, the Back-Up Bidder shall be released from any obligations under this Order or the Bid Procedures order as of November 30, 2023, and the Debtor shall return the Back-Up Bidder's deposit by December 2, 2023, provided, however, that the Back-Up Bidder may, in its sole discretion, extend the November 30, 2023 date one or more times, by written notice to the Debtors, prior to the

expiration of the then-current termination date, in which event the December 2, 2023 date shall be likewise extended for a period of four (4) calendar days from the then-current extended date established by the Back-Up Bidder.

### Transfer of the Assets

8.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Property to the Purchaser on the Closing Date upon satisfaction and fulfillment or waiver of the conditions to Closing contained in the Agreement, and such transfer shall (a) constitute a legal, valid, binding and effective transfer of the Property, (b) vest the Purchaser with title to the Property and (c) upon the Debtors' receipt of the Purchase Price by credit to reduce the Loans, be free and clear of all Liens, Claims and other interests of any kind or nature whatsoever (other than as provided in this Order or the Agreement), including but not limited to, successor or successor-in-interest liability and Claims, with such Liens, including mechanics, materialmen and subcontractor Liens and rights to receive payment of trust funds, Claims and other interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Property.  Notwithstanding anything to the contrary in this Order or the Agreement, the "**Closing Date**" shall occur no later than November 22, 2023.

9.      At the Closing the Lender Parties shall provide, at their election, either (a) a surety bond in the amount of the Purchase Price or (b) an amount in cash equal to the Purchase Price (less the Deposit) to be held in an interest-bearing account by the Title Company, in the case of either (a) or (b), to secure the extent of any obligations of Purchaser and/or the Lender Parties, as applicable, to Debtor to pay all or a portion of the Purchase Price in cash, in the event that a court of competent jurisdiction determines by Final Order (as defined in the Agreement) in the

Adversary Proceeding[5] commenced by the Debtors and the Other Plaintiffs[6] or in any other proceeding in a court of competent jurisdiction adjudicating the Lender Parties' claims with respect to the Obligations (as defined in the Loan Agreements), that the amount due by Debtor and the Other Plaintiffs to the Lender Parties and/or Purchaser (as applicable) on account of the Lender Parties' claims with respect to the Obligations (as defined in the Loan Agreements) is less than the Purchase Price.  For the avoidance of doubt, the security provided by the Purchaser and the Lender Parties to the Debtors and the Other Plaintiffs pursuant to this paragraph and the Agreement shall only be available to the Debtors and the Other Plaintiffs to the extent a court of competent jurisdiction disallows the Lender Parties' claims and liens or finds by Final Order that the Lender Parties and/or the Purchaser do not have a valid first priority lien and claim in an amount equal to the Purchase Price, and only to the extent of the difference between (x) the Purchase Price and (y) the amount of the Lender Parties and/or Purchaser's allowed  first priority lien and claim against the Property as determined by the Final Order.

10.     In the event that the Closing Date has not occurred in accordance with the Agreement (for reasons other than Debtors' breach of the Agreement), the Debtors shall provide a written notice to the Purchaser of a termination of the Agreement on November 23, 2023, and shall concurrently provide notice to the Back-Up Bidder to close the Back-Up Bidder Agreement by November 30, 2023, should the Back-Up Bidder Agreement still be valid in accordance with paragraph 7, above.

---

[5] "Adversary Proceeding" means in *AVR AH LLC et al. v. Nineteen77 Capital Solutions A LP, et al.*, Adv. Pro. No. 23-9003 (the "Adversary Proceeding").

11.     Upon the Closing (as defined in the Agreement), the Purchaser shall take title to and possession of the Property subject only to the Assumed Liabilities, if any, and any interests expressly provided for in this Order.

12.     Upon either (i) entry of a Final Order in the Adversary Proceeding or (ii) the closing shall occur with the Back-Up Bidder, only after termination of the Agreement with the Purchaser (in accordance with the terms of the Agreement), any and all liens, deeds of trust, claims, security interests, encumbrances and interests of any kind and nature (collectively, the "**Lenders' Claims**"), held by the Lender Parties or assignees of the Loans (as defined in the Agreement), are unconditionally released and extinguished with respect to the HOA Assets, which are:

a.  HOA Real Property: All of Seller's and all of Aspen Valley Ranch Homeowners' Association, Inc.'s (the "**HOA**") right, title, and interest in and to the land legally described on Exhibit C attached hereto, together with all easements, licenses, crossing permits, appurtenances and other rights, privileges and benefits appurtenant thereto and any land lying in the bed of any street, road, avenue, open or proposed, public or private, in front of or adjoining the said land or any portion thereof, to the center line thereof (collectively, the "**HOA Land**"), all residential and non-residential improvements thereon (including without limitation any water and sewage facilities and underground conduits located on the HOA Land and owned by Seller) (collectively, the "**HOA Improvements**"), and all oil, gas and other minerals and all oil, gas and other mineral rights.  The HOA Land and, the HOA Improvements are collectively referred to as the "**HOA Real Property**";

b.  HOA Intangible Property:  All of Seller's and all of the HOA's right, title, and interest in and to all design and other professional contracts pertaining to the design or construction of the HOA Improvements or any proposed improvements for the HOA Real Property and

all service and other contracts in effect as of August 20, 2021, relating to the HOA Real Property, hereto assignable permits, site plans, certificates of occupancy, transferrable development rights, development rights, plans and entitlements, and other public approvals if and to the extent related to the HOA Real Property, if any (the "**HOA Intangible Property**"); and

c.   HOA Personal Property. All of Seller's and all of the HOA's right, title, and interest in and to all furniture, furnishings, and appliances located in any residences or structures on the Property, fitness equipment, kitchen appliances and equipment, games of amusement, recreational vehicles, motorcycles, automobiles, tractors, wagons, snowmobiles, trailers, irrigation equipment, haying equipment, farming equipment, tools, supplies, machinery, apparatus  and other equipment used in the use, operation, enjoyment, management, repair and maintenance of the HOA Land and the HOA Improvements, and all other personal property owned by Seller and on the HOA Real Property as of August 20, 2021, as more fully detailed in Exhibit D, hereto (the "**HOA Personal Property**").

d.   Collectively, the HOA Real Property, the HOA Intangible Property and the HOA Personal Property are referred to herein as the "**HOA Assets**").

13.    Neither the Lenders Parties, any assignees of the Loans and/or the Lenders' Claims, nor the Purchaser shall foreclose on the HOA Assets prior to entry of a Final Order in the Adversary Proceeding, and with further order of the Court.  The Debtors shall not commence any avoidance action or adversary proceeding against the HOA or the HOA Assets without the prior written consent of the Lender Parties and entry of an Order by this Court.  Upon entry of a Final Order in the Adversary Proceeding or a Closing of the sale to the Back-Up Bidder, any and all claims, liens, or interest of any kind and nature held by the Lender Parties, assignees of the Loans and/or the

Lenders' Claims, or the Purchaser with respect to the HOA Assets, are unconditionally released and extinguished with respect to the HOA Assets. The Lender Parties can elect to release the Lenders' Claims on the HOA Assets at any time in their sole and absolute discretion.

14.     For the avoidance of doubt, neither the Property nor the HOA Assets shall include any personal property located in or on Aspen Valley Ranch Homestead 5 including, without limitation, all furniture and art, and any other personal property, including without limitation, furniture and art, located or stored elsewhere and labeled as "H5 Personal Property."

15.     Except with respect to Assumed Liabilities, if any, and any interests expressly provided for in this Order, all persons and entities that are in possession of some or all of the Property on the Closing Date are directed to surrender possession of such Property to the Purchaser or its assignee at the Closing. The provisions of this Order authorizing the sale of the Property free and clear of Liens, Claims and other interests of any kind or nature whatsoever (other than the Assumed Liabilities and any interests expressly provided for in this Order) shall be self-executing, and neither the Debtors, the Lender Parties, nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

16.     The Debtors are hereby authorized to take any and all actions necessary to consummate the Agreement, including any actions that otherwise would require further approval by members or managers, as the case may be, without the need of obtaining such approvals.

17.     After the Closing has occurred in accordance with the Agreement and this Order, a certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record except with respect to Assumed Liabilities or any interests expressly provided for in this Order.

18.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Property (other than statements or documents with respect to any Assumed Liabilities or interests expressly provided for in this Order) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all Liens or interests which the person or entity has or may assert with respect to all or any portion of the Property, the Debtors are hereby authorized and directed, and the Purchaser and Lender Parties are hereby authorized, on behalf of the Debtors and each of the Debtors' creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Property after the Closing has occurred in accordance with the Agreement and this Order.

19.     On the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order), this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Seller's interests in the Property.  This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims and other interest of any kind or nature whatsoever existing as to the Property prior to the Closing Date, including without limitation any hypothecation, encumbrance, liability, Lien, Claim, Interest, security interest, security agreement, interest, mortgage, pledge, restriction, covenant, charge, license, preference, reclamation claim, cause of action, suit, contract, right of first refusal, offset and recoupment (except as specifically excepted in this Order) alter-ego, transferee or successor liability claims, tax (including federal, state and local tax), Governmental Order of any kind or nature, conditional sale or other title retention agreement or lease having

substantially the same effect as any of the foregoing, assignment or deposit arrangement in the nature of a security device, whether secured, unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, perfected or unperfected, allowed or disallowed, matured or unmatured, disputed or undisputed, material or immaterial, known or unknown (referred collectively, whether having arisen, been incurred or accrued prepetition or postpetition, whether imposed by agreement, understanding, law, equity or otherwise, as "***Encumbrances***") pursuant to Section 363(f) of the Bankruptcy Code, other than Assumed Liabilities or as otherwise provided in this Order or the Agreement, shall have been unconditionally released, discharged and terminated as against the Property, and that the conveyances described herein have been effected.  This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

20.    To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any (i) federal, state, or local governmental or regulatory license, permit, registration, and (ii) governmental authorization or approval of the Debtors with respect to the Property, and all such licenses, permits, registrations and governmental

authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

21.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Property sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the transactions contemplated by the Agreement.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

22.     Notwithstanding anything contained in this Order or the Agreement to the contrary, nothing in this Order or the Agreement releases Purchaser from compliance with any applicable license, permit, registration, authorization, or approval of or with respect to a governmental unit as though such sale took place outside of bankruptcy.  Purchaser shall continue to honor and comply with the terms and requirements of any such applicable license, permit, registration, authorization or approval.

### Prohibition of Actions Against the Purchaser

23.     Except for the Assumed Liabilities, if any, or as otherwise expressly provided for in this Order or the Agreement, the Purchaser shall not have any liability or other obligation of any of the Debtors arising under or related to any of the Property, and the Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates under any theory of law or equity.  Solely with respect to the Property and without limiting the claims asserted against the Lender Parties in the Adversary Proceeding, neither the Purchaser nor the Lender Parties shall have any liability or obligation to

the Debtors or their estates or any other person to provide any additional value, consideration or credit against the Loans other than the Purchase Price.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Agreement, the Purchaser shall not be liable for any Claims against any of the Debtors or any of their respective predecessors or affiliates, and the Purchaser shall have no successor, transferee or vicarious liabilities of any kind or character.

24.     Effective as of the Closing Date and except for the Assumed Liabilities or as otherwise expressly provided for in this Order or the Agreement, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims or other interests of any kind or nature whatsoever against or in all or any portion of the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to any of the Debtors, the Property, the operation of any of the Debtors' businesses prior to the Closing Date or the transfer of the Property to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser, any of its affiliates, any of the foregoing's successors, assigns, assets or properties or the Property, such persons' or entities' Liens, Claims or interests in and to the Property, including, without limitation, the following actions:  (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, assets or properties; (c) creating, perfecting or enforcing any

Lien or other Claim against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, assets or properties; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, any of its affiliates or any of the foregoing's successors or assigns; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order, other orders of the Court or the Agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Property or conduct any of the businesses operated with the Property.

25.     On the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order), or as soon as possible thereafter, each creditor is authorized and directed, and the Purchaser and Lender Parties are hereby authorized, on behalf of each of the Debtors' creditors, to execute such documents and take all other actions as may be necessary to release Liens, Claims and other interests in or on the Property (except Assumed Liabilities or as otherwise provided in this Order), if any, as provided for herein, as such Liens, Claims and interests may have been recorded or may otherwise exist.

26.     The Debtors are authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.  The execution of any such document or

the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the applicable business corporation, trust and other laws of the applicable governmental units, including for the change of the Debtors' corporate names, with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

27.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of any of the Debtors to sell and transfer the Property to the Purchaser in accordance with the terms of the Agreement and this Order.  The transfer of the Property under the Agreement for the Purchase Price may not be avoided under any theory of avoidance or fraudulent transfer or under section 363(n) of the Bankruptcy Code.

28.    After the Closing has occurred in accordance with the Agreement and this Order, the Purchaser will have given substantial consideration under the Agreement for the benefit of the Debtors, their estates and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens as against the Property pursuant to the Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against, interests in or Claims against any of the Debtors or any of the Property other than holders of Liens or Claims relating to Assumed Liabilities or as otherwise provided in this Order.

29.    After the Closing has occurred in accordance with the Agreement and this Order, the Purchaser, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on

behalf of and for the benefit of the Purchaser, its successors and assigns, for any purpose as provided in the Agreement as amended by this Order, including for the following purposes:  to demand and receive any and all of the Property and to give receipts and releases for and in respect of the Property, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Property, and to do all acts and things with respect to the Property which the Purchaser, its successors and assigns, shall deem desirable.  The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

30.     Without limiting the generality of the foregoing, except as otherwise expressly provided in the Agreement or this Order, neither the Purchaser nor any Lender Party, shall be liable for any claims against or in the Property or against the Debtors or any affiliates of the Debtors, and the Purchaser and the Lender Parties shall have no successor, transferee, derivative, or vicarious liabilities of any kind or character, whether known or unknown as of the date of this Order, then existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Debtors or any affiliate of the Debtors or any obligations of the Debtors or any affiliate of the Debtors relating to the Property arising prior to the Closing Date, including, but not limited to (a) environmental liabilities, debts, claims, or obligations arising from conditions first existing on or prior to the closing of the Sale (including, without limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*; (b) any liabilities, debts, or obligations of or required to be paid by any Debtor for any taxes of any kind for any period; and

(c) any liabilities, debts, commitments, or obligations for any taxes relating to the operation of Property prior to the Closing Date.

**Assumption and Assignment of Assigned Contracts**

31.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the applicable Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Agreement as modified by this Order, of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

32.     The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date, the Assigned Contracts free and clear of all Claims, Liens or other interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

33.     The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Purchaser.

34.     All defaults or other obligations of any of the Debtors under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be

cured pursuant to the terms of the Agreement on the Closing Date or as soon thereafter as reasonably practicable.

35.     With respect to objections to any Cure Amounts or to Purchaser's adequate assurance of future performance that remain unresolved as of the Sale Hearing, such objections shall be resolved by a future Court hearing to be set at the request of the Debtors, the Purchaser and/or the respective counterparty, provided that, the Purchaser may remove any Assigned Contract in its sole discretion at any time prior to the Closing, or if the Cure Amount or objections to Purchaser's adequate assurance of future performance has not been determined by the Court prior to the Closing and the objection of any counterparty to such Assigned Contract has pending an unresolved objection to the assumption and assignment of such Assigned Contract at the time of Closing, the Purchaser may at its option proceed to seek the Court's determination of the assumption and assignment of such Assigned Contract or remove such Contract as an Assigned Contract.

36.     Nothing in this Order, the Sale Motion or in any notice or any other document is or shall be deemed an admission by the Debtors that any contract is an executory contract and/or unexpired lease or must be assumed and assigned pursuant to the Agreement or in order to consummate the Sale.

37.     The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such term(s) or condition(s) or of the Debtors' and Purchaser's rights to enforce every term and condition of such Assigned Contract.

38.     All parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, Claim, pecuniary loss or condition to assignment arising under or related to the Assigned Contracts existing as of the

Closing Date or arising by reason of the Closing, except for any cure amounts or as otherwise provided in this Order.

**Other Provisions**

39.     This Order and the Agreement shall be binding in all respects upon all creditors and equity-holders of any of the Debtors, all non-debtor parties to the Assigned Contracts, all successors and assigns of the Debtors and any of their respective affiliates and subsidiaries and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy cases or upon a conversion of such cases to cases under chapter 7 of the Bankruptcy Code in accordance with the Bankruptcy Code and other applicable law.  The Agreement shall not be subject to rejection or avoidance under any circumstances.

40.     The Agreement may be modified, amended, or supplemented by the parties thereto in a writing signed by the parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is consistent with the terms of this Order.

41.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Agreement, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, including, but not limited to, any bulk sales or similar law, successor or transferee liability, antitrust law, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter raised, which may be asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors, or any of their predecessors or affiliates or any obligations of the Debtors or their predecessors or affiliates arising prior to the Closing Date, for any liabilities, debts, commitments or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise) in any way whatsoever relating to

or arising from the Property or the Debtors' operation of their businesses or use of the Property on or prior to the Closing Date.

42.      Nothing in this Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order, and the Purchaser reserves all rights and defenses other than asserting that it is free of such liability on account of this Order with respect to any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.

43.      The transactions contemplated by the Agreement are undertaken by the Purchaser and the Lender Parties without collusion, in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

44.      Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, including any motion to dismiss these chapter 11 cases, (b) any subsequent chapter 7 cases into which these chapter 11 cases may be converted or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Agreement (as modified by this Order).

45.      The failure to specifically include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the

Court that the Agreement be authorized and approved in its entirety; *provided*, *however*, that this Order shall govern if there is any inconsistency between the Agreement and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent.

46.     Notwithstanding anything in this Order or the Agreement, including, without limitation, any findings related to the good faith of the Lender Parties and the Purchaser with respect to the Auction, all of the claims, defenses, and rights of the Debtors, the Other Plaintiffs, the Lender Parties, and the Purchaser with respect to the Adversary Proceeding, any other motions or proceedings in this Court, any other proceedings (including, without limitation, and proceedings in New York State Court or the United States District Court for the Southern District of New York), and the calculation of damages and/or other remedies with respect to any of the foregoing are expressly reserved and preserved, and nothing in this Order shall impact or alter any such rights or claims.

47.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by any Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Property to the Purchaser, (b) interpret, implement and enforce the provisions of this Order, (c) protect the Purchaser against any Liens, Claims or other interest in or against any of the Debtors or the Property of any kind or nature whatsoever and (d) enter any orders under section 363 or 365 of the Bankruptcy Code with respect to the Assigned Contracts. Nothing contained herein shall be deemed a waiver of any right by the Lender Parties to move to dismiss the Debtors' Chapter 11

Cases or a consent to jurisdiction of this Court with respect to the Adversary Proceeding or any claims asserted by the Lender Parties or the Purchaser with regards to or in connection with any other claim or matter.

48.    Any amounts payable by any of the Debtors under the Agreement, the Bid Procedures Order or any of the documents delivered by any of the Debtors in connection with the Agreement or the Bid Procedures Order shall be paid in the manner provided in the Agreement or the Bid Procedures Order, without further order of this Court, shall be allowed administrative claims in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided in the Bid Procedures Order, and shall not be discharged, modified or otherwise affected by any reorganization plan for any of the Debtors, except by an express written agreement of the Purchaser or its successors or assigns.  For purposes of clarification, this Order authorizes payment of claims by the Debtors only as expressly set forth in this Order, under the Agreement, or under the Bid Procedures Order.

49.    No later than three (3) business days following entry of this Order, the Debtors' Chief Restructuring Officer, Douglas J. Brickley, shall cause this Order to be recorded, with (i) the Recorder of Pitkin County, Colorado, and (ii) the Colorado Secretary of State, who shall accept such recordings, as against the HOA Assets, as applicable.

50.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

51.    This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, 9014 or otherwise.  The Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Order in accordance with and subject in all respects to the terms and conditions of the Agreement.

52.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in these chapter 11 cases, the terms of this Order shall govern.

Signed:  November 09, 2023

Christopher Lopez
United States Bankruptcy Judge

**EXHIBIT A**

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT is made and entered into as of this 24th day of October, 2023 (the "**Effective Date**"), by and between **CHIRON AVR LLC**, a Delaware limited liability company ("**Buyer**"), and **AVR AH LLC**, a Colorado limited liability company ("**Seller**").

In Consideration of the respective agreements hereinafter set forth, Seller and Buyer hereby agree as follows:

1.   Purchase and Sale.

Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, on the terms and conditions set forth in this Agreement, the Property.  As used herein, the term the "**Property**" shall mean, collectively:  (a) those certain parcels of land located in Pitkin County, Colorado, and containing approximately 282.31 acres of land and more particularly described on **Exhibit A** attached hereto (the "**Land**"), together with all of Seller's right, title and interest in all rights, easements and interests appurtenant thereto including, but not limited to, any streets or other public ways adjacent to the Land and any development rights, water or mineral rights owned by, or leased to, Seller, and including without limitation any water and sewage facilities and underground conduits located on the Land and owned by Seller, and all oil, gas and other mineral rights; (b) all improvements located on the Land, including, but not limited to, three homes located on the Land (the "**Buildings**"), and all other structures, systems, and utilities associated with, and utilized by Seller in the ownership and operation of the Buildings (all such improvements, together with the Buildings, being referred to herein as the "**Improvements**"), (c) all personal property owned by Seller, located on or in the Land or Improvements and used in connection with the operation and maintenance of the Property, including furniture, furnishings, and appliances located in any residences or structures on the Property, fitness equipment, kitchen appliances and equipment, games of amusement, recreational vehicles, motorcycles, automobiles, tractors, wagons, snowmobiles, trailers, irrigation equipment, haying equipment, farming equipment, tools, supplies, machinery, apparatus  and other equipment used in the use, operation, enjoyment, management, repair and maintenance of the Land and the Improvements, and all other personal property owned by Seller and on the Property (the "**Personal Property**"), including, without limitation, any personal property listed on **Exhibit B** attached hereto; (d) all buildings materials, supplies, hardware, carpeting and other inventory located on or in the Land or Improvements and maintained in connection with Seller's ownership and operation of the Property (the "**Inventory**"); (e) all design and other professional contracts pertaining to the design or construction of the Improvements or any proposed improvements for the Land and all service and other contracts in effect as of the Effective Date relating to the Property, assignable permits, site plans, certificates of occupancy, transferrable development rights, development rights, plans and entitlements, and other public approvals if and to the extent related to the Land, all trademarks, trade-names, permits, approvals, and entitlements and other intangible property used in connection with the foregoing, including, without limitation, all of Seller's right, title and interest in any and all warranties and guaranties relating to the Property (the "**Intangible Personal Property**"); (f) Seller's interest in all leases, licenses and other agreements to occupy all or any portion of the Property, if any, that are in effect on the Effective Date (defined above)

(the "**Leases**"); (g) all of Seller's rights as the "Declarant" under that certain Amended and Restated Declaration of Protective Covenants for Aspen Valley Ranch dated August 20, 2021 and recorded August 20, 2021 as Reception No. 679690, Pitkin County, Colorado (the "**Declaration**"), (h) all water and water rights, ditches and ditch rights (including certificated ditch rights), reservoirs and reservoir rights, streams and stream rights, water wells and well rights, whether tributary, non-tributary or not non-tributary, including, but not limited to all right, title and interest under C.R.S. §37-90-137 on, underlying, appurtenant to or now or historically used on or in connection with the Property described in Exhibit A, whether appropriated, conditionally appropriated or unappropriated, and whether adjudicated or un-adjudicated, including, without limitation, all State Engineer filings, well registration statements, well permits, decrees and pending water court applications, if any, and all water well equipment or other personalty or fixtures currently used for the supply, diversion, storage, treatment or distribution of water on or in connection with the Property, and all water and ditch stock relating thereto, including, without limitation all rights (if any are owned by Seller) referenced in that certain Memorandum dated May 22, 2020 from Kevin Patrick of the Patrick, Miller, Noto law firm in Aspen, CO to Seller, a copy of which has been provided to Buyer (collectively, the "**Subject Water Rights**"); and (i) all rights, title, and interest in and to all oil and gas and oil and gas rights and mineral and mineral rights on, under, or appurtenant to the Property ("**O&G/Mineral Rights**"). The Land and Improvements are generally known as (1) Aspen Valley Ranch Homesteads 2, 3, 5, 6 and 7; and (2) Aspen Valley Downs Lots 7, 8, and 9. Notwithstanding anything to the contrary contained in this definition of "Property", all physical personal property located in or on Aspen Valley Ranch Homestead 5 including, without limitation, all furniture and art, and any other personal property, including without limitation, furniture and art, stored elsewhere on the Property which is not owned by the Seller, Borrower, or any of their affiliates, and labelled as "**H5 Personal Property**" is excluded from the definition of Personal Property.

On the terms and subject to the conditions set forth herein and in the Sale Order (defined below), effective as of the Closing, Buyer shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably convey, transfer, and assign to Buyer, only the liabilities arising out of Buyer's ownership or operation of the Property solely to the extent arising from periods occurring after the Closing and only to the extent not otherwise paid, performed, discharged or otherwise satisfied prior to the Closing. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of, or action against, Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, in each case, that are not expressly assumed pursuant to the previous sentence (all such liabilities not being assumed by Buyer, the "**Excluded Liabilities**"), and Seller shall pay, perform, discharge, or otherwise satisfy in accordance with their respective terms all such Excluded Liabilities.

4161-7209-9915

2.	Purchase Price.

(a)	The purchase price of the Property shall be Thirty Million Five Hundred Thousand Dollars ($30,500,000) (the "**Purchase Price**").  The Purchase Price shall be credited to Seller at Closing in the manner set forth in Paragraph 2(b) below.

(b)	The Purchase Price shall be paid as follows: Nineteen77 Capital Solutions A LP and Bermudez Mutuari Ltd. (each, a "**Lender**" and, collectively, the "**Lenders**"), each an affiliate of Buyer, are the holder of loans in favor of Seller with an outstanding balance due and payable in excess of the Purchase Price (the "**Loans**").  Immediately prior to the Closing Date, the Administrative Agent on behalf of the Lenders shall assign, and the Buyer shall assume, an amount of the Loans equal to the Purchase Price and all rights of the Administrative Agent and the Lenders related to the Property and the Administrative Agent's Lien on the Property, including, without limitation, such rights pursuant to that certain Assignment of Rights Under Declaration, dated as of August 20, 2021, and recorded in the official records of Pitkin County, Colorado, as Reception No. 679708.  The consideration for the sale of the Property pursuant to this Agreement shall be a credit in the amount of the Purchase Price (the "**Credit**"), as adjusted based on the prorations to be made hereunder, given by Buyer in satisfaction of a portion of the Loan in the amount of the Purchase Price.  In the event the sale of the Property as contemplated hereunder is consummated, the Purchase Price shall be credited to Seller at the closing of the purchase and sale contemplated hereunder (the "**Closing**") and the lien on the Property in favor of the Administrative Agent (as defined below), for the benefit of the Lenders, shall be concurrently released.

(c)	The Loans were made by the Lenders and are currently outstanding under (a) that certain Loan Agreement, dated as of April 27, 2017 (as amended, restated, supplemented or otherwise modified and in effect as of the date hereof, the "**2017 Loan Agreement**") among Charif Souki ("**Souki**"), as borrower, certain affiliates of Souki (including Seller), as guarantors, the Lenders party thereto and Wilmington Trust, National Association, as administrative agent (in such capacity, the "**Administrative Agent**") and (b) that certain Loan Agreement, dated as of March 30, 2018 (as amended, restated, supplemented or otherwise modified and in effect as of the date hereof, the "**2018 Loan Agreement**" and, together with the 2017 Loan Agreement, collectively the "**Loan Agreements**") among Souki, as borrower, the guarantors (including Seller) party thereto, the Lenders party thereto and the Administrative Agent.  The Credit shall be applied, *first*, to reduce the "Obligations" as defined in and outstanding under the 2017 Loan Agreement, until such amounts are deemed to have been repaid in full.  Any remaining Credit amounts will thereafter be applied to reduce the "Obligations" as defined in and outstanding under the 2018 Loan Agreement.

(d)	Prior to or upon the execution and delivery hereof by Buyer and Seller, Buyer shall deposit with Title Company an amount equal to Five Hundred Thousand Dollars ($500,000.00) (together with any interest earned thereon, the "**Deposit**").  Title Company shall invest the Deposit in an interest-bearing account at such bank as Title Company may elect and approved by Buyer, and the Deposit shall be held and disbursed in accordance with this Agreement.  The interest shall accrue for the benefit of Buyer, unless it is released to the Seller pursuant to the terms of this Agreement.  Notwithstanding anything to the contrary in this Agreement, One Hundred Dollars ($100) of the Deposit shall be delivered to Seller, which

3

amount shall be non-refundable under all circumstances (the "**Nonrefundable Consideration**"). If the Closing occurs, the Nonrefundable Consideration shall be credited against the Purchase Price.

Buyer and Seller, and the Title Company, by execution of the acknowledgement page of this Agreement, agree that, regardless of any later instructions of any party, unless executed by both Buyer and Seller, (i) the Deposit shall be returned in full to Buyer upon Closing; (ii) the Deposit shall be returned in full to Buyer if this Agreement is terminated for any reason by Buyer pursuant to its rights under this Agreement on or before November 21, 2023; (iii) the Deposit shall be returned in full to Buyer if Buyer exercises its remedy to sue Seller for specific performance pursuant to Section 6(b); (iv) the Deposit shall be returned in full to Buyer if Buyer has to seek legal relief to cause Seller to fulfill its obligations under this Agreement, and (v) the Deposit shall *only* be released to Seller if Seller provides Title Company with an order of the Bankruptcy Court finding that Buyer has defaulted under the terms of this Agreement and failed to timely close on the purchase of the Property.

3.      Title to the Property.

(a)      At Closing, Fidelity National Title Insurance Company (the "**Title Company**") shall issue to Buyer an ALTA Owner's Policy of Title Insurance (2006 ALTA Extended Owner's Policy) in the amount of the Purchase Price, insuring fee simple title to the Land and the Improvements in Buyer, subject only to the Permitted Exceptions (as hereinafter defined) (the "**Title Policy**").  Seller shall execute and deliver to Title Company an owner's affidavit sufficient to support the issuance of the Title Policy.  As used herein, the term "**Permitted Exceptions**" shall mean, collectively:  (i) the standard printed exceptions on an ALTA Owner's Policy of Title Insurance (2006 ALTA Extended Owner's Policy), (ii) non-delinquent liens for general real estate taxes and assessments, (iii) matters disclosed by a current survey of the Property and approved by Buyer hereunder, and (iv) any exceptions disclosed by the preliminary title report previously provided to Buyer.  Notwithstanding the foregoing, the term "Permitted Exceptions" shall not include (x) any monetary liens, including, without limitation, the liens of any deeds of trust or other loan documents secured by the Property, or (y) any mechanics' liens.

(b)      Notwithstanding anything to the contrary provided herein, Seller shall be obligated to remove from title prior to the Closing (a) any delinquent taxes and assessments, (b) any mechanics' liens, (c) any other monetary liens, and (d) any exceptions caused by Seller's voluntary acts after the Effective Date and not approved by Buyer.

4.      Access to Information.

To the extent available, Seller shall make available to Buyer and its employees, representatives, counsel and consultants access to all of its books, records and files relating to the Property in Seller's, its affiliates' or managers' possession or reasonable control, including, without limitation, all of the items set form on said **Exhibit G** (collectively, the "**Due Diligence Items**"), and Seller agrees, to the extent reasonably feasible, to allow Buyer to make copies at Seller's office or the property management office of such items as Buyer reasonably requests and to provide updated Due Diligence Items upon request of Buyer at any time during the term of

4

this Agreement.  For the avoidance of doubt, Seller's obligations under this Agreement are not subject to any Due Diligence Items other than as provided in paragraph 6(c).

Attached hereto as **Exhibit J** is a schedule identifying all of the service contracts and similar agreements that Seller proposes to assign to Buyer at Closing (the "**Schedule of Agreements**").  Buyer shall have the right, in its sole discretion, to require the assumption and assignment of any service contract or other agreement identified on the Schedule of Agreements effective as of the Closing Date, by delivering to Seller written notice (the "**Contract Assumption Notice**") at least two (2) days prior to the Closing Date.  If Buyer fails to deliver the Contract Assumption Notice within such time period, Buyer shall be deemed to have elected to reject all of the agreements identified on the Schedule of Agreements.  Under all circumstances, Seller shall cause to be terminated as of the Closing all property management agreements and commission agreements with respect to the Property.  Those service contracts and agreements identified on the Schedule of Agreements that are expressly assumed and assigned pursuant to this Paragraph 4 are referred to herein as the "**Assumed Contracts**".

Seller previously provided written notice of the motion seeking entry of the Sale Order to all parties to any executory contracts or unexpired leases that are Assumed Contracts and took all other actions necessary or otherwise required to cause such Assumed Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, including but not limited to (i) serving on all non-Seller counterparties to all of the Assumed Contracts a notice specifically stating (A) that Seller is or may be seeking the assumption and assignment of such contract(s), (B) Seller's good faith estimate of the applicable Cure Amounts under such Contract(s), (C) the deadline for objecting to such Cure Amount (which deadline shall not be less than five business Days prior to the hearing before the Bankruptcy Court) and (D) any other aspect of the proposing assumption and assignment of such contract(s) to Buyer and (ii) taking, as promptly as practicable, all other actions reasonably requested by Buyer to facilitate any negotiations with the counterparties to such Assumed  Contracts and to obtain an order, including a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

5.      Conditions to Closing.

The following conditions are precedent to Buyer's obligation to acquire the Property and to credit the Purchase Price (the "**Conditions Precedent**").  If any Conditions Precedent are not satisfied as determined by Buyer in Buyer's sole discretion, Buyer may elect by written notice to Seller to terminate the Agreement.  In the event that Buyer terminates this Agreement pursuant to this paragraph, neither party shall have any further obligations hereunder, except for the obligations that survive closing.

(a)      This Agreement shall not have terminated pursuant to any other provision hereof, including, without limitation, Paragraph 10 below.

(b)      The physical condition of the Property shall be substantially the same on the day of Closing as on the Effective Date, reasonable wear and tear and loss by casualty excepted (subject to the provisions of Paragraph 10 below), and, as of the day of Closing, there shall be no litigation or administrative agency or other governmental proceeding of any kind

5

whatsoever, pending or threatened, which after Closing would materially adversely affect the value of the Property or the ability of Buyer to operate the Property in the manner in which it is currently being operated, and no proceedings shall be pending or threatened which could or would cause the re-designation or other modification of the zoning classification of, or of any building code requirements applicable to the Property or any portion thereof, which after Closing would materially adversely affect the value of the Property or the ability of Buyer to operate the Property in the manner in which it is currently being operated.

(c)     Title Company shall be irrevocably and unconditionally committed to issue to Buyer the Title Policy as described in Paragraph 3 above (subject only to payment of its premium therefor).

(d)     All of Seller's representations and warranties contained herein shall be true and correct on the Closing Date.

(e)     The Sale Order shall have been entered and be a Final Order.

6.     <u>Remedies</u>.

(a)     In the event the sale of the Property is not consummated because of the failure of any condition or any reason other than a default under this Agreement by Seller or Buyer, no credit shall be applied to the outstanding balance of the Loan.  If said sale is not consummated solely because of a default under this Agreement on the part of Buyer, Seller shall be excused from further performance hereunder.

(b)     In the event the sale of the Property is not consummated because of a default under this Agreement on the part of Seller, Buyer shall be excused from further performance hereunder and may either (i) terminate this Agreement by delivery of written notice of termination to Seller, whereupon Seller shall pay to Buyer any out-of-pocket title, escrow, legal and inspection fees, costs and expenses actually incurred by Buyer and any other out-of-pocket fees, costs and expenses actually incurred by Buyer in connection with the performance of its review of the Property and the negotiation and performance of this Agreement, including, without limitation, environmental and engineering consultants' fees and expenses, and neither party shall have any further rights or obligations hereunder except to the extent set forth in the provisions of this Agreement that survive closing  or termination, or (ii) continue this Agreement and bring an action for specific performance hereof.  Nothing contained in this Paragraph 6(b) shall limit or preclude Seller's liability for monetary damages due the breach of any default by Seller under any obligations of Seller that expressly survive the Closing or earlier termination pursuant to the terms of this Agreement.

(c)     Buyer has initiated a Phase I Environmental Assessment of the Property. If such report discovers material negative environmental issues at the Property, in the sole judgment of the Buyer, Buyer may terminate this Agreement by delivery of written notice of termination to Seller on or prior to November 21, 2023, the Deposit shall be immediately returned to Buyer, and Buyer and Seller shall have no further obligations under this Agreement except those that survive termination.  However, if the Phase I Environmental Assessment has

6

not been completed by November 21, 2023, Buyer shall have no right to terminate the Agreement pursuant to the preceding sentence.

       7.    <u>Closing and Escrow</u>.

       (a)    Upon mutual execution of this Agreement, the parties hereto shall deposit an executed counterpart of this Agreement with Title Company and this Agreement shall serve as instructions to Title Company for consummation of the purchase and sale contemplated hereby. Seller and Buyer agree to execute such additional escrow instructions as may be appropriate to enable the title company to comply with the terms of this Agreement; provided, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions (other than joint escrow instructions), the terms of this Agreement shall control.

       (b)    The parties shall conduct an escrow Closing pursuant to this Paragraph 7 on a date agreed to by Buyer and Seller, no later than November 22, 2023 (the "**Closing Date**").

       (c)    At or before the Closing, Seller shall deliver to Title Company (for delivery to Buyer upon Closing) the following (other than the materials described in clause (xii) below, which shall be delivered directly to Buyer by Seller substantially concurrent with the Closing):

       (i)    a duly executed and acknowledged special warranty deed in the form attached hereto as **<u>Exhibit C</u>** (the "**Deed**") conveying to Buyer title to the real Property, Subject Water Rights and O&G/Mineral Rights, free from all liens, encumbrances, easements, conditions and other matters affecting title except the Permitted Exceptions and subject to "Statutory Exceptions" as defined in § 38-30-113(5)(a), C.R.S., all of the records of the Pitkin County Clerk and Recorder's Office;

       (ii)    a bill of sale in the form attached hereto as **<u>Exhibit D</u>** (the "**Bill of Sale**");

       (iii)    an assignment of service contracts, warranties and guaranties and other intangible property in the form attached hereto as **<u>Exhibit E</u>** (the "**Assignment of Intangible Property**");

       (iv)    an assignment of Declarant's rights in the form attached hereto as **<u>Exhibit H</u>**, conveying to Buyer all of Seller's rights as Declarant under the Declaration;

       (v)    originals or, if originals are not available then copies, of all Assumed Contracts, and, to the extent in Seller's possession or reasonable control, buildings permits, certificates of occupancy, plans and specifications for the Improvements, and all other material documents, agreements and correspondence and items relating to the ownership, development, operation, maintenance or management of the Property;

       (vi)    a "FIRPTA Affidavit" pursuant to Section 1445 (b)(2) of the Internal Revenue Code, duly executed by Seller;

7

(vii)    such resolutions, authorizations, bylaws or other corporate and/or partnership documents relating to Seller as shall be required by Title Company;

(viii)    the certificate certifying as to Seller's representations and warranties as required by Paragraph 8(b) below;

(ix)    keys to all locks located in or about any portion of the Property and all personal property described in the Bill of Sale to the extent in Seller's possession or reasonable control;

(x)    evidence that the Bankruptcy Court has entered the Sale Order, such Sale Order is in full force and effect without modification and has become a Final Order. For purposes hereof, "**Final Order**" means an order which has not been reversed, stayed, modified or amended and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been filed has been resolved by the highest court to which the order or judgment could be appealed, or from which certiorari could be sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice;

(xi)    an instrument acceptable to Buyer to convey and assign all Subject Water Rights to Buyer, if applicable; and

(xii)    any other closing documents reasonably requested by Title Company or Buyer.  Buyer may waive compliance on Seller's part under any of the foregoing items by an instrument in writing.

(d)    At or before the Closing, Buyer shall deliver to Title Company (for delivery to Seller upon Closing) the following:

(i)    the duly executed Assignment of Intangible Property;

(ii)    such resolutions, authorizations, bylaws or other corporate and/or partnership documents or agreements relating to Buyer as shall be required by Title Company;

(iii)    any other customary and/or reasonable closing documents requested by Title Company or Seller (provided that in no event shall any such documents increase the liability of, or cost to, Buyer);

(iv)    a release of each deed of trust in favor of the Administrative Agent, for the benefit of the Lenders, currently encumbering the Property; and

(v)    at the election of Buyer, either (x) a surety bond in the amount of the Purchase Price or (y) an amount in cash equal to the Purchase Price (less the deposit) to be held in an interest-bearing account by the Title Company, in the case of either (x) or (y), to secure the extent of any obligations of Buyer and/or the Lender Parties (as defined in the Sale Order), as applicable, to Seller to pay all or a portion of the Purchase Price in cash, in the event that a court of competent jurisdiction determines by Final Order in *AVR AH LLC v. Ninteen77*

*Capital Solutions A LP, et al.*, Adv. Pro. No. 23-09003 (the "**Adversary Proceeding**") commenced by the Seller and the Other Plaintiffs (as defined in the Sale Order) or in any other proceeding in a court of competent jurisdiction adjudicating the Lender Parties' claims with respect to the Obligations (as defined in the Loan Agreements), that the amount due by Seller and the Other Plaintiffs to the Lender Parties and/or Buyer (as applicable) on account of the Lender Parties' claims with respect to the Obligations (as defined in the Loan Agreements) is less than the Purchase Price; provided, that, for the avoidance of doubt, the security provided by Buyer and the Lender Parties to Seller and the Other Plaintiffs pursuant to this Agreement shall only be available to Seller and the Other Plaintiffs to the extent a court of competent jurisdiction disallows the Lender Parties' claims and liens or finds by Final Order that the Lender Parties and/or Buyer do not have a valid first priority lien and claim in an amount equal to the Purchase Price, and only to the extent of the difference between (x) the Purchase Price and (y) the amount of the Lender Parties and/or Buyer's allowed first priority lien and claim against the Property as determined by the Final Order.

(e)     Seller and Buyer shall each deposit such other instruments, and take such other actions (including with respect to any applicable Subject Water Rights, O&G/Mineral Rights, water boards and ditch companies), as are reasonably necessary or required by the Title Company or otherwise required to close the escrow and consummate the acquisition of all the Property in accordance with the terms hereof (provided that in no event shall any such documents increase the liability of Buyer or Seller). Seller and Buyer hereby designate Title Company as the "**Reporting Person**" for the transaction pursuant to Section 6045(e) of the Internal Revenue Code and the regulations promulgated thereunder and agree to execute such documentation as is reasonably necessary to effectuate such designation.

(f)     The following are to be apportioned as of the Closing Date as follows, with Buyer being deemed to be the owner of the Property during the entire day on which the Deed is recorded and being entitled to receive all income of the Property, and being obligated to pay all expenses of the Property, with respect to such day:

(i)     Income.  All income of the Property shall be prorated as of the Closing to the extent received by Seller prior to Closing.

(ii)     Utility Charges.  Seller shall be responsible for the cost of all utilities used prior to the Closing Date, except to the extent such utility charges are billed to and paid by tenants directly.

(iii)     Other Apportionments; Closing Costs.  Amounts payable under the Assumed Contracts, annual or periodic permit and/or inspection fees (calculated on the basis of the period covered), and liability for other Property operation and maintenance expenses and other recurring costs shall be apportioned as of the Closing Date.  Seller and Buyer shall each pay one half (1/2) of all transfer taxes (if any), including documentary transfer taxes, and excise taxes with respect to the conveyance of the Property to Buyer and all sales tax (if any) owed with respect to the sale of the Personal Property.  Buyer shall pay the premium for the Title Policy. Seller shall be responsible for all costs incurred in connection with the prepayment or satisfaction of any loan secured by the Property other than the Loan, including, without limitation, any prepayment fees, penalties or charges.  All other costs and charges of the escrow for the sale not

otherwise provided for in this Agreement shall be allocated in accordance with the applicable closing customs for the county in which the Property is located, as determined by the Title Company.

(iv)     <u>Real Estate Taxes and Special Assessments</u>.  All delinquent real estate taxes and assessments shall be paid by Seller at or before Closing.  Non-delinquent real estate taxes and assessments shall be prorated between Buyer and Seller as of the Closing Date using the actual current tax bill, but if such tax bill is not available at Closing, then such proration shall use an estimate calculated to be 102% of the amount of the previous year's tax bill.  In the proration(s), Buyer shall be credited with an amount equal to the real estate taxes and assessments applicable to the period prior to the Closing Date, to the extent such amount has not been actually paid by Seller.  In the event that Seller has paid prior to Closing any real estate taxes or assessments applicable to the period after the Closing Date, Seller shall be entitled to a credit for such amount.  If, after Closing, any additional real estate taxes or assessments applicable to the period prior to the Closing Date are levied for any reason, including, without limitation, any back assessments or escape assessments, then Seller shall pay all such additional amounts promptly upon receipt of an invoice or bill for any such amounts.

(v)     <u>Survival</u>.  The provisions of this Paragraph 7(f) shall survive the Closing.

8.     <u>Representations and Warranties of Seller</u>.

(a)     Seller hereby represents and warrants to Buyer as follows:

(i)     Seller is not, and as of the Closing shall not be, a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**") and any related regulations.

(ii)     Subject to Bankruptcy Court approval, this Agreement (A) has been duly authorized, executed and delivered by Seller, and (B) does not, and as of the Closing shall not, violate any provision of any agreement or judicial order to which Seller is a party or to which Seller or the Property is subject.

(iii)     Seller has full and complete power and authority to enter into this Agreement and to perform its obligations hereunder, subject to the terms and conditions of this Agreement and the approval of the Bankruptcy Court.

(iv)     There are no Leases that have not expired or been terminated.

(v)     To Seller's knowledge, there is no litigation pending or threatened with respect to the Property or the transactions contemplated hereby except for (A) that certain Piktin County Public Foreclosure No. 23-002 ("**Foreclosure**") which Foreclosure was initiated by the Administrative Agent, at the direction of the Lenders, (B) the Adversary Proceeding, and (C) the Bankruptcy Case.

(vi)     To Seller's knowledge, there are no violations of any applicable building codes or any applicable environmental, zoning or land use law, or any other applicable

10

local, state or federal law or regulation relating to the Property, including, without limitation, the Americans with Disabilities Act of 1990.

(vii)    To Seller's knowledge, Seller has not failed to obtain any material governmental permit necessary for the operation of the Improvements in the manner in which they are presently being operated.

(viii)    To Seller's knowledge, there are no condemnation proceedings pending or threatened that would result in the taking of any portion of the Property.  Seller has not received any written notice of any special assessment proceedings or other governmental proceedings affecting the Property that is not disclosed on the Preliminary Reports.

(ix)    Seller has not granted any option or right of first refusal or first opportunity to any party to acquire any fee or ground leasehold interest in any portion of the Property.

(x)    To the best of Seller's knowledge, neither Seller nor any third party has used, manufactured, stored or disposed of, on under or about the Property or transported to or from the Property, any Hazardous Materials.  As used herein, the term, "**Hazardous Material**" shall mean any substance, chemical, waste or other material which is listed, defined or otherwise identified as "hazardous" or "toxic" under any federal, state, local or administrative agency ordinance or law, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.; and the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; or any regulation, order, rule or requirement adopted thereunder, as well as any formaldehyde, urea, polychlorinated biphenyls, petroleum, petroleum product or by-product, crude oil, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel or mixture thereof, radon, asbestos, and "source," "special nuclear" and "by-product" material as defined in the Atomic Energy Act of 1985, 42 U.S.C. §§ 3011 et seq.

(xi)    Seller is in compliance with all laws, statutes, rules and regulations and any federal, state or local governmental authority in the United States of America applicable to Seller and all beneficial owners of Seller arising out of the requirements of Executive Order No. 133224, 66 Fed Reg. 49079 (September 25, 2001) (the "**Order**") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury ("**OFAC**") and in any enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "**Orders**").

(xii)    All of the water rights, water structures or water interests owned by Seller were previously conveyed and described in the Quit Claim Deed and Assignment recorded at Reception #679728 of Pitkin County real property records.

(xiii)    Seller does not own any transferable development rights.

(xiv)    Seller has provided all holders of any lien on the Property and all of its and the Credit Agreement borrowers' creditors who are entitled to notice of the auction of

the Property conducted pursuant to the Bankruptcy Case adequate and required notice of such auction.

(b)     It shall be a condition precedent to Buyer's obligation to purchase the Property and to deliver the Purchase Price that all of Seller's representations and warranties contained in or made pursuant to this Agreement shall have been true and correct when made and shall be true and correct as of the Closing Date.  At the Closing, Seller shall deliver to Buyer a certificate certifying that each of Seller's representations and warranties contained in Paragraph 8(a) above are true and correct as of the Closing Date.

(c)     All representations and warranties by the respective parties contained herein or made in writing pursuant to this Agreement shall be deemed to be material and shall survive the execution and delivery of this Agreement and the Closing for a period of six (6) months.  In the event that a claim is not made with respect to a breach of a representation or warranty set forth herein or made in writing pursuant to this Agreement within such six (6) month period, such claim shall be deemed waived.

(d)     Buyer understands and agrees that the phrase "to Seller's knowledge" or "receipt of notice" or in either case words of similar import, as used in this Agreement, means only the actual knowledge of, without investigation, or the receipt of notice by, Charif Souki, Karim Souki, Simon Chen, or Brooke Peterson.

9.     <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller as follows:

(a)     Buyer is a duly organized and validly existing limited liability company in good standing under the laws of the State of Delaware; this Agreement and all documents executed by Buyer which are to be delivered to Seller at the Closing are or at the time of Closing will be duly authorized, executed and delivered by Buyer, and do not and at the time of Closing will not violate any provisions of any agreement or judicial order to which Buyer is subject.

(b)     Buyer has not, and as of the Closing Buyer shall not have (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Buyer's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Buyer's assets, which remains pending as of such time, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Buyer's assets, which remains pending as of such time, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(c)     Buyer is in compliance with all laws, statutes, rules and regulations and any federal, state or local governmental authority in the United States of America applicable to Buyer and all beneficial owners of Buyer arising out of the requirements of the Orders.

10.     <u>Risk of Loss</u>.

All risk of loss or damage to the Improvements prior to the Closing Date shall belong to and be borne by Seller.

12

(a)     Casualty.  Until and through the Closing Date, Seller shall maintain casualty insurance sufficient to pay for the restoration of the Improvements from all risks customarily covered by insurance on similar type properties located in the County where the Property is located ("**Seller's Insurance**").

(i)     If the Improvements are damaged as the result of a casualty, Seller shall provide Buyer with prompt written notice thereof (a "**Casualty Notice**"), describing the casualty and the extent of the damage, and indicating whether the damage is Material Damage (as defined below).

(ii)     If the damage is Material Damage, Buyer may terminate this Agreement upon written notice to Seller ("**Buyer's Termination Notice**") within twenty (20) days after receiving Seller's Casualty Notice; provided that if the Closing was otherwise required under this Agreement within such twenty (20) day notice period, the Closing shall be postponed to the fifteenth (15th) day following such twenty (20) day notice period.  Buyer's failure to timely provide a Buyer's Termination Notice shall nevertheless be deemed an election by Buyer to terminate this Agreement.

(iii)     If the damage is not Material Damage, or if the damage is Material Damage but Buyer elects not to terminate this Agreement pursuant to Paragraph 10(a)(ii) hereof, the obligations of the parties under this Agreement shall not be affected by such damage and the parties shall instead proceed to the Closing on the Property in its damaged state on the Closing Date (as the same may have been postponed pursuant to Paragraph 10(a)(ii) hereof), notwithstanding anything contained herein to the contrary; except that at Closing, Buyer shall receive a credit against the Purchase Price for the Cost to Restore (as defined below) and Seller shall retain all rights against the insurer, which rights shall not be assigned to Buyer; provided, however, that nothing contained in this Paragraph 10(a)(iii) shall preclude Seller and Buyer from otherwise agreeing in writing to effectuate an assignment of Seller's Insurance to Buyer, provided that Seller provides Buyer at Closing with (A) the written consent of the insurance company to such assignment and (B) a credit against the Purchase Price for the Cost to Restore, less the net proceeds yet unpaid but thereafter payable to Buyer under Seller's Insurance for the restoration of the Improvements.

(iv)     As used in this Paragraph 10(a), the term "**Material Damage**" means damage to the Improvements (A) for which the Cost to Restore exceeds one percent (1%) of the Purchase Price, (B) that destroys (i.e. renders unusable unless rebuilt) more than 1% of the total area of the Improvements, or (C) with respect to which applicable law or governmental regulation or action renders impossible the rebuilding of the Improvements to contain at least the same amount of square footage as existed prior to such damage.

(v)     As used in this Paragraph 10(a), the term "**Cost to Repair**" means 105% of the price that the owner of the Improvements will likely be required to pay for the repair and restoration of the damaged Improvements to the size and condition in which such Improvements existed prior to such damage; such Cost to Repair to be determined pursuant to a written estimate

13

obtained by Buyer, within fifteen (15) days after the damage occurs, from a licensed contractor or public adjusting firm located in the County where the Improvements are located.

(b)  Condemnation or Litigation.  In the event that Seller is given notice of any action, suit or proceeding prior to the Closing Date for the condemnation of all or any part of the Land or Improvements, Seller shall provide Buyer with prompt notice thereof (indicating the extent of the condemnation, the purpose thereof, and the timing thereof, if known, and whether such condemnation is a Material Condemnation (as defined below), whereupon Buyer shall be entitled, at its option, either: (i) to terminate this Agreement or (ii) to consummate the transaction and negotiate with the condemning governmental authority for a settlement, and to receive, at the Closing, an absolute assignment of all of Seller's rights to receive any and all awards and proceeds of such condemnation from the condemning governmental authority.  As used herein, the term "**Material Condemnation**" means any condemnation that could result in the loss of any part of the Improvements for more than 90 days or loss of more than 5% of any parcel included in the Land.

(c)  Termination.  In the event of a termination of this Agreement by Buyer pursuant to this Paragraph 10, neither party shall have any further rights or obligations hereunder, except for the obligations that expressly survive closing.

11.  Access; Indemnity; Possession.

(a)  Commencing on the Effective Date and through the Closing Date or the earlier termination of this Agreement, Seller shall afford authorized representatives of Buyer reasonable access to the Property for purposes of satisfying Buyer with respect to the representations, warranties and covenants of Seller contained herein, including, without limitation, to cause to be completed building, surveying, environmental or other diligence testing, and for the purpose of conducting tenant, HOA employee and vendor interviews or touring the Property with consultants of Buyer, marketing or sales professionals, or other interested parties.  Buyer hereby agrees to indemnify, defend and hold Seller harmless from and against any and all claims, judgments, damages, losses, penalties, fines, demands, liabilities, encumbrances, liens, costs and expenses (including reasonable attorneys' fees, court costs and costs of appeal) actually suffered or incurred by Seller to the extent arising out of damage or injury to persons or property caused by Buyer or its authorized representatives during their investigation of, entry onto and/or inspections of the Property prior to the Closing.  If this Agreement is terminated, Buyer shall repair the damage caused by Buyer's entry onto and/or inspections of the Property, provided the foregoing shall not require Buyer to repair or remediate any conditions that are discovered by Buyer.

(b)  Possession of the Property shall be delivered to Buyer on the Closing Date.

12.  Seller Covenants.

(a)  At the time of Closing, Seller shall cause to be paid in full all obligations under any outstanding written or oral contracts made by Seller for any improvements to the Property, and Seller shall cause to be discharged all mechanics' and materialmen's liens arising

14

from any labor or materials furnished to the Property prior to the time of Closing (other than obligations that are properly the obligation of any third party).

(b)     Between the Effective Date and the Closing, Seller shall (i) promptly notify Buyer of any condemnation, environmental, zoning, other land-use regulation proceedings and notices of violations of any Laws relating to the Property; and (ii) promptly notify Buyer of any litigation of which Seller obtains knowledge that arises out of the ownership of the Property.

(c)     Between the Effective Date and the Closing, Seller shall (i) perform all of the declarant's obligations under the Declaration in the same manner as historically performed, provided that Seller shall not exercise any rights of declarant under the Declaration or its bylaws without the prior, written authorization of the Buyer, and shall otherwise operate and maintain the association property on behalf of the association in the same manner as before the making of this Agreement, as if Seller were retaining its rights as declarant under the Declaration; (ii) promptly notify Buyer of any condemnation, environmental, zoning, other land-use regulation proceedings and notices of violations of any Laws relating to the association property or with respect to the Declaration; and (iii) promptly notify Buyer of any litigation of which Seller obtains knowledge that affects the Declaration or any rights or obligations thereunder.

(d)     Through the Closing Date, Seller shall maintain or cause to be maintained, at Seller's sole cost and expense, all policies of insurance currently in effect with respect to the Property (or comparable replacements thereof).

(e)     Seller shall deliver to Buyer copies of any bills for real estate taxes and personal property taxes and copies of any notices pertaining to real estate taxes or assessments applicable to the Property that are received by Seller after the Effective Date, even if received after Closing.  The obligations set forth in this Paragraph 12(d) shall survive the Closing.

(f)     Any and all liabilities, obligations or amounts due to the Aspen Valley Ranch Homeowners Association, Inc. by Seller or otherwise attributable or allocable to the Property shall be fully paid and satisfied by Seller as a condition of Closing.

(g)     All personal property described as "H5 Personal Property" shall be removed by Seller prior to Closing.

13.     Buyer's Consent to New Contracts Affecting the Property; Termination of Existing Contracts.

(a)     Seller shall not, after the Effective Date, enter into any Lease or contract, or any amendment thereof, or waive any rights of Seller under any contract, without in each case obtaining Buyer's prior written consent thereto, which consent Buyer may withhold or condition its consent in its sole and absolute discretion.  From and after the Effective Date, including at any time after the Closing, Seller shall promptly notify and provide Buyer with details of any inquiries made to Seller regarding the Property, including, without limitation, with respect to the purchase or lease of any portion of the Property.

(b)     Seller shall terminate prior to the Closing, at no cost or expense to Buyer, any and all management agreements, commission agreements (if any), service contracts or

15

similar agreements affecting the Property that are not Assumed Contracts (other than such contracts or agreements that Seller is not obligated to terminate pursuant to Paragraph 4 above) and all employees, if any, of the Property.  In addition, Seller shall be responsible for any amounts payable to any broker or finder relating to the Leases, including any agreements executed prior to the Closing.  The obligations set forth in the foregoing sentence shall survive the Closing.

(c)     Seller shall not, after the Effective Date, create any new encumbrance or lien affecting the Property other than liens and encumbrances that in fact will be and are discharged prior to the Closing.  The obligations set forth in this Paragraph 13(c) shall survive the Closing to the extent such obligations are violated prior to the Closing.

14.     <u>Bankruptcy</u>.  Seller and related entity Strudel Holdings LLC have filed voluntary Chapter 11 bankruptcy petitions commencing Case Nos. 23-90757 and 23-90758 (collectively, the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").  Seller has requested that the Bankruptcy Court enter an order, in the form attached hereto as <u>Exhibit L</u>, or otherwise in a form and substance acceptable to Buyer (the "**Sale Order**") approving this Agreement and all of the terms and conditions hereof and approving and authorizing Seller to consummate the transactions contemplated hereby pursuant to the Bankruptcy Code.

15.     <u>Miscellaneous</u>.

(a)     <u>Notices</u>.  Any notice, consent or approval required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given upon (i) hand delivery, (ii) one (1) business day after being deposited with Federal Express or another reliable overnight courier service, with receipt acknowledgment requested, (iii) upon receipt if transmitted by email, with a copy sent on the same day by one of the other permitted methods of delivery, or (iii) upon receipt or refused delivery deposited in the United States mail, registered or certified mail, postage prepaid, return receipt required, and addressed as follows:

IF TO SELLER:     AVR AH LLC
                  P.O. Box 4068
                  Aspen, Colorado 81612
                  Attn: _____
                  Telephone: _____
                  Email: _____


WITH A COPY TO:   Porter Hedges LLP
                  1000 Main Street, 36th Floor
                  Houston, Texas 77002
                  Attn:  Joshua Wolfshohl
                  email:  jwolfshohl@porterhedges.com

16

IF TO BUYER:    Chiron AVR LLC
c/o UBS O'Connor LLC
One North Wacker Dr., Floor 31
Chicago, IL 60606
Attn: Randal Johnson, Lilly Kaufmann and Connor Burke
Email:   randal.johnson@ubs.com;   lilly.kaufmann@ubs.com;
connor.burke@ubs.com

WITH A COPY TO:    Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, New York 10019
Attn:  Laura Metzger, Esq.
Phone No. 212-506-5149
email:  lmetzger@orrick.com

or such other address as either party may from time to time specify in writing to the other.

(b)    <u>Brokers and Finders</u>.  In the event that any broker or finder makes a claim for a commission or finder's fee based upon any contact, dealings or communication related to a sale by Seller to Buyer, the party whose conduct is the basis for the broker or finder making its claim shall indemnify, defend and hold harmless the other party against and from any commission, fee, liability, damage, cost and expense, including without limitation attorneys' fees, arising out of or resulting from any such claim.  The provisions of this Paragraph 14(b) shall survive the Closing, or in the event that the Closing does not occur, the termination of this Agreement.

(c)    <u>Successors and Assigns</u>.  Buyer reserves the right to take title to the Property in the name of a nominee or assignee.  This Agreement shall be binding upon the successors and assigns of the parties hereto.  Seller shall not be entitled to assign its rights or obligations hereunder.  Without limiting the foregoing, if Seller liquidates prior to satisfying all of Seller's obligations hereunder, Buyer shall have recourse against the proceeds distributed in such liquidation to the extent of any unsatisfied obligations of Seller hereunder.

(d)    <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed by Seller and Buyer.

(e)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado.

(f)    <u>Merger of Prior Agreements</u>.  This Agreement and the exhibits and schedules hereto, constitutes the entire agreement between the parties and supersede all prior agreements and understandings between the parties relating to the subject matter hereof.

(g)    <u>Enforcement</u>.  If either party hereto fails to perform any of its obligations under this Agreement or if a dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting party or the party not prevailing in such dispute shall pay any and all costs and expenses incurred by the other party on

17

account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs and attorneys' fees and disbursements.  The prevailing party shall be determined by the court based upon an assessment of which party's major arguments made or positions taken in the proceedings could fairly be said to have prevailed over the other party's major arguments or positions on major disputed issues in the court's decision.  If the party which shall have commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other party, such other party shall be deemed the prevailing party.  Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment.  The provisions of this Paragraph 14(g) shall survive the Closing, or in the event that the Closing does not occur, the termination of this Agreement.

(h)     <u>Time of the Essence</u>.  Time is of the essence of this Agreement.

(i)     <u>Severability</u>.  If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

(j)     <u>Counterparts and PDF or Electronic Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be one agreement. This Agreement may be executed pursuant to original, emailed PDF or electronic signatures, with the same effect as if the parties had signed the document pursuant to original signature. Each of the parties hereto agrees and acknowledges that (i) the transaction consisting of this Agreement may be conducted by electronic means, (ii) it is such party's intent that, if such party signs this Agreement using an electronic signature, it is signing, adopting and accepting this Agreement and that signing this Agreement using an electronic signature is the legal equivalent of having placed its handwritten signature on this Agreement on paper and (iii) it is being provided with an electronic or paper copy of this Agreement in a usable format.

(k)     <u>Limited Liability</u>.  The obligations of Buyer are intended to be binding only on Buyer and the property of Buyer, and shall not be personally binding upon, nor shall any resort be had to, the private properties of any of its trustees, officers, beneficiaries, directors, members, partners, or shareholders, or of its investment manager, the partners, officers, directors, members, or shareholders thereof, or any employees or agents of Buyer or its investment manager. The provisions of this Paragraph 14(k) shall survive the Closing, or in the event that the Closing does not occur, the termination of this Agreement.

16.     <u>COLORADO-SPECIFIC PROVISIONS</u>

(a)     <u>Non-Resident Withholding</u>.  Seller and Buyer agree and acknowledge that Colorado Revised Statute §39-22-604.5 provides that in the case of any conveyance of a Colorado real property interest, the person or party providing closing and settlement services shall be required to withhold an amount equal to two percent (2%) of the sales price or the net

proceeds resulting from such conveyance, whichever is less, when the transferor is a non-resident of the State of Colorado.  Seller shall be obligated to either comply with the withholding requirements of C.R.S. §39-22-604.5 or provide an affidavit in form and content satisfactory to the person or party providing closing and settlement services which certifies that Seller is not subject to the withholding requirements.

(b)     Methamphetamine Disclosure.  If Seller knows that methamphetamine was ever manufactured, processed, cooked, disposed of, used or stored at the Property, Seller is required to disclose such fact. No disclosure is required if the Property was remediated in accordance with state standards and other requirements are fulfilled pursuant to § 25-18.5-102, C.R.S., Buyer further acknowledges that Buyer has the right to engage a certified hygienist or industrial hygienist to test whether the Property has ever been used as a methamphetamine laboratory. Buyer has the right to terminate this Agreement based on Buyer's test results that indicate the Property has been contaminated with methamphetamine, but has not been remediated to meet the standards established by rules of the State Board of Health promulgated pursuant to § 25-18.5-102, C.R.S. Buyer must promptly give written notice to Seller of the results of any such test.

(c)     Common Interest Community Disclosure.  THE PROPERTY IS LOCATED WITHIN A COMMON INTEREST COMMUNITY AND IS SUBJECT TO THE DECLARATION FOR THE COMMUNITY. THE OWNER OF THE PROPERTY WILL BE REQUIRED TO BE A MEMBER OF THE OWNERS' ASSOCIATION FOR THE COMMUNITY AND WILL BE SUBJECT TO THE BYLAWS AND RULES AND REGULATIONS OF THE ASSOCIATION. THE DECLARATION, BYLAWS AND RULES AND REGULATIONS WILL IMPOSE FINANCIAL OBLIGATIONS UPON THE OWNER OF THE PROPERTY, INCLUDING AN OBLIGATION TO PAY ASSESSMENTS OF THE ASSOCIATION. IF THE OWNER DOES NOT PAY THESE ASSESSMENTS, THE ASSOCIATION COULD PLACE A LIEN ON THE PROPERTY AND POSSIBLY SELL IT TO PAY THE DEBT. THE DECLARATION, BYLAWS AND RULES AND REGULATIONS OF THE COMMUNITY MAY PROHIBIT THE OWNER FROM MAKING CHANGES TO THE PROPERTY WITHOUT AN ARCHITECTURAL REVIEW BY THE ASSOCIATION (OR A COMMITTEE OF THE ASSOCIATION) AND THE APPROVAL OF THE ASSOCIATION.   BUYERS OF PROPERTY WITHIN THE COMMON INTEREST COMMUNITY SHOULD INVESTIGATE THE FINANCIAL OBLIGATIONS OF MEMBERS OF THE ASSOCIATION. BUYERS SHOULD CAREFULLY READ THE DECLARATION FOR THE COMMUNITY AND THE BYLAWS AND RULES AND REGULATIONS OF THE ASSOCIATION.

(d)     Special Taxing Districts.  SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND TAX TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES. BUYERS SHOULD INVESTIGATE THE SPECIAL TAXING DISTRICTS IN WHICH THE PROPERTY IS LOCATED BY CONTACTING THE COUNTY

TREASURER, BY REVIEWING THE CERTIFICATE OF TAXES DUE FOR THE PROPERTY AND BY OBTAINING FURTHER INFORMATION FROM THE BOARD OF COUNTY COMMISSIONERS, THE COUNTY CLERK AND RECORDER, OR THE COUNTY ASSESSOR.

        (e)        <u>Oil, Gas, Water and Mineral Disclosure</u>.

        (i)        <u>Surface Use Agreement</u>.  The use of the surface estate of the Property to access the oil, gas or minerals may be governed by a surface use agreement, a memorandum or other notice of which may be recorded with the county clerk and recorder.

        (ii)        <u>Oil and Gas Activity</u>.  Oil and gas activity that may occur on or adjacent to the Property may include, but is not limited to, surveying, drilling, well completion operations, storage, oil and gas, or production facilities, producing wells, reworking of current wells and gas gathering and processing facilities.

        (iii)        <u>Additional Information</u>. BUYER is encouraged to seek additional information regarding oil and gas activity on or adjacent to the Property, including drilling permit applications. This information may be available from the Colorado Oil and Gas Conservation Commission.   THE SURFACE ESTATE OF THE PROPERTY MAY BE OWNED SEPARATELY FROM THE UNDERLYING MINERAL ESTATE AND TRANSFER OF THE SURFACE ESTATE MAY NOT NECESSARILY INCLUDE TRANSFER OF THE MINERAL ESTATE OR WATER RIGHTS. THIRD PARTIES MAY OWN OR LEASE INTERESTS IN OIL, GAS, OTHER MINERALS, GEOTHERMAL ENERGY OR WATER ON OR UNDER THE SURFACE OF THE PROPERTY, WHICH INTERESTS MAY GIVE THEM RIGHTS TO ENTER AND USE THE SURFACE OF THE PROPERTY TO ACCESS THE MINERAL ESTATE, OIL, GAS OR WATER.

        (f)        <u>Source of Water</u>.  The source of water on the Property is a well.

        (g)        THE COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT STRONGLY RECOMMENDS THAT ALL HOME BUYERS HAVE AN INDOOR RADON TEST PERFORMED BEFORE PURCHASING RESIDENTIAL REAL PROPERTY AND RECOMMENDS HAVING THE RADON LEVELS MITIGATED IF ELEVATED RADON CONCENTRATIONS ARE FOUND. ELEVATED RADON CONCENTRATIONSCAN BE REDUCED BY A RADON MITIGATION PROFESSIONAL. RESIDENTAL REAL PROPERTY MAY PRESENT EXPOSURE TO DANGEROUS LEVELS OF INDOOR RADON GAS THAT MAY PLACE THE OCCUPANTS AT RISK OF DEVELOPING RADON-INDUCED LUNG CANCER. RADON, A CLASS A HUMAN CARCINOGEN, IS THE LEADING CAUSE OF LUNG CANCER IN NONSMOKERS AND THE SECOND LEADING CAUSE OF LUNG CANCER OVERALL. THE SELLER OF RESIDENTAL REAL PROPERTY IS REQUIRED TO PROVIDE THE BUYER WITH ANY KNOWN INFORMATION ON RADON TEST RESULTS OF THE RESIDENTIAL REAL PROPERTY.  AN ELECTRONIC COPY OF THE MOST RECENT BROCHURE PUBLISHED BY THE DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT IN ACCORDANCE WITH C.R.S. §25-11-114(2)(A) THAT PROVIDES ADVICE ABOUT "RADON AND REAL ESTATE TRANSACTIONS IN COLORADO" IS AVAILABLE AT:

HTTPS://CDPHE.COLORADO.GOV/RADON-AND-REAL-ESTATE.

(h)     Carbon Monoxide Alarms.  If any of the Improvements on the Property have a fuel-fired heater or appliance, a fireplace, or an attached garage and include one or more rooms lawfully used for sleeping purposes (Bedroom), the parties acknowledge that Colorado law requires that Seller assure that the Property has an operational carbon monoxide alarm installed within fifteen feet of the entrance to each Bedroom or in a location as required by the applicable building code.

*[SIGNATURES APPEAR ON FOLLOWING PAGE]*

21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

BUYER:                          CHIRON AVR LLC,
                                a Delaware limited liability company

                                By:  UBS O'Connor LLC, as investment manager

                                By: _____
                                Name: BAXTER WASSON
                                Its: MANAGING DIRECTOR

                                By: _____
                                Name: RODRIGO TRELLES
                                Its: MANAGING DIRECTOR

SELLER:                         AVR AH LLC,
                                a Colorado limited liability company

                                By: _____
                                Name: DOUGLAS J. BRICKLEY
                                Its: CHIEF RESTRUCTURING OFFICER

[Signature Page to Purchase Agreement between CHIRON AVR LLC and AVR AH LLC]

COUNTERPART SIGNATURE PAGE TO
PURCHASE AGREEMENT

DATED AS OF OCTOBER __, 2023

(TITLE COMPANY)

Title Company agrees to act as escrow holder and title company in accordance with the terms of this Agreement and to act as the Reporting Person in accordance with Section 6045(e) of the Internal Revenue Code and the regulations promulgated thereunder.

FIDELITY NATIONAL TITLE INSURANCE
COMPANY

By: _____

Name: _____

Its: _____

Date: _____ __, 2023

**EXHIBIT A**

**LEGAL DESCRIPTION OF LAND**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF ASPEN, IN THE COUNTY OF PITKIN, STATE OF COLORADO, AND IS DESCRIBED AS FOLLOWS:

Parcel A:

Homesteads 2, 3, 5, 6, and 7, according to the Second Amended Subdivision Exemption Plat, Aspen Valley Ranch, recorded October 28, 2011 in Plat Book 98 at Page 49, County of Pitkin, State of Colorado.

Parcel C:

Lots 7, 8 and 9, Aspen Valley Downs Subdivision P.U.D. according to the First Amended Plat of Aspen Valley Downs Subdivision P.U.D. recorded March 22, 1999 in Plat Book 49 at Page 2 at Reception No. 429063, County of Pitkin, State of Colorado.

A-1

EXHIBIT B

LIST OF PERSONAL PROPERTY

[To be added]

**Exhibit C**

**Form of Special Warranty Deed**

**SPECIAL WARRANTY DEED**

       This Special Warranty Deed (this "**Deed**") is dated as of the ____ day of _____, 20__, between _____, a _____ ("**Grantor**"), whose address is _____, and _____ ("**Grantee**"), whose address is _____.

       WITNESSETH, that Grantor, for and in consideration of the sum of $10.00 and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by Grantor, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors and assigns forever, that certain real property, together with all appurtenances and improvements located thereon, situate, lying and being in the County of _____, State of Colorado, more particularly described on **Exhibit A** attached hereto and incorporated herein by this reference (the "**Property**");

       TOGETHER WITH all easements and rights-of-way appurtenant thereto, all and singular the hereditaments and appurtenances thereunto belonging, or in any ways appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim and demand whatsoever, of Grantor, either in law or equity, of, in and to the Property, expressly including (i) all of Grantor's rights, title, and interest in and to all oil and gas and oil and gas rights and mineral and mineral rights on, under, or appurtenant to the Property (collectively, "**Mineral Rights**"), and (ii) all water and water rights, ditches and ditch rights, reservoirs and reservoir rights, streams and stream rights, water wells and well rights, whether tributary, non-tributary or not non-tributary, including, but not limited to all right, title and interest under C.R.S. §37-90-137 on, underlying, appurtenant to or now or historically used on or in connection with the Property, whether appropriated, conditionally appropriated or unappropriated, and whether adjudicated or un-adjudicated, including, without limitation, all State Engineer filings, well registration statements, well permits, decrees and pending water court applications, if any, and all water well equipment or other personalty or fixtures currently used for the supply, diversion, storage, treatment or distribution of water on or in connection with the Property, and all water and ditch stock relating thereto (collectively, the "**Water Rights**").

       GRANTOR for itself, its successors and assigns, does covenant and agree that it shall and will WARRANT AND FOREVER DEFEND the above-bargained Property in the quiet and peaceable possession of Grantee, its successors and assigns, against all and every person or persons claiming the whole or any part thereof, by, through or under Grantor, SUBJECT TO those matters set forth on **Exhibit B** attached hereto and incorporated herein by this reference (the "**Permitted Exceptions**").

[Signature and acknowledgment appear on following page].

IN WITNESS WHEREOF, the undersigned has executed this Special Warranty Deed as of the date set forth above.

**GRANTOR:**

_____ , a
_____

By: _____
Name:
Its:

STATE OF _____)
                                                    ) ss.
COUNTY OF _____)

The foregoing instrument was acknowledged before me this \_\_\_\_\_ day of _____, 20\_\_, by _____, as _____ of _____.

_____
Notary Public

My commission expires:

_____

[Signature Page to Special Warranty Deed]

EXHIBIT A
TO
SPECIAL WARRANTY DEED

LEGAL DESCRIPTION

EXHIBIT B
TO
SPECIAL WARRANTY DEED

PERMITTED EXCEPTIONS

C-1

**Exhibit D**

**Form of Bill of Sale**

For good and valuable consideration the receipt of which is hereby acknowledged, _____, a _____ ("**Seller**"), does hereby sell, transfer, and convey to _____ ("**Buyer**"), all personal property owned by Seller and located on or in and used in connection with the Land and Improvements (as such terms are defined in that certain Purchase Agreement dated as of_____ __, 2023, between Seller and Buyer), including, without limitation, those items described in **Schedule A** attached hereto.  Seller hereby represents, warrants and covenants to Buyer that title to said personal property is free and clear of all liens, encumbrances, claims and exceptions of any kind or nature.

DATED this _____ day of _____, 201__.

SELLER:        _____,

a _____

By:        _____

Name: _____

Its: _____

By: _____

Name: _____

Its: _____

D-1

EXHIBIT A TO
BILL OF SALE

### LIST OF PERSONAL PROPERTY

**EXHIBIT E**

**FORM OF ASSIGNMENT OF INTANGIBLE PROPERTY**

THIS ASSIGNMENT ("**Assignment**") is made and entered into as of this ___ day of _____, 201__, by _____, a _____ ("**Assignor**") to _____ ("**Assignee**").

FOR GOOD AND VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, effective as of the Closing Date (as defined below), Assignor hereby assigns and transfers unto Assignee all of Assignor's right, title, claim and interest in and under:

(A)   all transferable warranties and guaranties made by or received from any third party with respect to any buildings, buildings component, structure, fixture, machinery, equipment, or material situated on, contained in any buildings or other improvement situated on, or comprising a part of any buildings or other improvement situated on, any part of that certain real property described in **Exhibit A** attached hereto (the "**Property**"), including, without limitation, those warranties and guaranties listed in **Schedule 1** attached hereto (collectively, "**Warranties**");

(B)   all of the service contracts and similar agreements listed on **Schedule 2** attached hereto (the "**Service Contracts**"); and

(C)   any Intangible Personal Property (as defined in that certain Purchase Agreement dated as of _____ __, 2023 between Assignor and Assignee (the "**Purchase Agreement**")).

ASSIGNOR AND ASSIGNEE FURTHER HEREBY AGREE AND COVENANT AS FOLLOWS:

1.   Assignor hereby agrees to indemnify Assignee against and hold Assignee harmless from any and all cost, liability, loss, damage or expense, including, without limitation, reasonable attorneys' fees, to the extent resulting from the owner's obligations under the Service Contracts that relate to the period prior to the Closing Date.

2.   Effective as of the Closing Date, Assignee hereby assumes all of the owner's obligations under the Service Contracts and agrees to indemnify Assignor against and hold Assignor harmless from any and all cost, liability, loss, damage or expense, including, without limitation, reasonable attorneys' fees, to the extent resulting from the owner's obligations under the Service Contracts that relate to the period on or after the Closing Date.

3.   If either party hereto fails to perform any of its obligations under this Assignment or, if a dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Assignment, and an action is filed, the prevailing party in any such action shall be entitled to recover from the other party, in addition to any other relief that may be granted, its court costs and reasonable attorneys' fees and disbursements, including such incurred in connection with any appeal. The prevailing party shall be determined by the court based upon an assessment of which party's major arguments made or positions taken in the proceedings could

E-1

fairly be said to have prevailed over the other party's major arguments or positions on major disputed issues in the court's decision.  If the party which shall have commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other party, such other party shall be deemed the prevailing party.

4.      This Assignment may be signed in counterparts and all counterparts so executed shall constitute one contract, binding on all parties hereto, even though all parties are not signatory to the same counterpart.

5.      This Assignment shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors in interest and assigns.

6.      This Assignment shall be governed by and construed and in accordance with the laws of the State of California.

7.      For purposes of this Assignment, the "**Closing Date**" shall be the date of the Closing (as defined in the Purchase Agreement).

8.      The obligations of Assignee are intended to be binding only on Assignee and the property of Assignee and shall not be personally binding upon, nor shall any resort be had to, the private properties of any of its trustees, officers, beneficiaries, directors, members, or shareholders, or of its investment manager, the general partners, officers, directors, members, or shareholders thereof, or any employees or agents of Assignee or its investment manager.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment the day and year first above written.

ASSIGNOR:      _____,
                       a _____

By: _____      _____
                       Name: _____
                       Its: _____

                       By: _____
                       Name: _____
                       Its: _____

ASSIGNEE:      _____,
                       a _____

                       By: _____

                       Its Authorized Representative

E-3

Schedule A to
Assignment of Service
Contracts Warranties
and Guaranties and
Other Intangible Property

**REAL PROPERTY**

Schedule 1 to
Assignment of Service
Contracts Warranties
and Guaranties and
Other Intangible Property

**LIST OF WARRANTIES**

4161-7209-9915.5

Schedule 2 to
Assignment of Service
Contracts Warranties
and Guaranties and
Other Intangible Property

**LIST OF CONTRACTS**

E-6

**EXHIBIT F**

**INTENTIONALLY OMITTED**

**EXHIBIT G**

**DUE DILIGENCE ITEMS**

1.      Copies of any and all Leases and all other occupancy agreements or licenses affecting the Property.

2.      Copies of all engineering and architectural plans and specifications and drawings in Seller's possession or reasonable control.

3.      Copies of all surveys relating to the Property in Seller's possession or reasonable control and copies of any third party structural or physical reports or studies in Seller's possession or reasonable control regarding the physical condition of the Property.

4.      Copies of the bills issued for the three (3) most recent fiscal years, including, if available, the current fiscal year for all real estate taxes and personal property taxes and copies of any and all notices pertaining to real estate taxes or assessments applicable to the Property.

5.      Copies of all maintenance, repair, service, pest control and supply contracts (including, without limitation, janitorial, and landscaping agreements), equipment rental agreements and any other contracts or agreements relating to or affecting the Property that involve an annual payment to the service provider or equipment lessor (when aggregated with all other contracts with such person or its affiliates relating to the Property).

6.      Copies of all maintenance, repair, service, pest control and supply contracts (including, without limitation, janitorial, scavenger, and landscaping agreements), equipment rental agreements and any other contracts or agreements relating to or affecting the Property other than those identified in Paragraph 5 above and that will be assumed by Buyer at Closing.

7.      Copies of all contracts for repairs or capital replacements to be performed at the Property or covering such work performed during the two (2) years immediately preceding the Effective Date for a contract price in excess of $10,000.

8.      Copies of all certificates of occupancy, licenses, permits, authorizations and approvals required by law or by any governmental authority having jurisdiction thereover in respect of the Property, or any portion thereof, occupancy thereof or any present use thereof, to the extent in Seller's possession or reasonable control.

9.      Copies of all guarantees, warranties and other documents or instruments evidencing or relating to the Intangible Personal Property, to the extent in Seller's possession or reasonable control.

10.      A list of (i) all reports, test results, analytical data, boring logs, and other studies undertaken by or at the request of Seller and/or in Seller's possession or reasonable control with respect to the Property and the environmental condition thereof, (ii) all outstanding written orders, directives and notices of governmental authorities in Seller's possession or reasonable control in connection with the environmental condition of the Property, and (iii) all

G-1

correspondence to and from governmental authorities and environmental consultants in Seller's possession or reasonable control with respect to any unremediated environmental condition at or about the Property.

   11.  Copies of insurance loss runs for the last five (5) calendar years and year to date.

   13.  Copies of all leases, contracts and other documents and information in Seller's possession regarding the O&G/Mineral Rights.

G-2

EXHIBIT H

FORM OF ASSIGNMENT OF DECLARANT'S RIGHTS

This **ASSIGNMENT OF DECLARANT'S RIGHTS** ("**Assignment**") is made as of _____, 202_ by AVR AH LLC, a Colorado limited liability company ("**Assignor**"), in favor of [_____], a [_____] ("**Assignee**").

## RECITALS:

Pursuant to an Agreement of Purchase and Sale, dated as of _____, 202_ ("**Agreement**"), between Assignor, as seller, and Assignee, as Buyer, Assignor has agreed to convey to Assignee all of Assignor's rights ("**Declarant's Rights**") as "Declarant" pursuant to Section 2.18 of the Amended and Restated Declaration of Protective Covenants for Aspen Valley Ranch dated August 20, 2021 and recorded August 20, 2021 as Reception No. 679690, Pitkin County, Colorado (the "**Declaration**").

**NOW, THEREFORE,** in consideration of the foregoing premises, and of other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Assignor and Assignee agree as follows:

1.      **Definitions**. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

2.      **Assignment.** Assignor hereby sells, assigns, conveys, transfers, and grants to Assignee, all of its right, title and interest as Declarant under the Declaration

3.      **Further Assurances**. Promptly upon request of the other party, Assignor and Assignee shall each execute and deliver to the other such further assurances and take such further actions as may be reasonably required or appropriate to perfect Assignor's the transfer of the Declarant's Rights to Assignee and otherwise carry out the intent and purpose of this Assignment.

4.      **Binding Effect and Assignment.** This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

5.      **Governing Law.** This Assignment shall be governed by and construed in accordance with the laws of the State of Colorado (without reference to conflicts of laws principles).

*[Signature page follows]*

H-1

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment of Declarant's Rights under seal as of the date first above written.

**ASSIGNOR:**

AVR AH LLC
a Colorado limited liability company

By:_____
Name:_____
Its:_____

STATE OF _____     )
                              ) ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me this \_\_\_\_ day of _____, 20\_\_\_, by _____ as _____ of AVR AH LLC, a Colorado limited liability company.

Witness my hand and official seal.

My commission expires:

_____
Notary Public

H-2

**EXHIBIT I**

**INTENTIONALLY OMITTED**

4161-7209-9915.5

**EXHIBIT J**

**LIST OF SERVICE AGREEMENTS PROPOSED TO BE ASSIGNED**

To be added.

**EXHIBIT K**

**INTENTIONALLY OMITTED**

4161-7209-9915.5

EXHIBIT L

FORM OF SALE ORDER

# EXHIBIT B

## PURCHASE AND SALE AGREEMENT

**AVR AH LLC**, a Colorado limited liability company ("**Seller**"), and **FLEEGER FAMILY FIRST LP and/or assigns** ("**Purchaser**"), hereby enter into this **PURCHASE AND SALE AGREEMENT** (this "**Agreement**") as of the Effective Date.

## R E C I T A L S:

This Agreement is made with reference to the following facts:

A.    Seller is the owner of certain real property located near Woody Creek, Colorado and improvements familiarly known as (1) Aspen Valley Ranch Homesteads 2, 3, 5, 6 and 7; and (2) Aspen Valley Downs Lots 7, 8, and 9, as more fully described in Section 1 below.

B.    Seller desires to sell the real property described in Section 1, below, to Purchaser and Purchaser desires to purchase the same from Seller.

C.    Seller is the "Declarant" under the Amended and Restated Declaration of Protective Covenants for Aspen Valley Ranch dated August 20, 2021, and recorded August 20, 2021, as Reception No. 679960, Pitkin County, Colorado (the "**Declaration**").

D.    Seller and Purchaser desire to set forth herein the terms, conditions and agreements under and by which Seller shall sell and transfer and Purchaser shall purchase, accept and assume the Property (as hereinafter defined).

E.    The effective date ("**Effective Date**") of this Agreement is the date on which Seller has accepted Purchaser's offer to purchase the Property on all of the terms and conditions set forth in this Agreement and the Sale Order has become a Final Order, and in accordance with the provisions of Section 18 hereof.

F.    On July 27, 2023 (the "**Petition Date**") Seller and related entity Strudel Holdings LLC have filed voluntary Chapter 11 bankruptcy petitions commencing Case Nos. 23-90757 and 23-90758 (collectively, the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

G.    Prior to Petition Date, the Seller, in accordance with, *inter alia*, the Declaration transferred the HOA Assets (as hereinafter defined), to the Aspen Valley Ranch Homeowners Association, Inc. (the "**Association**").

In consideration of One Hundred Dollars ($100.00) and other good and valuable consideration, the receipt, sufficiency and delivery of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **AGREEMENT TO PURCHASE AND SELL.**

Upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser, and Purchaser shall purchase from Seller, free and clear of all liens, claims, interests and encumbrances other than the Assumed Liabilities (defined

- 1 -

below), subject to the terms and conditions of this Agreement, all of Seller's right, title and interest in and to the following property (collectively, the "**Property"**):

1.1.   Real Property.   All of Seller's right, title, and interest in and to the land legally described on Exhibit A attached hereto, together with all easements, licenses, crossing permits, appurtenances and other rights, privileges and benefits appurtenant thereto and any land lying in the bed of any street, road, avenue, open or proposed, public or private, in front of or adjoining the said land or any portion thereof, to the center line thereof (collectively, the "**Land**"), all residential and non-residential improvements thereon (including without limitation any water and sewage facilities and underground conduits located on the Land and owned by Seller) (collectively, the "**Improvements**"), and all oil, gas and other mineral rights.  The Land and the Improvements are collectively referred to as the "**Real Property**."

1.2.   Intangible Property.   All of Seller's right, title, and interest in and to all design and other professional contracts pertaining to the design or construction of the Improvements or any proposed improvements for the Real Property and all service and other contracts in effect as of Closing Date (defined below) relating to the Real Property, hereto assignable permits, site plans, certificates of occupancy, development rights, plans and entitlements, and other public approvals if and to the extent related to the Real Property, if any (the "**Intangible Property**").

1.3.   Personal Property. All of Seller's right, title, and interest in and to all furniture, furnishings, and appliances located in any residences or structures on the Property, fitness equipment, kitchen appliances and equipment, games of amusement, recreational vehicles, motorcycles, automobiles, tractors, wagons, snowmobiles, trailers, irrigation equipment, haying equipment, farming equipment, tools, supplies, machinery, apparatus and other equipment used in the use, operation, enjoyment, management, repair and maintenance of the Land and the Improvements, and all other personal property owned by Seller and on the Property as of the Closing Date (as defined herein) (the "**Personal Property**"); provided, however, that all personal property located in or on Aspen Valley Ranch Homestead 5 including, without limitation, all furniture and art, and any other personal property, including without limitation, furniture and art, stored elsewhere on the Property and labelled as "H5 Personal Property" is excluded from the definition of Personal Property.

1.4.   Water Rights. Seller will convey to Purchaser all water and water rights, whether tributary or non-tributary, whether adjudicated or unadjudicated, and all ditches and ditch rights, water wells and well rights, water entitlements and water resources owned by Seller and appurtenant to the real Property described on Exhibit A ("**Subject Water Rights**"). Further, Seller shall sell, convey and assign to Purchaser such easements, rights-of-way, water diversion, carriage, storage, and transmission facilities, and all other improvements or appurtenances owned by Seller and related to, associated with, or historically used on or in connection with the Subject Water Rights. The Subject Water Rights shall be conveyed and assigned by Seller to Purchaser at closing by Bargain and Sale Deed and Assignment or other appropriate instrument. The Subject Water Rights do not include any of the water rights, water structures or water interests previously conveyed and described in the Quit Claim Deed and Assignment recorded at Reception #679728 of Pitkin County real property records.

1.5.    Potential additional Property.

1.5.1.   As provided in, *inter alia*, Sections 8.4, hereof, a condition of the Purchaser's obligation to Close is that the HOA Assets are free and clear of all interests, liens, claims and encumbrances.


2.    **PURCHASE PRICE AND PAYMENT.**

2.1.    Purchase Price.

2.1.1.   The purchase price for the Property (the "**Purchase Price**") shall be the sum of Thirty Million Dollars ($30,000,000.00).  Subject to the terms and conditions of this Agreement, the Purchase Price shall be paid as provided below.

2.2.    Deposit.

2.2.1   Deposit.  Within three (3) Business Days (as that term is defined in Section 16.14) after the execution and delivery of this Agreement by Seller and Purchaser, Purchaser shall have deposited in immediately available federal funds the amount of Five Hundred Thousand Dollars ($500,000.00) (together with any interest earned thereon, the "**Deposit**") to Aspen Title & Escrow, 449 E Hopkins Ave, Aspen, Colorado 81611 ("**Title Company**").  If the Deposit is not deposited as and when required as provided above in this Section 2.2.1, then, at Seller's option, this Agreement shall terminate.  Title Company shall invest the Deposit (as hereinafter defined) in an interest-bearing money market account at such bank as Title Company may elect and shall be approved by Purchaser and Seller, and the Deposit shall be held and disbursed in accordance with this Agreement. The interest shall accrue for the benefit of the Purchaser, unless any portion of the Deposit (as hereinafter defined) is released to the Seller pursuant to the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement, One Hundred and No/100 Dollars ($100.00) of the Deposit delivered to the Title Company shall be delivered by the Title Company to Seller as "**Independent Contract Consideration**," and the Deposit is reduced by the amount of the Independent Contract Consideration so delivered to Seller, which amount has been bargained for and agreed to as consideration for Seller's execution and delivery of this Agreement.

2.3.    Payment.  No later than 5:00 p.m. Mountain Time on the Closing Date, Purchaser shall deposit or cause to be deposited with the Title Company sums sufficient to pay the Purchase Price and all other amounts necessary to satisfy Purchaser's obligations with respect to closing the transactions contemplated in this Agreement.  At Closing, the Purchase Price will be paid to Seller, as adjusted for the prorations, debits and credits set forth in this Agreement, and Purchaser shall authorize the Title Company to transfer to Seller such amount by federal wire transfer in immediately available funds to such bank account(s) as Seller may designate.

2.4.    Closing.  Payment of the Purchase Price and the closing hereunder (the "**Closing**") shall take place pursuant to an escrow closing, conducted by the Title Company, on such date selected by Purchaser and Seller at least ten business days after the Effective Date, but no later than November 30, 2023, provided, that all conditions for Closing set forth in Section 10 have been satisfied (the "**Closing Date**"). TIME IS OF THE ESSENCE AS TO PURCHASER'S OBLIGATION TO CLOSE THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT ON THE CLOSING DATE.

14669616v3

On or prior to the Closing Date, the parties shall deposit in escrow with the Title Company all documents, instruments and Closing funds required to be delivered by such party in order to consummate Closing pursuant to this Agreement. Provided however, the Purchaser, in its sole and exclusive discretion, may extend the November 30, 2023, date provided above, one or more times by written notice to Seller.

3.    **DUE DILIGENCE PERIOD.**

    3.1.    <u>Due Diligence Period</u>. Purchaser's obligations hereunder are not subject to any further due diligence.

4.    **REPRESENTATIONS AND WARRANTIES OF SELLER.**

    4.1.    <u>Representations and Warranties</u>. Seller represents and warrants to Purchaser that the following are true and correct in all material respects as of the Effective Date:

        4.1.1    <u>Authority</u>. Seller is a limited liability company validly existing and in good standing under the laws of the State of Colorado and qualified to do business in the State of Colorado. Subject to the Bankruptcy Court approval, Seller has all requisite corporate company power and authority to enter into this Agreement and all documents now or hereafter to be executed and delivered by Seller pursuant to this Agreement and to perform its obligations under this Agreement and under such documents. Subject to Bankruptcy Court approval, Seller is duly authorized to enter into this Agreement, and shall obtain any consents necessary for it to perform this Agreement. Subject to Bankruptcy Court approval, this Agreement constitutes the valid and binding obligation of Seller and is enforceable against Seller.

        4.1.2    <u>Enforceability</u>. Subject to Bankruptcy Court approval, this Agreement constitutes a legal and binding agreement of the Seller enforceable in accordance with its terms, and that there exists no restriction on the right of Seller to transfer, sell, convey and assign the Property except as provided herein.

        4.1.3    <u>No Violation</u>. The execution, delivery and performance by Seller of this Agreement will not result in a violation by Seller of its obligations under any of the following that are binding on Seller: (a) any judgment or order entered by any court or governmental body, (b) any governmental statute, ordinance, code, rule or regulation, (c) to Seller's knowledge, any contract or agreement or indenture other than those matters involving and arising out of the Pitkin County Public Foreclosure No. 23-002 ("**Foreclosure**") which Foreclosure was initiated by the agent of Seller's lenders, Wilmington Trust National Association ("**Lender**") or (d) any agreement, covenant or obligation of Seller to Lender.

        4.1.4    <u>Compliance with Laws</u>. The Seller has not received any notice of any current violation of any federal, state, county or municipal or other local law, rule or regulation affecting or related to the Property, including, without limitation, those pertaining to building codes, air or water pollution, environmental pollution and/or endangered species other than as previously disclosed verbally or in writing to the Purchaser. Other than the Foreclosure and the Bankruptcy Cases, the Seller has not received notice of, and neither has knowledge of any pending or threatened litigation, proceeding, or investigation by any governmental authority or any other person against or otherwise affecting the Property, nor does Seller know of any grounds for any such litigation, proceeding, or investigation.

- 4 -

4.1.5    No Condemnation.  Seller has not received written notice of any pending or threatened (in writing), condemnation, eminent domain or similar proceedings with respect to all or any portion of the Real Property.

4.1.6    Litigation.  Except for the Foreclosure referenced in Section 4.1.3 hereof, Seller has not received written notice of any pending or threatened (in writing) actions, suits or proceedings against or affecting Seller, the Property, or arising out of the ownership, management or operation of the Property, this Agreement or the transactions contemplated by this Agreement that will bind or burden any of the Property after the Closing.

4.1.7    Leases.    There are no unrecorded leases, licenses or other occupancy agreements relating to the Real Property ("**Leases**").

4.1.8    Association.  With respect to the Association, all Association Obligations (as defined below) payable to the Association are paid in full or will be paid in full through the Closing Date with respect to the Property. It shall be the Seller's sole and exclusive obligation to pay, either prior to or concurrent with the Closing all such then due and owing Association Obligations, with any prorations to occur at the Closing.

4.1.9    Assigned Contracts.  Other than the as shown on Schedule G: Executory Contracts and Unexpired Leases filed with the Bankruptcy Court, there are no other potentially Assigned Contracts.

4.2.    Survival.  Seller's representations and warranties set forth in this Agreement shall survive the Closing for a period (the "**Survival Period**") of six (6) months and any action brought on Seller's representations and warranties shall be commenced within said Survival Period or shall be forever barred and waived.

4.3.    Matters Pertaining to Representations and Warranties

4.3.1.  As used throughout this Agreement, the phrase "to Seller's knowledge" or phrases of similar import shall mean the actual, not constructive or imputed, current knowledge of Charif Souki, Karim Souki or Brooke Peterson (each, a "**Knowledge Party**"), without independent investigation or inquiry.  Nothing in this Agreement shall be construed to imply that the Knowledge Party has any personal liability for a breach of a representation or warranty set forth in this Agreement.

4.3.2.  The representations and warranties of Seller in this Agreement are the sole representations and warranties of Seller with respect to the transaction contemplated by this Agreement.  Seller makes no representation or warranty other than those expressly set forth herein and, except for the warranties and representations expressly set forth herein, the sale of the Property is made on an "as-is" basis, without warranty.

5.    **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

Purchaser represents and warrants to Seller as follows as of the Effective Date:

5.1.    Authority.  Purchaser shall be duly formed, validly existing and in good standing under the laws of the State of its formation, and Purchaser shall have all requisite power and authority to enter into and perform this Agreement and all documents now or hereafter to be executed and

- 5 -

delivered by Purchaser pursuant to this Agreement and to perform its obligations under this Agreement and under such documents. Purchaser is duly authorized to enter into this Agreement, and in the event that Purchaser is an entity, shall obtain, prior to Closing, any consents necessary for it to perform this Agreement. In the event that Purchaser is an entity, prior to the Closing, Purchaser shall deliver to Title Company copies of any required authorizing consents. This Agreement constitutes the valid and binding obligation of Purchaser and is enforceable against Purchaser.

5.2. <u>No Violation</u>. The execution, delivery and performance by Purchaser of this Agreement will not result in a violation by Purchaser of (a) any judgment or order entered by any court or governmental body, (b) any governmental statute, ordinance, code, rule or regulation, or (c) any contract or agreement or indenture.

5.3. <u>Bankruptcy</u>. Purchaser has not (a) commenced a voluntary case with respect to it or its assets, or to Purchaser's knowledge, had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (b) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator, or similar official in any federal, state, or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its assets, or (c) made a general assignment for the benefit of creditors.

5.4. <u>OFAC</u>. To Purchaser's knowledge, Purchaser (a) is not in violation of any Anti-Terrorism Law, (b) is not a Prohibited Person, or (c) is not and will not knowingly (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose or intent of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

6. **<u>CONDITION OF PROPERTY</u>.**

6.1. <u>Disclaimer</u>. Except for Seller's special warranty of title to be contained in the deed to Purchaser at Closing, and except as expressly stated in <u>Section 4.1</u>, but subject to the limitations contained in <u>Section 4.3</u>, Seller hereby specifically disclaims any warranty, guaranty, or representation, oral or written; past, present or future, of, as to, or concerning (i) the nature and condition of the Property, including but not by way of limitation, the water, soil, geology and the suitability thereof, and of the Property, for any and all activities and uses which Purchaser may elect to conduct thereon, income to be derived therefrom or expenses to be incurred with respect thereto, or any obligations or any other matter or thing relating to or affecting the same; (ii) the manner of construction and condition and state of repair or lack of repair of any improvements located thereon; (iii) the nature and extent of any condition; and (iv) the compliance of the Property or the operation of the Property with any laws, rules, ordinances, or "regulations of any government or other body. EXCEPT AS STATED HEREIN, IN CONNECTION WITH THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN, SELLER HAS NOT MADE AND DOES NOT MAKE, ANY REPRESENTATIONS, WARRANTIES OR COVENANTS OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE

QUALITY OR CONDITION OF THE PROPERTY, THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, COMPLIANCE BY THE PROPERTY WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND SPECIFICALLY, SELLER DOES NOT MAKE ANY REPRESENTATIONS REGARDING HAZARDOUS WASTE, AS DEFINED BY THE LAWS OF THE STATE OF COLORADO AND ANY REGULATIONS ADOPTED PURSUANT THERETO OR THE U. S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS AT 40 C.F.R., PART 261, OR THE DISPOSAL OF ANY HAZARDOUS WASTE OR ANY OTHER HAZARDOUS OR TOXIC SUBSTANCES IN OR ON THE PROPERTY.  Purchaser agrees to accept the Property at Closing with the Property being in its present AS IS condition WITH ALL FAULTS.

  6.2. <u>Property Condition</u>.  PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER IS EXPERIENCED IN THE OWNERSHIP, DEVELOPMENT AND/OR OPERATION OF PROPERTIES SIMILAR TO THE PROPERTY AND THAT PURCHASER PRIOR TO THE CLOSING WILL HAVE INSPECTED THE PROPERTY TO ITS SATISFACTION AND IS QUALIFIED TO MAKE SUCH INSPECTION.  PURCHASER ACKNOWLEDGES THAT IT IS FULLY RELYING ON PURCHASER'S (OR PURCHASER'S REPRESENTATIVES') INSPECTIONS OF THE PROPERTY AND EXCEPT FOR THE SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED HEREIN, NOT UPON ANY STATEMENT (ORAL OR WRITTEN) WHICH MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY SELLER OR ANY OF ITS REPRESENTATIVES. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS (OR PURCHASER'S REPRESENTATIVES HAVE), OR PRIOR TO THE CLOSING WILL HAVE, THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE CONDITION OF THE PROPERTY AND ALL OTHER ASPECTS OF THE PROPERTY (INCLUDING, BUT NOT LIMITED TO, THE ENVIRONMENTAL CONDITION OF THE PROPERTY); AND PURCHASER ACKNOWLEDGES THAT PURCHASER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE PROPERTY.  PURCHASER HEREBY EXPRESSLY ASSUMES ALL RISKS, LIABILITIES, CLAIMS, DAMAGES AND COSTS (AND AGREES THAT SELLER SHALL NOT BE LIABLE FOR ANY SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, OR OTHER DAMAGES) RESULTING OR ARISING FROM OR RELATED TO THE OWNERSHIP, USE, CONDITION, LOCATION, MAINTENANCE, REPAIR OR OPERATION OF THE PROPERTY ATTRIBUTABLE TO THE PERIOD FROM AND AFTER THE DATE OF CLOSING. PURCHASER EXPRESSLY WAIVES (TO THE EXTENT ALLOWED BY APPLICABLE LAW) ANY CLAIMS UNDER FEDERAL, STATE OR OTHER LAW THAT PURCHASER MIGHT OTHERWISE HAVE AGAINST SELLER RELATING TO THE USE, CHARACTERISTICS OR CONDITION OF THE PROPERTY EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED BY THIS CONTRACT.  ANY REPAIRS PAID FOR BY SELLER PURSUANT TO THIS CONTRACT, IF ANY, SHALL BE DONE WITHOUT ANY WARRANTY OR REPRESENTATION BY SELLER, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER IN CONNECTION WITH SUCH REPAIRS.  THE PROVISIONS OF PARAGRAPHS 12(a) AND 12(b) OF THIS CONTRACT SHALL BE INCLUDED IN THE SPECIAL WARRANTY DEED TO BE DELIVERED BY SELLER TO PURCHASER AT CLOSING.

14669616v3

7. **PURCHASER'S INDUCEMENTS TO SELLER; SELLER'S INDUCEMENTS TO PURCHASER.**

7.1.    <u>Purchaser's Acknowledgements</u>.  Purchaser acknowledges and agrees that, except as expressly provided in this Agreement, having been given the opportunity to inspect the Property, Purchaser is relying solely on its own investigation of the Property and not, except as otherwise expressly provided in this Agreement, on any information provided or to be provided by Seller.  The provisions of this <u>Section 7.1</u> shall survive Closing or termination of this Agreement.

7.2.    <u>Land Use Approvals</u>. From and after the Effective Date, Seller and Knowledge Party shall reasonably cooperate with Purchaser regarding any investigation by Purchaser of the status of any development rights and approvals in connection with the Real Property, including, without limitation, authorizing Purchaser's filing of land use applications and requests for "comfort letters" or other informal clarifications with Pitkin County, Colorado and/or the Pitkin County Community Development Department.

7.3    <u>Condition of Property as of Closing</u>.  Immediately prior to Closing, Purchaser or Purchaser's designated representatives shall have the right to "walk through" the Property to inspect the condition thereof and to determine whether there has been any failure, dissipation, or damage to the Property or the Personal Property or the Improvements.

8. **ASSUMED LIABILITIES AND ASSOCIATION OBLIGATIONS.**

8.1    Upon the terms and subject to the conditions of this Agreement, Purchaser shall assume and agree to discharge, when due (in accordance with its respective terms and subject to the respective conditions hereof), only the following liabilities (the "Assumed Liabilities") and no others:

8.1.1 <u>Contracts</u>.  All of the Seller's Liabilities under the Assigned Contracts listed on Exhibit E attached hereto, to the extent such liabilities are attributable to periods from and after the Closing Date.  For the avoidance of doubt, any and all cure and reinstatement costs or expenses that are required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts shall be paid and shall be the sole responsibility of the Purchaser.

8.2    Purchaser acknowledges receipt of that: (a) certain document by and among the Debtors, the Association and Beyond The Beach, LLC ("**BTB**") entitled *Agreement Regarding Design Guidelines and Association Rules and Regulations*, dated as of October 15, 2021 (a copy of which is attached hereto as <u>Exhibit F-1</u>); and (ii) certain document by and between the Debtors and BTB entitled *Agreement Regarding Exercise of Declarant Control and Association Voting Rights*, dated October 15, 2021 (a copy of which is attached hereto as <u>Exhibit F-2</u>), hereinafter Exhibits F-1 and F-2, are collectively referred to as the "**BTB Documents**").  Purchaser acknowledges and agrees that the BTB Documents are binding and fully enforceable, as against, *inter alia*, the Purchaser, on the Closing, and that the BTB Documents run with the HOA Assets and the property described in that certain Special Warranty Deed recorded deed to BTB in the real property records for Pitkin County, Colorado on October 15, 2021, under Reception No. 681597 (the "**BTB Property**").  Concurrently with Closing, the BTB Documents shall be recorded by the Title Company in the real property records for Pitkin County, Colorado.

14669616v3

8.3     Any and all Assessments, liabilities, obligations or amounts due to the Association by the Seller or otherwise attributable or allocable to the Property ("**Association Obligations**") shall be fully paid and satisfied by Seller as a condition of Closing, either by (a) payment and satisfaction of the Association Obligations by Seller prior to Closing; or (b) payment and satisfaction of the Association Obligations from the Purchase Price at Closing. In the event the Association Obligations have not been satisfied as of the Closing Date, Purchaser shall be entitled to reduce the Purchase Price by an amount equal to the Association Obligations.

8.4     Notwithstanding anything herein to the contrary, upon Closing, any and all liens, deeds of trust, claims, security interests, encumbrances and interests of any kind and nature held by Seller or Lender, are or shall be prior to the Closing (as a condition of Purchaser's obligation to close) unconditionally transferred to the Association or released, as appropriate, with respect to the HOA Assets, which are:

8.4.1 HOA Real Property: All of Seller's right, title, and interest in and to the land legally described on Exhibit A-1 attached hereto, together with all easements, licenses, crossing permits, appurtenances and other rights, privileges and benefits appurtenant thereto and any land lying in the bed of any street, road, avenue, open or proposed, public or private, in front of or adjoining the said land or any portion thereof, to the center line thereof (collectively, the "**HOA Land**"), all residential and non-residential improvements thereon (including without limitation any water and sewage facilities and underground conduits located on the HOA Land and owned by Seller) (collectively, the "**HOA Improvements**"), all water and water rights, water resources and entitlements to water, whether tributary or non-tributary described on Exhibit A-1 ("**HOA Water**") and all oil, gas and other minerals and all oil, gas and other mineral rights ("**HOA Minerals**").  The HOA Land, the HOA Improvements, the HOA Water and the HOA Minerals are collectively referred to as the "**HOA Real Property**";

8.4.2 HOA Intangible Property:  All of Seller's right, title, and interest in and to all design and other professional contracts pertaining to the design or construction of the HOA Improvements or any proposed improvements for the HOA Real Property and all service and other contracts in effect as of August 20, 2021, relating to the HOA Real Property, hereto assignable permits, site plans, certificates of occupancy, transferrable development rights, development rights, plans and entitlements, and other public approvals if and to the extent related to the HOA Real Property, if any (the "**HOA Intangible Property**"); and

8.4.3 HOA Personal Property. All of Seller's right, title, and interest in and to all furniture, furnishings, and appliances located in any residences or structures on the Property, fitness equipment, kitchen appliances and equipment, games of amusement, recreational vehicles, motorcycles, automobiles, tractors, wagons, snowmobiles, trailers, irrigation equipment, haying equipment, farming equipment, tools, supplies, machinery, apparatus  and other equipment used in the use, operation, enjoyment, management, repair and maintenance of the HOA Land and the HOA Improvements, and all other personal property owned by Seller and on the HOA Real Property as of August 20, 2021 (the "**HOA Personal Property**").

8.4.4 HOA Assets.  Collectively, the HOA Real Property, the HOA Intangible Property and the HOA Personal Property are referred to herein as the "**HOA Assets**").

14669616v3

9.      **BANKRUPTCY COURT APPROVALS.**

9.1.    <u>Sale Order.</u>  Upon Purchaser being selected as the Back-Up Bidder after Auction, Seller shall request that the Bankruptcy Court enter an order, in form and substance reasonably acceptable to Purchaser (the "**Sale Order**"):

(a)      finding that Purchaser is purchasing the Property for reasonably equivalent value.

(b)      finding that the transactions contemplated by this Agreement have been negotiated at arm's length.

(c)      finding that Purchaser is purchasing the Property in good faith and is entitled to the protections of section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated.

(d)      providing that the Property, including the HOA Assets should the Seller implement the HOA Assets Alternative, to be sold to Purchaser, shall be sold free and clear of any and all liens, claims, encumbrances and interests of any kind and nature, including any and all interests within the meaning of section 363(f) of the Bankruptcy Code.

(e)      determining that Purchaser is not a successor to Seller or otherwise liable for any remedy, claim, cause of action or encumbrance against Seller or the Property.

(f)      providing that the terms and conditions of the Sale order shall be binding in all respects upon the Seller, its bankruptcy estate, its creditors, and their respective successors and assigns.

(g)      providing that the Seller shall implement the HOA Assets Alternative, prior to and as a condition of the Closing, in the event that concurrent with the Closing, the Seller cannot or does not cause any and all liens, deeds of trust, claims, security interests, encumbrances and interests of any kind and nature held by Seller or Lender, to be unconditionally transferred to the Association or released, as appropriate, with respect to the HOA Assets.

10.     **CONDITIONS TO CLOSING.**

10.1.   <u>Purchaser's Conditions.</u>  Purchaser's obligation to consummate Closing pursuant to this Agreement is conditioned upon the satisfaction (or waiver by Purchaser, in its sole and exclusive discretion) of the following conditions on and as of the Closing Date:

10.1.1. Seller shall have performed and satisfied its obligations under this Agreement in all material respects.

10.1.2. The representations and warranties of Seller shall be true and correct in all material respects as of the Closing.

10.1.3. The Title Company shall be committed, subject only to the payment by Purchaser of the costs and fees related thereto and satisfaction of Purchaser's other obligations, to

- 10 -

issue an owner's title insurance policy the form and substance of which shall be subject to Purchaser's reasonable approval.

10.1.4. The Bankruptcy Court shall have entered the Sale Order, such Sale Order shall be in full force and effect without modification and shall have become a Final Order. For purposes hereof, "**Final Order**" means an order which has not been reversed, stayed, modified or amended and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been filed has been resolved by the highest court to which the order or judgment could be appealed, or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

10.1.5. Seller shall have caused to be recorded in the Pitkin County Records a Release of all of the HOA Assets from any and all liens, encumbrances, agreements or covenants of Lender.

10.1.6. To the extent title to any of the HOA Assets is held by Seller, then Seller shall transfer or assign by appropriate instrument such HOA Assets to the Purchaser.

10.1.7. Seller shall have obtained and recorded a release of any and all assignments of Declarant Rights under the Declaration, including but not limited to the Assignment of Rights Under Declaration recorded August 20, 2021, in the Pitkin County Records as Reception No. 679708.

10.2.   Seller's Conditions.   Seller's obligation to consummate Closing pursuant to this Agreement is conditioned upon the satisfaction (or waiver by Seller, in its sole and exclusive discretion) of the following conditions on and as of the Closing Date:

10.2.1. Purchaser shall have performed and satisfied its obligations under this Agreement in all material respects, including delivery of the Purchase Price to the Title Company.

10.2.2.   The representations and warranties of Purchaser shall be true and correct in all material respects as of the Closing.

10.2.3.   The Bankruptcy Court shall have entered the Sale Order, such Sale Order shall be in full force and effect without modification, and shall have not been reversed, stayed, modified or amended.

10.2.4. Purchaser shall execute such documents deemed reasonably necessary to record or confirm title in and to the HOA Assets in the Association, to be recorded or delivered as appropriate at or immediately after the Closing.

10.3.   Failure of Purchaser's Condition.   In the event of the failure of any condition set forth in Section 10.1 that is not cured within five (5) days after written notice thereof from Purchaser to Seller, Purchaser, at its sole election and as its sole remedy for said failure, may (i) terminate this Agreement and, within 48 hours of such termination, receive a return of the Deposit, and any portion of the Purchase Price provided to the Title Company, or (ii) waive the condition and proceed to Closing, or (iii) extend the date for Closing for such additional period of time (not to exceed thirty (30) days in the aggregate for all such extensions) as may be reasonably required to allow such condition to be satisfied.

14669616v3

10.4.   Failure of Seller's Condition.  In the event of the failure of any condition set forth in Section 10.2, other than Section 10.2.3, that is not cured within ten (10) days after written notice thereof from Seller to Purchaser, Seller, at its sole election and as its sole remedy for said failure, may (i) terminate this Agreement and receive the Deposit, (ii) waive the condition and proceed to Closing, or (iii) extend the date for Closing for such additional period of time (not to exceed thirty (30) days in the aggregate for all such extensions) as may be reasonably required to allow Purchaser to satisfy such condition, or (iii) extend the date for Closing for such additional period of time (not to exceed thirty (30) days in the aggregate for all such extensions) as may be reasonably required to allow such condition to be satisfied.  In the event of a failure of the condition of Section 10.2.3, Purchaser's Deposit shall be returned and this Agreement shall be terminated and of no further force and effect except to the extent specifically provided herein.

11.   **CLOSING DELIVERIES.**

11.1.   Seller's Closing Deliveries.  At Closing, Seller shall deliver, or cause to be delivered, to Purchaser the following with respect to the Property:

11.1.1. An executed Special Warranty Deed (the "**Deed**") for the Real Property substantially in the form attached hereto as Exhibit B conveying to Purchaser title to the Real Property, free from all liens, encumbrances, easements, conditions and other matters affecting title except the Permitted Exceptions and subject to "Statutory Exceptions" as defined in § 38-30-113(5)(a), C.R.S., all of the records of the Pitkin County Clerk and Recorder's Office.

(A)   In the event the Seller implements the HOA Assets Alternative, the Deed provided in Section 11.1.1. shall include the HOA Real Property and, as applicable the HOA Intangible Property.

11.1.2. An executed Assignment of Declarant's Rights (the "**Assignment of Declarant's Rights**") substantially in the form attached hereto as Exhibit C, conveying to Purchaser all of Seller's rights as Declarant under the Declaration.

11.1.3. An executed Assignment (the "**Assignment**") substantially in the form attached hereto as Exhibit C-1, conveying to Purchaser all of Seller's rights to various warranties and other rights in the Property.

(A)   In the event the Seller implements the HOA Assets Alternative, the Assignment provided in Section 11.1.3. shall include the HOA Water and, as applicable the HOA Intangible Property.

11.1.4. An executed Bill of Sale (the "**Bill of Sale**") for the Personal Property substantially in the form attached hereto as Exhibit D, conveying to Purchaser title to the Personal Property, free from all liens and encumbrances except for Permitted Exceptions.

(A)   In the event the Seller implements the HOA Assets Alternative, the Bill of Sale provided in Section 11.1.4. shall include the HOA Personal Property, and as applicable the HOA Intangible Property.

- 12 -

14669616v3

11.1.5.  An executed certification and affidavit as required by the Foreign Investors Real Property Tax Act.

11.1.6.  An executed counterpart to the closing and proration statement agreed to by the parties which reflects all adjustments to the Purchase Price contemplated by this Agreement (the "**Closing Statement**").

11.1.7. Any transfer documents or certificates required by any applicable governing body or law to complete this transaction, including, without limitation, an IRS 1099S form and any forms relating to the transfer tax, the recordation tax or other similar tax.

11.1.8. An executed Seller's Affidavit.

11.1.9. All other documents reasonably required by Title Company to effectuate this Agreement and the transaction contemplated by this Agreement.

11.2.   Purchaser's Closing Deliveries.  At Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following:

11.2.1.  The Purchase Price, adjusted in accordance with the provisions of Sections 2, 8 and 12 hereof.

11.2.2. An executed counterpart to the Closing Statement.

11.2.3.  Any transfer documents or certificates required by any applicable governing body or law to complete this transaction, including, without limitation, any forms relating to the transfer tax, the recordation tax or other similar tax.

11.2.4.  All other documents reasonably required by Title Company to effectuate this Agreement and the transaction contemplated by this Agreement; including, should the Purchaser implement the HOA Assets Alternative, such documents deemed reasonably necessary to record or confirm title in and to the HOA Assets in the Association.

12.   **APPORTIONMENTS; EXPENSES.**

12.1.   Apportionments.  The following matters shall be apportioned and adjusted between Seller and Purchaser as of the Closing Date.

12.1.1. Taxes.  Applicable real estate, and personal property taxes for the Property shall be apportioned as of the Closing Date (i.e., with Seller being responsible for all such amounts payable with respect to the period up to but not including the Closing Date and with Purchaser being responsible for all such amounts payable with respect to the period from and after the Closing Date) and shall be prorated on the basis of the most recent assessed values, tax rates, and Mill Levy rates for the Property.  The term "real estate taxes" shall include any installments of betterment, special or similar assessments, and taxes attributable to the gross receipts or rental income of the Real Property. If the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties.

12.1.2. Utility Charges and Contracts.  All utility charges, if any, applicable to the Real

- 13 -

Property and all payments, if any, required under any Contracts shall be prorated between Seller and Purchaser as of the Closing Date based on estimates of the amounts that will be due and payable on the next payment date, unless final readings or invoices therefor as of the Closing Date shall have been obtained, in which case such final readings shall be utilized as the basis for adjustment.  Any and all deposits, if any, held by utility companies or with other providers of services to the Real Property shall remain the property of Seller and be returned to Seller by such companies and providers except to the extent that Purchaser elects to pay to Seller the amount of any such deposits and accruals, if any, thereon.

 12.1.3. <u>Calculations; Survival</u>.  Except as otherwise set forth herein, all items to be apportioned and adjusted pursuant to this <u>Section 12.1</u> shall be prorated as of midnight of the day immediately preceding the Closing Date.  All items of income and expense which accrue for the period prior to the Closing will be for the account of Seller and all items of income and expense which accrue for the period on and after the Closing will be for the account of Purchaser.  All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a three hundred sixty-five (365) day year.  The amount of such apportionments and adjustments shall be initially performed at Closing but shall be subject to adjustment in cash after the Closing as and when complete and accurate information becomes available if such information is not available at the Closing.  The provisions of this <u>Section 12</u> shall survive for a period of twelve (12) months following the Closing.

 12.2. <u>Expenses</u>.

 12.2.1.  <u>Seller's Expenses</u>.  Seller shall pay (a) one-half of Title Company's escrow and closing fees; (b) all expenses and charged incurred in connection with the discharge of any encumbrances or liens which are to be released pursuant to <u>Section 3.4.3</u> hereof; (c) one half of all state and county recordation and/or transfer, documentary stamp, and excise taxes payable in connection with the transfer of the Property and recordation of the deed; (d) Seller's share of prorations as determined in accordance with this Agreement; (e) Seller's attorneys' fees and all other expenses incurred by Seller in connection with the transaction contemplated by this Agreement; and (f) all premiums for Purchaser's owner's title insurance policy and Owner's Extended Coverage.

 12.2.2. <u>Purchaser's Expenses</u>.  Purchaser shall pay: (a) one half of Title Company's escrow and closing fees; (b) Purchaser's share of prorations as determined in accordance with this Agreement; (c) one half of all state and county recordation and/or transfer, documentary stamp, and excise taxes payable in connection with the transfer of the Property and recordation of the deed; (d) all lender fees, loan policy premiums (including any endorsements thereto) and applicable state and county fees and taxes in connection with the financing or mortgage (if any); and (e) Purchaser's attorneys' fees and the cost of expenses incurred by Purchaser in connection with this Agreement, including, without limitation: (i) all premiums for endorsements to Purchaser's title insurance policy or policies; (ii) the cost of Purchaser's due diligence and any survey or engineering work requested by Purchaser; and (iii) expenses incurred by Purchaser in connection with the transaction contemplated by this Agreement.

 12.2.3. <u>Other Expenses</u>.  Each party shall pay its own respective legal fees in connection with the negotiation of this Agreement.  Except as specifically provided for in this Agreement, Seller and Purchaser shall allocate all closing costs between them in accordance with customary practice in the State of Colorado.

13.    **EMINENT DOMAIN; CASUALTY.**

13.1.    <u>Eminent Domain</u>.   If prior to the Closing Date condemnation proceedings are commenced against all or any part of the Real Property, then Seller shall promptly notify Purchaser of the same (the "**Taking Notice**") and the following provisions shall apply:

13.1.1. <u>Total Taking</u>.   If such condemnation is commenced against all of the Real Property, this Agreement shall terminate in which event (a) the Deposit and any other funds delivered by Purchaser to Title Company shall be returned to Purchaser and (b) except as expressly provided for in this Agreement, neither Seller nor Purchaser shall have any further liability or obligation under this Agreement.

13.1.2. <u>Material Taking</u>.   In the event such condemnation is Material (as defined below) but not a total taking as set forth in 13.1.1 above, Purchaser shall have the right to terminate this Agreement by notice from Purchaser to Seller given on or before the date that is the earlier to occur of (a) ten (10) Business Days after the date of the Taking Notice and (b) the Closing. In the event Purchaser does not terminate this Agreement, Purchaser shall accept such title to the Real Property as Seller can deliver, in which case Seller shall pay over or assign to Purchaser all rights and proceeds arising by reason of such taking (less any collection costs incurred by Seller in connection therewith and any costs and expenses incurred by Seller to restore the Real Property) and Purchaser shall pay the Purchase Price without reduction.   If Purchaser terminates this Agreement pursuant to this <u>Section 13.1.2</u>, (i) the Deposit shall be returned to Purchaser, and (ii) except as expressly provided for in this Agreement, neither Seller nor Purchaser shall have any further liability or obligation under this Agreement.

13.1.3. <u>Immaterial Taking</u>.   In the event such condemnation is not Material, then Purchaser shall accept such title to the Real Property as Seller can deliver, in which case Seller shall pay over or assign to Purchaser all rights and proceeds arising by reason of such taking (less any actual third party collection costs incurred by Seller in connection therewith and any costs and expenses incurred by Seller to restore the Real Property) and Purchaser shall pay the Purchase Price at the Closing without reduction.

13.1.4. <u>"Material"</u>.   For purposes of this <u>Section 13.1</u>, the term "**Material**" shall mean a condemnation involving (i) ten percent (10%) or more of the Land or (ii) all or a material portion of access to the Real Property.

13.2.    <u>Casualty Loss.</u>  Seller shall bear all risk of destruction of or damage to the Property by flood, fire or other casualty until the Closing Date; provided, however, that in the event that the Property is damaged prior to the Closing Date so as to require repair costs in excess of $1,500,000.00, as reasonably estimated by Purchaser,  Purchaser may elect to terminate this Agreement by written notice to Seller within 10 days after the date of such damage (or the Closing Date, whichever period is shorter), in which event this Agreement shall terminate and the Deposit shall be returned to Purchaser.  If the damage does not exceed such amount, or if Purchaser elects not to terminate this Agreement in accordance with the terms of this Section, the parties shall proceed to Closing notwithstanding such damage and Purchaser shall be entitled to a credit, at Closing, equal to the amount of insurance proceeds received by Seller by reason of damage plus any deductible (net of attorneys' fees, court costs and other expenses incurred by Seller in obtaining such insurance proceeds), not to exceed the Purchase Price.  To the extent that the amount of such proceeds has not

- 15 -

been finally determined and received by Seller as of the Closing, the Purchase Price shall be adjusted only with respect to the deductible and Seller shall pay to Purchaser the net amount of any such insurance proceeds received by Seller following the date of Closing (which obligation shall survive Closing).  After the Closing, Purchaser shall bear the risk of destruction of or damage to the Property.

14.    **DEFAULT AND REMEDIES.**

14.1.    Seller's Remedies.    If Purchaser defaults in its obligation to close under this Agreement, Seller's remedies at law or in equity therefor shall be limited to (a) termination of this Agreement, in which event neither Seller nor Purchaser shall have any further liability or obligation under this Agreement except for those obligations that expressly survive the termination of this Agreement and the Seller shall retain the Deposit; or (b) waive such default and consummate the transactions contemplated hereby in accordance with the terms of this Agreement.  For the avoidance of doubt, in the event of the Seller terminating the Agreement consistent with this subsection, the Seller's monetary recovery shall be limited to retaining the Deposit.

14.2.    Purchaser's Remedies.    If Seller defaults in its obligation to close under this Agreement, Purchaser's remedies at law or in equity therefor shall be to either (a) terminate this Agreement and receive the entire Deposit, within 48 hours of such termination, and any other portion of the Purchase Price delivered to the Title Company, in which event neither Seller nor Purchaser shall have any further liability or obligation under this Agreement except for those obligations that expressly survive the termination of this Agreement; (b) require specific performance of this Agreement or (c) waive such default and consummate the transactions contemplated hereby in accordance with the terms of this Agreement.Remedies Exclusive.  By the express agreement of Purchaser and Seller, the remedies set forth in this Section 14 constitute the sole remedies at law or in equity available to Purchaser and Seller, as the case may be, on account of the other party's breach of its obligations to close under this Agreement, provided, however, to the extent any terms or provisions of this Agreement are specifically intended to survive the Closing and delivery of the Deed or the termination of this Agreement, Purchaser shall have all remedies with respect thereto as may be available at law or in equity, and Seller shall have all remedies with respect thereto as may be available at law or in equity.

15.    **FURTHER ASSURANCES.**

After the Closing, Seller, Knowledge Party and Purchaser agree to perform such other acts, and to execute, acknowledge and deliver, such other instruments, documents and other materials as the other may reasonably request (at no cost or liability to the performing party) and as shall be necessary in order to effect the consummation of the transactions contemplated by this Agreement or to provide further assurances of any transfer, conveyance or assignment made pursuant to this Agreement.  The provision of this Section 15 shall survive the Closing for a period of one year.

16.    **NOTICES.**

Except as may be otherwise provided in this Agreement, all notices, demands, requests or other communications required or permitted to be given under this Agreement must be delivered to the following addresses (a) personally, by hand delivery; (b) by Federal Express or a similar nationally recognized overnight courier service; or (c) by email, provided that a confirmation copy is delivered within one (1) Business Day by the method set forth in clause (a) or (b) of this Section 16. All such

- 16 -

notices, demands, requests or other communications shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a Business Day or is required to be delivered on or before a specific day which is not a Business Day, the day of receipt or required delivery shall automatically be extended to the next Business Day.

**If to Seller:**

AVR AH LLC
P.O. Box 4068
Aspen, Colorado 81612
Attn: _____
Telephone: _____
Email: _____

and with a copy to:

**If to Purchaser:**

Fleeger Family First LP
Matthew Fleeger
Email: mattf@gulfcoastwestern.com
Tele: (214) 878-0333

and with a copy to:
Joseph E. Edwards, III
Klein Cote Edwards Citron LLC
101 South Mill St., Ste. 200
Aspen, CO 81611
Email: jee@kceclaw.com
Tele: (970) 925-87004009

**If to Title Company**:

[____]

Notice given by counsel to a party to this Agreement shall be considered notice given by such party. Any party to this Agreement or its counsel may designate a different address for itself by notice given in the manner set forth above.

17.   **BROKERS.**

Each party represents to the other party that it has not dealt with any broker or agent in connection with this transaction and no commission shall be due or paid at Closing. Further, each party agrees to indemnify and hold harmless the other party from and against any claim to a commission by a broker or agent making such claim by, through or under the indemnifying party.

- 17 -

18.    **MISCELLANEOUS.**

18.1.    <u>Assignability</u>.  Purchaser may assign or transfer all of its rights and obligations under this Agreement to any other individual, entity or person without the prior written consent thereto by Seller  The assignee: (a) must assume all of Purchaser's obligations hereunder and shall be jointly and severally liable with Purchaser for all such assigned obligations; (b) the assignee must be able to truthfully make all representations set forth in this Agreement; (c) such assignment shall occur no later than ten (10) days prior to the Closing Date; and (d) at least ten (10) days prior to the Closing Date, Purchaser shall provide Seller with notice thereof.

18.2.1. Either party may treat the transaction contemplated by this Agreement as a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code (the "**Exchange Transaction**").  At the request of either party (the "**Requesting Party**"), the other party (the "**Non-Requesting Party**") shall cooperate with the Requesting Party to effect the Exchange Transaction.  To implement such Exchange Transaction, the Requesting Party may, upon written notice to the Non-Requesting Party, assign the Requesting Party's rights, but not its obligations, under this Agreement to a third party designated by the Requesting Party to act as a qualified intermediary (as such phrase is defined in applicable Internal Revenue Service regulations), and the Non-Requesting Party agrees to perform its obligations under this Agreement as to any such qualified intermediary.

18.2.2.  The Non-Requesting Party shall not be required, solely for the purpose of the Non-Requesting Party's cooperation related to the Requesting Party's Exchange Transaction, to incur any other cost, expense, obligation or liability whatsoever.  The Requesting Party shall in all events be responsible for all reasonable incremental costs and expenses related to the Exchange Transaction, and shall fully indemnify, defend and hold the Non-Requesting Party harmless from and against any and all liability, claims, damages, expenses (including reasonable attorneys' fees), proceedings and causes of actions of any kind or nature whatsoever actually incurred by the Non-Requesting Party and solely attributable to such Exchange Transaction.  The provisions of the immediately preceding sentence shall survive Closing.

18.2.3. The Non-Requesting Party shall use commercially reasonable efforts to mitigate their damages and costs incurred that are attributable to any Exchange Transaction.  In no event whatsoever shall the Closing be delayed because of any delay relating to the Exchange Transaction, unless such delay is agreed to by Purchaser and Seller.

18.3.    <u>Governing Law; Parties in Interest</u>.  This Agreement shall be governed by the law of the State of Colorado without giving effect to its conflicts of law principles and shall bind and inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, successors, and permitted assigns.

18.4.    <u>Recording</u>.  No notice or memorandum of this Agreement shall be recorded in any public record.  A violation of this prohibition shall constitute a material breach of this Agreement.

18.5.    <u>Time of the Essence</u>.  Time is of the essence of each and every provision of this Agreement.

18.6.    <u>Headings</u>.  The headings preceding the text of the sections and subsections hereof are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

14669616v3

18.7.   Counterparts; Signatures.  This Agreement, and any amendments hereto, may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile signatures and signatures delivered electronically (e.g., via .pdf file or via DocuSign or similar service) shall be deemed to be the equivalent of original signatures for purposes of this Agreement and any amendments hereto.

18.8.   Exhibits.  All Exhibits which are referred to in this Agreement and which are attached to this Agreement are expressly made and constitute a part of this Agreement.

18.9.   Merger.  Except as otherwise specifically provided in this Agreement, the acceptance of the Deed by the recordation thereof shall be deemed to be a full and complete performance and discharge of every agreement and obligation of Seller contained in this Agreement.

18.10.   Entire Agreement; Amendments.  There are no oral conditions to the effectiveness of this Agreement.  This Agreement and the Exhibits to this Agreement set forth all of the covenants, representations, warranties, agreements, conditions and undertakings between the parties to this Agreement with respect to the subject matter of this Agreement, and supersede all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written.  This Agreement may not be changed orally but only by an agreement in writing, duly executed by or on behalf of the party or parties against whom enforcement of any waiver, change, modification, consent or discharge is sought.

18.11.   Jury Trial Waiver.  Each party hereby waives trial by jury in any action, proceeding, claim or counterclaim brought by either party in connection with any matter arising out of or in any way connected with this Agreement and the relationship of Purchaser and Seller under this Agreement.  Each party hereby consents to any service of process in any such action, proceeding, claim or counterclaim at the address set forth for such party in this Agreement; provided, however, that nothing in this Agreement shall be construed as requiring such service at such address.  This jury trial waiver provision shall survive the Closing or the termination of this Agreement.

18.12.   Exclusive Jurisdiction.  Any claim, counterclaim or other action arising under this Agreement shall be brought only in the United States Bankruptcy Court for the Southern District of Texas, unless such court lacks jurisdiction over the matter, in which event such claim, counterclaim or other action shall be brought only in the state or cognizant federal courts in the State of Colorado.  This provision shall survive the Closing or the termination of this Agreement.

18.13.   No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the parties to this Agreement (and their respective successors and permitted assigns), and no other person or entity shall be deemed to be a third-party beneficiary of this Agreement.

18.14.   Business Day.  For purposes of this Agreement, "**Business Day**" means any day on which business is generally transacted by banks in Aspen, Colorado.   If a date or the expiration date of any period that is set out in any paragraph of this Agreement falls upon a day that is not a Business Day, then, in such event, the date or expiration date of such period shall be extended to the next Business Day.

18.15.   Severability.  If any one or more of the provisions hereof shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability

shall not affect any other provision hereof, and this Agreement shall be construed as if such <u>invalid</u>, illegal or unenforceable provision had never been contained herein.

18.16. <u>Limitations on Liability</u>. The acceptance of the Deed shall constitute full performance of all of Seller's obligations hereunder other than those obligations of Seller that by the express terms hereof survive the Closing. For purposes of this <u>Section 18.16</u>, no negative capital account or any contribution or payment obligation of any partner or member of Seller shall constitute an asset of Seller. The provisions of this <u>Section 18.16</u> shall survive the Closing or termination of this Agreement.

## 19.   **COLORADO-SPECIFIC PROVISIONS**

19.1. <u>Non-Resident Withholding</u>. Seller and Purchaser agree and acknowledge that Colorado Revised Statute §39-22-604.5 provides that in the case of any conveyance of a Colorado real property interest, the person or party providing closing and settlement services shall be required to withhold an amount equal to two percent (2%) of the sales price or the net proceeds resulting from such conveyance, whichever is less, when the transferor is a non-resident of the State of Colorado. Seller shall be obligated to either comply with the withholding requirements of C.R.S. §39-22-604.5 or provide an affidavit in form and content satisfactory to the person or party providing closing and settlement services which certifies that Seller is not subject to the withholding requirements.

19.2. <u>Methamphetamine Disclosure</u>. If Seller knows that methamphetamine was ever manufactured, processed, cooked, disposed of, used or stored at the Property, Seller is required to disclose such fact. No disclosure is required if the Property was remediated in accordance with state standards and other requirements are fulfilled pursuant to § 25-18.5-102, C.R.S., Purchaser further acknowledges that Purchaser has the right to engage a certified hygienist or industrial hygienist to test whether the Property has ever been used as a methamphetamine laboratory. Purchaser has the Right to Terminate hereunder prior to the expiration of the Due Diligence Deadline, upon Seller's receipt of Purchaser's written Notice to Terminate, notwithstanding any other provision of this Agreement, based on Purchaser's test results that indicate the Property has been contaminated with methamphetamine, but has not been remediated to meet the standards established by rules of the State Board of Health promulgated pursuant to § 25-18.5-102, C.R.S. Purchaser must promptly give written notice to Seller of the results of any such test.

19.3. <u>Common Interest Community Disclosure</u>. THE PROPERTY IS LOCATED WITHIN A COMMON INTEREST COMMUNITY AND IS SUBJECT TO THE DECLARATION FOR THE COMMUNITY. THE OWNER OF THE PROPERTY WILL BE REQUIRED TO BE A MEMBER OF THE OWNERS' ASSOCIATION FOR THE COMMUNITY AND WILL BE SUBJECT TO THE BYLAWS AND RULES AND REGULATIONS OF THE ASSOCIATION. THE DECLARATION, BYLAWS AND RULES AND REGULATIONS WILL IMPOSE FINANCIAL OBLIGATIONS UPON THE OWNER OF THE PROPERTY, INCLUDING AN OBLIGATION TO PAY ASSESSMENTS OF THE ASSOCIATION. IF THE OWNER DOES NOT PAY THESE ASSESSMENTS, THE ASSOCIATION COULD PLACE A LIEN ON THE PROPERTY AND POSSIBLY SELL IT TO PAY THE DEBT. THE DECLARATION, BYLAWS AND RULES AND REGULATIONS OF THE COMMUNITY MAY PROHIBIT THE OWNER FROM MAKING CHANGES TO THE PROPERTY WITHOUT AN ARCHITECTURAL REVIEW BY THE ASSOCIATION (OR A COMMITTEE OF THE ASSOCIATION) AND THE APPROVAL OF THE ASSOCIATION.   PURCHASERS OF PROPERTY WITHIN THE COMMON INTEREST

COMMUNITY SHOULD INVESTIGATE THE FINANCIAL OBLIGATIONS OF MEMBERS OF THE ASSOCIATION. PURCHASERS SHOULD CAREFULLY READ THE DECLARATION FOR THE COMMUNITY AND THE BYLAWS AND RULES AND REGULATIONS OF THE ASSOCIATION.

19.4.    Special Taxing Districts.  SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND TAX TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES. PURCHASERS SHOULD INVESTIGATE THE SPECIAL TAXING DISTRICTS IN WHICH THE PROPERTY IS LOCATED BY CONTACTING THE COUNTY TREASURER, BY REVIEWING THE CERTIFICATE OF TAXES DUE FOR THE PROPERTY AND BY OBTAINING FURTHER INFORMATION FROM THE BOARD OF COUNTY COMMISSIONERS, THE COUNTY CLERK AND RECORDER, OR THE COUNTY ASSESSOR.

19.5.    Oil, Gas, Water and Mineral Disclosure.

19.5.1. SURFACE USE AGREEMENT.  THE USE OF THE SURFACE ESTATE OF THE PROPERTY TO ACCESS THE OIL, GAS OR MINERALS MAY BE GOVERNED BY A SURFACE USE AGREEMENT, A MEMORANDUM OR OTHER NOTICE OF WHICH MAY BE RECORDED WITH THE COUNTY CLERK AND RECORDER.

19.5.2. OIL AND GAS ACTIVITY.  OIL AND GAS ACTIVITY THAT MAY OCCUR ON OR ADJACENT TO THE PROPERTY MAY INCLUDE, BUT IS NOT LIMITED TO, SURVEYING, DRILLING, WELL COMPLETION OPERATIONS, STORAGE, OIL AND GAS, OR PRODUCTION FACILITIES, PRODUCING WELLS, REWORKING OF CURRENT WELLS AND GAS GATHERING AND PROCESSING FACILITIES.

19.5.3. ADDITIONAL INFORMATION. PURCHASER IS ENCOURAGED TO SEEK ADDITIONAL INFORMATION REGARDING OIL AND GAS ACTIVITY ON OR ADJACENT TO THE PROPERTY, INCLUDING DRILLING PERMIT APPLICATIONS. THIS INFORMATION MAY BE AVAILABLE FROM THE COLORADO OIL AND GAS CONSERVATION COMMISSION. THE SURFACE ESTATE OF THE PROPERTY MAY BE OWNED SEPARATELY FROM THE UNDERLYING MINERAL ESTATE AND TRANSFER OF THE SURFACE ESTATE MAY NOT NECESSARILY INCLUDE TRANSFER OF THE MINERAL ESTATE OR WATER RIGHTS. THIRD PARTIES MAY OWN OR LEASE INTERESTS IN OIL, GAS, OTHER MINERALS, GEOTHERMAL ENERGY OR WATER ON OR UNDER THE SURFACE OF THE PROPERTY, WHICH INTERESTS MAY GIVE THEM RIGHTS TO ENTER AND USE THE SURFACE OF THE PROPERTY TO ACCESS THE MINERAL ESTATE, OIL, GAS OR WATER.

19.6.    Source of Water.  The source of potable water on the Property is wells.

19.7.    Carbon Monoxide Alarms.  If any of the Improvements on the Property have a fuel-fired heater or appliance, a fireplace, or an attached garage and include one or more rooms lawfully

- 21 -

used for sleeping purposes (Bedroom), the parties acknowledge that Colorado law requires that Seller assure that the Property has an operational carbon monoxide alarm installed within fifteen feet of the entrance to each Bedroom or in a location as required by the applicable building code.

*[SIGNATURES APPEAR ON FOLLOWING PAGE]*

14669616v3

**IN WITNESS WHEREOF**, the parties have executed and delivered this Purchase and Sale Agreement as of the date first above written.

<u>**SELLER**</u>:

**AVR AH LLC**,
a Colorado limited liability company

By: _____
Name:   Douglas J. Brickley
Title:    Chief Restructuring Officer

Date     November 7, 2023

<u>**PURCHASER**</u>:
**FLEEGER FAMILY FIRST LP**

By: _____
Name:
Title:   Managing Partner

Date:  October<u>24</u>, 2023

## SCHEDULE OF
## EXHIBITS AND SCHEDULES

| | |
|---|---|
| EXHIBIT A | LEGAL DESCRIPTION OF THE LAND |
| EXHIBIT A-1 | LEGAL DESCRIPTION OF THE HOA LAND |
| EXHIBIT B | FORM OF SPECIAL WARRANTY DEED |
| EXHIBIT C | FORM OF ASSIGNMENT OF DECLARANT'S RIGHTS |
| EXHIBIT C-1 | FORM OF ASSIGNMENT |
| EXHIBIT D | FORM OF BILL OF SALE |
| EXHIBIT E | ASSIGNED CONTRACTS |

14669616v3

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE LAND**

Parcel A:

HOMESTEADS 2, 3, 5, 6, AND 7 ACCORDING TO THE SECOND AMENDED SUBDIVISION EXEMPTION PLAT, ASPEN VALLEY RANCH, RECORDED OCTOBER 28, 2011, IN PLAT BOOK 98  AT PAGE 49., COUNTY OF PITKIN, STATE OF COLORADO.

Parcel B:

LOTS 7, 8 AND 9, ASPEN VALLEY DOWNS SUBDIVISION P.U.D. ACCORDING TO THE FIRST AMENDED PLAT OF ASPEN VALLEY DOWNS SUBDIVISION P.U.D. RECORDED MARCH 22, 1999, IN PLAT BOOK 49 AT PAGE 2 AT RECEPTION NO. 429063, COUNTY OF PITKIN, STATE OF COLORADO.

14669616v3

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF THE HOA LAND**

Property described in Deeds recorded in the Pitkin County Records at Reception Nos. 679709, 679710, 682589 and 686429.

A-2

## EXHIBIT B

### FORM OF SPECIAL WARRANTY DEED

### SPECIAL WARRANTY DEED

AVR AH LLC, a Colorado limited liability company for _____ Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby bargains, sells and conveys to _____, whose address is _____, the real property in Pitkin County Colorado described on Exhibit A attached hereto and incorporated herein by this reference, together with all its appurtenances, and warrants the title against all persons claiming under by, through or under it, but not otherwise, subject to taxes for 2023 and thereafter, subject to the "Permitted Exceptions" set forth on Exhibit B attached hereto and incorporated herein by this reference, and subject to "Statutory Exceptions" as defined in § 38-30-113(5)(a), C.R.S., all of the records of the Pitkin County Clerk and Recorder's Office.

Dated: _____, 202__

AVR AH LLC
a Colorado limited liability company

By:_____

STATE OF _____          )
                               ) ss.
COUNTY OF _____         )

The foregoing instrument was acknowledged before me this ____ day of _____, 20___, by _____ as _____ of AVR AH LLC, a Colorado limited liability company.

Witness my hand and official seal.

My commission expires:

_____
Notary Public

14669616v3

**EXHIBIT A**
**(to Special Warranty Deed)**

**LEGAL DESCRIPTION**

Parcel A:

HOMESTEADS 2, 3, 5, 6, AND 7 ACCORDING TO THE SECOND AMENDED
SUBDIVISION EXEMPTION PLAT, ASPEN VALLEY RANCH, RECORDED OCTOBER
28, 2011, IN PLAT BOOK 98  AT PAGE 49., COUNTY OF PITKIN, STATE OF
COLORADO.

Parcel B:

LOTS 7, 8 AND 9, ASPEN VALLEY DOWNS SUBDIVISION P.U.D. ACCORDING TO
THE FIRST AMENDED PLAT OF ASPEN VALLEY DOWNS SUBDIVISION P.U.D.
RECORDED MARCH 22, 1999, IN PLAT BOOK 49 AT PAGE 2 AT RECEPTION NO.
429063, COUNTY OF PITKIN, STATE OF COLORADO.

**<ins>EXHIBIT B</ins>**
**(to Special Warranty Deed)**
"Permitted Exceptions"

[ntd: to be finalized based on final form of Agreement and title policy][NEED THIS]

## EXHIBIT C

### FORM OF ASSIGNMENT OF DECLARANT'S RIGHTS

This **ASSIGNMENT OF DECLARANT'S RIGHTS** ("**Assignment**") is made as of
_____, 202_ by AVR AH LLC, a Colorado limited liability company ("**Assignor**"), in favor of
**[_____]**, a **[_____]** ("**Assignee**").

### RECITALS:

Pursuant to an Agreement of Purchase and Sale, dated as of _____, 202_
("**Agreement**"), between Assignor, as seller, and Assignee, as purchaser, Assignor has agreed to
convey to Assignee all of Assignor's rights ("**Declarant's Rights**") as "Declarant" pursuant to
Section 2.18 of the Amended and Restated Declaration of Protective Covenants for Aspen Valley
Ranch dated August 20, 2021 and recorded August 20, 2021 as Reception No. 679690, Pitkin County,
Colorado (the "**Declaration**").

**Definitions**.  Capitalized terms used in this Assignment and not otherwise defined herein shall
have the meanings ascribed to them in the Agreement, the Declaration or the Colorado Common
Interest Ownership Act.

**NOW, THEREFORE,** in consideration of the foregoing premises, and of other good and
valuable consideration, the receipt and sufficiency of which are acknowledged, Assignor: hereby
sells, assigns, conveys, transfers, and grants to Assignee, all of its right, title and interest as Declarant
under the Declaration including all reserved Declarant Rights and Special Declarant Rights.

**Further Assurances**.  Promptly upon request of the other party, Assignor and Assignee shall
each execute and deliver to the other such further assurances and take such further actions as may be
reasonably required or appropriate to perfect Assignor's the transfer of the Declarant's Rights to
Assignee and otherwise carry out the intent and purpose of this Assignment.

**Binding Effect and Assignment.**  This Assignment shall be binding upon and inure to the
benefit of Assignor and Assignee and their respective successors and assigns.

**Governing Law.**  This Assignment shall be governed by and construed in accordance with
the laws of the State of Colorado (without reference to conflicts of laws principles).

*[Signature page follows]*

**IN WITNESS WHEREOF**, Assignor has executed this Assignment of Declarant's Rights as of the date first above written.

**ASSIGNOR:**

AVR AH LLC
a Colorado limited liability company

By:_____
Name:_____
Its:_____

STATE OF _____  )
                         ) ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me this ____ day of _____, 20___, by _____ as _____ of AVR AH LLC, a Colorado limited liability company.

Witness my hand and official seal.

My commission expires:

_____
Notary Public

14669616v3

**ASSIGNEE:**

FLEEGER FAMILY FIRST LP
a _____ limited partnership

By:_____
Name:_____
Its:_____

STATE OF _____          )
                               ) ss.
COUNTY OF _____          )

   The foregoing instrument was acknowledged before me this _____ day of _____, 2023, by _____ as _____ of Fleeger Family First LP, a _____ limited partnership.

   Witness my hand and official seal.

   My commission expires:

_____
Notary Public

14669616v3

**EXHIBIT C-1**
**FORM OF ASSIGNMENT**

**ASSIGNMENT**

AVR AH LLC, a Colorado limited liability company ("**Assignor**"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid by _____, LLC ("**Assignee**"), the receipt and sufficiency of which are hereby acknowledged, has Granted, Sold, Set Over, Assigned, Transferred, Conveyed, and Delivered and does by these presents Grant, Sell, Set Over, Assign, Transfer, Convey and Deliver unto Assignee, all of Assignor's rights, titles, and interests in and to the following described properties located in, affixed to, and/or arising out of or used in connection with the land in the County of Pitkin, State of Colorado, more particularly described on Exhibit A attached hereto and made a part hereof for all purposes (the "**Property**"):

(a)    all of Assignor's right, title and interest in and to all contracts or agreements relating to the Property or any portion thereof (collectively, the "**Property Agreements**");

(b)    all of Assignor's right, title and interest in and to any warranties, indemnities and guaranties relating to the Property or any portion thereof;

(c)    all of Assignor's right, title and interest in and to any intangible property relating to the Property or any portion thereof, or the operations thereon, or the right to the use thereof, including but not limited to Assignor's rights under governmental permits or entitlements, approvals and licenses, utility contracts and deposits, plans and specifications, surveys, environmental reports, soils reports and engineering plans and studies;

(d)    all of Assignor's right, title and interest in and to other property (real, personal, or mixed), owned or held by Assignor that relates to the design, construction, ownership, use, leasing, maintenance, service, or operation of the Property and any future improvements;

(e)    all rights, privileges, and appurtenances of Assignor in any way related to the Property and Property Agreements described above.

TO HAVE AND TO HOLD the above-referenced property unto Assignee, its successors and assigns forever, and Assignor binds itself and its successors and assigns to forever WARRANT AND DEFEND such property unto Assignee, its successors and assigns, forever against every person whomsoever lawfully claiming or to claim any interest therein by, through or under Assignor, but not otherwise.

**This Assignment shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns of each of the parties hereto.**

14669616v3

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of this ___ day of _____, 2023.

**<u>ASSIGNOR:</u>**

AVR AH LLC
a Colorado limited liability company

By:_____
Name:_____
Its:_____

STATE OF _____        )
                             ) ss.
COUNTY OF _____        )

The foregoing instrument was acknowledged before me this ____ day of _____, 20___, by _____ as _____ of AVR AH LLC, a Colorado limited liability company.

Witness my hand and official seal.

My commission expires:

_____
Notary Public

14669616v3

## EXHIBIT A TO ASSIGNMENT

Parcel A:

HOMESTEADS 2, 3, 5, 6, AND 7 ACCORDING TO THE SECOND AMENDED SUBDIVISION EXEMPTION PLAT, ASPEN VALLEY RANCH, RECORDED OCTOBER 28, 2011, IN PLAT BOOK 98 AT PAGE 49., COUNTY OF PITKIN, STATE OF COLORADO.

Parcel B:

LOTS 7, 8 AND 9, ASPEN VALLEY DOWNS SUBDIVISION P.U.D. ACCORDING TO THE FIRST AMENDED PLAT OF ASPEN VALLEY DOWNS SUBDIVISION P.U.D. RECORDED MARCH 22, 1999, IN PLAT BOOK 49 AT PAGE 2 AT RECEPTION NO. 429063, COUNTY OF PITKIN, STATE OF COLORADO.

14669616v3

**<u>EXHIBIT D</u>**

**FORM OF BILL OF SALE**

[TO BE INSERTED]

**EXHIBIT E**

**ASSIGNED CONTRACTS**

[TO BE INSERTED]
[Need to See these]

# EXHIBIT C

EXHIBIT C

HOA REAL PROPERTY

All of the real property, fixtures and improvements of the Aspen Valley Ranch Home Owners Association, Inc., including the following:

1. LOT I, LOT II, LOT III, LOT IV, LOT V (DRY WOODY CREEK TRUST PARCEL) LOT VI AND LOT VII, ACCORDING TO THE SECOND AMENDED SUBDIVISION EXEMPTION PLAT, ASPEN VALLEY RANCH, RECORDED OCTOBER 28, 2011 IN PLAT BOOK 98 AT PAGE **49**.

   COUNTY OF PITKIN
   STATE OF COLORADO.

2. AGRICULTURAL FACILITIES PARCEL, ACCORDING TO THE SECOND AMENDED SUBDIVISION EXEMPTION PLAT, ASPEN VALLEY RANCH, RECORDED OCTOBER 28, 2011 IN PLAT BOOK 98 AT PAGE **49**.

   COUNTY OF PITKIN
   STATE OF COLORADO.

3. HOMESTEAD 1 , ACCORDING TO THE SECOND AMENDED SUBDIVISION EXEMPTION PLAT, ASPEN VALLEY RANCH, RECORDED OCTOBER 28, 2011 IN PLAT BOOK 98 AT PAGE **49**.

   COUNTY OF PITKIN
   STATE OF COLORADO.

4. A TRACT OF LAND SITUATED IN LOT 1, SECTION 4, AND LOT 1, SECTION 5, TOWNSHIP 9 SOUTH, RANGE 85 WEST OF THE 6TH P.M., MORE FULLY DESCRIBED AS FOLLOWS:

   BEGINNING AT A POINT ON THE WEST LINE OF SAID LOT 1, SECTION 5, WHENCE THE NORTHWEST CORNER OF SAID LOT 1, SECTION 5 BEARS N 00° 06'08" W 628.22
   THENCE N 00° 06'08" W 628.22 FEET TO THE NORTHWEST CORNER OF SAID LOT 1, SECTION 5;
   THENCE N 89° 59'59" E 992.08 FEET ALONG THE NORTH LINE OF SAID LOT 1, SECTION 5 AND LOT 1, SECTION 4;
   THENCE S 00° 00'00" W 823.12 FEET TO THE CENTER OF DRY WOODY CREEK;
   THENCE S 45° 11'00" W 23.22 FEET ALONG THE CENTER OF DRY WOODY CREEK;
   THENCE S 52° 12'00" W 195.35 FEET ALONG THE CENTER OF DRY WOODY

CREEK;
THENCE S 79° 41'00" W 263.65 FEET ALONG THE CENTER OF DRY WOODY
CREEK;
THENCE N 56° 00'00" W 676.38 FEET TO THE POINT OF BEGINNING.

BEING HISTORICALLY DESCRIBED AS FOLLOWS:

A TRACT OF LAND SITUATED IN LOT 1, SECTION 4, AND LOT 1, SECTION 5,
TOWNSHIP 9 SOUTH, RANGE 85 WEST OF THE 6TH P.M., MORE FULLY
DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WEST LINE OF SAID LOT 1, SECTION 5
WHENCE THE WITNESS CORNER TO THE SOUTHEAST CORNER OF SAID
SECTION 5 BEARS S 04° 33' E 2572.12 FEET;
THENCE N 626.37 FEET TO THE NORTHWEST CORNER OF SAID LOT 1;
THENCE EAST 989.82 FEET ALONG THE NORTH LINE OF SAID LOT 1,
SECTION 5 AND LOT 1, SECTION 4;
THENCE S 823.52 FEET TO THE CENTER OF DRY WOODY CREEK;
THENCE S 45° 11' W 23.22 FEET ALONG THE CENTER OF DRY WOODY CREEK;
THENCE 79° 41' W 263.65 FEET ALONG THE CENTER OF DRY WOODY CREEK;
THENCE N 56° W 674.97 FEET TO THE WEST LINE OF SAID LOT 1, SECTION 5,
THE POINT OF BEGINNING.

COUNTY OF PITKIN
STATE OF COLORADO

5. LOT 6, ASPEN VALLEY DOWNS SUBDIVISION P.U.D. ACCORDING TO THE
FIRST AMENDED PLAT OF ASPEN VALLEY DOWNS SUBDIVISION P.U.D.
RECORDED MARCH 22, 1999 IN PLAT BOOK 49 AT PAGE 2 AT RECEPTION NO.
429063.

COUNTY OF PITKIN
STATE OF COLORADO.

Also described as:

Parcel A:

HOMESTEAD 1, ACRICULTURAL FACILITIES PARCEL AND PARCELS I THROUGH VII,
RURAL AND REMOTE PARCELS, ACCORDING TO THE SECONDED AMENDED
SUBDIVISION EXEMPTION PLAT, ASPEN VALLEY RANCH, RECORDED OCTOBER 28,
2011 IN PLAT BOOK 98 AT PAGE 49,

COUNTY OF PITKIN, STATE OF COLORADO.

Parcel B:

A TRACT OF LAND SITUATED IN LOT 1, SECTION 4, AND LOT 1, SECTION 5, TOWNSHIP 9 SOUTH, RANGE 85 WEST OF THE 6TH P.M., MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WEST LINE OF SAID LOT 1, SECTION 5, WHENCE THE NORTHWEST CORNER OF SAID LOT 1, SECTION 5 BEARS NORTH 00 DEGREES 06 MINUTES 08 SECONDS WEST 628.22 FEET; THENCE NORTH 00 DEGREES 06 MINUTES 08 SECONDS WEST 628.22 FEET TO THE NORTHWEST CORNER OF SAID LOT 1, SECTION 5; THENCE NORTH 89 DEGREES 59 MINUTES 59 SECONDS EAST 992.08 FEET ALONG THE NORTH LINE OF SAID LOT 1, SECTION 5 AND LOT 1, SECTION 4; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST 823.12 FEET TO THE CENTER OF DRY WOODY CREEK; THENCE SOUTH 45 DEGREES 11 MINUTES 00 SECONDS WEST 23.22 FEET ALONG THE CENTER OF DRY WOODY CREEK; THENCE SOUTH 52 DEGREES 12 MINUTES 00 SECONDS WEST 195.35 FEET ALONG THE CENTER OF DRY WOODY CREEK; THENCE SOUTH 79 DEGREES 41 MINUTES 00 SECONDS WEST 263.65 FEET ALONG THE CENTER OF DRY WOODY CREEK; THENCE NORTH 56 DEGREES 00 MINUTES 00 SECONDS WEST 676.38 FEET TO THE POINT OF BEGINNING,

Being historically described as follows:

A TRACT OF LAND SITUATED IN LOT 1, SECTION 4, AND LOT 1, SECTION 5, TOWNSHIP 0 SOUTH, RANGE 85 WEST OF THE 6TH P.M., MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WEST LINE OF SAID LOT 1, SECTION 5 WHENCE THE WITNESS CORNER TO THE SOUTHEAST CORNER OF SAID SECTION 5 BEARS SOUTH 04 DEGREES 33 MINUTES EAST 2572.12 FEET; THENCE NORTH 626.37 FEET TO THE NORTHWEST CORNER OF LOT 1; THENCE EAST 989.82 FEET ALONG THE NORTH LINE OF SAID LOT 1, SECTION 5, AND LOT 1, SECTION 4; THENCE SOUTH 823.52 FEET TO THE CENTER OF DRY WOODY CREEK; THENCE SOUTH 45 DEGREES 11 MINUTES WEST 23.22 FEET ALONG THE CENTER OF DRY WOODY CREEK; THENCE 79 DEGREES 41 MINUTES WEST 263.65 FEET ALONG THE CENTER OF DRY WOODY CREEK; THENCE NORTH 56 DEGREES WEST 674.97 FEET TO THE WEST LINE OF SAID LOT 1, SECTION 5, THE POINT OF BEGINNING,

COUNTY OF PITKIN, STATE OF COLORADO.

Parcel C:

LOT 6, ASPEN VALLEY DOWNS SUBDIVISION P.U.D. ACCORDING TO THE FIRST AMENDED PLAT OF ASPEN VALLEY DOWNS SUBDIVISION P.U.D. RECORDED MARCH 22, 1999 IN PLAT BOOK 49 AT PAGE 2 AT RECEPTION NO. 429063,

COUNTY OF PITKIN, STATE OF COLORADO.

# EXHIBIT D

**HOA Assets**

**(in the case of each asset listed, solely to the extent such asset was owned by the Seller and on the HOA Real Property as of August 21, 2021 or purchased by the HOA thereafter)**

**Concierge Cabin**

| # | Asset Description |
|---|---|
| 1 | Art – 5 pieces located within the Concierge Cabin. |
| 2 | Desk x2 |
| 3 | Bench |
| 4 | Fireplace Tool Set |
| 5 | Bathroom |
| 6 | Concierge Cabin Kitchen |
| 7 | Trash Can x2 |
| 8 | Chair Outside Upper Office Cabin |
| 9 | Leather Desk Chair x4 |
| 10 | Cabinet |
| 11 | Computer x2 |
| 12 | White Fur Chair x2 |
| 13 | Small Side Table x2 |
| 14 | Back Media Console |
| 15 | Coat Rack |
| 16 | Large Wall Map of Ranch |
| 17 | Desk Chair |
| 18 | Desk Lamp x2 |
| 19 | Gold Bowls And Statues |
| 20 | Leather Chair |
| 21 | White Rug |
| 22 | Fire Extinguisher |
| 23 | Floor Lamp x2 |
| 24 | TV Above Fireplace |
| 25 | Wooden Bowl |
| 26 | Decorative Book x2 |

| 27 | Side Table |
|---|---|
| 28 | Tissue Box |
| 29 | Paper Towel Holder |
| 30 | Toilet |
| 31 | Leaf Blower |
| 32 | Mutiple Towels |
| 33 | Printer |
| 34 | Electric Kettle |
| 35 | Microwave |
| 36 | Various Misc. Dishes and Cleaning Supplies |
| 37 | Tea Box |
| 38 | Wine Fridge - Not On (Does Not Cool Down Properly) |
| 39 | Various statues and stands |
| 40 | Plant |
| 41 | Lamps |
| 42 | Space Heater |
| 43 | Chairs |
| 44 | Sofa |
| 45 | TV |
| 46 | Coffee Cabinet |
| 47 | Nespresso |
| 48 | Glassware |
| 49 | Rug |
| 50 | Printer |
| 51 | Bug Spray Can |
| 52 | Water Backstock |

**Landscape Art**

| # | Asset Description |
|---|---|
| 1 | Art – 5 pieces located outside on the AVR grounds. |

14685449v2

**Pool House**

| # | Asset Description |
|---|---|
| 1 | All Kitchenware, Glassware, and Linens located inside the Pool House. |
| 2 | Art – 5 pieces located within the Pool House. |
| 3 | Refrigerator |
| 4 | Ice Machine |
| 5 | Washer and Dryer in Laundry Room |
| 6 | Treadmill |
| 7 | Rowing Machine |
| 8 | Stationary Bikes |
| 9 | Pilates Reformer |
| 10 | Peloton |
| 11 | Nordic Track |
| 12 | Elliptical |
| 13 | Paramount Free Motion Workout Stations |
| 14 | Paramount Station |
| 15 | Paramount Bench Press |
| 16 | Dumbbell set 1 of 2 |
| 17 | Dumbbell set 2 of 2 |
| 18 | Assorted Yoga and Workout Accessories |
| 19 | Paramount Squat Station |
| 20 | EliteFTS Station |
| 21 | Outdoor Shower Outside of Steam Shower |
| 22 | Lockers with Benches x4 in Two Locker Rooms |
| 23 | Vanity x2 in Two Locker Rooms |
| 24 | Jacuzzi with Soft and Stone Cover |
| 25 | Steam Shower |
| 26 | Nespresso |
| 27 | iPad |

**Ranch House**

| # | Asset Description |
|---|---|
| 1 | Art – 11 Pieces located within the Ranch House |
| 2 | All kitchenware, glassware, and linens located inside the Ranch House |
| 3 | Ranch House Kitchen |
| 4 | Viking Range |
| 5 | Wolf Ovens |
| 6 | Refrigerator |
| 7 | Ice Machine |
| 8 | Freezers |
| 9 | Espresso Machine |
| 10 | Microwave |
| 11 | Camera System for Dining Room |
| 12 | Telephone |
| 13 | Nespresso |
| 14 | Assorted Cooking/Catering Equipment in Pantry |
| 15 | Dining Table with 16 Chairs |
| 16 | Chairs in Wine Room Area |
| 17 | Wine Room Service Area |
| 18 | Wine Cellar With Various Bottles |
| 19 | Dining Room Service Station |
| 20 | Dining Room Light Fixture |
| 21 | Grand Piano |
| 22 | Steam Shower |
| 23 | Buffet Table |
| 24 | Custom Built in Movie Theater Seating |
| 25 | Antique Hutch |
| 26 | Chairs in Great Room x4 |
| 27 | Coffee Tables and Bench – Living Room |
| 28 | Coffee Tables and Bench – Living Room #2 |
| 29 | Couch |

| 30 | Entryway Bench |
|----|----------------|
| 31 | Entryway Couch, Chair and Lights |
| 32 | Entryway Hutch and Sculpture |
| 33 | Movie Theater Screen |
| 34 | Bathrooms x2 |
| 35 | Benches In Great Room |
| 36 | Great Room Couch |
| 37 | End Tables |
| 38 | Accent Chair |
| 39 | Binoculars With Stand |
| 40 | Couches |
| 41 | Coffee Table |
| 42 | Light Fixtures |
| 43 | Decorative Dishes |
| 44 | Candy Jar Stand |
| 45 | Barstools x6 |
| 46 | Bar Light Fixture |
| 47 | Bar |
| 48 | Various Liquor Bottles |
| 49 | iPads x2 |

**Toy Barn**

| # | Asset Description |
|---|-------------------|
| 1 | Art – 12 pieces located within the Toy Barn |
| 2 | Skee-Ball Game |
| 3 | Ping Pong Table |
| 4 | Polaris Razr |
| 5 | KTM Dirtbikes x4 |
| 6 | ATVS x8 |
| 7 | Rocky Mountain E Bikes x4 |

| 8 | Child's Dirt Bike |
| 9 | Air Hockey Table |
| 10 | Elby Electric Bikes x10 |
| 11 | Kids Fat Bikes x6 |
| 12 | iPad at Entryway |
| 13 | Rear Closet Air Compressor |
| 14 | Gas Can/Tool Cabinet |
| 15 | Dirt Bike |
| 16 | ATV Ramps x2 |
| 17 | Samsung Refrigerator |
| 18 | Bathroom |
| 19 | Bike Helmets |
| 20 | Snowmobile Helmets |
| 21 | Gladiator Vehicle Maintenance Cabinet Various Oils |
| 22 | Work Bench Tool Cabinet |
| 23 | Various Tools in Cabinet |
| 24 | Gladiator Tool Chest with Various Tools |
| 25 | Vehicle Bike Rack |
| 26 | Snowshoe Poles |
| 27 | Pairs of Snowshoes x10 |
| 28 | Backpack x5 |
| 29 | Snowsuits. 1 Piece And 2 Piece |
| 30 | Helmets |
| 31 | First Aid Kits |
| 32 | Mittens and Gloves |
| 33 | Various Coolers |
| 34 | Pinball Game x2 |
| 35 | Foosball Table |
| 36 | Multi-Arcade Game |
| 37 | Arcade Racing/Flight Sim Game x3 |

| 38 | Loveseat Couch |
| 39 | L Shaped Couch |
| 40 | Lighting Fixtures |
| 41 | Coffee Table |
| 42 | TV |
| 43 | Dishwasher |
| 44 | A/V Racks |
| 45 | Cruiser Bike x8 |
| 46 | All kitchenware, glassware, linens, and machinery located inside the Toy Barn |
| 47 | Sound System |
| 48 | TV Cabinet |
| 49 | Ice Machine x2 |
| 50 | Refrigerator with 2 Drawers of Nespresso |
| 51 | Telephone |
| 52 | Popcorn Machine |
| 53 | Barstools x8 |
| 54 | Various Goggles |

**Equine Barn**

| # | Asset Description |
|---|---|
| 1 | Tack Rooms x2 |
| 2 | Saddles x7 |
| 3 | Whips |
| 4 | Barrels |
| 5 | Round Pen |
| 6 | Shed with Winter Equipment |
| 7 | Horse Stall x8 |
| 8 | Blanket Rack |
| 9 | Mini Fridge x2 |
| 10 | Printer x2 |

| 11 | Paper Tray |
|----|------------|
| 12 | Storage Supply Stall with Daily Equipment Use |
| 13 | Office |
| 14 | Sink |
| 15 | Washer |
| 16 | Dryer |
| 17 | Cabinets |
| 18 | Drawers |
| 19 | Computer |
| 20 | Bridles |
| 21 | Reins |
| 22 | Barn Aisle x2 |
| 23 | Saddle Stands |
| 24 | Saddle Pads |
| 25 | Helmet Bins |

**Equipment Barn**

| # | Asset Description |
|---|-------------------|
| 1 | GMC with Snowplow |
| 2 | Loft Storage of Extra Dishes |
| 3 | Loft Storage of Misc. Items |
| 4 | Loft Storage: Misc. Light Fixtures Etc. |
| 5 | Loft Storage Paints |
| 6 | Boxes of Balls |
| 7 | Golf Cart for Concierge x2 |
| 8 | Hoses |
| 9 | Table Saw and Recycle Bin |
| 10 | Weedwhacker x2 |
| 11 | Tools |
| 12 | Toolbox |

| 13 | Misc. Tools and Kits |
| 14 | Landscaping Side by Sides (4 Total) |
| 15 | Employee Kitchen |
| 16 | Storage Closet |
| 17 | Landscaping Managers Office x2 |
| 18 | Office Cubicles |
| 19 | Office |
| 20 | Landscaping Cabinet |
| 21 | Folding Chairs |
| 22 | [Omitted] |
| 23 | Wash Bay Horsy Pressure Washer Machine |
| 24 | Wash Bay Closet Shop Vacuum |
| 25 | [Omitted] |
| 26 | Kitchen Ware |
| 27 | Humidifiers |
| 28 | Glassware |
| 29 | Buckets of Paint |
| 30 | Cones |
| 31 | Tupperware |
| 32 | Equipment |
| 33 | Housekeeping Golf Cart x2 |
| 34 | Buckets |
| 35 | Tools |
| 36 | Compressors |
| 37 | Paint Tools |
| 38 | Game Items |
| 39 | Power Jack |
| 40 | Microwaves |
| 41 | Cart |
| 42 | Cones |

| 43 | Saw |
|----|-----|
| 44 | Cutting Board and Dishes |
| 45 | Golf Cart Tires |
| 46 | Wine Glasses |
| 47 | Dog Beds |
| 48 | Tool Cart |
| 49 | Snacks |
| 50 | Shelving |
| 51 | Kitchen Items |
| 52 | Radios for Communication |
| 53 | Stations |
| 54 | Ranch Manager Desk and Items |
| 55 | Navigator Tires |
| 56 | Trash Can x2 |
| 57 | Lincoln Navigator SUV (Used by Concierge) |
| 58 | Ford F150 Maintenance Truck |
| 59 | Maintenance Cabinet of Products |
| 60 | Maintenance Misc. Tools and Parts |
| 61 | Landscaping Misc. Chemicals and Oils |
| 62 | Maintenance Kawaski Side by Side |
| 63 | Landscaping Leaf Blower Backpack Tools |
| 64 | Flammable Material Cabinets |
| 65 | Landscaping Fertilizer Cart |
| 66 | Landscaping Chainsaws |
| 67 | Maintenance Bench and Tools |
| 68 | Paddleboards x2 |
| 69 | Employee Kitchen: Fridge |
| 70 | Conference Table |
| 71 | Storage Closet |
| 72 | Water Backstock- Flat and Sparkling |

| 73 | Wash Bay Items |
|----|----------------|
| 74 | Wash Bay Closet Air Compressor |
| 75 | Oils |
| 76 | Containers |
| 77 | Shelving |
| 78 | Toilet |
| 79 | Sink |
| 80 | Chairs |
| 81 | Portable Ac Unit |
| 82 | Paper Towels |
| 83 | Sprays |
| 84 | Storage Racks |
| 85 | Buckets |
| 86 | Coffee Maker |
| 87 | Dry Erase Board |
| 88 | Cabinets |
| 89 | Coolers |
| 90 | Sandbags |
| 91 | Electrical Parts |
| 92 | Misc. Chemicals |
| 93 | Wire |
| 94 | Backpack Weed Sprayers |

**Hay Barn**

| # | Asset Description |
|---|-------------------|
| 1 | Fire Extinguisher |
| 2 | Hay Bales |
| 3 | Landscaping Machines |
| 4 | ATV's x3 |

| 5 | ATV Snow Tracks |
|---|---|
| 6 | Bobcat Plows |
| 7 | Wood Shavings for The Stables |
| 8 | Track Plow |
| 9 | ATV Tires |
| 10 | Landscaping Machines |
| 11 | Landscaping Tractor Part |
| 12 | Insulation |
| 13 | Misc. Tubing |
| 14 | Tires and Plumbing Insulation |

**Misc Storage / Pond**

| # | Asset Description |
|---|---|
| 1 | Pond Dock |
| 2 | Pond Shed Storage. |
| 3 | Pond Storage |
| 4 | Landscaping Water Tanks x2 |
| 5 | Snowblowers x3 |
| 6 | Toro Mower and Parts (Leased) |
| 7 | Tackle Boxes |
| 8 | Scag Mower x2 |
| 9 | John Deer Tractor |
| 10 | Conex Storage Container x2 |
| 11 | Trailer x2 |
| 12 | Massey Ferguson Tractor |
| 13 | Motorcycle Trailer and Bucket for Skid Steer Tractor |
| 14 | Fishing Equipment |
| 15 | Sup Pump |
| 16 | Lawn Mower |
| 17 | Shelving with Misc. Equipment Parts |
| 18 | Riding Mower |
| 19 | John Deer Mower |
| 20 | Snow Removal/ Gravel |
| 21 | Skid Steer |
| 22 | Gopher Hole Sealer |
| 23 | Salt Spreader |
| 24 | Landscaping Machine x2 |
| 25 | Flatbed and Snowmobile |
| 26 | Paddle |
| 27 | Mini Excavator |
| 28 | Trash Container |

| 29 | Misc. Attachments |
|----|-------------------|

**Potato Barn**

| # | Asset Description |
|----|-------------------|
| 1 | Chewy Boxes (Not HOA - Owners) |
| 2 | Misc. Equine Items |
| 3 | Snowmobiles- Touring (6 Total in Potato Barn) |
| 4 | Tree Fencing |
| 5 | Lawnmower |
| 6 | Snowmobile/ATV Tracks for Winter |
| 7 | Snowmobiles - Sport (6 Total in Potato Barn) |
| 8 | Irrigation Piping and Parts |
| 9 | Christmas Light Storage |
| 10 | Landscaping/Aerator |
| 11 | Mower Deck for John Deer Tractor |
| 12 | Firewood |
| 13 | Landscaping: Irrigation Guns for Fields |
| 14 | Post Hole Digger |
| 15 | Electrical Cord Storage |
| 16 | Landscaping Equipment |
| 17 | Buckets |
| 18 | Hub Caps |
| 19 | Mower Deck |
| 20 | Rototiller |
| 21 | Misc. Piping |
| 22 | John Deer Chemical Tanks |
| 23 | Storage Shelving |
| 24 | Posters |
| 25 | Water Tank Heater |

| 26 | Black Storage Containers |
|---|---|

**Bourg Cabin**

| # | Asset Description |
|---|---|
| 1 | Art – 5 pieces located in the Bourg Cabin |
| 2 | Sconces x 2 |
| 3 | Metal Artwork |
| 4 | Console table |
| 5 | Candles x 2 |
| 6 | Glass votive lamp decorations x 2 |
| 7 | Hanging mirror |
| 8 | Floor lamp |
| 9 | Chairs x 2 |
| 10 | Side table |
| 11 | Decorative books |
| 12 | Throw blanket |
| 13 | 4 decorative pillows |
| 14 | Shelving with misc. decorative items/books |
| 15 | Stairway mirror |
| 16 | Dining room table and four chairs |
| 17 | Fruit bowl and fruit centerpiece |
| 18 | Rug |
| 19 | Mirror |
| 20 | Pendant |
| 21 | Keys to cabin |
| 22 | Living room TV |
| 23 | 2 Ottomans |
| 24 | Artwork in dining room |
| 25 | Living room rug |
| 26 | Coffee table |

| 27 | Monopoly game |
|----|---------------|
| 28 | Table trays with misc. items x 2 |
| 29 | Book |
| 30 | Side table with lamp and tissue box |
| 31 | 1 of 2 couches in living room |
| 32 | 4 pillows |
| 33 | Coasters |
| 34 | Woody Allen artwork |
| 35 | Refrigerator |
| 36 | Glass canisters |
| 37 | Sink |
| 38 | Floor mat |
| 39 | 2 of 2 couches in living room |
| 40 | Wood side table |
| 41 | 4 decorative pillows |
| 42 | Dishes |
| 43 | Cutting board |
| 44 | Toaster |
| 45 | Electric Kettle |
| 46 | Glassware |
| 47 | Hand soap and lotion set |
| 48 | Paper towel holder |
| 49 | Runner rug |
| 50 | Trash can |
| 51 | Stove and range |
| 52 | Nespresso coffee station |
| 53 | Milk frother |
| 54 | Tea box |
| 55 | Utensils and holder |
| 56 | Living room rug |

| 57 | Mud room bench and wall hooks |
|----|-------------------------------|
| 58 | Washer and dryer in closet |
| 59 | Stairway pendant |
| 60 | Guest room queen bed and bedding, headboard |
| 61 | Night stands x 2 |
| 62 | 2 wall sconces |
| 63 | Decorative items in Guest room |
| 64 | Savant Pad |
| 65 | Guest Bathroom accessories, mirror, hand towels |
| 66 | Guest bedroom TV |
| 67 | Guest bathroom scale, hamper, bath mat |
| 68 | Master bedroom TV |
| 69 | Master bedroom dressers x 2 |
| 70 | Master bedroom floor lamp and wood stump |
| 71 | Closet shelving (both bedroom closets) |
| 72 | Master bedroom King bed, bedding and pillows |
| 73 | Chaise lounge chair |
| 74 | Master bedroom Nightstands x 2 |
| 75 | Master bedroom wall sconces x 2 |
| 76 | Master bedroom decorative items |
| 77 | Master bedroom Savant Pad |
| 78 | Master bedroom window curtains and rod |
| 79 | Master bath, bath mats, trash can, facial mirror, hand soap set, towels, tissue box |
| 80 | Master bath hamper, scale, shower stool and mat |
| 81 | Molton Brown bath products |
| 82 | Master bath toilet, scrubber, tissue holder, and spray |
| 83 | All kitchenware, glassware, and linens located inside the Bourg Cabin |
| 84 | All bedding and sheets in Bourg Cabin |
| 85 | Bourg Cabin kitchen dishes, bowls, cutting boards, tupperware, skillets and utensils |
| 86 | Bourg Cabin bathroom items, robes, cloths, mats, and towels |

| 87 | Various wines, beers, drinks and liquor bottles |

**Independence House**

| # | Asset Description |
|---|---|
| 1 | Art – 10 pieces located in the Independence House |
| 2 | All bedding, sheets, and covers in Independence House |
| 3 | All bath rugs, bathmats, robes, towels, and wash cloths in Independence House |
| 4 | All kitchenware, utensils, bowls, dishes, platters, bowls, and placemats in Independence House |
| 5 | Various liquor bottles, wine bottles, beer, and drinks in Independence House |
| 6 | Tupperware, cutting boards, skillets, pots, pans, and cooking utensils |
| 7 | Blenders, toaster, kettle, coffee machine |
| 8 | Vacuum, iron and ironing board |
| 9 | Steamer |
| 10 | Pillow and blanket bags |
| 11 | Small and large broom and dustpan |
| 12 | Safe |
| 13 | Toilet brush and plunger |
| 14 | Wooden hangers, children's hangers, and satin hangers |
| 15 | Master bedroom bed |
| 16 | Master bedroom nightstands x 2 |
| 17 | Master bedroom rug |
| 18 | Master bedroom dresser |
| 19 | Master bedroom TV |
| 20 | Master bedroom accent chair |
| 21 | Master bedroom side chair |
| 22 | Accent table outside of Master bedroom |
| 23 | Dinging table |
| 24 | Entryway cabinets |

| 25 | Living room couch |
|----|-------------------|
| 26 | Coffee table and end table |
| 27 | Accent chair and table in living room |
| 28 | Telephone |
| 29 | Living room TV |
| 30 | Kitchen barstools x 5 |
| 31 | Refrigerator |
| 32 | Microwave |
| 33 | Dishwasher |
| 34 | Oven |
| 35 | Washer and dryer in Laundry room |
| 36 | 2nd Bedroom bed, nightstands, and lamps |
| 37 | 2nd Bedroom rug |
| 38 | 2nd Bedroom dresser |
| 39 | 2nd Bedroom TV |
| 40 | 3rd Bedroom bed |
| 41 | 3rd Bedroom side tables x 2 |
| 42 | 3rd Bedroom rug |