

December 3, 2023

**Orrick, Herrington & Sutcliffe LLP**
51 West 52nd Street
New York, NY 10019-6142

+1 212 506 5000
**orrick.com**

*Via ECF*

The Honorable Christopher M. Lopez
United States Bankruptcy Court
Southern District of Texas
515 Rusk Street, Courtroom 401
Houston, TX 77002

**Laura Metzger**

E lmetzger@orrick.com
**D +1 212 506 5149**
**F +1 212 506 5151**

> Re:    *In re: Strudel Holdings LLC and AVR AH LLC, Case No. 23-90757 (CML)*
> *(Jointly Administered)*

Dear Judge Lopez:

On behalf of Nineteen77 Capital Solutions A LP, Bermudez Mutuari, Ltd., and UBS O'Connor LLC (together with Wilmington Trust National Association, the "Secured Parties"), we write concerning and to supplement the *Secured Parties' (I) Response to (A) Debtors' Emergency Motion for Status Conference, (B) Statement of Back-Up Bidder Fleeger Family First LP Regarding Notice of Postponement of Closing and Emergency Motion for Status Conference, (C) Notice of Intent to Close with Back Up Bidder and (II) Emergency Motion to Modify the Sale Order to Extend the Closing Date* (Dkt. No. 275) (the "Sale Enforcement Motion")[1] and the status conference held on November 30 (the "Status Conference").

## I.    <u>SUPPLEMENT TO SALE ENFORCEMENT MOTION</u>

As explained in the Sale Enforcement Motion, the Sale Order unambiguously prevents the Debtors from terminating the Purchase Agreement if the failure to close results from the Debtors' own breach. The Debtors *intentionally* breached the Purchase Agreement by failing to pay all amounts due to the HOA, *admitted* to the breach and then *refused* to cure. Thus, the Debtors' attempt to terminate the Purchase Agreement is void and the Purchase Agreement remains in effect. Section 6(b) of the Purchase Agreement provides that, if the sale is not consummated because of the Debtors' default, the Purchaser is excused from further performance and may either (i) terminate the Purchase Agreement or (ii) "seek specific performance." *See* Metzger Decl., Ex. 1 § 6(b). Accordingly, by the Sale Enforcement Motion, the Secured Parties sought an order from this Court to enforce the Sale Order by "caus[ing] the Debtors to comply with the Purchase Agreement (as currently drafted, or as proposed in the Second Amendment, which provides a

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Enforcement Motion.



The Honorable Christopher M. Lopez
December 3, 2023
Page 2

material benefit to the estate)", "uphold[ing] the Sale Order", and extending the Closing Date under the Sale Order through December 8. Sale Enforcement Motion ¶ 17.

The Secured Parties urge this Court to take all appropriate judicial action to cause the Debtors to move forward with the sale to the Purchaser. *To read the Sale Order and the Purchase Agreement otherwise, would be the same as negating the entire Sale Order that approved the transaction with the Purchaser – it would provide the Debtors with the power to elect which bidder to close with, simply by opting to default, upending the bidding procedures, the auction, and the bargain memorialized in the Sale Order and the Purchase Agreement.* Under such a reading, all the Debtors would have had to do is default immediately before the closing deadline and refuse to cure (as they did) and say, "sorry, your closing deadline has passed." Such a decision by this Court would not only be inequitable and contrary to parties' agreement in this case, but potentially have larger implications in future 363 sales.

## II.   **RESPONSE TO STATUS CONFERENCE**

The Secured Parties also respectfully submit this letter to correct the inaccurate statements made by counsel for Debtors' and the Back-Up Bidder at the Status Conference.

*First*, the Debtors and the Back-Up Bidder cannot invoke paragraph 8 of the Sale Order to close a sale to the Back-Up Bidder. As explained in the Sale Enforcement Motion, paragraph 10 prevents the Debtors from closing with the Back-Up Bidder if the Closing Date did not occur because of the Debtors' breach of the Purchase Agreement.  At the Status Conference, the Secured Parties proffered evidence of the breach and filed evidence with their Sale Enforcement Motion. Although paragraph 8 specifies that the Closing Date "shall occur no later than November 22, 2023", it contains no mechanism for the Debtors to switch to the Back-Up Bidder after the Debtors' breach. As such, even if paragraph 8 can be interpreted in the draconian way the Back-Up Bidder suggests (preventing closing to the Secured Parties after the initial Closing Date under *any* circumstances and putting the Debtors in complete control to opt whether to comply with the Purchase Agreement to which they are bound) the Sale Order *also* prohibits the alternative sale to the Back-Up Bidder. The sale of the Ranch cannot close with *any* party until this Court addresses this, as requested by the Sale Enforcement Motion.[2]

*Second*, the Debtors and the Back Up Bidder's position relies on the Debtors' misleading statements that they did not default.  But they did not submit *any evidence* in furtherance of their positions.  Nor could they because it is untrue. For their part, the Debtors drafted a simple statement that they did not default and, at the Status Conference, contested whether a default had occurred

---

[2]     As a procedural matter, neither the Debtors nor the Back-Up Bidder have requested modification of, or other relief from, the Sale Order, that would enable them to close around the Secured Parties' bargained-for protections in paragraph 10 of the Sale Order.



The Honorable Christopher M. Lopez
December 3, 2023
Page 3

but provided no evidence to support that view, and offered no alternative interpretation of the Purchase Agreement to explain why their failure to pay HOA fees and taxes on the property were not defaults thereunder.[3] The Back-Up Bidder's counsel expressed many falsehoods, and he clearly lacked personal knowledge of the relevant facts here. In contrast, the Secured Parties were (and remain prepared) to present evidence of the Debtors' default and their own compliance with the Purchase Agreement if this Court deems necessary. Indeed, the Secured Parties' principal, Randal Johnson, appeared and was available to testify at the Status Conference.

*Third*, the Secured Parties did not know until November 20 that the Debtors had insufficient funds to cover the HOA obligations. The Secured Parties do not, as the Back-Up Bidder claimed, have access to the Debtors' accounts, nor do they receive reporting under the DIP Order.[4] The Debtors included HOA fees in the DIP Budget, and the Purchase Agreement clearly provides that "[a]ny and all liabilities, obligations or amounts due to the [HOA] by Seller or otherwise attributable or allocable to the Property shall be fully paid and satisfied by Seller as a condition of Closing." *See* Metzger Decl., Ex. 1 § 12(f). The Secured Parties were blindsided when the HOA manager disclosed that the Debtors had not paid their HOA fees, and then the Debtors' chief restructuring officer disclosed that he had not drawn under the DIP Facility to pay any HOA fees.[5] Even more shocking was that the Debtors' insider affiliated DIP Lender was refusing to fund these budgeted expenses.[6]

---

[3] In fact, at the hearing they admitted they did not pay the HOA fees because they did not think they had approval to pay prepetition obligations notwithstanding their agreement to do so in the Purchase Agreement that the Sale Order approved.

[4] Under the DIP Order, the Secured Parties do not receive variance or any other reports provided to the DIP Lender.

[5] The Debtors have since disclosed that the Soukis had directly paid part, but not all, of the HOA fees due for the post-petition period. This is just another example of the Soukis' control over the case, blatant disregard for applicable law, and unwillingness to abide by the Bankruptcy Code and the bankruptcy process. The Secured Parties expressly reserve their rights to object to any claim by the Soukis for reimbursement of these fees from the DIP Facility (or any budget that provides as such) and/or the Debtors, and believe that the DIP Facility cannot be used to reimburse the Soukis without further order of this Court.

[6] The Secured Parties remind the Court that under the Purchase Agreement, if the Secured Parties are the prevailing party, the Debtors are responsible for the fees costs and expenses. Purchase Agreement § 15(g). If they prevail in this dispute, the Secured Parties will bring a separate motion for payment of such costs and expenses on an administrative basis.



The Honorable Christopher M. Lopez
December 3, 2023
Page 4

*Fourth*, the Purchaser was not in breach when the Sale failed to close by November 22 because the Debtors and the Purchaser amended the Purchase Agreement to extend the Closing Date as permitted under paragraph 40 of the Sale Order.[7] *See* Status Conference Motion, Ex. 3.

*Fifth*, the Purchaser's November 21 Default Notice did not terminate the Purchase Agreement, nor did the Purchaser claim that it was unwilling to close the Sale. On the contrary, the Default Notice demanded that the Debtors cure the defaults and advised the Debtors that if they failed to do so, the Purchaser would seek specific performance to enforce the Purchase Agreement. *See* Status Conference Motion, Ex. 1.

*Sixth*, the Purchaser did not receive notice of the Fidelity Cyberattack breach until *after* it delivered the Default Notice. Neither the Debtors nor the Back-Up Bidder have any evidence to support the notion that, if the cyberattack had not occurred and the First Amendment not been entered into, that the Secured Parties would not have closed over the default or sought specific performance at that moment.[8]

*Seventh*, the fact that the Back-Up Bidder Purchase Agreement provided for an option to offset their purchase price with respect to unpaid HOA fees is irrelevant to the Secured Parties' Purchase Agreement. The Secured Parties did not agree to similar language. Ironically, the Back-Up Bidder's argument for why it's "bargained-for rights" should prevail is premised on the Back-Up Bidder's attempt to fault the Secured Parties for not giving up the rights they negotiated.

The Fidelity Cyberattack altered the alternatives available to the parties, and the only reasonable path forward for the Secured Parties was to amend the Closing Date and then productively use that time to negotiate a resolution of the defaults with the Debtors. This is exactly what the Secured Parties did until the Debtors ceased engaging on November 29th with the Status Conference already on the calendar.[9] The Secured Parties certainly appreciate how willing Your

---

[7]     The Back-Up Bidder's counsel referenced that the Secured Parties were not prepared to close because they only first funded $30.5 million on Monday, November 27th. This completely misses the mark. Under the Purchase Agreement the Secured Parties were required to fund an escrow or deliver a surety bond. Prior to this default, the Secured Parties had lined up a surety and had fully negotiated terms ready to implement at closing consistent with the terms of the Purchase Agreement. The surety bond was a significant out-of-pocket expense to the Secured Parties that was to be funded contemporaneously with closing. As stated in the Sale Enforcement Motion, the Secured Parties funded the account as part of the proposed Draft Second Amendment. *See* Sale Enforcement Motion ¶ 14.

[8]     The Secured Parties note, however, that there is no timing requirement by which the Purchaser was required to move for specific performance in the Purchase Agreement, which remains in effect.

[9]     The Secured Parties did not "unilaterally" extend the Closing Date. The Secured Parties reached an agreement with the Debtors to amend the Closing Date and provided notice to the Court. The Back-Up Bidder could have sought relief from the Court to prevent the deadline extension but chose not to do so.



The Honorable Christopher M. Lopez
December 3, 2023
Page 5

Honor is to make himself available to resolve disputes – but the Secured Parties also believe that Your Honor and this District strongly encourages parties to resolve disputes on their own and then seek the Court's approval, which is exactly what the Secured Parties, in good faith, believed they were doing. A ruling that moves to a back-up bidder because a cyberattack prevented a closing, where the debtors clearly defaulted pre-closing and the purchaser had noticed the default, demanded cure, and actively negotiated a resolution through a holiday weekend would truly surprise the market.  Such a result would encourage litigation and discourage the self-mediation bankruptcy professionals excel at, massively increasing expenses for all involved, and flooding the courts with countless issues to resolve.

Finally, the Secured Parties are seriously concerned about the damage done to their collateral directly caused by the Back-Up Bidder's and Debtors' conduct over the last two weeks, if not longer.  Although the Secured Parties have a new committed title policy, an appeal in this dispute could materially alter the terms of that policy.  The Debtors and Mr. Souki are sophisticated real estate investors, and they know the impact that this dispute has had on clean title.  There is risk that no matter the Court's decision, the Debtors' and the Back-Up Bidders' actions have sabotaged the sale and it may never close.  As this Court relied heavily on the sale as the "bankruptcy purpose" in its ruling on the Secured Parties' motion to dismiss the Debtors' chapter 11 cases, the Secured Parties reserve all rights to bring a new motion to dismiss, seek relief from the automatic stay or the appointment of a chapter 11 trustee because of the change in circumstances.

We thank the Court for its attention to this matter.

Respectfully,

_/s/ Laura Metzger_____

Laura Metzger